## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., 8757 Georgia Ave., Suite 850, Silver Spring, MD 20910; | Case No.: 21-cv-094 |
| BROOKLYN DEFENDER SERVICES, 177 Livingston Street, 7th Floor, Brooklyn, NY 11201; | **COMPLAINT** |
| FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT,* P.O. Box 86299, Tucson, AZ 85754-6299; | *Submitted Electronically* |
| HIAS, 1300 Spring Street, Suite 500, Silver Spring, MD 20910; and | |
| NATIONAL IMMIGRANT JUSTICE CENTER, 224 South Michigan Ave, Suite 600, Chicago, IL 60604, | |
| *Plaintiffs*, | |
| v. | |
| EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, 20 Massachusetts Ave., NW, Washington, D.C. 20529; | |
| U.S. DEPARTMENT OF JUSTICE, 950 Pennsylvania Ave., NW, Washington, D.C. 20530; | |
| JEFFREY A. ROSEN, *in his official capacity as Acting Attorney General of the United States*, U.S. Department of Justice, 950 Pennsylvania Ave., NW, Washington, D.C. 20530; and | |
| JAMES McHENRY, *in his official capacity as Director of the Executive Office for Immigration Review*, 20 Massachusetts Ave., NW, Washington, D.C. 20529, | |
| *Defendants*. | |

*Motion to proceed without physical address forthcoming*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................................ i

INTRODUCTION ............................................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 4

THE PARTIES .................................................................................................................... 4

FACTUAL ALLEGATIONS ............................................................................................. 8

I.      EOIR's Appellate and Adjudicatory Process ........................................................ 8

        A.      Overview of Proceedings for Relief from Removal ................................... 8

                1.      Proceedings Before EOIR ............................................................... 8

                2.      Proceedings Before USCIS and Other Fora ................................... 9

        B.      Due Process Protections and Other Rights Codified in the INA ............ 10

        C.      Existing Procedural Mechanisms at EOIR .............................................. 11

                1.      Motions to Remand ........................................................................ 11

                2.      Administrative Closure ................................................................. 12

                3.      *Sua Sponte* Motions to Reopen .................................................... 13

                4.      Voluntary Departure ...................................................................... 13

        D.      Appeals to the BIA .................................................................................... 14

        E.      EOIR's Recent Politicization and Substantive Restrictions on Access to
                Immigration Courts ................................................................................... 16

        F.      Effects of Recent Changes at EOIR ......................................................... 20

II.     Promulgation of the Rule and Overview of the Rule's Flaws .......................... 22

III.    The Rule Must Be Vacated Because Defendant McHenry Had No Statutory or
        Regulatory Authority to Issue It. ....................................................................... 24

IV.     The Rule Must Be Vacated Because It Is Contrary to Law and Arbitrary and
        Capricious, in Violation of the APA. .................................................................. 25

        A.      Defendants' Significant Changes to EOIR Procedures Are Unlawful. .... 25

                1.      The Rule Hamstrings Appellate Briefing Schedules .................... 26

                2.      The Rule Eviscerates the BIA's Remand Authority ..................... 34

                        a.      Limitation of BIA Remands for Further Factfinding and
                                Consideration of New Evidence ...................................... 34

                        b.      Limitation on Scope of Remands ..................................... 43

                3.      The Rule Unlawfully "Enhances" the BIA's Factfinding Powers ............ 44

                        a.      Expansion of BIA Factfinding Abilities ......................... 44

b.    Authority for BIA to Affirm on Any Basis in the Record ........... 49

4.    The Rule Upends EOIR Procedures for Voluntary Departure Requests and Background Checks ............................................... 50

a.    Elimination of BIA Remands for Voluntary Departure ............... 50

b.    Limitation on BIA Remand for Background Checks & Deemed Abandonment ................................................. 55

5.    The Rule Eliminates Critical Procedural Mechanisms, Upending Noncitizens' Ability to Seek Relief ........................................... 57

a.    Elimination of *Sua Sponte* Authority to Reopen ........................... 58

b.    Elimination of BIA Self-Certification Authority ........................ 64

c.    Elimination of Administrative Closure ......................................... 66

6.    The Rule Implements Measures that Further Politicize EOIR and Undermine Timely, Neutral Decisionmaking ................................... 74

a.    IJ Certification of BIA Decisions .................................................... 74

b.    Referral of Pending BIA Appeals to the EOIR Director. ............. 80

c.    Mandatory Timelines & Other Changes for Adjudication of BIA Appeals ................................................. 85

B.    Defendants Failed to Consider the Effect of Contemporaneously-Issued Rules and Failed to Provide the Public an Opportunity to Comment on the Effect of Subsequently-Proposed Rules ................................................. 87

C.    Defendants Failed to Comply With the Certification Requirements Under the Regulatory Flexibility Act. ......................................................... 92

V.    The Rule Must Be Vacated Because It Was Issued Without a Sufficient Notice and Comment Period or a Reasoned Explanation for Providing a Shortened Comment Period. ........................................................................................... 94

VI.    The Rule Irreparably Harms Plaintiffs by Frustrating their Respective Missions, Jeopardizing Funding, and Forcing them to Divert Resources, as Well as by Harming Their Existing Clients. ............................................................... 97

CLAIMS FOR RELIEF ........................................................................................... 101

PRAYER FOR RELIEF ........................................................................................... 111

Plaintiffs Catholic Legal Immigration Network, Inc., Brooklyn Defender Services, Florence Immigrant and Refugee Rights Project, HIAS, and National Immigrant Justice Center sue Defendants the Executive Office for Immigration Review, U.S. Department of Justice, Jeffrey A. Rosen, in his official capacity as Acting Attorney General of the United States, and James McHenry, in his official capacity as Director of the Executive Office for Immigration Review, and allege as follows:

## INTRODUCTION

1.   In an unlawfully promulgated rule, rushed through in the waning days of an outgoing administration by an official acting beyond his authority, Defendants have erected devastating and, in some cases, insuperable barriers to the ability of noncitizens to seek relief before the courts overseen by the Executive Office for Immigration Review ("EOIR"). *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020) (hereinafter, "the Rule").

2.   The Rule grafts a laundry list of unjustifiable procedural changes onto the already byzantine immigration court system. Among other changes, the Rule:

    a.   Curtails briefing schedules and extensions before the Board of Immigration Appeals ("BIA") in an inflexible manner that ignores already-existing barriers, all but eliminates the ability of noncitizens to retain counsel and mount an appeal, and impedes counsel from taking on cases and providing meaningful representation;

    b.   Eviscerates the BIA's ability to remand cases to the immigration judge ("IJ"), even where further factfinding is required, and even where new facts or law would make an individual eligible for relief;

    c.   Authorizes the BIA to make findings of fact and introduce evidence in the first instance, contrary to the system designed by Congress and contrary to the BIA's proper role as an appellate body;

    d.   Upends procedures for determining voluntary departure, a form of relief that avoids the devastating consequences of a removal order, such as prolonged family separation;

1

e. Eliminates the IJ's and the BIA's authority to reopen cases *sua sponte* or to administratively close proceedings, depriving EOIR of important case-management tools that are designed to promote efficiency and due process, choosing instead a system that will rush through the senseless deportation of individuals who qualify for congressionally mandated forms of relief;

f. Politicizes EOIR by impermissibly assigning to the Director of EOIR, an unconfirmed non-judicial official, drastic new adjudicatory powers;

g. Turns IJs into advocates by giving them the opportunity to countermand opinions reversing them; and

h. Imposes on the BIA adjudication timeframes that will result in summary and erroneous dismissals and deportation orders.

3. Each of these changes—which cut off avenues to legal relief and result in deportation despite eligibility for protection—irreparably harms Plaintiffs, who are nonprofit legal service providers working to serve and secure justice for as many noncitizens as possible. The Rule will undermine their missions by making it impossible to represent potential clients and eliminating options the Plaintiffs would otherwise use to serve existing clients.

4. Left unaddressed, the Rule will make it exceedingly difficult for noncitizens to vindicate their rights in immigration court and, accordingly, Plaintiffs have already been forced to divert precious resources to respond and stave off the worst effects of the Rule's changes. Plaintiffs will be forced by the Rule to contribute even more resources toward existing cases, all while being cut off from serving as many noncitizens as they previously did.

5. The Rule should be vacated as unlawful for several reasons. *First*, as a threshold matter, the Rule is null and void because it was published solely by the Director of EOIR, who does not have the authority to issue a final rule.

6. *Second,* the Rule eviscerates procedural protections enshrined in the Immigration and Nationality Act ("INA"), including the right to counsel and to a full and fair hearing, which underpin substantive protections against persecution or torture. The Rule runs roughshod over

these congressionally provided rights and is therefore not in accordance with law, violating the Administrative Procedure Act ("APA").

7.   *Third*, the Rule is arbitrary and capricious under the APA. Despite numerous comments from Plaintiffs and others, Defendants: (a) failed to consider the significant harms the Rule will cause to noncitizens and those who advocate for them in removal proceedings, like Plaintiffs; (b) failed to adequately explain the Rule's departure from decades of longstanding practice and appellate norms; (c) failed to meaningfully consider the significant reliance interests of more than one million noncitizens in removal proceedings and their advocates, like Plaintiffs; (d) failed to explain how radically altering EOIR procedures, at the expense of noncitizens' due process rights, will achieve their purported ends of improving "efficiency" and "finality;" (e) failed to consider obvious alternatives proposed by commenters; and, ultimately, (f) ignored facts that plainly show that these changes will breed chaos and expand case backlogs.

8.   *Fourth*, the Rule is the product of rushed rulemaking that failed to provide a meaningful opportunity for the public to comment, in violation of the APA. Indeed, the Rule, which massively dismantles the EOIR system, was promulgated with only a thirty-day comment period despite its publication during a global pandemic, and amid a deluge of other final and proposed rules on inextricably related subjects. Commenters could not possibly provide full, informed commentary to the agency under these circumstances.

9.   *Fifth*, the Rule fails to comply with the certification requirements under the Regulatory Flexibility Act ("RFA"), and the agency's basis for determining that the Rule will not have a significant impact on small entities was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

10. *Finally*, the rule violates due process of the constitution in myriad ways by eviscerating the rights of noncitizens to present evidence and denying them a fair opportunity to be heard.

11. Ultimately, "executive branch officials may not circumvent clear legal requirements in the eleventh hour to achieve goals they couldn't accomplish in the normal course," which is exactly what has happened with this piece of midnight rulemaking. *Cal. Life Scis. Ass'n v. Ctr. for Medicare & Medicaid Servs.*, No. 20-cv-8603, 2020 WL 7696050, at *2 (N.D. Cal. Dec. 28, 2020). For these reasons, Plaintiffs ask this Court to reject Defendants' last-ditch attempt to eviscerate the immigration court system and the tools legal services providers, like Plaintiffs, use to represent noncitizens. The Rule should be found unlawful in its entirety, set aside, and vacated.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under the laws of the United States, including the APA, 5 U.S.C. §§ 701 *et seq.*

13. The publication of the final Rule in the Federal Register on December 16, 2020, constitutes final agency action within the meaning of 5 U.S.C. § 704.

14. Venue is proper under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States, the action does not involve real property, and Defendants reside in this District. Plaintiffs NIJC and HIAS have offices in this District.

## THE PARTIES

15. Plaintiffs are legal services organizations that serve immigrants around the country. Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a nonprofit organization incorporated in Washington, D.C., and headquartered in Silver Spring, Maryland. Pursuant to its mission to protect the dignity and rights of low-income and vulnerable populations, CLINIC coordinates and provides technical support and services to approximately 400 affiliate

organizations, spread out across 48 states and the District of Columbia. CLINIC also provides legal representation directly and in partnership with *pro bono* attorneys to vulnerable adults, children, and families in proceedings in immigration courts and before the BIA. That representation includes applications, motions, and appeals that are subject to the Rule. CLINIC operates the BIA Pro Bono Project, an official collaboration with EOIR that connects detained, unrepresented individuals with appellate *pro bono* representation before the BIA and the U.S. Courts of Appeals. CLINIC also operates a Motion to Reopen Project that represents noncitizens seeking to reopen their removal proceedings in order to pursue protection, such as asylum, for themselves and their children. CLINIC trains and mentors *pro bono* counsel through these projects and other programs. CLINIC and its affiliates serve approximately 500,000 noncitizens each year.

16. Plaintiff Brooklyn Defender Services ("BDS") is a public defender organization in Brooklyn, New York, that provides multi-disciplinary and client-centered criminal defense, family defense, immigration, and civil legal services, along with social work and advocacy support. BDS seeks to advance access to legal representation for low-income noncitizens as they navigate the immigration system in order for them to stabilize their immigration status, particularly for those with contacts with the criminal and family court legal systems. BDS is a provider in the New York Immigration Family Unity Project, the country's first universal representation program for indigent and low-income detained immigrants in removal proceedings. BDS's 75-person immigration practice also provides legal services and representation to noncitizens in non-detained removal proceedings and in affirmative applications for relief before the Department of Homeland Security ("DHS"), as well as immigration screenings, advisals, consultations with respect to the consequences of criminal convictions, and "Know Your Rights" presentations. BDS regularly litigates appeals at the BIA and in the U.S. Courts of Appeals, placing a significant number with

*pro bono* counsel. Since 2009, BDS has counseled, advised, or represented approximately 15,000 clients in immigration matters.

17. Plaintiff Florence Immigrant and Refugee Rights Project ("FIRRP" or "the Florence Project") is a nonprofit organization headquartered in Tucson, Arizona, with offices in Phoenix and Florence, Arizona. The Florence Project provides free legal and social services to adults and unaccompanied children in immigration custody in Arizona, including at the U.S.-Mexico border. Its vision is to ensure that all noncitizens facing removal have access to counsel, understand their legal rights, and are treated fairly and humanely. FIRRP directly represents detained immigrants before the IJs and the BIA, including noncitizens deemed incompetent to represent themselves due to mental health needs or disabilities. FIRRP also runs multiple Legal Orientation Programs ("LOPs"), which provide *pro se* assistance to noncitizens detained in Arizona. FIRRP writes *pro se* materials for the LOP program, which are distributed nationally. In 2019, FIRRP served over 10,000 detained adults and children; placed over 100 cases with *pro bono* attorneys; and provided over 500 noncitizens with social services.

18. Plaintiff HIAS is a global, Jewish nonprofit organization and resettlement agency headquartered in Silver Spring, Maryland, that is dedicated to ensuring that forcibly displaced people find welcome, safety, and freedom. HIAS operates in sixteen countries, including the United States, supporting refugees and other forcibly displaced persons with services to ensure legal protection, economic inclusion, protection from gender-based violence, and access to mental health services. HIAS's U.S.-based team has provided immigration legal services for more than fifty years. In addition, through its domestic Pro Bono Program, HIAS helps detained noncitizens at the U.S.-Mexico border find representation in appeals before the BIA. HIAS relies on its *pro*

*bono* network, which includes over 700 solo practitioners and small- or medium-sized firm attorneys, plus attorneys at nearly 50 large law firms and corporations, to expand its capacity.

19. Plaintiff National Immigrant Justice Center ("NIJC") is a program of Heartland Alliance, a nonprofit organization headquartered in Chicago, Illinois. NIJC provides comprehensive legal services to noncitizens around the country. In addition to its Chicago headquarters, NIJC maintains offices in Washington, D.C.; San Diego, California; and Goshen and Indianapolis, Indiana. NIJC's mission is to vindicate and defend the legal rights of immigrants, regardless of background, and transform the immigration system to one that affords equal opportunity for all. To advance that mission, NIJC provides high quality immigration legal services for as many low-income immigrants as it can possibly reach. NIJC's priority areas are (a) ensuring access to counsel in immigration proceedings, which includes providing counsel and advocating for a guaranteed right to counsel in all immigration proceedings; (b) defending, maintaining, and expanding access to asylum and other forms of immigration relief; and (c) decriminalizing immigration and reducing the detention of noncitizens. In 2020, NIJC provided consultations or legal information to more than 12,000 noncitizens and represented more than 5,000 clients in their immigration cases, including in appeals before the BIA and U.S. Courts of Appeals.

20. Defendant EOIR is a sub-agency of Defendant U.S. Department of Justice ("DOJ" or the "Department") responsible for adjudicating administrative claims concerning federal immigration laws, including proceedings before the immigration courts and BIA. EOIR issued the instant Rule.

21. Defendant DOJ is a cabinet-level department of the federal Government.

22. Defendant Jeffrey A. Rosen is the Deputy Attorney General of the United States. He became the Acting Attorney General of the United States on December 24, 2020. As such, he is

responsible for the administration of the immigration laws and oversees EOIR. He is sued in his official capacity.

23. Defendant James McHenry is sued in his official capacity as the Director of EOIR. He is responsible for the direction and supervision of the immigration courts and the BIA. Defendant McHenry issued the instant Rule.

## FACTUAL ALLEGATIONS

### I.   EOIR's Appellate and Adjudicatory Process

#### A.  Overview of Proceedings for Relief from Removal

##### 1.  Proceedings Before EOIR

24. Immigration law is well known for its complexity. *See, e.g.*, *Ardestani v. INS*, 502 U.S. 129, 138 (1991); *Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1987). The INA governs custodial detention, the steps DHS must take to seek removal of a noncitizen, noncitizens' access to dozens of immigration remedies that ultimately confer the right to remain in the United States, and the procedural mechanisms that allow applicants to pursue these remedies. The consequences that flow from immigration proceedings are also notably severe, often involving matters of life or death. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010) ("[D]eportation is a particularly severe 'penalty.'" (citation omitted)); *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

25. When DHS wishes to deport a noncitizen, it must obtain an order of removal from an IJ (with exceptions not relevant to this case). An IJ conducts removal proceedings, finds facts, and grants relief or orders removal. *See* 8 U.S.C. §§ 1229a(a)(1), (c)(1)(A). Proceedings before the

IJ "shall be the *sole and exclusive procedure* for determining whether an alien may be . . . removed from the United States." *Id.* § 1229a(a)(3) (emphasis added).

26. IJ decisions are appealable to the BIA, and "become final upon the earlier of" (1) "a determination by the [BIA] *affirming* such order," or (2) the expiration of an appeal period. 8 U.S.C. § 1101(a)(47) (emphasis added). The INA does not permit the BIA to determine removability or issue a removal order in the first instance. *See Mejia Galindo v. Sessions*, 897 F.3d 894, 897 (7th Cir. 2018) (assessing whether the INA permits the BIA to issue removal orders and "conclud[ing] that it does not"); *Sosa-Valenzuela v. Gonzales*, 483 F.3d 1140, 1147 (10th Cir. 2007) (The INA "plainly place[s] with the IJ the initial responsibility of ordering deportation").

27. Consistent with these obligations, and like any appellate body, "the [BIA] will not engage in factfinding in the course of deciding appeals." 8 C.F.R. § 1003.1(d)(3)(iv). And its review of an IJ's factfinding is limited to identifying clear errors. *Id.* § 1003.1(d)(3)(i). Thus, the BIA must remand if further factfinding is needed, and a party arguing that further factfinding is needed "must file a motion for remand." *Id.* § 1003.1(d)(3)(iv).

## 2.  Proceedings Before USCIS and Other Fora

28. While the INA and related regulations allow IJs to grant some forms of relief, others may be pursued only before U.S. Citizenship and Immigration Services ("USCIS"). These include T or U visa petitions, for survivors of human trafficking or certain crimes, respectively, *see* 8 U.S.C. § 1101(a)(15); petitions for survivors of abuse under the Violence Against Women Act ("VAWA"), *id.* § 1154; and certain family-based petitions, *id.* §§ 1151(b), 1153. Therefore, when a noncitizen is pursuing a remedy before USCIS, but is also in removal proceedings before EOIR, he or she often must continue on both tracks, unless the IJ agrees to "administratively close" the EOIR track. *See infra* Part I.C.2. When USCIS grants an application, the noncitizen may move to terminate

proceedings before EOIR or seek other relief based on the grant. Denial of relief by EOIR results in a removal order, even if an application for relief is pending before USCIS.

29. In some situations, a noncitizen may also pursue relief from state courts that will ultimately translate to relief before EOIR. For example, they can seek post-conviction relief in state court, which may impact removability or eligibility for relief, or special findings in family court, which may make a child eligible to apply for Special Immigrant Juvenile Status ("SIJS"), 8 U.S.C. § 1101(a)(27)(J). These proceedings occur in parallel with proceedings before EOIR. Denial of relief by EOIR results in a removal order, even if concurrent proceedings remain pending.

**B.  Due Process Protections and Other Rights Codified in the INA**

30. "[D]ue process requires that [deportation] hearings be fundamentally fair." *Rosales v. ICE*, 426 F.3d 733, 736 (5th Cir. 2005) (citation omitted); *see also Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005); *Borges v. Gonzales*, 402 F.3d 398, 408 (3d Cir. 2005).

31. The INA effectuates these rights. Noncitizens are entitled to be "represented, at no expense to the Government, by counsel of the [applicant's] choosing." 8 U.S.C. §§ 1229a(b)(4)(A); 1362. In addition, "the alien shall have a reasonable opportunity to examine the evidence against the alien, [and] to present evidence on the alien's own behalf." *Id.* § 1229a(b)(4)(B).

32. The INA also addresses the right to apply for and be granted certain forms of relief. For example, the INA implements the United States' treaty obligations to refugees by providing that "[a]ny alien who is physically present in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Additionally, the INA instructs that "the Attorney General *may not remove* an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country" based on membership in a protected group. *Id.* § 1231(b)(3) (emphasis added); *see INS v. Stevic*, 467 U.S. 407, 422 (1984).

10

33. Despite these protections, the nature of immigration proceedings and the barriers experienced by noncitizens—especially the most vulnerable—present obstacles to seeking relief from removal. Thus, these safeguards, while crucial, are not always implemented as designed.

### C.  Existing Procedural Mechanisms at EOIR

34. The current system for adjudicating immigration cases is rife with flaws. For example, as discussed below, EOIR lacks an electronic case management system, and nearly all of immigration practice remains paper-based. There is also no right to appointed counsel, so many noncitizens participate in hearings with life-or-death consequences without representation.

35. Against the backdrop of these and many other flaws, existing procedural tools provide a measure of protection against the injustices inherent in the system. These tools are vital to account for changes in fact or law, to correct for ineffective assistance of counsel, and to enable noncitizens to pursue alternative relief before USCIS. Such tools include:

### 1.  <u>Motions to Remand</u>

36. Under existing regulations, if new and material evidence becomes available while an appeal is pending before the BIA, either party can file a motion to remand. *See Matter of Coelho,* 20 I. & N. Dec. 464 (BIA 1992). The evidence might alert the BIA to changes in an applicant's eligibility for relief. It could include: notice of an approved application by USCIS or evidence of a new familial relationship that would authorize new relief; new evidence that an applicant suffers from mental health conditions of which the IJ was unaware; a significant change in country conditions or personal facts in an asylum case; or a change in law that impacts eligibility for relief.

37. Unlike a motion to reopen, a motion to remand can be filed *while* an appeal is pending before the BIA, and, though the standards are identical, movants do not need to file them within a certain time, nor are they limited to only one, as is the case with statutory motions to reopen. *See*

8 C.F.R. § 1003.2(c)(2) (limiting noncitizens to one motion to reopen (the "number bar"), which must be filed within 90 days of a removal order (the "time bar")). A motion to remand thus allows noncitizens to present material, previously unavailable evidence before their order of removal becomes final and before the BIA must expend resources on the underlying appeal. *See id.*; *Matter of Coelho,* 20 I. & N. Dec. at 471. Without this mechanism, many noncitizens would be precluded from presenting evidence that would materially change the outcome of their removal proceedings.

## 2. <u>Administrative Closure</u>

38. At least since the 1980s, IJs and the BIA have been permitted to administratively close cases to temporarily remove them from the active docket. *See Matter of Avetisyan*, 25 I. & N. Dec. 688 (BIA 2012); *Matter of Amico*, 19 I. & N. Dec. 652 (BIA 1988).

39. Administrative closure is "a procedural device that temporarily takes a removal case off of an [IJ's] calendar, preventing it from moving forward," which enables a "noncitizen to pursue alternative relief—such as a U visa—from USCIS." *Meza Morales v. Barr*, 973 F.3d 656, 664 (7th Cir. 2020) (internal citations omitted). This tool allows IJs to prioritize cases in need of immediate resolution. Without administrative closure, EOIR would need to conduct many additional hearings and order many persons removed, even when that person is likely to receive alternative immigration relief from USCIS or a state court that would protect against deportation.

