**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., *et al.*,<br><br>　　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*,<br><br>　　　　　　　*Defendants*. | Case No.: 1:21-cv-00094 (RJL) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**MOTION TO STAY AGENCY ACTION UNDER 5 U.S.C. § 705 AND/OR FOR A**
**PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.      Overview of Immigration Proceedings Under Previous Regulations ................................. 3

        A.      Proceedings Before an Immigration Judge .................................................. 3

        B.      Parallel Proceedings Before an Immigration Judge and USCIS ........................... 4

        C.      Proceedings Before the Board of Immigration Appeals ................................... 6

II.     Defendants' Rulemaking Process ....................................................................... 8

III.    The Substance of the Rule ............................................................................ 10

IV.     Defendants' Stated Justifications for the Rule .................................................... 14

V.      Plaintiffs' Missions and Activities .................................................................. 14

LEGAL STANDARD ..................................................................................................... 16

ARGUMENT ................................................................................................................. 17

I.      Plaintiffs Are Likely to Succeed on the Merits .................................................... 17

        A.      Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Contrary
                to Law ....................................................................................... 17

                1.    The Rule Is Contrary to the INA ............................................... 18

                2.    The Rule Is Contrary to 8 C.F.R. § 1003.0(c) ................................. 22

        B.      Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Arbitrary
                and Capricious ................................................................................ 25

        C.      Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to
                Provide an Adequate Opportunity to Comment ............................................ 35

        D.      Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to
                Comply with the Regulatory Flexibility Act ............................................. 37

II.     The Rule Will Irreparably Harm Plaintiffs .......................................................... 38

III.    The Balance of Equities and the Public Interest Favors a Stay ..................................... 44

CONCLUSION .............................................................................................................. 45

CERTIFICATE OF SERVICE ........................................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3Q Digital, Inc. v. USCIS*,
No. 19-cv-579, 2020 WL 1079068 (D.D.C. Mar. 6, 2020) ....................................................27

*Matter of A-C-A-A-*,
28 I. & N. Dec. 84 (AG 2020) ...............................................................................................36

*Agyeman v. INS*,
296 F.3d 871 (9th Cir. 2002) ...................................................................................................3

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ............................................................................................25

*Matter of Avetisyan*,
25 I. & N. Dec. 688 (BIA 2012) .........................................................................................6, 27

*Becerra v. U.S. Dep't of the Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................................................................35

*Biwot v. Gonzales*,
403 F.3d 1094 (9th Cir. 2005) ..........................................................................................20, 21

*Bridges v. Wixon*, 326 U.S. 135 (1945) .......................................................................................3

*Cap. Area Immigrants' Rts Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................................................39

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989)...............................................................................................................42

*Castaneda-Delgado v. INS*,
525 F.2d 1295 (7th Cir. 1975) ...............................................................................................21

*Matter of Castro-Tum*,
27 I. & N. Dec. 271 (BIA 2018) ..............................................................................................6

*Chlomos v. DOJ, INS*,
516 F.2d 310 (3d Cir. 1975)...................................................................................................21

*Cath. Legal Immig. Network, Inc. v. EOIR*,
No. 20-cv-3812, 2021 WL 184359 (D.D.C. Jan. 18, 2021)............................................ *passim*

*Confederated Tribes of Chehalis Reservation v. Mnuchin*,
456 F. Supp. 3d 152 (D.D.C. 2020) .......................................................................................17

*ConverDyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. 2014) ....................................................................45

*Davis v. PBGC*,
  571 F.3d 1288 (D.C. Cir. 2009) .....................................................................17

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) ...........................................................................25

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ...................................................................................31

*Dist. of Columbia v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ............................................16, 17, 44, 45

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .............................................................................27, 32

*FCC v. Fox Tele. Stations, Inc.*,
  556 U.S. 502 (2009) .......................................................................................30

*Fla. Power & Light Co. v. United States*,
  846 F.2d 765 (D.C. Cir. 1988) .......................................................................35

*Gresham v. Azar*,
  950 F.3d 93 (D.C. Cir. 2020) ....................................................................25, 34

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  920 F.3d 1 (D.C. Cir. 2019) ...........................................................................44

*Hernandez-Serrano v. Barr*,
  981 F.3d 459 (6th Cir. 2020) ...........................................................................6

*Immig. Legal Res. Ctr. v. Wolf*,
  No. 20-cv-5883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ....................29

*INS v. Stevic*,
  467 U.S. 407 (1984) .......................................................................................19

*Jacinto-Castanon de Nolasco v. ICE*,
  319 F. Supp. 3d 491 (D.D.C. 2018) ...............................................................44

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1977) .........................................................................44

*Kucana v. Holder*,
  558 U.S 233 (2010) ........................................................................................33

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................38, 44

*Make The Rd. N.Y. v. McAleenan*,
    405 F. Supp. 3d 1 (D.D.C. 2019), *rev'd on other grounds and remanded sub*
    *nom. Make The Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) ...........................43

*McFarland v. Scott*,
    512 U.S. 849 (1994) ........................................................................................20

*Meza Morales v. Barr*,
    973 F.3d 656 (7th Cir. 2020) (Barrett, J.) .........................................................6, 30

*Michigan v. EPA*,
    576 U.S. 743 (2015) ........................................................................................31

*Mills v. Dist. of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) .........................................................................43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ......................................................................................25, 29

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) .......................................................................44

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) .........................................................................38

*Nat'l Immigrant Justice Ctr. v. EOIR*,
    Dkt. No. 11, No. 21-cv-56 (D.D.C. Jan. 14, 2021) ................................................39

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................................17, 45

*Nw. Immig. Rts. Proj. v. USCIS*,
    No. 19-cv-3282, 2020 WL 5995206 ...................................................................39

*Nw. Min. Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998) ..........................................................................37

*OA v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) .....................................................................4

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) .............................................................................21

*Pangea Legal Servs. v. DHS*,
    No. 20-cv-7721, 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) .........................36, 37

*Petry v. Block*,
   737 F.2d 1193 (D.C. Cir. 1984) ................................................................35

*Portland Cement Ass'n v. EPA*,
   665 F.3d 177 (D.C. Cir. 2011) ..................................................................29

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................44

*Rios-Berrios v. INS*,
   776 F.2d 859 (9th Cir. 1985) ....................................................................21

*Robertson v. Cartinhour*,
   429 F. App'x 1 (D.C. Cir. 2011) ...............................................................45

*Matter of S-O-G- & F-D-B-*,
   27 I. & N. Dec. 462 (A.G. 2018) ...............................................................5

*Subhan v. Ashcroft*,
   383 F. 3d 591 (7th Cir. 2004) ...................................................................21

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ....................................................................43

*Walters v. Reno*,
   145 F.3d 1032 (9th Cir. 1998) ..................................................................43

*Zuniga Romero v. Barr*,
   937 F.3d 282 (4th Cir. 2019) ................................................................6, 27

**Statutes, Regulations, and Rules**

5 U.S.C. § 553(c) .........................................................................................35

Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*

   § 604 .........................................................................................................37

   § 605(b) ...............................................................................................32, 37

   § 611(a)(4) ...............................................................................................37

Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*

   § 705 ...........................................................................................2, 16, 17, 44

   § 706(2) .......................................................................................1, 17, 24

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*

§ 1101(a) .................................................................................................5, 18, 24

§ 1151(b) ............................................................................................................5

§ 1153(a) ............................................................................................................5

§ 1154 .................................................................................................................5

§ 1158(a) ............................................................................................................5

§ 1182(a) ............................................................................................................5

§ 1228 ...............................................................................................................10

§ 1229a ..................................................................................................... *passim*

§ 1229b ...............................................................................................................5

§ 1231(b)(3) ..............................................................................................5, 18, 19

§ 1252 ..........................................................................................................8, 33

§ 1362 .....................................................................................................3, 20, 22

8 C.F.R.

§ 1003.0(c) ................................................................................................ *passim*

§ 1003.1 (2020) .....................................................................................6, 7, 23, 24

§ 1003.1 (2021) ...................................................................................8, 10, 23, 24

§ 1003.2 (2020) ..................................................................................................4

§ 1003.3 (2020) ..................................................................................................7

Appellate Procedures and Decisional Finality in Immigration Proceedings;
Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020)....................... *passim*

Appellate Procedures and Decisional Finality in Immigration Proceedings;
Administrative Closure, 85 Fed. Reg. 52,491 (Aug. 26, 2020) .........................9, 36

Authorities Delegated to the Director of the EOIR, the Chairman of the BIA, and
the Chief Immigration Judge, 65 Fed. Reg. 81,434 (Dec. 26, 2000)......................23

Authorities Delegated to the Director of the EOIR, and the Chief Immigration
Judge, 72 Fed. Reg. 53,673 (Sept. 20, 2007) ...........................................22

EOIR; Motions and Appeals in Immigration Proceedings, 61 Fed. Reg. 18,900,
(Apr. 29, 1996)................................................................................................30

Exec. Order 12,866, Regulatory Planning and Review, 58 Fed. Reg. 51,735,
(Sept. 30, 1993)...............................................................................................35

Exec. Order 13,563, Improving Regulation and Regulatory Review, 76 Fed. Reg.
3,821 (Jan. 18, 2011)......................................................................................35

Expansion of Provisional Unlawful Presence Waivers of Inadmissibility,
81 Fed. Reg. 50,244 (July 29, 2016).............................................................31

Good Cause for a Continuance in Immigration Proceedings,
85 Fed. Reg. 75,925 (Nov. 27, 2020)............................................................29

Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal,
85 Fed. Reg. 75,942 (Nov. 27, 2020)............................................................29

Organization of the Executive Office for Immigration Review,
84 Fed. Reg. 44,537 (Aug. 26, 2019).............................................................23

Organization of the Executive Office for Immigration Review,
85 Fed. Reg. 69,465 (Nov. 3, 2020)..........................................................23, 24

**Other Authorities**

Aaron Reichlin-Melnick, Public Comment on 85 Fed. Reg. 52,491
(Sept. 25, 2020), https://bit.ly/3hDvPfr .................................................28, 33, 36

American Immigration Lawyers Association, et al., Public Comment on
85 Fed. Reg. 52,491 (Sept. 25, 2020), https://bit.ly/3or8uj1 .................................36

Att'y Gen. Order No. 4910-2020 (Nov. 17, 2020) ...........................................25

Booz Allen Hamilton, *Department of Justice, Executive Office for Immigration
Review, Legal Case Study Summary Report* (Apr. 6, 2017),
https://bit.ly/35td6yo.....................................................................................14, 27, 28

Capital Area Immigrants' Rights Coalition, 85 Fed. Reg. 52,491
(Sept. 26, 2020), https://bit.ly/3oE2tjb.............................................................31, 33

Catholic Legal Immigration Network, Public Comment on 85 Fed. Reg. 52,491
(Sept. 25, 2020), https://bit.ly/3pIWhXP .........................................7, 22, 28, 34

Center for Gender & Refugee Studies, Public Comment on 85 Fed. Reg. 52,491
(Sept. 25, 2020), https://bit.ly/2NzSbU8 ........................................................36

Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018),
https://bit.ly/3ahunfC ...................................................................................8

Legal Aid Society, Public Comment on 85 Fed. Reg. 52,491 (Sept. 25, 2020),
https://bit.ly/3pqjRJ3 .............................................................................................28, 34

Memorandum from EOIR Dir. James McHenry to the EOIR (Jan. 8, 2021),
https://bit.ly/38udq1T; ....................................................................................29

National Immigrant Justice Center, Public Comment on 85 Fed. Reg. 52,491
(Sept. 26, 2020), https://bit.ly/3qUuW5J; ..........................................................22

*President Trump Before Marine One Departure*, The White House (Apr. 5, 2019),
https://bit.ly/39uSmZu .....................................................................................9

Round Table of Former Immigration Judges, Public Comment on 85 Fed. Reg.
52,491 (Sept. 24, 2020), http://bit.ly/3oFfRE8 ....................................................33

U.S. Dep't of Justice, BIA Practice Manual, https://bit.ly/3c6AsOx

§ 4.6 ..................................................................................................................7

§ 4.7 ..................................................................................................................7

U.S. Gov't Accountability Off., Testimony Before the Subcommittee on Border
Security and Immigration, Committee on the Judiciary, Immigration Courts:
Observations on Restructuring Options and Actions Needed to Address Long-
Standing Management Challenges (Apr. 18, 2018), https://bit.ly/3rQDJqm ........................28

## <u>INTRODUCTION</u>

On December 16, 2020, then-Director James McHenry of the Executive Office for Immigration Review ("EOIR") issued a final rule making sweeping changes to the procedures governing proceedings before the Board of Immigration Appeals ("BIA") and immigration judges ("IJs"). Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020) (the "Rule").

