# EXHIBIT A

## DECLARATION OF MICHELLE N. MENDEZ

I, Michelle N. Mendez declare as follows:

1.    I am the Director of the Defending Vulnerable Populations ("DVP") program at Catholic Legal Immigration Network, Inc. ("CLINIC"), headquartered in Silver Spring, Maryland. The information in this declaration is based on my personal knowledge and on data that CLINIC maintains in our ordinary course of business. I am an attorney licensed in Maryland. I have worked at CLINIC since January 2015.

2.    As the Director of the DVP program at CLINIC, I manage a team of seven attorneys, two legal assistants, and various consulting attorneys. Our team issues written resources, plans and executes in-person and web-based trainings, responds to requests for technical support, strategizes on new projects that serve the legal needs of the immigrant community, develops and presents legal challenges in federal court, submits Freedom of Information Act requests, issues reports, engages with media, and represents clients in select cases before the immigration court, the Board of Immigration Appeals ("BIA") through our BIA Pro Bono Project, and the U.S. Courts of Appeals.

3.    From 2009 to 2015, before joining CLINIC, I worked in the Immigration Legal Services program at Catholic Charities for the Archdiocese of Washington where I represented detained and non-detained immigrants in immigration court, on appeals to the BIA, and on petitions for review to the U.S. Court of Appeals for the Fourth Circuit. I began my legal career in 2008 as an Equal Justice Works Fellow sponsored by DLA Piper.

4.    I am familiar with the Executive Office for Immigration Review Rule ("EOIR"), titled, "Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure" (the "Rule" or the "EOIR Procedures Rule"). It is my understanding that the Rule will severely damage the due process rights of noncitizens in removal proceedings and who appeal those proceedings to the BIA and impair CLINIC's ability to pursue its mission, as discussed below.

### CLINIC's Mission and Services

5.    CLINIC's mission is to provide immigration legal services to low income and vulnerable populations. This mission is part of CLINIC's broader purpose of embracing the Gospel value of welcoming the stranger and promoting the dignity and protecting the rights of immigrants. As Pope Francis has said, "thousands of persons are led to travel [here] in search of a better life for themselves and for their loved ones, in search of greater opportunities . . . We must not be taken aback by their numbers, but rather view them as persons, seeing their faces and listening to their stories, trying to respond as best we can to their situation. To respond in a way which is always humane, just and fraternal."[1]

---

[1] *Transcript: Read the Speech Pope Francis Gave to Congress*, TIME, Sept. 24, 2015, https://time.com/4048176/pope-francis-us-visit-congress-transcript/.

CLINIC likewise believes that the most vulnerable among us deserve compassion, fairness and due process in the adjudication of their claims for immigration relief.

6.     CLINIC is the nation's largest network of nonprofit legal immigration services programs. The CLINIC network includes almost 400 affiliated immigration programs, which operate out of more than 400 offices in 48 states and the District of Columbia. The network includes faith-based institutions, farmworker programs, domestic violence shelters, ethnic community-focused organizations, libraries and other non-profit entities that serve immigrants. CLINIC's network employs more than 2,300 attorneys, United States Department of Justice ("DOJ") accredited representatives, and paralegals who, in turn, serve approximately 500,000 low-income immigrants each year.

7.     Accredited representatives are non-attorney staff or volunteers who are approved by the DOJ to represent immigrants before the Department of Homeland Security ("DHS") and—where "fully accredited"—in removal proceedings before the immigration court and the BIA. An accredited representative must work for a DOJ-recognized non-profit religious, charitable, social service, or similar organization that provides low- or no-cost immigration legal services. Approximately 45 percent of CLINIC affiliates lack an attorney on staff and thereby rely on DOJ accredited representatives to provide authorized legal representation. In turn, those DOJ accredited representatives rely on CLINIC's resources for legal updates, training, and guidance.

8.     Members of the network, referred to as "affiliates," provide *pro bono* or low-cost immigration services using materials, training, education, best practices, and sometimes, funding provided by CLINIC. CLINIC's affiliates run the gamut from large to very small organizations, and include organizations that provide a wide array of immigration legal services before USCIS, the immigration courts, and the BIA. These legal services include pursuit of remedies such as cancellation of removal, adjustment of status, the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Temporary Protected Status ("TPS") applications, special immigrant juvenile status ("SIJS") petitions, family-based visas, U visas for certain crime victims, and T visas for trafficking victims.

9.     CLINIC affiliates pay an annual affiliate fee to be a part of the CLINIC network. While CLINIC's revenues for 2019 were just over $10 million, our projected revenues for 2020 and 2021 are under $10 million for each year.

10.    In return for the annual affiliate fee, affiliates receive a discount on CLINIC's trainings, which include webinars, online courses (including self-directed pre-recorded courses and live interactive courses), in-person trainings, and our annual Convening. In some cases, affiliates gain access to affiliate-only trainings or get priority for trainings that are in high demand. CLINIC provides trainings on substantive law, procedures, trial skills, legal best practices, and issues of nonprofit management. In addition to web-based and in-person trainings, CLINIC also provides technical support to our affiliates through the "Ask-the-Experts" portal on our website. Attorneys and DOJ accredited representatives from affiliates submit inquiries regarding individual immigration matters that are particularly complex, and CLINIC staff provide an expert consultation.

11.    Additionally, CLINIC has a Capacity Building program that advises affiliates on issues of program management. CLINIC's Capacity Building program helps organizations to establish legal services programs, provides technical support on building and managing programs, including assisting with establishing a sustainable structure for low bono fees, and maintaining caseloads that allow for ethical representation.

12.    CLINIC's DVP program, which employs eight full-time attorneys, including me, offers the trainings and technical support described above. In addition to providing technical assistance and developing web-based and in-person trainings, DVP drafts comprehensive written resources. DVP's areas of expertise on which we support affiliates include removal defense, including appeals to the BIA and petitions for review at the U.S. courts of appeals, asylum, SIJS petitions, analyzing the consequences of criminal conduct on immigration status, trial skills, and legal writing. Whenever EOIR effects a change in law or procedure, CLINIC's DVP staff endeavor to offer a webinar outlining the challenges and offering strategies and spend weeks updating written resources and other training materials to keep our affiliates and other immigration practitioners informed of the changes. Most of our written resources are available on our website while a few written resources are available upon request.

13.    CLINIC prioritizes the provision of removal defense program management support, technical assistance, and training because CLINIC understands that winning immigration relief in immigration court and before the BIA is highly dependent on access to competent counsel. Many CLINIC affiliates provide *pro bono* representation before EOIR; indeed, providing free services to individuals in removal proceedings is a critical part of the mission of CLINIC and our affiliates. A significant percentage of CLINIC affiliates provide removal defense and each year CLINIC's affiliate network assists hundreds of individuals in removal proceedings.

