# EXHIBIT B

## DECLARATION OF ANDREA SAENZ, BROOKLYN DEFENDER SERVICES

I, Andrea Sáenz, declare under perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Andrea Sáenz. I am the Attorney-in-Charge of the New York Immigrant Family Unity Project ("NYIFUP") team at Brooklyn Defender Services ("BDS"), located in Brooklyn, New York.

2. BDS is a full-service public defender 501(c)(3) organization that provides multi-disciplinary and client-centered criminal defense, family defense, immigration, and civil legal services, along with social work and advocacy support.

3. I am one of the three leaders of our Immigration Practice. I have directed the NYIFUP team at BDS since May 2016. The NYIFUP team represents detained and non-detained noncitizens who are in removal proceedings. I supervise cases at the immigration court-level and before the Board of Immigration Appeals ("BIA"), as well as directing BDS's docket of petitions for review filed with circuit courts and writs of habeas corpus filed with district courts.

4. I have practiced exclusively immigration law for twelve years and have specialized in removal and detention issues during that time. I am licensed to practice law in New York, the Southern District of New York, the U.S. Courts of Appeals for the First, Second, and Third Circuits, and the U.S. Supreme Court.

5. This declaration is based on my personal knowledge, gathered through my own experiences, supervision of my team, and coordination with the other leaders of BDS's Immigration Practice. I also regularly consult and coordinate with other immigration practitioners.

### Brooklyn Defender Service's Immigration Practice

6. BDS seeks to advance access to legal representation for low-income noncitizens as they navigate the immigration system in order for them to stabilize their immigration status, particularly for those with contacts with the criminal and family court legal systems.

7. In furtherance of this, BDS represents low-income people in nearly 30,000 criminal, family, civil, and immigration proceedings each year. Since 2009, BDS's Immigration Practice has counseled, advised, or represented approximately 15,000 clients in immigration matters including removal defense, affirmative applications, advisals, and immigration consequence consultations for individuals in contact with Brooklyn's criminal and family court systems.

8. BDS's Immigration Practice in total encompasses 75 staff—53 attorneys, BIA accredited representatives, and law clerks, 16 support staff, and 6 social workers, and consists of three teams—NYIFUP, the Immigration Community Action Project ("ICAP"), and the Padilla team.

9. BDS is one of three NYIFUP providers. NYIFUP is a New York City-funded assigned counsel program for indigent and low-income detained immigrants in removal proceedings at the Varick Street, New York Immigration Court. The BDS NYIFUP team has represented more than 1,500 people in detained deportation proceedings since the inception of the program in 2013.

10. The Immigration Community Action Project ("ICAP") represents individuals in non-detained removal cases and affirmative applications for immigration relief and status. ICAP represents individuals referred from other BDS practice areas, in particular the criminal defense and family defense units, and provides immigration screening and representation to community members through its intake system. ICAP also provides limited representation through brief advice consultations with noncitizens.

11. The Padilla team—the first immigration team at BDS, staffed since 2009—provides immigration consequence consultations for individuals represented by BDS in Brooklyn's criminal and family court systems. The Padilla team also provides limited representation counseling through immigration screenings and Know Your Rights advisals.

12. The Immigration Practice currently represents over 600 people in removal proceedings in the immigration courts in New York City and New Jersey, and in federal court in petitions for review and writs of habeas corpus. BDS represents both detained and non-detained low-income individuals who, generally, reside in New York City and the surrounding areas. BDS specializes in providing legal representation to noncitizens with contacts with the criminal and family court legal systems, and other complex immigration cases.

13. The BDS Immigration Practice represents individuals in applications for immigration status and relief, both in removal proceedings and affirmatively before the United States Citizenship and Immigration Services ("USCIS"). This includes: family-based petitions and applications; relief for victims of domestic violence and other crimes; asylum, withholding, and the Convention Against Torture ("CAT") relief; temporary protected status ("TPS"); and citizenship.

14. Many of the people whom BDS represents are in removal proceedings due to their contact with the criminal legal system. About a quarter of BDS's criminal defense clients are foreign-born, roughly half of whom are not citizens. These individuals are at risk of losing lawful immigration status or the opportunity to obtain lawful status as a result of criminal or family court cases.

15. BDS's Immigration Practice also serves young people, including in applications for special immigrant juvenile status ("SIJS") and deferred action for childhood arrivals ("DACA").

16. Through the National Qualified Representation Program ("NQRP"), BDS's Immigration Practice is appointed to represent individuals who are not mentally competent to represent themselves in their immigration proceedings because of a serious mental disorder.

17. As part of BDS's removal defense representation, BDS regularly litigates appeals before the BIA, in both detained and non-detained cases. Over the last two years, BDS represented

       approximately 75 people in appeals before the BIA, and has nearly 40 pending merits appeals.

18. BDS regularly files motions to reopen in immigration courts across the country and at the BIA.

19. As part of BDS's federal immigration practice, BDS regularly brings petitions for review in the U.S. Circuit Court of Appeals for the Second and Third Circuits after our cases are denied at the BIA. Last year, BDS represented approximately 26 people in petitions for review.

20. BDS co-counsels with private *pro bono* law firm counsel in certain of its removal defense cases. For appeals, *pro bono* counsel plays a very substantial role, co-counseling on approximately one-third of BIA cases and the majority of petitions for review.

21. BDS's federal immigration practice also brings immigration-related litigation, including writs of habeas corpus seeking release from immigration custody, in U.S. district courts.

22. The BDS Immigration Practice delivers Know Your Rights educational presentations to the community on issues such as immigration enforcement and regulatory changes to immigration relief.

