EXHIBIT C

## DECLARATION OF LAURA ST. JOHN,
## FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

1. I, Laura St. John, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. I am a licensed attorney and a member in good standing in both the California (No. 275558) and Arizona bars (No. 035160). I am currently employed as the legal director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I have practiced as an immigration attorney with FIRRP since March 2011.

3. Founded in 1989, FIRRP is a 501(c)(3) non-profit organization that is dedicated to providing free legal and social services to the thousands of adults and children detained in immigration custody in Arizona on any given day. As the only 501(c)(3) non-profit organization in Arizona dedicated to providing free legal services to people in immigration detention, our vision is to ensure that every person facing removal proceedings has access to counsel, understands their rights under the law, and is treated fairly and humanely.

4. I am writing to address the substantive harm that FIRRP will experience because of a new Rule issued by the Executive Office for Immigration Review (EOIR) entitled, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588 (Dec. 16, 2020) (hereinafter, "the Rule").

### My Professional Background and Role at the Florence Project

5. I have practiced as an immigration attorney in Arizona with FIRRP for approximately a decade. Within FIRRP, I have worked as a staff attorney, managing attorney, and legal director providing free legal services to adults who are facing removal and detained in Immigration and Customs Enforcement ("ICE") custody in Florence and Eloy, Arizona. I have served in my current position as legal director since December 2015.

6. As legal director, I manage FIRRP's legal advocacy and our appellate practice before the Board of Immigration Appeals ("BIA") and Ninth Circuit Court of Appeals. Working with other members of our leadership team, I supervise staff and direct the provision of services across our children, adult, and social service program areas. I work particularly closely with our programs serving detained adults, mentoring staff in cases that raise complex or novel issues in the areas of asylum, withholding, and Convention Against Torture protections; representing individuals with serious mental illness; the intersection between criminal and immigration law; and major due process violations.

7. FIRRP is also widely known for developing resources specifically targeted to assist *pro se* respondents in immigration proceedings. Florence Project *pro se* guides are distributed in detention centers throughout the country. In my role as legal director, I oversee staff

and contractors working to update and develop these *pro se* guides and other *pro se* materials designed to assist those who do not have counsel.

8.  I also provide direct representation and supervision in custody matters and all major areas of removal defense, including asylum, withholding of removal, and protection under the Convention Against Torture, LPR and non-LPR cancellation, defensive adjustment of status, and immigration remedies for survivors of violence and other crimes. I have litigated all major forms of defensive immigration applications and regularly represent and supervise those who represent individuals who are deemed mentally incompetent to represent themselves in removal proceedings due to serious mental health conditions.

9.  I also train and supervise Florence Project staff and *pro bono* attorneys handling a wide variety of immigration matters. Additionally, from January 2017 through January 2020, I served the Ninth Circuit Court of Appeals as an Appellate Lawyer Representative and, in that role, became and continue to be an immigration mentor to *pro bono* attorneys before the Ninth Circuit Court of Appeals. I also serve on the Ninth Circuit's *Pro Se* Committee, working with court staff and judges throughout the Ninth Circuit to improve access to justice for parties proceeding in federal court *pro se*.

## Florence Project's Mission and Scope

10. FIRRP's mission is to provide free legal and social services to detained adults and unaccompanied children facing immigration removal proceedings in Arizona. With no public defender system in immigration removal proceedings, an estimated 75% to 86% of all detained noncitizens go unrepresented in immigration court due to poverty or lack of access. FIRRP strives to address this inequity both locally and nationally through direct services, partnerships with the community, and advocacy and outreach efforts. FIRRP's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

11. To that end, FIRRP provides high quality immigration legal services and education to the thousands of people detained in immigration custody in Arizona every year. We provide detailed legal orientation and technical support to thousands of detained *pro se* respondents each year, including group orientations and workshops that enable people to represent themselves in bond and removal proceedings. Many of these *pro se* services are provided under the auspices of the Congressionally supported Legal Orientation Program ("LOP"). Our attorneys also represent hundreds of clients before the BIA and EOIR each year, including unaccompanied minors who are often seeking humanitarian relief, such as asylum, special immigrant juvenile status, and T-visas as well as adults who are held in isolated detention centers in Eloy and Florence, Arizona.

12. FIRRP also has a robust *pro bono* program that places hundreds of cases with volunteer attorneys before the immigration court, BIA, and the Ninth Circuit Court of Appeals. In 2020, FIRRP placed approximately 100 matters with volunteer attorneys, nearly half of which involved appeals before the BIA and the Ninth Circuit Court of Appeals.

2

13. Finally, since 2017 FIRRP has provided legal orientation services, accompaniment, and representation to migrants in Nogales, Sonora, Mexico, a program that we further expanded in 2020 due to Arizona's inclusion in the so-called Migration Protection Protocols ("MPP"). The vast majority of these individuals face unique due process complications among other issues in their cases that can require an appellate litigation strategy.

14. FIRRP maintains a staff of more than 150 attorneys, social workers, and support staff dedicated to providing legal and social services to the approximately seven thousand detained adults and children facing removal in Arizona on any given day. Our staff are based in offices in Phoenix, Tucson, and Florence, Arizona. FIRRP works in all areas of detained removal defense, providing high quality legal and social services both to adults in ICE custody and unaccompanied children in the custody of the Office of Refugee Resettlement ("ORR"). FIRRP attorneys also serve as appointed counsel for individuals deemed mentally incompetent to represent themselves in removal proceedings, maintaining a caseload of approximately one hundred such clients throughout Arizona.

15. In 2019, the last year for which we have completed data, FIRRP provided legal services, including legal orientation and education, to more than 10,000 people.[1] FIRRP clients are nationals of over 60 countries and speak more than 30 languages. With such a broad set of services, this Rule could potentially have a tremendous impact on FIRRP and those we serve.

## Florence Project's Core Service Areas

16. FIRRP's core function is to provide direct legal and social services for detained adults and children as well as to provide legal education, including Know Your Rights presentations and *pro se* resources, to individuals without counsel. In addition to our practice before he agency, FIRRP engages in federal court litigation and national advocacy to support immigration policy reform.

17. FIRRP has four broad programmatic areas tasked with providing direct services to our clients: the Adult Program, the Children's Program, the Social Services Program, and the Advocacy Program. Within those programmatic areas, there are sub-projects or teams concentrated on specific areas of our work.

18. The Children's Program serves unaccompanied children, with a focus on children who are abandoned, abused, or neglected; asylum seekers; or survivors of trafficking or other violence. In 2019, the Children's Program served over 5,000 unaccompanied children in Arizona.[2] The Children's Program is divided into teams based on geographic areas served – Phoenix and Tucson – and further divided by expertise working with released or detained children. The Children's Pro Bono Team is dedicated to training, placing, and

---

[1] In 2020, the COVID-19 pandemic dramatically impacted our services and FIRRP's complete 2020 data is not yet available.

[2] In 2020, despite a global pandemic and other barriers, we served, at a minimum, over 2,000 unaccompanied children.

3

mentoring cases involving unaccompanied minors with *pro bono* counsel. The vast majority of the Children Program's clients are detained in ORR custody or long-term foster care while facing removal proceedings, though FIRRP attorneys do provide continuing representation on a limited basis to unaccompanied children who are reunited with sponsors in the Phoenix and Tucson areas.

19. The Adult Program primarily serves adults who are detained in ICE custody in the four immigration detention centers located in the remote towns of Florence and Eloy, Arizona. Individuals in these detention centers attend immigration hearings in the Florence, Eloy, or Tucson EOIR. In 2019, the Adult Program served over 5,000 adults in ICE custody facing removal.[3] The Adult Program is divided into teams by the types of services provided. Our Detention Action Response Team (DART) primarily provides legal orientation and *pro se* support services to unrepresented individuals in ICE custody. This includes group presentations; one-on-one education in immigration law and procedure; *pro se* workshops; assistance gathering, understanding, and translating documents necessary for court; and developing and distributing specialized written *pro se* guides on immigration relief and procedures. Our Adult Pro Bono Team places cases with outside *pro bono* counsel and provides trainings, technical support, and mentorship to *pro bonos*. Our Border Action Team delivers legal services and orientation to migrants in Nogales, Sonora, Mexico. This includes providing orientation and technical assistance to individuals trapped in MPP, accompanying clients presenting at the port-of-entry, and representing individuals in expedited removal or removal proceedings. Our Direct Representation team provides free, in-house representation in a broad range of immigration matters; we emphasize serving asylum seekers, uniquely vulnerable populations such as LGBTQ immigrants in detention, separated families, and individuals with serious mental health conditions. All Adult Program attorneys serve as appointed counsel for individuals found incompetent to represent themselves under the *Franco-Gonzalez*[4] court order and National Qualified Representative Program ("NQRP"). FIRRP provides ongoing representation to our *Franco* clients following release from custody.

