# EXHIBIT D

**DECLARATION OF SMITA RAO DAZZO, SENIOR DIRECTOR, LEGAL AND ASYLUM, HIAS**

1. I, Smita Rao Dazzo, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct. If called as a witness, I could and would testify as follows.

2. I am an attorney, licensed to practice law in Maryland and the District of Columbia, since 2011. I have focused my practice on immigration law, with a particular focus on refugees and asylum seekers.

3. Since 2018, I have worked for HIAS. I first served as Director of U.S. Legal Services and since July 2019 I have served as the Senior Director of Legal and Asylum. In my current role, I oversee HIAS' direct U.S. Legal Services in Silver Spring, MD and New York City, in addition to our local and national *pro bono* programs. I also oversee our programming and partnerships along the US/Mexico border, including the legal services provided through our HIAS Border Fellows, located at partner organizations in El Paso, TX, Harlingen, TX, and San Diego, CA. My role also includes supervision of our refugee resettlement programs in the HIAS New York office. As Legal Director, I represented individuals before the Executive Office for Immigration Review (EOIR), including before the immigration judge (IJ) and the Board of Immigration Appeals (BIA), and in affirmative asylum cases before U.S. Citizenship and Immigration Services (USCIS). As Senior Director, I continue to engage in some direct representation of noncitizen clients as well as supervise attorneys and other staff at HIAS who represent individuals detained during immigration proceedings.

4. Prior to joining HIAS, I worked at a different immigration legal services non-profit as well as a small immigration law firm, providing direct representation to noncitizen clients. I also served as an Associate Protection Officer for the United Nations High Commissioner for Refugees in Phnom Penh, Cambodia.

5. I am writing to address the harm that HIAS will experience because of a new Rule issued by the Executive Office for Immigration Review (EOIR) entitled, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588 (Dec. 16, 2020) (hereinafter, "the Rule").

6. The facts set forth in this Declaration are based on my personal knowledge as well as the experience and work of our HIAS attorneys.

### HIAS' Mission and Scope

7. HIAS is a global, faith-based nonprofit organization which, working with the organized American Jewish community, is dedicated to ensuring that the world's forcibly displaced people find welcome, safety and freedom. Founded in 1881 as the Hebrew Immigrant Aid Society, HIAS is the oldest refugee protection organization in the world.

1

8. Our mission is to rescue as many people as possible whose lives are in danger for being who they are. To that end, we protect the most vulnerable refugees, including noncitizens living in the United States, helping them build new lives and reuniting them with their families in safety and freedom. We also advocate for the protection of refugees and assure that displaced people are treated with the dignity they deserve.

9. Today, HIAS operates offices in 17 countries, including the U.S., supporting refugees and other forcibly displaced persons with services to ensure legal protection, economic inclusion, protection from gender-based violence and access to mental health services.

10. In the United States, HIAS is one of nine non-profit organizations, called Resettlement Agencies, that are designated by the federal government to implement the refugee resettlement program through cooperative agreements with the U.S. Department of State and U.S. Department of Health and Human Services.

11. HIAS has also been providing *pro bono* immigration and asylum legal services for more than 50 years. We currently have a team of nine attorneys on staff providing direct civil legal services to vulnerable men, women and children. HIAS immigration legal services provides all services *pro bono* and HIAS clientele fall below 200% of the national poverty line. We currently have approximately 483 clients between our New York and Silver Spring offices, roughly 50% of which are currently or were in immigration removal proceedings.

## The Rule Causes Serious and Irreparable Harm to HIAS and Our Clients

12. HIAS U.S. Legal Services represents some of the most vulnerable of noncitizen clients, many of whom are afraid to return to their home countries or are seeking protection in the United States. We represent clients seeking diverse forms of humanitarian relief, including asylum, U and T visas for victims of crime or trafficking, Special Immigrant Juvenile Status (SIJS), and protection under the Violence Against Women Act (VAWA). Our attorneys represent clients before the U.S. Immigration Courts, the Board of Immigration Appeals (BIA), USCIS, and before local family courts (for SIJS-related custody and guardianship matters). We also maintain a robust *pro bono* program, managed by two full time staff members, which utilizes the support of volunteer attorneys to expand the capacity of our legal services program and further engages in this work. This includes a project specifically dedicated to pairing noncitizens with *pro bono* counsel for representation before the BIA.

13. As noted, we charge no fees to our clients and provide all our legal services completely *pro bono*. Our program is funded entirely through federal, state, and local grants, as well as through institutional and small donors. At any given time, HIAS attorneys are responsible for meeting requirements under five or more grants, some of which require us to take a specific number of cases that fall under either categorical requirements (*i.e.*, survivors of torture) or jurisdictional ones (*i.e.*, residents of Montgomery County, MD). As a small legal services organization, with many obligations under our current funders, we have to be very specific about what kinds of cases we take and ensure that we maintain capacity to meet the required number of clients, relative to each grant we have

been awarded. Because we do not charge fees for our services, if we could not continue to take on new cases and commit ourselves to new obligations through grant opportunities, our programs could not remain financially viable.