40. In 2018, the Attorney General eliminated the ability to order administrative closure except in very limited circumstances and despite nearly 40 years of regular use. *See Matter of Castro Tum,* 27 I. & N. Dec. 271 (A.G. 2018). The Fourth and Seventh Circuits, however, rejected the rule of *Castro Tum* and reinstated the IJ and BIA's authority to order administrative closure, recognizing in part that administrative closure was an effective case management tool. *See Meza Morales*, 973 F.3d at 664; *Romero v. Barr*, 937 F.3d 282, 287 (4th Cir. 2019).

### 3. *Sua Sponte* Motions to Reopen

41. The existing regulations have also long authorized the IJ and the BIA to reopen final orders of removal *sua sponte*, and, like motions to remand, allow them to reopen proceedings outside of the time and number bars required by the statutory motion to reopen. *See* 8 C.F.R. § 1003.2(a). IJs and the BIA reopen cases *sua sponte* only where "exceptional situations," such as new eligibility for relief or identification of errors in the prior proceedings, exist. *See, e.g.*, *Matter of G–D–*, 22 I. & N. Dec. 1132, 1133-34 (BIA 1999). IJs and the BIA may exercise this discretion on their own action or in response to motions filed by noncitizens. This *sua sponte* authority protects many noncitizens from orders of removal where outcome-determinative relief is available but they are otherwise not yet eligible to seek it.

### 4. Voluntary Departure

42. Unlike the other procedural mechanisms outlined above, voluntary departure is a substantive grant of relief authorized by the INA. It allows noncitizens to depart the United States without receiving a removal order. 8 U.S.C. § 1229c. The ability to depart without a removal order is significant, because a removal order can bar noncitizens from seeking "any relief" in the future or require a person to remain abroad for a prolonged period before reuniting with a U.S. citizen or permanent resident family member in the United States. *See* 8 U.S.C. § 1231(a)(5) (bar to seeking relief); *id.* § 1182(a)(9)(A)(ii) (ten-year reentry bar).

43. Eligibility for voluntary departure is a highly factual inquiry, thus far only determined by an IJ through a hearing conducted in immigration court. Qualification for voluntary departure requires, among other things, a finding that the noncitizen is "a person of good moral character" with "the means to depart the United States." 8 U.S.C. § 1229c(b)(1). Additionally, voluntary

13

departure may only be granted after the IJ provides instructions, or "advisals," regarding compliance with the grant, which must be accepted by the noncitizen. *See* 8 C.F.R. § 1240.26(b)(3).

### D.  Appeals to the BIA

44. Since long before the issuance of the Rule, the BIA has been "unable to adjudicate immigration appeals in removal proceedings effectively and efficiently." *See* BIA: Procedural Reforms To Improve Case Management, 67 Fed. Reg. 54,878 (Aug. 26, 2002).

45. In 2016, EOIR tasked the independent consulting firm Booz Allen Hamilton with review of the BIA's internal processes and recommended, as one of the most important changes, that the BIA implement an electronic case management system.[1] The BIA has not done so. Nor has it implemented other recommendations to improve efficiency.[2] Accordingly, as described below, litigants continue to face a system that is rife with delays and unpredictability on the one hand, but exceptional inflexibility in terms of its demands on noncitizens on the other.

46. Appellate proceedings before the BIA commence with the filing of the notice of appeal within thirty days of the IJ's decision. 8 C.F.R. § 1003.3(a).

47. Next—at an uncertain time weeks, months, or even years into the future, *see* 67 Fed. Reg. at 54,895—the BIA provides the IJ's decision, the transcript of the hearing, and a briefing schedule. *See* 8 C.F.R. § 1003.3(c)(1). The BIA does not provide a copy of the evidentiary record

---

[1] Public Comment of Catholic Legal Immigration Network, Inc. at 5–6 (Sept. 25, 2020), https://bit.ly/3pIWhXP (hereinafter "CLINIC Comment"); Department of Justice, Executive Office for Immigration Review, Legal Case Study Summary Report, Booz Allen Hamilton at 26 (Apr. 6, 2017), https://bit.ly/35td6yo (hereinafter, "Booz Allen Hamilton Report").

[2] U.S. Gov't Accountability Off., GAO-18-469T, Testimony Before the Subcommittee on Border Security and Immigration, Committee on the Judiciary, Immigration Courts: Observations on Restructuring Options and Actions Needed to Address Long-Standing Management Challenges at 9 (Apr. 18, 2018), https://bit.ly/3rQDJqm ("EOIR could take several actions to address long-standing management and operational challenges and reduce the case backlog. . . . Overall, EOIR has fully implemented 1 recommendation" of eleven total).

14

or any other materials. Accordingly, unless the noncitizen has her own copy, which is particularly unlikely in cases involving *pro se* respondents and detained individuals, litigants must write their briefs without reviewing the record.

48. The parties have 21 days to file their briefs, starting from the date on which the briefing schedule is *issued*.[3] The briefing schedule is consecutive for non-detained litigants (*i.e.*, appellee files its brief after appellant) and concurrent when the noncitizen is detained (*i.e.*, briefs are filed simultaneously). 8 C.F.R. § 1003.3(c)(1). Even within the limited 21-day time period, a week or more is often lost on the front end because the BIA sends the materials by U.S. mail, and a few days or more are lost on the back end because the brief must be *received* in paper by the deadline. After accounting for these delays, noncitizens typically have fewer than two weeks to prepare and file their appellate briefs. This time frame can be even further abbreviated for detained individuals due to delays in mail processing and other complications in immigration detention centers.

49. Currently, either party may seek an extension of the briefing deadline of up to 90 days, which the BIA may grant in its discretion. *See id.* The BIA's current practice is to grant "an additional 21 days to file a brief regardless of the amount of time requested." BIA Practice Manual §§ 4.7(c)(i)(A), (B). The current regulations permit multiple extensions, which the Practice Manual states should be granted "only in rare circumstances." *Id.*

50. Under existing procedures, meeting deadlines is difficult for noncitizens and counsel alike. When noncitizens are represented by the same counsel before the BIA and IJ, these procedures require counsel to rearrange their workload without notice upon receipt of the transcript and briefing schedule, and then review the record and prepare a brief in, at most, a month's time.

---

[3] Pursuant to the BIA Practice Manual, these briefing deadlines "remain in effect" even where the transcript provided by EOIR was defective in some manner. *See* U.S. Dep't of Justice, BIA Practice Manual § 4.2(f)(iii) (Oct. 5, 2020), https://bit.ly/351icSa.

51. And since there is no right to counsel before EOIR, approximately 70% of individuals proceed *pro se* before the IJ and must seek out appellate counsel for BIA representation on this tight timeline.[4] That process requires copying and mailing the paper transcripts, determining whether counsel has the available resources to comply with the swift briefing schedule, and time for potential counsel to evaluate the merits of the case. These steps are likely to occupy all or most of the briefing timeline. If the noncitizen is lucky enough to secure counsel, their attorney is left with very little time to prepare and file the brief. And when these *pro se* noncitizens are unable to identify counsel, they must navigate the process on their own.

52. Unlike in federal court practice, the BIA disfavors reply briefs. *See* BIA Practice Manual § 4.6(h). They must be accompanied by a motion asserting surprise at opposing party's assertions and are granted only in the BIA's discretion. *Id.*

53. After the completion of briefing a case on the merits, the wait for a decision is arbitrary and unpredictable. For detained individuals, the BIA might issue a decision anywhere from three to six months later, though it can often take up to a year or longer. For non-detained individuals, it routinely takes a year or even several years to receive a decision.

### E.  EOIR's Recent Politicization and Substantive Restrictions on Access to Immigration Courts

54. Though Defendants adopted the Rule in the purported name of efficiency, there is reason to doubt Defendants' commitment to that goal. Indeed, the Rule is another in a string of actions taken by Defendants to curtail access to the judicial system, none of which has contributed

---

[4] Noncitizens were *pro se* in 136,592 out of 191,633 (69.2%) cases initiated in FY 2020. Transactional Records Access Clearinghouse at Syracuse University ("TRAC"), State and County Details on Deportation Proceedings in Immigration Court, (last updated Nov. 2020), https://bit.ly/3s8wZnV (hereinafter "TRAC Representation Rates"). The percentage is even higher for detained noncitizens.

to EOIR's overall function or efficiency. Rather, *foreclosing* access to relief—not to efficiently administer justice—has been central to the Trump administration's immigration policy.

55. President Trump himself has called for limits on due process, stating that immigrants should be immediately deported "with no Judges or Court Cases."[5] Overall, the administration's explicit strategy has been to "present[] aliens with multiple *unsolvable* dilemmas to impact their calculus for choosing to make the arduous journey to begin with."[6]

56. Defendants and their counterparts at DHS have adopted an onslaught of changes in furtherance of this goal, including, paradoxically, measures that have directly contributed to existing backlogs. In particular, Defendants have increased pressure on IJs "to speed adjudications to reduce the court's sizable backlog," while making it increasingly difficult for IJs to "efficiently manage their dockets."[7] For example, in July 2017, EOIR issued an Operating Policies and Procedures Memorandum ("OPPM") restricting IJs' continuance authority, particularly when the purpose of the continuance is to retain counsel.[8] Defendant McHenry followed that OPPM with a

---

[5] @realDonaldTrump, Twitter (June 24, 2018), https://bit.ly/3qbArN6; *see also* Public Comment of Aaron Reichlin-Melnick at 4–5 (Sept. 27, 2020), https://bit.ly/3hDvPfr (collecting quotations) (hereinafter, "Reichlin-Melnick Comment").

[6] *See* Julia Ainsley, *Stephen Miller Wants Border Patrol, Not Asylum Officers, to Determine Migrant Asylum Claims*, NBC News (Jul. 29, 2019), https://nbcnews.to/3mq1Ic5 (quoting a White House National Security Council official) (emphasis added).

[7] *See* Migration Policy Inst., *Dismantling and Reconstructing the U.S. Immigration System: A Catalog of Changes under the Trump Presidency* at 50 (July 2020), https://bit.ly/3hBIGi6.

[8] MaryBeth Keller, Chief Immigration Judge, EOIR, Memorandum re: Operating Policies and Procedures Memorandum 17-01: *Continuances* (July 31, 2017), https://bit.ly/3q7TPdU ("OPPM 17-01"); *see also* National Immigrant Justice Center, *Policy Brief: The Weaponization of the Immigration Court System* (Apr. 2018), https://bit.ly/391N3PT.

new memo on January 8, 2021, reversing long-standing policy to state for the first time that "EOIR has no policy mandating or requiring [IJs] to grant a continuance for any reason."[9]

57. EOIR's push for speedier IJ case adjudications is at odds with DHS's routine refusal to exercise prosecutorial discretion not to pursue removal cases, which could remove non-priority cases from the court's docket.

58. The crisis within EOIR has drawn the attention of legal organizations, including the American Bar Association ("ABA"), which has decried the lack of due process in the immigration courts.[10] In January 2020, Congress convened an oversight hearing titled "Courts in Crisis: the State of Judicial Independence and Due Process in U.S. Immigration Courts," where members of the ABA, National Association of Immigration Judges, and the American Immigration Lawyers Association ("AILA") testified about due process concerns and systemic flaws.

59. The changes adopted over the last several years have affected all aspects of the immigration system. As most relevant here, EOIR has limited and threatened to eliminate programs that serve otherwise unrepresented individuals like the Legal Orientation Program ("LOP") and the BIA Pro Bono Project. It has restricted IJ authority over docket management by limiting or eliminating most procedural mechanisms that IJs use to balance efficiency and fairness. And DOJ has concentrated significantly more power at the top of EOIR, particularly in the EOIR Director, which is an un-confirmed political position, with certain operational authorities, who

---

[9] EOIR Dir. James McHenry, Continuances: Procedural Memorandum (Jan. 8, 2021), https://bit.ly/38udq1T; *compare with* OPPM 17-01, *supra* n. 8, ("With regard to granting a continuance to give a respondent the opportunity to obtain legal counsel, it remains general policy that at least one continuance should be granted for that purpose.").

[10] American Bar Association, *ABA President to Congress: Fix the Immigration Courts* (Jan. 29, 2020), https://bit.ly/3hBSzMN.

now yields influence second only to the Attorney General himself in actions ranging from IJ hiring to the substantive adjudication of appeals.

60. The dismantling of the BIA Pro Bono Project is particularly notable. That program was created by EOIR and administered by Plaintiff CLINIC. The program identified meritorious appeals and recruited *pro bono* counsel to staff them. The program also included various measures to facilitate that representation, such as providing newly engaged counsel with the full record of proceedings and automatically re-setting the 21-day briefing schedule.[11] Without adequate justification, the Trump administration all but discontinued this project, creating numerous procedural hurdles that led to a 90% cut in project participation—from over 120 cases to 12.

61. These changes exist *in addition to* many substantive changes, particularly to the asylum system, that have eliminated or curtailed access to an IJ. For example, the Government has promulgated regulations to bar asylum to individuals who enter outside of a port of entry, who do not first seek asylum in a country through which they transit, and who have even minor exposure to portions of the criminal justice system.[12] The Government has also forced approximately 60,000 asylum seekers to remain in Mexico, in often life-threatening conditions and with inadequate procedural protections, to await their U.S. asylum proceedings.[13]

62. Indeed, in the second half of December 2020 alone, the Government issued six final and two proposed rules occupying more than 400 pages of the Federal Register to curtail access to

---

[11] *See* DOJ BIA Pro Bono Project, https://bit.ly/3o4XkB0 (acknowledging that "Legal representation has had a meaningful impact in many . . . cases" on appeal before the BIA).

[12] *See* National Immigrant Justice Center, *A Timeline Of The Trump Administration's Efforts To End Asylum* (Nov. 2020), https://bit.ly/3narjH6 (describing these and other policies).

[13] *Id*.

the immigration courts and to substantive immigration remedies. In addition to the Rule at issue here, DHS and DOJ have finalized rules that:

a. Radically altered substantive eligibility grounds for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") while also narrowing the criteria for who will be able to see an IJ to present these claims. *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (Dec. 11, 2020) (hereinafter, "Omnibus Asylum Rule").

b. Instructed IJs to deny asylum, without an evidentiary hearing if an asylum application is filed more than 15 days after an initial hearing, fails to include proof of payment of a newly imposed fee, or leaves any field on the application blank (even if that field is inapplicable). *See* Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81,698 (Dec. 16, 2020) (hereinafter, "Asylum Procedures Rule").

c. Finalized a prior interim final rule that barred access to asylum for those who do not first seek asylum and receive a final adjudication in another country while *en route* to this country. *See* Asylum Eligibility and Procedural Modifications, 85 Fed. Reg. 82,260 (Dec. 17, 2020) (hereinafter, "Transit Ban Rule");

d. Imposed new fees that did not previously exist and increased nine-fold others for applications filed before EOIR. *See* Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 82,750 (Dec. 18, 2020) (hereinafter, "EOIR Fee Rule").

e. Created new rules to block and deport asylum seekers as purported security and public health risks. *See* Security Bars and Processing, 85 Fed. Reg. 84,160 (Dec. 23, 2020) (hereinafter, "Security Bar Rule").

63. The two proposed rules in this flurry significantly compound the changes made by this Rule because they eliminate or curtail other remedies that Defendants used to justify this Rule. *See* Good Cause for a Continuance in Immigration Proceedings, 85 Fed. Reg. 75925 (Nov. 27, 2020) (hereinafter, "Continuance NPRM"); Motions To Reopen and Reconsider; Effect of Departure; Stay of Removal, 85 Fed. Reg. 75942 (Nov. 27, 2020) (hereinafter, "Motion to Reopen NPRM").

**F.  Effects of Recent Changes at EOIR**

64. These changes—both cumulatively and individually—eviscerate due process rights before EOIR, upset settled reliance interests, and hinder rather than help efficiency goals.

65. For example, the elimination of administrative closure will cause the premature deportation of many individuals with meritorious claims for relief, while causing more inefficiencies by removing an important tool used by IJs and the BIA to manage their caseloads. About 60% of noncitizens who had their cases administratively closed between FY 1986-2020 were ultimately granted relief or had their removal proceedings terminated altogether, usually within just four months after the case was re-calendared.[14] Administrative closure has reduced EOIR's growing backlog, and eliminating it completely would "result in a considerable rise in the number of cases" in that backlog.[15]

66. Another example of reducing due process without achieving any actual efficiencies is EOIR's introduction of case completion metrics in 2018. Under these metrics, IJs are subject to a case completion quota requiring completion of 700 cases each year, a remand rate requiring fewer than 15% of their decisions to be reversed, and speed-related adjudication benchmarks constraining the time that an IJ may spend on a given case.[16] Failure to meet these benchmarks can result in discipline, reassignment, or termination.

67. Yet, in significant part because of these changes, as well as chronic understaffing, IJ workloads continue to burgeon.[17] Fiscal Year 2021 started with the largest immigration court

---

[14] TRAC, *The Life and Death of Administrative Closure* (Sept. 10, 2020), https://bit.ly/38cJMOB (hereinafter "TRAC Administrative Closure Report").

[15] *Id.*

[16] EOIR Performance Plan – Adjudicative Employees, https://bit.ly/388BjM7 (hereinafter "EOIR Performance Plan").

[17] TRAC, *Burgeoning Immigration Judge Workloads* (May 23, 2019), https://bit.ly/3pLV4iw; *see also* Marisa Esthimer, *Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?* Migration Policy Institute (October 3, 2019), http://bit.ly/3s8iPU9.

backlog on record.[18] As former IJs explained in their comment on the proposed Rule, EOIR's recent policymaking has actually *caused* the "crushing backlogs" it allegedly is trying to fix, while eroding due process.[19] Without tools like administrative closure, continuances, and prosecutorial discretion, it will be impossible to tackle this backlog, let alone provide noncitizens with a meaningful adjudicatory process.

68. Since March 2020, the Trump administration has also used COVID-19 to advance its agenda of undermining due process protections and expediting deportation. For example, EOIR refuses to extend deadlines or continue cases despite acute access to counsel issues the pandemic has created, particularly for detained noncitizens. As a group of senators writing to the Government Accountability Office ("GAO") in August 2020 explained, "[w]hile the Trump administration has justified its incursions into the independence of immigration courts as efficiency measures, . . . EOIR's response to the COVID-19 pandemic demonstrates how the agency can use seemingly neutral measures to tip the scales of justice against noncitizens."[20]

## II.    Promulgation of the Rule and Overview of the Rule's Flaws

69. In August 2020, the Department issued an NPRM proposing sweeping changes to EOIR's appellate and adjudicatory systems. NPRM, Appellate Procedures and Decisional Finality

---

[18] TRAC, *FY 2021 Begins with Largest Immigration Court Backlog on Record*, (Nov. 24, 2020), https://bit.ly/35c4MTD.

[19] Public Comment of Round Table of Immigration Judges at 3 (Sept. 24, 2020), http://bit.ly/3oFfRE8.

[20] *Senators Call for GAO Investigation of Trump Politicization of Immigration Courts as COVID-19 Crisis Rages*, Sheldon Whitehouse, U.S. Senator for Rhode Island (Press Release, Aug. 21, 2020), https://bit.ly/2LADvmW.

in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (Aug. 26, 2020). Then-Attorney General William Barr signed the NPRM. *Id.* at 52,514.

70. Defendants gave the public only 30 days to comment on the proposed Rule, despite requests to extend the comment period, despite the COVID-19 pandemic, and despite other immigration-related rulemaking proposals and decisionmaking issued days before the comment period closed. *See, e.g., infra* ¶ 312 (discussing the Asylum Procedures Rule, which was issued two days before the close of comments), ¶ 313 (discussing AG decision issued one day before the close of comments). Defendants subsequently issued two closely related rules on which the public was deprived from commenting: the Continuance NPRM and the Motion to Reopen NPRM.

71. On December 16, 2020, the Department published the Rule under Defendant McHenry's signature, with an effective date of January 15, 2021. Despite comments raising significant concerns with the proposed changes, the final Rule is nearly identical to the proposed version. And, as discussed below, *see infra* Part III, Defendant McHenry lacked authority to issue the Rule at all, and particularly lacked authority to assign himself new adjudicatory powers.

72. The Rule was published with a barrage of other immigration-related rulemakings that were either proposed or finalized in the last few weeks of December 2020 alone, *see supra* ¶¶ 62–63. This staggered process made it exceedingly difficult, if not impossible, for Plaintiffs to meaningfully comment on the Rule.

73. As reflected in the Rule, Defendants failed to meaningfully analyze how the Rule would affect small entities, including but not limited to nonprofit organizations like certain Plaintiffs that provide legal services to immigrants and whose missions and operations will be upended by the Rule's radical changes to EOIR procedures.

74. Substantively, in promulgating the Rule, Defendants failed to meaningfully confront the profound structural flaws that exist within EOIR and the extensive comments addressing them, instead improperly putting in place measures that will exacerbate many of these structural flaws and justifying these changes with false claims of increased efficiency.

75. Far from advancing efficiency, the Rule will exacerbate existing flaws and result in *further* backlogs and appeals to address the Rule's changes and undo erroneous decisionmaking, while imposing devastating barriers to noncitizens' rights to fair proceedings. That will, in turn, undercut the missions of Plaintiffs and force them to divert resources, spending more time and effort on each case and able to take on fewer and fewer cases.

76. Yet, Defendants failed to account for these significant impediments or consider reasonable alternatives; failed to provide a reasoned explanation that justified their significant departure from prior factual findings, legal conclusions, and policy positions; failed to consider alternatives proposed by commenters; and failed to consider the significant reliance interests, including meaningful access to seek relief from deportation, the Rule undermines.

77. Indeed, the poor fit between the Rule and Defendants' purported justifications for it suggests that those justifications were pretextual. It is reasonable to conclude that the Rule was designed not to improve efficiency, but to foreclose meritorious motions, appeals, and relief altogether—as the Trump administration has repeatedly made clear is its goal. *See supra* ¶ 55.

### III.     The Rule Must Be Vacated Because Defendant McHenry Had No Statutory or Regulatory Authority to Issue It.

78.     The INA provides that "[t]he Attorney General shall establish such regulations, . . . delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" his authority under the INA. 8 U.S.C. § 1103(g)(2). And by statute, EOIR is made "subject to the direction and regulation of the Attorney General." 6 U.S.C. § 521.

79. The Attorney General by regulation has delegated certain powers to the EOIR Director. 8 C.F.R. § 1003.0(b). But that regulation does not delegate to the EOIR Director any rulemaking authority. *See id.*

80.     Instead, that regulation allows the EOIR Director to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities." *Id.* § 1003.0(b)(1)(i). It thus distinguishes between "operational instructions," "policy," and "procedural instructions," on the one hand, and "new regulatory authorities," on the other, and do not allow the EOIR Director to issue regulations. *Id.*

81.     The Rule does not describe any other source of delegated authority for the Director of EOIR to issue the Rule, and Plaintiffs are aware of none. Nor does the Rule indicate that then–Attorney General Barr otherwise approved the Rule. Nor does the Rule point to any instance in which an EOIR Director has issued a rule. That is because, at least as far as Plaintiffs are aware and on information and belief, it had never occurred before December 2020.

82.     Because Defendant McHenry was without statutory or delegated authority to issue the Rule, the issuance of the rule was *ultra vires*, "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and not in accordance with law, *id.* § 706(2)(A), and the Rule in its entirety should be set aside.

## IV.    The Rule Must Be Vacated Because It Is Contrary to Law and Arbitrary and Capricious, in Violation of the APA.

### A.    Defendants' Significant Changes to EOIR Procedures Are Unlawful.

83. Additionally, the substantive changes effectuated by the Rule violate the APA because they are arbitrary and capricious and contrary to law.

25

## 1.  **The Rule Hamstrings Appellate Briefing Schedules**

84. First, the Rule hamstrings BIA briefing processes, purportedly to expedite appeals. But it does so by shifting the burden to noncitizens and those working on their behalf without reducing the duration that an appeal is pending. The effect is to limit noncitizens' ability to mount appeals.