This Rule is unlawful for several reasons. First, the Rule violates several provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and its implementing regulations. This includes the INA's requirement that the BIA affirm removal orders before they become final, its prohibition on removing persons determined to require withholding of removal, the statutory rights to counsel and to present evidence, and the regulatory limitations on the EOIR Director's authority to adjudicate cases. Second, the Rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, because it is unsupported by reasoned analysis, is internally inconsistent, ignores important aspects of the problem, and disregards significant comments and proposed alternatives. Third, in finalizing the Rule, Defendants[1] failed to comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 *et seq.* Finally, Defendants provided just 30 days for comment, contrary to explicit presidential directives, which was inadequate in light of the complexity of the regulation and the numerous related rulemakings occurring simultaneously. When the Court considers the merits of Plaintiffs' claims, it is likely to set the Rule aside under the APA, 5 U.S.C. § 706(2).

---

[1] Defendants in this case are EOIR, the Department of Justice ("DOJ"), and their respective leaders in their official capacities. Pursuant to Federal Rule of Civil Procedure 25(d), Defendants Jean King and Monty Wilkinson are automatically substituted for former EOIR Director McHenry and Acting Attorney General Jeffrey Rosen, respectively.

While this case is pending, however, the Rule will irreparably harm respondents in immigration proceedings and their counsel. Plaintiffs in this case, the Catholic Legal Immigration Network, Inc. ("CLINIC"), Brooklyn Defender Services ("BDS"), Florence Immigrant and Refugee Rights Project ("FIRRP"), HIAS, and National Immigrant Justice Center ("NIJC"; collectively, "Plaintiffs"), serve tens of thousands of noncitizens in immigration proceedings each year. That work takes the form of direct representation, *pro se* education programming and support, recruitment and mentorship of *pro bono* attorneys in immigration representation, creation of training materials and practice advisories, and legal trainings.

The Rule will immediately make this work far more difficult, and in many cases nearly impossible. It will increase the burden of Plaintiffs' casework, mentorship, and *pro se* education and support; it will impair their ability to locate and prepare *pro bono* counsel or affiliates to take referrals; and it will likely reduce the number of cases they can accept. Collectively, these burdens will undermine Plaintiffs' missions and foreclose the opportunity to represent clients or otherwise serve noncitizens whom they would have otherwise been able to assist. Because of the strict deadlines in immigration proceedings and the consequences attendant to removal orders, it will be impossible to remedy these harms after the fact, even if Plaintiffs succeed in this lawsuit.

Accordingly, Plaintiffs request that the Court exercise its authority under 5 U.S.C. § 705 "to preserve status or rights pending conclusion of the review proceedings" by staying the Rule during the pendency of this case. Such relief is necessary to prevent irreparable harm to Plaintiffs and is warranted in light of their likelihood of success on the merits, the public interest in ensuring that the government follows the law and that all persons receive fair adjudication of their claims to relief, and the lack of any prejudice to Defendants. Additionally, and for the same

reasons, Plaintiffs request that the Court enter a preliminary injunction enjoining the operation of the Rule until Plaintiffs' claims can be resolved.

## BACKGROUND

**I.     Overview of Immigration Proceedings Under Previous Regulations**

**A.     Proceedings Before an Immigration Judge**

When the Department of Homeland Security ("DHS") seeks to have a noncitizen ordered removed under 8 U.S.C. § 1229a, it initiates an action before an IJ. In those proceedings, noncitizens are entitled to be "represented, at no expense to the Government, by counsel of the alien's choosing," and "shall have a reasonable opportunity to examine the evidence against the alien [and] to present evidence on the alien's own behalf." 8 U.S.C. § 1229a(b)(4)(A), (B); *see also* 8 U.S.C. § 1362. The Due Process Clause of the Fifth Amendment requires that such proceedings "meet the essential standards of fairness." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945). The IJ determines a noncitizen's amenability to removal and then adjudicates applications for immigration remedies, either granting relief or ordering removal. *See* Compl., ECF No. 1, ¶ 25.

The majority of noncitizens in removal proceedings, including the vast majority of those who are detained, are unable to obtain counsel and therefore proceed *pro se* before the IJ. Compl. ¶ 51 & n.4. In such cases, an IJ has an obligation to develop the record on critical facts pertaining to removal and the noncitizen's eligibility for relief therefrom. *See, e.g.*, *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) ("In addition, when the alien appears pro se, it is the IJ's duty to 'fully develop the record.'") (quoting *Jacinto v. INS*, 208 F.3d 725, 728 (9th Cir. 2000)). However, where an IJ finds a noncitizen is not removable or is eligible for one form of relief, the IJ typically will not develop the record on other potential forms of relief, such as the noncitizen's

eligibility for voluntary departure (permission for noncitizens to depart independently subject to various conditions, instead of receiving a removal order). *See* Compl. ¶ 116.

Unlike proceedings in Article III courts, proceedings before an IJ are recorded but not concurrently transcribed, IJs routinely issue oral decisions, and copies of evidentiary submissions are generally available. *Id.* ¶ 47. If an order of removal is issued by the IJ, the noncitizen may file a notice of appeal to the BIA within 30 days, at which point jurisdiction vests with the BIA. A written transcription of the proceedings and the IJ's decision is produced, if at all, only *after* a party has filed a notice of appeal, and those documents are served on the parties by mail, at the same time they receive the appellate briefing schedule. *Id.* ¶¶ 47-48.

If a notice of appeal has not yet been filed, the noncitizen has a statutory right to file a single motion to reopen within 90 days of the IJ's ruling (or 180 days in certain limited circumstances). 8 U.S.C. § 1229a(c)(7). Pursuant to the previous regulations, IJs also had authority to reopen proceedings *sua sponte* in extraordinary circumstances outside of the statutory parameters, which they sometimes exercised after litigants brought to their attention issues warranting reopening, such as new eligibility for relief or errors in the prior proceeding. *See* Compl. ¶ 41 (discussing former 8 C.F.R. § 1003.2(a) (2020)).

### B.      Parallel Proceedings Before an Immigration Judge and USCIS

The INA provides noncitizens with numerous bases for applying for legal status. A few of these forms of relief may be sought directly from EOIR, including asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"),[2] as well as cancellation

---

[2] Asylum, but not withholding or protection under the CAT, can also be sought affirmatively by unaccompanied immigrant children and noncitizens who are not in removal proceedings. *See generally OA v. Trump*, 404 F. Supp. 3d 109, 117, 121 (D.D.C. 2019) (discussing difference between affirmative and defensive asylum applications).

of removal for certain permanent and non-permanent residents. *See* 8 U.S.C. §§ 1158(a), 1229b, 1231(b)(3). Other forms of relief, however, usually must first be obtained from the U.S. Citizenship and Immigration Services ("USCIS"). These include visas for survivors of human trafficking or certain crimes who are cooperating with law enforcement ("T" and "U" visas, respectively), *id.* § 1101(a)(15)(T), (U); most petitions for survivors of abuse under the Violence Against Women Act ("VAWA"), *id.* § 1154; petitions for Special Immigrant Juvenile Status ("SIJS"), which also require findings from state court, *id.* § 1101(a)(27)(J); certain family-based petitions, *id.* §§ 1151(b), 1153(a); and many waivers of unlawful presence for family-based petitions where deportation would cause extreme hardship to a U.S. citizen or lawful permanent resident ("LPR") spouse or parent, *id.* § 1182(a)(9)(B)(v). *See* Compl. ¶¶ 28-29.

In many circumstances, noncitizens in removal proceedings must apply for these remedies with USCIS while concurrently defending against the removal proceedings initiated by DHS. Once they have obtained approval from USCIS, they typically may use their new status to terminate removal proceedings or seek adjustment of status before EOIR.[3] *See* Compl. ¶ 28. However, the process of obtaining approval from USCIS can take years, and often outlasts removal proceedings.

Because it is often clear that a noncitizen is eligible for and likely to have their petition approved by USCIS, it is often burdensome on courts, noncitizens, and counsel to conduct removal proceedings that will likely be mooted when USCIS finishes its process. To prevent this inefficiency, IJs have for decades used administrative closure, "a procedural device that temporarily takes a removal case off of an [IJ's] calendar," while a noncitizen is "pursu[ing]

---

[3] In *Matter of S-O-G- & F-D-B-*, 27 I. & N. Dec. 462 (A.G. 2018) the attorney general limited an IJ's termination authority, but termination remains available for individuals who are no longer removable due to the grant of a remedy from USCIS. *Id.* at 468.

alternative relief." *Meza Morales v. Barr*, 973 F.3d 656, 664 (7th Cir. 2020) (Barrett, J.) (internal citations omitted). This docketing tool prevents "two coordinate offices in the executive branch [from] simultaneously adjudicating collateral applications" and can thereby "help advance a case toward resolution." *Id.* at 665. Accordingly, federal courts and the BIA have long recognized that administrative closure advances the "efficient and timely administration of immigration proceedings." *Zuniga Romero v. Barr*, 937 F.3d 282, 297 (4th Cir. 2019); *Matter of Avetisyan*, 25 I. & N. Dec. 688, 694 (BIA 2012), *overruled by Matter of Castro-Tum*, 27 I. & N. Dec. 271 (BIA 2018). In 2018, the Attorney General issued an opinion eliminating administrative closure, but that opinion has been overturned by two courts of appeals. *See Meza Morales*, 973 F.3d 656; *Zuniga Romero*, 937 F.3d 282; *but see Hernandez-Serrano v. Barr*, 981 F.3d 459, 466-67 (6th Cir. 2020) (upholding *Castro-Tum*).

Before the instant Rule, EOIR also used a variety of other procedures to recognize the relief or status granted by USCIS or state courts,[4] including remands to the IJ if the relief or status was granted while a noncitizen's appeal was pending, and *sua sponte* reopening if it was granted after a removal order. *See* Compl. ¶¶ 36-37, 41.

## C.    Proceedings Before the Board of Immigration Appeals

After an IJ decides a case, either party may appeal to the BIA within 30 days.[5] When a notice of appeal is filed, the BIA does not order a briefing schedule until the transcript of the proceedings and any written IJ opinion is transmitted to the BIA and processed. *Id.* ¶ 47. This

---

[4] In addition to seeking predicate findings for SIJS, certain noncitizens, such as lawful permanent residents, may pursue post-conviction relief in state court that would make them no longer removable at all or eligible for new forms of relief.

[5] Under the previous regulations, the BIA also had authority to certify a case to itself in extraordinary circumstances, a device that was usually used to remediate issues like the arrival of a notice of appeal after the 30-day deadline due to a mailing delay. *See* Compl. ¶ 221 (discussing former 8 C.F.R. § 1003.1(c) (2020)). The Rule also eliminates this provision.

process can occur weeks, months, or more than a year after the filing of the notice of appeal. *Id.*

Once the BIA issues a briefing schedule, the appellant's brief is due within 21 days. *Id.* ¶ 48.

Under the prior regulations, if the noncitizen was not detained, the appellee's response was due

21 days later; if the noncitizen was detained, the appellee's brief was due at the same time as the

appellant's in light of the detention. The BIA Practice Manual provided that extensions would be

21 days by default, DOJ, BIA Practice Manual § 4.7(c) (last revised Oct. 5, 2020), but the BIA

had discretion to extend a party's briefing deadline by up to 90 days, Compl. ¶ 49 (discussing

former 8 C.F.R. § 1003.3(c)(1) (2020)). In many cases, DHS files form or checkbox briefs, or

forgoes briefing altogether.[6] Reply briefs are "disfavored" and were permitted only with leave of

the BIA upon a showing of "surprise at [the] opposing party's assertions." *Id.* ¶ 52; BIA Practice

Manual § 4.6(h).[7]

Before the Rule, the BIA, as an appellate body, lacked authority to conduct independent

factfinding. It would remand to an IJ where it determined that further factfinding was necessary,

*see* former 8 C.F.R. § 1003.1(d)(3) (2020), or where a noncitizen's background check (known as

an identity, law enforcement, and security investigation) was incomplete, *see id.*

§ 1003.1(d)(6)(ii) (2020). Similarly, the Attorney General had not previously provided the BIA

itself with authority to issue orders of removal or voluntary departure orders in the first instance.