14.    CLINIC also responds to urgent gaps in access to counsel created by immigration policy that prioritizes enforcement and deterrence above all. For example, in 2019 CLINIC launched a project in Ciudad Juarez, Mexico called *Estamos Unidos* to assist asylum seekers who have been subjected to the "Migrant Protection Protocols" ("MPP") and are thus required to remain in Mexico during their removal proceedings. *Estamos Unidos* employs two full-time staff in Mexico who perform Know Your Rights presentations, assist asylum seekers to complete applications *pro se*, and match some asylum seekers with *pro bono* representation.

### CLINIC's Removal Defense Direct Representation Projects

15.    In addition to the support CLINIC's DVP Program provides our non-profit affiliate network, DVP also provides direct representation and *pro bono* referrals through three remote-based projects providing removal defense assistance on a nationwide basis: 1) the BIA Pro Bono Project, 2) the Formerly Separated Families Project, and 3) the Remote Motions to Reopen Project.

16.    In 2001, under the Bush administration, EOIR, and several nongovernmental

organizations, including CLINIC, joined together to create the BIA Pro Bono Project. Since then, CLINIC has housed the BIA Pro Bono Project and collaborated with EOIR's Office of Legal Access Programs and the BIA Clerk's office to carry out its mission of increasing the quality and level of representation before the BIA, thereby reducing procedural errors and enabling the BIA to review cases more efficiently. Since 2001, CLINIC has coordinated the review of case files, recruited volunteer attorneys and DOJ accredited representatives, and mentored *pro bono* counsel to ensure high quality representation in the Project. CLINIC's DVP Program has two staff members, a full-time attorney and a full-time legal assistant dedicated to the BIA Pro Bono Project. Before 2019, as described below, the BIA Pro Bono Project accepted roughly 120 cases a year, approximately ten of which CLINIC represented directly and the remainder of which *pro bono* counsel represented with support and mentorship from CLINIC. The Project has placed over 1600 appeals with *pro bono* attorneys in its nearly 20 years in operation.

17.    CLINIC's DVP Formerly Separated Families Project began in response to the Trump administration "Zero-Tolerance" policy through which it detained and sometimes prosecuted asylum-seeking parents and separated them from their children. In response to this crisis, CLINIC sought to secure full representation with competent counsel for every family. Thus far, the Project has placed 158 formerly separated families with long-term legal representation, mentored *pro bono* counsel through 76 cases, assisted a dozen families in changing venue to the immigration court near their destination cities, and, in collaboration with CLINIC's Remote Motions to Reopen Project, described below, filed 64 motions to reopen (which included *sua sponte* reopening arguments) the cases of families already ordered removed by an immigration judge. The families were either ordered removed *in absentia* or received removal orders after the immigration judge denied protection from removal. Families who have a removal order following the immigration judge's denial of protection from removal and whose 90-day statutory period to move to reopen has already expired must rely on the immigration judge's *sua sponte* reopening authority. While some of the families have *in absentia* reopening arguments that they did not receive adequate notice of the hearing, which carries no deadline for filing a motion to reopen, they also typically seek *sua sponte* reopening in addition to making equitable tolling arguments. In our experience, immigration judges have been willing to exercise their *sua sponte* authority on motions to reopen filed by the families who were separated as part of the Trump administration's "Zero-Tolerance" policy. In addition, CLINIC has hosted webinars and published practice advisories, guides, and a motion to reopen template to assist practitioners who represent or wish to represent formerly separated families.

18.    CLINIC's DVP Motions to Reopen Project provides representation to formerly separated families, families released from family detention, asylum-seekers, and other vulnerable people around the country in filing motions to reopen before the immigration courts and the BIA. Through this Project, CLINIC either represents these individuals directly or partners with *pro bono* legal counsel to provide high quality representation on motions to reopen. Once the immigration judge or the BIA reopens a case allowing the individual to continue with their removal proceedings, CLINIC places the case with competent local counsel, which includes CLINIC affiliates, and provides mentorship

assistance as needed. In 2019, CLINIC hired one attorney to focus specifically on this Project and we have publicized the Project among *pro bono* partners, including law firms. The Motions to Reopen Project has accepted 24 cases. As a result of this work, CLINIC has gained expertise on motions to reopen practice, including *sua sponte* claims, and we are regarded in the field as an organizational expert.

19.    CLINIC's commitment to supporting our non-profit affiliate network in its removal defense representation and to filling the gap in removal defense through the BIA Pro Bono Project, the Formerly Separated Families Project, and the Remote Motions to Reopen Project led CLINIC to submit a 32-page comprehensive comment in response to the Rule's Notice of Proposed Rulemaking.

### The Rule Misrepresents How the BIA Pro Bono Project Currently Functions

20.    In dismissing concerns highlighted in many of the public comments, the preamble to the Rule cites to CLINIC's BIA Pro Bono Project three times, implying that this Project prevents unrepresented immigrants from having to proceed without counsel, while failing to recognize that since 2019, EOIR has frustrated the purpose and historical workings of the BIA Pro Bono Project.

21.    Since 2001, CLINIC's BIA Pro Bono Project has facilitated *pro bono* legal representation before the BIA for *pro se*, indigent, detained individuals who filed a Notice of Appeal from an immigration judge's denial of their applications for relief or where the immigration judge granted relief and DHS appealed. Since its inception, the BIA Pro Bono Project has worked with EOIR's Office of Legal Access Programs (OLAP) to identify detained *pro se* immigrants in need of representation on appeal. OLAP exists to "improve the efficiency of immigration court hearings by increasing access to information and raising the level of representation for individuals appearing before the immigration courts and the BIA."[2] Until the fall of 2019, a select group of CLINIC volunteers would screen case files at EOIR headquarters each week identifying possible immigration judge errors. CLINIC would then circulate confidential summaries (with identifying information omitted) of the selected cases to its network of *pro bono* counsel. If *pro bono* counsel agreed to represent a case, CLINIC sent the immigrant a letter describing the BIA Pro Bono Project and a form to consent to the release of their file to the *pro bono* attorney. However, in October of 2019, EOIR stripped OLAP of its autonomy and moved it under the newly created Office of Policy. Thereafter, EOIR implemented changes to the Project that severely restricted CLINIC's ability to screen cases for representation and to match respondents with *pro bono* counsel. Until then, the BIA Pro Bono Project had operated for 18 years with the shared goal of increasing high quality, *pro bono* representation of *pro se*, indigent, and detained individuals before the BIA.

22.    In response to several comments regarding the possible impact of the Rule on *pro se*

---

[2] *See Office of Legal Access Programs*, https://www.justice.gov/eoir/office-of-legal-access-programs.

5

individuals, the Department noted that "there are multiple avenues they may pursue to obtain representation. For example, the Department maintains a BIA Pro Bono Project in which 'EOIR assists in identifying potentially meritorious cases based upon criteria determined by the partnering volunteer groups.'" *See* 85 Fed. Reg. 81597 (quoting EOIR, BIA Pro Bono Project, Oct. 16, 2020, *available at* https://www.justice.gov/eoir/bia-pro-bonoproject); *see also id.* at 81606 (same). In response to comments regarding concern for the simultaneous briefing schedules, EOIR likewise noted that "the Department's BIA Pro Bono Project is not tied to the issuance of a briefing schedule. The Department reviews cases for referral through that Project upon the filing of a Notice of Appeal, not upon the issuance of a briefing schedule. Moreover, under current practice, pro bono volunteers who accept a case typically receive a copy of the alien's file before a briefing schedule is issued and, like all representatives, may request an extension if appropriate." *See* 85 Fed. Reg. 81637.