23. BDS also regularly works to advance just immigration policy through advocacy to the public, as well as before federal, state, and local governments.

## The Rule Irreparably Harms BDS and the People We Represent

24. The new rule amending the regulations of the Executive Office for Immigration Review ("EOIR"), *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure* (the "Rule"), is already causing—and will continue to cause—irreparable harm to BDS's purpose of providing legal services to low-income individuals in the New York-area, particularly for those with contacts with the criminal and family court legal systems, as well as to BDS's resources and funding.

25. In response to the Notice of Proposed Rulemaking ("NPRM") EOIR published in 85 Fed. Reg. 52491 (Aug. 26, 2020), BDS submitted a public comment setting forth the significant harms to the people we represent, and to us as an organization, that would be caused if the proposed Rule were implemented. We also explained that the 30-day comment period was too short for such an extensive rule, particularly during the COVID-19 pandemic, making it especially difficult to digest the NPRM, consider the impact on our community, and offer substantive feedback. These difficulties were compounded by the fact that the Administration noticed two other important immigration-related proposed rules that would significantly impact BDS's practice, which our team needed to digest during an overlapping timeframe.[1] In addition, as the Administration issued other closely-related

---

[1] DHS NPRM, *Collection and Use of Biometrics by U.S. Citizenship and Immigration Services*, 85 Fed. Reg. 56338 (Sept. 11, 2020) (30-day comment period ending Oct. 13, 2020); DHS NPRM, *Procedures for Asylum and Withholding of Removal*, 85 Fed. Reg. 59692 (Sept. 23, 2020) (30-day comment period ending Oct. 23, 2020).

3

decisions, proposed rules, and policy at the tail-end of, or subsequent to, the NPRM's comment period, we were not—and still have not been—given the opportunity to meaningfully comment on the cumulative impact of the changes to EOIR's processes.[2]

26. Despite significant concerns raised by BDS and other legal organizations during the public comment period, EOIR did not address most, if any, of BDS's comments or those of many other organizations in the final Rule.

27. The changes made by the Rule will significantly harm BDS and the people we represent. Changes that are of particular concern include: (1) curtailing the BIA briefing schedule; (2) eliminating motions to remand for new evidence; (3) eliminating *sua sponte* motions to reopen; (4) allowing the BIA to engage in improper fact-finding; (5) eliminating administrative closure; and (6) the further politicization of EOIR.

28. The Rule will cause widespread injustices and significant inefficiencies in removal cases, and will eliminate crucial tools that BDS staff uses to demonstrate eligibility for relief. In so doing, the Rule frustrates BDS's purpose of helping low-income immigrants achieve stable immigration statuses for which they are eligible.

29. The Rule will also jeopardize BDS's funding as it overburdens our Immigration Practice. As a NYIFUP provider, BDS is assigned and funded by New York City to provide coverage of the detained docket at the detained immigration court in New York. Similarly, as a NQRP provider, BDS is funded to accept a certain portion of cases for individuals deemed mentally incompetent. Even as the Rule makes immigration representation and each case more time, labor, and resource intensive, BDS is expected by these funding sources to continue the same coverage of its assigned and appointed representation. This not only puts a significant strain on BDS's resources, it also likely results in diverting resources from other areas, programs, and priorities. The ICAP team depends on funding sources that require them to perform certain amounts of removal defense and brief advice cases for a fixed cost per case. As the Rule makes each case more labor intensive, ICAP will be able to take on fewer removal defense cases and screen and serve fewer clients, causing them to fall short of their case targets and put their funding at risk. For example, it may force ICAP to pause its community intake system to focus on its existing removal defense cases and internal referrals, which in addition to putting its funding at risk, frustrates BDS's purpose of helping low-income immigrants assert their legal rights and pursue relief they are eligible for.

---

[2] *See Matter of ACAA*, 28 I&N Dec. 84 (A.G. 2020) (issued on September 24, 2020 the day before the comment period closed, the decision changes how asylum cases are handled at the BIA); *Good Cause for a Continuance in Immigration Proceedings*, 85 Fed. Reg. 75925 (proposed Nov. 27, 2020) (further restricting continuances before the immigration court); *Motions To Reopen and Reconsider; Effect of Departure; Stay of Removal*, 85 Fed. Reg. 75942 (proposed Nov. 27, 2020) (further limits the availability of motions to reopen, as well as stays of removal); EOIR Dir. James McHenry, *Continuances: Procedural Memorandum* (Jan. 8, 2021) (providing that EOIR has no policy mandating immigration judges to grant a continuance, reversing long-standing agency policy).

*The Rule Will Curtail the BIA Briefing Schedule*

30. The Rule's changes curtailing the briefing schedule for BIA appeals and reducing the length and number of briefing extensions will disrupt and burden BDS's Immigration Practice. The Rule does this in three ways. First, it reduces the maximum allowable time for an extension of the briefing schedule where good cause is shown, from 90 days to 14 days, and expressly limits both parties to just one possible extension per case. Second, it requires that in non-detained cases, both parties' BIA briefs be filed at the same time rather than consecutively. Third, the Rule shortens the period for reply briefs, where leave to file must be granted, from 21 days to 14 days. The changes in briefing timelines will have a significant deleterious impact on the time and resources required to prepare cases on appeal for BDS staff, as BDS has an active appellate docket and these provisions fail to take into account the practical reality of practicing before the BIA.