20. The Social Services Program works closely with the Adult and Children's Programs to provide critical trauma-informed case management to both our minor and adult clients with a focus on needs assessment and service planning and monitoring for clients who are detained or have been recently released from immigration custody. Social workers provide critical support to asylum seekers and survivors of trauma who are detained in immigration custody, working closely to support their needs. Our social workers provide clients with psychoeducation and trainings on situation specific coping mechanisms. Also, because the vast majority of our clients struggle with the experience of detention, our social workers train every FIRRP direct services provider on mental health and how to work with suicidal clients, including detailed review of risk assessment questions and internal procedures on how to handle suicidality among those we serve. This is part of the

---

[3] In 2020, despite a global pandemic and other barriers we served, at a minimum, approximately 1,700 detained adults.

[4] *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013).

standard new-hire training because realistically almost every person on staff will encounter this issue at some point with their clients due, in part, to the harsh conditions of detention and the disorienting and often traumatizing effect of immigration court itself. Finally, because of their specialized training in mental health conditions, FIRRP social workers help notify EOIR regarding cases where there are indicia that a person is experiencing a potentially serious mental health condition(s).

21. The Advocacy Program works closely with legal and social services staff across all of FIRRP's program areas and strives to support FIRRP's greater mission and vision by engaging in strategic litigation, including federal habeas petitions, petitions for review before the Ninth Circuit Court of Appeals, and appeals of high importance before the BIA. Additionally, the Advocacy Program supports legal programs by mentoring and providing technical support to staff on cases that raise complex or novel issues in the areas of asylum and other protection-based relief, the intersection between criminal and immigration law, and due process.

22. FIRRP's legal services includes representation of individuals in custody and removal proceedings before the Phoenix, Tucson, Florence, and Eloy immigration courts as well as appellate and motions practice before the BIA. Also, FIRRP represents individuals seeking benefits before USCIS in the context of deportation defense, which includes family-based petitions for individuals who are eligible to adjust status before the immigration judge ("IJ"), U-visas for victims of crime, T-visas for victims of trafficking, and asylum and Special Immigrant Juvenile Status (SIJS) for unaccompanied minors who qualify to seek such relief under the Trafficking Victims Protection and Reauthorization Act (TVPRA).

23. FIRRP routinely represents individuals in their cases before the BIA, which can often include filing motions to reopen or remand. In addition to these cases, FIRRP's Pro Bono Teams also placed over 30 matters before the BIA with *pro bono* counsel, providing extensive mentoring and technical support to those attorneys. Many of those cases involved individuals who were previously *pro se* before the immigration court.

24. In addition to representing clients at the BIA, FIRRP also regularly provides *pro se* support to individuals who are representing themselves before the BIA. This support includes explaining appellate procedure, helping people file notices of appeal, helping people file *pro se* motions, and explaining the content of transcripts or IJ written decisions to help with appellate briefings.

25. In direct representation and federal court litigation alike, *pro bono* attorneys are critical to FIRRP's model to achieve its mission of increasing access to counsel. While *pro bono* resources in Arizona are limited, in 2020 we were able to place approximately 100 matters with *pro bono* attorneys. A significant number of the *pro bono* attorneys with whom we place cases are limited to working on appellate matters as they are not located in Arizona and are unable to attend hearings before the immigration court.

26.  Finally, FIRRP was founded with the recognition that, without access to counsel and high-quality legal orientation, it is nearly impossible for people in detention centers to have the chance of due process or a fair day in court. Efficiency and fairness are the very things that EOIR professes to concern itself with in the publication of this Rule, yet the content of this Rule restricts both the IJs and the BIA from taking actions consistent with basic tenets of due process or established mechanisms for judicial efficiency. As a result, the Rule places an increased burden of work on our staff to try and remedy many of the problems, delineated below, that the Rule will cause, ultimately allowing us to represent fewer noncitizens overall and frustrating the very purpose of our organization.

### The BIA Rule Irreparably Harms FIRRP and Our Clients

27.  EOIR's new Rule will cause irreparable harm to FIRRP's mission by fundamentally interfering with our ability to providing free legal and social services to detained adults and children facing removal proceedings in a way that ensures that all immigrants have access to counsel, understand their rights, and are treated fairly and humanely.

28.  The Rule fundamentally alters EOIR procedures, particularly appellate procedures, in ways that undermines fundamental fairness and will ultimately cause increased inefficiencies in an already backlogged system. By eliminating many individuals' ability to seek relief from removal for which they are otherwise eligible, by forcing court proceedings to move forward when alternative applications for relief would negate the need for removal proceedings, and by limiting the scope and opportunity for remand after appeal, the Rule will cause dramatic injustices and ultimately only increase delay and litigation in ways that a full and fair process would not.

29.  The result will be the wrongful removal of individuals who otherwise would be eligible for relief or protection. Nowhere will this Rule be more prejudicial than towards detained *pro se* litigants who FIRRP serves. The Rule will not only result in more work and more appeals for our staff providing full representation, but it will simultaneously make it significantly more difficult to place BIA appeals with *pro bono* counsel and create a massive increase in the need for rapid technical assistance to *pro se* individuals appealing an IJ decision. This Rule will significantly strain FIRRP's direct service programs.

30.  When EOIR issued a notice of proposed rulemaking, FIRRP submitted lengthy comments in opposition of the proposed rule, despite the minimal 30-day timeframe to do so. We expressed numerous concerns about the Rule, focusing on the significant due process concerns that the Rule presents, with an emphasis on how the proposed Rule would disproportionately harm the detained, *pro se* respondents FIRRP serves. We noted that the proposal uniformly prioritized speed over fairness highlighting, for example, the adverse impacts FIRRP and our clients would suffer because of the significantly abbreviated briefing schedules, which undermine due process and access to counsel; the elimination of administrative closure, which would be to the detriment of judicial efficiency and justice; and the effective elimination of remand in most circumstances, even for necessary fact-finding or *sua sponte* in the interest of justice. EOIR ignored the

vast majority, if not all, of the concerns we raised in our comment, implementing each of the challenged provisions with little or no change.

31. In the name of "streamlining procedures," this Rule unjustifiably curtails due process and further politicizes EOIR in a manner that ensures that the people who FIRRP serves will be unable to fairly present their defenses to removal. For many the result will be wrongful removal without a meaningful opportunity to be heard. Specifically, by curtailing the ability of litigants to seek remand, a reasonable extension of briefing deadlines, administrative closure, or *sua sponte* reopening, the Rule eliminates the very tools necessary for our attorneys and *pro se* clients to ensure that they can access basic due process protections. It frustrates our mission of ensuring that each person in removal proceedings in Arizona is treated with fairness. In the name of efficiency, the Rule also forecloses meaningful opportunities for appellate review. Additionally, the Rule will force us to undertake additional motions practice and appellate work because of the serious due process violations it creates. This will place additional burdens on our staff and will result in decreased ability to accept additional cases—a direct harm to our mission to increase access to counsel.

32. The Rule will create these results based on numerous substantive changes, all of which will adversely impact FIRRP's programming, as discussed in turn below.

*Massively Reducing the Allowable Briefing Extensions Undermines Access to Counsel and Disproportionately Harms Detained Pro Se Respondents*

33. One of the most concerning aspects of the Rule from FIRRP's perspective is the massive reduction in the allowable length of briefing extensions from 90 days to 14 days. This drastically shortened briefing extension puts unreasonable and significant strain on the limited resources of attorneys representing individuals at the BIA and makes it nearly impossible to identify and place appellate cases with *pro bono* counsel. Moreover, the Rule simply fails to account for the immense logistical barriers faced by detained *pro se* individuals in timely receiving and sending mail, let alone preparing an appellate brief.

34. Curtailing possible extension requests is particularly egregious when one considers the tight timelines and numerous barriers that already exist for BIA briefing deadlines. To understand these barriers, it is crucial to understand how BIA appellate practice in Arizona worked even before this Rule, described below:

   a. Parties wishing to appeal the decision of the IJ have 30 days to file a notice of appeal to the BIA. While a notice of appeal requires parties to state their reasons for appeal, parties do not have access to the full transcripts, or often even the complete IJ decision if it was issued orally, or in a subsequently filed written decision, and therefore parties almost universally reserve the right to raise additional issues upon review of the transcripts. This is true for both Department of Homeland Security ("DHS") attorneys as well as individual respondents.

b.  Once a notice of appeal is filed, the timing for issuance of the briefing schedule is uncertain and arbitrary. Although detained appeals are on an accelerated schedule, the BIA commonly takes anywhere from one to four months to prepare transcripts and issue a briefing schedule in detained cases.

c.  The BIA provides parties with copies of transcripts for the first time at the same time it issues the initial briefing schedule. In cases involving oral decisions, IJs review and, if necessary, correct their decision; a corrected version of the decision is issued for the first time with the transcripts. Additionally, in Arizona, some IJs do not issue full decisions at the time of the denial either orally or in writing, instead drafting a complete written decision only *after* a party files their notice of appeal.[5] In such cases, *pro se* individuals often get the written decision providing actual reasons for the denial for the first time when they receive the briefing schedule. The BIA also does not provide a copy of the complete record of proceedings, which means that if a noncitizen is missing any of the applications, motions, or evidence submitted before the IJ, one must request copies either from EOIR through a Freedom of Information Act ("FOIA") request or request copies directly from DHS.[6] Access to the underlying decision, evidence, and transcripts are critical to identifying legal error and preparing an appeal. Despite these obstacles, the initial briefing schedule gives parties only 21 calendar days *from the date of mailing* to prepare and file their brief at the BIA.

d.  The BIA mails parties the briefing notice and transcripts through standard U.S. mail. In Arizona, this routinely results in a three- to seven-day delay in receipt of the briefing schedule and transcripts, even for attorneys. For detained *pro se* people working with FIRRP, normal postal delays are often exacerbated by mail processing delays in the detention centers. Indeed, incoming mail from the BIA can regularly take a week or more to reach a detained *pro se* person, while outgoing mail from detention centers to the BIA routinely takes anywhere from five to ten days to arrive and be officially marked as received at the BIA. In light of the BIA's standard 21-day briefing period, this leaves detained *pro se* individuals with very little time in which to prepare and file their brief and extensions are often necessary.