14. The Rule will cause severe and irreparable harm to HIAS and our clients by a) limiting the kinds of new cases we can accept; b) forcing us to spend additional time working on current cases, which will limit our ability to accept new cases; c) risking continuity to our funding if our capacity becomes more limited; and d) inhibiting our mission and ability to help our clients obtain long-term and meaningful relief, in certain situations. These harms are clarified, in detail, below.

*This Rule, in its Entirety, will Harm HIAS'* Pro Bono *Program by Straining Resources and Hampering Our Ability to Meet Our Goals*

15. Since 2016, HIAS has been working to develop and expand its *pro bono* program to build capacity, serve more clients, meet funding goals, and create new partnerships. HIAS works with *pro bono* attorneys in several ways, through our headquarters in Silver Spring, Maryland, our office in New York City, as well as along the U.S./Mexico border. HIAS currently employs two full time staff members in its *pro bono* program who, together, oversee and supervise a robust network of *pro bono* attorneys located across the United States. HIAS' *pro bono* network includes over 700 solo practitioners and small/medium firm attorneys, plus attorneys at nearly 50 large national/international law firms and corporations.

16. In 2020, HIAS' *pro bono* program included the following projects: directly representing asylum seekers before USCIS, EOIR, and the BIA; assisting refugees with their adjustment of status applications for legal permanent residence; serving survivors of the 2019 Walmart mass shooting with the preparation of their U-visa applications; and engaging in limited legal representation of unrepresented asylum seekers forced to remain in Mexico as a result of the Trump Administration's "Migrant Protection Protocol" program. *Pro bono* attorneys also worked on discrete research and writing projects, helped create a library of country conditions research, and helped prepare evidence and documentation for asylum seekers to supplement their filings before USCIS and EOIR. In 2020, alone, over 400 noncitizens were assisted through our *pro bono* program initiatives.

17. A key component of HIAS' *pro bono* program is our comprehensive training program, which includes a library of resources and a hands-on mentoring model. These resources are vital to our *pro bono* attorneys, who are bound by ethical rules to competently represent their clients. *See* ABA Model Rule 1:1. As most of HIAS' *pro bono* attorneys are not practicing immigration attorneys, they rely on HIAS' trainings, resources, and mentoring to represent their clients, which includes staying up to date on changes to the law.

18. Our U.S. Legal Services team holds regular trainings on topics relevant to the representation of asylum seekers and other noncitizens. In 2020, we held trainings on at least 15 separate topics, including a new informal "Q and A" training series to provide

3

our *pro bono* network with information about emerging issues in immigration law. We maintain an archive of over 20 recorded trainings that our *pro bono* attorneys can access to further develop their skills and competency in taking on *pro bono* representation. We have designed comprehensive toolkits, including samples and templates, which are available to *pro bono* attorneys representing clients through HIAS. Our *pro bono* team is also available to volunteer attorneys in the course of their representation of *pro bono* clients through HIAS to review their drafts, answer questions, and trouble shoot issues that arise over the course of a *pro bono* project or case.

19. As a result of the vast changes implemented in the Rule, HIAS' *pro bono* program will need to develop new training modules and mentoring resources to ensure our *pro bono* attorneys are equipped with the information they need to competently represent their clients. For example, HIAS would need to develop new trainings on strategies for clients who were previously eligible for *sua sponte* reopening or administrative closure, as well as new trainings regarding representation on appeal to the BIA, including several new sample motions, briefs, and toolkits specifically for the *Pro Bono* BIA Appeals Project. As a result of the sweeping changes in the Rule, it will also be necessary for HIAS to work more closely with *pro bono* attorneys who are representing asylum seekers and other non-citizens seeking relief to ensure that they understand how the new Rule will impact their clients.

20. Because the *pro bono* team will need to focus on updating training resources and mentoring *pro bono* attorneys in response to this Rule, we will have fewer resources available to meet our other goals, including expanding existing programming and building out new opportunities. Any time we limit the number of new cases that can be referred to our *pro bono* network, we must reduce the number of cases we can take overall. If our overall capacity is substantially diminished, it impacts our ability to apply for new funding sources, because we cannot promise to take on more cases than our capacity will allow.

*By Limiting Briefing Extensions, The Rule Impedes HIAS'* Pro Bono *Attorneys' Ability to Effectively Represent Clients, and Will Discourage Zealous Attorneys from Taking on Appellate* Pro Bono *Matters with HIAS*

21. Since December 2018, HIAS' *Pro Bono* Program has operated a project to pair detained asylum seekers and other forcibly displaced persons with *pro bono* counsel to represent them in appealing their claims to the BIA. To run this *Pro Bono* BIA Appeals Project, HIAS works with four organizational partners along the US/Mexico border, who represent the clients in their claims before the IJ and then refer clients to HIAS for their appeals. HIAS works with one additional organizational partner with whom it places cases and trains and mentors volunteer *pro bono* attorneys. As noted, few of our *pro bono* attorneys have experience in immigration law, so they rely heavily upon HIAS' training and mentoring to effectively represent clients through this project.