85. The Rule introduces four substantive changes to the briefing schedule for appeals. First, it reduces the maximum allowable time for an extension of the opening brief from 90 to 14 days, regardless of circumstances. 85 Fed. Reg. at 81,654 (new 8 C.F.R. § 1003.3(c)(1)). Second, it limits the parties to one extension, again regardless of circumstances. *Id.* Next, it eliminates consecutive briefing for non-detained BIA appeals, instead adopting a concurrent briefing schedule, as is the practice for detained appeals. *Id.* Finally, it shortens the deadline for submitting reply briefs, requiring briefs to be filed within 14 days of the brief in chief, instead of 21 days. *Id.*

86. For the 70% of noncitizens who were unrepresented before the IJ,[21] and especially for *pro se* noncitizens who are detained at the time of their appeal, the Rule makes retaining appellate counsel virtually impossible. Even for noncitizens who are fortunate enough to retain counsel on appeal, the Rule exacerbates existing difficulties, limiting the ability of prospective counsel, like Plaintiffs, to accept cases and imposing significant barriers to representation. And these restrictions also significantly limit Plaintiffs' ability to refer cases to *pro bono* counsel, further impairing their ability to carry out their missions. The Rule imposes these harms in the following ways.

87. First, the BIA's mail-based system, unpredictable briefing schedules, and the short timeline to file a brief *already* limit the ability of noncitizens to obtain counsel. Noncitizens who are unrepresented before the IJ or need new counsel for appeal are often unable to obtain counsel prior to receipt of the briefing schedule, transcript, and any written decision, as attorneys generally

---

[21] *See* TRAC Representation Rates, *supra* n.4.

will not take on a case without evaluating the merits and considering deadlines. Thus, many noncitizens expend the majority of their appeal timeline waiting to receive materials in the mail and seeking out appellate counsel. By the time prospective counsel receives these materials, counsel often has less than two weeks to review the record, ascertain the merits of a claim, finalize representation agreements, and prepare an appellate brief.

88. Additionally, because the Attorney General recently issued a decision requiring the BIA to examine substantive issues on all statutory elements *de novo* without deference to the parties' stipulations below, the process of writing a BIA brief is now more substantively complex and cumbersome. *See Matter of A-C-A-A-*, 28 I. & N. Dec. 84 (A.G. 2020). This is further exacerbated by the Rule's new authority for the BIA to affirm on any basis in the record. *See infra* Part IV.A.3.b.

89. These hurdles will make it exceptionally difficult for prospective counsel, like Plaintiffs, to accept new cases for BIA representation. For example, Plaintiff NIJC accepts BIA cases from previously *pro se* litigants consistent with its mission to provide representation and improve access to counsel. But NIJC will not be able to do so, or at least will need to accept far fewer cases, under the Rule's unreasonable and unpredictable timeline. Plaintiff CLINIC's affiliates will similarly be unable to continue to accept BIA cases under these time constraints.

90. Moreover, because Plaintiffs and other nonprofit legal service providers have limited resources, they often engage *pro bono* attorneys in the private bar to take on appellate representation. The Rule will severely curtail such efforts to place cases with *pro bono* attorneys, who are ordinarily not experienced in immigration law. This change will especially harm CLINIC's BIA Pro Bono Project and HIAS's BIA Project, which exist to screen meritorious BIA appeals and place them with *pro bono* counsel.

91. Even where *pro bono* representation might be possible, Plaintiffs will have to recruit, train, and mentor *pro bono* counsel within a more limited timeframe, which will require a significant diversion of resources from other projects and acceptance of fewer cases. These changes will thus frustrate Plaintiffs' missions to ensure access to counsel for as many noncitizens as possible, particularly those who are indigent or detained.

92. Similarly, the Rule will make self-representation unrealistic. *Pro se* litigants already struggle to represent themselves before the BIA given language barriers and limited access to resources that would aid in appellate brief writing. As such, a few days can be dispositive in *pro se* litigants' ability to pursue their appeals. To further reduce their time to file a brief makes self-representation nearly impossible. These challenges are especially profound for detained *pro se* noncitizens. For these individuals, their mail is further delayed, their access to a law library limited, and their ability to send and receive mail or make phone calls to prospective counsel is curtailed.

93. The Rule thus directly undermines the entire point of LOP programs, such as those operated by Plaintiffs FIRRP and NIJC: to ensure *pro se* individuals have a shot at success. To avoid the harms imposed by the Rule, Plaintiffs FIRRP and NIJC will need to divert more resources to teaching *pro se* individuals about the appellate process and brief writing—concepts that are already exceptionally difficult to explain in a *pro se* support model—and to do so under significant, new time pressures.

94. Even with counsel at the appeals stage, the single-extension provision leaves counsel, like Plaintiffs, with no room for additional timing constraints, such as competing workload requirements inherent in immigration practice (*e.g.*, briefing in other appeals), natural disasters, illness, or unforeseen life events. And because it is not possible to predict when the BIA will issue

28

the briefing schedule, there is no ability for Plaintiffs' staff, affiliates, or *pro bono* teams to plan for foreseen circumstances like long-standing court deadlines or scheduled medical procedures.

95. The truncated briefing schedule will also increase Plaintiffs' mailing expenses. The BIA requires hard-copy-only filing, and Plaintiffs anticipate a greater need to use more expensive expedited mailing options, including same-day couriers that charge at least $150 per case, in light of the shorter timelines under the Rule.

96. Timing aside, the Rule imposes substantive hurdles for Plaintiffs. Plaintiffs must attempt to anticipate the Government's arguments in their briefing as well as any ground in the record upon which the BIA may affirm the IJ's decision, even if not raised by either party. As a result of this uncertainty, Plaintiffs will need to file many more reply briefs, even though such briefs are disfavored by the BIA. The increased burden per case will *further* reduce Plaintiffs' capacity to take on additional cases. And though the Rule purports to apply equally to DHS and noncitizens alike, the burden of this change will fall dramatically on noncitizens and their advocates, like Plaintiffs, who cannot follow DHS's routine practice of filing boilerplate, truncated briefs, even though DHS is *always* represented by counsel.

97. These changes, which irreparably harm Plaintiffs, are contrary to law because they deprive noncitizens of the right to appeal to the BIA, the right to counsel of their choosing (at no expense to the Government), and a reasonable opportunity to present arguments and evidence. *See* 8 U.S.C. §§ 1229a(b), 1362. These changes similarly undermine various provisions in the INA contemplating *pro bono* legal services by organizations like Plaintiffs. *See, e.g.*, 8 U.S.C. §§ 1229(a)(1), (b)(2) (requiring that noncitizens in removal proceedings be provided a list of *pro bono* attorneys); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process).

Additionally, the Due Process Clause, which applies to noncitizens in removal proceedings, affords noncitizens an opportunity to be heard. These changes eviscerate these rights.

98. Furthermore, the Rule's concurrent briefing requirement, which forces the noncitizen to anticipate what the Government will argue and also disprove any possible ground upon which the BIA could affirm the IJ's decision, conflicts with noncitizens' rights to counsel and a meaningful opportunity to confront arguments against them.

99. These provisions are also arbitrary and capricious under the APA. Defendants' justifications for these changes do not pass muster. First, Defendants claim that these changes would curb "gamesmanship" and end "last-minute delay tactics." *See* 85 Fed. Reg. at 81,637. But Defendants provide no evidence of such gamesmanship. To the contrary, modest briefing extensions, reply briefs, and consecutive briefing are hallmarks of ordinary appellate processes. Noncitizens' use of these mechanisms reflect a reasonable, indeed common, response to the myriad procedural barriers that preclude them, particularly those who are detained and/or *pro se*, from meaningfully participating in the appellate process. Tellingly, Defendants did not identify any existing judicial procedures whereby judges are *forbidden* from giving extensions for briefing in their cases regardless of circumstances.

100.    Second, Defendants claim that these provisions will make the BIA's adjudication process more efficient. *See* 85 Fed. Reg. at 81,637. Yet they provide no evidence that shortening extensions or requiring concurrent briefing will meaningfully impact existing delays, which largely occur before the briefing schedule is issued and after the briefs are filed. The Rule merely increases the noncitizen's need to "hurry up" without changing the "wait" that inevitably follows.

101.   In fact, the Rule's mandate that the BIA conduct an individualized good cause analysis for every extension request, where extensions were previously granted as a matter of course, will offset any timing benefits the Rule purportedly provides.

102.   Defendants' responses to relevant comments further fail to meaningfully address these issues. For instance, Defendants' response to the harm caused to *pro se* individuals who struggle to retain counsel was simply to assert that no rationale had been offered for why this problem exists. 85 Fed. Reg. at 81,637. This non-response is belied by both Plaintiffs' comments and those submitted by numerous other legal service providers, which offered detailed, concrete facts explaining the barriers discussed above.

103.   Additionally, Defendants' response that noncitizens may overcome any timing restrictions by beginning to prepare their appeal while they await a briefing schedule ignores the BIA's own practice. Without access to the IJ decision and the transcripts, which arrive with the briefing schedule, noncitizens and/or their counsel, like Plaintiffs, have no reasonable way to meaningfully prepare an appeal in advance. Here again, Defendants did not acknowledge this fact despite the numerous comments explaining it.

104.   Belying Defendants' feigned disbelief that noncitizens and their counsel must await a transcript to begin briefing, EOIR previously acknowledged these hurdles when it created the BIA Pro Bono Project. That program provided counsel with a full copy of the record of proceedings and automatically reset the briefing schedule to allow sufficient time for newly engaged *pro bono* counsel to adequately prepare an appellate brief. It did so with the understanding that such accommodations actually "enable[ ] the BIA to provide a more effective and timely case review."[22] Despite previously acknowledging the utility of such procedures, Defendants restricted

---

[22] EOIR DOJ Pro Bono Project, *supra* n.11.

those same procedures in the Rule, dismissing out of hand commenters' concerns and failing to explain its departure from its previous view.

105.    Moreover, as Plaintiff CLINIC explained in its comment, the changes will be devastating to the viability of the BIA Pro Bono Project.[23] Defendants did not dispute this point, despite relying on the existence of the Project as evidence that the Rule would not have "*any* negative impact on representation before the BIA.*" See* 85 Fed. Reg. at 81,637. Nor did Defendants acknowledge that they have effectively dismantled the BIA Pro Bono Project even before this Rule, *see supra* ¶ 60. Defendants' failure to acknowledge changes in the Project both before and as a result of this Rule undermines their reliance on the project to justify the Rule.

106.    Defendants' reasoning for concurrent briefing (as opposed to the parties filing consecutively) is likewise arbitrary. Defendants claim that there is not a "legal or operational reason to adjudicate non-detained cases in a less efficient manner than detained cases." 85 Fed. Reg. at 52,499 (NPRM); *see also* 85 Fed. Reg. at 81,636. Yet, in the detained context, a noncitizen's liberty interests and the Government's expense related to detention at least weigh in favor of speedier adjudications (though, speedier adjudication does not require concurrent briefing). Indeed, when EOIR previously created concurrent briefing for detained cases nearly 20 years ago, it considered but then *reversed* its proposal to implement a concurrent briefing schedule in non-detained appeals, too. *See* 67 Fed Reg. 54,895. Defendants provided no rationale for departing from this practice, or justification for changing their prior decision.

107.    Defendants' justification for concurrent appeals and limits on reply briefs is even more irrational when DHS appeals. Defendants assume, incorrectly, that DHS's notices accurately preview the arguments to be raised on appeal, and suggest that noncitizens' interests are protected

---

[23] CLINIC Comment, *supra* n.1 at 14.

if they brief all issues on the notice. 85 Fed. Reg. at 81,636. But DHS routinely reserves the right to raise additional arguments, and it does in fact develop, add, or change arguments based on a review of the transcript. Defendants do not account for this fact.

108.    Defendants suggest that EOIR's plan to institute an electronic filing system at the BIA should mitigate these various concerns. *See* 85 Fed. Reg. at 81,638. As a preliminary matter, they provide no evidence that the electronic filing system will actually be implemented in the near future. But even assuming that it is, they did not explain why they are codifying and effectuating these changes, as well as the changes to briefing extensions, before that system is operational. Defendants provided no reason for declining to consider the obvious alternative of deferring the changes until an electronic filing system is in place. Nor did Defendants confront the fact that, in many cases, an e-filing system will not improve matters. Many immigration detention centers deny detained noncitizens any access to the internet, which will eliminate the mitigating effect of any electronic filing system for *pro se*, detained noncitizens.

109.    Finally, Defendants failed to consider how these changes in the BIA's briefing procedures interact with other changes in the Rule and with BIA practice generally. For example, the Rule's provision granting the BIA new authority to affirm on any basis in the record and the Attorney General decision disallowing the BIA's reliance on IJ-level stipulations, *see supra* ¶ 88, will require appellate briefs that not only challenge the IJ's errors, but also anticipate the Government's response and disprove any other reasoning that the BIA could offer. Defendants also fail to consider the compound effect of numerous other sub-regulatory changes that Defendants made, including limiting BIA briefs and motions to 25 pages, and adopting a policy

33

that disfavors granting extensions.[24] These changes make the Rule's restrictions even more burdensome on noncitizens and Plaintiffs.

## 2.   **The Rule Eviscerates the BIA's Remand Authority**

110.    Second, in a series of revisions in the name of "finality," the Rule eviscerates the BIA's remand authority. Without advancing efficiency or finality, let alone justice, these changes preclude noncitizens from presenting new and material evidence, correcting errors in the proceedings below, and seeking relief from removal *while* their appeals remain pending. In turn, the Rule will increase the work required of Plaintiffs per case, thereby limiting the overall number of cases each organization will be able to accept and undercutting their respective missions.

### a.   **Limitation of BIA Remands for Further Factfinding and Consideration of New Evidence**

111.    Under the Rule, the BIA is prohibited from remanding to the IJ for further factfinding unless the party seeking a remand—almost always the noncitizen—meets new criteria. *See* 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(D)). Specifically, the Rule permits a remand for factfinding only if (1) the noncitizen "preserved the issue" before the IJ and "attempted to adduce the additional facts"; (2) the factfinding would "alter the outcome" of the case; *and* (3) either the IJ's factual findings were "clearly erroneous," or the IJ committed an error of law that requires additional factfinding. *Id.*

112.    The Rule likewise bars remands for the introduction of new evidence. It provides that "the [BIA] shall not receive or review new evidence submitted on appeal, shall not remand a case for consideration of new evidence received on appeal, and shall not consider a motion to

---

[24] AILA, *Practice Alert: Updates to the BIA Practice Manual, Briefing Extensions Now Disfavored* (Dec. 11, 2019), https://bit.ly/3pOEXkd.

remand based on new evidence." 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(d)(7)(v)(A)). The only exception relates to EOIR's jurisdiction, *i.e.*, evidence that an individual is a U.S. citizen or non-removable immigrant. *Id.* (new 8 C.F.R. § 1003.1(d)(7)(v)(B)).[25]

113.    Under the Rule, noncitizens will no longer be able to seek a remand to pursue relief for which they are newly eligible. This includes, for example, where parallel proceedings result in the grant of SIJS, where post-conviction relief renders a lawful permanent resident eligible for cancellation of removal, or where an asylum seeker experiences a new threat to her life.

114.    But the Rule is asymmetrical: it allows DHS to seek a remand at any time it obtains new evidence "as a result of identity, law enforcement, or security investigations or examinations." *Id.* at 81,590. Even in that instance, the Rule precludes noncitizens from filing rebuttal evidence. *See id.*; *see also id.* at 81,617. The Rule also allows that some remands go directly to DHS and not the IJ. The implication of that provision is that an applicant who purportedly has a new aggravated felony conviction will not be able to challenge that finding before an IJ without first clearing a series of hurdles imposed by DHS for individuals who are vulnerable to administrative removal orders. *See* 8 C.F.R. § 1238.1 (explaining the applicable process before DHS).

115.    These changes upend remand practice—whether on the BIA's own order in a direct appeal or in response to a motion—in a manner that is contrary to law. First, requiring a noncitizen to "preserve[ ] the issue" and "attempt[ ] to adduce the additional facts" in a removal proceeding as a prerequisite to remand is illogical because it would require the noncitizen and/or their advocate to predict the IJ's legal or factual errors *before* a decision is rendered. It is also contrary to law, because—particularly in cases involving *pro se* litigants—the IJs have a duty to develop the record.

---

[25] Likewise, the Rule prohibits the BIA from remanding a case *sua sponte* except in these same circumstances. 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(d)(7)(ii)(C)-(D)).

*See, e.g., Jacinto v. INS*, 208 F.3d 725, 733 (9th Cir. 2000). This change reassigns that burden to *pro se* noncitizens. This harm will impact FIRRP and NIJC in particular because, in the LOP context, the process of teaching self-representation will have to include instruction on the need to develop the record no matter what. But context matters; if a *pro se* litigant insists on developing the record, even on issues that DHS does not dispute, she risks irritating the IJ in a way that could impact the outcome. The process for handling this balance cannot be taught in a *pro se* workshop.

116.     Moreover, this provision undermines due process because, under the pressure of existing case completion quotas, *see supra* ¶ 66, and with virtually no risk of remand for failure to develop the record, there will be little incentive for IJs to take the steps necessary to develop the record. By eliminating the safeguard that remand provides, the Rule leaves those most dependent upon IJs to protect their right to due process without recourse to challenge their failure to do so.

117.     Second, restricting the BIA's ability to remand for further factfinding or on the basis of new evidence violates the Due Process Clause and the right to a fair hearing under 8 U.S.C. § 1229a(b). Noncitizens cannot possibly "preserve" issues or "adduce additional facts" when they do not yet exist, nor can they be expected to preserve issues that may only arise once the IJ issues a decision at the end of proceedings. The Rule violates due process by demanding a standard for remands that cannot possibly be met in most circumstances.

118.     Third, the Rule's limits on remand violate *non-refoulement* obligations, which require this country to refrain from deporting noncitizens where there is a substantial risk of persecution or torture abroad. In the context of remand for factfinding, the BIA could be adjudicating an asylum case on an obviously stale record, yet it would be barred from remanding even if a noncitizen's circumstances have changed substantially. Paradoxically, the Rule allows the BIA to rely on "administrative[ly] noticed" facts regarding, say, a civil war in the applicant's

36

home country, *see infra* Part IV.A.3.a, but it prohibits a remand to assess how these developments would impact the noncitizen. In the context of an applicant-filed motion for remand, the problem is even clearer. The basis for the protection claim may arise while an appeal is pending, yet a motion to remand is unavailable.

119.    Fourth, the limits on remand are an especially egregious violation of law in the context of noncitizens with psychiatric conditions or cognitive limitations. These individuals may require certain safeguards to ensure they have access to a full and fair hearing. *See Matter of M-A-M-*, 25 I. & N. Dec. 474 (BIA 2011). Yet, where the IJ fails to implement those safeguards or otherwise address an applicant's competency, a disability may prevent these noncitizens from eliciting the facts and arguments required to qualify for remand.

120.    The BIA cannot order a remand for further factfinding even if its own review of the record raises these concerns of competency or if appellate counsel presents new evidence of that nature. As such, the Rule conflicts with *Franco-Gonzalez v. Holder*, a case involving safeguards for mentally ill or incompetent noncitizens under the INA, the Rehabilitation Act, and the Due Process Clause. No. 10-cv-02211-DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013). The permanent injunction in that case provides that when competency concerns arise, "the [BIA] *shall* order a remand to the [IJ] with instructions to apply the procedures" for safeguards that are afforded to class members. *Id.*, Dkt. 786 at 23 (emphasis added). This Rule prohibits that action.

121.    Finally, the remand provision is contrary to law because it disallows remands for changes in law. This prohibition applies even when a federal court declares an immigration provision or decision illegal. For example, the Supreme Court has frequently opined on the definition of the term "aggravated felony" in the immigration context. *See, e.g. Moncrieffe v.*

*Holder*, 133 S. Ct. 1678 (2013). Under the Rule, an applicant can seek remand *only if* such a change vitiates removability. If it merely adds a new avenue to *relief* from removal, remand is prohibited.

122.    These changes present substantial harm to Plaintiffs. They frustrate Plaintiffs' missions of ensuring due process for immigrants and facilitating access to substantive forms of immigration relief for which noncitizens remain legally eligible.

123.    The Rule will also complicate, prolong, and require more resources for Plaintiffs' representation of existing and future clients. For example, in place of motions to remand for new evidence, the Rule directs noncitizens to file motions to reopen, which may only be filed *after* removal proceedings have concluded before the BIA, *i.e.*, when an order of removal becomes final. *See* 85 Fed. Reg. at 81,611 & n.27. The purported goal of this Rule is efficiency, but this change will delay proceedings by months or even years, and it will force Plaintiffs to litigate and the BIA to adjudicate appeals on possibly outdated facts that would not have previously been necessary with a remand. In addition, this approach ignores the significant consequences that flow from an order of removal, including a substantial risk of removal from the United States, prolonged family separation, and other attendant consequences.

124.    The resulting harms from the unavailability of motions to remand are exacerbated by Defendants' parallel efforts to limit the availability of motions to reopen and stays of removal in the Motion to Reopen NPRM. *See supra ¶* 63. Without the ability to file motions to remand, noncitizens will be forced to exhaust their sole statutory motion to reopen and potentially forgo any other legally viable basis for reopening their claim after a removal order issues. Moreover, while motions to remand are free of cost, motions to reopen will cost $895 under the EOIR Fee Rule, further inhibiting noncitizens from seeking this relief. *See infra ¶* 305.

125.    As a result of these changes in the Rule, Plaintiffs will be required to file more motions to reopen, which are subject to time and number bars, and under the EOIR Fee Rule, exorbitant fees. The new fees will also force Plaintiffs to consider assisting noncitizens with finding resources to pay the fees or filing time-consuming waivers. Because filing a motion to reopen uses an applicant's one chance to do so, this change will significantly increase the amount of time and resources Plaintiffs will require to prepare each motion and advise clients.

126.    The change is also likely to prolong Plaintiffs' representation by forcing additional circuit court appeals. For example, Plaintiff NIJC currently represents a transgender man before the BIA. This individual identified as a gender nonconforming woman when an IJ denied protection, but during the pendency of his appeal, he came out as transgender and started receiving gender affirming medical care, which NIJC submitted as evidence along with a request to remand. Under the Rule, NIJC would have had to wait until the BIA affirmed the denial of protection on the asylum case to produce this evidence in a motion to reopen. This requirement would prolong NIJC's representation of this client significantly, likely by years. And it would require NIJC to seek a stay of removal, usually within days of the BIA's decision, in order to avoid the client's deportation, which likely would require a concurrent request to the BIA and to the circuit court. Because each of these additional steps takes considerable time and resources, the Rule would have hindered NIJC from advocating for additional clients.

127.    Moreover, if noncitizens are removed while seeking a motion to reopen—a risk that is not present in seeking a motion to remand, since the appeal is still pending—Plaintiffs will also have to divert resources to cover the additional costs associated with representing clients from abroad and possibly even assisting the client's return to the United States.

128.    Plaintiff CLINIC's Motion to Reopen Project will be especially harmed by the Rule's limit on remands. The Rule will increase demand for *pro bono* representation because many would-be motions to remand will instead have to be filed as motions to reopen, requiring CLINIC to divert resources to its Motion to Reopen Project. This change, combined with the elimination of *sua sponte* authority, discussed below, will force Plaintiffs, their *pro bono* attorneys, and their affiliates to pursue more time- and labor-intensive legal arguments, such as equitable tolling. In turn, this will decrease the number of *pro bono* and affiliate partners who are able or willing to accept cases, while increasing the resources required by Plaintiffs to mentor such cases.

129.    The increased burdens on *pro se* noncitizens also translates to harm for Plaintiffs FIRRP and NIJC, as it will make their work of preparing individuals for self-representation through LOPs far more difficult and resource intensive.