Instead, it was required to remand to the IJ for further proceedings. *Id.* § 1003.1(d)(3) (2020).

At the moment that the BIA affirms a removal order, a noncitizen's removal becomes

administratively final and he or she can be physically removed from the United States at any

time, absent a stay of removal. 8 U.S.C. § 1101(a)(47)(B). After the BIA issues a final decision,

---

[6] *See, e.g.*, CLINIC, Pub. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 8 (Sept. 25, 2020), https://bit.ly/3pIWhXP ("CLINIC Comment").

[7] The BIA Practice Manual is available at https://bit.ly/3c6AsOx.

either party has 90 days to file a motion to reopen, although the noncitizen generally may not do so if he or she previously filed such a motion before the IJ or the BIA. *See* 8 U.S.C. § 1229a(c)(7)(C)(i); Compl. ¶¶ 37, 41, 124, 199 (addressing the time and number limits on statutory motions to reopen). Prior to the issuance of the Rule, the BIA could also reopen a case *sua sponte* in exceptional circumstances. *See* Compl. ¶ 41 (citing former 8 C.F.R. § 1003.2(a) (2020)). Noncitizens may also petition for review of a BIA decision in the U.S. Courts of Appeals, but must overcome numerous jurisdictional bars. *See, e.g.*, 8 U.S.C. § 1252(a)(2)(B).

Under a rule issued by then-Attorney General William Barr in 2019, cases heard by a single member of the BIA must be decided within 90 days from the completion of briefing, and cases heard by a three-member panel must be decided within 180 days. 8 C.F.R. § 1003.1(e)(8)(i). The Chairman of the BIA may extend this deadline by up to 60 days in "exigent circumstances." *Id.* § 1003.1(e)(8)(ii). Otherwise, the Chairman must assign the case to himself or a Vice Chairman for decision within 14 days or refer the case to the EOIR Director for decision. *Id.* This delegation is an exception to DOJ regulations specifically prohibiting the EOIR Director from adjudicating cases or directing the result of adjudications assigned to the BIA or an IJ "[e]xcept as provided by statute, regulation, or delegation of authority from the Attorney General, or when acting as a designee of the Attorney General." *Id.* § 1003.0(c).

## II.    Defendants' Rulemaking Process

Over the past year, DOJ and DHS have embarked on an unprecedented rulemaking campaign that drastically changes the immigration system, with the effect and stated goal of reducing access to courts and making it harder to obtain relief from removal.[8] Between June

---

[8] *See, e.g.*, Donald J. Trump (@realDonaldTrump), Twitter (June 24, 2018), https://bit.ly/3ahunfC ("When somebody comes in, we must immediately, with no Judges or

2020 and December 2020, DOJ and DHS published at least a dozen final rules, and many more notices of proposed rulemaking, that limited or sought to limit the availability of relief, constrained the judicial process, increased existing fees and created new ones, and limited access to work authorization. *See, e.g.*, Compl. ¶¶ 62-63 (summarizing five such rules). They finalized six of these rules in the 12 days from December 11 to December 23, 2020. *See id.* ¶ 62.

On August 26, 2020, Defendants proposed the Rule at issue in this case, publishing a Notice of Proposed Rulemaking ("NPRM") proposing (by EOIR's categorization) 12 discrete changes to practice before the BIA and IJs. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (Aug. 26, 2020) (the "Proposed Rule"). Contradicting an explicit presidential policy of providing at least 60 days for comment, *see infra* Part I.C, Defendants provided just 30 days to comment. *Id.* at 52,491. Despite the COVID-19 pandemic, the overlap with multiple related NPRMs and precedential decisions by the Attorney General, and numerous requests for more time to comment, Defendants refused to extend the comment period. *See* Compl. ¶¶ 70, 331-34. During the unusually abbreviated comment period, 1,284 comments were submitted, the majority of which "expressed opposition to the rule, either in whole or part." 85 Fed. Reg. at 81,592.

On December 16, 2020, Mr. McHenry signed the Rule in his capacity as Director of EOIR, *id.* at 81,656, the first time an EOIR Director had ever issued a final rule. The Rule took effect on January 15, 2021. At that point, certain provisions became applicable prospectively, while others applied both prospectively and retroactively. *Id.* at 81,588.

---

Court Cases, bring them back from [sic] where they came."); *Remarks by President Trump Before Marine One Departure*, The White House (Apr. 5, 2019), https://bit.ly/39uSmZu ("They have to get rid of the whole asylum system because it doesn't work. And, frankly, we should get rid of judges. You can't have a court case every time somebody steps their foot on our ground.").

### III.     The Substance of the Rule

In brief, the Rule effectuates the following changes:

*Shortened and Inflexible Briefing Schedules*. The Rule limits briefing extensions before the BIA to a maximum of 14 days and prohibits the BIA from granting more than one extension, regardless of circumstances. 85 Fed. Reg. at 81,654. It also requires simultaneous briefing before the BIA in all cases. *Id.* at 81,588; *see* Compl. ¶ 85.

*Limitations on BIA's Remand Authority and IJs' Authority on Remand*. The Rule prohibits the BIA from remanding to the IJ to conduct further factfinding, unless the party seeking remand attempted to adduce the additional facts before the IJ and preserved the issue, the factfinding would alter the outcome of the case, and the IJ made clearly erroneous findings or an error of law requiring additional factfinding. 85 Fed. Reg. at 81,651; Compl. ¶ 111.[9] It similarly prohibits the BIA from remanding a case to the IJ to consider new evidence or evidence that is newly relevant under an intervening change in law, unless the evidence (a) results from a DHS identity, law enforcement, or security investigation; (b) is relevant to jurisdiction or removability; or (c) vitiates all applicable grounds of removability. 85 Fed. Reg. at 81,652; Compl. ¶¶ 112-13. A change in law that alters a noncitizen's eligibility for relief does not suffice to justify a remand. Compl. ¶¶ 113, 121. The Rule also prohibits the BIA from remanding based on the totality of the circumstances. 85 Fed. Reg. at 81,652; Compl. ¶¶ 140-41. Where the BIA has limited the scope of a remand, the IJ may not consider any other issues on remand, regardless of any intervening facts or changes in law. 85 Fed. Reg. at 81,652; Compl. ¶ 137.

---

[9] The Rule also allows remand to DHS, rather than to an IJ, in unspecified circumstances. *See* 85 Fed. Reg. at 81,651 (8 C.F.R. § 1003.1(d)(3)(iv)(D)(5)(iii) (2021)). Although this provision is largely unexplained, it appears to pertain to circumstances in which a criminal conviction would authorize DHS to issue a final administrative removal order under 8 U.S.C. § 1228.

*Procedure for Incomplete Background Checks*. The Rule establishes two significantly different procedures for incomplete background checks, depending on which party is responsible. If a noncitizen has not provided required biometric or other biographical information within 90 days of the BIA and DHS providing written notice of the requirement (or 120 days if good cause is shown in advance by the noncitizen), the BIA must deem all applications for relief abandoned. 85 Fed. Reg. at 81,651-52; Compl. ¶ 189. However, if DHS fails to complete its identity, law enforcement, or security investigation within 180 days, the Board must remand to the IJ for further proceedings. 85 Fed. Reg. at 81,652; Compl. ¶¶ 189-90.

*BIA Factfinding.* The Rule allows the BIA, despite its role as an appellate body, to introduce and rely on "facts that are not reasonably subject to dispute, such as current events, the contents of official documents outside the record, or facts that can be accurately and readily determined from official government sources and whose accuracy is not disputed," including adverse documents submitted by DHS. 85 Fed. Reg. at 81,590; Compl. ¶¶ 145, 147. The BIA is required to give notice to the parties or an opportunity to respond only if the evidence is the basis for overturning a grant of relief or protection issued by the IJ. 85 Fed. Reg. at 81,651; Compl. ¶ 145. The BIA need not provide any notice or opportunity to respond if the new facts are the basis for *affirming* a removal order or if they support a decision to reverse an IJ's decision without forming the explicit basis for that decision. 85 Fed. Reg. at 81,590; Compl. ¶ 151.

*BIA Authority to Adjudicate Voluntary Departure Requests and Issue Final Orders*. Although the INA requires removability to be determined in the first instance by IJs, *see* 8 U.S.C. § 1229a(a)(1), the Rule authorizes the BIA to issue final orders of removal and grant or deny voluntary departure. 85 Fed. Reg. at 81,589; Compl. ¶¶ 25, 353. Together with this change, the Rule prohibits the BIA from remanding to the IJ to consider voluntary departure, even if the

IJ did not make the relevant findings (including, for example, that the noncitizen demonstrated good moral character and current capacity to pay for their departure) because the IJ granted relief to the noncitizen on other grounds. 85 Fed. Reg. at 81,589; Compl. ¶¶ 170-75.

In addition, should the BIA grant voluntary departure, the noncitizen will now only receive notice of that decision and the instructions for compliance in writing. If a noncitizen fails to comply with these instructions within five or ten days of receipt, the voluntary departure order will be converted into a removal order. *See* 85 Fed. Reg. at 81,589; Compl. ¶¶ 171, 178-87.

*Elimination of Administrative Closure*. The Rule bars IJs from administratively closing cases in most contexts, circumscribing the ability of IJs to manage their own dockets. 85 Fed. Reg. at 81,590-91; Compl. ¶ 230. This change is particularly harmful to those who must concurrently seek relief before USCIS and an IJ. *See supra* pp. 5-6; Compl. ¶¶ 231-53. While USCIS may grant protection that will either make these applicants not removable or provide an avenue to new forms of relief from removal, the Rule now effectively forecloses IJs from allowing that process to run its course before adjudicating a removal case. This change therefore eliminates IJs' ability to prioritize cases that are ripe for decision. *See* Compl. ¶¶ 231-53.

*Elimination of Sua Sponte and Self-Certification Authority*. The Rule prohibits the BIA and IJs from reopening a case *sua sponte* (subject to limited circumstances, like evidence that vitiates removability), and prohibits the BIA from self-certifying appeals under any circumstances. 85 Fed. Reg. at 81,591; Compl. ¶¶ 198-203, 221. The elimination of *sua sponte* authority prevents the BIA and IJs from correcting manifest injustices in underlying removal proceedings or reopening proceedings based on new eligibility for relief. *See* Compl. ¶¶ 202-06. Nor could the BIA reopen a case *sua sponte* when, due to a change in law—like the vacatur of a regulation or a change in the criteria for asylum eligibility—the noncitizen has access to new

forms of relief from removal. *See id.* ¶¶ 202-03. Similarly, because of the elimination of self-certification, the BIA can no longer correct inadvertent technical defects like a notice of appeal that is untimely due to mail delays. *See id.* ¶¶ 222-29.

*Adjudication by the EOIR Director of All Appeals Pending for 335 Days.* With limited exceptions, the Rule requires the BIA to refer to the EOIR Director all cases that have been pending before the BIA for more than 335 days from the filing of an appeal. 85 Fed. Reg. at 81,591-92; Compl. ¶ 278. This change applies even if the briefing schedule failed to issue within 335 days, denying the BIA any opportunity to consider the appeal in such cases. *See* Compl. ¶¶ 279, 284-85. Given current case-processing times, through this certification, the EOIR Director has assigned to himself the adjudication of a significant majority of cases pending at the BIA, *see id.* ¶¶ 284-85, 288, despite an explicit prohibition on the Director adjudicating cases without authorization by the Attorney General, *see* 8 C.F.R. § 1003.0(c).