23.    However, these descriptions are inaccurate. After 18 years of EOIR sharing court files, including the transcript of the hearing, of *pro se* detained respondents with CLINIC's BIA Pro Bono Project, EOIR suddenly changed its process. Initially, the change came about by EOIR restricting the types of files that CLINIC's volunteers could review. Then, EOIR determined that file review must occur before the production of transcripts. This change meant that review would be based solely on the evidentiary record, prior to the transcription of the immigration judge's oral decision. But since the transcript is usually the only record of the immigration judge's decision, it was impossible for CLINIC volunteers to determine which cases contained immigration judge errors. Without access to the transcript or any of the courtroom testimony, it was impossible to determine which cases should be circulated to the network of *pro bono* counsel. For example, prior to these changes, a BIA Pro Bono Project volunteer attorney won asylum for a Honduran woman who gang members had sexually assaulted and threatened. The immigration judge originally ordered her removed at her second hearing for failure to complete her asylum application, even though she explained in court that she did not speak English and was on a waiting list to receive legal assistance. This error was apparent to the volunteer who reviewed her file because the volunteer had access to the transcript of the hearings. Without the transcript, the file would have been virtually empty and the volunteer would never have known about the error that led to a successful appeal.

24.    EOIR cited to the privacy of respondents as the reason for this sudden change after 18 years despite immigration proceedings generally being public, with the parties and judges discussing the details of the cases in open court. In addition, by the time EOIR changed its procedures, President Trump had signed an executive order directing agencies to exclude most noncitizens from protections under the Privacy Act. Moreover, EOIR rejected, without explanation, a proposal by the EOIR Office of Legal Access Programs and CLINIC to have respondents sign a release form giving the Project permission to review their files.

25.    After altering the procedures to prevent CLINIC's volunteers from screening cases, EOIR failed to uphold the new procedures. EOIR determined that it was too burdensome to have its own staff review cases for placement with the BIA Pro Bono Project. As a result,

EOIR began to consider only cases in which the Notice of Appeal was filed by the DHS for placement with our *pro bono* counsel. EOIR now does not review any cases in which the respondent files the notice of appeal. Additionally, due to technical issues with EOIR's computer system and EOIR's decision to send out its own consent forms, rather than allow CLINIC to oversee that process, many cases that qualify for *pro bono* representation under the new procedures are never referred to CLINIC. More recently, in October 2020, EOIR's leadership transferred the sole employee who coordinated the BIA Pro Bono Project and did not replace him. Since then, CLINIC has not received any cases from EOIR to place with *pro bono* counsel, and the only cases placed through the project have been referred to CLINIC by non-profit partners (as discussed below).

26.    For cases that the BIA Pro Bono Project matches with *pro bono* counsel, EOIR does not generally provide a copy of the respondent's file before the briefing schedule is issued. A copy of the file is sent to counsel only with the transcript and briefing schedule. Traditionally, counsel taking a case through the BIA Pro Bono Project was guaranteed to receive a three-week extension of time to file the brief. The guarantee of additional time encouraged *pro bono* representation because counsel, who was previously unfamiliar with the case, would feel confident that they had sufficient time to review the record of proceedings and research the relevant, complex legal issues. After the changes implemented in October 2019, counsel could still request an extension but there was no guarantee that the BIA would grant the request for an extension. This change has since discouraged volunteers from accepting cases through the BIA Pro Bono Project.

27.    Prior to these changes, in year 2019 the BIA Pro Bono Project, in collaboration with EOIR's Office of Legal Access Programs and the BIA Clerk's office, placed 142 cases with *pro bono* counsel. As a result of EOIR's restrictions, in 2020 that number dropped to 12 cases. Though the BIA Pro Bono Project was able to independently identify and place other unrepresented cases with its *pro bono* volunteers by accepting referrals from non-profits, EOIR's lack of collaboration created significant burdens on our program.

28.    In publishing the Rule, either the Department did not realize that its EOIR Office of Policy had stopped collaborating with CLINIC on the BIA Pro Bono Project or EOIR intentionally misrepresented the ability of the BIA Pro Bono Project to serve as an actual avenue for *pro se* respondents to obtain representation. As discussed below, the Rule will further exacerbate the damage already done to the BIA Pro Bono Project, and render it virtually impossible for CLINIC to successfully operate this program.

**The Rule Will Harm CLINIC and its Non-Profit Affiliate Network**

29.    This Rule removes the following procedural protections from removal proceedings: administrative closure (immigration court and the BIA), motions to remand (BIA), and *sua sponte* motions to reopen (immigration court and the BIA). The Rule also, among other things: requires simultaneous briefing before the BIA; curtails the ability to obtain a briefing extension before the BIA; requires the BIA to deny relief to meritorious applicants who fail to comply with technical biometrics or voluntary departure requirements due to inadequate notice; limits the BIA remand authority for new evidence

or additional factfinding; provides the BIA with authority to determine voluntary departure in the first instance and make findings of fact on allegedly "undisputed" facts; creates new mandatory adjudication timelines at the BIA and delegates broad authority to the EOIR Director; and eviscerates common sense remedies, such as the BIA's self-certification authority, in place of procedures the strip noncitizens of due process, such as the IJ's certification of a BIA remand or reopening decision to the EOIR Director.

30.    The Rule will have a detrimental impact on CLINIC's core programs that seek to defend immigrants against removal and on appeals. For our BIA Pro Bono Project and Motions to Reopen Project, the Rule will create the need for more appeals to the BIA and more motions to reopen, respectively. Yet the Rule will harm CLINIC's ability to recruit and mentor *pro bono* counsel because of the constraints placed on the practice of law through the elimination of briefing extensions and simultaneous briefing in addition to the new limitations on immigrations judges and the BIA through the lack of administrative closure and *sua sponte* reopening authority. Without *pro bono* counsel, the BIA Pro Bono Project and Motions to Reopen Project must either accept fewer cases, in direct contravention of CLINIC's mission, or allocate resources to allow CLINIC to directly represent more individuals, which is impossible at current capacities and would burden our other programming. If the projects are able to recruit *pro bono* counsel, the Rule will increase the burden on CLINIC staff to train and support *pro bono* attorneys on navigating the new procedural complexities created by the Rule. The Rule will also immediately impair the core missions of CLINIC's affiliates to provide competent removal defense to low-income and vulnerable populations, as detailed below. Many non-profit organizations among CLINIC's affiliate network provide representation on applications for protection and relief, motions and appeals covered by the Rule.

31.    As described in turn below, these changes will cause significant harm to the clients our affiliates represent and to the operations and mission of CLINIC's affiliates themselves.