31. BDS files individual, unique briefs in every appeal before the BIA, making the shortened timeframes particularly problematic. In contrast, it is very common for the Department of Homeland Security ("DHS") not to file BIA briefs at all, or only file a brief that is a few pages long. DHS also relies on stock briefs or those consisting of checklists.

32. The realities of the BIA's hard-copy-only filing system and mail delays mean the briefing schedule is in practice much shorter—a problem that is exacerbated by the inability to request a reasonable extension. As the BIA does not have an electronic docket or filing system, BDS staff do not receive the BIA briefing schedule immediately, nor are we able to file on the deadline itself. It often takes several days or up to a week to receive the briefing schedule by U.S. Postal Service mail. Then it takes *at least* two days for us to ensure the brief is filed on time via overnight express mail, which imposes additional, significant costs on BDS for each filing. It is important for us to give sufficient time for our briefs to arrive, as the BIA can strike the brief entirely for being even a day late. There have also been lengthy delays in receiving mail, including from the BIA and other immigration agencies, due to the COVID-19 pandemic, both because BDS offices have been closed and due to U.S. Postal Service delays. BDS staff have been working from home since March 2020, making receiving mailed briefing schedules and notices from the BIA even more challenging.

33. The Rule's suggestion that a shortened briefing and extension schedule will have little impact on practitioners because they may begin to brief when a notice of appeal is filed is inaccurate. This suggestion does not take into account that hearing transcripts are necessary to prepare the appellate brief but not accessible until the transcripts are created and sent by EOIR with the notice of briefing schedule. BDS staff frequently rely heavily on hearing transcripts when writing their briefs to ensure accuracy and completeness because hearing transcripts contain important evidence to be cited in the appeal. Also, as many decisions issued by immigration judges are done orally at a hearing, transcripts are often the only written memorandum of the bases for the immigration judge's determination and, therefore, necessary to identify factual and legal errors to be raised and addressed on appeal.

34. Given the time required to review an extensive record and the transcript of proceedings, BDS staff may request briefing extensions to write a thorough brief that fully explains the relevant facts, analyzes the relevant law, and puts forth fulsome advocacy for the people we represent. This is particularly true as the removal defense cases that BDS generally handles are complex. Once staff receives the hearing transcript, they may also need to correct the transcript or challenge the translation. To do this, staff must request the underlying recording and then listen to it, both of which are time consuming and burdensome tasks.

35. The shortened briefing and extension schedule will also make it more difficult for BDS to coordinate and co-counsel with *pro bono* partners on BIA appeals to help expand BDS's bandwidth. The curtailed briefing schedule will make it more difficult for *pro bono* attorneys at law firms—who often did not represent the respondent at the immigration court-level, are not immigration law specialists, and do not have experience in complicated immigration law issues—to assist in preparing the appellate briefs. Specifically, it will be extremely difficult for *pro bono* counsel to familiarize themselves with the full record and transcript, let alone specifics of immigration proceedings, during the shortened time period without a proper opportunity to request a reasonable extension. The Rule will, therefore, mean there will typically not be time to coordinate with *pro bono* counsel on BIA appeals, and BDS staff will have to take on even more BIA appeals themselves—all with shortened briefing schedules.

36. The undue burden that the briefing schedule will have on BDS staff is exacerbated because the timeline for receiving a briefing schedule is not predictable. After a party files a notice of appeal, EOIR prepares the transcript based on the audio of the hearing. Where an immigration judge issued an oral decision, that judge reviews the transcript for errors and approval (a common-sense practice this Rule eliminates, causing further difficulties). It is only after that transcript is ready that a briefing schedule is issued, appending the transcript. In detained cases, it can take approximately 5-10 weeks, and sometimes longer, to receive a briefing schedule after the notice of appeal is filed. In non-detained cases, it can take up to two years or more before the briefing schedule is received. That unpredictability combined with the abbreviated briefing schedule, will make it especially difficult to ensure that BDS has sufficient resources allocated to appealing each case when it receives the briefing schedule, given the competing demands on BDS staff at any given time. When our office requests an extension, we are ensuring that the people we represent are able to fully assert their rights and have an opportunity to access the relief for which they are entitled, despite hurdles beyond their control.

37. The Rule's implementation of a simultaneous briefing schedule for non-detained removal cases will also create inefficiencies and harm the people we represent. The Rule requires both parties in non-detained proceedings to file the appellate briefs at the same time, meaning there will not be a fair opportunity for respondents to counter, much less consider, the arguments made by DHS, and BDS staff may not have the opportunity to respond to DHS's arguments thoroughly. Despite what the Rule suggests, the notice of appeal does not contain a detailed statement of the findings of fact and law that are being challenged and it is, therefore, not a complete indicator of the arguments an appellate brief will contain. In practice, notices of appeal generally provide only a cursory summary of the issues to be

appealed, and may explicitly reserve the right to raise additional issues upon review of the transcript, which is received with the briefing schedule. Indeed, we have seen DHS add claims, drop claims, or even fail to file an opening brief altogether, later withdrawing the appeal. Further aggravating the harm of depriving our clients of an opportunity to challenge DHS's arguments in consecutive briefing, is that the ability to reply to DHS's arguments and provide supplemental briefing is at the discretion of the BIA.[3]

38. A shortened, simultaneous briefing period represents an exceedingly short window to brief important issues, particularly without an opportunity to request a reasonable extension. It is not only reasonable, but often necessary, to require more than a few weeks to write a fulsome appellate brief. Also, as described above, we must wait months or years for a briefing schedule, and once briefing is complete our appeals are then pending for months or even years before adjudication. Allowing noncitizens and their counsel a reasonable opportunity to prepare appellate briefs does not have a rational impact on the BIA adjudication process. Instead, it will represent a significant burden on BDS staff on top of their existing workloads. For our ICAP and Padilla teams, the shortened briefing schedule, inability to request a reasonable extension, or to respond to DHS arguments, will mean each appeal will require more work per case. As a result, the teams will be able to take on less removal defense cases and screen and serve fewer clients. The inability to meet their case and screening targets will put their funding at risk.