---

[5] Although FIRRP and *pro bono* attorneys have challenged this procedure as a violation of due process, certain IJs in Arizona still follow this procedure in some cases.

[6] These requests are typically made pursuant to *Dent v. Holder*, 627 F.3d 365 (9th Cir. 2010), which requires DHS to provide immigrants in removal proceedings a copy of the government's A-file. However, such requests are widely ignored by DHS and referred to a formal FOIA process instead, which can routinely take three to six months to process or longer. *See* . *Nightingale v. USCIS*, 19-CV-03512-WHO (Dkt 89 – Order Granting Summary Judgment in Favor of Plaintiff for Declaratory and Injunctive Relief) (Dec. 17, 2020) (finding routine non-compliance by USCIS with statutorily mandated deadlines under the FOIA).

e.  The BIA does not follow the mailbox rule. Rather, documents mailed to the BIA are only considered properly filed when they are stamped as received by BIA clerks. In the last year, the BIA has had several periods during which they had backlogs of one or more days in marking mail as properly received. FIRRP staff experienced this even when documents were delivered by courier service with proof of delivery. In our experience, the BIA mail room delays are entirely unpredictable. As a result, to ensure that briefs are properly marked as received at the BIA by the due date, FIRRP staff and *pro se* respondents who we help navigate the appellate process must send briefs well in advance of the actual due date as a precautionary measure. This further restricts the already limited period available for filing a brief in the standard 21-day briefing window. Additionally, both to maximize time available to thoroughly draft appellate briefs and because of mail room delays at the BIA, FIRRP often pays for tracking or courier services for represented and some *pro se* cases, at significant additional cost to the organization.

f.  The combined impact of these issues is that despite working diligently to overcome tight appellate timeline for those we serve, FIRRP attorneys, *pro bonos*, and the *pro se* respondents who we assist at the BIA regularly must request reasonable briefing extensions for good cause. BIA extensions requests are not granted as a matter of course, but only for good cause shown. Despite the regulatory time frame allowing up to a 90-day extension, it has been longstanding practice of the BIA to give one 21-day extension. Second extensions can be obtained in extraordinary circumstances.

35. By reducing the maximum extension available to only 14 days, the Rule exacerbates very real burdens and due process concerns that already exist with the BIA process, while doing essentially nothing to address the true causes of delay in BIA case processing.

36. Detained cases make up the vast majority of FIRRP's work and, as such, FIRRP attorneys already regularly brief matters on accelerated timeframes with simultaneous briefing schedules. Any further tightening of the appellate timeframe will seriously damage FIRRP's ability to take and place cases. Given the many competing demands on FIRRP staff at any given time, uncertainty about when the BIA will set a briefing schedule already makes it difficult to ensure that our attorneys will have the necessary time and resources to dedicate to an appeal. Indeed, reasonable briefing extensions create flexibility that allows FIRRP to regularly take appeals despite competing work responsibilities. Moreover, numerous recent changes in immigration law and practice that require additional legal research and writing, as well as logistical complications caused by COVID - from staff working remotely to problems with mail delivery - all contribute to a need for reasonable briefing extensions. By significantly shortening the maximum allowable briefing extension, this Rule will make appeals more time-intensive and onerous, while also eliminating much of that critical flexibility. This ultimately will reduce how many people FIRRP can represent on appeal, undermining FIRRP's mission of ensuring that ever detained person has access to counsel and receive a fundamentally fair court process.

9

37. The Rule further harms our mission because FIRRP actively pursues cases for appellate representation before the BIA not only to help individual clients win relief, but also to develop and preserve arguments for federal court appeals, since in many cases – particularly with recent changes in asylum law – federal court intervention is necessary to clarify the law and to obtain relief for those we serve. FIRRP directly represents individuals before the Ninth Circuit Court of Appeal. Additionally, we routinely help *pro se* individuals prepare and file petitions for review to the Ninth Circuit as well as accompanying motions for stay of removal, appointment of counsel, and leave to file in forma pauperis. We also provide limited *pro se* support for individuals who must respond to dispositive government motions before the Court of Appeals. The extent to which the record and legal issues were clearly developed before the agency is a key factor that can determine whether a federal appeal is viable for placement with *pro bono* counsel through FIRRP and, for *pro se* petitioners, it will determine whether the individual can avoid summary dismissal, obtain a stay, or have a chance to obtain counsel through the Ninth Circuit's *Pro Bono* Program. All of these things will become significantly more challenging in light of this Rule since the limitation of extensions will both reduce the number of people who are able to obtain counsel to develop their cases before the BIA, as well as limit how much time people have to prepare quality briefs. This, in turn, will harm FIRRP because it creates additional burdens for our DART team to help *pro se* detained individuals develop arguments at a minimum at the PFR and motions phase of federal litigation. This type of critical *pro se* support before the Ninth Circuit is unfunded and requires FIRRP to divert critical resources to safeguard the rights of the people we serve.

38. Likewise, this Rule will substantially undermine FIRRP's ability to place BIA appeals with *pro bono* attorneys. As noted above, FIRRP has a robust *pro bono* program and routinely relies on *pro bono* attorneys for BIA representation to maximize our limited resources. Most appellate *pro bonos* require time to familiarize themselves with the record. Indeed, potential *pro bonos* are rarely willing to enter on a case without first having access to the transcripts. Unfortunately, since transcripts are not issued until briefing deadlines are set, FIRRP typically has two weeks or less to identify a *pro bono* attorney; go through the necessary conflicts checks and retainer process; and mentor that attorney as they prepare and file an appellate brief. These timelines, as always, are further curtailed for detained noncitizens who must wait to receive the transcripts in detention, then mail those documents to FIRRP or directly to prospective *pro bono* counsel, which adds delay while the briefing clock is ticking.

39. Many of FIRRP's *pro bono* partners are not immigration law specialists and require significant mentorship on both substantive law as well as immigration procedures. Even for experienced pro bono attorneys, the preliminary logistics of getting a case referral, doing a conflict check, and having the client sign a retainer often takes most if not all of standard briefing period, thus necessitating extension requests. This extremely compressed timeframe makes briefing extensions critical for *pro bono* placement, as attorneys are unlikely to take on a case without a reasonable extension to review the record and prepare a quality brief. Briefing schedules that give parties only several

weeks, including at most a two-week extension, to fully review the record, prepare, and file the brief fails to account for the overarching complexity of immigration law, not to mention the need to research and understand the many recent changes in immigration law and policy. Reducing the allowable timeframe for extensions, therefore, will seriously impair FIRRP's ability to place and mentor *pro bono* appeals.

40. Between our decreased capacity to take appellate cases in house, and the increased difficulty we will have identifying and placing cases with *pro bono* counsel, the Rule will leave even more detained noncitizens without counsel. Thus, this Rule will erode a program that FIRRP has spent decades building that provides potentially life-saving opportunities for representation to detained noncitizens. It will seriously undermine FIRRP's mission of ensuring access to counsel and due process for all detained noncitizens, all while simultaneously drastically increasing the burden on our DART team to provide *pro se* support to those we cannot represent.

41. The Rule limiting briefing extensions will disproportionately harm detained *pro se* people. FIRRP offers legal orientation and *pro se* support to litigants drafting their own appeals. The vast majority of *pro se* noncitizens FIRRP serves are non-English speaking and in addition to the substantial language barriers, they overwhelmingly have limited access to law libraries, computers[7], and other resources that could potentially help them prepare briefs. Additionally, as addressed above, *pro se* people detained in Arizona persistently encounter significant mail delays directly tied to their detention and those delays can be further exacerbated by processing backlogs in the BIA's own mail room. Thus, even in the best of circumstances before this Rule, *pro se* detained individuals were often left with very little time to prepare and file their briefs. Some of the most common requests FIRRP staff get regarding appeals is how to request a BIA briefing extension and for help mailing documents to the BIA because detention center mail is often too slow or uncertain to ensure that filings are timely received.