22. It can take more than two months from the date that an IJ denies a client's application for HIAS' *Pro Bono* team to place the client's appeal case with a *pro bono* Attorney, assuming we are able to immediately begin the placement search. It may take an even

4

longer amount of time for a variety of reasons, including if the client is unsure if they wish to pursue an appeal, if the case has specific challenges, if the trial-level attorneys does not have the record fully digitized or is not immediately available to review the case with HIAS, if the *pro bono* attorneys' firm faces delays in their internal approval or conflict-checking process, or if the *pro bono* attorneys need to complete required training. Other issues that may cause *pro bono* placement delays include holidays, scheduling conflicts, and competing law firm *pro bono* priorities.

23. For cases accepted into the *Pro Bono* BIA Appeals Project, we have seen it take up to six months between the date an IJ denies a client's asylum claim and the date the BIA's issues a briefing schedule for the asylum seeker's appeal brief. During that time, the *pro bono* attorneys will likely not have access to the underlying IJ decision because the BIA does not provide the hearing transcript until it issues the briefing schedule. *Pro bono* attorneys thus must spend the majority of the little time they have in representing these clients to familiarize themselves with an incomplete record and conduct substantial legal research in an unfamiliar field of law. Given mailing delays, attorneys typically have only about 2 weeks (14 days) to comprehensively work on the appellate briefs with the benefit of the hearing transcript before the BIA's initial filing deadline. To date, all of our *pro bono* attorneys have benefitted from a 21-day extension of the filing deadline, which gives them much-needed additional time with the transcript to adequately prepare the clients' appellate brief. Even then, it is extremely difficult for volunteers to meet the deadlines.

24. The Rule would essentially make it so that in any appeal, we would need to prepare to defend every element, even those that are not on appeal. It effectively means no stipulations at the trial level unless it is a complete grant, which amounts to a lot of work to fully prepare an individual hearing. Additionally, it deprives our clients of due process by forcing them to essentially have two trials—one before the IJ and one before the BIA.

25. *Pro bono* attorneys are already working within an extremely restricted schedule in accepting asylum appeals for detained clients. As mentioned, our *pro bono* attorneys, like all attorneys, are bound by ethical rules to competently represent their clients. *See* ABA Model Rule 1:1. Curtailing these timelines further will severely restrict the ability of *pro bono* attorneys to sufficiently prepare appellate briefs and ethically and competently represent detained asylum seekers, and thus will discourage *pro bono* attorneys to volunteer for cases through HIAS' *Pro Bono* Program. This, in turn, will damage HIAS' ability to secure grants for this program. In addition, because these timelines will demand more from HIAS staff attorneys, our attorneys will be able to take on fewer cases or be required to divert their attention from other matters to representation on appeal.

*By Limiting the Ability of the BIA to Remand an Incomplete Record for Further Fact-Finding or for New Evidence, and Expanding the BIA's Fact-Finding Abilities, The Rule Deprives HIAS Clients of Due Process*

26. The nation's immigration courts are facing a backlog of well over one million cases. Combined with recent policy rules instituting case completion quotas on immigration

judges,[1] IJs have less than three (3) hours take testimony (including interpretation where the asylum applicant does not speak English), evaluate evidence, and decide life-or-death asylum claims.[2] As a result, HIAS clients must often wait years to get their cases heard and when they do, IJs regularly rush through hearings within an allotted set of time, even if that time is insufficient to thoroughly review all the facts of the client's case.

27. Where an IJ provides an insufficient factual basis for his/her decision, the IJ deprives an asylum seeker of due process by frustrating the asylum seeker's ability to meaningfully appeal a negative decision. For this reason, the BIA has been empowered to remand a case to the IJ where insufficient facts exist in the IJ's decision to determine whether the asylum seeker has established eligibility for protection. We are very concerned that IJs, faced with performance metrics that require them to adjudicate 700 cases per year, would have little incentive to take the time to develop the record in *pro se* cases where there is a much more limited possibility that the case could be remanded for failure to do so.

28. In addition to negatively impacting *pro se* respondents, this Rule would also negatively impact represented respondents, both of whom HIAS and HIAS' *pro bono* attorneys represent before the BIA. For example, a HIAS *pro bono* attorney represented "N" in his asylum appeal. N is a 20-year-old Honduran boy who was kidnapped, beaten, and threatened with torture after witnessing police collaboration with drug-dealing gang members. The IJ denied N's asylum claim without conducting an individualized analysis; he summarily concluded that N was ineligible for asylum but failed to articulate why the facts of N's case did not meet the legal standard. The BIA sustained the HIAS *pro bono* attorney's appeal filed on N's behalf and remanded the case to the immigration court because the IJ did not articulate sufficient factual findings to deny N's asylum claim. N now has the chance to fight his asylum claim again and ensure that the IJ sufficiently considers the facts in his case prior to deciding whether he qualifies for protection.