130.    For several reasons, these portions of the Rule are also arbitrary and capricious. First, Defendants' justifications defy logic. Defendants admit that data supporting the Rule's alleged efficiency gains "is not available and is likely untraceable," yet Defendants do not explain why efficiency gains will occur. 85 Fed. Reg. at 81,606 & n.31. The Rule's approach to data gaps is also internally inconsistent: when convenient for their position, Defendants take commenters to task for failing to provide data; when they have no data of their own, they maintain that the changes "are not intended to turn on data." *Id.*

131.    Second, the Rule fails to provide a reasoned basis for its departure from prior practice, including longstanding agency-level precedent endorsing remand motions. *See Matter of Coelho,* 20 I. & N. Dec. at 470–71. Defendants repeatedly defend the Rule's elimination of remands for further factfinding by suggesting that remanding to the IJ would allow the BIA, "in essence, [to] be acting on behalf of a party in order to advance that party's arguments, which is

inappropriate," and would allow the BIA to "abdicat[e] its role as an impartial or neutral arbiter." 85 Fed. Reg. at 81,605. Under this illogical view, every time an appellate court corrected a trial court's error, it would reflect improper partiality. This argument disregards the well-established role of appellate bodies: to remand when further factfinding is needed. *See INS v. Ventura,* 537 U.S. 12 (2002). It is also, as discussed below, irreconcilable with Defendants' creation of a new process for IJs to appeal BIA decisions to the EOIR Director, a far greater impingement on the impartiality of EOIR adjudicators.

132.    Likewise, in the context of applicant-filed motions to remand for new evidence, Defendants repeatedly state that the elimination of that longstanding remedy would reduce alleged "gamesmanship" by noncitizens, who purportedly seek remands based on evidence that could have been filed previously. *See, e.g.*, 85 Fed. Reg. at 81,611; 81,612. Not only do Defendants provide no evidence of such gamesmanship, but they also they fail to appreciate that the existing standards governing motions to remand (which also govern motions to reopen) allow the BIA to deny motions that are not based on material or previously unavailable evidence.

133.    Defendants' justifications are especially suspect since the Rule creates a significant exception for DHS to present new evidence or seek remand for factfinding at any time based on identity, law enforcement, or security investigations, without *any* requirement that the evidence be material or previously unavailable. No explanation is provided as to why preserving that right asymmetrically does not promote alleged gamesmanship.

134.    Defendants attempt to justify the dramatic change from longstanding practice by repeatedly explaining that motions to remand are created by regulation, not statute. *See, e.g.*, 85 Fed. Reg. at 81,616. That assertion, though, is not contested and does not justify departing from

longstanding practice, nor does it excuse the lack of reasoned analysis or explanation for why Defendants would retain remands only for DHS.

135.   Defendants also failed to provide a justification for curtailing noncitizens' ability to pursue relief in the event of changes in intervening law. Rather, Defendants claim that remands for new relief based on changes in intervening law would be "irrelevant" unless that relief makes the individual no longer removable. *Id.* Defendants then conclude, without foundation, that arguments developed from the new, intervening law would have *already* been presented below in the "vast majority" of cases. *Id.* In actuality, noncitizens and/or their advocates generally would not raise arguments that are foreclosed by law at the time of the hearing.

136.   Finally, Defendants falsely claim that the Rule does not in fact harm *pro se* populations. This premise is based on Defendants' strawman conclusions (1) that *pro se* individuals have access to electronic *pro se* resources even though often they do not, particularly from detention, (2) that most BIA appeals are counseled, even though only 3% of noncitizens without lawyers seek appeal to the BIA *precisely because* of the challenges presented by appellate self-representation,[26] and (3) that the BIA Pro Bono Project exists as a backstop, 85 Fed. Reg. at 81,606, even though Defendants have effectively dismantled that program.

---

[26] David Hausman, *The Failure of Immigration Appeals*, 164 U. Pa. L. Rev. 1177, 1193 (2016) ("[O]nly 3% of immigrants without lawyers appeal."). Furthermore, Defendants misstate the data upon which they rely in support of their oft-repeated contention that 86% of individuals are represented before the BIA. *See, e.g.*, 85 Fed. Reg. at 81,606 (citing EOIR, Adjudication Statistics: Current Representation Rates, Oct. 13, 2020, https://bit.ly/3bkvw8b). The report reflects that 86% of *currently pending* appeals at the BIA have representation, but appeals that were *completed* in 2020 have a lower representation rate of 72%. In any event, that statistic is irrelevant to the fact that Defendants were purporting to rebut: that their changes will make it harder for noncitizens who were *pro se* before the IJ to find counsel for their appeal.

### b.  Limitation on Scope of Remands

137.    In the same vein, the Rule prohibits the IJ from "consider[ing] any issues outside the scope or purpose" of a limited or qualified BIA remand, unless it pertains to jurisdiction. 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(d)(7)(iii)).

138.    The Rule thus prevents the noncitizen or the IJ, on remand, from supplementing the record in the case of a change in law or circumstances in the period that a noncitizen is waiting for a new hearing, which could range anywhere from months to several years. The Rule will therefore cause the inefficiency it purportedly seeks to eliminate by requiring otherwise-unnecessary motions to reopen and subsequent proceedings, wasting far more judicial resources than the current system and requiring a significant diversion of Plaintiffs' resources.

139.    Defendants claim that current practices cause inefficiency by "encourag[ing] the re-litigation of issues," 85 Fed. Reg. at 81,615, but, in the case of new facts or intervening law, the issues would *not* have been addressed previously. Moreover, because the Rule prohibits the IJ from hearing new facts or legal arguments in the now limited instances when a case is remanded, it produces the absurd result of mandating IJs to ignore controlling law or relevant facts at the time of the hearing. This will also result in orders of removal that are based on outdated law and facts and force Plaintiffs to engage in additional court of appeals litigation to overturn such orders.

140.    The Rule also eliminates the BIA's practice of remanding a case based on the "totality of the circumstances," 85 Fed. Reg. at 81,652 (new 8 C.F.R. § 1003.1(7)(ii)(B)), a standard of review customarily employed by the BIA where it is clear that the noncitizen did not understand the proceedings, or that the IJ relied on a mistaken belief or demonstrated blatant misconduct, among other examples.

141.     A blanket prohibition on such remands will tie the hands of the BIA and force the issuance of denials and removal orders based on undeveloped records or other errors. Especially with the strict limitations imposed by this Rule on other forms of remand and reopening, there are virtually no remaining procedures available to address such miscarriages of justice.

142.     Like the other remand provisions, this aspect of the Rule is premised on flawed justifications, ignores commenters' substantial objections and proposals for more targeted changes, and fails to advance Defendants' purported objectives. Taken together, these provisions impermissibly infringe upon noncitizens' statutory and constitutional rights to a fair hearing and access to relief, frustrating Plaintiffs' purposes in serving them and requiring Plaintiffs to expend more resources on the unnecessary motions to reopen this aspect of the Rule will cause.

### 3.   The Rule Unlawfully "Enhances" the BIA's Factfinding Powers

143.     Third, the Rule delegates to the BIA new, exceedingly broad authority to make findings of fact appropriate only for the IJ in trial court.

144.     The Rule's provisions will create additional burdens for Plaintiffs and their clients, who must relitigate noncitizens' removal proceedings before an appellate body with a limited ability to review adverse evidence or to present counter evidence. These provisions violate the INA, deprive noncitizens of due process, and will force Plaintiffs to undertake more complicated and resource-intensive approaches to appellate representation on behalf of those they serve.

### a.   Expansion of BIA Factfinding Abilities

145.     The Rule allows the BIA to take "administrative notice" of any purported facts "not reasonably subject to dispute," including "[t]he contents of official documents outside the record," "facts that can be accurately and readily determined from official Government sources and whose accuracy is not disputed," and "[u]ndisputed facts contained in the record." 85 Fed. Reg. at 81,651

(new 8 C.F.R. § 1003.1(d)(3)(iv)(A)). The BIA is only required to give notice to the parties or an opportunity to respond if the noticed facts are the explicit basis for *overturning* a grant of relief or protection issued by the IJ. *Id.* (new 8 C.F.R. § 1003.1(d)(3)(iv)(B)). But the BIA need not provide any notice or opportunity to respond if the noticed facts are the basis for affirming a removal order, or if those facts merely inform the BIA's decision to reverse an IJ's decision without forming the explicit basis. *See id.*

146.    These provisions invert the INA's framework, and the Department's own regulations, which commit factfinding to the trial court. *See* 8 U.S.C. § 1229a(a)(3), (b)(1); 8 C.F.R. § 1003.1(d)(3).[27] The provisions also deprive noncitizens of the opportunity to be heard and present evidence on facts that they reasonably dispute.

147.    Official documents or facts from Government sources—which may be submitted by DHS and, under the Asylum Procedures Rule, even the IJ, *see infra* ¶ 304—may contain incorrect or disputable material. For example, the Rule explicitly contemplates that the BIA will deem State Department Reports an "official government source[]," *see* 85 Fed. Reg. at 81,602, even though they go to the heart of a matter in a fear-based case, are subject to interpretation and rebuttal, and are *not* accepted as fact. *Cf. Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000) (stating that it would be inappropriate for the BIA to "give conclusive weight to statements in [State Department] reports that not only are not incontestable, but also are not even facts"); *Yuk v. Ashcroft*, 355 F.3d 1222, 1236 n.12 (10th Cir. 2004) ("[T]he use of a State Department Report

---

[27] Even IJs lack authority to introduce evidence. The INA provides that IJs "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). It does not mention the introduction of evidence, a significant departure from this provision's predecessor, which allowed adjudicators to "present and receive evidence." 8 U.S.C. § 1252(b) (1994).

'does not substitute for an analysis of the facts of each applicant's individual circumstances.'" (quoting *Krastev v. INS*, 292 F.3d 1268, 1277 (10th Cir. 2002))). Moreover, Department of State reports have become increasingly politicized in recent years.[28] Yet, the Rule does not ensure that noncitizens will have an opportunity to show that these materials are reasonably disputed or to counter their use.

148.    The Rule also permits the BIA to consider DHS-issued documents—such as border interviews contained in Form I-213s—as "official documents," even though those materials are often unreliable and will invariably present adverse facts that the noncitizen has a right to examine and refute.[29] These "official documents" could also include criminal complaints or police reports.

149.    Indeed, the Rule provides no administrable definitions for these terms, including what constitutes an "undisputed" fact. Rather, noncitizens, to their detriment and the detriment of overall court efficiency, would be forced to pursue appeals or motions to reopen to test those limits.

150.    Even in the Rule's limited circumstances for when the parties will receive notice and an opportunity to respond to the BIA's judicially noticed facts, the BIA would not remand to the IJ. Rather, inverting appellate practice, and requiring the noncitizen to respond in writing to the BIA months or years after the IJ issued a decision, the BIA itself will determine the matter in the first instance. *See* 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(B)).

---

[28] *See, e.g.*, Asylum Research Center, *Comparative Analysis of US Department of State Country Reports on Human Rights Practices (2016-2019)* (Oct. 21, 2020), https://bit.ly/35n135K; Catholic Legal Immigration Network, Inc., *Department of State Country Report on Human Rights Practices: Honduras: Comparison Chart: 2016 and 2019* (Oct. 20, 2020), http://bit.ly/3bmcb6L.

[29] *See* Human Rights Watch, *You Don't Have Rights Here* (Oct. 16, 2014), https://bit.ly/39a3cmo (reporting CBP officers' failure to screen protection claims and recording wrong information); *see also, e.g.*, *Singh v. INS*, 292 F.3d 1017, 1021–24 (9th Cir. 2002) (discrediting the reliability of CBP airport interviews as "not sufficient standing alone" to be a reliable impeachment source).

151.    While the Rule requires the parties to respond within a period of time of not less than 14 days, *see id.*, it does not ensure that noncitizens or their counsel would *receive* notice of that opportunity. Nor does it permit a hearing or provide for the submission of rebuttal evidence. In fact, the Rule does not describe any procedures governing this newly minted process.

152.    Receiving such a notice will almost certainly prompt *pro se* noncitizens to seek help in responding from Plaintiffs or other organizations. But as with the timing for filing briefs on appeal, *see infra* IV.A.1, Plaintiffs will rarely be able to help otherwise *pro se* individuals respond to such a request. Indeed, this timeline is even worse than the truncated briefing schedule in terms of Plaintiffs' abilities to serve noncitizens—even the ones they already represent—because the Rule does not provide an opportunity to seek extensions. These provisions thus unjustifiably deprive noncitizens of notice and the opportunity to be heard, and create new burdens for Plaintiffs.

153.    Despite comments raising these issues, Defendants did not change the Rule, and their final justification is nonsensical. First, Defendants improperly characterize commenters' concerns as attempting to avoid the BIA's consideration of undisputed, adverse facts. 85 Fed. Reg. at 81,602. Not so; the commenters' concern rests in the BIA's authority to find facts at all, particularly possibly disputed ones, without notice and an opportunity to respond.

154.    Second, despite "recogniz[ing] that parties may disagree over whether a fact is truly undisputed," Defendants quickly dismiss those concerns, stating that "factual disputes are already a common feature of immigration proceedings and can be resolved under existing law." *Id.* But resolving factual disputes is not a typical aspect of appellate adjudication and under existing law, the BIA is not empowered to address these factual disputes and lacks a process to resolve them.

155.    Third, Defendants shield themselves by arguing that taking "judicial notice" of facts is permitted in federal court, *see id.*, which misstates federal court practice. Federal courts do

not generally accept factual submissions on appeal as "truth" without giving the other party notice or an opportunity to respond. Moreover, Article III courts are not positioned in the same way as the BIA, an administrative tribunal, which, even more so through this Rule, has become increasingly politicized. *See infra* Part IV.A.6.

156.    Fourth, Defendants "reject[] any allegation that official documents or government documents contain 'egregious errors' and 'coerced statements,' or are 'unreliable,'" 85 Fed. Reg. at 81,603, ignoring well-documented studies and case law to the contrary. *See supra* ¶¶ 147-48.

157.    With such a significant departure from prior practice, under which the BIA was not permitted to find facts, and in direct contravention of the INA and the Department's own regulations, Defendants were required to have provided a more detailed justification. They did not.

158.    Defendants also failed to consider the serious harm the Rule would impose, on noncitizens and their advocates, like Plaintiffs, as they try to prepare a defense to the BIA's new factfinding and prosecutorial role. Instead, Defendants claim incorrectly that the function is not prosecutorial and that parties will have an opportunity to respond, even though that opportunity is limited to when the BIA reverses on the basis of those facts. 85 Fed. Reg. at 81,604.

159.    Finally, despite issuing the Rule in the name of efficiency, Defendants disregard the fact that the noncitizen's only recourse is to appeal the BIA's (improper) factfinding to the courts of appeals or pursue otherwise unnecessary motions practice, both of which will only serve to prolong proceedings and undermine the purported efficiency justification for the Rule. This prolonged process will draw additional resources from Plaintiffs, thereby limiting their ability to handle other matters and undermining their respective missions.

### b.  Authority for BIA to Affirm on Any Basis in the Record

160.    The Rule also allows the BIA to affirm the underlying decision of the IJ on "any basis" supported by the record, including on the basis of "undisputed" facts or "facts that are not reasonably subject to dispute, such as undisputed facts in the record," 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(v)), which, as described above, will permit impermissible factfinding by the BIA and deprive the noncitizen of the opportunity to challenge those determinations in the first instance, in violation of due process and the INA.

161.    Moreover, there is potentially no limit to the "bases" upon which the BIA may affirm. The Rule even allows the BIA to affirm denials on the basis of facts unrelated to the IJ's decision, *i.e.*, facts which may have not been developed or potentially even considered by the IJ, much less rebutted by the noncitizen. The Rule therefore permits a second "adjudication" of the case on issues the parties did not address in their appeal.

162.    The problems created by the Rule are exacerbated by the Attorney General's recent decision in *Matter of A-C-A-A-*, *see supra* ¶ 88, barring reliance on IJ-level stipulations or concessions by DHS. In combination with this Rule, the BIA could find that an element that was uncontested below was nonetheless insufficiently proven, and then affirm the IJ's denial on that basis, without ever giving the noncitizen an opportunity to contest or present evidence.

163.    The Rule is also arbitrary and capricious because it fails to sufficiently explain its departure from prior practice and fails to consider important aspects of the problem.

164.    Defendants' primary defense is that federal appellate courts, too, may affirm the lower court on any basis in the record. 85 Fed. Reg. at 81,607. Again, the comparison is inapt. Even assuming the systems were comparable, federal appellate courts do not affirm where one party never had notice or the opportunity to respond to a disputed fact.

165.   The Rule also fails to consider important aspects of the problem. Defendants completely overlook comments that the Rule would invite improper factfinding on issues reasonably subject to dispute or create absurd results when applied with *Matter of A-C-A-A-*.

166.   Defendants likewise disregard legal service providers' comments that, to avoid negative consequences created by this provision, they would need to brief every issue that could *potentially* be considered, expanding briefing and requiring more time, more resources, and more requests for extensions, replies, or enlarged briefs—thus undermining the BIA's purported efficiency justifications and compounding the aforementioned barriers to representation on appeal. Side-stepping these implications, Defendants tout that an *appealing* party must address all relevant issues, 85 Fed. Reg. at 81,608, which not only misses the thrust of the provision but also reveals the extent to which Defendants ignored that noncitizens will, at least sometimes, be the appellee.

167.   Likewise, litigants may be forced to seek needless cross-appeals of an IJ decision even when they prevail, to establish that a fact is disputed or that the IJ misstated a fact. Noncitizens and their counsel, like Plaintiffs, will also be forced to file more motions to reopen BIA decisions, due to the inevitability of the BIA relying on facts or theories that neither party saw a need to discuss in their briefs. Defendants fail to account for these eventualities, too.

168.   The additional actions required by this provision will increase the burden of client representation, thereby limiting the overall number of cases each Plaintiff will be able to handle.

**4.   The Rule Upends EOIR Procedures for Voluntary Departure Requests and Background Checks**

169.   Fourth, the Rule eliminates the power to remand in two other circumstances.

**a.   Elimination of BIA Remands for Voluntary Departure**

170.   The Rule eliminates the BIA's ability to remand a case to the IJ "solely to consider a request for voluntary departure" or to provide instructions (*i.e.*, "advisals") for complying with

a grant of voluntary departure. 85 Fed. Reg. at 81,589 (new 8 C.F.R. § 1003.1(d)(7)(ii)(E)). Instead, the Rule authorizes the BIA to decide a request for voluntary departure as long as it was preserved below, regardless of which party appealed. *Id.* (new 8 C.F.R. §§ 1003.1(d)(7)(iv), 1240.26(k)(1)).

171.    When the BIA decides to grant voluntary departure, the Rule requires that bond be posted within ten days of the order if served by mail or five days if served electronically. *Id.* (new 8 C.F.R. § 1240.26(k)(4)). The BIA will also be responsible for advising the recipient of the terms of the voluntary departure order, including, presumably, that non-compliance can convert the voluntary departure grant into a removal order with all its collateral consequences. *Id.*

172.    Voluntary departure is a discretionary benefit for which the noncitizen must show, among other things, five years of "good moral character," which involves an intensive factual finding. 8 U.S.C. § 1229c(b)(1)(B). These changes not only permit the BIA to consider these factual questions in the first instance, but also allow it to do so based on an incomplete record and without providing noncitizens an opportunity to present evidence in support of their eligibility.

173.    Some forms of immigration relief, such as withholding of removal and protection under CAT, do not require a showing of "good moral character," or any discretionary assessment, and therefore may be based on records before the IJ that might not include a shred of relevant evidence. Moreover, if the IJ grants other relief and does not reach the alternative request for voluntary departure, there will not have been any facts developed in support of the request. Indeed, as discussed above, IJs have a large degree of control over what issues are heard in a hearing and a significant incentive to decide cases quickly, and therefore may not entertain testimony on an issue that they do not intend to reach, especially if they intend to grant a primary application.

174.    The only way to avoid this outcome would be to require IJs to develop the record on voluntary departure for all applicants who are *prima facie* eligible. This would force IJs to

develop a record, primarily for circumstances where DHS appeals the grant of some other relief and the BIA sustains, even though there is no need under the IJ's decision to reach the issue. This approach is both inefficient and unlikely to occur, given EOIR's backlog.

175.   Given these hurdles, the changes will force Plaintiffs to engage in burdensome and suboptimal litigation strategies. For example, Plaintiffs will frequently have to affirmatively seek voluntary departure before the IJ, even when such a request undercuts a client's primary form of relief, such as asylum. Plaintiff's will have to file evidence and insist on developing a record even when the IJ is planning to grant permanent, alternate relief, which is time intensive and would strain the relationship between Plaintiffs' representatives and the IJ.

176.   The Rule is also likely to introduce significant confusion and risk of inadvertent non-compliance. Though the Rule requires the BIA to give advisals about the consequences of failing to comply with voluntary departure, it fails to explain how it will do so meaningfully in the context of a paper-based appellate process in which the noncitizen never appears in person.

177.   "Voluntary departure is an agreed-upon exchange of benefits, much like a settlement agreement." *Dada v. Mukasey*, 554 U.S. 1, 16–17 (2008). As such, IJs "shall advise the [noncitizen]" of all the boilerplate conditions, including the conversion of the voluntary departure order into a removal order for failure to comply, as well as any additional terms "beyond those specifically enumerated" before granting voluntary departure. 8 C.F.R. § 1240.26(b)(3). Only after the conditions are "set forth" can the noncitizen accept or refuse the grant of voluntary departure. *Id.* The Rule departs from these safeguards, which by definition occur in person, at a hearing.

178.   With such important rights at stake, the five- or ten-day bond requirement provided for in the Rule is arbitrary and woefully insufficient to satisfy due process. As described by Plaintiff CLINIC, it is very unlikely that applicants would even receive the BIA order within

sufficient time to post the bond, especially factoring in mail delays.[30] Even if the BIA eventually institutes electronic filing (and then reduces the time to post bond from ten days to five), these problems will persist because many indigent noncitizens lack daily access to the internet. And circumstances will be even more challenging for detained noncitizens, who are subject to the vagaries of the detention centers' mail systems and where internet access is rare, if available at all.

179.    The burden of this insufficient notice will harm Plaintiffs. For counseled clients, without the benefit of an in-person advisal by the IJ, Plaintiffs will have to take additional time to explain the process, beyond the level of explanation required currently, and react at a moment's notice to the order received by mail—which may be received months or even years after briefing an appeal. For Plaintiffs who provide *pro se* support, like FIRRP and NIJC, a significant amount of additional time will be required to explain to *pro se* individuals the meaning of incomprehensible papers that they will receive by mail and helping individuals figure out payment.

180.    The Rule's changes present numerous other problems. Though noncitizens may wait months or years for a BIA decision, often without work authorization, they are given just days to pay a considerable sum of money. Yet, a one-week delay in collecting the funds is likely to result in the conversion of voluntary departure into a removal order. For someone who sought voluntary departure in order to pursue family reunification via consular processing from abroad, the consequence of this one-week delay will be ten years of family separation because of a statutory bar to reentry following a removal order. The Rule does not account for that disparity, nor the time and resources required to undo an erroneous decision deeming an application abandoned.

181.    The timeline for posting voluntary departure bonds also harm Plaintiffs. In many instances, to avoid losing the benefit of voluntary departure for their clients, Plaintiffs will have to

---

[30] CLINIC Comment, *supra* n.1 at 14.

urgently seek assistance from a bond fund or similar group or consider ways to pay the bond themselves. That is because many noncitizens will be unable to gather the money in the time the Rule prescribes. In addition, because there are strict requirements regarding who may post a bond (DHS requires bond to be posted by a U.S. citizen or permanent resident, and ethics rules make it questionable whether an attorney can pay for their client), Plaintiffs will have to seek out others to post the bond. This process would require Plaintiffs to expend considerable time and potential funds to respond to the challenges that this provision creates, to the detriment of other priority work and client representations they would otherwise accept.

182.    Nor does the Rule provide any opportunity to challenge lack of notice, seek additional time, or request an appropriate amendment to the terms of a voluntary departure order. With just a written advisal, BIA members will not even be able to ensure that the noncitizen can read and understand the order, which may be in a language the individual does not speak.

183.    Collectively, these obstacles will cause countless voluntary departure applications to be denied on an insufficient record or converted to removal orders for non-compliance. Yet if an applicant wanted to challenge the denial of voluntary departure for any reason, she cannot: the INA bars further appeal to a circuit court. *See* 8 U.S.C. §§ 1229c(f); 1252(a)(2)(B)(i). Requests for amendments are also impossible because filing a motion to reopen or reconsider at the BIA will result in termination of voluntary departure. 85 Fed. Reg. at 81,656 (new 8 CFR § 1240.26(k)(4)).