*IJ Certification of BIA Decisions to the EOIR Director.* The Rule allows IJs to seek review by the EOIR Director of a BIA decision. 85 Fed. Reg. at 81,653-54; Compl. ¶ 255. This is essentially the equivalent of allowing a federal district court to petition the Supreme Court for review of a circuit court's decision reversing the district court's decision. IJs may seek review any time an IJ believes the BIA's holding (a) was clearly contrary to statute, regulation, or binding precedent; (b) "fail[s] to resolve the basis for appeal, including being vague, ambiguous, [or] internally inconsistent"; or (c) clearly did not "consider[] a material factor pertinent to the issue(s) before the immigration judge." 85 Fed. Reg. at 81,590. The parties are not provided an opportunity to respond unless the Director requests it. *Id.* at 81,627. Upon reviewing the case, the Director may "issue a precedent decision" or "remand the case back to the BIA for further proceedings," among other options. 85 Fed. Reg. at 81,625; Compl. ¶¶ 255, 265.

## IV.     Defendants' Stated Justifications for the Rule

Defendants purport to justify the Rule as a means to "ensure the consistency, efficiency, and quality of [EOIR's] adjudications." 85 Fed. Reg. at 81,588. They also base it on a purported desire "to bring needed clarity to certain areas of law, improve efficiency at the BIA, ensure authority is appropriately exercised, reduce the risk of gamesmanship by parties, and promote impartial and timely adjudications." *Id.* at 81,593. Despite claiming that efficiency was the principal reason for issuing the Rule, Defendants did not discuss other possible means of increasing efficiency, such as the numerous proposals contained in an analysis by Booz Allen Hamilton that EOIR commissioned to study this exact issue. *See, e.g.*, Compl. ¶¶ 45, 299.[10]

## V.     Plaintiffs' Missions and Activities

These changes have a real and immediate impact on Plaintiffs and the noncitizens they serve. Plaintiffs are nonprofit organizations that work to help immigrants vindicate their legal rights and pursue relief for which they are eligible. Their missions include, among other things, serving as many noncitizens as possible in removal proceedings, improving access to counsel and substantive relief in immigration proceedings, and ensuring that all noncitizens—represented or not—are informed and able to meaningfully participate in their removal proceedings. *See* Ex. A, Decl. of Michelle N. Mendez ("CLINIC Decl.") at ¶ 5; Ex. B, Decl. of Andrea Saenz ("BDS Decl.") at ¶ 6; Ex. C, Decl. of Laura St. John ("FIRRP Decl.") at ¶ 10; Ex. D, Decl. of Smita Rao Dazzo ("HIAS Decl.") at ¶ 8; Ex. E, Decl. of Lisa Koop ("NIJC Decl.") at ¶ 7.

Though Plaintiffs have differing models for the delivery of legal services, one common method is reliance on *pro bono* attorneys to improve access to legal representation for

---

[10] *See* Booz Allen Hamilton, *Department of Justice, Executive Office for Immigration Review, Legal Case Study Summary Report*, at 26 (Apr. 6, 2017), https://bit.ly/35td6yo ("Booz Allen Report").

noncitizens. Plaintiff CLINIC oversees the BIA Pro Bono Project, which was founded by EOIR itself, as a means to promote efficiency and fairness in BIA proceedings. CLINIC Decl. at ¶¶ 16, 20-28. The Project is designed to identify meritorious appeals and staff them with *pro bono* counsel. *See id.* HIAS works with organizational partners along the U.S.-Mexico border to enable *pro bono* appellate representation before the BIA. HIAS Decl. at ¶ 21. Plaintiffs BDS, FIRRP, and NIJC place a significant percentage of their casework, including before the BIA, with *pro bono* attorneys; for example, NIJC partners with more than 2,000 *pro bono* attorneys. BDS Decl. at ¶ 19; FIRRP Decl. at ¶ 12; NIJC Decl. at ¶ 17. Plaintiff CLINIC provides assistance to dues-paying affiliates in 48 states who provide *pro bono* or low-cost immigration services to respondents in EOIR proceedings. CLINIC Decl. at ¶¶ 8-9. Affiliates and *pro bono* attorneys alike rely on Plaintiffs to provide instruction on representation before EOIR as well as mentorship and oversight of the case process. *See, e.g.*, *id.* ¶¶ 30, 44, 57.

Assistance to *pro se* litigants is another key activity that Plaintiffs undertake to fulfill their missions. For instance, Plaintiffs NIJC and FIRRP receive funding from Defendants to manage the Legal Orientation Project ("LOP") and the Immigration Court Helpdesk ("ICH"). NIJC Decl. at ¶ 12; FIRRP Decl. at ¶ 11. These programs exist to facilitate self-representation by noncitizens and require Plaintiffs to engage with significant numbers of individuals whom they will not represent directly. In particular, FIRRP's LOP covers detention centers near the U.S.-Mexico border and reaches thousands of detained noncitizens in any given year. *See* FIRRP Decl. at ¶¶ 11, 19. The ICH run by NIJC serves the Chicago Immigration Court, one of the busiest immigration courts in the country. NIJC Decl. at ¶ 12.

In addition to their services assisting *pro se* litigants and *pro bono* counsel, Plaintiffs directly represent respondents in EOIR proceedings. Plaintiffs have intake procedures and

receive specific funding to serve as many clients as possible. *See* BDS Decl. at ¶ 29; FIRRP Decl. at ¶ 82; HIAS Decl. at ¶¶ 8, 61; NIJC Decl. at ¶¶ 8, 84. For CLINIC's Motions to Reopen Project, the objectives of the project and the direct representation feasible under it are directly impacted by the Rule. CLINIC Decl. at ¶¶ 17-18, 30, 43. Additionally, BDS acts as assigned counsel in detained removal proceedings in New York City. BDS Decl. at ¶ 9. And Plaintiffs FIRRP, BDS, and NIJC accept appointments for clients who are not mentally competent to represent themselves in their immigration proceedings because of a serious mental disorder under the National Qualified Representative Program, which is funded by Defendants. *See* FIRRP Decl. at ¶¶ 11, 46; BDS Decl. at ¶ 14; NIJC Decl. at ¶ 13. In these contexts, Plaintiffs will be expected to continue serving the same number of assigned or appointed clients, even though the Rule makes immigration representation more uncertain, costly, time- and labor-intensive, and complex.

In all, Plaintiffs work to provide legal services to noncitizens and to ensure the overall fairness of removal proceedings. Both of these aims are frustrated by the Rule.

## LEGAL STANDARD

Section 705 of the APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of [the] agency action or to preserve status or rights pending conclusion of the review proceedings" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705.

In determining whether to stay agency action under section 705, the Court considers the familiar four-factor test governing issuance of a preliminary injunction. *See, e.g.*, *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). That test requires movants to establish "that (1) they are likely to succeed on the merits, (2) they are likely to suffer

16

irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their

favor, and (4) an injunction is in the public interest." *Id.* (citing *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008)). When the Government is the opposing party, the last two factors

merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts in this Circuit have traditionally

evaluated the four factors "on a sliding scale," under which "[i]f the movant makes an unusually

strong showing on one of the factors, then it does not necessarily have to make as strong a

showing on another factor." *Davis v. PBGC*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (internal

quotation omitted); *see also Confederated Tribes of Chehalis Reservation v. Mnuchin*, 456 F.

Supp. 3d 152, 162 (D.D.C. 2020) ("In the absence of a D.C. Circuit decision overruling it, the

sliding scale framework remains binding precedent that this court must follow.")

## **ARGUMENT**

### I.    **Plaintiffs Are Likely to Succeed on the Merits**

The Rule must be set aside under the APA for several reasons: because it is contrary to

the INA and the Due Process Clause; because it exceeds Mr. McHenry's authority; because it is

arbitrary and capricious under the APA; because it violated the RFA; and because it was issued

without observance of necessary procedures. *See* Compl. ¶¶ 351-69, 376-94. Success on even

one of these claims would require that the Rule be stayed. *See* 5 U.S.C. § 705(2); *CLINIC v.*

*EOIR*, No. 20-cv-3812, 2021 WL 184359, at *11 (D.D.C. Jan. 18, 2021) ("Plaintiffs need show

that they are likely to succeed on only one of their claims to justify a stay of the Final Rule's

effective date or preliminary injunction."). Plaintiffs are likely to succeed on all of them.

### A.    **Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Contrary to Law**

The APA requires courts to "set aside" agency action that is "not in accordance with law"

or "contrary to constitutional right." 5 U.S.C. § 706(2)(A), (B). The Rule must be set aside

because it is contrary to numerous provisions of the INA, as well as implementing regulations issued by the Attorney General.[11]

### 1. **The Rule Is Contrary to the INA**

As explained in the Complaint, the Rule contravenes numerous provisions of the INA, as well as EOIR's governing regulations. *See* Compl. ¶ 353. Because any one of those conflicts provides a sufficient basis for the Court to grant the relief requested herein, this motion focuses on four of the most significant violations: the requirement that the BIA determine appeals, the mandatory prohibition of removal to persecution or torture, the right to present evidence, and the right to counsel.

*8 U.S.C. § 1101(a)(47)(B)—BIA determination of appeals.* The INA explicitly provides that IJs' orders of deportation become final only upon a "determination by the [BIA] affirming such order," or the expiration of the time to file a notice of appeal. 8 U.S.C. § 1101(a)(47)(B). But under the Rule, most appeals pending more than 335 days after a notice of appeal will *not* be determined by the BIA. Instead, the case shall be determined by the EOIR Director. 85 Fed. Reg. at 81,653. The Rule thus establishes a procedure for making orders of deportation final without any determination by the BIA, in plain contravention of Section 1101(a)(47)(B).

*8 U.S.C. § 1231(b)(3)—Mandatory protection from removal.* The INA provides that "the Attorney General *may not remove* an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion,

---

[11] The Rule is also contrary to the Due Process Clause. *See* Compl. ¶¶ 385-93. Because this claim overlaps with the claim that it is contrary to the right of counsel and right to present and examine evidence enshrined in the INA, the Court would presumably not reach any due process issues under the doctrine of constitutional avoidance. Plaintiffs therefore omit that argument from this brief but would be happy to provide supplemental briefing if the Court finds it necessary, and reserve the right to raise this and all other claims not addressed in this motion for preliminary relief when the parties brief the case on the merits.

nationality, membership in a particular social group, or political opinion." 8 U.S.C.

§ 1231(b)(3)(A) (emphasis added). This protection, known as withholding of removal, is

required by the United States' international treaty obligations. *See generally INS v. Stevic*, 467

U.S. 407 (1984). The Rule violates the withholding statute in multiple respects. Most critically,

the Rule instructs the BIA to treat an application as abandoned if a noncitizen does not complete

required background checks—even if the BIA has previously determined that the noncitizen has

demonstrated eligibility for withholding of removal. *See supra* p. 11. Because background

checks are only required following a grant of relief, this provision only applies to noncitizens for

whom the BIA has ordered or affirmed a grant of relief. Therefore, the provision requiring the

BIA to treat these applications as abandoned will necessarily result in the removal of individuals

whom the BIA has determined qualify for mandatory protection from removal. Similarly, by

eliminating *sua sponte* reopening and remand motions, the Rule eliminates the ability of

individuals to seek these mandatory protections from removal based on intervening law or facts

that would make them eligible to do so.

*8 U.S.C. § 1229a(b)(4)(B)—Right to examine and present evidence.* The INA ensures that

noncitizens in removal proceedings "shall have a reasonable opportunity to examine the evidence

against [them] [and] to present evidence on [their] own behalf." 8 U.S.C. § 1229a(b)(4)(B)

(emphasis added). The Rule undermines these core due process protections in a number of ways.