*Elimination of Administrative Closure*

32.    Despite two U.S. courts of appeals preserving administrative closure[3] following the Attorney General's *Matter of Castro-Tum*, 27 I&N Dec. 271 (A.G. 2018) decision, the Rule forecloses the ability of immigration judges and the BIA to administratively close cases. Administrative closure is a docket management tool that allows immigration judges to temporarily remove cases from their dockets pending, for example, USCIS adjudication of a request for relief, or after a respondent has been approved for an immigration benefit but the corresponding visa has not yet become available because of annual statutory caps. These types of relief include congressionally authorized forms of protection, such as SIJS for children who have been abused, abandoned, or neglected by at least one parent and T and U visas for victims of severe forms of human trafficking and certain crimes, respectively. Formally ending administrative closure will lead to

---

[3] *Meza Morales v. Barr*, 973 F.3d 656 (7th Cir. 2020); *Zuniga Romero v. Barr*, 937 F.3d 282 (4th Cir. 2019).

immigration judges issuing more removal orders because they can no longer pause proceedings to allow USCIS to complete concurrent adjudications. Therefore, ending administrative closure will inevitably lead to an increased number of removal defense cases, including cases requiring an appeal to the BIA, as representatives will be forced to pursue secondary forms of relief, such as asylum, before the immigration court even though their primary or stronger applications are still pending with USCIS.

33.    Notwithstanding *Matter of Castro-Tum*, legal counsel practicing in the immigration courts in the jurisdiction of the Fourth and Seventh Circuit could (prior to the Rule) request administrative closure before the immigration judge to allow USCIS to adjudicate the forms of relief over which it has exclusive jurisdiction. If the immigration judge denied the motion for administrative closure, counsel could appeal the immigration judge's order to the BIA (interlocutory appeal of the administrative closure denial or an appeal on the denial of the secondary forms of relief, such as asylum) and seek remand to the immigration court once USCIS granted the relief. The Rule forecloses the ability of both the immigration judge and BIA to grant administrative closure and closes off the BIA's ability to remand cases based on new evidence or new relief. Because of the changes imposed by the Rule, immigration judges will issue removal orders to many immigrants with viable relief pending before USCIS because they will not have the authority or opportunity to pause removal proceedings. Instead of simply waiting for USCIS to grant relief while the case is paused at the immigration court, CLINIC and our affiliates must consider, assess, and seek secondary forms of relief, such as asylum, in many cases. In cases where secondary forms of relief are unavailable, CLINIC and our affiliates must expend time and resources seeking an administrative or judicial stay of removal, a process that is time intensive and often unsuccessful,.

*Elimination of Briefing Extensions and Simultaneous Briefing*

34.    Since the Rule virtually eliminates the possibility of obtaining a briefing extension, *pro bono* counsel will have fewer than three weeks to familiarize themselves with the transcript, identify the legal issues, and research and write the brief.  This expedited timeframe will put extraordinary pressure on CLINIC's BIA Pro Bono Project staff, which consists of only one attorney and one legal assistant, to secure *pro bono* counsel before the briefing deadline is issued, evaluate the legal issues, and mentor *pro bono* counsel to ensure the legal issues are thoroughly researched and presented in the brief.

35.    Making matters worse, the Rule's simultaneous briefing requirement means that the BIA Pro Bono Project's *pro bono* attorneys will have to brief every issue in every case that DHS appeals because they will not be able to see the DHS brief before filing their own appeal. Because the Notice of Appeal is prepared without the benefit of the transcript or the IJ's oral decision, the Notice of Appeal often contains issues that DHS later declines to brief, or is missing issues that DHS later decides to brief. In fact, though the BIA Pro Bono Project's case-acceptance mechanisms have been eviscerated, in cases that are in active briefing, DHS has twice recently briefed issues that it never mentioned in the Notice of Appeal. This approach of briefing issues not mentioned on the Notice of Appeal necessitated a reply brief by the *pro bono* attorney, who had not addressed those

issues in their original brief (which was filed simultaneously with the DHS brief for a detained case). Because of the Rule, *pro bono* attorneys will also have to brief *every* issue upon which the BIA could possibly affirm the IJ under another aspect of the Rule. Briefing every issue will require significantly more work, much of it unnecessary, and will likely force each case to surpass the BIA's 25-page limit thereby requiring an additional motion to exceed the page limit.

36.    To sustain the BIA Pro Bono Project, CLINIC anticipates having to invest significantly more work on appeals before placing the cases. In order to quickly screen a case and match it with *pro bono* counsel, CLINIC will need to submit Freedom of Information Act Requests and review audio recordings of the testimony and IJ decision. CLINIC will need to provide more guidance and supervision to *pro bono* counsel, who will no longer have sufficient time to research the complex legal issues on their own. CLINIC anticipates that to maintain the BIA Pro Bono Project's volume of cases with these added complications, it will have to seek to hire additional staff. However, we do not currently have the resources to hire additional staff for the BIA Pro Bono Project. While the current number of cases referred by EOIR to the BIA Pro Bono Project is low given EOIR's sudden withdrawal of support, the BIA Pro Bono Project adapted by accepting referrals from non-profit partners to preserve the Project's mandate while we awaited further instruction from EOIR. This adaptation allowed us to continue placing cases, but we were unable to place as many cases as years past, and the system is much less precise because nonprofit partners generally cannot review the record or access the materials that previously facilitated case selection through EOIR. Yet, while EOIR has made it impossible for the BIA Pro Bono Project to provide the level of representation we previously provided, the Rule suggests that the project is a backstop for ensuring representation before the BIA.

37.    Unfortunately, even if we were able to secure additional staff despite our lack of financial resources, the number of volunteers willing to accept *pro bono* appeals, and thus the number of cases we could place with counsel, would dramatically decrease under the Rule. Without an extension, *pro bono* counsel will have just over two weeks to review a completely new file, research complex and unfamiliar legal issues outside their normal area of practice, and write a comprehensive brief. Almost no *pro bono* volunteer would take a case under these circumstances, completely undermining the purpose of our BIA Pro Bono Project and CLINIC's intent more generally to provide critical legal services to underserved individuals.

38.    Likewise, these changes will impact CLINIC's and CLINIC's affiliates' attorneys and DOJ fully accredited representatives who represent clients on appeal in the same manner. All told, CLINIC and their affiliates will be unable to represent as many clients on appeal under the Rule, if at all.

*Elimination of Remands for New Evidence, Further Factfinding, and Various Other Situations*

39.    The Rule eliminates the noncitizen's ability to move for a remand from the BIA. Prior to the Rule, if new material evidence in an individual's case became available during the pendency of a BIA appeal, the individual could move to remand to the immigration judge for further consideration. Examples of the types of evidence that might support a motion

to remand include: 1) new threats or possibility of harm to an asylum-seeker; 2) new hardship to a qualifying relative for purposes of cancellation of removal for non-lawful permanent residents; 3) eligibility for a new form of relief; or 4) the grant of an application or petition by USCIS. Now, under the Rule, an individual who becomes eligible for relief due to a change in the law or who uncovers new evidence to support their claim of persecution during the pendency of their appeal after an immigration judge issues an order of removal must first await an adjudication by the BIA of the appeal (which could take months or even years) and the order of removal becomes final. For example, *pro bono* attorneys who have accepted cases via the BIA Pro Bono Project have filed motions to remand upon discovering competency issues, or to alert the BIA to circumstances where immigration judges evaluated cases of transgender women as if they were gay men.