***The Various Changes to Remand Authority Will Prevent the Introduction of New Evidence As to Relief***

39. The Rule will significantly narrow the ability of the BIA to remand cases to the immigration court when new evidence is available, resulting in immigration courts not being able to consider all relevant facts or available information before a final determination is made about a person's ability to remain in this country. Under the Rule, the BIA is prohibited from receiving new evidence on appeal, remanding a case for the immigration judge to consider new evidence, or considering a motion to remand based on new evidence, except in certain limited circumstances. For BDS staff, motions to remand are an important tool to provide the individuals we represent a fair and full opportunity to present their claims for immigration relief.

40. The Rule drastically limits the ability of BDS staff to have cases remanded, which will leave the people we represent without meaningful legal avenues to pursue meritorious claims for relief. After individual hearings in immigration court, material evidence as to relief can develop for many different reasons. For example, USCIS could approve a petition or application that makes an individual we represent eligible for new relief or lawful status. Similarly, new hardships to a qualifying relative for the purpose of cancellation of removal for non-lawful permanent residents can develop after the individual hearing. Or, for asylum-seekers, new evidence related to the likelihood of persecution could develop that would bolster and establish their claim for asylum.

---

[3] *See* BIA Practice Manual § 4.6(h) (reply briefs are disfavored); AILA, *Practice Alert: Updates to the BIA Practice Manual, Briefing Extensions Now Disfavored* (Dec. 11, 2019) (recent adoption of a policy that disfavors granting extensions).

41. BDS staff also file motions to remand for new factfinding in the context of post-conviction relief, which is a parallel proceeding in a separate court system that could take time to resolve and for which an immigration court will seldom grant a continuance. Vacatur of a conviction or modification of a sentence for constitutional deficiencies in the underlying criminal proceeding can remove barriers to eligibility for relief that an individual was not able to assert at their individual hearing, or could change the calculus of discretion as assessed by the immigration court. For example, we have represented lawful permanent residents and other noncitizens who have resided in the United States for most of their lives, and who have U.S. citizen and lawful permanent resident family members, who were not eligible to apply for cancellation of removal relief at the individual hearing due to a criminal conviction that was later vacated. Not being able to move to remand on behalf of such individuals means they will be deprived of the ability to assert relief they are eligible for because of a conviction that was later found to be constitutionally defective.

42. BDS staff has also sought remand on behalf of individuals with mental health issues, where we receive additional evidence related to a mental health diagnosis after the individual hearing. Such evidence is highly relevant to their competency and the need for procedural safeguards and it is vital that it be included in the record and assessed by a factfinder. But the Rule prevents a motion to remand in these instances and thereby denies many people with mental health concerns access to fair proceedings.

43. Where the BIA will apply intervening precedent, a remand is necessary as a matter of basic fairness to ensure a complete record; however, the Rule prevents motions to remand even where there have been changes in the law as to relief from removal. The impact of this provision of the Rule on BDS staff and the individuals we represent will be to deprive them of the opportunity to present the facts necessary to meet new relief criteria and the legal standards being applied to the determination of relief. Neither the immigration judge—nor the respondent or their representative—would have any way of knowing that certain evidence would eventually be necessary to establish immigration relief. Denying noncitizens the opportunity to present the requisite evidence will result in the application of inconsistent standards and arbitrary distinctions across cases.

44. For example, many of the people that BDS represents in removal proceedings are applying for asylum, withholding of removal, and/or relief under CAT. It is particularly harmful for EOIR to limit motions to remand at the same time that, both through agency rulemaking and Attorney General certification of cases, the government has made frequent and drastic changes to the eligibility, standards, and legal precedent for asylum-seekers and those fleeing persecution. This is precisely the kind of intervening change in law for which BDS staff will bring motions to remand on behalf of the asylum seekers we represent, which the Rule significantly curtails.

45. The Rule also limits the scope of an immigration judge's review when a case is remanded, preventing them from considering all available evidence and relief beyond those issues specified on remand. As explained above, it can take months or years for BDS staff to receive briefing schedules, and even longer for a decision remanding the case to be issued. Given this passage of time, we have seen that new facts relevant to relief, as well as new avenues for relief, can develop for the people we represent in the intervening months or

years while we wait for a new individual hearing (or, as described above, while their appeal is pending before the BIA). However, the Rule prohibits immigration judges from considering these intervening circumstances and essentially requires them to order removal, even where the respondent is now eligible for relief. This is yet another way the Rule deprives the people we represent of the opportunity to seek all available opportunities to obtain legal status, frustrates BDS's purpose, and taxes its resources by making litigating such cases more time and resource intensive.