42. FIRRP has an entire team dedicated to helping *pro se* noncitizens understand their rights, immigration law, and procedure, but appeals pose particular difficulties due to the tight and unpredictable timelines and because language barriers are amplified by the appellate (written) format. As a result, many *pro se* individuals struggle to file briefs that adequately raise legal issues without substantial support as it is. Rather than remove barriers that prevent *pro se* noncitizens from pursuing their right to appeal, the Rule only increases the number of people who will have their cases summarily dismissed, not because their proceedings were free of legal errors, but simply because the Rule's procedural mechanisms are nearly impossible for detained *pro se* individuals to navigate. This will leave *pro se* detained noncitizens unable to timely file a brief, let alone one that thoroughly addresses the legal issues. In turn, this will create additional work and obstacles for FIRRP as we scramble to assist *pro se* individuals on compressed timelines. FIRRP's DART team staff will have to spend considerably more time with *pro se*

---

[7] While detained people have limited access to computers in law libraries to type documents and conduct basic research, in Arizona computers in detention centers do not have any form of internet access.

litigants to explain the appeal process and, to support that pressing need, FIRRP will have to divert resources from other programs and clients that we serve. We also will have to accept fewer cases for full representation and will have to create new robust sample materials and educational *pro se* packets about how the Rule changes appellate procedures.

43. FIRRP is particularly concerned about how the implementation of this new Rule will harm detained *pro se* individuals while the COVID-19 pandemic is ongoing. During the pandemic, FIRRP has had to shift our normal in-person orientations, workshops, and other support to remote assistance operated largely through a hotline, telephonic visitation, and mailed materials and correspondence. Thus, FIRRP relies even more now than ever on the slow and unreliable detention center mail systems. Where previously we could meet with a client in person to help explain documents received from the BIA or translate key portions of the IJ decision or transcripts for non-English speaking individuals, now we must rely on detained people mailing us copies of those documents before we can review or explain them accurately. As a result, it is highly likely that FIRRP will be simply unable to offer many people timely orientation under the Rule for so long as we must rely on mail correspondence for relevant case documents and scheduled phone appointments. Without our assistance, many *pro se* people will not be able to timely submit complete appeals briefs to the BIA. For FIRRP, this result not only cuts at the heart of our core principle, ensuring meaningful access to due process for all detained noncitizens, but it also will cause very real stress and burn-out among our staff who are attempting to serve this *pro se* population in difficult circumstances through a Rule change that creates often insurmountable barriers preventing those we serve from getting meaningful appellate review.

44. Shorter briefing deadlines will not make the BIA more efficient. In FIRRP's experience, the most substantial delays in the BIA appellate process are not caused by parties' limited requests for briefing extensions, but rather by the BIA itself and its internal processes. At the outset, as described above, it can take anywhere from one to four months for the BIA to issue transcripts and a briefing schedule even on the detained docket. Moreover, once briefing is complete, FIRRP's experience is that it typically takes the BIA between two and six months to decide a detained appeal. However, in some cases, the BIA delays issuing a decision on detained cases for much longer. For example, in at least one FIRRP case the BIA took approximately eighteen months to decide an appeal from the date the briefing was completed, despite the case being on the detained docket – in total that case was pending before the BIA for twenty-one months, all the while the client was detained. This Rule does little to address the true source of delay and denying noncitizens a reasonable opportunity to write their briefs has no rational relationship to efficiency compared to the time it takes the BIA to decide cases.

### *Elimination of Ability to Seek Remand & Various Changes to Remand Authority Undermines Due Process and is Contrary to Law*

45. The Rule largely eliminates remand as a critical tool that is designed to preserve noncitizens' opportunity to receive full and fair consideration of their claims based on

new, material evidence that arises during appeal. Under the Rule, the BIA may no longer receive new evidence on appeal, or remand for further consideration of such evidence, except in a limited set of circumstances that is so narrowly defined that it is doubtful that the conditions will ever be squarely met. This provision undermines noncitizens' full and fair opportunity to present their claims for immigration relief, will create substantial additional work for FIRRP staff serving *pro se* individuals, and will lead to massive inefficiencies within EOIR.

46. At FIRRP, we routinely request remand to address material changes in a client's case that occur while the case is pending at the BIA. This approach preserves time and both FIRRP's and the court's valuable resources. For example:

   a. Mental Health Cases:

   Remand for additional factfinding is regularly necessary in cases involving noncitizens with serious mental health conditions. FIRRP has represented more than two hundred detained persons who have been found incompetent to represent themselves under the *Franco-Gonzalez* court order and EOIR's NQRP program. FIRRP also routinely provides *pro se* legal and social service support to people who are experiencing serious mental health conditions before they are properly identified and appointed counsel. As recognized in *Franco-Gonzalez*, detained *pro se* litigants with mental health disabilities are some of the most vulnerable people appearing before EOIR.

   FIRRP frequently represents or works with *pro se* individuals at the BIA who require remand for additional hearings and findings on competency because their mental health condition was unflagged, unrecognized, or improperly addressed before the IJ. Often these are cases wherein IJs failed to conduct competency inquiries and ordered those clients removed despite clear indicia of incompetency. Indeed, there is an established pattern in Arizona of significant delays and failures in the process for timely and appropriately identifying individuals who are members of the *Franco-Gonzalez* class, which means that a significant number of people who were eventually identified as *Franco-Gonzalez* class members required remand in order to be appropriately identified. *See Franco-Gonzalez v. Wolf*, CV 10-2211-DMG (DTBx), Dkt. 1072, Order Granting Plaintiff's Motion for Leave to Conduct Limited Discovery to Establish Non-Compliance with Court Order (Jan. 10, 2020) (finding that "[t]he record before the Court is more than adequate to raise questions about potential ongoing noncompliance with the mandatory procedures [for identification of class members]" and citing to four examples from Arizona as evidence of said non-compliance). As explicitly envisioned in the *Franco-Gonzalez* order, remand is necessary anytime the BIA becomes aware of evidence of a serious mental health condition for the IJ to

properly conduct a competency inquiry.[8] In fact, one of the cases highlighted in Judge Gee's order for non-compliance with the *Franco* provisions involved a man with a history of mental health conditions including at least one suicide attempt in custody who submitted medical records in support of remand while his case was first pending before the BIA, though his case was not ultimately remanded until he had further appealed to the Ninth Circuit.

In FIRRP's experience, many of the cases remanded for competency hearings ultimately result in appointment of counsel. For example, one current client was found incompetent after FIRRP helped him request remand before the BIA based on evidence of a serious mental health condition that the IJ had failed to identify or address previously, despite records showing a history of mental instability, hallucinations, and treatment with antipsychotics throughout his lengthy detention. By eliminating remand for additional factfinding in cases like these, the Rule will deny seriously mentally ill noncitizens due process and court mandated procedures to protect their rights. It will also directly harm FIRRP as an organization since, without such remands, it is likely that FIRRP will never be appointed as counsel for these individuals under the *Franco* order or NQRP. Indeed, it is unclear what remedy, if any, we could seek on behalf of these individuals, other than a motion to reopen months or years down the line, which is not practicable for detained, incompetent clients.

b.  Unaccompanied Children:

Unaccompanied children are another particularly vulnerable segment of people that FIRRP serves who will also suffer under this Rule because it prohibits remand to address material changes that have come about while the case is on appeal. FIRRP routinely helps children who qualify seek Special Immigrant Juvenile Status ("SIJS"), a process that entails representing children first in state dependency proceedings, where a dependency judge makes requisite factual findings about whether a child is abandoned, abused, or neglected, and then before USCIS, where the petition for SIJS (the Form I-360) is adjudicated. This all occurs concurrently with EOIR removal proceedings for these children.

Unfortunately, recently it has become common in Arizona for IJs to deny continuances and requests for administrative closure while USCIS adjudicates the Form I-360 or while the parties wait for a visa to become available considering recent backlogs. As a result, unaccompanied children who have been abandoned,

---

[8] *See Franco-Gonzalez*, No. 10-cv-02211-DMG, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014) (mandating that the BIA remand the case to the IJ with instructions to apply the injunction procedures anytime documentary, medical, or other evidence indicating that individuals are potentially class members "comes to the [BIA's] attention.")

abused, or neglected, can be ordered removed by the IJ while their SIJS application remains pending at USCIS. FIRRP helps these children seek remand before the BIA when their Form I-360 petitions are approved during appeal, since an approved Form I-360 is a material change in circumstances.

Under this Rule, remand for this reason will no longer be available. This will severely harm FIRRP's clients and create substantial additional work not only for FIRRP, but for the BIA itself, since we must first fully and zealously litigate any other claims before the BIA, despite the possibility that the case could be otherwise resolved, and once there is an administratively final decision from the BIA, we must file a motion to reopen based on the approved SIJS petition.

For example, in one recent case, FIRRP represented a young man whose mother severely physically abused him for years and who was also sexually abused by his mother's boyfriend, a member in a powerful gang. FIRRP worked diligently to obtain underlying dependency court findings and file his Form I-360 petition for SIJS, however, at the time of this young man's merits hearing on asylum, his petition was still pending with USCIS. Despite FIRRP counsel seeking a reasonable continuance or in the alternative requesting that the IJ defer ruling on asylum until the SIJS petition was decided, the IJ ordered this child removed. FIRRP filed an appeal to the BIA, but less than one month after the IJ ordered removal, USCIS approved this child's petition for SIJS. Because the case was already before the BIA, FIRRP requested remand in light of the granted petition. To date, that motion for remand is still pending. Under the Rule, this young man would not have the option to remand at all.

c.  Asylum Seekers and Others with Fear Based Claims:

This Rule will also leave those with fear-based claims without meaningful legal avenues to pursue meritorious claims for relief when new evidence arises in their country of origin related to the likelihood of persecution in that country. While the Rule relies heavily on the availability of motions to reopen to address this scenario, that fails to consider that such motions may only be filed after the BIA has issued an administratively final order months or years into the future, causing a massive waste of resources that would go into fully litigating an asylum claim based on outdated, inaccurate facts when there has been a significant change in circumstances.