29. The ability of BIA members to sustain appeals and remand in cases like N's is also critically important for the work that HIAS and our *pro bono* team performs for asylum seekers, as such remand authority serves to hold IJs accountable for their decisions. With the BIA's current authority to sustain and remand appeals for more thorough reconsideration, IJs see that they must sufficiently evaluate asylum seekers' life-or-death claims. By stifling the circumstances under which BIA members may remand a matter to an IJ, the appellate process fails to hold IJs accountable for depriving asylum seekers of fair adjudications.

---

[1] IJs are required to adjudicate over 700 cases per year. CLINIC, *DOJ Requires Immigration Judges to Meet Quotas* (Apr. 27, 2018), https://cliniclegal.org/resources/doj-requires-immigration-judges-meet-quotas.

[2] Assuming a 250-work-day year, an IJ would need to complete 2.8 cases per day to meet their quota. Assuming an 8-hour workday, an IJ would have approximately 2.9 hours to complete each case.

30. The Rule also eliminates the authority of the BIA to consider new evidence while the appeal is pending.  For example, HIAS has had several clients who have pursued dual forms of relief, including asylum and Special Immigrant Juvenile Status (SIJS).  Under this Rule, a client who is designated by USCIS as a Special Immigrant Juvenile after his asylum claim is adjudicated and denied would not be able to pursue this legitimate defense to removal; the BIA would not be able to consider the relevant evidence of the approved special immigrant visa petition while the asylum appeal is pending.  Also, taken in context with other recently-passed regulations, clients would have much less time to gather and submit evidence for submission in support of their asylum claims; in the case of an asylum seeker who is only able to obtain a critical piece of corroborating evidence after the date of the individual hearing, it would be much more efficient to permit that person to seek remand to consider new evidence than force such a person to accept an administrative removal order and then move to reopen the case, as this Rule suggests.

31. Finally, this Rule expands the ability of BIA members to engage in fact-finding on appeal, including identifying facts from official or government resources that the BIA deems "undisputed" and to affirm the decision of the IJ on any basis as a result of that fact-finding.  This unparalleled change to appellate procedure flies in the face of the long-standing principle that an adjudicator hearing a case in-person is best suited to evaluate testimony and evidence.  More importantly however, this new Rule will permit BIA members to decide cases without giving the respondent the notice or opportunity to sufficiently argue on his own behalf, particularly with respect to which facts he or she may dispute.  In addition to depriving respondents of due process, the BIA's ability to affirm on any basis in the records, including on these disputed facts, will require HIAS and HIAS *pro bono* attorneys to do an impossible feat – to anticipate and make arguments on appeal that may not have been contested or decided against the respondent before the IJ.  Especially given EOIR's new 25-page limitation on appellate legal memoranda before the BIA, this regulation will put undue strain on HIAS and HIAS' *pro bono* attorneys by requiring them to thoroughly brief all potential issues – even those not identified by the IJ.

32. In summary, these aspects of the Rule will harm HIAS' asylum seeking clients, such as HIAS' client N by severely restricting the circumstances under which the BIA may remand a case to the IJ for further fact-finding or new evidence, possibly leading to the wrongful removal of our clients despite their well-founded fear of return. It will also hurt HIAS by impeding the ability of its *pro bono* program to litigate appeals for HIAS' asylum seeking clients.   Because of  the necessary training and mentoring that goes into placing such cases with volunteer attorneys, and the substantial amount of work that these appeals will now require on a much shorter timeline, HIAS' *pro bono* team would be unlikely to secure counsel for, or assist asylum seeking clients on appeal.

*Eliminating Administrative Closure Limits HIAS' Ability to Represent a Greater Number of Noncitizens*

33. Administrative closure is an important docketing tool that allows IJs to prioritize cases that require immediate resolution, while suspending adjudication on lower priority cases,

7

such as those where USCIS has jurisdiction over an alternative application for relief. This allows an IJ to use their discretion in suspending status hearings and hearings on the merits of the removal case before EOIR where a respondent has demonstrated *prima facie* eligibility for relief before USCIS. Accordingly, administrative closure is a powerful tool to alleviate the increasing backlog at immigration courts nationwide.

34. A significant portion of HIAS' legal clientele are respondents in removal proceedings who are simultaneously seeking benefits before USCIS that provide alternative relief from removal, like SIJS; Temporary Protected Status (TPS), a temporary status given to eligible nationals of designated countries affected by armed conflict or natural disaster, and allows persons to live and work in the United States for limited times; U and T visas, for victims of trafficking and other serious crimes), and family-based petitions and waivers of inadmissibility. Without administrative closure, HIAS and our clients will no longer be able to suspend their removal proceedings to pursue humanitarian benefits before USCIS, and thus will suffer serious and irreparable harm by forcing them to present alternative defenses to removal before the immigration court, in addition to their applications for benefits before USCIS.