184.    These changes deprive applicants of proper notice and a meaningful opportunity to be heard, and fail to provide adequate procedures to ensure that those bound by the order understand how to comply, in violation of due process.

185.    The Rule is also arbitrary and capricious. Commenters raised the issues described above, yet Defendants failed to recognize or flatly ignored those comments. To the contrary,

Defendants relied on the incorrect assumption that the noncitizen would have necessarily developed the record for voluntary departure before the IJ, and that the "[t]he requirements for [voluntary departure] . . . involve determinations that the [BIA] already makes." 85 Fed. Reg. at 81,640. This statement is false: while the BIA may *review* questions relating to good moral character, there is no context in which it makes such a determination in the first instance.

186.    Defendants' slight revision to the proposed Rule—to allow the BIA to grant voluntary departure even where the request was not developed before the IJ because alternate relief was granted, *see id.* at 81,641, is insufficient as the BIA will *still* be unable to determine a noncitizen's eligibility for relief in cases where the relevant fact questions, *e.g.*, good moral character, were not at issue before the IJ.

187.    Finally, Defendants entirely disregard concerns that issuing a written notice, in English, and via mail—which requires possibly indigent individuals to post a bond within days— will lead to unjust conversions of voluntary departure grants to orders of removal. *See id.* And Defendants fail to appreciate why the existing process before the IJ cannot be replicated at the BIA, even though the Rule purports to "incorporate" the requirements of 8 C.F.R. § 1240.26(b)(3) and apply them identically to the BIA. Nowhere do Defendants acknowledge the difference between an oral advisal, with an interpreter and the ability to ask questions, and a letter received in the mail (likely in English) months or years after the individual last appeared before the IJ.

### b.  Limitation on BIA Remand for Background Checks & Deemed Abandonment

188.  Background checks (often referred to in immigration parlance as biometrics) are required for most forms of immigration relief. 8 C.F.R. § 1003.47(b). Currently, if background checks are incomplete, the general practice is to remand cases to the IJ for the checks to be verified by DHS. *Id.* § 1003.1(d)(6)(ii)(A).

189. Under the Rule, instead of remanding to the IJ, the BIA must now "hold" a noncitizen's case for up to 180 days until DHS reports the results of the background checks. 85 Fed. Reg. at 81,651-652 (new 8 C.F.R. § 1003.1(d)(6)(ii)). Respondents must await instruction from DHS to complete background checks. *Id.* If the respondent fails to respond to DHS's instructions within 90 days (or 120 days, with one 30-day extension), the application will be deemed abandoned. 85 Fed. Reg. at 81,651–652 (new 8 C.F.R. § 1003.1(d)(6)(ii)).

190. The Rule is asymmetrical. It provides no recourse if the application is wrongfully deemed abandoned. *See id.* If DHS fails to timely complete background checks, on the other hand, the case will be remanded to the IJ. *Id.*

191. These changes create a significant departure from current safeguards, which require DHS to notify the respondent *in person at an immigration court hearing* of the background check requirements and provide instructions for compliance, and for the IJ to "specify for the record when the respondent receives" this information, along with a warning about the consequences of failing to do so. 8 C.F.R. § 1003.47(d). Under the Rule, if background checks are outstanding months or even years after relief was first sought before the IJ, DHS will mail out instructions.

192. Completing background checks requires travel to a particular law enforcement agency or DHS office. It is understandable that someone—especially a non-English speaker— would be unable to navigate those processes or require more time to do so. The notice may get lost in the mail or be mailed to the wrong address, or be mailed with insufficient time for completion.

193. The Rule therefore authorizes the BIA to order removal based on noncompliance with a technical requirement of which there has been no or insufficient notice for noncitizens who have fought their case, litigated an appeal, and prevailed, all while depriving them of the ability to meaningfully contest that technicality. This is patently arbitrary.

194.  Deeming a fully adjudicated and granted application, such as asylum, abandoned in these circumstances is unnecessarily harsh and will prevent many noncitizens from receiving the relief they have already been granted, in violation of due process, the individual's right to present evidence and seek relief under the INA, and the United States' *non-refoulement* obligations.

195.  The Rule will also harm Plaintiffs by requiring that they divert resources to provide additional counseling to represented and *pro se* individuals regarding these consequences, and may require otherwise unnecessary motions practice to undo an erroneously abandoned application. Even now, in the existing system, it often requires Plaintiffs to repeatedly call DHS or even talk to them in person in court to get them to take the steps necessary to even begin the process.

196.  The Rule also heightens Plaintiffs' obligations to assist noncitizens with completing background checks or pursuing an extension, and at a moment's notice months or years into the pendency of an appeal.

197.  This process is also arbitrary and capricious because Defendants fail to justify or consider alternatives in lieu of the significant consequences imposed by the Rule, and they fail to explain the Rule's asymmetric consequences for non-compliance.

### 5.  **The Rule Eliminates Critical Procedural Mechanisms, Upending Noncitizens' Ability to Seek Relief**

198.   Fifth, compounding the effect of stripping the aforementioned remedies, the Rule eliminates other critical procedural mechanisms, including *sua sponte* reopening or reconsideration, the BIA's self-certification authority, and administrative closure. These changes significantly limit, or may preclude altogether, noncitizens' ability to correct miscarriages of justice in their proceedings or pursue forms of relief that Congress made available to them.

### a. Elimination of *Sua Sponte* Authority to Reopen

199.     The Rule prohibits both IJs and the BIA from reopening or reconsidering a case *sua sponte*—a vital mechanism for curing later-discovered injustices or seeking forms of relief for which the noncitizen becomes eligible outside the time or number limitations of a statutory motion to reopen. The only exception is to correct minor mistakes such as typographical errors. *See* 85 Fed. Reg. at 81,654 (new 8 C.F.R. § 1003.2(a)); *cf.* 8 C.F.R. §§ 1003.2(a), 1003.23(b)(1).

200.     *Sua sponte* authority allows IJs and the BIA to reopen a case due to "exceptional" circumstances, like ineffective assistance of counsel or the emergence of new facts or law rendering a noncitizen eligible for relief after an order of removal has issued. *See* 8 C.F.R. § 1003.2(a); *Mata v. Lynch*, 576 U.S. 143, 145 (2015) ("[T]he BIA's regulations provide that, separate and apart from acting on the [noncitizen's] motion, the BIA may reopen removal proceedings "on its own motion"—or, in Latin, *sua sponte*—at any time."); *Matter of Beckford*, 22 I. & N. Dec. 1216, 1219 (BIA 2000) (*en banc*) ("To warrant our taking this untimely motion *sua sponte,* the respondent needed to show the existence of an exceptional situation.") (internal citations omitted). IJs and BIA often exercise this authority after noncitizens alert them to relevant facts via motion.

201.     In place of this traditional authority, the Rule permits *sua sponte* reopening on the noncitizen's motion in just two circumstances: (a) where the individual claims U.S. citizenship, or, (b) subject to a three-member BIA decision only, where the individual's "removability is vitiated *in toto* prior to the execution of the removal order" *and* he or she exercised due diligence in pursuit of the motion. 85 Fed. Reg. at 81,591 (new 8 C.F.R. §§ 1003.2(c)(3)(v)-(vi), 1003.23(b)(4)(v)).

202.     Individuals who are newly eligible for relief based on a change of law or facts, or who are no longer removable but have already been removed, are not covered by this exception.

This means that applicants for asylum or other mandatory refugee protections whose changed personal circumstances form the basis for their claims will not be able to seek *sua sponte* reopening. The same will be true for individuals who were victims of fraud or ineffective assistance of counsel in their prior proceedings, or the mentally ill who never received a proper competency assessment.

203.    Even individuals with approved petitions from USCIS do not qualify under the Rule's limited exception to the *sua sponte* reopening bar. Take for example, the spouse of a U.S. citizen with an approved family-based petition, a woman whose VAWA petition was approved by USCIS because she demonstrated that she suffered extreme cruelty by her U.S. citizen spouse, or a child whose SIJS petition was approved because he demonstrated that he had been abandoned by his parents. These individuals would not be able seek *sua sponte* reopening to obtain the legal benefits that flow from approved applications, effectively voiding the relief that USCIS granted.

204.    In each of these scenarios, the due process rights of noncitizens to be heard on their claims to relief would be curtailed, thwarting the ability of legal service providers like Plaintiffs to seek relief that would secure noncitizens protection from persecution and harm.

205.    To add to these injuries, this element of the Rule is immediately effective regardless of posture, meaning that individuals with pending motions before an IJ or the BIA to exercise their authority to reopen *sua sponte* can be ordered removed as soon as the Rule takes effect, even if those motions have been pending for years. This change will have a substantial retroactive effect on many of thousands of people who filed motions to reopen with EOIR in 2020 alone, yet Defendants did not provide the "more detailed justification" required when changing a policy that has engendered reliance interests. *Fox Television v. FCC*, 556 U.S. 502, 515–16 (2009).

206.    These substantive changes will frustrate Plaintiffs' respective missions. For Plaintiffs that strive to protect and expand access to immigration remedies for noncitizens, this

change directly undermines their ability to do so. The result is the removal of noncitizens who qualify for congressionally authorized forms of relief, including some mandatory forms of protection. Indeed, Plaintiffs *currently represent* numerous clients who have pending *sua sponte* motions to reopen. Those motions are vulnerable to denial on January 15, 2021, and those denials will force Plaintiffs to expend time and resources counseling these clients, advising them of their legal rights, and pursuing other extraordinary remedies that may not have been necessary under current law. Plaintiffs will also be required to expend considerable resources seeking stays of their clients' removals or assisting *pro se* individuals with the same, as well as possible representation and advisal of clients in the country to which they were removed.

207.    Moreover, this sudden batch of denied motions to reopen will cause deterioration in clients' mental and emotional health, which will tax Plaintiffs' limited social services resources. In particular, the Rule will burden the social work programs of Plaintiff BDS and force all Plaintiffs to dedicate more staff time and resources to support these individuals, to the exclusion of other noncitizens they would otherwise be able to serve.

208.    Every justification proffered by Defendants in support of this drastic change is arbitrary and capricious. In the words of the National Association for Immigration Judges ("NAIJ"), "[t]his [provision] too is a solution in search of a problem."[31]

209.    First, Defendants argue that "meaningful standard[s]" do not exist to govern *sua sponte* reopening, because the standards, particularly the "exceptional circumstances" standard, have led to "inconsistent application or even abuse." 85 Fed. Reg. at 81,628, 81,630; *see also* 85 Fed. Reg. at 52,505. Yet, Defendants cite no examples. Nor do they identify any shortcomings or ambiguities in the precedential decisions that set forth the standards that Defendants acknowledges

---

[31] Public Comment of NAIJ  at 6 (Sept. 25, 2020), http://bit.ly/2JO6OBU.

currently govern *sua sponte* reopening. *See* 85 Fed. Reg. at 81,630; 85 Fed. Reg. at 52,497 (citing *Matter of J-J-*, 21 I. & N. Dec. 976, 984 (BIA 1997); *Matter of G-D-*, 22 I. & N. Dec. 1132, 1133–34 (BIA 1999); *Matter of Beckford*, 22 I. & N. Dec. at 1221)).

210.   Defendants are also incorrect that there is no clear definition for "exceptional circumstances." The standard is guided by the precedent that Defendants cited. Moreover, IJs and the BIA regularly make similar determinations. *See, e.g.*, 8 U.S.C. § 1158(a)(2)(D) ("extraordinary circumstances" exception to the one-year filing deadline in asylum); *id.* § 1229b(b)(1)(D) ("exceptional and extremely unusual hardship" standard for cancellation of removal). Defendants thus do not demonstrate that EOIR is unable to follow its own precedent relating to *sua sponte* reopening or that "exceptional circumstances" presents an unadministrable standard. And if the lack of a standard were the true problem, Defendants could have—by regulation or a precedential decision—created one. They did not, nor did they explain why they did not.

211.   Second, Defendants repeatedly aver that *sua sponte* reopenings that follow a motion to reopen are not properly considered "*sua sponte*" because they are by motion. 85 Fed. Reg. at 81,628. But that semantic quibbling does not justify the elimination of *sua sponte* authority; the authority could simply be called by a different name, an alternative Defendants did not consider.

212.   Moreover, all of the Rule's purported rationales apply (if at all) only to *sua sponte* reopening by the BIA. Defendants never explain why *IJs* should be prohibited from exercising *sua sponte* authority—yet the Rule terminates their authority, too. Defendants' purported rationales are further contradicted by their decision to allow DHS to file a potentially infinite number of motions to reopen with the BIA, at any time. 85 Fed. Reg. at 81,591. This allowance undercuts Defendants' alleged purpose of promoting finality and undermines EOIR's requirement to adjudicate cases fairly and uniformly.

213.    Nor do Defendants adequately explain why they now consider *sua sponte* authority unnecessary to cure injustices. IJs and the BIA have long held limited discretionary powers to reopen or reconsider cases *sua sponte* where it would "serve the interest of justice." *Matter of X-G-W-*, 22 I. & N. Dec. 71, 73 (BIA 1998). The Rule thus contradicts decades of BIA precedent stating that it "is a basic concept of the BIA's appellate jurisdiction that it must do complete justice for the [noncitizen] in a given case." *In re Shaar*, 21 I. & N. Dec. 541, 553 (BIA 1996) (internal quotations omitted); *see also Matter of Farinas*, 12 I. & N. Dec. 467, 471 (BIA 1967) (ordering reopening, and noting that a deportation order is not "clothed with the armor of immunity" and that the interests of justice may require reopening for "a change in facts or in the law").

214.    Defendants further conclude, without adequate explanation, that the purported negatives of *sua sponte* reopening outweigh the positives. Yet they do so without meaningfully engaging with the harms imposed, the avoidance of which is the positive in favor of *sua sponte* reopening. In particular, Defendants fail to confront the fact that EOIR will be foreclosed from undoing miscarriages of justice and that many noncitizens will have no avenue to obtain relief for which they are eligible based on circumstances that arise after an order of removal is issued. Indeed, Defendants reject the notion that the Rule would "affect any specific populations." 85 Fed. Reg. at 81,628–630. Yet, as commenters explained, the elimination of *sua sponte* reopening is particularly damaging to the most vulnerable noncitizens, including unaccompanied children and survivors of battery or extreme cruelty by their U.S. citizen spouses. Despite these examples of impacted groups, which were discussed at length by Plaintiffs and other providers in comments, Defendants flatly stated that the Rule would "not affect any specific populations." *Id.* at 81,630.

215.    Defendants further downplayed the harms that will inevitably impact vulnerable groups by pointing to the availability of "equally functional alternatives," *id.* at 81,629, but these

alternatives are completely unavailable in many cases and cannot adequately address the identified harms. For example, Defendants suggest repeatedly that noncitizens may file a joint motion to reopen with DHS. *Id.* But DHS is an adversarial party that rarely agrees to join such motions. In fact, in recent years, DHS instructed its prosecutors their discretion *against* noncitizens.[32]

216.    Defendants also offer repeatedly that an individual may seek a statutory motion to reopen, along with equitable tolling, despite acknowledging that such motions are strictly limited in time and number. Moreover, equitable tolling covers a limited category of circumstances and may not be satisfied in circumstances where the individual could not have filed the motion until long after the 90-day window.

217.    Commenters also explained that the Rule would make it impossible for IJs or the BIA to remedy inappropriate *in absentia* removal orders, yet Defendants insist that existing statutory exceptions adequately cover these individuals. *See id.* at 81,630. This is not so. The existing statutory exceptions only apply (a) where there is lack of notice regarding the initiation or time or place of proceedings or (b) where exceptional circumstances exist and only if filed within 180 days of the date of the removal order. 8 U.S.C. § 1229a(b)(5)(C). These exceptions do not cover many other circumstances where an *in absentia* order may result. For example, a neglected child may have no knowledge that a removal order was issued against her years prior if she appeared *pro se* or was abandoned by the parent who appeared with her.

218.    Nor are the Rule's narrow exceptions for permitting a *sua sponte* motion to reopen, *see supra* ¶ 200, adequate as an alternative, since they exclude individuals who have already been removed or who are eligible for *relief* from removal. Moreover, because this exception requires

---

[32] American Immigration Council, *The End of Immigration Enforcement Priorities Under the Trump Administration* (Mar. 2018), http://bit.ly/3hUtgWJ (describing expanded enforcement priorities so broad the term becomes "meaningless").

individuals to prove "due diligence," the same showing required in seeking a statutory motion to reopen, the additional protection provided by this provision is extraordinarily limited.

219.    Thus, while these "equally functional alternatives" may preserve remedies for a few individuals, many noncitizens would be foreclosed from relief altogether.

220.    These are particularly bad alternatives when considering that the Rule also severely restricts the BIA's authority to remand pending cases and prohibits IJs and the BIA from administratively closing cases while a respondent is petitioning for concurrent relief for USCIS. Defendants fail to meaningfully consider the compound effect of these measures, which in many cases will serve to eviscerate a noncitizen's ability to seek relief designed by Congress and result in avoidable orders of removal and, perhaps, permanent family separation.

### b.   Elimination of BIA Self-Certification Authority

221.    In addition, the Rule eliminates the BIA's self-certification authority, a remedy the BIA can use to cure untimely appeals or other filing defects based on extraordinary circumstances, such as delays caused by the U.S. Postal Service. *See* 8 C.F.R. § 1003.1(c).

222.    This change will make it more difficult and at times impossible to access the appellate process. As a result, many noncitizens—especially those who are detained or *pro se*— will be denied the opportunity to appeal adverse decisions. Others will need to use their single motion to reopen to challenge technical defects and unavoidable delays outside their control.

223.    The elimination of the BIA's self-certification authority harms Plaintiffs by restricting the pool of noncitizens Plaintiffs are able to represent on appeal or by causing Plaintiffs to divert significantly more resources to filing, or to assisting *pro se* individual in filing, statutory motions to reopen to correct these minor technicalities.

224.     Defendants' rationalization for eliminating the BIA's ability to cure minor defects of this kind does not justify the wholesale elimination of that authority.

225.     Specifically, as with *sua sponte* reopening, Defendants claim that such authority lacks clear standards, despite the longstanding limitation to "exceptional circumstances," and assert without evidence that the authority has been applied inconsistently or abusively. 85 Fed. Reg. at 81,596. As commenters showed, this is incorrect; in fact, the authority is "uncommonly used" and "allows the BIA to correct injustices" like mail delays outside the parties' control.[33]

226.     But even if Defendants had substantiated their purported concern, it would not justify their refusal to consider obvious alternatives, like issuing a clearer standard. Defendants reject this suggestion by commenters, allegedly because BIA members have "disregard[ed]" the standard, and because there is "no effective check on its usage." 85 Fed. Reg. at 81,596. As with *sua sponte* reopening, none of these justifications is supported with evidence. Even so, it defies logic to burden noncitizens and their counsel to solve a problem of the BIA's own making.

227.     Moreover, commenters explained that the Rule would disproportionally impact *pro se* individuals, who are least likely to be able to comply with appellate procedures. In response, Defendants merely repeated the same assertions that it did throughout, including that most noncitizens are represented on appeal and that the BIA Pro Bono Project is an effective backstop. *See* 85 Fed. Reg. at 81,596–97. As discussed above, *see supra* ¶ 136, these excuses for burdening *pro se* litigants are both false and flawed.

228.     Defendants also fail to consider the Rule's impact on detained noncitizens. Indeed, there are many factors beyond the control of noncitizens in detention that might prevent them from

---

[33] *See, e.g.*, Public Comment of AILA at 13 (Sept. 25, 2020), http://bit.ly/3pNe14r (hereinafter "AILA Comment").

timely filing a notice of appeal, such as mail processing delays, lockdowns due to illness, or the inability to access the commissary to purchase stamps. Without self-certification of appeals, and particularly in combination with the elimination of the BIA's *sua sponte* authority, there might not be any available remedy for these situations.

229.   As with *sua sponte* authority, Defendants' justifications for the changes made in the Rule are inadequate, fail to address a myriad of problems the Rule would create, and suggest that Defendants' true purpose was to foreclose even meritorious applications for relief.

### c.  Elimination of Administrative Closure

230.   As explained above, IJs and the BIA have used administrative closure for decades to defer cases while respondents await USCIS decisions on applications that are likely to provide relief from removal. *See supra* Part I.C.2. The Rule amends the regulations at 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) to prohibit IJs or the BIA from exercising this authority.

231.   The elimination of administrative closure—especially in combination with the elimination of motions to remand for new evidence and EOIR's *sua sponte* reopening authority— makes it impossible for many noncitizens to pursue various forms of relief that Congress made available by statute, depriving them of an opportunity to be heard on such remedies.

232.   The outright prohibition on administrative closure is also arbitrary and capricious. Defendants purportedly base the elimination of administrative closure on a belief that administrative closure (1) decreases the efficiency of the immigration courts, (2) conflicts with the immigration courts' duty to resolve cases in a timely fashion, (3) is not authorized by, or even conflicts with, existing regulations, and (4) infringes on DHS's prosecutorial discretion. 85 Fed. Reg. at 81,598–99. None of these rationales justifies Defendants' action. These concerns largely echoed the decision in *Matter of Castro-Tum*, 27 I. & N. Dec. 271, which interpreted the existing

regulations as forbidding administrative closure—but that decision has now been rejected twice by courts of appeals. *See Meza Morales*, 973 F.3d at 664–67; *Romero*, 937 F.3d at 287–97.

233. First, as numerous commenters, the BIA, NAIJ, EOIR consultants, and multiple federal courts have explained, administrative closure *improves* efficiency and facilitates timely resolution of cases.

234. The BIA has itself explained that administrative closure facilitates "efficient[] management of the resources" of the immigration courts by allowing IJs and the BIA to manage their dockets. *Matter of Avetisyan*, 25 I. & N. Dec. at 694. It is typically employed in cases where the respondent is seeking relief in another forum that would moot or otherwise dispositively affect the proceedings before EOIR. In such cases, "in which two coordinate offices in the executive branch are simultaneously adjudicating collateral applications, closing one proceeding might help advance a case toward resolution." *Meza Morales*, 973 F.3d at 665.

235. Far from advancing the "efficient and timely administration of immigration proceedings," eliminating administrative closure "would in fact serve to lengthen and delay many of these proceedings by: (1) depriving IJs and the BIA of flexible docketing measures sometimes required for adjudication of an immigration proceeding, as illustrated by *Avetisyan*, and (2) leading to the reopening of over 330,000 cases upon the motion of either party, straining the burden on immigration courts." *Romero*, 937 F.3d at 297.

236. This efficiency has long been clear to IJs themselves. As the NAIJ has explained, administrative closure benefits "[e]fficient and fair management of a docket" because it "allows for cases to be held in abeyance, without unnecessary use of court time and resources, when

preliminary matters need to be completed for the case to become ripe for further adjudication."[34] It thereby "permits the [IJ] to attend to and resolve cases that are ready for resolution and allows [IJs] to complete more cases."[35] As a result, IJs are typically able to render decision within four months of recalendaring an administratively closed case.[36] Even the independent study by Booz Allen Hamilton, which EOIR commissioned, recommended working with DHS "to administratively close cases awaiting adjudication in other agencies or courts" as a way to improve EOIR's processes.[37]

237.    In the face of this evidence, Defendants cite an increase in cases pending before the immigration courts after *Matter of Avetisyan* in 2012 to imply that administrative closure was the cause. 85 Fed. Reg. at 81,599. As multiple commenters pointed out, this assertion is fatally flawed, as it makes no attempt to control for the numerous other factors increasing the immigration court backlog during that time—including the historic rise in asylum seekers arriving at the border, a years-long EOIR hiring freeze that reduced the number of IJs, and changes in DHS's enforcement practices during that time.[38]

238.    Defendants' next rationale, that administrative closure is inconsistent with existing regulations, was incorrect, as both the Fourth Circuit and Seventh Circuit have concluded. *See Romero*, 937 F.3d at 292 ("[T]he authority of IJs and the BIA to administratively close cases is conferred by the plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii)."); *accord Meza*

---

[34] NAIJ, *Letter to Attorney General Sessions, Re: Administrative Closure of Removal Cases* (Jan. 30, 2018), https://bit.ly/398PYX6.

[35] *Id.*

[36] TRAC Administrative Closure Report, *supra* n.14.

[37] Booz Allen Hamilton Report*, supra* n.1, at 26.