First, DHS may seek a remand to the IJ based on new evidence from background checks, but the

noncitizen is prohibited from presenting counter- or rebuttal evidence in response to that

evidence. *See* 85 Fed. Reg. at 81,617. Second, the Rule newly permits the BIA to admit "facts"

based on official government documents, including adverse documents submitted by DHS, but

does not provide the noncitizen with notice or an opportunity to respond unless the BIA reverses

19

an IJ's grant of relief explicitly on the basis of those facts. *Id.* at 81,651. If the BIA affirms an adverse judgment based in part or in whole on such documents, the noncitizen does not get an opportunity to contest the evidence. Third, the BIA may now deem a grant of relief abandoned, or convert a grant of voluntary departure into a removal order, if the noncitizen fails to comply with certain written instructions served by U.S. mail, without providing the noncitizen a reasonable opportunity to contest whether they received notice of that requirement. *Id.* at 81,589, 81,651-52. Finally, the Rule allows the BIA to deny both requests for remand based on new evidence and requests for voluntary departure even where the noncitizen did not have an opportunity before the IJ to develop the record and present evidence in support of those requests. *See* Compl. ¶¶ 115, 173. Both individually and collectively, these changes deprive noncitizens of a reasonable opportunity to examine and present evidence, and are therefore contrary to the INA.

*8 U.S.C. § 1362—Right to counsel.* The INA (and, as explained in the Complaint, the Due Process Clause) guarantees that all noncitizens in appellate proceedings "shall have the privilege of being represented (at no expense to the Government) by such counsel . . . as he shall choose." 8 U.S.C. § 1362.[12] In light of the "high stakes of a removal proceeding and the maze of immigration rules and regulations," "[o]ne way we ensure that the 'standards of fairness' are met is by guaranteeing that aliens have the opportunity to be represented by counsel." *Biwot v. Gonzales*, 403 F.3d 1094, 1098 (9th Cir. 2005) (quoting *Bridges*, 326 U.S. at 154). As in other contexts, the right to counsel requires *meaningful* representation. *See, e.g.*, *McFarland v. Scott*,

---

[12] While section 1362 refers to "appeal proceedings before the Attorney General," EOIR has recognized that it applies equally to proceedings before the BIA, which is exercising authority delegated by the Attorney General. *See, e.g.*, 85 Fed. Reg. at 81,597 n.21 (noting that section 1362 applies "[i]n an appeal to the Board in removal proceedings"). Additionally, section 1229a(b)(4)(A) provides an analogous right to counsel before an IJ. The provisions of the Rule that interfere with this right at the IJ level, such as the elimination of administrative closure and *sua sponte* reopening, violate that provision as well.

512 U.S. 849, 858 (1994) ("[T]he right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's . . . claims."). Thus, EOIR "must provide aliens with reasonable time to locate counsel and permit counsel to prepare for the hearing." *Biwot*, 403 F.3d at 1099.

In order for the right to counsel to be meaningful, EOIR cannot impose "obstacles" such as "time restrictions" that have "the cumulative effect of … prevent[ing] aliens from contacting counsel and receiving any legal advice." *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565-66 (9th Cir. 1990).[13] The Rule directly interferes with the right to be meaningfully represented by counsel by severely restricting the timeframe under which appellate counsel must be identified, agree to representation, learn the case, and prepare a brief. *See, e.g.*, Compl. ¶¶ 86-109. Specifically, it requires that all respondents file their briefs within 21 days of the *issuance* of a briefing schedule. Because the transcripts and decision issue with the briefing schedule, this timeline also marks the first opportunity that a *pro se* noncitizen will have to share the IJ's oral decision with counsel. The Rule prohibits the BIA from extending that deadline by more than 14 days under *any* circumstance. *See* 85 Fed. Reg. at 81,654. No matter what the need—a natural disaster, a critical health emergency, competing court deadlines, the complexity of a case—respondents and their counsel cannot obtain more than a single two-week extension.

---

[13] *See also, e.g.*, *Subhan v. Ashcroft*, 383 F. 3d 591, 596 (7th Cir. 2004) (concluding that the IJ and BIA's denial of a continuance without providing any reasoning violated the applicant's statutory right to seek an immigration remedy for which he otherwise qualified); *Rios-Berrios v. INS*, 776 F.2d 859, 863 (9th Cir. 1985) (failure to grant continuances violated right to counsel); *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1300 (7th Cir. 1975) ("[T]he immigration judge had no justification for denying a reasonable further continuance to the Castanedas for the purpose of obtaining counsel."); *Chlomos v. DOJ, INS*, 516 F.2d 310, 314 (3d Cir. 1975) ("While two continuances were granted in this case, as a practical matter, they were inadequate to make the services of his chosen counsel available to petitioner.").

As Plaintiffs and others explained in their comments on the Rule, this compressed and unalterable timeline, combined with the unavailability of a written transcript until a briefing schedule is issued and the unpredictability of when the BIA issues that schedule, will make it nearly impossible for noncitizens to retain counsel. This, in turn, will devastate Plaintiffs' abilities to form attorney client relationships with prospective clients or match noncitizens with *pro bono* partners. *See* Compl. ¶¶ 86-105; *see also CLINIC*, 2021 WL 184359, at \*12 ("Congress was concerned not merely about the right to counsel in removal proceedings, but with actual access to counsel for persons who Congress anticipated might not be able to afford to hire private lawyers.").[14] Just as numerous courts have found that continuances may be necessary for a noncitizen to have a meaningful right to counsel before an IJ, *see supra* n.13, a flat prohibition on extensions longer than two weeks will eviscerate the right to counsel in a vast swath of cases. Accordingly, Plaintiffs are likely to succeed on their claim that the Rule violates Section 1362.

## 2.   The Rule Is Contrary to 8 C.F.R. § 1003.0(c)

Until 2019, the EOIR Director was completely prohibited from adjudicating cases or directing the result of an adjudication by the BIA or an IJ. Under a regulation proposed by then-Attorney General Janet Reno and finalized by then-Attorney General Alberto Gonzales, "[t]he Director shall have no authority to adjudicate cases arising under the Act or regulations and shall not direct the result of an adjudication assigned to the Board, an Immigration Judge, the Chief Administrative Hearing Officer, or an Administrative Law Judge." Authorities Delegated to the Director of the EOIR, and the Chief Immigration Judge, 72 Fed. Reg. 53,673, 53,677 (Sept. 20, 2007) (promulgating 8 C.F.R. § 1003.0(c)); Authorities Delegated to the Director of the EOIR,

---

[14] *See also, e.g.*, NIJC, Publ. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 3-11 (Sept. 26, 2020), https://bit.ly/3qUuW5J; CLINIC Comment at 5-11.

the Chairman of the BIA, and the Chief Immigration Judge, 65 Fed. Reg. 81,434, 81,436 (Dec. 26, 2000) (proposing same).

In a 2019 interim final rule, reissued as a new final rule on November 3, 2020, then-Attorney General William Barr created a limited exception to this rule. Organization of the Executive Office for Immigration Review, 85 Fed. Reg. 69,465 ("Nov. 3 Final Rule"); 84 Fed. Reg. 44,537 (Aug. 26, 2019) ("2019 IFR"). The 2019 IFR issued by the Attorney General added a caveat to the blanket prohibition in section 1003.0(c), stating that the EOIR Director would be able to adjudicate cases assigned to the BIA or an IJ "as provided by statute, regulation, or delegation of authority from the Attorney General, or when acting as a designee of the Attorney General." 8 C.F.R. § 1003.0(c). The 2019 IFR simultaneously provided a single such authorization: cases that had been pending before a single member of the BIA for more than 90 days, or a three-member panel for more than 120 days, and were not thereafter decided by the BIA Chairman or a BIA Vice Chairman within 14 days, would be "refer[red] . . . to the Director for decision." Former 8 C.F.R. § 1003.1(e)(8)(ii) (2020) (referring to deadlines established in section 1003.1(e)(8)(i)).

Attorney General Barr made clear that this exception was limited to its terms. In the Nov. 3 Final Rule, he explained that "the Director will only adjudicate cases on appeal that have exceeded regulatory deadlines, which would only occur after the record is complete, including the submission of briefs." 85 Fed. Reg. at 69,473.[15]

---

[15] *See also* 85 Fed. Reg. at 69,474 ("The IFR revised this process *only* by delegating the authority previously provided to the Attorney General to the Director to review *certain cases* before the BIA that have otherwise not been timely adjudicated … ." (emphasis added)); *id.* at 69,475 ("The Department also disagrees that the IFR vested broad or improper adjudicatory authority … . [T]he IFR delegated limited authority to the Director: 'in exigent circumstances … in those cases where the panel is unable to issue a decision within the established time limits [in

Thus, prior to the Rule issued by Mr. McHenry, the Attorney General had clearly prohibited the EOIR Director from adjudicating cases except where they had been pending before the BIA for a specific period of time, post-briefing, and had further provided that only the Attorney General could authorize adjudications beyond that category. In the Rule, however, Mr. McHenry purported to authorize himself to adjudicate a much broader range of cases: any case that had been pending for more than 335 days from the notice of appeal, regardless of whether the deadlines in section 1003.1(e)(8)(i) had elapsed. This purported authority is directly contrary to section 1003.1(c) and therefore "not in accordance with law." 5 U.S.C. § 706(2)(A).

It bears noting that this new authority is likely to apply to an enormous percentage of appeals before the BIA. According to the Rule, the median appeal takes 323 days from notice of appeal to decision. 85 Fed. Reg. at 81,619. The change thus means that the EOIR Director could decide nearly half of the appeals that reach the BIA—all appeals that are pending more than 12 days past the average. Even worse, the Rule acknowledges that *every* non-detained appeal filed during the last four years took more than 335 days to resolve. *Id.* If that trend continues, *every single case* involving a non-detained noncitizen would be decided by the EOIR Director rather than the BIA, despite the Attorney General's stated intent to limit Directorial adjudication "to only a narrow subset of EOIR cases," 85 Fed. Reg. at 69,475, and Congress's explicit command that an appealed order of removal would be final only when the *BIA* affirmed the order, 8 U.S.C. § 1101(a)(47)(B). The Rule is therefore not in accordance with law and must be set aside.

For similar reasons, the provision allowing IJs to certify cases to the EOIR Director, who then can "issue a precedent decision" or "refer the case back to the BIA" (presumably with

---

8 C.F.R. § 1003.1(e)(8)(i)]. … Clearly, the Director's scope of review is limited to only a narrow subset of EOIR cases.").

instructions to reverse their prior decision) violates 8 C.F.R. § 1003.0(c). No Attorney General

has ever delegated or designated anything remotely resembling this adjudicatory power,[16] and it

is therefore contrary to 8 C.F.R. § 1003.0(c) and must be set aside.

**B.    Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Arbitrary and Capricious**

In issuing a rule, an agency must "examine the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An

agency action is arbitrary and capricious "if the agency has relied on factors which Congress has

not intended it to consider, entirely failed to consider an important aspect of the problem, offered

an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Id.* An analysis that is "internally inconsistent" is arbitrary and capricious. *ANR

Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018). An agency must also "respond to

'relevant and significant' comments," *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d

1, 15 (D.C. Cir. 2015) (quoting *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 225 (D.C.

Cir. 2007)), which cannot be done merely by "[n]odding to concerns raised by commenters only

to dismiss them in a conclusory manner," *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020).

Plaintiffs are likely to succeed in showing that the Rule was arbitrary and capricious. The

---

[16] While then-Attorney General Barr delegated to Mr. McHenry "the authority to issue regulations related to immigration matters within the jurisdiction of [EOIR]," *see* Att'y Gen. Order No. 4910-2020 (Nov. 17, 2020), that Order did not delegate the authority to adjudicate cases, designate Mr. McHenry to adjudicate cases in the Attorney General's stead, or purport to override 8 C.F.R. § 1003.0(c).

Complaint explains the Rule's many flaws at length, but for this motion, the Court need only focus on its most glaring shortcomings.

*First*, the Rule failed to substantiate its core assertion that the Rule would improve efficiency, its purported chief goal. *See, e.g.*, 85 Fed. Reg. at 81,588. In fact, as numerous commenters pointed out, the Rule will likely *decrease* efficiency. For example, the Rule drastically restricts motions to remand to consider new evidence and directs noncitizens to instead "file a motion to reopen to submit new evidence after proceedings have concluded." *Id.* at 81,611 n.37. This provision will require the BIA to see an appeal through to its conclusion on the basis of outdated facts and then reopen the case and adjudicate it again—a plainly less efficient approach than the current system wherein the BIA can terminate an appeal where it expects new evidence will change the result and perhaps obviate the appeal altogether. Similarly, the Rule limits the scope of the IJ's review on remand, *see id.* at 81,652, forcing the IJ to issue a decision on what may be outdated facts or law by the time the IJ hears the case, which will often necessitate more appeals and motions.