40.   Even in circumstances where this evidence could eventually be produced via a motion to reopen, the Rule will still impose significant damage. That is because motions to reopen are only available after the issuance of a removal order, and for detained individuals—the focus of the BIA Pro Bono Project—that means they will have to seek a stay of removal to be able to present that evidence without being deported first. Since the BIA rarely grants stays of removal, this change will also require the filing of circuit court appeals and requests for stays of removal from those courts.

41.   To make matters worse, the Rule precludes the immigration judge from considering issues outside the scope of a remand. Thus, where new evidence emerges after the remand but before the immigration judge calendars the case, the immigration judge will be foreclosed from considering it even then, even if that new evidence provides a new path to legal status.

42.   Foreclosing administrative closure in combination with the elimination of motions to remand means that the BIA will not be able to remand cases back to the immigration judge even after USCIS grants relief. In a best case scenario, CLINIC affiliates who represent these vulnerable individuals must now file a Motion to Reopen once USCIS grants the benefit, which is an extremely laborious process and may be foreclosed to many individuals who have already sought a motion to reopen.

43.   Our Motions to Reopen Project will therefore face a higher demand for *pro bono* representation and mentorship because the Rule effectively eliminates motions to remand, thereby forcing immigrants to pursue motions to reopen in cases where a more convenient and cost-effective motion to remand would have been appropriate. Higher demand for *pro bono* motions to reopen will require the Motions to Reopen Project to recruit, train, and mentor more *pro bono* counsel, diverting resources from other programs and requiring CLINIC to dedicate more resources to a single case, thereby limiting its ability to take on other cases.

44.   The impact of the Rule is even worse considering that the BIA may no longer remand cases to the immigration judge for further factfinding, except in very narrow circumstances that many individuals will simply be unable to meet. Instead of being able

to properly develop the record before the IJ, CLINIC and its affiliates will now be forced to appeal or reopen the BIA's decision and dedicate resources to otherwise unnecessary challenges and remands, possibly over years. The Rule also eliminates remands for voluntary departure, instead delegating to the BIA the authority to make those determinations even where the noncitizen did not have the chance to develop the record and to issue instructions for compliance with the BIA's voluntary departure order or risk the conversion of the order into an order of removal—again, likely years after the client appeared before the IJ. The Rule likewise authorizes the BIA to deem an application abandoned if the noncitizen does not comply with the BIA's written instructions for background checks, issued months or years after an appeal is filed. All of these changes will require the allocation of significant resources and challenges on existing cases, further preventing CLINIC and its affiliates from serving a broader base of individuals.

*Elimination of Sua Sponte Reopening Authority*

45. The Rule also eliminates the inherent authority of both immigration judges and the BIA to reopen proceedings *sua sponte.* Under current practice, immigration judges and the BIA commonly grant motions to reopen using their *sua sponte* authority, in situations where it was not possible for the noncitizen to comply with the deadlines or numerical limitations of a statutory motion to reopen, pursuant to their discretionary authority and in the interest of justice. For example, EOIR may exercise this discretionary *sua sponte* authority when the individual has been granted immigration status by USCIS or when there is new evidence that could change the outcome of their immigration court proceedings.

46. The end of *sua sponte* reopening by the BIA and immigration judges means that it will become common practice for immigrants awaiting adjudication before USCIS or even those who have received a grant of relief from USCIS to be removed from the United States because neither the immigration judge nor the BIA will be able to reopen proceedings. In this worst case scenario, many CLINIC affiliates will likely stop representing immigrants in removal proceedings who are pursuing benefits before USCIS because, even if USCIS grants that status, DHS will remove those clients from the United States. Those CLINIC affiliates will continue to provide removal defense will need to expend additional time and resources on filing stays of removal, motions to reopen with statutory arguments, and appeals, as well as labor-intensive post-deportation motions to reopen, while trying to get their clients back to the United States. Furthermore, because removal triggers immigration penalties against the individual, ensuring the clients' return will require a significant amount of time and resources navigating the return process with numerous government agencies, including the Department of State (in cases where USCIS has granted a benefit), Customs and Border Protection, and Immigration and Customs Enforcement. Often clients cannot obtain the necessary documents to facilitate the return (like a passport), particularly where they are indigent or fear persecution by the government of their home country.  Ensuring return may even require litigation in federal court to force the government to take the necessary steps to facilitate the return. CLINIC affiliates will undoubtedly seek CLINIC's support in this process in turn requiring CLINIC to allocate or divert resources to this new issue. However, CLINIC's 2021

budget did not account for the allocation of resources to this issue and it would be impossible to seek assistance from funders because we already face a significant deficit for 2021.

47.   In addition to a higher volume of cases, the Motions to Reopen Project will also be forced to expend more time on each motion to reopen, as the Project will have to posit a more labor-intensive equitable tolling arguments for clients who are now limited to statutory claims. Many individuals will not be able to satisfy the requirements for statutory motions to reopen or equitable tolling, however, if they are beyond the 90-day motion to reopen filing deadline or have already exhausted their single motion to reopen previously in proceedings (*e.g.*, to correct an IJ error, to raise an issue of incompetency, or to raise ineffective assistance of counsel). Nor will they be eligible for exceptions to the statutory motion if they received an *in absentia* order of removal and cannot make an argument based on lack of notice or are beyond the 180-day motion to reopen filing deadline. Equitable tolling arguments are more labor intensive because these are more complicated and often require more evidence in the form of declarations and psychological evaluations, to name a couple of examples. In the past, many CLINIC affiliates have relied on *sua sponte* reopening in cases with very strong equities or very clear relief eligibility, and with the elimination of *sua sponte* reopening that path will no longer exist. As a result, affiliates who may have been able to do short motions in the past that minimally laid out the relief now available and the equities that warrant exercise of the court's *sua sponte* authority, will instead have to conduct research and write more fulsome briefs about statutory arguments and equitable tolling. The increased level of complication brought by equitable tolling arguments means that each motion to reopen client and each request for mentorship by an affiliate will require more resources than we currently have. Unfortunately, CLINIC affiliates may instead choose to not represent clients with weak claims to equitable tolling, not wanting to expend resources on cases that are unlikely to succeed thereby impairing their mission to serve vulnerable immigrants.