46. The Rule will require BDS staff to file more petitions for review in circuit courts to protect the due process rights of the individuals we represent where they have not been permitted to present all available evidence for relief. Litigating petitions for review is substantially more onerous in terms of complexity and resources than utilizing a motion to remand to present new evidence. Once a BIA appeal is decided, a removal order is considered final; thus, even if a petition for review is filed, the people we represent are at risk of deportation. As a result, in connection with the petition for review we must also file a stay of removal, which the courts of appeals often do not adjudicate. Petitions for review can be pending at the circuit for approximately two years before the circuit court ultimately orders a remand. During this time, the people we represent will have ongoing check-ins with Immigration and Customs Enforcement ("ICE") where they could be detained and possibly removed; BDS staff often accompany individuals to ICE check-ins for this reason. People with pending petitions for review may lose their ability to work and support their family, or have to continue paying high fees to renew employment authorization every year, despite being eligible for relief that would authorize them to work. Notably, concurrently with this Rule, the Administration has made securing employment authorization more difficult for individuals appealing BIA denials in the circuit courts,[4] and has sought to substantially increase the renewal fees for employment authorization applications.[5] While these individuals are in this limbo, with cases pending at the circuit courts despite being eligible for relief, BDS will have to expend additional legal and social work support. In turn, the Rule will also result in more remands back to the BIA, putting a strain on our staff and resources to litigate additional matters and requiring us to reallocate resources from other programming or services.

47. For the people we represent who are charged with being removable because of criminal convictions, motions to remand are especially important for procedural fairness, given the provisions of the Immigration and Nationality Act ("INA") limiting jurisdiction over questions of fact, which pose an obstacle to review at the circuit level.

48. Motions to reopen are not a reasonable alternative to filing motions to remand. Not only are motions to reopen subject to strict numerical and time bars, but there is also no statutory

---

[4] DHS, *Asylum Application, Interview, and Employment Authorization for Applicants,* 85 Fed. Reg. 38532 (final rule published June 26, 2020) (effective date Aug. 25, 2020); *see also* DHS NPRM, *Employment Authorization for Certain Classes of Aliens With Final Orders of Removal*, 85 Fed. Reg. 74196 (Nov. 19, 2020) (30-day comment period ending Dec. 21, 2020).

[5] USCIS, *Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46788 (final rule published Aug. 3, 2020) (effective date enjoined by *ILRC v. Wolf*, No. 20-cv-05883 (JSW), Dkt No. 98 (N.D. Cal. Sept. 29, 2020)).

basis to bring a motion to reopen simply for new evidence outside of asylum claims raising changed country conditions. The Rule forces individuals we represent who have viable claims to relief to utilize their sole statutory motion to reopen and potentially forgo any other legally viable basis for reopening their case down the road. This will require BDS to provide significantly more counseling to the people we represent and potentially redesign each of their removal defense strategy. Moreover, the harm of limiting motions to remand is aggravated by the Rule also eliminating the sole regulatory basis, *sua sponte* authority, for bringing non-statutory motions to reopen to present new evidence and that are outside the number and time bars (as described in the next section below).

49. The Rule does not consider the human toll in suggesting that a motion to reopen is appropriate for a change in applicable legal standards or eligibility for relief. This would require the people we represent to accept a removal order even where they are eligible for relief, and wait—months or years later—until they can file a motion to reopen. The Rule thus prolongs representation and delays or prevents the people we represent from regularizing their status in the United States. This will particularly harm detained individuals, who may decide to abandon relief altogether, and are at great risk of deportation as soon as a final order is entered. As such, the Rule is forcing the people we represent who have viable claims to relief and lawful status to accept a removal order—along with all the consequences that entails, including being removed from the country, separated from their family, returned to a country they may fear persecution or have little connection to, and losing any employment authorization—in order to continue fighting their immigration case.

50. In turn, this requires more work by our staff and *pro bono* partners, as we would have to expend significant resources to avoid these dire consequences. Our attorneys need to litigate both the case on the merits *and* the motion to reopen, rather than just a single proceeding before the immigration court on remand, and pursue stays of removal. Furthermore, the Rule will result in more federal litigation—which, as explained above, takes substantially more resources—because the Rule increases the need for more petitions for review in circuit courts and leads to more habeas petitions, motions for temporary restraining orders, and stay litigation in district court to protect the detained clients who end up with final orders of removal. As NYIFUP's funding does not contemplate or cover the cost of federal court representation, the Rule will place a substantial strain on its resources as it does not have the funding to hire the staff necessary to handle this increase in federal litigation. For ICAP and the Padilla team, the expanded workload of each case and increased federal litigation will likely result in less funding as the Rule will make it more difficult for those teams to meet their funding case targets.

### The Rule Will Eliminate Sua Sponte Authority To Reopen Removal Proceedings

51. The Rule will eliminate the longstanding *sua sponte* authority of immigration judges and BIA board members to exercise discretion to reopen immigration cases in order to prevent manifest injustices from being carried out. The result will not only place additional strain on BDS, but also erect barriers to justice for those we represent.

52. Given the statutory and regulatory constraints on motions to reopen filed by noncitizens, eliminating *sua sponte* authority to reopen will greatly reduce the ability of noncitizens to reopen their removal cases, even where doing so is necessary to ensure a just result. For example, the Rule will bar cases where an individual is now eligible for relief or not removable, even in circumstances where the noncitizen could not have presented the evidence earlier. Under the statute, with only a few exceptions, a noncitizen may only file one motion to reopen and must file that motion within 90 days of the final order. *See* 8 U.S.C. § 1229a(c)(7). BDS staff bring motions to reopen individuals' removal proceedings *sua sponte* outside of these parameters when there are new facts that could change the outcome of their case, either because of a change in law that means they are not removable or because they are now eligible for relief or lawful status, or due to a manifest injustice and error in the underlying proceedings.