For example, in one case an IJ terminated a Sudanese man's asylee status based on DHS's arguments that country conditions had changed and largely stabilized in Sudan while the client was *pro se*. FIRRP was able to secure him *pro bono* counsel to work on his appeal. After the IJ's decision, there was a military coup in Sudan that fundamentally changed his case and undercut DHS's arguments

15

regarding the alleged political stability in Sudan. Using reliable media resources and non-governmental organization reports on the violent situation in Sudan, the *pro bono* was able to file a motion to remand to conserve judicial resources. However, under this Rule, the appeal would have to be fully litigated using old pre-coup information and taking months or more to resolve, before *pro bono* counsel could file a motion to reopen based on the coup and new political reality in Sudan.

47. Under the Rule, noncitizens are likewise barred from seeking remand even where there is an intervening change in law that would open new avenues for relief, unless that change of law would entirely invalidate removability. In many cases this Rule will result in manifest injustice to FIRRP's clients. For example, FIRRP has worked with many individuals who, though properly found inadmissible to the U.S., were subsequently granted withholding of removal, but denied asylum due to the so-called "transit ban." Although the "transit ban" was ultimately enjoined and vacated,[9] and although withholding has a higher burden of proof than asylum such that each of these applicants would undoubtedly meet the legal threshold for asylum, under this Rule the BIA could not remand to grant relief for asylum, because the change in law did not disturb the applicants' underlying removability.

48. This Rule will force FIRRP attorneys to fully and zealously litigate cases on appeal applying invalidated law or outdated facts, only to subsequently file motions to reconsider or reopen once there is a final order of removal in place. This is wildly inefficient. It will create substantially more work for FIRRP staff and, because cases will take significantly longer, FIRRP will have to reduce our overall caseload and divert resources to ensure that we are able to follow cases that may require a motion to reopen once the BIA has made a decision. This harms our mission to defend noncitizens' access to legal relief in fundamentally fair proceedings by eliminating a critical tool needed to present new evidence. Additionally, it will mean that we are unable to accept other cases and our organizational goal of increasing access to high-quality representation for detained pro se respondents will be frustrated.

49. Likewise, by severely limiting when remand is available for additional factfinding on direct appeal, this Rule contravenes key due process protections for *pro se* noncitizens before the IJ. At FIRRP, we often seek remand in cases where we discover that Arizona IJs have failed in their constitutionally mandated duty to fully and fairly develop the record for *pro se* respondents, as well as to address other fundamental due process violations that can unfortunately occur when detained *pro se* noncitizens are forced to defend themselves in immigration court. For example:

    a. In one case, an IJ pressured a detained *pro se* litigant to present his asylum case in a hearing that lasted 35 minutes from start to finish. The client, appearing via

---

[9] *See East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 838–39 (9th Cir. 2020) (enjoining transit ban); *CAIR Coalition v. Trump*, 471 F. Supp. 3d 25, 31 (D.D.C. 2020) (vacating interim final rule).

videoconference from a remote detention center, was not able to fully present his claim and the IJ failed to develop the record because the IJ told this client at the outset—without hearing any evidence—that his case was meritless. On appeal, FIRRP placed the case with *pro bono* counsel who was able to successfully argue for remand in light of the due process violation and the IJ's failure to fully or fairly develop the record. In cases like this one, remand from the BIA provides an important protection against IJs who fail to abide by their constitutional obligation to develop the record and advise litigants of all available relief.

b.  In another case, an IJ denied relief to an asylum seeker in a hearing that lasted less than thirty minutes.  The IJ denied his motion to continue (requested because *pro-bono* counsel was willing to enter if given more time), made a negative credibility finding, and found that the respondent had failed to corroborate his testimony with evidence. The IJ made these findings despite the fact that the facility had confiscated some of the respondent's direct evidence—a fact that the respondent documented in motions asking for the IJ's assistance in getting the evidence back. These are problems that the BIA would not be able to address in the first instance on appeal, and the underdeveloped record was a result of actions by the facility and the IJ, not the noncitizen. FIRRP was able to place his case with *pro bono* counsel on appeal, who convinced the BIA to remand the case because the IJ had failed to develop the record. Following more complete testimony, evidence, and argument on remand, the same IJ decided the respondent was credible, and merited asylum from Cameroon. The Department did not appeal the grant of asylum. However, this result would not have been possible under this Rule.

50. While the Rule clarifies that an IJ's failure to develop a *pro se* record as is constitutionally mandated would satisfy one element of a five element test for requests to remand for factfinding, the Rule fails to consider the impossibility of a *pro se* respondent being able to establish the other four elements of that test. The Rule "clarifies that, **subject to other requirements**, the Board may remand a case for additional factfinding in cases in which the immigration judge committed an error of law and that error requires additional factfinding on remand," citing as an example an IJ's failure to develop the record for a *pro se* respondent. *See* 85 Fed. Reg. 81590 (emphasis added). In reality, though, this purported clarification is a hollow promise of relief because the "other requirements" will effectively bar most *pro se* people FIRRP works with from being able to successfully seek remand even once they have established a violation of law requiring remand. For example, the first two "other requirements" that must be met for the BIA to remand for additional factfinding is that "the party seeking remand preserved the issue by presenting it before the [IJ]," and "must have attempted to adduce the additional facts before the IJ." 85 Fed. Reg. 81651. It is unclear how a *pro se* person will ever be able to establish these elements where the legal error is based in the IJ failing to help the individual develop the record or identify relief. Moreover, these requirements improperly alleviate IJs of their constitutional obligations and shift the burden to the *pro se* noncitizens. At FIRRP we are nationally known for developing *pro se* materials that are

designed specifically to explain complex legal concepts to people with no legal knowledge and often limited education. We work with experts in explaining complex concepts in "plain language" and conduct popular education workshops wherein we provide concrete examples of how to navigate the labyrinth of immigration law. Yet, this Rule has created a standard that is so nonsensical that it is difficult to imagine how we can effectively explain to *pro se* people what they need to prove or how they might go about proving it. This will frustrate our mission of ensuring due process for all detained noncitizens, it will take hours of additional time to try to explain this new provision, and it will cause significant burn-out among our staff who try to educate and assist *pro se* individuals.

51. Additionally, while EOIR touted efficiency as the guiding rationale for this Rule, this change will make proceedings *less* efficient. Individuals in circumstances like those described above will have to wait until the BIA has already expended time and resources adjudicating the underlying claim on the merits before they can file motions to reopen or reconsider.[10] For the detained population FIRRP serves, unnecessary delay causes concrete human suffering because it prolongs people's detention. The unfortunate reality is that FIRRP regularly encounters people with meritorious claims who cannot endure prolonged time in the prison-like conditions of immigration detention and give up on their cases, or worse, attempt to harm themselves in their desperation. This reality is a sizeable emotional and physical burden that FIRRP staff carry every day. By instituting a system that forces people to hold-off raising new, relevant facts or law until a motion to reopen can be filed will cause immeasurable harm to FIRRP and those we serve.

52. FIRRP is also concerned by provisions in the Rule that expand the BIA's own factfinding authority, including its ability to affirm on any basis in the record and issue orders of removal in the first instance. Allowing the BIA to take administrative notice of certain facts and introduce evidence into the record for the first time on appeal is contrary to established appellate practice and law. It will be particularly confusing and harmful to the detained *pro se* individuals that we serve for several reasons. First, in cases where FIRRP is providing *pro se* assistance to individuals appealing to the BIA without counsel, FIRRP staff will now be burdened with attempting to explain to individuals how to anticipate additional evidence the BIA could rely upon, all while also conveying that they, as a party, cannot submit additional evidence. This will be exceptionally confusing to *pro se* individuals. Second, the Rule will effectively deny noncitizens a meaningful opportunity to contest or rebut evidence presented for the first time on appeal. Under the Rule, if the BIA intends to take judicial notice of new facts, it must only give parties notice of those facts if the new evidence will be used to overturn a grant of relief, but not, for example,

---

[10] Alternatively, the only viable option is for both FIRRP attorneys and the *pro se* individuals we work with to try to anticipate every direction a case may develop and what circumstances in a country may change so that we can do our utmost to develop the record on every issue that could, later, give rise to a need to remand. However, even if this were possible, it is very unlikely that this approach will be tolerated in Arizona's detained docket, where, as seen in examples above, IJ's often already schedule merits hearings for extremely short—thirty to sixty minute—trials.

where it will be used to affirm a denial of relief, even though both are dispositive. This deprives our clients of their statutory right to review and confront evidence against them. *See* 8 U.S.C. § 1229a(b)(4). Moreover, because BIA corresponds with parties only in writing, in English, and because mail from the detention centers to detained persons is often significantly delayed, it is highly likely that even where the BIA issues such notice to the parties, detained *pro se* noncitizens will not get a meaningful opportunity to respond or object and FIRRP will bear the burden of trying to help them navigate how to enforce their rights under a Rule that fails to meet the minimal requirements of due process.