35. Eliminating administrative closure is especially problematic and would cause immediate harm to HIAS in the immigration courts that fall within the jurisdiction of the U.S. Court of Appeals for the Fourth Circuit. In *Romero v. Barr* (937 F.3d 282 (4th Cir. 2019), the Court held that DOJ regulations unambiguously give immigration judges the authority to administratively close removal proceedings. This decision abrogated the decision of former Attorney General Jefferson Sessions in *Matter of Castro-Tum,* 27 I&N Dec. 271 (A.G. 2018), which held that IJs do not have the authority to administratively close cases. Since the Fourth Circuit's decision in *Romero*, HIAS clients have benefited from grants of administrative closure in Immigration Court, allowing them to pursue alternative relief with USCIS without the threat of immediate removal. Elimination of this valuable resource would be extremely harmful to HIAS clients.

36. As discussed in turn below, the elimination of administrative closure harms HIAS directly by increasing the amount of HIAS resources that a single case will require, as our attorneys will have to represent clients both on the removal case and before USCIS. This will reduce the amount of cases that HIAS can accept, thus jeopardizing HIAS funding. The elimination of administrative closure also prevents HIAS clients from applying for alternative relief for which they are eligible by prematurely removing them from the United States, and, meanwhile, would create further backlogs and force other HIAS clients to wait an unreasonable amount of time for case adjudication.

37. First, where clients in removal proceedings are eligible for alternative relief before USCIS, if administrative closure is not possible, HIAS must spend significant additional time and resources attending or preparing for hearings before EOIR or drafting motions to continue (which, under other policy memoranda, are now disfavored by the immigration courts). When required to go to court, HIAS must expend significant staff time for travel, as well as pay for transportation costs. HIAS attorneys must spend roughly half a day, including transit time, to attend even a single, five-minute Master

Calendar Hearing. If HIAS attorneys cannot get cases administratively closed or continued, HIAS attorneys will also have to prepare for individual hearings on the merits, including the submission of evidence, preparation of testimony, and the full set of tasks required to present a case. This would cost valuable time that cannot then be spent working with new clients or conducting legal intakes. This also jeopardizes HIAS' funding because it reduces the number of clients who can be served due to the increased burden each case presents.

38. Furthermore, many HIAS clients who are eligible for collateral relief before USCIS would not be able to pursue such relief without administrative closure. Specifically, HIAS clients in removal proceedings would not be able to file a Provisional Unlawful Presence Waiver (Form I-601A), an application that allows individuals to adjust to a legal permanent resident after receiving a family-based visa, which *require* administrative closure to file the application before USCIS. Clients seeking alternative forms of relief before USCIS would enjoy relief from removal if granted these applications, but under this new Rule, would nonetheless need to prepare and file additional alternative defenses to removal (*e.g.*, asylum or cancellation of removal) before the immigration court to avoid deportation. Clients who are not eligible for other defenses to removal would be ordered removed, and wholly unable to pursue their relief before USCIS.

39. This Rule also harms HIAS' clients who are not seeking alternative relief before USCIS, but whose cases require speedy resolution, particularly asylum applicants. Asylum applications before the Immigration Courts currently take three to four years to adjudicate due to the backlog. If administrative closure is eliminated, the Immigration Courts would be forced to schedule hearings for respondents who could pursue alternative forms of relief outside of the immigration court, which would result in an even greater backlog of cases and longer wait for respondents to get their day in court. The increased wait time harms the mental health of HIAS clients, many of whom are already traumatized and eager to find safety, and also prejudices their cases by impacting the evidence submitted; evidence will become stale, country conditions will change, and key witnesses may no longer be available to testify in support of an application. This causes increased work on HIAS' and HIAS' *pro bono* attorneys, who must serve their clients' needs in the meantime and file updated evidence over the years the case is still pending.

40. Additionally, as motions to continue are increasingly disfavored by the immigration courts, an inability to administratively close cases means that IJs will be forced to enter orders of removal for respondents, even if they are eligible for and pursuing relief before USCIS. Due to lengthy USCIS processing times, applicants often wait years for decisions on requests for humanitarian benefits. Because IJs do not have jurisdiction over these applications and cannot otherwise adjudicate them more quickly, their inability to continue or administratively close cases would force them to order many respondents removed from the United States, even if their requests for humanitarian benefits are pending before USCIS. Importantly, the clients that are typically eligible for relief that requires administrative closure tend to be vulnerable populations, such as SIJS and Unaccompanied minor (UAC) asylum applicants (who litigate their applications before USCIS). If these clients are ordered removed, HIAS would have to expend additional

9

resources on appeals or motions to reopen for these clients. Given the substantial additional resources required, it will also likely mean that HIAS will be unable to take these clients on in the first place, or take fewer clients, jeopardizing our funding.