[38] *See, e.g.*, Reichlin-Melnick Comment, *supra* n.5, at 7–8.

*Morales*, 973 F.3d at 665. The Rule claimed that administrative closure conflicts with the regulatory requirement that IJs and the BIA resolve cases in a "timely" manner, but did not address the fact that, as then-Judge Barrett explained, "some cases are more complex and simply take longer to resolve," *Meza Morales*, 973 F.3d at 665. Tabling cases that are not ripe for adjudication can facilitate resolution of other cases—a strategic consideration undercut by the Rule and unacknowledged by Defendants.

239.    Similarly, the Rule claimed that the general authorization of administrative closure would render superfluous other regulatory provisions that specify situations in which administrative closure is appropriate. 85 Fed. Reg. at 81,599. Here again, Defendants did not consider the explicit rejection of this argument by the Seventh Circuit, which explained that these provisions "*mandate* administrative closure in specific circumstances with 'shall' language," as distinct from the discretionary availability of administrative closure in other circumstances. *Meza Morales*, 973 F.3d at 666 (emphasis added).

240.    Nor was EOIR correct that IJs' and the BIA's authority to manage their own docket conflicts with the EOIR Director's, BIA Chairman's, and Chief Immigration Judge's authority to "[d]irect that the adjudication of certain cases be deferred." 8 C.F.R. §§ 1003.0(b)(1)(ii), 1003.1(a)(2)(i)(C), 1003.9(b)(3). The fact that those supervising officials have the authority to order deferrals in cases whose result they cannot otherwise direct, *see* 8 C.F.R. §§ 1003.0(c), 1003.1(a)(2)(ii), 1003.9(c), says nothing about the authority of the adjudicators hearing those cases, who are tasked with "exercis[ing] their independent judgment and discretion and … tak[ing] any action … that is appropriate and necessary for the disposition of such cases," 8 C.F.R. § 1003.10(b); *accord* 8 C.F.R. § 1003.1(d)(1)(ii).

241.   Defendants' remaining rationale, that administrative closure interferes with prosecutorial discretion, is equally baseless. As the Rule repeatedly acknowledges, administrative closure does not terminate proceedings; it defers their resolution until they are ripe for adjudication.

242.   The Rule also incorrectly dismissed or failed to consider several crucial negative consequences of eliminating administrative closure. First, the Rule failed to consider fairness to noncitizens in removal proceedings who are likely to obtain relief from removal through proceedings outside of EOIR. To the contrary, it explicitly rejected such considerations as "of little relevance to the rule." 85 Fed. Reg. at 81,648. But fairness to litigants is an essential component of any judicial system, making it an "important aspect of the problem" that the Rule needed to address. *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983); *see also Meza Morales*, 973 F.3d at 665 ("[C]ases must be disposed of fairly, and granting a noncitizen the opportunity to pursue relief to which she is entitled may be appropriate and necessary for a fair disposition."). Because prohibiting administrative closure is likely to result in some noncitizens being removed, even though they would have been able to obtain relief, the risk of unfairness and injustice is high, yet Defendants discounted this important consideration altogether.

243.   This change harms noncitizens seeking many forms of immigration relief, including SIJS; visas for victims of crimes, trafficking, or spousal abuse; family-based petitions; temporary protected status for individuals from designated disaster-stricken countries; post-conviction relief; Deferred Action for Childhood Arrivals status; or access to relief or procedural protections due to mental incompetency, among others.

244.   Defendants also fail to meaningfully engage with the reliance interests affected by this change. Countless individuals currently in proceedings before EOIR are pursuing relief before USCIS or state courts while their proceedings are administratively closed, or on the understanding

that they will be able to request that the IJ consider administratively closing their case so that they can complete that parallel process. On day one of the Rule, either EOIR or DHS can move to re-calendar all cases that are currently administratively closed, and individuals in the Fourth and Seventh Circuit, including Plaintiffs NIJC and HIAS, can no longer pursue administrative closure despite recent judicial decisions sanctioning the use of this procedural device. Defendants dismiss or ignore these interests with little explanation. *See, e.g.*, 85 Fed. Reg. at 81,645 (finding concerns about reliance interests with respect to administrative closure "misplaced"); *see also id.* at 81,601 (same). Indeed, Defendants absurdly suggest that noncitizens and their counsel can still *seek* administrative closure, *id.*, even though such requests would be frivolous in many cases.

245.    The harm extends to Plaintiffs by expanding their workload in numerous ways. First, every case that is currently administratively closed is vulnerable to being calendared as soon as January 15, 2021. If this happens, Plaintiffs workload will expand dramatically in a short amount of time on duplicative proceedings.

246.    Specifically, Plaintiffs must expend resources to simultaneously represent clients in their removal proceedings *and* before USCIS. Plaintiffs will need to repeatedly seek continuances before EOIR and prepare to argue every issue in the case in the event that the continuance is denied—a likely scenario given Defendants' recent OPPMs restricting the IJs' authority to grant continuances and Defendants' recently-promulgated NPRM on the same.[39]

247.    The need for parallel-track representation before EOIR and USCIS will also hinder Plaintiffs' ability to place cases with *pro bono* or affiliate partners, who tend to limit their representation to one form of relief. While harming noncitizens' access to counsel, this limitation will also require Plaintiffs to divert resources and hire more staff for direct representation and, for

---

[39] *See supra* n.9.

those cases they are unable to absorb in-house, *pro se* support. Even in cases that Plaintiffs do place with *pro bono* attorneys or affiliates, mentoring resources will grow considerably.

248.    Finally, the elimination of administrative closure will completely prevent Plaintiffs from seeking an important substantive benefit on behalf of noncitizens with approved family-based petitions: a hardship waiver of unlawful presence required to return to the United States after obtaining the approved visa from the U.S. consulate abroad. 8 U.S.C. § 1182(a)(9)(B)(v). As EOIR acknowledged, noncitizens in removal proceedings can obtain this waiver only if their removal proceedings are administratively closed. *See* 8 C.F.R. § 212.7(e)(4)(iii). Eliminating administrative closure makes it impossible for many noncitizens to apply for the waiver. Defendants justify their approach by asserting that individuals could take voluntary departure and then seek a provisional waiver before DHS. 85 Fed. Reg. at 81,644. In effect, EOIR has tried to pass the buck to DHS. But Defendants' assertion is contradicted by DHS regulations, *see* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 Fed. Reg. 50,243, 50,256 (July 29, 2016) ("[I]ndividuals granted voluntary departure will not be eligible for provisional waivers."), and, in any event, an agency regulates against the background of existing law, and must consider the effect of the changes it is making.

249.    Defendants' elimination of administrative closure, despite these consequences, is therefore contrary to law, in violation of the APA. Defendants' refusal to consider whether this harm (together with the other negative consequences of the Rule) outweighed the supposed benefits of the Rule was therefore arbitrary and capricious.

250.    These barriers to obtaining relief—much of it statutorily authorized—are even more significant when considering the interaction between the elimination of administrative closure and the other changes in the Rule. Restricting motions to reopen, motions to remand, and the BIA's

authority to act *sua sponte* makes it more difficult and often impossible to alter an order of removal or other IJ decision when a noncitizen subsequently obtains relief from USCIS or another agency. The Rule did not consider this combined effect.

251.    EOIR sought to downplay any harm by noting that *Castro-Tum* has been enjoined only in the Fourth and Seventh Circuits. 85 Fed. Reg. at 81,600. But even assuming that *Castro-Tum* would be upheld in the nine Circuits where it has not been addressed, the Fourth and Seventh Circuits govern the immigration courts in Arlington, Baltimore, Charlotte, and Chicago, where DHS files as many as 51,000 cases per year.[40]

252.    While EOIR seeks to minimize the unfairness of the Rule by suggesting that IJs can simply issue repeated continuances instead, the Rule fails to consider the burden of such a process. By requiring regular court appearances and motions for continuances, the Rule imposes a substantial burden on noncitizens and their representatives, like Plaintiffs. Plaintiffs, noncitizens, DHS, and the IJs all must prepare for those appearances and substantiate or evaluate the showing required for a continuance anew each time. The Rule's reliance on continuances is especially disingenuous give that on January 8, 2021, Defendant McHenry issued a memo restricting access to continuances.[41] Since EOIR's restrictions on continuances are increasingly severe, Plaintiffs and noncitizens now must be prepared to address all issues when a continuance is denied.

253.    As the BIA noted in *Avetisyan*, this process can even delay the ultimate relief that the noncitizen will receive, forcing them to live in continued uncertainty and prolonging the drain on the courts' and DHS's resources. *See Avetisyan*, 25 I. & N. Dec. at 689–90 (explaining that the

---

[40] *See* EOIR, *Statistics Yearbook—Fiscal Year 2018* at Table 2, https://bit.ly/38pLRqw.

[41] *See supra* n.9

continuances required DHS to transfer the file back and forth between DHS's visa petition unit and litigating counsel, leading to six continuances while the visa petition was pending).

**6. The Rule Implements Measures that Further Politicize EOIR and Undermine Timely, Neutral Decisionmaking**

254. Sixth, and finally, the Rule unlawfully effectuates several changes to EOIR processes that will further politicize EOIR and cause wrongful denials of immigration relief, while harming efficiency and finality.

**a. IJ Certification of BIA Decisions**

255. The Rule establishes a so-called "quality assurance certification process" that permits "an [IJ] to certify BIA decisions" that reverse the IJ's prior decision "for further review by the Director in situations in which the [IJ] alleges that the BIA made an error." 85 Fed. Reg. at 81,590. The Rule permits the Director, a non-judicial executive charged with the day-to-day management of EOIR,[42] to then decide the legal dispute between the IJ and the BIA, including "the authority to issue a precedent decision." 85 Fed. Reg. at 81,653. This provision contravenes existing regulations as well as Defendants' supposed interest in efficiency and finality.

256. By permitting the Director to either dismiss certifications and return a case to the IJ or to remand to the BIA, the Rule calls upon the Director to adjudicate cases arising under the INA. This process harms Plaintiffs by prolonging appeals and obligating them to spend time and staff resources contesting or at least participating in the EOIR Director's process, without making it clear how to do so and thus making it impossible for Plaintiffs to allocate resources accordingly.

257. Absent specific delegation of authority from the Attorney General, the EOIR Director is prohibited from adjudicating cases. 8 C.F.R. § 1003.0(c). This new "quality assurance

---

[42] *See* 8 C.F.R. § 1003.0(b); *see also supra* Part III.

certification process" created by the Rule establishes a substantive process of reviewing and reversing BIA decisions, *see* 85 Fed. Reg. at 81,590, and thus falls squarely within section 1003.0(c)'s prohibition on Directorial adjudication without delegation by the Attorney General.

258.    On information and belief, no prior delegation from the Attorney General—and certainly not those cited in the Rule—confers on the Director the authority to adjudicate cases.

259.    The Rule asserts that "[r]eviewing certified cases falls within the 'such other authorities' provided to the Director by the Attorney General," contained in 8 C.F.R. § 1003.0(b)(1)(ix), and also points to 8 C.F.R. § 1003.1(e)(8)(ii). 85 Fed. Reg. at 81,626. Neither provision delegates to the Director the authority to review BIA decisions in this manner.

260.    In particular, 8 C.F.R. § 1003.0(b)(1)(ix) provides that the Director may "[e]xercise such other authorities as the Attorney General may provide." This general statement merely leaves open the possibility that the Attorney General will delegate additional powers to the Director. It does not itself delegate any authority, let alone the authority that the Rule attempts to grant to the Director. *See* 85 Fed. Reg. at 81,590. Moreover, the recognition that the Attorney General *could* delegate other authorities in no way overrides section 1003.0(c)'s explicit prohibition on the Director adjudicating immigration cases.

261.    Nor does the Rule itself constitute a delegation, because it was signed by the Director of EOIR rather than the Attorney General. 85 Fed. Reg. at 81,656; *see* 8 C.F.R. § 1003.0(c) (limiting the authority of the Director to adjudicate cases "[e]xcept as provided by statute, regulation, or delegation of authority from the Attorney General").

262.    The other authority Defendants cite, 8 C.F.R. § 1003.1(e)(8)(ii), similarly fails to authorize the Director to adjudicate cases, as the Rule contemplates. That delegation merely allows the Chairman of the BIA to refer cases to the Director for a decision if none has been rendered

"within the established time limits," *id.*, in order to "ensure that adjudications are conducted in a timely manner." 84 Fed. Reg. at 44,539. This exception to the general prohibition on the Director's ability to adjudicate cases is narrow and confined to cases referred by the Chairman that have remained pending for longer than is permitted by regulation. *Id.*

263.    The new "quality assurance certification process" is not limited to such cases, however, and is therefore not authorized by 8 C.F.R. 1003.1(e)(8)(ii).

264.    Because no existing delegation authorizes the Director to review of BIA decisionmaking as the "quality assurance certification process" requires, it conflicts with 8 C.F.R. § 1003.0(c)'s prohibition on the Director engaging in such adjudication and was promulgated in excess of the Director's authority and in a manner contrary to law. 5 U.S.C. § 706(2).

265.    The "quality assurance certification process" is also arbitrary and capricious. First, Defendants incorrectly claim that the Rule "do[es] not create a higher secondary appellate review body." 85 Fed. Reg. at 81,625. That is exactly what it does: it grants the Director power to reverse BIA decisions and "issue a precedent decision" or "remand the case back to the BIA for further proceedings." *Id.* Defendants do not explain how this process could be anything other than a new form of appellate review, and instead simply insist that they have not done what they in fact did.

266.    Second, the certification process is in direct conflict with the goals of finality and timely adjudication that the EOIR espouses throughout the Rule. The certification process lacks any timetable for the Director's decision. The risk of significant delay when a case is certified is especially high given that the Rule simultaneously assigns to the Director (with few exceptions) every case that has been pending for more than 335 days from the notice of appeal—a group that would include most if not the vast majority of non-detained case in the past four years. 85 Fed.

Reg. at 81,653. Despite the plain tension between the certification process and EOIR's stated goals,[43] the Rule did not evaluate the certification process's effect on timeliness and finality at all.

267.   Third, Defendants assert that IJs cannot "simply certify cases with which they disagree" and that "merely disagreeing . . . is not a basis for certification." *Id.* at 81,626. But the plain text of the change allows IJs to certify based on, among other things, their belief that "the BIA decision is clearly contrary to a provision of the INA, any other immigration law or statute, any applicable regulation, or a published, binding decision," that "the BIA decision is vague, ambiguous, internally inconsistent, or otherwise did not resolve the basis for the appeal," or that "a material factor pertinent to the issue(s) before the [IJ] was clearly not considered." *Id.* at 81,625.

268.   The Rule asserts that these are "narrow situations … tailored to quality control," *id.*, but this statement is conclusory *ipse dixit* rather than a reasoned explanation. In order to make even this conclusory statement, the Rule must ignore most of the grounds on which it authorizes certification, and mischaracterize others. For example, in response to the concern that "an [IJ] could solely object to a particular legal interpretation and still certify the case," the Rule states only that this would not justify certification under the "vagueness" criteria—ignoring that it is permitted by the provision allowing certification where an IJ believes the BIA decision is contrary to law, regulation, or published decision. *Id.* at 81,626.

269.   Defendants provide no mechanism to ensure that IJs will not abuse this process and instead speculate "that these procedures will be employed infrequently" because of IJs' busy docket. *See id.* But, in baldly asserting this conclusion, Defendants fail to acknowledge that having cases remanded negatively reflects on the IJ's job performance, which creates an incentive to certify remanded cases in hopes of reducing their remand rate. *See supra* ¶ 66.

---

[43] *See* CLINIC Comment, *supra* n.1, at 23.

270.    Fourth, Defendants arbitrarily refused to allow the parties to file objections or responses to IJ certifications. Defendants contend that such an opportunity is not required because "the case was likely already briefed to the [BIA] prior to the certification to the Director." *Id.* at 81,627. This conclusion fails to recognize that new issues or arguments might be presented in the certification to which the parties may wish to respond, just as parties routinely submit briefs to an appellate body despite having discussed many of the same issues before the lower court. It also fails to account for the possibility that the certification may omit an important procedural or substantive fact, relying instead on the Director (or his "support staff," *id.* at 81,626) to scour the entire record of a case to ensure that he is aware of all material facts. Tellingly, the Rule fails to identify *any* situations anywhere in U.S. law where a ruling can routinely be referred for review by a higher adjudicator without an opportunity for the parties to provide response and context.

271.    Defendants also claimed that providing an opportunity for the parties to submit briefs opposing the certification would "plac[e] an additional burden on the parties." *Id.* at 81,627. This conclusion fails to consider the reasonable alternative of allowing optional response briefs, rather than mandatory ones. This process would allow parties to stand on their arguments to the Board if they so choose, mitigating any supposed burden.

272.    Fifth, Defendants erroneously compared the new certification process to the existing authority of IJs to certify their decisions to the BIA. *Id.*; *see* 8 C.F.R. § 1003.7. However, this existing process is simply a means for IJs to refer a decision to the ordinary appellate body for review, much like district judges can certify a case for interlocutory appeal. *See* 28 U.S.C. § 1292(b). This process bears no resemblance to the Rule's novel creation whereby a judge whose decision has been reversed can ask a non-judicial arbiter to intervene. 85 Fed. Reg. at 81,590.

273.    Sixth, Defendants fail to grapple with the ethical issues raised by converting IJs into advocates seeking to overturn BIA decisions in the cases they are adjudicating. Defendants seek to minimize the IJ's role in the certification process as merely "flagging an issue and relaying it to the Director for examination," but fail to harmonize that characterization with the requirement that the IJ, in making the certification, "specify the regulatory basis for the certification and summarize the underlying procedural, factual, or legal basis . . . necessary to relay the [IJ]'s determination of error by the BIA." *Id.* at 81,627 (quotation marks omitted).

274.    Moreover, the ability for an IJ to attempt to overturn a ruling in favor of one the parties before it places the IJ in the position of advocating against one of the litigants before it. As former IJs explained in their comment, "[i]t is wholly inappropriate for a trial judge to have the authority to appeal from an appellate tribunal's decision which reverses her/him. . . . [IJs] are neutral arbitrators, not parties in the cases they hear."[44]

275.    Nor did the Rule consider the relevance of the performance metrics established for IJs in October 2018, under which they must maintain a low remand rate or risk discipline, reassignment, or termination.[45] This creates a significant incentive for IJs to certify cases.

276.    Defendants' rejection of these concerns is also irreconcilable with their insistence elsewhere in the Rule that the BIA should be prohibited from remanding for factfinding because it would interfere with the BIA's "role as an impartial or neutral arbiter." 85 Fed. Reg. at 81,605; *see supra* ¶ 131. If the unremarkable judicial function of requiring further factfinding is improperly partial, an IJ petitioning the Director to overrule an opinion in a case before her—a case that could

---

[44] Public Comment of Round Table of Immigration Judges at 10–11, http://bit.ly/3oFfRE8.

[45] *See supra* n.16, EOIR Performance Plan.

affect her continued employment—cannot possibly be defended as "impartial or neutral." Defendants nowhere explain this internal inconsistency.

277.     This arbitrary and capricious certification process will harm Plaintiffs who must divert resources to engaging with it. Though the Rule prohibits formal briefing in the certification process, Plaintiffs will be compelled to file briefs anyway, in order to preserve issues for federal court review, or risk having to make time-consuming and potentially dispositive arguments at the federal courts regarding exhaustion of remedies.

**b.   Referral of Pending BIA Appeals to the EOIR Director.**

278.     The Rule, with limited exceptions, "instructs the [BIA] Chairman to refer appeals pending beyond 335 days to the Director for adjudication," even if that appeal is days away from a determination or is particularly complex. 85 Fed. Reg. at 81,591.

279.     This provision conflicts with the INA, which provides that removal orders shall be final *only* upon the expiration of a noncitizen's right to appeal the order or "a determination *by the Board of Immigration Appeals* affirming such order." 8 U.S.C. § 1101(a)(47)(B) (emphasis added). Under the Rule, timely appealed removal orders would become final without affirmance by the BIA, but by the Director in the BIA's place, despite the INA's unambiguous requirement.

280.     Additionally, as with the IJ certification process, this provision conflicts with the prohibition on the Director adjudicating immigration cases, absent a specific delegation of authority from the Attorney General. *See* 8 C.F.R. § 1003.0(c).

281.     The Rule purports to find this delegated authority through 8 C.F.R. § 1003.1(e)(8) on the theory that this section, which grants the Director "authority . . . to adjudicate BIA cases that have otherwise not been timely adjudicated," constitutes "such other authorit[y]" within the meaning of section 1003.0(b)(1)(ix). *See* 85 Fed. Reg. at 81,621.

282.    Section 1003.1(e)(8), however, provides authority for the Director to adjudicate cases on far narrower grounds than those provided for in the Rule. Under that section, the Director is permitted to adjudicate cases only when an appeal has been pending before the BIA for more than 90 or 180 days (depending on whether the case is before a single BIA judge or a three-judge panel) from the "completion of the record on appeal." 8 C.F.R. § 1003.1(e)(8)(i). Even then, the Director may only adjudicate the case if the Chair of the BIA elects to refer the case to the Director instead of referring it to itself or to the Vice Chair. *See id.* § 1003.1(e)(8)(ii).

283.    The Rule purports to provide the Director authority to adjudicate cases that exceed the Attorney General's delegation in section 1003.1(e)(8). As noted, section 1003.1(e)(8) authorizes the Director only to adjudicate cases that have been pending 90 or 180 days *from the time the record is completed—i.e.*, after the transcript and record are submitted to the BIA and "any briefs, motions, or other submissions" have been filed. 8 C.F.R. § 1003.1(e)(8)(i). The Attorney General was explicit in memorializing this authority that it was "limited to only a narrow subset of EOIR cases." 85 Fed. Reg. at 69,475; *see ¶* 262. The Rule conflicts with that provision and exceeds the explicit limits of that delegation, granting the Director authority to adjudicate any case more than 335 days *from the filing of the notice of appeal. See* 85 Fed. Reg. at 81,622 (335-day period includes "time for transcription, briefing, and adherence to the exiting [sic] 90- or 180-day time frames for decision"). Through the Rule, EOIR grants itself authority that violates the delegation from the Attorney General and is therefore contrary to law.

284.    In so doing, EOIR has assigned itself authority in a large number of cases. As discussed above, Defendants often do not produce the briefing schedule in non-detained cases for months or even years after a notice of appeal is filed. *See supra* ¶ 47. In such cases, the Rule would

shift adjudication from the BIA to the Director even in situations where the BIA never issued a briefing schedule, or where the BIA had fewer than 90 or 180 days to consider briefs.

285.    More generally, the median time from a notice of appeal to a BIA decision is approximately 323 days and, as a result of COVID-19-related delays, it has become increasingly common for appeals to remain pending for 335 days or longer. *See* 85 Fed. Reg. at 81,619 (acknowledging the "323-day median case appeal time period"). In fact, a 2015 report shows that appeals of removal decisions averaged around 500 days.[46] The Director has thus not only given himself adjudicatory authority that the Attorney General has not granted, but has also taken it away from the BIA in the vast majority of non-detained cases.

286.    This provision is also arbitrary and capricious. Beyond the flawed legal basis for the Director's authority, Defendants responded to comments with erroneous arguments, failed to adequately explain various aspects of the change, failed to consider important aspects of the problem, and overlooked important reliance interests impacted by the change.

287.    Far from reducing the time to decision, referral to the EOIR Director will likely *lengthen* it. When the EOIR Director receives a case, he (or his support staff, as discussed below) will need to begin review of the case from scratch—even if the BIA has been working on the case for weeks or months. Nor does the Rule suggest any reason to believe that the EOIR Director and his staff will be able to adjudicate cases more quickly than BIA members, whose sole responsibility is to adjudicate cases. Tellingly, the Rule places no time limits on the EOIR Director's consideration of a case. It is thus entirely implausible to assume that adjudication by the EOIR Director will be any swifter than BIA adjudication, and the Rule provides no justification for this

---

[46] Government Accountability Office (GAO), *Immigration Courts, Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges* at 33, Fig. 7, (June 2017), https://bit.ly/2Xsp7Qi.

assumption. This change, in turn, will harm Plaintiffs because it will lengthen the amount of time it takes them to resolve cases while heightening the amount of unpredictability in outcomes.