In addition, many of the Rule's changes will force the parties to file longer briefs to address all possible issues, more motions to expand page limits, more reply briefs, and longer motions to justify extensions or continuances. *See* Compl. ¶¶ 88, 96, 100-01. The need for such practices will require the BIA to wade through a far larger volume of briefing and thereby slow its decisionmaking.

Nor did the Rule grapple with the impact on efficiency from its massive transfer of adjudicative authority from the BIA to the EOIR Director. By referring virtually all appeals pending more than 335 days to the EOIR Director, the Director will take on an enormous portion of the BIA's docket. This will plainly *slow* the resolution of appeals, as the EOIR Director's staff

will need to begin reviewing each appeal from scratch even if the BIA had already been considering it. Tellingly, the Rule places no time limits on the EOIR Director's consideration of a case. All that the Rule does to rebut comments about this delay is assert, conclusorily and implausibly, that "few, if any" appeals will be transferred, despite simultaneously acknowledging that the transferred cases would include every case pending for even 12 days longer than the average case. 85 Fed. Reg. at 81,619).

The Rule's elimination of the common case-management device of administrative closure will similarly decrease efficiency. As numerous commenters and courts have observed, administrative closure advances the "efficient and timely administration of immigration proceedings," and eliminating it "would in fact serve to lengthen and delay many of these proceedings by: (1) depriving IJs and the BIA of flexible docketing measures sometimes required for adjudication of an immigration proceeding, as illustrated by *Avetisyan*, and (2) leading to the reopening of over 330,000 cases upon the motion of either party, straining the burden on immigration courts." *Zuniga Romero*, 937 F.3d at 297. Indeed, even the report EOIR had produced with Booz Allen Hamilton recommended working with DHS "to administratively close cases awaiting adjudication in other agencies or courts" as a way to improve EOIR's efficiency.[17] EOIR not only failed to explain why it was reversing this prior conclusion, it failed to acknowledge that that contrary evidence even existed, rendering its decision arbitrary and capricious. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("[T]he agency must at least 'display awareness that it is changing position' . . . .") (quoting *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also, e.g.*, *3Q Digital, Inc. v. USCIS*, No. 19-

---

[17] Booz Allen Report, *supra* n.8, at 26.

cv-579, 2020 WL 1079068, at *4 (D.D.C. Mar. 6, 2020) (setting aside agency action where its "rationale for disregarding [a relevant] report was arbitrary and capricious").

Instead, in the face of this evidence, EOIR mainly cited an increase in cases pending following a 2012 BIA decision reaffirming the availability of administrative closure to imply that administrative closure caused the backlog. 85 Fed. Reg. at 81,599. This conflation of correlation with causation is grievously problematic given the many other factors increasing IJs' backlog over that period, like the unprecedented number of Central American migrants who fled to the United States seeking protection during that period. Not only did EOIR fail to acknowledge this reality, it made little attempt to respond to the many comments explaining it.[18] As many commenters explained, there are numerous other causes for the current backlog in the immigration courts and many means by which efficiency could be increased without inhibiting respondents' ability to pursue meritorious claims for relief.[19] Nevertheless, Defendants completely failed to consider whether they could better increase efficiency by addressing these issues, and, as noted, failed even to consider the report on this very issue that they had produced with Booz Allen Hamilton just a few years earlier. *See* Booz Allen Report, *supra* n.8, at 18-26. The Rule's purported efficiency rationale was therefore against the evidence in the record, failed

---

[18] *See, e.g.*, Aaron Reichlin-Melnick, Publ. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 7-8 (Sept. 25, 2020), https://bit.ly/3hDvPfr ("Reichlin-Melnick Comment").

[19] *See, e.g.*, CLINIC Comment at 5-6; Legal Aid Soc'y, Publ. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 7-8 (Sept. 25, 2020), https://bit.ly/3pqjRJ3 ("LAS Comment"); *see also, e.g.*, U.S. Gov't Accountability Off., GAO-18-469T, Testimony Before the Subcommittee on Border Security and Immigration, Committee on the Judiciary, Immigration Courts: Observations on Restructuring Options and Actions Needed to Address Long-Standing Management Challenges 9 (Apr. 18, 2018), https://bit.ly/3rQDJqm ("EOIR could take several actions to address long-standing management and operational challenges and reduce the case backlog. . . . Overall, EOIR has fully implemented 1 recommendation" of eleven total).

to consider important aspects of the problem, and failed to consider reasonable alternatives. *See State Farm*, 463 U.S. at 43.

    *Second*, Defendants failed to consider other important aspects of the problem before them. The most striking example is the complete failure to consider parallel rulemakings that affected the impact and propriety of this Rule. *See* Compl. ¶¶ 301-15. For example, the Rule repeatedly relied on the availability of motions to reopen to cure the gaps created by the procedural tools the Rules prohibited and relied on the availability of continuances to solve the inefficiencies created by eliminating administrative closure. *See, e.g.*, 85 Fed. Reg. at 81,611, 81,647. But just two weeks before finalizing the Rule, Defendants proposed two additional rules that would drastically reduce the availability of these escape valves.[20] And on January 8, 2021, apparently having concluded that time had run out to finalize those rules, Mr. McHenry issued a policy memo that implemented many of those changes in a sub-regulatory fashion.[21] A rule that "bas[es] its decision on a premise the agency itself has already planned to disrupt is arbitrary and capricious," and particularly "when the change impacts a contemporaneous and closely related rulemaking." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011); *see also, e.g.*, *Immig. Legal Res. Ctr. v. Wolf*, No. 20-cv-5883, 2020 WL 5798269, at *14 (N.D. Cal. Sept. 29, 2020) ("By failing to consider the combined impact of these rules, DHS either failed to consider an important aspect of the problem and disregarded 'inconvenient facts' about the combined impact of these rules, … or DHS reached a conclusion that defies common sense" (quoting *Fox Tele. Stations*, 556 U.S. at 537). Yet the Rule contains no mention of these or the many other

---

    [20] *See* Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal, 85 Fed. Reg. 75,942 (Nov. 27, 2020); Good Cause for a Continuance in Immigration Proceedings, 85 Fed. Reg. 75,925 (Nov. 27, 2020).

    [21] *See* Memorandum from EOIR Dir. James McHenry to the EOIR (Jan. 8, 2021), https://bit.ly/38udq1T; *see also* Compl. ¶ 56.

changes that DOJ and DHS were simultaneously making to the standards and procedures governing immigration proceedings.

As another example, Defendants refused to consider the possibility that changes such as the elimination of administrative closure would disproportionately affect noncitizens who "are likely to have followed legal requirements and obtain lawful status," rejecting that concern as "of little relevance to the rule." 85 Fed. Reg. at 81,648 (internal quotation omitted). But as then-Judge Barrett explained when rejecting an earlier attempt to eliminate administrative closure, "cases must be disposed of fairly, and granting a noncitizen the opportunity to pursue relief to which [he or] she is entitled may be appropriate and necessary for a fair disposition." *Meza Morales*, 973 F.3d at 665; *see supra* pp. 5-6 (explaining role of administrative closure when noncitizen has an application pending with USCIS). Defendants' failure to consider the effect of rushing through orders of removal against individuals who are likely to obtain relief once USCIS processes their application—relief that Congress specifically created—is a naked refusal to consider an obvious and important aspect of the problems facing a judicial system.

A similar omission taints many of the Rule's other changes, such as the elimination of *sua sponte* reopening and the limitations on remands. Indeed, Defendants' description of *sua sponte* authority as being a means to "circumvent regulatory or statutory deadlines," 85 Fed. Reg. at 81,633, entirely ignores Defendants' explicit intention when creating those deadlines that they coexist with *sua sponte* authority so that the BIA would have "a procedural vehicle for the consideration of cases with exceptional circumstances," EOIR; Motions and Appeals in Immigration Proceedings, 61 Fed. Reg. 18,900, 18,902 (Apr. 29, 1996). Defendants thus failed to provide a reasoned explanation "for disregarding facts and circumstances that underlay … the prior policy." *Fox Tele. Stations*, 556 U.S. at 516.

Defendants similarly disregarded or gave short shrift to a number of other significant aspects of the problem before them. They discounted the impact on *pro se* and detained individuals, who are more likely to be inhibited by the Rule as they both seek counsel and pursue self-representation. Defendants also discounted—indeed, never mentioned—the impact of these changes on LOP and ICH programming that is designed to serve *pro se* and detained noncitizens. They also overlooked the impact on other vulnerable groups, such as noncitizens who may be removed to persecution or harm without the opportunity to contest their removal or present new evidence regarding their fear. Defendants repeatedly cited alternative routes to relief, such as joint motions to reopen, without grappling with the fact that they are entirely unavailable to many noncitizens.[22] All told, Defendants' failure to acknowledge that the Rule forecloses relief for some noncitizens, much less weigh that fact against any competing considerations, is arbitrary and capricious. *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (agencies must "pay[] attention to the advantages and the disadvantages" of their rules) (emphasis in original).

Moreover, despite the fact that many provisions of the Rule apply to ongoing removal proceedings and are therefore retroactive, Defendants discussed the reliance interests of the millions of individuals in removal proceedings only with regard to administrative closure, *see* 85 Fed. Reg. at 81,601, 81,643, 81,645, ignoring the impact of the numerous other changes on reliance interests. *See* Compl. ¶¶ 205, 244; *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (agency must "assess whether there were reliance interests, determine whether they

---

[22] *See, e.g.*, Cap. Area Immigrants' Rts. Coal., Pub. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 30-32 (Sept. 26, 2020), https://bit.ly/3oE2tjb ("CAIR Comment") (discussing joint motions to reopen). As another example, *compare* 85 Fed. Reg. at 81,644 (suggesting that individuals could take voluntary departure and then seek a provisional waiver from DHS) *with* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 Fed. Reg. 50,244, 50,256 (July 29, 2016) ("[I]ndividuals granted voluntary departure will not be eligible for provisional waivers.").

were significant, and weigh any such interests against competing policy concerns"). They similarly brushed off the interests of small entities (including several of the Plaintiffs) without reasoned analysis, despite the RFA's requirement that they be considered. *See* 5 U.S.C. § 605(b) (requiring a factual basis for the certification that small entities are not affected); *CLINIC*, 2021 WL 184359, at *10 ("Congress plainly had as an objective under the INA to optimize the availability of pro bono or low-cost counsel to persons subject to removal.").

*Third*, the Rule is riddled with internal inconsistencies. *See Encino Motorcars*, 136 S. Ct. at 2126 ("'Unexplained inconsistency' [is] 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'") (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). For example, the Rule reversed the longstanding policy of allowing the BIA to remand to the IJ for further factfinding because it purportedly forces the BIA to "act[] on behalf of a party in order to advance that party's arguments," thereby "abdicating its role as an impartial or neutral arbiter." 85 Fed. Reg. at 81,605. This is an absurd characterization of the unremarkable authority of an appellate court to determine that the trier of fact had insufficient facts to resolve the case before it. However, it perfectly describes a different new authority that the Rule created: the unprecedented authority of IJs to ask the EOIR Director to reverse the BIA if an IJ thinks the BIA should have come out the other way. *See id.* at 81,590. This new process truly *does* "abdicat[e] [the IJ's] role as an impartial or neutral arbiter" and put IJs in the position of "acting on behalf of a party in order to advance that party's arguments." *Id.* at 81,605. As the Round Table of Former Immigration Judges explained in its comment, "[i]t is wholly inappropriate for a trial judge to have the authority to appeal from an appellate tribunal's decision which reverses her/him. … [IJs] are

neutral arbitrators, not parties in the cases they hear."[23] Nonetheless, Defendants did not apply the same standard that they applied to BIA remands. Similarly, Defendants repeatedly justify changes as promoting "finality," *see, e.g.*, *id.* at 81,591, 81,615, 81,628-30, 81,632, but do not acknowledge that allowing IJs to relitigate appeals inhibits finality, much less explain why they are creating such a significant deviation from one of their major purported goals.