48.   CLINIC affiliates have contacted us seeking guidance on their pending motions to reopen because they are concerned about getting a ruling on these motions on or after January 15, 2021 when this aspect of the Rule goes into effect. Despite having filed these motions months ago, before the Department notified the public of this Rule, immigration judges and the BIA may quickly dispose of these motions based on their new lack of *sua sponte* authority instead of on the merits. Affiliates who presented only a *sua sponte* reopening argument will face very limited opportunities to seek review by U.S. courts of appeals because, generally, the U.S. courts of appeals do not have jurisdiction to review the BIA's discretionary denial to reopen *sua sponte*. CLINIC will need to advise affiliates who receive denials of motions to reopen on filing a petition for review and possibly a stay of removal. However, because many affiliates rely on DOJ fully accredited representatives, these affiliates will need to find an attorney to pursue a petition for review. Even if the affiliate has attorneys on staff, those attorneys may not be admitted at the U.S. court of appeals with jurisdiction, may feel too overcommitted to represent the petition for review, or may not feel comfortable representing this type of matter. It is likely that our affiliates will request assistance from our Motions to Reopen Project to fill this petition for review representation gap.

49.    Likewise, the Motions to Reopen Project is concerned about the motions to reopen currently pending with immigration judges and the BIA that will be subject to this Rule's elimination of *sua sponte* reopening authority. Our Motions to Reopen Project also currently has two motions to reopen pending before the BIA and two appeals from denials of motions to reopen pending before the BIA, all of which involve requests for BIA to exercise its authority to reopen the case *sua sponte*. The *sua sponte* argument in one of the motions to reopen pending before the BIA is very strong because the client is a DACA recipient who is now eligible to become a lawful permanent resident through his U.S. citizen wife and, together, they have a child with cerebral palsy. Because of this Rule, the BIA will not be able to consider the client's compelling *sua sponte* argument, and it is unlikely that the client will be able to satisfy equitable tolling because this client previously filed two motions to reopen. We are alleging ineffective assistance of counsel on both prior motions to reopen, but the BIA may reject this argument, particularly since a substantial period of time has passed since the client was first ordered removed.

50.    With only one full time attorney dedicated to the Motions to Reopen Project, CLINIC anticipates needing to hire additional staff if we plan to represent or mentor *pro bono* teams to represent existing and new clients with heightened needs for more complex statutory motions to reopen. However, we do not currently have the resources to hire additional staff for the Motions to Reopen Project, thus we would be required to take funds from other programming, at the expense of serving more individuals, or limit the amount of cases we can accept.

51.    In addition, CLINIC's *Estamos Unidos* staff serving asylum seekers stranded in Mexico are particularly concerned about the changes under the Rule. Asylum seekers who have been subjected to MPP are uniquely vulnerable to receiving *in absentia* removal orders because they often do not have fixed addresses while awaiting their court dates in Mexico. Often individuals and families subject to MPP do not even know that they already have been ordered removed for missing a court date until they meet with CLINIC's *Estamos Unidos* project attorney. In some instances, the 90-day statutory period to move to reopen has already passed by the time the asylum seeker learns of the removal order against them. While asylum seekers who move to reopen in this situation may have arguments that they did not receive adequate notice, these notice arguments are often weak if they did not update their address with the immigration court, which is often the result of not knowing how to do this. Usually, failure to update their address with the immigration court is attributed to the complexities of navigating the immigration court maze *pro se*. Unfortunately, regardless of the reasons for not updating their address, this lapse is very difficult to overcome. As such, individuals typically seek *sua sponte* reopening in addition to making notice and equitable tolling arguments. Most *pro se* applicants are not familiar with the statutory arguments governing motions to reopen and, under current law, immigration judges or the BIA have granted *sua sponte* reopening based on exceptional circumstances such as these. The Rule completely strips immigration judges and the BIA of their ability to reopen proceedings *sua sponte.* Thus asylum seekers subject to MPP will be much less likely to have their proceedings reopened.

*Expansion of BIA Factfinding Authority*

52.     CLINIC is also concerned by the proposed expansion of the BIA's factfinding authority
allowing for the BIA to determine facts in the first instance, including facts that will be
disputed by the respondent, such as facts contained in ICE or CBP documents. Indeed,
the Rule refers to "official government sources" as those "whose accuracy is not
disputed." Yet, in our experience (especially through our motions to suppress work), the
accuracy of ICE and CBP submissions is commonly in dispute. For example, our
Motions to Reopen Project has clients for whom we successfully won reopening where
the children's I-213s alleged that the children—who were only three and nine years old,
respectively, when they entered the United States—each "stated that she was aware that
crossing the border in the manner in which she did was illegal" and divulged their parents
and grandparents' citizenship, information that children are unable to articulate or
understand.

53.     Expanding the BIA's factfinding authority has a significant impact on brief writing for
motions and appeals, as it will make it harder to comply with the 25-page limit. CLINIC
and our affiliates will be forced to write longer motions in order to overcome the
presumption of accuracy that this Rule gives "official government sources," and, under
other aspects of the Rule, address all of the legal issues and address or correct all relevant
facts. In essence, this aspect of the Rule will force us to try to adapt the adversarial
process of an immigration court proceeding to briefing before the BIA. However, the
most trustworthy approach to factfinding, regardless of the purpose, is through a hearing
during which the immigration judge listens to testimony, observes the demeanor of
witnesses, and reviews the documents. The new requirements imposed on motions to
reopen by the expansion of the BIA's factfinding increases our work and burden and, in
turn, will dissuade our *pro bono* attorneys from continuing their representation. Our
various projects therefore stand to lose *pro bono* counsel and CLINIC counsel alike.

*Other Aspects of the Rule*

Various other aspects of the Rule exacerbate these harms to CLINIC, CLINIC's *pro bono*
teams and affiliates, and those we serve. For example, the Rule's provisions for the EOIR
Director to adjudicate appeals pending for more than 335 days, which will be nearly all
non-detained appeals in CLINIC's experiences, will result in decisions that are unfair,
impartial, and inaccurate. So, too, with the immigration judge's ability to self-certify
cases that the BIA reverses or remands, which they are incentivized to avoid due to
performance metrics that require BIA remand rates to be below 15 percent for a
satisfactory job performance.[4]  Likewise, the BIA's mandatory adjudication timelines
will also result in more summary dismissals.  All of these aspects of the Rule will create
more appeals and motions practice, requiring CLINIC and their affiliates to dedicate
more time to each case.

---

[4] *See* EOIR Performance Plan, https://cdn.cnn.com/cnn/2018/images/04/02/immigration-judges-memo.pdf.

**Overall Financial Harm**

54.     In addition to the specific detrimental effects on CLINIC's affiliates, we expect the Rule to ultimately result in a decrease in CLINIC's affiliate membership thus causing CLINIC financial harm. CLINIC depends in part on affiliate membership fees to carry out its programs, including the high-quality removal defense training programs it provides to its affiliates' attorneys and DOJ accredited representatives, and to develop practice advisories and other written training materials. As described above, the Rule will result in affiliates taking fewer cases. The end of administrative closure means that even when affiliates are pursuing viable forms of relief before USCIS, such as SIJS, family-based visas, U visas for certain crime victims, or T visas for trafficking victims, they will simultaneously have to pursue relief before the immigration court rather than seeking administrative closure. As a result, these cases will essentially require the work of two cases under prior rules—the primary form of relief that is being pursued before USCIS and a secondary form of relief before the immigration court. The Rule will therefore dramatically decrease the number of cases affiliates will be able to accept. These harms are exacerbated from the elimination of the BIA's remand and *sua sponte* reopening authority for new evidence, both of which may require affiliates to represent the client on the merits *and* in any motion to reopen to present the new evidence. As described above, affiliates must also take on more work for each case based on the Rule's provisions for BIA factfinding, voluntary departure, background checks, mandatory adjudications, and other changes.