53. Although there is a regulatory exception in the Rule for individuals who are entirely no longer removable, it is insufficient to minimize harm to the people that BDS represents because, even in those limited circumstances, it only applies where the individual can establish that they have exercised "diligence" in pursuing reopening. It also does not apply to individuals who are newly eligible for immigration relief or status, such as cancellation of removal, because of an intervening change in law or circumstances, or an approved petition. For individuals we work with, BDS is often the first representatives to do a fulsome dive into complicated immigration histories and are often the first to identify and explain to individuals the relief or strategies available to them. An inquiry as to "diligence" may not take into account the many barriers that caused delay, including lack of or ineffective assistance of prior counsel, inability to exit an abusive relationship or situation, fear of authorities, and less formal education. In addition, the "diligence" requirement means the Rule does not provide a real exception because it appears to simply replicate the standards to equitably toll the time deadline for statutory motions to reopen; simply put, it does not offer clients a meaningful mechanism for reopening for which they might not *already* qualify. Thus, the Rule likely precludes *sua sponte* reopening for many individuals who will not qualify for equitable tolling under the statute for similar reasons.

54. BDS frequently represents individuals who would be eligible for lawful permanent residence in the U.S., but for an old removal order. Because of the strict number and time bars on statutory motions to reopen, these individuals frequently do not have any recourse other than asking the court to reopen the case under its *sua sponte* authority so that the individuals can adjust status and remain with their families. BDS often represents such individuals with approved I-130 family-based petitions who are being sponsored by their U.S. citizen spouse or child. BDS also represents VAWA recipients and children granted SIJ status, both of whom may adjust status to a lawful permanent resident before EOIR once USCIS grants the underlying benefit. For U, T, VAWA and SIJS beneficiaries, Congress has explicitly extended protections to them by statute and provided a pathway to apply for permanent residence; the Rule contravenes this congressional intent in cutting off this avenue to seek lawful status. In these cases, USCIS has already approved their underlying petitions and applications. For example:

    a. BDS represented a teenager for his motion to reopen who came to the United States when he was a toddler with his mother. In his removal proceedings, no independent

relief was asserted on his behalf, and his mother lost her asylum claim, causing him, as a young child, to have a removal order. Instead of filing a direct appeal, their attorney at the time filed a motion to reopen, which was denied. Years later, BDS began working with him as a teenager and he applied for and was granted SIJS, but he was both time- and number-barred from bringing a statutory motion to reopen his case. Thus, despite having spent nearly his entire life in the United States, he had no other avenue to lift his removal order than a *sua sponte* motion to reopen. Under the Rule, this young person, who the BIA noted in their decision reopening his case had significant positive equities, would have been left without recourse to lift his removal order for the remainder of his life. In granting his motion to reopen, the BIA specifically rejected the argument that the Rule now advances, finding that reopening this young person's case would not threaten the finality of thousands of final orders. As the BIA recognized in that case, finality is not undermined simply by the existence—and sometimes exercise—of discretionary authority, because that authority allows judges to look at the totality of the circumstances, and decide whether, in each individual case, relief is appropriate.

b. BDS has a pending motion to reopen filed on behalf of a single mother and sole caretaker of two U.S. citizens whose U-visa was recently approved by USCIS, which makes her eligible to apply for permanent residency before USCIS. She was the victim of a violent crime, and assisted the police and prosecutors to convict the perpetrator, voluntarily testifying on more than one occasion while dealing with the physical and mental trauma of the attack. She is also the widow of a U.S. citizen, and has lived in the United States for almost 20 years. Her removal order, issued *in absentia* over 17 years ago, was due to her not being provided notice of her immigration hearing. As is often the case, limited income, limited English, and limited understanding of the complex U.S. immigration and legal system meant that she was unable to hire a private attorney or access a legal services attorney until she was referred to BDS, a few years ago. The Rule will bar the immigration court from exercising its *sua sponte* authority to reopen her case on the basis of the U visa grant, unless she first establishes "due diligence," despite the numerous positive equities and exceptional circumstances involved, and even though EOIR has repeatedly granted *sua sponte* reopening and rescinded *in absentia* orders for individuals in similar circumstances.

55. BDS also represents individuals who are lawful permanent residents placed in removal proceedings because of criminal convictions that were obtained unconstitutionally. The process of vacating these convictions can take several years, but the result is that these individuals are no longer removable. In addition, BDS represents individuals with final orders of removal where a change in law means that a criminal conviction no longer makes them removable or ineligible for relief. In both of these circumstances, the IJs and BIA's *sua sponte* authority to reopen provides an important avenue for BDS staff and the people we represent to obtain relief from removal. In many of these cases, the people we represent have been in the United States for most of their lives. Under the Rule, as described above, these individuals may no longer qualify for *sua sponte* reopening and may have no other recourse available to them.

56. Particularly for individuals without access to immigration counsel prior to engaging with BDS, low-income individuals, and especially vulnerable individuals, including those dealing with mental health issues, substance use, abuse, and trauma, the time and number bars associated with statutory motions to reopen prevent them from being able to file a motion to reopen even if they are now eligible for relief or no longer removable. As shown in the examples above, this discretionary authority is a necessary tool to ensure that the strict bars around motions to reopen are not undermining access to relief for noncitizens, as well as contravening fundamental notions of fairness. Without the availability of *sua sponte* reopening, many of the people we represent will be deported and separated from their families, despite having strong claims to lawful status.