53. This provision will force FIRRP staff and *pro bonos* to fundamentally change how we approach appellate writing to show that certain additional factfinding would or would not change the outcome of a case. FIRRP staff will have to file an appeal brief—refraining from submitting new evidence—while also arguing that the IJ either should or should not be permitted to engage in further factfinding because the additional facts either would or would not be dispositive, depending on the IJ decision below. Indeed, this rule runs so counter to fundamentals of appellate practice that FIRRP will have to completely retrain staff on how to prepare a brief before the BIA, as compared to any other appellate court, and develop new training materials for *pro bono* attorneys. Thus, the Rule imposes illogical and unrealistic requirements on attorneys to argue why further factfinding is or is not needed without being able to submit, review, or delve into the new evidence to be able to show what that factfinding would yield.

54. This Rule also imposes new, problematic limits on an IJ's authority when a case is remanded. Under the Rule, where the BIA limited the scope of remand, an IJ cannot consider intervening facts. This is true even if a case is remanded after spending years pending on the BIA's docket, as can happen particularly for non-detained appeals. In one recent case, FIRRP worked with a man whose case was pending at the BIA for *over ten years* and in the course of the intervening decade, the client arguably became eligible for forms of relief that were not initially available to him. In another case, there was a coup d'etat in the client's country of origin shortly after the IJ denied relief and the case was on appeal before the BIA. The result of this Rule will be that noncitizens, like these clients, who can qualify for forms of relief that may not have been previously available now will be barred from seeking it on remand and the courts will go forward adjudicating a case based on limited and outdated information, wasting both the Court's and the parties' resources. Because of this change, in cases like these, FIRRP will need to file a subsequent appeal on the underlying case *and*, eventually, seek a motion to reopen to broaden the IJ's authority to cover dispositive applications for relief. This aspect of the Rule change will mean that each case potentially will consume significantly more time and resources as FIRRP works to preserve access to legal relief for which our clients otherwise qualify and is forced to litigate cases on incomplete facts while also anticipating the need to file a post-decision motion to reopen once there is an administratively final decision.

55. The cumulative effect of each of these remand-related rules will be the imposition of premature and wrongful orders of removal, even where individuals qualify for

immigration remedies contemplated by Congress and included in the INA. Preserving access to these remedies will demand substantial resources in each case, which in turn will reduce FIRRP's ability to serve as many clients.

*Elimination of Administrative Closure Causes Serious Harm to Some of FIRRP's Most Vulnerable Clients*

56. Despite the Attorney General's decision in *Matter of Castro-Tum* in 2018, the validity of that decision is still an open question in the Ninth Circuit and administrative closure continues to be an important tool that FIRRP seeks in certain cases involving FIRRP's most vulnerable clients. Most notably, FIRRP attorneys routinely seek administrative closure in cases where unaccompanied minors have filed asylum applications before USCIS and, per 6 U.S.C. § 279(g) and 8 U.S.C. § 1158(b)(3)(C), EOIR lacks jurisdiction to consider the asylum claim until USCIS has rendered a decision. Additionally, we ask for administrative closure when Arizona state courts have made the requisite dependency findings for clients who qualify for SIJS, but where the minor is either awaiting a decision from USCIS on the I-360 SIJS petition or the I-360 is approved and the minor is awaiting a current visa. Likewise, FIRRP seeks administrative closure in cases involving severely mentally ill respondents as a due process safeguard, for instance where additional mental health treatment is necessary for the client to be able to meaningfully assist counsel.

57. In 2020, our staff filed numerous requests for administrative closure. Though nearly none were granted, we continued to argue both at the agency and at the Ninth Circuit Court of Appeals that *Matter of Castro-Tum* was wrongly decided and that administrative closure is necessary in, at a minimum, the specific circumstances described above. This Rule forecloses such arguments.

58. Administrative closures had long been a vital tool for FIRRP's clients seeking relief that must be adjudicated outside of removal proceedings. In addition to children in short-term federal shelters and those living in the community, FIRRP serves a large number of children in the federal government's long-term foster care program who have all been identified as clients with strong cases for relief from removal, but who are unlikely to reunite with family in the United States. The unaccompanied children that we serve often face dual legal tracks: while their SIJS petitions and asylum petitions are pending before USCIS, their removal proceedings are held before EOIR. The clashing timelines of these two tracks requires a tool like administrative closure to ensure that these children have the opportunity to have their USCIS claims adjudicated before being forced to go forward with more adversarial proceedings in immigration court. In these cases, FIRRP routinely seeks administrative closure while children who qualify for SIJS or asylum pursue that protection before USCIS.

59. As such, administrative closure is crucial to allowing our children clients to exercise their right to pursue paths to relief before USCIS that the Trafficking Victims Protection and Reauthorization Act ("TVPRA") specifically created for vulnerable children without also having to defend themselves in removal proceedings and without having to clog the

EOIR docket with cases that are or should be effectively on hold while USCIS adjudicates relevant applications. Specifically the TVPRA grants exclusive jurisdiction to USCIS to adjudicate visas for abused, abandoned, or neglected children, as well as providing USCIS with initial jurisdiction over unaccompanied children's asylum claims. Without a mechanism to close or pause their immigration court case while relevant applications before USCIS are pending, these special protections for vulnerable unaccompanied children will be rendered meaningless and, ultimately, will violate their right to pursue such relief.

60. Recently, FIRRP staff have noted a regular pattern of IJs in Arizona denying both requests for administrative closure and continuances in cases involving minor children who are clearly eligible for SIJS, but whose I-360 is either pending before USCIS or approved and simply waiting for a current visa date to be able to adjust before the IJ. In such cases, the denial of administrative closure and reasonable continuances results in massive inefficiencies, hardship to FIRRP's clients who are forced to proceed with unnecessary removal proceedings, and an extraordinary amount of additional work for our staff.

61. It is inefficient because EOIR wastes resources on pursuing piecemeal adjudication, regardless of alternative avenues of relief that exist through other parts of the immigration system. This in turn creates substantial hardship to FIRRP and our clients who not only must prepare for additional hearings before the immigration court and potential alternate forms of relief, all while preparing parallel USCIS or state court proceedings, but also must then pursue appeals, sometimes even to the Ninth Circuit Court of Appeals, addressing why the Court's procedures violated due process and the TVPRA.

62. The hardship caused by the lack of access to administrative closure in these cases cannot be overstated. Children who have strong cases for SIJS or asylum have necessarily survived serious past trauma, often by the very person who should be protecting the child. Our clients report that the stress of going to court brings up painful memories of the past and is a frequent disruption of their education, work, and family responsibilities. They regularly state that going to court increases a feeling of a loss of hope, depression, and increased vulnerability. This harm is serious and real: Congress created a pathway to permanent residency for these clients in recognition of their vulnerability. Yet, if IJs deny administrative closure and order clients removed before USCIS or a state court grants relief, the client will either have to accept a premature removal order or pursue a lengthy appeal.

63. The elimination of administrative closure has also already complicated case placement with *pro bono* attorneys, particularly of children's cases. In the past, FIRRP could provide a clear road map for volunteer attorneys about practice, timelines, and legal strategy. However, without administrative closure, a significant number of cases will have a much more complicated procedural posture for the reasons addressed above. This requires *pro bonos* to seek multiple forms of relief and make many more appearances both before EOIR *and* USCIS, and then potentially appeal a premature removal order. As

a result, each case requires more time and legal resources, making the attorneys who take these cases able to represent fewer children *pro bono*. It also consumes more FIRRP resources since the attorneys taking these cases require a much more intensive mentorship process, reducing our overall *pro bono* capacity.

64. The elimination of administrative closure will also have severe and drastic consequences for our clients with severe mental health conditions by further foreclosing a potentially critical due process safeguard. FIRRP has represented more than two hundred individuals under the *Franco-Gonzalez* court order and the NQRP and we currently maintain a caseload of approximately one hundred cases. Administrative closure is a key due process safeguard in a small, but critical group of cases in which a noncitizen's mental health symptoms are so severely disabling that the individual is simply unable to communicate with or assist counsel in any meaningful way. *See Matter of M-A-M-*, 25 I. & N. Dec. 474, 483 (BIA 2011) (specifically acknowledging that administrative closure may be a necessary safeguard in some cases where due process concerns remain after implementation of other safeguards). For example, in one pre-*Castro-Tum* case, our client suffered from "extreme paranoia" and "entrenched persecutory and paranoid delusions that significant[ly] impaired his thought process" that rendered him "unable to meaningfully cooperate with or assist his legal counsel" and despite lengthy attempts to work with the client, as well as efforts to reach family and identify other evidence that could shed light on his case, it was simply not possible to adequately represent this particular individual unless or until he was more mentally stable. The IJ and BIA ultimately agreed and his case was administratively closed. Since *Castro-Tum* FIRRP still seeks administrative closure in such cases and, although those motions are routinely denied, by preserving the issue we preserve a path to continue to represent our most severely disabled clients zealously and ethically. The elimination of administrative closure through formal rule making largely forecloses that advocacy path. FIRRP also has at least once client whose case was re-calendared as a direct result of *Castro-Tum* despite his ongoing severe mental health symptoms.