41. Many HIAS clients have benefitted from administrative closure. The policy has enabled them to apply for Form I-601A Provisional Unlawful Presence Waivers. Several clients who now have approved I-130 petitions benefitted from administrative closure, and two clients who were able to first get TPS due to administrative closure, were then able to receive asylum after filing affirmative applications.

    For example, HIAS client "J" benefitted from administrative closure. He is a citizen of Honduras who is married to a Lawful Permanent Resident of the U.S. J's wife filed an I-130, Petition for Alien Relative, on J's behalf, to provide him a pathway to obtain lawful status in the U.S. Because J accrued unlawful presence in the U.S., he needed to seek a Provisional Unlawful Presence Waiver (Form I-601A); J was eligible for this waiver because his wife would suffer substantial financial and emotional hardship if J were unable to stay in the United States with their family. Although J fears returning to his native Honduras, if granted the Form I-601A waiver, he would be able to secure lawful permanent residency following only a brief trip back to his native country for a consular interview. Without administrative closure, J is faced with an impossible choice: pursue asylum before the immigration court (substantially more difficult now due to other emerging policy changes), which adds to the immigration court backlog; or return to Honduras for a much longer period of time, risking his life and safety while he pursues a Form I-601 waiver from there, with no guarantee that he'd be allowed back into the United States.

42. As indicated, administrative closure is an important docketing tool that courts routinely use to prioritize cases most in need of immediate resolution and deprioritize cases where there is not an urgent need for fast resolution. By stripping adjudicators of the ability to manage their dockets, the proposed rule wastes DOJ and Department of Homeland Security ("DHS") time and resources, forcing respondents to pursue multiple avenues of relief at once and unnecessarily contributing to significant backlogs before both agencies. If respondents will be required to pursue multiple avenues of relief, HIAS attorneys will have to spend additional time crafting and developing legal strategies before the IJ, in order to give our clients every chance possible. For those clients that have clear cut or strong applications pending before USCIS, this additional time spent on developing other legal strategies is wasteful, counter to HIAS's goal of seeking the best form of relief for our clients, and prevents HIAS from representing other individuals as a result.

*Elimination of Sua Sponte Motions Would Frustrate HIAS' Operations and Mission*

43. As discussed, HIAS represents many immigrants who are eligible for humanitarian protection, who also have prior removal orders or who are at risk for deportation. In many of those cases, clients are eligible for alternative relief before USCIS, such as SIJS, U and T Visas, and family-based petitions, and seek motions to reopen their removal proceedings *sua sponte* once that relief becomes available. *Sua sponte* motions to reopen permit the IJs and the BIA to reopen cases where there is a compelling interest to do so,

10

such as when a client is newly eligible for relief. As a result of the Rule's elimination of *sua sponte* reopening authority, some of HIAS's clients will be unable to obtain the immigration benefits for which they are currently eligible. Instead, these clients' orders of removal will remain intact, and our clients will face imminent removal from the United States. This fundamentally undermines HIAS' mission to protect individuals from harm.

44. By eliminating *sua sponte* motions to reopen, HIAS's clients would only be able to seek reopening of their removal proceedings on other, more limited bases under the law, including to present an asylum claim based on changed country conditions, or where DHS joins the motion. Asylum seekers whose *personal* circumstances have changed may be foreclosed from seeking asylum based on those changes if this Rule is not enjoined. In HIAS's experience, DHS rarely joins in motions to reopen. Without the ability to seek *sua sponte* motions to reopen, HIAS's clients will have fewer bases to seek reopening of their removal proceedings and will likely be left with removal orders that render them at risk for deportation.

45. HIAS' clients are particularly vulnerable immigrants fleeing persecution. Prior to receiving representation by HIAS, they often miss a court hearing by no fault of their own, leading to the issuance of an order of removal. For example, HIAS represented "A," a VAWA self-petitioner whose abusive spouse prohibited her from attending her immigration court hearing; she was consequently ordered removed *in absentia*. HIAS also represented "B," an asylum-seeker who missed her court hearing (and was ordered removed *in absentia*) due to complications in her pregnancy. Another client, "C," came to the U.S. as an unaccompanied child and missed a court date (and was ordered removed *in absentia*) because – as a child – he was unaware of his requirement to do so. Under the Rule, it will be very difficult, if not impossible, for any of the clients mentioned above to reopen their removal cases and ultimately obtain legal immigration status without the option of *sua sponte* reopening of their cases. Instead, they may be ordered removed, and HIAS will have to expend substantially more resources seeking appeals, motions to stay removal, or other remedies to avoid removal. HIAS may also possibly be required to represent these clients from their country of origin, even after they have been removed, which requires additional time and resources, such as coordinating international calls and collection of documents through international postal mail and/or email, which can be especially difficult for clients who lack modern technology.