288.   To quell concerns about the potentially large volume of cases that will be mandatorily referred to the Director under this change, Defendants further incorrectly state that the Director will decide "few, if any" appeals under the new Rule. 85 Fed. Reg. at 81,619. But as discussed, Defendants acknowledge that the median case appeal takes 323 days, 85 Fed. Reg. at 52,508 n.39, meaning the Director could potentially decide thousands of appeals each year.

289.   Even if Defendants' speculative prediction proves true and the Director does not actually handle many appeals under this new referral authority, that only undercuts Defendants' rationale for expanding the Director's referral authority in the first place. If the change will result in few referrals, then, by Defendants' own logic, it will also do little if anything to address backlogs.

290.   Defendants also attempt to rebut concerns that many appeals, especially complex ones, will take longer than 335 days and so will be referred to the Director by suggesting that, "for such cases that are atypical" or where "it would be appropriate for the BIA to devote additional time to completing adjudication," the BIA can take extra time without triggering the referral obligation. *Id.* at 81,622 (citing 8 C.F.R. § 1003.1(e)(8)(ii)). That assertion is misguided. Section 1003.1(e)(8)(ii) permits the BIA to extend the amount of time it has to render a decision only once the record has been completed, only for exigent circumstances as determined by the BIA Chairman, and only for 60 days. Moreover, as noted, the 335-day clock runs from the time the appeal is *filed*, not from the time the record has been completed. *See* 85 Fed. Reg. at 81,653. The Rule identifies no general authority that would permit the BIA to stop the 335-day clock where delays occur during the completion of the record.

291.    The Rule does identify certain reasons for delay that are exempt from the 335-day referral requirement, such as cases administratively closed pursuant to settlement or on "hold" for background checks, *see id.* at 81,622, but fails to discuss why these exceptions were established and not others. It further fails to discuss whether these exceptions reach a significant number of cases, such as by describing what portion of the BIA caseload will be affected by these exceptions.

292.    Defendants likewise fail to consider the costs that adjudication by a non-BIA member will create. Indeed, the Director, with no formal training or expertise in adjudicating appeals, and who need not even be an attorney (as BIA members must, *see* 8 C.F.R. § 1003.1(a)(1)), may issue erroneous decisions on some of the most complicated issues pending before the BIA.

293.    The Rule also fails to address how the Director will deal with the volume of cases that will be mandatorily referred, except to say that the Director will rely on qualified staff. *See* 85 Fed. Reg. at 81,621. That is no answer, however, because, as the Rule acknowledges, the Director is also responsible for "ensuring the [BIA] itself has sufficient staff," *id.* The Rule fails to explain why the caseload concerns that purportedly animate the Rule would not be better addressed by the addition of staff at the BIA, as opposed to the imposition of a new referral authority that will direct cases to the Director, where the same backlog concerns will become an issue.

294.    Finally, Defendants failed to take seriously the concerns expressed by commenters that the referral to the Director will deepen the politicization of the various immigration agencies and cast doubt on the BIA's impartiality. Instead of grappling with this concern, Defendants dismiss it out of hand as nothing more than "ad hominem dislike, crude suppositions, and unfounded, tendentious accusations of bias." 85 Fed. Reg. at 81,621.

295.    Defendants' aspersions are misplaced. Defendants assume the worst of Plaintiffs and similar commenters, inferring from their plea for fair process that they secretly want a system

set up to guarantee success for their clients. That is hardly the case. Plaintiffs are organizations that seek fairness in the immigration process, and each is sufficiently sophisticated to know that fairness is not necessarily outcome determinative. Yet these changes place case adjudications squarely in the hands of a policymaker. Such a system is fundamentally contrary to the neutral judicial process that Defendants purport to uphold and Plaintiffs seek to defend.

### c.  Mandatory Timelines & Other Changes for Adjudication of BIA Appeals

296.    In addition, the Rule imposes mandatory internal deadlines for adjudicating BIA appeals. Among other things, it requires initial screening for summary dismissals to be completed within 14 days of filing and a decision to be issued within 30 days, and a single BIA member to determine within 14 days whether to adjudicate the case in a single-member decision or assign it to a three-member panel, reserved for more complex review. *See* 85 Fed. Reg. at 81,652–53 (new 8 C.F.R. § 1003.1(e)(8)(i)). A single BIA member can affirm the IJ in a two-sentence boilerplate opinion (known as an "affirmance without opinion" or "AWO")—a practice that Defendants recently expanded despite widespread criticism—which is ordinarily not issued in a three-member decision.[47] The Rule also eliminates the requirement for IJs to review the transcript of an oral decision to correct mis-transcribed language or other errors before it is sent to the parties, which is currently required to be completed with 14 days of receipt. *Id.* at 81,638 (new 8 C.F.R. § 1003.5).

297.    These changes prioritize speed at the expense of due process, in violation of the APA. Imposing arbitrary adjudication timelines pressures screeners to review cases quickly rather than thoroughly, causing erroneous summary dismissals and AWOs. This is especially true since the BIA is already incentivized to adjudicate cases quickly in light of the 90- and 180-day

---

[47] *See* 8 C.F.R. §§ 1003.1(e)(4)-(6); Affirmance Without Opinion, Referral for Panel Review, and Publication of Decisions as Precedents, 84 Fed. Reg. 31,463 (July 2, 2019).

adjudication requirements and other case management procedures, and therefore would more likely suggest that a case may be summarily dismissed or decided by a single BIA member. This process will ultimately lead to more federal court appeals and remands back to the BIA.

298. Rather than respond to comments on this provision, Defendants deflect allegations that BIA members will be unable to properly adjudicate cases on this timeline by again mischaracterizing the commenters' concerns as attacks on the BIA members' competency and integrity. 85 Fed. Reg. at 81,617. Defendants also claimed that there was no meaningful difference between requiring screeners to adjudicate cases "promptly," which the previous regulations required, and a fixed, 14- or 30-day deadline. *Id.* Finally, Defendants dismissed comments that the recently issued case management procedures, which already established the Rule's timelines, failed to result in improved efficiency. *Id.* None of these justifications survive scrutiny or adequately respond to commenters' objections.

299. In addition, the elimination of the IJ transcript review is counterproductive. EOIR contractor Booz Allen Hamilton reported that the issuance of oral decisions—which are often inaccurate or contain gaps in law or reason—actually *contributes* to inefficiencies in adjudicating cases, rather than alleviating them, because it prevents the parties and the BIA from deliberating on the issues of the case. [48] Conspicuously absent from the Rule is any mention of this countervailing data, which is also supported by the comments; in fact, Defendants stated that removing the transcript review process "will not affect the quality of transcriptions" at all. 85 Fed. Reg. at 81,639. Nor did Defendants explain why limiting the 14-day review process would reduce inefficiencies in lieu of more effective alternatives, such as hiring more transcribers to produce transcripts in a timely manner after the IJ's review.

---

[48] *See* Booz Allen Hamilton Report, *supra* n.1, at 18, 25.

300.     Similarly, Defendants outright dismissed concerns that litigation at the courts of appeals would increase on the basis of inaccurate or defective transcripts—which is especially true since the BIA can now affirm the IJ on any basis in the record, even if that basis is erroneous, *see supra* ¶ 161—harming noncitizens and their advocates, like Plaintiffs.

### B. Defendants Failed to Consider the Effect of Contemporaneously-Issued Rules and Failed to Provide the Public an Opportunity to Comment on the Effect of Subsequently-Proposed Rules.

301.     Defendants' rulemaking process also violates the APA because Defendants failed to consider the cumulative impact of closely related final and proposed rules and deprived the public of a meaningful opportunity to submit informed comments.

302.     Defendants, either independently or along with DHS, issued six immigration rules and two NPRMs for future rulemaking in the second half of December 2020 alone. All of the final Rules are scheduled to take effect in January 2021, yet EOIR did not consider the compound impact of *any* of these rules. Specifically:

303.     Defendants' and DHS's joint Omnibus Asylum Rule will radically alter the substance and procedure of asylum adjudications. *See* 85 Fed. Reg. 80, 274. Because the Omnibus Asylum Rule gives IJs more authority to summarily deny asylum claims, EOIR can expect more appeals to the BIA, where asylum seekers will now face heightened barriers in seeking representation and correcting errors. In addition, the Omnibus Asylum Rule curtails the discretion of the IJ or the BIA to consider motions to reopen even based on changed country conditions, yet the Rule at issue in this case repeatedly rests on the availability of such motions to justify limiting other procedural remedies like *sua sponte* reopening and motions to remand. *See, e.g.*, 85 Fed. Reg. at 81,629; 81,632; 81,634. Defendants did not consider the interactions between these rules.

304.     Likewise, the Asylum Procedures Rule imposes a strict 15-day timeline for filing an asylum application for those in asylum-only and withholding-only proceedings, which will include every asylum seeker who has gone through the credible fear process, making it more difficult to apply for asylum, withholding of removal, and protection under CAT. *See* 85 Fed. Reg. 82,698. Because individuals denied asylum under that Rule are to have their cases "returned to DHS," it is unclear what appellate rights they will have at all. For those who can appeal, the Asylum Procedures Rule will generate more appeals. For others, the availability of *sua sponte* reopening by an IJ will become all the more critical to prevent miscarriages of justice. The Asylum Procedures Rule also allows, for example, IJs to submit evidence in proceedings, which has profound implications for "undisputed" facts the BIA may now "administratively notice" under the instant Rule. Yet, Defendants did not consider the interactions between these rules.

305.     Next, the EOIR Fee Rule increases the fee from $110 to $975 for BIA appeals, and from $110 to $895 for BIA motions to reopen or reconsider. *See* 85 Fed. Reg. 82,750. Defendants acknowledge the EOIR Fee Rule but refuse to consider its implications because it could be enjoined. *See* 85 Fed. Reg. at 81,594. Thus, Defendants did not meaningfully consider the deterrence effect of the EOIR Fee Rule before overhauling the EOIR system in the name of "efficiency," nor the burden of seeking fee waivers or other sources of funding for appeals while also meeting an expedited timeframe for briefing. Nor did Defendants consider the harm in eliminating the BIA's self-certification and *sua sponte* reopening authority, which are often used to accept appeals and motions that are rejected after denial of a fee waiver.

306.     The two other final rules issued in December 2020 also impact the substantive issues in this case. Specifically, the Transit Ban Rule, 85 Fed. Reg. 82,260, bars individuals from seeking asylum if they transited through another country and did not seek and receive a denial of

protection in that country, and the Security Bar Rule, 85 Fed. Reg. 84,160, bars access to the United States, the asylum process, and the immigration courts in the purported name of national security and public health, but is so sweeping in nature that anyone who traveled through a country where COVID-19 is prevalent or manifests minor symptoms could be barred from immigration relief, *id.* at 84,196. Both of these rules are likely to be declared substantively illegal.[49] Yet, even if those rules are vacated, individuals will not be able to seek remand of a pending appeal at the BIA to address the change in law, due to changes made by the Rule at issue here.

307.    Defendants' failure to consider the implications of these rules—though they were issued "by the same agency, at the same time, on overlapping topics"—reflects arbitrary and capricious rulemaking. *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *14 (N.D. Cal. Sept. 29, 2020) (preliminarily enjoining DHS-issued rule under APA in part because DHS "fail[ed] to consider the combined impact" of another DHS-issued rule); *see also Casa de Maryland, Inc. v. Wolf*, 2020 WL 5500165, at *26 (D. Md. Sept. 11, 2020) (preliminarily enjoining DHS-issued rule under APA in part because DHS staggered rulemaking, precluding the public from considering the cumulative impact of the rules).

308.    Separately, Defendants' rulemaking also violates the APA because Defendants published two other NPRMs *after* the comment period on the Rule at issue here closed but before

---

[49] As to the Transit Ban, Judge Timothy Kelly of this District vacated the interim final rule that preceded that rule because it violates the APA, *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 57 (D.D.C. 2020) (on appeal), and the Ninth Circuit has also signaled its view that the same interim final rule violates the INA and the APA. *See East Bay Sanctuary Covenant v. Barr*, 964 F. 3d 832 (9th Cir. 2020). As to the Security Bar Rule, a D.C. District Court has recently concluded that COVID-19 cannot be the basis for expedient deportation of children. *See P.J.E.S. v. Wolf*, No. 20-cv-2245 (EGS), 2020 WL 6770508 (D.D.C. Nov. 18, 2020). Though *P.J.E.S.* does not directly involve the Security Bar Rule, the decision signals a judicial rejection of its underlying approach and reasoning.

its effective date, which deprived the public of the opportunity to comment on the significant cumulative effects of the subsequently-proposed rules.

309.     Specifically, weeks before Defendants published the final Rule, Defendants issued notices of proposed rulemaking on two closely related, if not inextricably connected, matters.[50]

310.     Defendants' Motion to Reopen NPRM significantly heightens the standards and burdens of proof for adjudicating statutory motions to reopen, including claims regarding ineffective assistance of counsel. *See* 85 Fed. Reg. 75,942. Though the Rule at issue here justifies the elimination of various procedural mechanisms by pointing to the availability of statutory motions to reopen,[51] Defendants prevented the public from commenting on the impact of the Motion to Reopen NPRM's proposed restrictions and did not address that impact themselves. For example, the Motion to Reopen NPRM prohibits IJs from receiving evidence outside the scope of relief for which reopening was granted, *see id.* at 75,953, which compounds the harms caused by the instant Rule in eviscerating the IJ's ability to consider new evidence. The Motion to Reopen NPRM also proposes significant hurdles to obtaining a stay of removal and consequences to departing the United States, which will exacerbate the harm caused by many of the changes in this Rule, such as authorization of BIA-issued removal orders and the requirement that respondents await a final order of removal before seeking remand or reopening in many cases.

---

[50] DHS, too, issued a proposed rule affecting individuals impacted by the instant Rule during this period. *See* Employment Authorization for Certain Classes of Aliens With Final Orders of Removal, 85 Fed. Reg. 74,196 (eliminating work authorization for individuals with final orders).

[51] *See, e.g.*, 85 Fed. Reg. at 81,616 (in eliminating BIA's ability to remand for new evidence, noting that "[b]ecause the sole statutorily created process to consider new evidence is still available, the Department finds that [noncitizens]' due process rights regarding the submission of new evidence remain intact"); *id.* at 81,611 (stating that, in lieu of motions to remand for new facts or law, noncitizens should "simply rely on the established motion to reopen procedure"); *id.* at 81,615 (relying on the availability of motions to reopen in limiting scope of remands to the IJ); *id.* at 81,628-630; 81,633 (same, in eliminating *sua sponte* motions to reopen); *id.* at 81,639 (same, with respect to changes to the BIA's voluntary departure authority).

311.    Defendants' other proposed rule, the Continuance NPRM, further restricts continuances before the immigration court. *See* 85 Fed. Reg. 75,925. It therefore makes seeking parallel relief before EOIR and USCIS or state courts even more difficult, adding to the erosion of procedural protections at issue in this Rule. The Rule at issue in this case also relies on the existence of continuances to justify the elimination of remedies like administrative closure and *sua sponte* reopening. *See, e.g.*, 85 Fed. Reg. at 81,647. But Defendants deprived commenters of the ability to discuss the interplay of these two rules, and did not consider it themselves.

312.    Similarly, Defendants' notice of proposed rulemaking for the Asylum Procedures Rule was issued only two days before the comment period for this Rule ended, after the vast majority of comments were submitted, depriving the public of the opportunity to meaningfully comment on the rules' interrelated effect.

313.    The public was also precluded from submitting comments based on other changes to the EOIR system, such as the Attorney General's decision in *Matter of A-C-A-A-*, 28 I. & N. Dec. 84, which was issued about 24 hours before the Rule's comment period closed and fundamentally intersects with the instant Rule. *See infra* ¶ 332.

314.    This piecemeal, staggered rulemaking hides the full scope of the expected harm of each rule on the EOIR system, allowing Defendants to disregard "'inconvenient facts' about the combined impact of these rules." *Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *14 (quoting *Fox Television*, 556 U.S. at 537).

315.    Rather, by information and belief, Defendants rushed the promulgation of these interrelated rules without due deliberation in order to codify changes to EOIR before a transition of presidential power. The Rule is therefore arbitrary and capricious because it was promulgated "without observance of procedure required by law," in violation of 5 U.S.C. § 706(2)(D).

### C.  Defendants Failed to Comply With the Certification Requirements Under the Regulatory Flexibility Act.

316.    The Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.*, requires federal agencies to conduct a "regulatory flexibility analysis" analyzing how rules they promulgate will affect "small entities," and to publish final versions of that analysis. 5 U.S.C. § 604.

317.    Plaintiffs other than NIJC qualify as "small entities" under the RFA because each is a "not-for-profit enterprise which is independently owned and operated and is not dominant in its field." 5 U.S.C. § 601(4).

318.    An agency can forgo a regulatory flexibility analysis "if the head of the agency certifies that the rule will not . . . have a significant economic impact on a substantial number of small entities" and publishes that certification, "along with a statement providing the factual basis for such certification," in the Federal Register when it publishes the final Rule. 5 U.S.C. § 605(b).

319.    Defendants did not conduct a regulatory flexibility analysis of the Rule. Rather, "the Department," not the head of agency, issued an uncertified statement that the Rule "will not have a significant economic impact on a substantial number of small entities." 85 Fed. Reg. at 81,650. Defendants likewise did not publish "a statement providing the factual basis" for the Department's claim that the Rule does not significantly impact small entities. *See id.*

320.    Instead, Defendants assert, only in response to one commenter, that the Rule has no adverse impact on small entities because the Rule "does not limit the fees [practitioners] may charge, or the number of cases a representative may ethically accept under the rules of professional responsibility." 85 Fed. Reg. at 81,645. It adds, "[t]he rule will not economically impact representatives of aliens in immigration proceedings." *Id.* at 81,646. Defendants' response does not meaningfully address the significant, adverse impacts the Rule will have on the number of

cases that small entities are able to handle, their ability to secure ongoing funding, and other consequences—points that the not-for-profit Plaintiffs and others made in their comments.

321.     Defendants also claim that portions of the Rule apply only to individuals and not entities, such that there can be no adverse impact to small entities. *See* 85 Fed. Reg. at 81,646. This conclusion misses the impacts that Plaintiffs face both directly and through their representation of their clients. "Congress took steps to ensure that pro bono legal services of the type that the Organizations provide are available to asylum seekers." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 768 (9th Cir. 2018) (citing 8 U.S.C. § 1158(d)(4)(A)-(B)); *see also* 8 U.S.C. § 1229(a)(1)(E), (b)(1)-(2). This disregards the point that Plaintiffs and similar organizations will be hindered in their efforts to provide this congressionally contemplated *pro bono* service. Moreover, courts recognize that "small entities" can be a party affected by or otherwise regulated by a Rule by virtue of their contractual relationships to their clients. *See Aeronautical Repair Station Ass'n, Inc. v. F.A.A.*, 494 F.3d 161, 176-77 (D.C. Cir. 2007) (distinguishing the two Circuit decisions cited by Defendants in the Rule).

322.     Defendants, therefore, failed to comply with the certification requirements under § 605(b) of the RFA, and the Defendants' claims that the Rule does not significantly impact small entities were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Northwest Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 16 (D.D.C. 1998) (remanding Rule to the agency due to violation of § 605(b)).

**V.     The Rule Must Be Vacated Because It Was Issued Without a Sufficient Notice and Comment Period or a Reasoned Explanation for Providing a Shortened Comment Period.**

323.    Because the Rule is a legislative rule that has the force and effect of law, Defendants were required to follow the requirements of the APA for notice-and-comment rulemaking in issuing it. *See* 5 U.S.C. § 553(b).

324.    As several courts have noted, 60 or "90 days is the 'usual' amount of time allotted for a comment period." *Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1176 (N.D. Cal. 2019) (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011)); *accord Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) ("[A] thirty-day period is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests a sixty-day period as 'a more reasonable *minimum* time for comment.'" (footnotes omitted)); *Pangea Legal Servs. v. DHS*, No. 20-cv-7721, 2020 WL 6802474, at \*20 (N.D. Cal. Nov. 19, 2020) (enjoining immigration rule for, *inter alia*, providing a 30-day comment period).

325.    The executive branch similarly recognizes that a comment period should normally be 60 days or longer. Executive Order 13563 directs that "[t]o the extent feasible and permitted by law, each agency *shall* afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." Exec. Order 13563, "Improving Regulation and Regulatory Review," § 2(b) (Jan. 18, 2011) (emphasis added); *see also* Exec. Order 12866, "Regulatory Planning and Review," § 6(a) (Sept. 30, 1993) ("[I]n most cases [rulemaking] should include a comment period of not less than 60 days."). Indeed, other substantial immigration regulations had a 60-day comment period. *See* NPRM: Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,144 (Oct. 10, 2018).

326. Defendants acknowledged that the Rule is a "significant regulatory action" whose issuance must be "consistent with the principles of Executive Orders 12866 and 13563." 85 Fed. Reg. at 81,643. Accordingly, a 60- or even 90-day comment period would have been an appropriate minimum here. Instead, Defendants provided a mere 30 days for comments on the proposed Rule.

327. Courts have recognized that a 30-day comment period for a complex immigration-related rule is particularly inadequate where it is part of a "staggered" rulemaking process "in which [DOJ and DHS] published this NPRM and several other related proposed rules." *Pangea Legal Servs.*, 2020 WL 6802474, at *22. This is precisely the case here. *See supra* Part IV.B.

328. In addition, Defendants issued the Rule in the midst of a global pandemic that has upended the lives of millions and killed hundreds of thousands. Other agencies have acknowledged the difficulties posed by COVID-19 and provided significant extensions of comment periods.[52]

329. There is no permissible reason to rush through this overhaul of the immigration court and appellate system without allowing a standard-length comment period.

330. In violation of the APA, however, Defendants offer no reasoned explanation for providing a shortened comment period. Defendants neither suggest that a 60-day comment period was infeasible, nor that some urgency necessitated the shortened comment period. Indeed, Defendants do not even provide an explanation for why they think a 30-day comment period was *preferable* to a standard 60-day (or longer) comment period.

331. In lieu of an affirmative, reasoned explanation for their decision to depart from the default minimum comment period length established in Executive Order 13563, Defendants focus

---

[52] *See, e.g.*, Bureau of Consumer Financial Protection, Debt Collection Practices (Regulation F); Extension of Comment Period, 85 Fed. Reg. 30,890 (May 21, 2020) (agreeing that "the pandemic makes it difficult to respond to the SNPRM thoroughly" and providing an additional 90 days to comment on a proposal "in light of the challenges posed by the COVID-19 pandemic").

on rebutting commenters' numerous requests for an extension. None of these rebuttal arguments supplies a valid basis for Defendants' hurried approach.

332.    For example, Defendants assert that "commenters did not suggest or indicate what additional issues the comment period precluded them from addressing." 85 Fed. Reg. at 81,642. This is patently false. Multiple commenters identified issues that they would have addressed given more time, such as the interaction between this Rule and the Asylum Procedures Rules, which was issued just two days before the close of this Rule's comment period; the effect of *Matter of A-C-A-A-*, 28 I. & N. Dec. 84, which was issued just 24 hours before the close of the comment period; and the implications of domestic and international law.[53]

333.    Defendants also point to rulemaking from 2002, where a 30-day comment period was provided for a rule amending certain BIA procedures. *See* 85 Fed. Reg. at 81,642 & n.72 (citing Board of Immigration Appeals: Procedural Reform to Improve Case Management, 67 Fed. Reg. 54,878 (Aug. 26, 2002)). Setting aside whether a single example of rulemaking from nearly twenty years ago—and which predated implementation of the E-Government Act of 2002 and the surge in newly-permitted electronic comments that followed—has any relevance to the one that produced the Rule, or whether that outweighs the many other more recent examples in which commenters were given substantially more time, Defendants must defend their decisionmaking on its own terms and in the staggered rulemaking, global pandemic context in which the Rule was promulgated. They make no effort to do so.