As another example, the Rule's approach to data—and, just as critically, the absence of data—is internally inconsistent. Defendants brushed off comments pointing out that there was no data or other evidence to support Defendants' assertions of inappropriate remands or difficulties applying the BIA's remand standards, demurring that such data "is not available and is likely untraceable." *Id.* at 81,606 n.31. But where it suited their interests, Defendants faulted commenters for not providing "granular data" to support their criticisms. *Id.* at 81,644 n.74.

Similarly, the Rule asserts that there is "no accepted way of determining whether an adjudicator's decision is normatively 'correct,'" *id.* at 81,627 n.50, yet insists that existing procedures have been insufficient to "ensure[] that the Board issues a quality or correct decision in every case," *id.* at 81,627 n.52. Federal court review is the means for ensuring quality BIA decisions. *See* 8 U.S.C. § 1252; *Kucana v. Holder*, 558 U.S 233, 251 (2010) (presumption of judicial review of administrative action). Nothing in the Rule will alleviate this burden on federal courts; instead it promises *more* appeals by funneling the work of 23 BIA members through the single EOIR director and inviting trial judges into the appeal process through IJ certifications.

*Fourth*, Defendants ignored significant comments. For example, commenters explained that the Rule would cripple the EOIR BIA Pro Bono Project.[24] Defendants did not acknowledge

---

[23] Round Table of Former Immig. Judges, Pub. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 10-11 (Sept. 24, 2020), http://bit.ly/3oFfRE8.

[24] *See, e.g.*, Reichlin-Melnick Comment at 5-6; CAIR Comment at 11-13.

this concern, despite relying on the Project to mitigate "any negative impact on representation before the BIA." *See, e.g.*, 85 Fed. Reg. at 81,637. Plaintiffs and others explained why shortening the BIA briefing schedule would destroy the ability of immigration lawyers to take on *pro bono* cases,[25] but Defendants dismissed this concern. Given Congress's express "concern for the availability of pro bono and low-cost legal services in removal proceedings," "when multiple legal service providers raised the alarm that [the Rule] would adversely impact their organizations and would depress their capacities to provide pro bono and low-cost legal services, the APA required EOIR to acknowledge those concerns and respond to them in a meaningful way, not blithely dismiss them." *CLINIC*, 2021 WL 184359, at *12.

Similarly, Defendants dismissed concerns about the Rule's effect on *pro se* individuals by noting that most individuals are represented before the BIA. *See,* 85 Fed. Reg. at 81,606. This retort ignores commenters' criticisms of the changes in practice *before IJs*, as well as their concern that the changes in practice before the BIA will reduce the already low number of individuals who can obtain counsel in order to litigate an appeal. *See* Compl. ¶ 136.

Defendants also failed to acknowledge many of the alternatives commenters proposed, much less provide a reasoned explanation for rejecting them. For example, commenters proposed staffing changes, revised standards or more targeted constraints for the judicial tools Defendants were banning, or deferring changes until an electronic filing system is in place.[26] Defendants largely ignored these proposals altogether, and at best "[n]odd[ed] to [them] only to dismiss them in a conclusory manner," *Gresham*, 950 F.3d at 103. Defendants therefore failed to fulfill their obligation to provide a reasoned explanation for their choices.

---

[25] *See, e.g.*, CLINIC Comment at 8-9.

[26] *See, e.g.*, CLINIC Comment at 5-6; LAS Comment at 7-8.

**C.      Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to Provide an Adequate Opportunity to Comment**

The APA requires that agencies "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). This requires "adequate time for comments" so that "interested parties [can] comment meaningfully." *Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988).

Courts have recognized that "90 days is the 'usual' amount of time allotted for a comment period." *Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1176 (N.D. Cal. 2019) (quoting *Prometheus Radio Proj. v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011)). As the D.C. Circuit has explained, "a thirty-day period as "is, in the Administrative Conference's view, 'an inadequate time to allow people to respond to proposals that are complex or based on scientific or technical data.' The Administrative Conference itself thus suggests a sixty-day period as 'a more reasonable *minimum* time for comment.'" *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (footnotes omitted). Accordingly, two Executive Orders instruct agencies that, "[t]o the extent feasible and permitted by law, each agency *shall* afford the public a meaningful opportunity to comment . . . , with a comment period that should generally be at least 60 days." Exec. Order 13,563, Improving Regulation and Regulatory Review, 76 Fed. Reg. 3,821, § 2(b) (Jan. 18, 2011) (emphasis added); *see also* Exec. Order 12,866, Regulatory Planning and Review, 58 Fed. Reg. 51,735, § 6(a) (Sept. 30, 1993) ("[I]n most cases [rulemaking] should include a comment period of not less than 60 days.").

The Rule was a "significant regulatory action" whose issuance needed to be "consistent with the principles of Executive Orders 12866 and 13563." 85 Fed. Reg. at 81,643 (citation omitted). Yet Defendants provided just 30 days to comment. As a court explained while preliminarily enjoining another DOJ immigration rule, 30 days for a complex immigration-

related rule that is part of a "staggered" rulemaking process "in which [DOJ and DHS] published this NPRM and several other related proposed rules" is likely inadequate. *Pangea Legal Servs. v. DHS*, No. 20-cv-7721, 2020 WL 6802474, at *22 (N.D. Cal. Nov. 19, 2020).

Defendants' proposed Rule contains at least a dozen separate changes to a byzantine process affecting the lives of hundreds of thousands of immigrants and asylum seekers. 85 Fed. Reg. at 81,588-92. It was proposed and finalized during a period in which DOJ and DHS issued numerous interrelated rules, along with a slew of policy memoranda and precedential immigration decisions from the BIA or the Attorney General. *See* Compl. ¶ 62. And it was issued during a global pandemic that complicated and slowed business all across the United States.

Defendants provided no reason to believe a 30-day comment period was necessary or even preferable, nor attempted to justify their deviation from the governing Executive Orders. Instead, they offered inaccurate responses to commenters' pleas for more time. For example, Defendants asserted that "commenters did not suggest or indicate what additional issues the comment period precluded them from addressing." 85 Fed. Reg. at 81,642. This is false: numerous commenters identified specific issues they would have addressed given more time, such as the interaction between this Rule and the recently proposed Asylum Procedures Rule; the effect of *Matter of A-C-A-A-*, 28 I. & N. Dec. 84 (AG 2020), issued by then-Attorney General Barr the day before the close of the comment period; and the implications of domestic and international law on the legality of the Rule.[27]

---

[27] *See* Reichlin-Melnick Comment at 2-3; Am. Immig. Lawyers Ass'n, et al., Publ. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 2 (Sept. 25, 2020), https://bit.ly/3or8uj1; Ctr. for Gender & Refugee Studies, Publ. Comment on 85 Fed. Reg. 52,491 (Aug. 20, 2020), at 4 (Sept. 25, 2020), https://bit.ly/2NzSbU8.

The comment period was particularly inadequate because commenters were unable to fully opine on the Rule's interaction with the various rulemakings and decisions issued during the comment period or the subsequently issued NPRMs on inextricably related subjects. *See* Compl. ¶¶ 302-14, 327; *see, e.g.*, CLINIC Decl. ¶ 71; *see also Pangea Legal Servs.*, 2020 WL 6802474, at *22. Accordingly, Defendants provided neither a sufficient opportunity to comment nor a reasoned explanation for their rushed deadline, making the Rule invalid under the APA.

### D.      Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to Comply with the Regulatory Flexibility Act

The RFA requires federal agencies to analyze how rules will affect "small entities," which most Plaintiffs are, and to publish the final results of that analysis when promulgating a new Rule. 5 U.S.C. § 604. Defendants did not conduct an RFA analysis of the Rule.

An agency can forgo the RFA analysis "if the head of the agency certifies" that the Rule will not significantly impact small entities and publishes that certification in the Federal Register with the final Rule. 5 U.S.C. § 605(b). Defendants failed to provide such a certification. Instead of the "head of agency" certifying compliance with the RFA, the Rule simply states that unspecified personnel of "the Department … has determined" that the Rule complied with the RFA. 85 Fed. Reg. at 81,650. Strikingly, Defendants provide an example of a proper § 605(b) certification from prior rulemaking, *see id.* at 81,646, but inexplicably fail to do the same for the Rule itself. As such, Defendants failed to comply with the certification process under § 605(b) of the RFA. Similarly, as discussed above, Defendants failed to support the certification with a reasoned analysis, making it arbitrary and capricious. *See supra* p. 32. Accordingly, the Court should stay the Rule and remand it to the agency for corrective action. 5 U.S.C. § 611(a)(4); *see Nw. Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 16 (D.D.C. 1998) (remanding Rule to the agency due to violation of § 605(b)).

## II.     The Rule Will Irreparably Harm Plaintiffs

Plaintiffs and their clients face immediate and irreparable harm absent an order enjoining the Rule. To demonstrate irreparable harm, Plaintiffs must first show that the harm is "certain and great," "actual and not theoretical," and so "imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (citation omitted). Second, the harm "must be beyond remediation." *Id.* The D.C. Circuit has held that an organization suffers irreparable injury where defendants' action will "perceptibly impair[]" its programs and "directly conflict" with its mission, and where "there can be no do over and no redress." *Id.* at 8-9; *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (looking to whether "a defendant's conduct has made the organization's activities more difficult" or "conflict[s] with the organization's mission"). Plaintiffs satisfy this test.

Plaintiffs' missions are, at their core, to help immigrants seeking safety and security in the United States to vindicate their legal rights and pursue relief for which they are eligible. Compl. ¶ 336; *see also supra* pp. 14-16. Plaintiffs pursue this mission by providing free or low-cost legal services to low-income immigrants and asylum seekers, coordinating representation by *pro bono* partners and affiliates, and assisting *pro se* respondents. CLINIC Decl. ¶¶ 6-15; BDS Decl. ¶¶ 7-22; FIRRP Decl. ¶ 34; HIAS Decl. ¶¶ 11-13, 21; NIJC Decl. ¶¶ 10-18. The Rule frustrates these missions by making representation of immigrants in removal proceedings costlier and more time- and labor-intensive, which will reduce Plaintiffs' overall capacity to take cases, impair their ability to locate and train *pro bono* counsel, jeopardize their funding, and overburden their *pro se* assistance programs. *See* Compl. ¶¶ 337-48; *see, e.g.*, CLINIC Decl. ¶¶ 30, 54-56; BDS Decl. ¶¶ 27, 62-66; FIRRP Decl. ¶ 27-31; HIAS Decl. ¶¶ 59-62; NIJC Decl. ¶¶ 82-91. It

will also lead to the removal of immigrants with valid claims for relief and the loss of legal rights, the very injustices Plaintiffs exist to prevent. *See* Compl. ¶¶ 349-50.

Several courts in this District have found irreparable harm on remarkably similar facts. Just in the past few weeks, three different judges have found that Plaintiffs and similar organizations have standing to challenge and are irreparably harmed by rules that interfere with counsel's ability to provide services to noncitizens in removal proceedings. *See CLINIC*, 2021 WL 184359, at *13-14 (challenge by Plaintiff CLINIC to EOIR rule increasing fees for noncitizens); *Nw. Immig. Rts. Proj. v. USCIS*, No. 19-cv-3282, 2020 WL 5995206 (challenge by other legal service organizations to USCIS rule increasing fees for noncitizens); Order, *NIJC v. EOIR*, Dkt. No. 11, No. 21-cv-56 (D.D.C. Jan. 14, 2021) (challenge by Plaintiff NIJC to EOIR rule altering procedures for adjudicating asylum applications); *see also, e.g.*, *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38-9 (D.D.C. 2020) (finding standing and enjoining rule that "will frustrate [plaintiff legal services organizations'] ability to provide legal services directly to asylum applicants, a core component of their respective missions"). Those decisions should guide this Court's analysis in the following respects.

First, in both fee cases, Plaintiffs showed that the Final Rule "will interfere with the[ir] ability … to provide essential services to their clients and/or members—in some cases irretrievably so." *CLINIC*, 2021 WL 184359, at *13 (quoting *Nw. Immig. Rts. Proj.*, 2020 WL 5995206, at *30, *32). Just so here. The Rule's expedited briefing schedule and inflexible limit on extensions will interfere with Plaintiffs' ability to form attorney-client relationships with many of the noncitizens they would otherwise serve, impede their ability to provide adequate representation to their existing clients, and make it more difficult, if not impossible in many cases, to assist *pro se* respondents with self-representation. *See* Compl. ¶¶ 337-40; CLINIC Decl.