55.     With many affiliates being forced to scale back their removal defense immigration caseload or eliminate it altogether due to the increased time and resources they will have to invest in every case, we anticipate a decline in CLINIC affiliate membership. A shrinking affiliate membership means that CLINIC will have fewer resources available to provide trainings and develop written training materials. This decrease in membership will frustrate CLINIC's mission of providing low-cost legal services to indigent immigrants through its affiliates and force us to seek new sources of funding to cover the gap caused by the decline in affiliate membership.

56.     Some CLINIC affiliates whose practice has not previously included significant removal defense or appellate work will have to expand into these areas to preserve their clients' rights. These affiliates may see this expansion as their moral and ethical duty despite the financial difficulties this expansion may cause. CLINIC will therefore have to expend significant resources creating and updating training materials for our affiliates as they are forced to shift the focus of their work because of the dramatic changes to procedure effected by the Rule.

**The Rule Will Require CLINIC to Revamp Its Training Materials**

57.     The Rule will also require CLINIC's DVP Program to revamp many of its published training materials on a variety of issues fundamentally overhauled by the Rule. CLINIC's DVP Program has created several in-depth written resources on removal defense and appeals in the past two years and contracts with the American Immigration Lawyers

Association to edit and update the publication, *Representing Clients in Immigration Court*, which is a 500-page resource currently in its 5th edition. These include practice advisories such as: *Practice Pointer: Matter of L-E-A-* (updated April 20, 2020*); Practice Advisory: Status Dockets in Immigration Court* (Oct. 1, 2019); *Practice Pointer: Matter of Castro-Tum, 27 I&N Dec. 271 (A.G. 2018)* (June 5, 2018). CLINIC will have to update these materials with the procedural changes at the immigration court level, changes in removal defense strategy, and changes to procedure at the BIA, among other things.

58.     CLINIC has also published several practice advisories on motions to reopen, including *Practice Advisory: Motions to Reopen for DACA Recipients With Removal Orders* (Oct. 14, 2020); *Practice Advisory: Post-Departure Motions to Reopen and Reconsider* (Nov. 14, 2019) and *A Guide to Assisting Asylum-Seekers with In Absentia Removal Orders* (July 10, 2019)*.* CLINIC also issued a *Template Motion to Rescind In Absentia Removal Order and Reopen Removal Proceedings for Formerly Separated Families* (March 2019). CLINIC attorneys must update these resources to address the elimination of motions to remand and *sua sponte* reopening authority, advising clients on the pros and cons of pursuing a motion to reopen, and petition for review options and strategies on the denial of previously filed motions to reopen. The advisories will also need an update to the equitable tolling and *sua sponte* sections given the elimination of *sua sponte* authority and the compound impact of various other rules issued in staggered rulemaking, as discussed below.

59.     CLINIC will also have to update our trial skills training materials. We currently have three case files—two on asylum and one on non-Lawful Permanent Resident Cancellation of Removal—that we use to train non-profit and *pro bono* legal counsel on removal defense. Our trial skills trainings also require participants to view recorded webinars. We will have to re-record these webinars to ensure they reflect this Rule's various barriers to seeking relief, including what remedies are available. We recently recorded the webinars and were not planning to re-record these so soon.

60.     Because the Rule effectuates dramatic changes to established procedures in immigration court and the BIA, all these updates will require CLINIC to devote considerable resources and divert staff time from other work. Furthermore, we will need to create new materials, including webinars, to train affiliates and *pro bono* counsel on the dramatic procedural changes.

**Combined Effect of the Rule and Other Recently-Finalized EOIR and DHS Rules**

61.     CLINIC is very concerned about the compound impact of three additional recently finalized EOIR rules (one of which is a joint DOJ/DHS rule) combined with the EOIR Procedures Rule on our mission and ability to provide assistance and training to our affiliates. CLINIC is concerned about these three EOIR rules scheduled to take effect in January 2021: "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," ("Omnibus Asylum Rule"), 85 Fed. Reg. 80274; "Procedures for Asylum and Withholding of Removal" ("Asylum Procedures Rule"), 85 Fed. Reg. 81698; and the "Executive Office for Immigration Review; Fee Review" (the "Fee Rule"), 85 Fed. Reg. 82750. The EOIR Procedures Rule in combination with these three

additional rules will compound the difficulty for CLINIC and our affiliates in representing clients whose cases must be tried before the immigration judge, reopened, or appealed to preserve access to relief from removal from the United States.

62.    The finalized DOJ and DHS joint "Omnibus Asylum Rule" will radically alter the substance and procedure of asylum adjudications.[5] Among other changes, the rule will: narrow the definition of "political opinion" for purposes of qualifying for asylum; significantly limit the types of harm that would be considered persecution; prevent most asylum seekers from demonstrating a nexus between the harm they suffered and a protected characteristic; and expand grounds for discretionary asylum denials to include, among other things, near-automatic denials for those who enter the United States between ports of entry or have spent 14 days in a country *en route* to the United States. Furthermore, the "Omnibus Asylum Rule" would allow immigration judges to pretermit asylum applications based on the application form alone without requiring the immigration judge to hold a hearing and develop the record.[6]

63.    The "Omnibus Asylum Rule" changes will likely result in an unprecedented increase of asylum denials by immigration judges. As a result, tens of thousands of asylum seekers would need to file appeals before the BIA, in many cases with the ultimate goal of getting their cases before a federal court of appeals for review. The Rule, with its expedited and un-extendable deadlines, will make it more difficult for asylum seekers to find counsel before the BIA and therefore will make it more difficult to preserve issues for appeal before federal courts of appeals to challenge the radical new restrictions on asylum eligibility.

64.    The second related EOIR Rule, the "Asylum Procedures Rule," requires asylum-seekers who have gone through a "credible fear" interview to submit their asylum applications (via form I-589) within fifteen (15) days of their initial hearing in immigration court (known as a "master calendar" hearing) and requires immigration judges to adjudicate

---

[5] On January 8, 2020, the Northern District of California issued a preliminary injunction in *Pangea II v. DHS* temporarily prohibiting the Rule from going into effect. However, CLINIC remains concerned that EOIR will attempt to implement parts of the rule, given that DOJ argued before the federal court that some aspects of the rule merely "clarified" existing law rather than altering it.