57. Under the Rule, *sua sponte* authority over motions to reopen will be eliminated as of the effective date, meaning that pending motions to reopen may now be denied without adjudication as a result of the Rule going into effect. This will significantly challenge the resources of BDS. BDS has motions to reopen pending with immigration courts or the BIA that are based entirely, or in the alternative, on *sua sponte* authority. BDS filed these motions on behalf of the people we represent when *sua sponte* authority was authorized, in reliance on the availability of *sua sponte* authority in place at the time the brief was filed. BDS has motions to reopen pending with the BIA, filed as far back as 2018. The Rule will further stretch the workload of BDS staff because of the need to find alternative strategies for these individuals to access the relief for which they are eligible, appeal any denial of the motion, and seek stays of removal before the agency and even in federal court. In addition, BDS represents individuals on orders of supervision who have had their removal stayed pending the resolution of motions to reopen, who could be at immediate risk of deportation after the effective date of the Rule. Now that EOIR's authority to reopen cases *sua sponte* motions is eliminated, deportation officers may decide to move forward with detention and deportation of people despite their eligibility for relief.

58. The elimination of *sua sponte* authority, and its retroactive application to pending motions, means BDS staff has been forced, and will continue to be forced in the immediate future, to spend more time counseling clients to ensure that they understand a process that has, in some cases, changed repeatedly during the course of the case. It will mean BDS staff will need to spend more time strategizing difficult alternatives for cases where, previously, the BIA and immigration courts would consider *sua sponte* reopening. It will also mean more appeals and petitions for review will need to be filed at the BIA and circuit-level, diverting resources from other important aspects of our representation and reducing the number of people we can represent; thus, frustrating our purpose and putting funding for our ICAP and Padilla teams at risk.

### *Other Provisions of the Rule*

59. Oher aspects of the Rule will likewise pose a significant burden on the practice of BDS staff, as each case will require more work and we will have less tools to advocate for the people we represent to have a fair shot, and thus significantly tax the resources of BDS.

60. For example, the Rule will permit the BIA to engage in fact finding on appeal, allowing the BIA to notice facts that were not contained in the original record, instead of remanding

13

cases to the immigration judge so that a proper factfinder may assess evidentiary issues. This represents a divergence from established BIA practice and regulations, and would expand the role of the BIA—an *appellate* administrative court—to that of a factfinder. Specifically, the BIA will be allowed to administratively notice facts allegedly "not reasonably in dispute," including current events, official documents, or government sources. But such sources frequently contain disputed and incorrect material. For example, in fear-based claims, State Department country reports should not just be accepted as fact, as they can contain information subject to interpretation or even politicization. Another example is a Form I-213, issued by DHS, which is frequently unreliable, contains incorrect information, and is created in a situation adverse to the noncitizen. Similarly, criminal complaints or police reports should not be accepted as undisputed fact without an opportunity to challenge them. These types of documents, and the material contained therein, are ones that the people we represent have a right to examine and refute. Challenging the use of these "facts" will require more federal court appeals and remands to the BIA, all while prolonging proceedings and requiring BDS to navigate the effects of a removal order on the people they represent. Further, allowing the BIA to affirm the decision of the IJ on any basis in the record, including on the basis of "undisputed facts," may require BDS staff to try to anticipate and brief more arguments on appeal at this BIA, even while the Rule also curtails the briefing schedule.

61. For individuals in removal proceedings who are pursuing relief with USCIS, over which EOIR does not have jurisdiction, administrative closure is a temporary measure that avoids an immigration judge having to schedule and conduct unnecessary hearings or issue a removal order where an individual has viable relief, but the danger of being ordered removed still remains. The Rule eliminates the authority for immigration judges and the BIA to administratively close immigration cases absent an express regulatory or settlement basis, even with the consent of both parties. Administrative closure is a routine but important docketing tool allowing judges to prioritize cases most in need of their immediate attention, while allowing cases that rely on a parallel proceeding for resolution to be deprioritized. Its elimination will significantly increase the likelihood that noncitizens with viable relief are nonetheless ordered removed. BDS is already seeing the extra workload and injustices caused by the re-calendaring of cases administratively closed as a result of *Matter of Castro Tum*, 27 I & N Dec. 187 (A.G. 2018), including several cases where individuals were ordered removed only to be subsequently granted relief after being deported. For this reason, BDS joined an *amicus curiae* brief in support of a petition for review challenging *Castro Tum* currently pending before the U.S. Court of Appeals for the Second Circuit.[6]

62. For BDS, eliminating administrative closure has had a substantial burden on our staff, as cases that are being re-calendared become more time consuming and complex. BDS has had to represent more individuals in *both* removal cases and before USCIS, creating more work for the immigration practice as a whole. As they cannot move for administrative closure, staff have had to prepare for and attend more hearings to ask for continuances. If continuances are denied, which is likely given new performance metrics imposed on

---

[6] *See Benitez Marquez v. Rosen*, No. 18-3460 (2d Cir.) (oral argument scheduled for Feb. 3, 2021).

immigration judges and other policies issued by the Administration, staff have to prepare more applications and go to more merits hearings for alternative relief. For example, individuals applying for SIJS or U-visas are often also eligible for asylum. However, an asylum case takes significantly more time and resources than preparing an adjustment of status case: extensive country conditions must be compiled, experts retained, complicated legal briefing submitted, and lengthy direct testimony prepared. If the alternative relief is denied, or there is no alternative relief, and the individual is ordered removed, we may have to file appeals with the BIA and potentially petitions for review with the circuit court. If the parallel USCIS application or petition is granted after the individual hearing, we then have to file a motion to remand (if at the BIA) or a motion to reopen—even though the Rule (and other proposed rulemaking) makes doing either of those substantially more difficult if not impossible. Removing administrative closure has also exacerbated the immigration court backlog and created additional inefficiencies in removal proceedings. For example, BDS represents individuals who have been waiting years for their individual hearing on their asylum claim while, at the same time, young people, who have been granted SIJS by USCIS and are still waiting their priority date to become current so that they can apply for adjustment of status, are being calendared for hearings.