65. In another pre-*Castro-Tum* case, FIRRP sought and received administrative closure where, despite the IJ appointing a qualified representative under *Franco* and the NQRP for an individual who suffered from a serious mental health condition, DHS *sua sponte* released that individual from custody before counsel had an opportunity to meet with the client and without any notice to counsel. The client was released from custody with no mechanism for counsel to contact him and was dropped at a Greyhound station, with presumptive plans to take a cross-country bus trip to Ohio. FIRRP sought administrative closure in this case as a necessary safeguard because, as a *Franco* class member, this gentleman was entitled to ongoing representation in removal proceedings, which could not be guaranteed in the future if his case was simply terminated. FIRRP recently had at least two similar releases without notice of a newly appointed class-members, and while in those cases our staff were able to find the clients in Arizona, if we had not, we would have sought administrative closure as a necessary safeguard and reasonable accommodation of individuals' serious mental health conditions and disabilities. Given ICE's history of releasing individuals with severe mental health conditions without notice to appointed counsel in a manner that would deny those clients their right to counsel

under *Franco*, it is crucial that administrative closure be available as a possible accommodation to protect our client's due process rights and rights under the Rehabilitation Act.

## *Elimination of Sua Sponte Reopening Harms FIRRP's Clients and Staff*

66. The Rule further reshapes EOIR and BIA practice by eliminating adjudicators' *sua sponte* authority to reopen immigration cases to prevent serious error or injustice. This fundamental safeguard ensures efficiency, fairness, and basic due process. Its elimination will result in harm to our clients, including long stays in immigration detention centers, and unnecessary, lengthy petitions for review to the Ninth Circuit in cases that could have been previously resolved before the IJ or BIA. It will also require FIRRP to retrain and reassign staff to be able to assist clients negatively impacted by this provision of the Rule.

67. This provision will most negatively impact clients who are now eligible for forms of relief that were not previously available to them. Most notably, the hundreds of young people that FIRRP represents in SIJS petitions before USCIS often wait *years* for the agency to adjudicate their petitions, despite the 180-day adjudication requirement in the statute. Further, even once their petitions are granted, our clients then often must wait even longer, again often for years, for their visa dates to become current or available so they can apply for adjustment of status. *Sua sponte* reopening plays a key role in allowing these children to pursue their adjustment after these lengthy, government-caused delays. By eliminating that protection, the Rule contravenes congressional intent by cutting off a path to relief that Congress specifically created for these minors.

68. Under current regulations, a noncitizen may only file one motion to reopen and must file that motion within 90 days of the final order. 8 U.S.C. § 1229a(c)(7). FIRRP attorneys regularly file motions to reopen in order to point to new facts that could change the outcome of our clients' cases, either because of a change in law that means they are not removable or because they are now eligible for relief or status under the law. However, because of the strict number and time bars on motions to reopen, many of our clients—especially youth who have been waiting for years for USCIS to make an adjudication of their petitions— may face bars to filing for reopening, for example, because the 90-day window has already elapsed.

69. The onerous changes in this Rule frustrate our clients' ability to have their applications for relief fairly adjudicated. As discussed above, the elimination of administrative closure means that children are forced to proceed with removal proceedings in adversarial settings even while their SIJS petitions are pending. Then, if the IJ denies relief, the BIA cannot grant *sua sponte* reopening once the youth's I-360 petition has been granted. Clients—and by extension, our staff—must continue to appeal to Ninth Circuit Court of Appeals. This is an inefficient use of judicial resources and an enormous amount of work for our staff, thus impacting our ability to accept new cases and provide services to all of those who are detained and facing removal in Arizona.

70. Eliminating access to *sua sponte* reopening will also be devastating for many of the *pro se* clients that we assist. Given the incredible number of changes to U.S. asylum law in the last four years, the ability of an IJ or the BIA to repair manifest injustice in response to changes in case law or policy is essential. For example, as discussed above, the Ninth Circuit recently struck down the third-country transit ban.[11] As a result, many people who were awarded only withholding of removal are now eligible for asylum. Eliminating the IJ and BIA's *sua sponte* powers, however, will prevent EOIR from reopening cases like these, even though a manifest injustice occurred because the IJ applied an illegal and subsequently vacated policy.

71. *Sua sponte* reopening also provides an essential safety valve for *pro se* client who have suffered serious harm while awaiting proceedings in the MPP. FIRRP provides legal orientation to persons in Nogales, Sonora, who are subject to the MPP. In 2020, we assisted one family of six people who were ordered removed *in absentia* when they failed to appear for their third master calendar hearing. They were unable to appear because, after kidnappers accosted the family and attempted to harm them as they left the port of entry near the immigration court after their second court date the month before, the family feared that, if they attended their third hearing, they would again be harmed. The family filed a *pro se* motion to reopen in mid-2020, explaining the exceptional circumstances that prevented their attendance of the hearing and asked for *sua sponte* reopening. The IJ denied their motion in October 2020 and now the BIA will be barred from exercising its *sua sponte* authority in the pending appeal of that motion.

72. This type of harm, unfortunately, is not uncommon among the clients that we serve in Nogales, Sonora, Mexico. Eliminating *sua sponte* reopening authority, when so many of our clients in the MPP program face homelessness, unemployment, lack of access to basic services, and rampant victimization, means that they will be unable to have full and fair hearings or access basic due process protections. It will also make the process of seeking reopening exponentially more legally complicated for FIRRP staff who regularly serve those trapped at the U.S.-Mexico border.

73. *Sua sponte* reopening can also provide an essential protection for clients with mental health disabilities. For example, in one case FIRRP is currently litigating a motion to reopen based on ineffective assistance of prior counsel that also requests *sua sponte* reopening because the client had auditory hallucinations when she was before the IJ but did not receive a competency inquiry or any other protections under *Matter of M-A-M-*. The client was later placed in segregation at the detention center because of her suicidal ideation. The BIA has not yet adjudicated her pending motion, and under this Rule will not be able reopen her case *sua sponte,* despite the clear due process violations.

74. As with the other changes, the elimination of *sua sponte* reopening authority will create a substantial burden on FIRRP because we will have to retrain staff and *pro bono* attorneys on how to approach reopening before the BIA. We will have to create new advisals for *pro se* clients and train staff on how to provide that information. We will have to work

---

[11] *See supra* n.9.

individually and intensively with young people with pending or approved I-360 SIJS petitions to strategize how to best preserve their right to apply for adjustment of status, as provided by Congress. This additional work will frustrate FIRRP's ability to effectuate our mission to ensure that every person in Arizona facing removal proceedings can access due process, since clients who otherwise qualify for immigration benefits established by Congress will be unable to seek those benefits.

*Other Changes in this Rule Harm FIRRP and our Clients*

75. Other provisions of the Rule also harm FIRRP's mission and frustrate our ability to serve clients. One of the most concerning is the Rule's elimination of the remand for the completion of biometrics checks because the procedures are inadequate to ensure that people do not wrongfully have their applications deemed abandoned, despite winning relief, for failing to comply with biometric procedures through no fault of their own. The Rule requires DHS to send the individual notice and instructions for how to complete biometrics, but that notice will likely be written in English only, which poses significant barriers for non-English speaking *pro se* individuals subsequently released from custody. Additionally, there is no mechanism for FIRRP's released clients to contest a finding of abandonment if they did not receive the notice, or did receive it, but could not comply during the given timeframe. Moreover, there is no mechanism to ensure that individual can access additional information about background check notifications, no mechanism or incentive for accountability by the agency, and no mechanism for respondents to obtain review when an application is wrongly deemed abandoned for failure to complete biometrics. During a pandemic that has resulted in millions of infections with a highly contagious virus as well as sporadic opening and closing of federal facilities where biometrics are taken, the timing could not be worse and the stakes could not be higher.

76. FIRRP will now have to spend significant time not only advising *pro se* clients about their obligation to keep their address updated by filing a Form EOIR-33 Change of Address each time they move—something we already do—but must advise all individuals about the possibility of biometric requirements should they prevail in the future. FIRRP will have to divert significant legal assistant and social worker time to ensure that ICE complies with its obligations for our released clients and will also have to spend significant time educating clients and creating advisals about the changes the Rule imposes.

77. FIRRP is also deeply concerned that the Rule's provision that allow IJs who disagree with a BIA remand to certify the case to the EOIR Director. This person's status as a political appointee allows the IJs to essentially circumvent the BIA to try and find another adjudicator who might be more favorable to a decision that the BIA has already reversed.

78. This Rule harms FIRRP because it allows IJs to disturb the finality of the BIA's findings and use political pressure to affirm their own rulings. This is yet another change that FIRRP will have to spend energy explaining to staff, clients, and the community and will

require FIRRP to respond to and participate in a previously non-existent certification process.

### Overall Harm of the Rule on FIRRP's Operations

79. In addition to the harms to FIRRP's mission and services described above, the Rule will pose an overarching adverse impact on FIRRP as an organization.