46. Without the ability to seek *sua sponte* reopening, HIAS attorneys will have to expend substantially more resources to serve clients with removal orders. For example, one HIAS client with a prior removal order, "L," has spent over a year seeking DHS's agreement to join motion to reopen, following her grant of lawful permanent residency by USCIS on the basis of being granted a U visa. Absent a joint motion with DHS, a *sua sponte* motion to reopen is the only option that L can pursue to reopen removal proceedings and enjoy unrestricted lawful permanent residency, since she is not seeking other relief, the *in absentia* order was entered years before she ever came to HIAS or received a U Visa (thus is time-barred for reopening an *in absentia* order), and she did not have counsel at the time the removal order was entered (so therefore no ineffective assistance of counsel basis to reopen). Absent that option, L's removal order will remain unchallenged, and will prevent L from being able to fully enjoy the rights of Lawful

Permanent Residence, including returning to the U.S. after brief travel abroad. The removal order will also prevent immigrants like L from seeking to become US citizens, as they cannot naturalize if they have an unexecuted removal order. Permitting judges to reopen *sua sponte* and terminate removal proceedings in matters like L's avoids duplication of DHS efforts by minimizing future complications, such as issues of inadmissibility before Customs and Border Protection (CBP) or questions of eligibility in applications for naturalization before USCIS. The exception to the Rule where motions to reopen can proceed where removability was vitiated is likely to not get far with immigration judges, such as the ones at the Court where L's case is, who believe that the grant of U Visas don't affect removability.

47. Without the ability to seek reopening *sua sponte,* many HIAS clients will need to file and seek DHS' joinder in statutory motions to reopen. Statutory motions to reopen, including the standard for equitable tolling, are more resource intensive, and will be even more demanding under the new proposed rulemaking on statutory motions. The time that a HIAS attorney will spend developing those theories for eligible clients and trying to persuade DHS to join a motion to reopen is time that they could have spent assisting other clients.

48. Even so, many clients will not be eligible for a statutory motion to reopen, so will be left without any recourse at all. For example, Client K is a teenager who has petitioned for Special Immigrant Juvenile Status and whose priority date to adjust status is now current; he is therefore now eligible to submit an application to adjust status. However, he has an *in absentia* removal order from August 2015, when he was only 10 years old. He will not be able to submit an application to adjust status if he cannot reopen that removal order. However, much like L earlier, he is not eligible to reopen on any other grounds except via joint motion with DHS or *sua sponte*. This client is time barred from pursuing any other basis for reopening, such as for *in absentia* orders. He doesn't meet the timing exception for asylum because he doesn't qualify for asylum on the merits. He didn't have an attorney prior to the issuance of the *in absentia* removal order, so there's likely no ineffective assistance of counsel claim.

49. The elimination of *sua sponte* motions to reopen would cause much uncertainty for HIAS and would lead to HIAS being unable to serve as many clients as possible effectively. For example, if HIAS has a Salvadoran client eligible for SIJS but is in removal proceedings, there is much uncertainty about whether the child will ultimately be able to obtain this status because of the long wait times and given that immigration judges are limited in their ability to issue continuances (*see Matter of L-N-Y-* and OPPM on Continuances) for collateral relief, and given the limitations on *sua sponte* reopening if the IJ orders removal after denying a continuance or admin closure. Such uncertainty would prevent HIAS from properly budgeting its resources and would frustrate the balance between HIAS's limited resources and its mission to take impactful cases. HIAS will be forced to decline representation for clients we would otherwise serve if they have, or are likely to receive removal orders, which contravenes our mission and values.

50. Should HIAS opt for greater certainty by disfavoring representation in cases with unexecuted removal orders that would require a motion to reopen, which directly

12

conflicts with our mission, HIAS will have to inform many of its current clients that they are no longer eligible for relief from removal. HIAS attorneys have relied on the use of *sua sponte* motions to reopen in crafting removal defense strategies for existing clients. This stark change will frustrate attorneys and clients who were relying on this strategy in their respective cases. Ultimately, this provision in the Rule will reduce the amount of clients that HIAS represents, as the Rule forecloses an entire avenue of seeking relief.

*Other Miscellaneous Rule Changes*

51. Other provisions of the Rule also harm HIAS's mission and frustrate our ability to serve clients.

52. For example, the Rule eliminates remands to the IJ for the completion of biometrics checks and allows the BIA to resolve outstanding biometrics issues and grant or deny relief outright. The BIA deems an application abandoned, unless the client completes biometrics within 90 days. Individuals will not be able to challenge the fact that they did not receive notice, potentially preventing them from complying or requesting additional time to comply.