334.    Finally, in response to commenters' concerns that the COVID-19 pandemic made commenting more difficult by, for example, disrupting workplaces, increasing childcare duties,

---

[53] *See* AILA Comment, *supra* n.33, at 2-3; Reichlin-Melnick Comment, *supra* n.5, at 2-4; Public Comment of Center for Gender and Refugee Studies at 4 (Sept. 25, 2020), http://bit.ly/3s6c2tW.

and making it harder to communicate with clients who might have relevant information, Defendants offered a nonresponse. They asserted that allowing a 60-day comment period in light of COVID-19, "would effectively preclude rulemaking by the Department for the duration of the COVID-19 outbreak" because "individual personal circumstances" that make commenting a challenge are present for "every rulemaking." 85 Fed. Reg. at 81,643. That is a *non sequitur*. Giving parties more time is not the same thing as saying that rulemaking must cease during that period. Beyond that, conflating circumstances unique to a global pandemic with a typical rulemaking period is the epitome of an agency "entirely fail[ing] to consider an important aspect of the problem," and "offer[ing] an explanation for its decision that runs counter to the evidence before" it. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

## VI.   The Rule Irreparably Harms Plaintiffs by Frustrating their Respective Missions, Jeopardizing Funding, and Forcing them to Divert Resources, as Well as by Harming Their Existing Clients.

335.   Plaintiffs CLINIC, BDS, FIRRP, HIAS, and NIJC are nonprofit organizations that provide legal services to immigrant communities. Absent declaratory and injunctive relief, the Rule will cause Plaintiffs severe, irreparable harm. The Rule will jeopardize ongoing programs and existing and future relationships, force Plaintiffs to divert resources, and put their funding at risk. By impeding noncitizens' access to counsel and eroding due process protections in immigration proceedings, the Rule frustrates Plaintiffs' respective missions to protect against these harms. And by denying their clients the protections of the INA and fair proceedings consistent with due process, the Rule harms third parties with whom Plaintiffs have a close relationship.

336.   Plaintiffs' missions are, at their core, to help immigrants seeking safety and security in the United States, to vindicate their legal rights, and to pursue relief for which they are eligible.

In addition to the myriad harms to Plaintiffs described above, the Rule presents a number of global harms to Plaintiffs' respective missions.

337.    ***Impeding Orderly Case Management.*** First, the Rule makes immigration representation more uncertain, costly, time- and labor-intensive, and complex, all while restricting or eliminating the legal and administrative tools Plaintiffs have historically employed to facilitate orderly litigation, manage their workloads, and seek relief on behalf of noncitizens.

338.    ***Reduced Capacity.*** Second, the Rule will force Plaintiffs to substantially decrease the range and amount of services they provide. The Rule will increase the time and expense associated with each case, requiring Plaintiffs to accept fewer cases. The Rule will also require Plaintiffs to file more appeals, preserve more issues for appeal, and simultaneously litigate both removal defense cases and alternate avenues for relief where previously the latter would have been sufficient. Each of these developments will reduce Plaintiffs' capacity to help as many noncitizens as they have in the past.

339.    The Rule will increase Plaintiffs' obligation in other ways as well. For example, Plaintiffs will likely be required to meet with and advise clients with pending appeals on a more regular basis to ensure that clients receive background check notices and attend their appointments, as the Rule now considers applications abandoned if such appointments are not completed within 90 days. And in the absence of administrative closure, Plaintiffs will need to seek repeated continuances and prepare to argue the case on the merits if a continuance is denied.

340.    The Rule will also dramatically undermine Plaintiffs' *pro bono* programming and, in the case of CLINIC, the strength of its affiliate network. As mentioned above, the Rule dramatically complicates *pro bono* representation by condensing timelines at the BIA, requiring concurrent representation before the BIA and IJ, and eliminating many of the procedural

mechanisms that *pro bono* attorneys use to serve their clients. This will reduce the pool of suitable *pro bono* counsel and require Plaintiffs to expend more resources to find counsel.

341.    ***New Training Obligations.*** Third, the Rule will require Plaintiffs to retrain staff, *pro bono* partners, and volunteers on representation before the BIA and to develop new training and programmatic materials. For example, the Rule will force CLINIC to revise or rewrite numerous written materials and publications, including its 500-page guide to immigration representation authored with AILA, numerous practice advisories, and its trial skills training materials. CLINIC will also be forced to re-record recently finished webinars. Relatedly, FIRRP is a leader among providers of legal services to detained noncitizens, and it develops materials that are used by *pro se* litigants around the country. Like CLINIC, FIRRP will have to re-do many of these materials.

342.    Plaintiffs will likewise be required to develop new practice advisories for noncitizens in light of the Rule, such as the new constraints on appellate representation and changes to noncitizens' remedies they are able to seek in removal proceedings.

343.    Plaintiffs, such as NIJC, that have both public education and policy advocacy programs will have to re-educate stakeholders on the substantive changes to EOIR procedures and their consequences. In doing so, Plaintiffs have and will continue to expend resources on training and informational materials.

344.    ***Jeopardized Funding.*** Fourth, the reduced case capacity caused by the Rule is likely to put Plaintiffs' funding at risk. Plaintiffs receive funding from a variety of sources, including private foundations, governmental funds (federal, state, and local), and private donors. In some instances, the metrics that determine funding are tied to the number of clients the

organization serves. Plaintiffs anticipate that, because the Rule will decrease the number of clients they can serve, their funding will similarly decrease.

345.    In particular, Plaintiff CLINIC operates on a membership model, and CLINIC anticipates that this Rule will cause a decrease in affiliate membership due to the complexity it introduces into immigration representation. As the number of affiliates declines, so too will the membership fees that enable CLINIC to provide removal defense training programs, practice advisories, and other written training materials.

346.    Plaintiff NIJC runs a robust federal court litigation practice, which includes many appeals from the BIA. For many of NIJC's appeals, it begins representation at the BIA to properly preserve issues. When NIJC takes on new cases at the court of appeals level, the cases will be more time-consuming and complicated because each appeal will require considering issues presented by the Rule's injustices. As a result, NIJC will be less able to accept appeals from the BIA and correspondingly less able to receive funding associated with this work.

347.    ***Increased Demand on Funding.*** Fifth, just as the Rule jeopardizes Plaintiffs' funding, the need for that funding will increase. Plaintiffs anticipate needing to hire new staff to accommodate for the additional demands required in each case, and pay for new training materials. Additionally, because the Rule creates so many timing pitfalls (*e.g.*, in the appellate process and in the voluntary departure context), Plaintiffs are likely to absorb more costs for clients than would have been necessary before.

348.    ***Overburdened Pro Se Programming.*** Sixth, as a result of this reduced capacity and the greater difficulty of recruiting *pro bono* attorneys, the Rule will force Plaintiffs to expand or develop *pro se* programs and redesign existing ones. This change will require them to divert resources to programs from other important programs. Plaintiffs will be required to develop

intricate and robust materials explaining the timelines and limitations under the Rule, along with its impact with the many other restrictions and pitfalls created by DOJ's and DHS's recent flurry of regulations. Plaintiffs will also have to spend more staff time with these individuals to help them understand procedures at the BIA.

349.   ***Frustration of Mission.*** Finally, and perhaps most fundamentally, the Rule upends access to a fair and just removal process with every provision it enacts. The Rule eliminates critical procedural devices that are currently used to correct fundamental miscarriages of justice, allow individuals to receive relief from deportation for which they qualify, and to avoid dramatic consequences like deportation to death or torture.

350.   While taking away many of the devices designed to ensure fairness in the system and used by Plaintiffs to that end, the Rule creates new injustices for the noncitizens Plaintiffs serve. As described at length above, many of the Rule's changes deny noncitizens a fair opportunity to present evidence, create systemic biases against obtaining relief, destroy adjudicators' ability to manage their proceedings and avoid miscarriages of justice, and deprive noncitizens of a neutral adjudicator. These changes are likely to result in more denials of relief for represented individuals and *pro se* respondents alike.

<u>**CLAIMS FOR RELIEF**</u>

**COUNT ONE**
**(Violation of the APA, 5 U.S.C.§ 706(2)(A) – Contrary to Law)**

351.   Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

352.   The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(a)(A).

353.   The Rule is not in accordance with the INA. Among other things, it:

    a.   **Violates 8 U.S.C. §§ 1229a(b)(4)(A) and 1362 and 8 U.S.C. §§ 1229(a)(1), (b)(2), 1443(h).** The first group of provisions afford noncitizens the right to counsel of their choosing, as long as it is not at the Government's expense. By reducing the timetable for briefing at the BIA, the Rule, all but eliminates the right to counsel before the BIA. Likewise, the elimination of administrative closure will cause many immigration practitioners to refuse to accept cases where they will have to pursue relief simultaneously before EOIR and USCIS. The second set of provisions, along with numerous other portions of the INA, contemplate the role of *pro bono* service providers like Plaintiffs in ensuring access to counsel for noncitizens.

    b.   **Violates 8 U.S.C. § 1229a(b)(4)(B).** Under that provision, noncitizens have a right to a "reasonable opportunity to examine evidence" against them and to present evidence of their own. The Rule violates this provision by eliminating critical devices that exist for noncitizens to present evidence: motions to remand and *sua sponte* reopening; by vesting in the BIA the authority to adjudicate voluntary departure claims, which require factfinding; and by allowing IJs to challenge a BIA decision when they disagree with it.

    c.   **Violates 8 U.S.C. §§ 1229a(a)(1), (a)(3), (c)(1)(A).** Under these provisions, an IJ and not the BIA shall conduct removal hearings and order removal. The Rule violates this provision by vesting factfinding authority with the BIA; by allowing the BIA to rely on evidence not in the record through "administrative notice" of undefined, "undisputed" facts; and by authorizing the BIA to deny voluntary departure requests (or convert grants into an order of removal for noncompliance), and deem applications abandoned.

    d.   **Violates 8 U.S.C. § 1101(a)(47)(B).** This provision require "a determination by the [BIA]" or the expiration of a noncitizen's time to appeal before an order of removal becomes final. The Rule violates this provision by purporting to replace BIA determinations with determinations by the Director of EOIR, who is not a member of the BIA.

    e.   **Violates 8 U.S.C. § 1182(a)(9)(B)(v).** This provision allows noncitizens to seek a provisional hardship waiver of unlawful presence in the United States. Under current regulations that the Rule does not change, *see* 8 C.F.R. § 212.7(e)(4)(iii), such requests are only possible for individuals subject to removal proceedings if those proceedings are administratively closed. The Rule makes it impossible for an entire class of noncitizens to seek a provisional unlawful presence waiver that are contemplated by statute, frustrating congressional purpose.

    f.   **Violates 8 U.S.C. §§ 1158(a)(1) and 1231(b)(3).** The first of these provisions allows "any alien" to apply for asylum if she is present in the United States, and the second provides *mandatory* relief from deportation in cases where there is

a clear probability that the individual will be persecuted abroad. By eliminating motions to remand and *sua sponte* reopening, the Rule eliminates two mechanisms that enable noncitizens to pursue these forms of relief.

354.    The Rule also violates 8 C.F.R. § 1003.0(c), which prohibits the EOIR Director from adjudicating cases except as authorized by the Attorney General. As explained above, the Attorney General has not authorized the EOIR Director to adjudicate cases certified to him by an IJ, nor has the Attorney General authorized the EOIR Director to adjudicate cases whenever they have been pending more than 335 days from the notice of appeal.

355.    The Rule also violates international treaty obligations requiring the United States to refrain from returning individuals to places where they face a significant possibility of persecution or torture. Article 33.1 of the 1951 United Nations Convention Relating to the Status of Refugees, "imposed a mandatory duty . . . not to return an alien to a country where his 'life or freedom would be threatened' on account of one of the enumerated reasons." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 429 (1987) (quoting the Refugee Convention, 19 U.S.T. 6223, 6259-6276, T.I.A.S. No. 6577 (1968)). Likewise, the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231), codified the United States' prohibition on deportation to counrties where there are substantial grounds for believing that the person would face torture. *See also* 8 C.F.R. §§ 1208.16-1208.18. By eliminating key mechanisms that will enable noncitizens to seek protection from deportation to persecution or torture, the Rule violates the United States' obligation to provide avenues for all noncitizens to apply for these mandatory protections.

356.    Finally, the Rule is contrary to law in that it violates the Due Process Clause, *see infra* Count Six, and the Regulatory Flexibility Act, *see infra* Count Five.

**COUNT TWO**
**(Violation of the APA, 5 U.S.C.§ 706(2)(A) – Arbitrary & Capricious)**

357.    Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

358.    The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Rule, which lacks the hallmarks of reasoned decisionmaking, is arbitrary and capricious.

359.    In promulgating the Rule, Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*., 463 U.S. at 43.

360.    The Rule purports to seek to improve operational efficiency when in fact many of its provisions will make EOIR less efficient. Among other problems:

   a.    The elimination of administrative closure will require IJs to keep cases open while USCIS processes pending applications for relief, causing more work for IJs and additional appeals flowing from premature removal orders.

   b.    By eliminating motions to remand, the Rule will require the BIA to adjudicate pending appeals even when the evidence presented in a motion to remand could eliminate the need to do so.

   c.    The concurrent briefing requirement will increase the size of principal briefs and the frequency of reply briefs, which will add volume to the materials the BIA must review.

   d.    The new extension procedure established in the Rule imposes a requirement that each extension request to the BIA be adjudicated on individualized facts, thereby requiring additional resources.

   e.    By automatically transferring appeals from the BIA to the EOIR Director, the Rule will require the appellate adjudication process to be restarted before a new adjudicator with substantial, unrelated responsibilities who must review the case from scratch, slowing the resolution of appeals.

  f. By creating a process for IJs to certify BIA decisions with which they disagree to the EOIR Director, the Rule will increase IJs' work, disrupt the orderly process of litigation, and reduce the certainty and finality of BIA decisions.

For these and the other reasons, stated above, the Rule's purported efficiency justification is pretext for the Rule's actual goal: allowing fewer noncitizens to access the immigration courts and pursue relief from removal. By pursuing this objective, Defendants "relied on factors which Congress has not intended [them] to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Defendants' failure to consider other, less restrictive methods for improving efficiency further illustrates this fact.

361. Additionally, Defendants failed to adequately justify the departure from longstanding policies. When an agency substantially alters its position, it must "supply a reasoned analysis for the change." *Id.* at 42. Likewise, it may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books." *Fox Tele. Studios*, 556 U.S. at 515. Among other things, in issuing the Rule, Defendants failed to explain or justify the elimination of longstanding procedural remedies like *sua sponte* reopening, motions to remand, and administrative closure. Defendants similarly failed to justify their conversion to universal concurrent briefing schedules, a policy they had previously considered and explicitly rejected.

362. Defendants likewise ignored the interaction between the Rule and other changes they were proposing or finalizing contemporaneously. Many of these changes curtailed the availability of remedies or procedural devices that the Rule relied on as justifications for rejecting commenters' objections, yet Defendants did not account for concurrent plans to limit them.

363. As explained throughout this Complaint, Defendants failed to analyze many other substantial issues and reasonable alternatives raised in comments. For example, Defendants ignored the devastating impact of the Rule on noncitizens, misstating the impact on their ability to obtain counsel for appeals or obtain statutorily created relief on meritorious claims; failed to

provide a sufficient justification for applying parts of the Rule retroactively and in detriment to noncitizens' and Plaintiffs' reliance interests; and failed to rebut the substantial effect on the operations of legal service organizations such as Plaintiffs and on the BIA's own Pro Bono Project.

364.     Finally, Defendants ignored the significant reliance interests that are implicated by the Rule. Among other examples, Plaintiffs have accepted cases expecting that they will be able to undertake representation in a specific fashion under longstanding procedures. Plaintiffs have also accepted appeals with the expectation that they would also file a motion to remand to present new, previously unavailable evidence. And Plaintiffs—particularly NIJC and HIAS—have accepted cases expecting that they would be able to pursue administrative closure concurrently with an application for relief to USCIS.

365.     For these and the other reasons stated above, the Rule is arbitrary and capricious and unlawful under the APA.

**COUNT THREE**
**(Violation of the APA, 5 U.S.C.§ 706(2)(D) – Failure to Observe Required Procedure)**

366.     Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

367.     The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Specifically, the APA provides that agencies must "give interested persons an opportunity to participate in the rule making," *id.* § 553(c), which requires a meaningful opportunity to comment.

368.     Defendants failed to comply with the APA' requirement of an adequate opportunity to comment by imposing a 30-day comment period. "[A] thirty-day period is . . . 'an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical

data.' The Administrative Conference itself thus suggests a sixty-day period as 'a more reasonable *minimum* time for comment.'" *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (footnotes omitted); *see also Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1176 (N.D. Cal. 2019; *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011); *Pangea Legal Servs. v. DHS*, No. 20-cv-7721, 2020 WL 6802474, at *20 (N.D. Cal. Nov. 19, 2020).

369.    Defendants violated the APA by allowing the public only 30 days to comment on this sprawling Rule in the midst of a global pandemic and in close succession to the comment periods for numerous other related NPRMs and relevant decisions. This abbreviated comment period deprived the public of the ability to comment on the interaction between the Rule and the other proposed (and subsequently enacted) rules, among other infringements on the right to an adequate opportunity to comment.

**COUNT FOUR**
**(Violation of the APA, 5 U.S.C.§ 706(2) – Agency Action in Excess of Statutory Jurisdiction or Authority)**

370.    Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

371.    The APA provides that a "reviewing court shall—hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

372.    Under the INA and Homeland Security Act, Congress has vested all of EOIR's rulemaking authority in the Attorney General. 8 U.S.C. § 1103(g); 6 U.S.C. § 521.

373.    The final Rule was signed solely by Defendant McHenry as Director of EOIR, and not by the Attorney General or acting Attorney General.

374.    The Attorney General has never delegated authority to the Director of EOIR to engage in notice and comment rulemaking. *See* 8 C.F.R. § 1003.0(b).

375.    Because Defendant McHenry lacked statutory or delegated authority to issue the Rule, doing so was "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and not in accordance with law, *id.* § 706(2)(A), and the Rule should be set aside.

## COUNT FIVE
### (Violation of the Regulatory Flexibility Act, 5 U.S.C. 601, *et seq.*)

376.    Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

377.    The RFA, as amended, requires federal administrative agencies to analyze how rules they promulgate will affect "small entities," and to publish final versions of that analysis. 5 U.S.C. § 604.

378.    Plaintiffs CLINIC, FIRRP, HIAS, and BDS are small entities within the meaning of the RFA, as each is a "not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[54] 5 U.S.C. § 601(4).

379.    An agency can forgo a regulatory flexibility analysis if "the head of the agency certifies that the rule will not . . . have a significant economic impact on a substantial number of small entities" and publishes that certification, "along with a statement providing the factual basis for such certification," in the Federal Register. 5 U.S.C. § 605(b).

380.    Defendants did not publish a regulatory flexibility analysis concerning the Rule.

---

[54] Plaintiff NIJC is an entity of a larger nonprofit organization, Heartland Alliance. Because NIJC is not an independent nonprofit, this claim is not being brought on behalf of NIJC or Heartland Alliance.

381.     Rather, "the Department," not the head of agency, issued an uncertified statement that the Rule will not significantly impact small entities in violation of the certification requirements under the RFA. 85 Fed. Reg. at 81,650.

382.     Defendants also did not publish a "a statement providing the factual basis" for the Department's purported certification. *See id.*

383.     Defendants' few statements did not address the significant, adverse impacts the Rule will have on small entities as raised by Plaintiffs in their comments. Also, Defendants' statements that portions of the Rule impact only individuals and not entities is incorrect. If the Rule goes into effect, it will regulate Plaintiffs, both directly and through their representation of their clients. As explained above and in numerous comments, the Rule will have a significant economic impact on a substantial number of small entities.

384.     Defendants, therefore, violated the RFA by failing to comply with the certification requirements under 5 U.S.C. § 605(b), and the Defendants' claims that the Rule does not significantly impact small entities were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### COUNT SIX
### (Violation of the Fifth Amendment Due Process Clause)

385.     Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

386.     The Due Process Clause of the Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend.. V, cl.4.

387.     "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations and citations omitted). Procedural due process also "protect[s] a substantive

interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983). The provisions of this Rule, both separately and collectively, undermine that fundamental right.

388. The provisions limiting extension requests, eliminating consecutive briefing, and shortening reply brief deadlines violate due process by depriving noncitizens—particularly those who are detained and/or appeared *pro se* before the IJ—of a reasonable opportunity to meaningfully challenge the IJ's decision and the government's assertions on appeal.

389. The provisions implementing expedited adjudication timeframes and delegating appeals to the EOIR Director violate due process by incentivizing summary dismissals or affirmances and fundamentally unfair decisionmaking.

390. The provisions authorizing the BIA to find facts and introduce evidence and authorizing IJs to seek certification to the EOIR Director when they disagree with BIA decisions interfere with noncitizens' right to confront evidence against them and their right to be heard by a neutral arbiter.

391. The provisions eliminating a noncitizen's ability to seek remand or reopening to correct miscarriages of justice violate due process because they withdraw critical tools upon which noncitizens rely to present their evidence and to correct fundamental errors in the adjudication of their cases. Indeed, under the Rule, remand will not be allowed even if the IJ's decision was based on precedent that has been overturned or a regulation that has been vacated as unlawful. Likewise, under the Rule, IJs will have no incentive to develop the record for *pro se* respondents since the Rule effectively strips the BIA of its ability to remand on this basis.

392. The Rule's changes to voluntary departure processing, which require payment of voluntary departure bond on an expedited timeframe, with no advance notice, violate due process

because this change authorizes the outright denial of a substantive right without sufficient notice to comply with a procedural requirement.

393.    The Rule's elimination of various procedural vehicles that are used to pursue substantive relief—administrative closure, motions to remand, and *sua sponte* reopening—violate due process by depriving noncitizens of their liberty and property interests in pursuing statutorily prescribed relief including forms of relief that are mandatory for whomever qualifies to receive them. Additionally, the retroactive nature of the *sua sponte* provision further violates due process.

394.    Each of the foregoing violations is an independent and sufficient reason that the Rule should be set aside.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a.    A preliminary injunction under Federal Rule of Civil Procedure 65 or an order under 5 U.S.C. § 705 to preserve status and rights pending the Court's final adjudication of the claims herein;

b.    A stay of the implementation of the Rule pending a remand to the agency under 5 U.S.C. § 611(a)(4) in order for the agency to comply with the RFA;

c.    A declaration pursuant to 28 U.S.C. § 2201 setting aside the Rule in its entirety because it is contrary to law, arbitrary and capricious, in excess of statutory authority, and/or unconstitutional;

d.    Vacatur of the Rule in its entirety;

e.    An injunction prohibiting Defendants, their officials, agents, employees, assigns, and all persons acting in concert with them from implementing or enforcing the Rule;

f.    An order requiring Defendants to return cases before EOIR to the status quo *ante*;

g.    An order enjoining Defendants from applying this Rule retroactively to cases pending before EOIR on or before the effective date of the Rule.

h.    An order awarding Plaintiffs the costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

i.    Such other and further relief as the Court deems equitable, just, and proper.

Dated: January 11, 2021                    Respectfully submitted,

                                    By:   *s/* Keren Zwick
                                          _____

Mary Van Houten Harper**              Keren Zwick (D.D.C. Bar. No. IL0055)
NATIONAL IMMIGRANT JUSTICE CENTER     Mark Fleming*
1099 New York Ave. NW                 Tania Linares Garcia
Washington, DC 20001                  NATIONAL IMMIGRANT JUSTICE CENTER
(312) 660-1370                        224 S. Michigan Ave., Suite 600
mharper@heartlandalliance.org         Chicago, IL 60604
                                      (312) 660-1370
Sarah Thompson (D.D.C. Bar No.        kzwick@heartlandalliance.org
CA00073)                              mfleming@heartlandalliance.org
NATIONAL IMMIGRANT JUSTICE CENTER     tlinaresgarcia@heartlandalliance.org
PO Box 124975
San Diego, CA 92112                   Jeffrey Dubner (D.C. Bar No. 1013399)
(312) 660-1370                        Benjamin Seel (D.C. Bar No. 1035286)
sthompson@heartlandalliance.org       Sean A. Lev (D.C. Bar. No. 449936)
                                      DEMOCRACY FORWARD FOUNDATION
                                      P.O. Box 34553
*** Application for admission pro hac vice*   Washington, DC 20043
*forthcoming; Limited to practice before the*  (202) 448-9090
*federal courts pending reinstatement to*     jdubner@democracyforward.org
*D.C. Bar*                            bseel@democracyforward.org
                                      slev@democracyforward.org
 ** Application for admission pro hac vice*
*forthcoming*                          *Counsel for Plaintiffs*