¶¶ 34-38; BDS Decl. ¶¶ 28-36; FIRRP Decl. ¶¶ 33-44; HIAS Decl. ¶¶ 21-25; NIJC Decl. ¶¶ 25-35. It will likewise reduce Plaintiffs' ability to rely on their *pro bono* and volunteer programs, which significantly augment the number of noncitizens that they can serve. *See* Compl. ¶¶ 340-43. Specifically, as Plaintiffs and numerous other commenters explained, it will be extremely difficult for Plaintiffs to recruit, refer, and train *pro bono* attorneys to represent noncitizens on appeal in the timeline imposed by the Rule. *See* CLINIC Decl. ¶ 36; BDS Decl. ¶ 33; FIRRP Decl. ¶¶ 38-39; HIAS Decl. ¶ 25; NIJC Decl. ¶ 29. As such, it will be harder to place *pro bono* cases and more work will fall on in-house staff as their capacity is being squeezed by the Rule. Even when a private *pro bono* attorney ultimately takes a case, Plaintiffs' staff will have to dedicate additional time to mentorship given the compressed timeline, substantive changes, and dire consequences that the Rule introduces. *See, e.g.*, CLINIC Decl. ¶ 36.

Second, judges in this District have recognized that the need to divert resources from other work is a form of irreparable harm. In *CLINIC*, the court recognized that the diversion of resources to "prepare training materials and provide technical assistance" on forthcoming challenges, was a cognizable and irreparable harm. *CLINIC*, 2021 WL 184359, at *13 (internal quotation omitted). Plaintiffs in this case will endure that very same hardship. *See, e.g.*, CLINIC Decl. ¶¶ 57-60 (noting that CLINIC must revamp published training materials on a variety of substantive matters and trial skills, as well as a number of practice advisories); FIRRP Decl. ¶ 53 (discussing changes needed to materials for *pro se* assistance, which are used nationally); HIAS Decl. ¶ 19 (noting that HIAS must develop new training modules and mentoring resources for *pro bono* attorneys). The *CLINIC* court recognized that the same harm accrued because the EOIR fee increases would frustrate plaintiffs' mission "by increasing the amount of work required per case[,] therefore limiting [the organization's] transformative impact by decreasing

the number of individuals [it] can serve." *CLINIC*, 2021 WL 184359, at *13 (citation omitted).

Again, so too here. This Rule's elimination of administrative closure will force Plaintiffs to engage in parallel representation before USCIS and EOIR, which previously would not have been needed. *See, e.g.*, CLINIC Decl. ¶ 32; HIAS Decl. ¶¶ 33-40; NIJC Decl. ¶¶ 55-59. The elimination of motions to remand will require Plaintiffs to litigate cases on the merits and only then file a motion to reopen, while also requiring Plaintiffs to engage in additional steps of seeking stays of removal and filing federal court appeals, little if any of which would be necessary in the context of a motion to remand. *See, e.g.*, FIRRP Decl. ¶ 48 ("This Rule will force FIRRP attorneys to fully and zealously litigate cases on appeal applying inaccurate laws or outdated facts, only to subsequently file motions to reconsider or reopen once there is a final order of removal in place."). The changes to voluntary departure will require Plaintiffs to preserve and develop a record on factual issues even when those issues are not relevant to, or even undermine, the primary claim for relief. *See, e.g.*, NIJC Decl. ¶ 72. None of that additional work would have been required absent the Rule. These are just a few examples; the ways in which the Rule increases the amount of work per case and thus decreases capacity are myriad.

Third, as courts have similarly recognized, increasing the cost of indigent representation and thereby creating a need to "divert time and resources to fundraising efforts" to cover new expenses is a form of irreparable harm. *CLINIC*, 2021 WL 184359, at *13 (internal quotation omitted). In this case, Plaintiffs have explained that the extraordinarily short timeframe to post a voluntary departure bond will require Plaintiffs to engage in fundraising and coordination of bond assistance for clients to make it possible to cover those fees in the five- or ten-day window that the Rule offers to post the bond. *See, e.g.*, CLINIC Decl. ¶ 44; NIJC Decl. ¶ 74. Plaintiffs have also explained that they will have to pay for additional mailing costs, in-person courier

services, international costs to connect with removed individuals, traveling expenses due to more frequent court visits, and additional staffing to accommodate other changes that the Rule imposes. *See, e.g.*, BDS Decl. ¶¶ 32, 37; FIRRP Decl. ¶ 34(e); HIAS Decl. ¶ 45; CLINIC Decl. ¶¶ 36, 50. The need to do this sort of coordinating and/or fundraising work is a cognizable irreparable harm. And, as in *CLINIC*, the expected reduction in the number of clients Plaintiffs can represent is anticipated to directly reduce the amount of funding they receive. *See* CLINIC Decl. ¶¶ 54-55; BDS Decl. ¶¶ 29, 63; FIRRP Decl. ¶¶ 80-84; HIAS Decl. ¶ 61; NIJC Decl. ¶¶ 83-84; *see CLINIC*, 2021 WL 184359, at *9, *13 (discussing impacts on plaintiffs' funding).

Fourth, Plaintiffs CLINIC and HIAS have identified specific projects that are likely to be fundamentally changed or even cease to exist as a result of the Rule. CLINIC oversees the EOIR BIA Pro Bono Project and runs a Motions to Reopen Project, and HIAS also runs a BIA Project. These projects are devoted to placing appeals and motions to reopen with *pro bono* attorneys, but the timing and substantive changes in this Rule will make those referrals all but impossible. *See* CLINIC Decl. ¶¶ 34-38; HIAS Decl. ¶¶ 21-25.

The Court should also consider the irreparable harm that the Rule imposes on Plaintiffs' clients and the populations they serve. *See, e.g.*, *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) (finding that attorneys with standing may also assert their clients' rights if it is "credibly alleged" that the challenged action "may 'materially impair the ability' of third persons in [the clients'] position to exercise their constitutional rights") (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 445 (1972)). The Rule will deny due process to respondents and make it impossible for noncitizens who are in removal proceedings to seek and be granted status and relief for which they are eligible. This harm will accrue to survivors of domestic violence, abandoned children, survivors of human trafficking and violent crime, and refugees who qualify

42

for *mandatory* forms of protection from removal. The risk of wrongful removal, extended detention, and loss of due process protections is quintessentially irreparable harm. *See, e.g.*, *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998) ("There is no way to calculate the value of such a constitutional deprivation or the damages that result from erroneous deportation.").

Finally, Plaintiffs face additional harm by "being irreparably deprived of a procedural protection to which they are entitled under the APA, because the agency has not considered the comments that Plaintiffs would have submitted as part of the required notice and comment process." *Make The Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 61 (D.D.C. 2019), *rev'd on other grounds and remanded sub nom. Make The Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020) (cleaned up). Due to the truncated comment period, Plaintiffs could not meaningfully comment on all aspects of the Rule, *see supra* Part I.C, which itself constitutes irreparable harm. *Cf. Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) ("If a party claiming the deprivation of a right to notice-and-comment rulemaking under the APA had to show that its comment would have altered the agency's rule, section 553 would be a dead letter.").

Collectively, these harms, along with the many others identified in the Complaint and in Plaintiffs' declarations, "show that the Final Rule will have an 'immediate effect on' Plaintiffs' 'ability to serve their existing clients' and take on new clients." *CLINIC,* 2021 WL 184359, at *14 (citing *Nw. Immigrant Rts. Proj.*, 2020 WL 5995206, at *31) (alterations adopted). "The cumulative impact of the Final Rule will lead to decreased representation of applicants in

immigration proceedings. Such harm is irreparable to both Plaintiffs and the immigrant populations they represent." *Id.* This Court should reach precisely that conclusion here.

## III.    The Balance of Equities and the Public Interest Favors a Stay

The balance of equities and public interest factors "merge when the Government is the opposing party." *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quotation omitted). "In considering whether to grant a preliminary injunction, the Court must 'balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief.'" *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (quoting *Texas Child. Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014)). "That burden is easily and decisively met" here and so staying the Rule pursuant to 5 U.S.C. § 705 is appropriate. *Dist. of Columbia*, 444 F. Supp. 3d at 45.

*First*, as described above, the Rule violates multiple federal statutes and Defendants' own regulations. The D.C. Circuit has emphasized that "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quotation omitted); *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing "an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate"). In particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (citation omitted). In the immigration context, courts in this district have enjoined policies deemed to be "likely unlawful" and concluded that "[t]he Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quotation omitted). For the same reason, a stay is appropriate in this case.

*Second*, the Rule purports to enhance EOIR's ability to adjudicate cases efficiently and with finality but, as explained above, most aspects of the Rule actually undermine Defendants' ostensible goals while doing violence to noncitizens' procedural rights. *See supra* Part I.B. By the same token, Defendants can demonstrate no harm from simply abiding by their preexisting policies. Indeed, Defendants' "only harm is that it will be required to keep in place" the long-standing immigration court and BIA procedures that pre-date the Rule "while judicial review of its new regulation runs its course." *Dist. of Columbia*, 444 F. Supp. 3d at 45. "That hardship pales in comparison to the injuries asserted by the plaintiffs." *Id.* Staying the Rule until the Court can determine its lawfulness merely "preserve[s] the relative positions of the parties" as they existed prior to the Rule's January 15, 2021 effective date. *Robertson v. Cartinhour*, 429 F. App'x 1, 2 (D.C. Cir. 2011) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 53 (D.D.C. 2014) ("[T]he balance of the equities tips in [movant's] favor because issuance of an injunction would preserve the status quo.").

*Third*, there is always "a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. As explained above, the Rule strains the resources and reach of Plaintiffs, limiting the number of noncitizens they can effectively serve in the exceedingly difficult adjudicatory environment the Rule creates, and will thwart meritorious claims for relief. The result is that many noncitizens will face unjust removal from the country and be sent to countries where they may face persecution and the threat of physical violence.

Thus, both the balance of the equities and the public interest favor injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court should enjoin the implementation of the Rule pending the resolution of these proceedings.

Dated: February 1, 2021                          Respectfully submitted,

                                        By:   *s/ Jeffrey B. Dubner*
                                                                                                _____

Mary Van Houten Harper*                    Jeffrey B. Dubner (D.C. Bar No. 1013399)
NATIONAL IMMIGRANT JUSTICE CENTER          Benjamin Seel (D.C. Bar No. 1035286)
1099 New York Ave. NW                      Sean A. Lev (D.C. Bar. No. 449936)
Washington, DC 20001                       DEMOCRACY FORWARD FOUNDATION
(312) 660-1370                             P.O. Box 34553
mharper@heartlandalliance.org              Washington, DC 20043
                                           (202) 448-9090
Sarah Thompson (D.D.C. Bar No.             jdubner@democracyforward.org
CA00073)                                   bseel@democracyforward.org
NATIONAL IMMIGRANT JUSTICE CENTER          slev@democracyforward.org
PO Box 124975
San Diego, CA 92112                        Keren Zwick (D.D.C. Bar No. IL0055)
(312) 660-1370                             Mark Fleming*
sthompson@heartlandalliance.org            Tania Linares Garcia
                                           NATIONAL IMMIGRANT JUSTICE CENTER
*Application for admission pro hac vice*    224 S. Michigan Ave., Suite 600
*forthcoming*                               Chicago, IL 60604
                                           (312) 660-1370
                                           kzwick@heartlandalliance.org
                                           mfleming@heartlandalliance.org
                                           tlinaresgarcia@heartlandalliance.org

                                           *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey B. Dubner, hereby certify that on February 1, 2021, I electronically filed the

foregoing document with the Clerk of the Court for the United States District Court for the

District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF

users and service will be accomplished by the CM/ECF system.

Dated: <u>February 1, 2021_</u>                  By: _____*s/ Jeffrey B. Dubner*_____
                                                    Jeffrey B. Dubner
                                                    DEMOCRACY FORWARD FOUNDATION
                                                    P.O. Box 34553
                                                    Washington, DC 20043