[6] The preamble to the EOIR Procedures Rule states, "Moreover, immigration judges have a duty to develop the record in cases involving pro se aliens which will assist such aliens in pursuing appeals if needed." 85 Fed. Reg. 81597. This statement demonstrates that with the administration's staggered rulemaking over the past six months, the government itself is not able to consider the cumulative effects of the vast changes brought about through these multiple rulemakings. The EOIR Procedures Rule does not even acknowledge that the Omnibus Asylum Rule allows immigration judges to pretermit asylum claims based solely on the I-589 application form and therefore no longer requires immigration judges to develop the record in many asylum cases.

asylum applications within 180 days of filing.[7] A well-documented asylum application is highly time-consuming to prepare, including gathering evidence (sometimes from sources abroad), working sensitively with traumatized clients to elicit details about their experiences in their home countries to support development of their declarations, and often working with experts to support the client's asylum claim. A fifteen-day deadline to complete such applications—especially for detained clients—tips the scale sharply against the asylum-seeker and makes it nearly impossible for legal representatives to adequately prepare an asylum-seeking client's case. As a result, CLINIC anticipates that many more asylum seekers will be forced to appeal denials of asylum claims as immigration judges may find discrepancies between asylum seekers' application forms, which were submitted in haste, and their testimony. Moreover, the combination of the "Asylum Procedures Rule" speeding up the filing of I-589 applications and the "Omnibus Asylum Rule," allowing immigration judges to pretermit asylum cases without holding hearings, will also lead to more appeals before the BIA, and ultimately, the federal courts of appeals, as asylum seekers never receive a day in court to present their claim.

65.     CLINIC anticipates that the compressed period for filing asylum applications with EOIR, along with the strict asylum eligibility provisions of the "Omnibus Asylum Rule" will lead to a greater number of denied asylum claims, because it will be extremely difficult for asylum-seekers and their attorneys to compile the necessary evidence to support the applications. These increased denials, in turn, will require more motions to reopen and appeals, which are essential to preserve the possibility of an asylum-seeker's ability to apply for relief protected by statute triggering the steep fees discussed below.

66.     The effects of the expedited briefing schedule required by the Rule are further compounded by a precedential decision issued by the Attorney General on September 24, 2020, *Matter of A-C-A-A-*, 28 I&N Dec. 84 (A.G. 2020). This decision, which is not meaningfully addressed in the Rule, also upends established immigration court and appellate practice. In this decision, the Attorney General held that, regardless of whether the parties stipulated to an element of a claim before the BIA and regardless of whether DHS waived an issue by not briefing it on appeal, the BIA must nonetheless review every element of an asylum grant before upholding an immigration judge's positive decision. "DHS's decision not to expressly challenge a particular element of an asylum claim did not relieve the Board from its need to review the immigration judge's determination as to that element." *Id.* at 88. The combination of this precedential decision and the Rule's requirement for simultaneous briefing will require respondent's counsel to brief every element of every claim even if there was only one disputed issue that DHS raised before the immigration judge.

---

[7] On January 14, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction in *NIJC v. EOIR*, No. 21-cv-0056 (RBW), temporarily prohibiting the rule from going into effect.

67.    The third rule, the "Fee Rule," will dramatically affect all aspects of practice before EOIR because it increases the BIA appeal fee from $110 to $975 and the BIA motion to reopen or reconsider fee from $110 to $895.[8]

68.    The "Fee Rule" also intersects with this Rule to the detriment of CLINIC's affiliates and our own direct representation practice. Under the previous rates for EOIR fees for motions, appeals, and applications, affiliate attorneys, DOJ accredited representatives, and support staff generally chose one of three options: 1) counsel clients to pay the fee in full; 2) apply for fee waivers for indigent clients; or 3) seek alternative sources of funding to cover client filing fees, usually through charitable institutions. However, with the implementation of the Fee Rule, CLINIC and our affiliates' client base will be largely unable to afford filing fees. CLINIC affiliate staff will have to file significantly more fee waiver applications for clients thereby shifting their workloads to accommodate the increased demand for fee waiver requests at the expense of the merits of the removal case or appeal. The increase in fee waiver practice, coupled with the decreased time to file BIA appeal briefs, and the need to brief every potential issue as a result of simultaneous briefing schedules and the BIA's authority to affirm on any basis in the record, will make it more expensive for affiliates to take on BIA appeals, and will likely lead to even fewer affiliates taking appeals. Likewise, it will be more difficult for CLINIC to place appeals through the BIA Pro Bono Project as a result of the combined effect of these rules; *pro bono* counsel will have to devote more time to putting together fee waiver requests and then will have less time to write briefs that will have to cover more issues than in the past.

69.    The Rule in combination with the Fee Rule will compound the difficulty for CLINIC and our affiliates in representing clients whose cases must be reopened or appealed to preserve access to avenues of relief from deportation. Ending administrative closure will inevitably lead to an increased number of cases requiring an appeal to the BIA, pressuring CLINIC affiliates whose practice has not previously included significant appellate work. Then, because the Rule significantly restricts the BIA's remand authority, the individual must file a motion to reopen instead of a motion to remand. However, the motion to reopen fee is now $895 due to the new EOIR Fee Rule. By contrast, motions to remand did not a require a fee.

70.    The negative effects of these three rules are further compounded by this Rule which makes it more difficult for representatives to pursue appeals before the BIA and eliminates the ability of the BIA and immigration judges to reopen proceedings *sua sponte* even when there has been a manifest injustice in the underlying proceedings or where USCIS could grant permanent status but for the existence of a removal order.

71.    CLINIC submitted comments in opposition to all three of these rules in addition to this Rule, but our task was complicated considerably by the staggered rulemaking in which

---

[8] On January 18, 2020, the U.S. District Court for the District of Columbia issued a preliminary injunction in *CLINIC v. EOIR*, No. 20-cv-3812 (APM), temporarily prohibiting certain aspects of the Rule from taking effect.

EOIR engaged from June through September 2020. With the four rules issued separately, each with just a 30-day comment period, and new, related rules proposed after the comment period had closed,[9] it was very difficult to fully comment on the scope of the changes and their relationship to each other, along with the Rule. CLINIC provided the best comment possible given these time constraints, but we could have discussed other ways in which this Rule will harm our affiliates and immigrants in removal proceedings, including those pursuing a motion to suppress evidence of alienage based on constitutional or regulatory violations in obtaining the evidence of alienage. With more time to comment, CLINIC would have explained how the proposed expansion of the BIA's factfinding authority would seemingly allow the BIA reviewing appeals of denied motions to suppress to determine that the respondent has not established a *prima facie* suppression case instead of remanding the case back to the immigration judge to conduct a suppression hearing.

72.     In sum, the Rule will harm CLINIC in myriad ways. It will directly affect our BIA Pro Bono Project, Motions to Reopen Project, and *Estamos Unidos* Project and clients, by forcing CLINIC to expend more resources on each case and take fewer cases as a result. Likewise, the Rule will upend our affiliates' practice before EOIR and require CLINIC to divert substantial resources to train and mentor affiliates.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed at Baltimore, Maryland on February 1, 2021.

_____

Michelle Mendez

---

[9] This includes proposed rulemaking on statutory motions to reopen and continuances, both of which have significant implications for the instant Rule, but were not finalized by the previous administration.