63. The Rule will also exacerbate the politicization of EOIR. The Rule allows IJs to certify cases to the EOIR Director for various reasons where the IJ disagrees with a BIA remand, encouraging IJs to become advocates for their decision rather than arbiters. This will mean BDS must expend resources preparing responses and litigating in this additional and previously unavailable certification process. In addition, the Rule imposes mandatory adjudication timeliness that delegates appeals pending more than 335 days to the EOIR Director for adjudication. Interjecting a political appointee in these ways will undermine the integrity of the judicial process and deprive the people we represent of fair and impartial arbiters. It will also likely mean more erroneous decisions to be appealed to the federal courts, and erroneous removal orders for the people we represent.

*Conclusion*

64. The aggregate effect of the various provisions of the Rule will be to cause more people we represent to be ordered removed without a viable option to challenge that removal order, in contravention of our underlying purpose. For example, an individual with a pending USCIS application whose case cannot be administratively closed and is ordered removed will still have to wait for the application to be granted to file a motion to reopen. By that time, they may be outside the time periods for filing a statutory motion to reopen and, as provided for by the Rule, no *sua sponte* authority will be available to them. Such individuals with a pathway to a lawful status will nonetheless be deported under the Rule.

65. As explained above, the Rule will require BDS to allocate more resources to each case and represent more individuals in multiple avenues simultaneously. The Rule will also exacerbate—rather than ameliorate—inefficiencies by necessitating otherwise unnecessary appeals and motions practice and prolonging proceedings and representation. BDS will, thus, likely be at risk of jeopardizing its funding if it cannot meet its various case targets. This Rule serves to even further tax and divert BDS resources towards ensuring the new

practices are properly followed and strategizing alternatives for the people we represent to access the relief for which they are eligible.

66. Because individuals will not have access to the stabilizing immigration relief or lawful status they are eligible for, and may lose employment authorization, health insurance, and other financial assistance after being ordered removed, BDS social workers will need to expend more resources in supporting these individuals.

67. The Rule will also burden, aggravate, and further complicate BDS's education, training, and supervision efforts both internally with staff and externally with private *pro bono* counsel and the people we serve. The Rule is even more burdensome because it was issued in conjunction with the many immigration-related actions that were proposed or hurriedly finalized at the end of the year.[7] This includes the related DOJ Rule, *Executive Office for Immigration Review; Fee Review*, 85 Fed. Reg. 82750 (final rule published Dec. 18, 2020), which will significantly increase the filing fees for BIA appeals and motions to reopen and likely require significantly more effort to complete fee waivers.[8] It also includes *Matter of ACAA*, 28 I & N Dec. 84 (A.G. 2020) (issued on Sept. 24, 2020), which significantly changes how asylum cases are litigated at the BIA by mandating that, to overturn a denial, the BIA must reconsider every aspect of an asylum application, instead of just those aspects in contention at the trial level. As the Administration is requiring asylum-seekers to essentially reprove every element of their asylum claim on appeal, it is also giving them less time to do so. Responding to these changes, and this Rule in particular requires BDS to reallocate and expend additional resources to train and supervise staff about new provisions that will directly impact their work. The changes also require BDS to reallocate resources from other areas to ICAP's Know Your Rights education efforts for the community and the people we serve, who rely on information we provide to navigate the increasingly complex immigration system.

68. The procedural and adjudicatory changes the Rule imposes on EOIR, and in particular the BIA, will undermine the due process rights of the noncitizens we represent. Specifically, it will have a detrimental impact on their ability to defend themselves from removal by making it substantially more difficult for noncitizens to pursue and obtain the relief for which they are eligible, while simultaneously increasing the ability of the BIA to make arbitrary and inappropriate findings to finalize deportation orders. It will also make it more difficult for noncitizens who have been lawful permanent residents to fight their removal orders, even after they are no longer legally removable. As a result, individuals we

---

[7] *See, e.g.*, DOJ & DHS, *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67202 (final rule published Oct. 21, 2020); DOJ & DHS, *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80274 (final rule published Dec. 11, 2020); DHS & DOJ, *Asylum Eligibility and Procedural Modifications*, 85 Fed. Reg. 82260 (final rule published Dec. 17, 2020); DHS NPRM, *Employment Authorization for Certain Classes of Aliens With Final Orders of Removal*, 85 Fed. Reg. 74196 (Nov. 19, 2020) (30-day comment period ending Dec. 21, 2020); EOIR NPRM, *Good Cause for a Continuance in Immigration Proceedings*, 85 Fed. Reg. 75925 (Nov. 27, 2020) (30-day comment period ending Dec. 28, 2020); EOIR NPRM, *Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal*, 85 Fed. Reg. 75942 (Nov. 2, 2020) (same).

[8] This rule was preliminarily enjoined in federal court. *See CLINIC v. EOIR*, 20-cv-03812 (APM), Dkt. No. 34 (D.D.C. Jan. 18, 2021).

represent will be deported despite being eligible for relief or immigration status. Such a result undermines our purpose of assisting low-income immigrants achieve a stable immigration status for which they are eligible, violates the due process rights of the people we represent, taxes our resources, and is fundamentally unjust.

Brooklyn, New York
February 1, 2021

*Andrea Sáenz*
Andrea Sáenz, Esq.