80. First, the Rule will require us to devote more resources to fewer cases, meaning we will serve fewer clients. This reality fundamentally undermines FIRRP's vision of ensuring that all people facing removal proceedings in Arizona have access to counsel and receive due process, including a full and fair opportunity to present their case. By creating so many new procedural barriers in the appellate process, like reducing the maximum allowable briefing extension to only 14 days or by drastically limiting the situations in which a case can be remanded for additional factfinding, this Rule does irreparable damage to the fundamental fairness of the BIA at great cost to the noncitizens who come before it and those who serve them. FIRRP was founded after an IJ in Arizona decried the plight of *pro se* asylum seekers who, detained in remote Arizona detention centers, struggled to navigate immigration court procedures even when they had viable claims for relief. As an organization rooted in protecting the due process rights of detained people, this Rule cuts at the heart of FIRRP's mission and upends more than 30 years of our work.

81. This change will also impact FIRRP's funding in a number of ways. FIRRP's funding comes from various sources including, but not limited to, federal sub-contracts for programs to provide *pro se* orientation and support services under the LOP, as well as representation to those deemed mentally incompetent under the NQRP.

82. First, FIRRP routinely reports on the number of individuals we serve, and several funders make decisions regarding the renewal of grants based on performance metrics like the number of clients represented. Because this Rule will make representation both more complicated and lengthier due to the elimination of various procedures, FIRRP will be able to enter on fewer cases. Funders also consider the impact of our work, not only on the individual client but also on the overall immigrant community. For these funders, appellate representation—including at the BIA—is critical to ensuring that we are able to pursue appeals that are most likely to positively affect immigrant communities. The Rule jeopardizes these funding streams because we will be unable to represent as many clients and will need to overcome several new hurdles to avoid summary dismissals of meritorious claims.

83. Second, because Arizona has bedspace for approximately 7,000 adult and children noncitizens in custody on any given day, any change that decreases representation puts significant strain on FIRRP's programs and funding to provide *pro se* support to those without counsel. FIRRP's *pro se* services are largely funded through the LOP federal

sub-contract, however, that contract lacks the flexibility necessary for FIRRP to effectively respond to the new demands from detained *pro se* noncitizens that this Rule will inevitably create. As an initial matter, the LOP contract is based on hourly billing, but has a firm overall cap such that any services FIRRP provides to *pro se* individuals beyond that contractual amount is unreimbursed. Under the LOP contract, FIRRP provides certain baseline services, including group orientations providing an introductory review of forms of relief and immigration court procedures, followed by brief initial individual orientations and *pro se* workshops. The majority of FIRRP's LOP contractual funding goes to the provision of these fundamental services. By creating significant new obstacles for noncitizens in the removal process that disproportionately impact detained *pro se* individuals, this Rule creates a substantial demand for additional *pro se* orientation and support to navigate these complex procedures, yet FIRRP's LOP funding does not grow based on how complicated the procedures are. Moreover, because only certain designated staff members may bill under the LOP contract, FIRRP does not have flexibility to easily add or reassign staff to support these increased *pro se* needs without submitting an entirely new budget and restarting the full budgetary approval process. Ultimately, these factors will force FIRRP to do more with the same amount of staffing resources and funding or, alternatively, engage in substantial additional fundraising to support these critical efforts.

84. Third, the Rule also undermines FIRRP's contract to represent individuals found incompetent to represent themselves before the immigration court under *Franco-Gonzalez* and the NQRP. This contract provides a fixed budget based, in part, on how many new cases we accept each fiscal year. This Rule will negatively impact NQRP funding because the limitations on remand for additional factfinding, combined with the documented history in Arizona of DHS and EOIR's failure to properly and timely identify potential class members, will result in some incompetent noncitizens falling through the cracks and fewer noncitizens in Arizona being identified as *Franco* class members and appointed counsel. Additionally, for those clients who are still identified and appointed, as well as the approximately one hundred cases FIRRP already represent, it will make representing our seriously mentally ill clients significantly more challenging, time, and resource intensive than these cases were when FIRRP negotiated our contract before the start of FY21.

85. The Rule will also drastically erode our *pro bono* program, which is central to our mission and vision to increase access to counsel and ensure due process for all persons in removal proceedings. Our *pro bono* program provides representation to a significant number of clients each year. As mentioned above, the Rule will make appellate representation drastically more complicated and burdensome. Reduction of reasonable briefing extensions will undermine FIRRP's ability to place BIA cases with *pro bonos* and the many changes to remand authority and elimination of *sua sponte* reopening will make the tasks for *pro bono* attorneys considerably less clear and more time-consuming. This lack of clarity will make it harder for *pro bono* attorneys to take cases, and will increase the burden of mentoring these cases when we do place them, as even experienced *pro bonos* will not be familiar with the new procedures.

86. The Rule will also burden FIRRP's *pro se* services. As FIRRP attorneys and our *pro bono* partners are able to represent fewer cases, there will be a corresponding increase in demand for FIRRP's *pro se* services. FIRRP may need to increase staff resources devoted to providing *pro se* services to support the increased numbers of people without counsel. However, as noted above, it is complicated and difficult to expand the LOP contract, so any expansion would likely require diversion of general funding from other programs or significant fundraising. Unless or until we can fund additional supporting staff, the increased demand for *pro se* support is likely to stretch our DART team extremely thin. This will contribute significantly to team burn-out and will also likely lead to many detained individuals not getting the standard of support the FIRRP traditionally has provided.

87. Moreover, this Rule is one of dozens of other significant changes to immigration law and procedure in the last two years. As a national leader in the creation of *pro se* guides and materials, FIRRP will need to divert substantial resources to amending existing guides to reflect changes and creating sample *pro se* templates and other materials to help *pro se* individuals navigate the many changes.

88. Internally, this Rule also complicates FIRRP's training for staff. Specifically, resources will have to be dedicated to re-education and re-training staff on practice before EOIR in light of this new Rule. This effort will require development of new or revised sample briefs and motions for staff and *pro bono* attorneys engaged in representation. In addition, it will require more resources dedicated to supervision to ensure that staff, interns, and *pro bonos* are aware of and properly employing the new practices.

89. The Rule rewrites many aspects of long-established immigration court and appellate practice and prizes speed over fairness. It will now be more difficult for unrepresented noncitizens to obtain counsel, and more difficult to prevail on appeal. Even when a noncitizen become eligible for a new form or relief or new facts arise relevant to their claim while on appeal, FIRRP and those we serve will have to unnecessarily litigate claims based on outdated information or law to an administratively final decision, and then, will have to use even more resources to litigate a motion to reopen. This greatly impacts our mission—due process and a fair day in court will be even more elusive for our clients. Our staff will face a significant increase in work as we scramble to mitigate the worst of these consequences for these clients and, more and more of our clients will be ordered removed in violation of due process.

90. Our clients can see when a judicial system is stacked against them, and pervasive denials combined with detention already frequently cause people to give up on meritorious cases. Seeing our clients lose hope and having meritorious cases unjustly denied or unnecessarily delayed is a major cause of staff burnout and turnover, which in turn hamper productivity and lead to significant lost costs as the staff we invest in leave earlier. FIRRP has worked extremely hard over the last decade to reduce staff turnover and changes like this Rule threaten to undo much of that good work.

91. Finally, I fear that this Rule will irreparably harm some of our client's physical and mental well-being. Many of the people we serve in Arizona's immigration detention centers and children's shelters have been traumatized before they were detained, and detention itself is traumatizing. Many of our clients tell us that they came to the U.S. thinking that here they would finally be heard, treated fairly, and protected, but the experience of immigration detention and going through a court system with convoluted rules—rules like this one that create bureaucratic hurdles that, in practice, are insurmountable barriers to those who are detained, do not have counsel, or both – shake people and their faith in the fairness of our institutions to their core. We often encounter clients who express feeling like they are facing an impossible uphill battle. In the face of their Sisyphean task, sadly many clients become desperate. Some give up on their cases and accept removal to serious harm or death. Others develop severe mental health conditions or resort to self-harm.

92. This Rule is confusing, creates expectations on respondents that are unmoored from the reality of what is even logistically possible for people in detention, particularly *pro se* people in detention to achieve, and forces people to choose between giving up on their case or the prolonged uncertainty of a lengthy appeal process, sometimes followed by subsequent motions to reopen due to the reduced availability of remand. Based on my experience working with individuals with serious mental health conditions and detained individuals who expressed suicidal ideation, this Rule checks many of the boxes that could lead our clients to feel desperate or hopeless and place them at risk of possible harm. This harms not only our clients, but our social workers and staff who seek to support them.

93. In sum, in the name of streamlining procedures, these measures significantly curtail FIRRP clients' due process rights and harms our mission of safeguarding those rights, providing access to counsel, and ensuring fair and humane treatment for everyone facing removal in Arizona. This Rule claims it will improve efficiency and promote meritorious claims but, in reality, it is more likely to decrease efficiency, particularly with regard to the remand and administrative closure rule, and will wrongly prevent applicants with meritorious claims for relief from obtaining that protection.

Executed on: February 1, 2021 in Flagstaff, Arizona.

s/ Laura St. John
Laura St. John
Legal Director
Florence Immigrant & Refugee Rights
Project
P.O. Box 86299
Tucson, AZ 85754