53. This provision harms HIAS' clients because they may never receive or understand a renewed notice for biometrics checks, and if the BIA deems such an application abandoned, it will result in the *ex post facto* denial of granted applications, without a meaningful opportunity to contest that result. Most of HIAS' clients with pending cases before the BIA are currently or were previously detained. Both detained clients and formerly detained clients alike often struggle to receive or understand the correspondence they receive by mail. Especially when an individual is released from detention, there is the chance for miscommunication about the person's new mailing address. If a respondent does not receive notice for renewed biometrics checks, or does not understand the notice, they may face the denial of their claim without any opportunity to challenge that denial. Additionally, for the cases in HIAS' BIA appeal project, the clients' representatives are volunteer *pro bono* attorneys, not well-versed in nuances of immigration legal procedure such as this. With this major change, HIAS will now have to take additional steps to train and mentor *pro bono* attorneys about what to expect while a client's case is on appeal, including how to monitor a case for biometrics checks, and to how to explain this critically important notification and risk to clients. It will very likely require that our pro bono team meet more frequently with the *pro bono* attorneys handling BIA matters, to ensure correspondence like this is not missed.

54. For similar reasons, we are concerned with the Rule's elimination of remands to the IJ for voluntary departure requests, instead allowing the BIA to issue decisions on voluntary departure and issue written advisals to individuals. Failure to depart under an order of voluntary departure carries severe penalties, including a 10-year bar on receiving most statuses in the United States and a fine. The BIAs written advisals would really just push EOIR's burden under the law to warn immigrants of the penalties for failure to depart on to attorneys like those at HIAS. This is because our clients will not have had the chance

    to have asked for clarifying questions of the BIA that they would get at a hearing before an IJ, nor would this rule constitute a knowing waiver of that right to ask those questions.

55. Instead of remanding to the IJ in these instances, the BIA will take it upon itself to issue orders of removal. This will result in even more appeals and remands back to the BIA, causing further diversion of HIAS' resources, and could result in the premature removal of many of our clients despite meritorious claims for relief.

56. The Rule also allows IJs who disagree with a BIA remand, to certify the case to the EOIR Director, who is not a BIA member, in many circumstances, including when an IJ believes a decision is "vague, ambiguous, internally inconsistent; or [] clearly not considering a material factor pertinent to the issue(s)."

57. This change will essentially extinguish the integrity of the BIA and remove any semblance of neutrality of the IJ. If the IJ can advocate in this way for their own decisions, HIAS will also be forced to find ways to challenge these self-certifications, even though the Rule does not permit us to do so, where we have not done before.

58. The Rule also imposes mandatory adjudicatory timelines and delegates appeals pending beyond 335 days to the EOIR Director. Imposing arbitrary timeframes will rush adjudicators to render ill-informed decisions. Likewise, vesting power in the EOIR Director deprives clients of a fair and impartial adjudicator. These changes encourage wrongful denials, resulting in more appeals, more work, and more uncertainty for HIAS.

*Conclusion*

59. Based on these aspects of the Rule and the Rule's changes as a whole, HIAS will not be able to carry out its mission to protect the most vulnerable non-citizens and help them build new lives in the United States.

60. The changes proposed in this Rule will have the cumulative effect of causing severe and irreparable harm to HIAS and its clients. Many of the changes in the Rule, including eliminating *sua sponte* motions to reopen, remands, and administrative closure, will essentially eradicate avenues of relief for many current or potential HIAS clients in immigration removal proceedings. This will limit the type and number of new clients HIAS will be able to accept, and prevent us from implementing legal strategy developed for current clients.

61. If we are forced to spend additional time working on current cases, to the detriment of taking new ones, it will severely risk our ability to apply for new funding opportunities or even meet required outputs of current funders. Two sources of HIAS funding, Montgomery County (MD), to serve county residents in removal proceedings and the Office of Refugee Resettlement (ORR), to provide services for Survivors of Torture have strict output requirements in terms of the number of clients we must take on for representation. Together, these account for over fifty percent of funding necessary to cover our attorneys in Silver Spring, MD. In addition to the grants already received, we

currently have three different pending proposals that have been submitted to various funders, including private corporations and The U.N. High Commissioner for Refugees, totaling more than $350,000, which all include commitments to serve a specific number of clients. Funders almost universally require metrics by which to judge that their funds were well-spent and made impact, and often this is through clients served by the organization. Generally speaking, funders want to serve larger numbers of people, not fewer. So, for example, if we proposed to a funder one year to serve 200 people, and propose in a renewal application to serve 100 people, for the same amount of money, the funder will very likely not be as interested in funding that work, thus jeopardizing our ability to secure that funding and continue our work. Lack of sufficient funding will radically reduce our capacity if we are required to lay off staff due to funding cuts. Such departures will result in greater workloads for remaining staff and decreased capacity to assist new clients until additional staff are hired, further undermining our mission.

62. Likewise, because many of the most vulnerable immigrants will be unable to obtain certain forms of relief or might not have sufficient time to access competent appellate counsel, HIAS may not be able to provide these most vulnerable displaced persons with *pro bono* legal representation.

I, Smita Rao Dazzo, declare under penalty of perjury that the information contained in this declaration is true and correct to the best of my knowledge.

Executed in Washington, D.C. on January 21, 2021

Smita Rao Dazzo
Senior Director, Legal and Asylum
HIAS