# EXHIBIT E

## DECLARATION OF LISA KOOP
## NATIONAL IMMIGRANT JUSTICE CENTER

1.  I, Lisa Koop, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2.  I am an associate director of legal services at the National Immigrant Justice Center (NIJC), where I have worked since 2006. NIJC is a nonprofit organization that provides direct legal services to and advocates for immigrants through policy reform, impact litigation, and public education.[1] Since its founding more than three decades ago, NIJC has blended individual client advocacy with broad-based systemic change.

3.  I am writing to address the substantive harm that NIJC will experience because of a new Rule issued by the Executive Office for Immigration Review (EOIR) entitled, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020) (hereinafter, "the Rule").

### My Professional Background and Role at NIJC

4.  I manage NIJC's legal services before the Executive Office for Immigration Review (EOIR) and United States Immigration and Citizenship Services (USCIS), with a focus on asylum seekers and unaccompanied minors. I also direct NIJC's legal services in Indiana and Texas and represent clients myself in all levels of removal proceedings, including before the Board of Immigration Appeals (BIA) and in federal courts.

5.  My direct representation and supervision in deportation defense matters includes family-based immigration, immigration remedies for survivors of domestic violence and other crimes, Special Immigrant Juvenile status (SIJS), Deferred Action for Childhood Arrivals (DACA), Temporary Protected Status (TPS), removal defense, asylum, and other forms of protection-based relief. I also train and supervise NIJC staff and *pro bono* attorneys handling a wide variety of immigration matters.

6.  Prior to joining NIJC, I worked as a clinical fellow at the Notre Dame Law School Immigration Clinic, where I taught and supervised students in immigration cases. When I was in law school, I held immigration-related positions at Farmworker Legal Services in Michigan; the United Nations High Commissioner for Refugees in Washington, D.C.; the Immigrant and Refugee Appellate Center in Washington, D.C.; and the Asociación Pro Derechos Humanos (Association for Human Rights) in Lima, Peru. Before law school, from 1999 to 2001, I was a paralegal at the South Texas Pro Bono Asylum Representation Project, a project of the American Bar Association. There, I presented Know Your Rights Presentations to adults and children in immigration custody and worked with detained immigrants seeking asylum and other forms of immigration relief.

---

[1] NIJC is a program of Heartland Alliance, a nonprofit social services organization that is headquartered in Chicago, Illinois.

## NIJC's Mission and Services

7.  NIJC's mission is to establish and defend the legal rights of immigrants regardless of background and transform the immigration system to one that affords equal opportunity for all. NIJC's vision is that immigrants have the opportunity to gain the rights and privileges of living in the United States through a humane and just immigration process.

8.  To that end, NIJC provides high quality immigration legal services for as many low-income individuals and families as it can possibly reach. NIJC seeks to advance a just immigration policy using a human rights framework through education and advocacy in the public arena, as well as before the executive and legislative branches of government at the federal, state and local levels.

9.  NIJC's key priority areas are (a) ensuring access to counsel in immigration proceedings, which includes providing high quality legal counsel and advocating for a guaranteed right to counsel; (b) defending, maintaining, and expanding access to asylum and other forms of immigration relief; and (c) decriminalizing immigration and reducing the detention of noncitizens.

10.  NIJC maintains a staff of more than 120 people who work to advance this mission. That staff includes attorneys and support staff, in Chicago, Illinois; Washington, D.C.; San Diego, California; and Goshen and Indianapolis, Indiana. NIJC's staff work in the areas of general immigration services, unaccompanied children, asylum, detention, anti-human trafficking, LGBT rights, litigation and policy.

11.  In 2020, NIJC has provided legal services, including legal orientation and education, to more than 12,300 individuals, and represented more than 5,500 noncitizens in their immigration or removal defense cases.

12.  NIJC's core service areas are direct legal services, federal court litigation, policy reform, and community education, which includes Know Your Rights (KYR) presentations, a Legal Orientation Program (LOP), and an Immigration Court Helpdesk (ICH). LOP and ICH are EOIR funded programs that enable NIJC and other organizations around the country to provide *pro se* assistance to immigrants in selected detention centers and courts, including the Chicago Immigration Court—one of the busiest immigration courts in the country.[2] LOP serves detained individuals and ICH serves non-detained noncitizens.

13.  NIJC provides direct representation in removal proceedings before the immigration court and the BIA. NIJC also represents individuals seeking benefits before USCIS, which includes affirmative asylum applications, family-based benefits, DACA, TPS, survivor-based visas, and requests for SIJS. NIJC's direct-representation work is divided into teams, with some teams focusing on a particular venue (e.g. NIJC's detention project), other teams focusing on a particular population (e.g. the Children's Protection Project,

---

[2] *See, e.g.*, TRAC Immigration, Immigration Court Backlog Tool, https://bit.ly/3a2lXbQ.

Counter Trafficking Project, and LGBT Immigrant Rights Initiative), and other teams focusing on certain remedies (e.g. NIJC's Asylum and DACA Projects). NIJC also accepts limited representation through the National Qualified Representative Program ("NQRP"), an EOIR program which provides appointed counsel to individuals deemed incompetent to represent themselves.

14. As is most relevant to the subject matter of this Rule, in 2020, NIJC's direct representation teams represented more than 80 individuals in their cases before the BIA. Many individuals who sought our services before the BIA were *pro se* in the immigration court and often they were detained in detention centers around the country. Administrative closure has been intermittently available for NIJC's clients over the last four years, but our staff has filed almost 100 requests since January 2016.

15. In addition, among the 12,300 individuals that NIJC served in 2020, more than 2,000 of those were adults seeking *pro se* assistance through our KYR Sessions, LOP, and ICH. *Pro se* participants often ask about how to represent themselves in an appellate procedure or in filing a motion to the BIA or about how to overcome a prior removal order.

16. A significant portion of NIJC's federal litigation practice is devoted to appellate representation through petitions for review, which begin with the denial of immigration relief at the BIA. In 2020, NIJC was counsel on more than 40 circuit-court appeals, having been referred the cases from NIJC's own direct representation projects or outside sources. One key factor in deciding whether a federal appeal is viable is the degree to which issues were preserved before the BIA, which will become more challenging in light of this Rule.

17. In direct representation and federal court litigation alike, *pro bono* attorneys are central to NIJC's model. NIJC maintains a panel of more than 2,000 *pro bono* attorneys. NIJC was founded and its first *pro bono* program was focused on improving access to counsel for asylum seekers. NIJC has since expanded its *pro bono* programs, to support attorneys representing noncitizens in a wide variety of matters.

18. Finally, advocating for broad access to counsel for noncitizens as well as a fair day in court has long been a central tenet of NIJC's policy work. NIJC has advocated for expanded legal services for immigrants and has written about how EOIR can meaningfully improve the immigration-court system. In October 2014, NIJC published "Order in the Court: Commonsense Solutions to Improve Efficiency and Fairness in the Immigration Court."[3] Efficiency (and, to a lesser extent, fairness) is the very thing that EOIR professes to concern itself with in the publication of this Rule, yet the content of this Rule bears little to no resemblance to the recommendations that NIJC made more than six years ago.

---

[3] This publication is available on NIJC's website, at https://bit.ly/3nMhLm3.

## The BIA Rule Irreparably Harms NIJC and Our Clients

19.  EOIR's new Rule will cause irreparable harm to NIJC's mission of establishing and defending the legal rights of immigrants.

20.  The Rule completely upends procedures at EOIR and especially the BIA. These changes will cause drastic injustices and inefficiencies, and they will eliminate many clients' ability to seek relief from removal for which they are otherwise eligible. The result will be the removal of many individuals who would otherwise qualify for relief or protection. At minimum, the Rule will result in more work and more appeals for NIJC's staff. More likely, the Rule will limit our ability to form relationships with our current, broad client base because it cuts off entire avenues to relief and reduces the amount of time we would have to form these attorney-client relationships.

21.  When EOIR issued a notice of proposed rulemaking, NIJC submitted lengthy comments opposing the Rule, despite the limited timeframe to do so. We expressed various concerns about the Rule and focused in particular on the due process concerns that the Rule presents. EOIR ignored or summarily rejected most, if not all, of our comments.

22.  The Rule contains numerous substantive changes, all of which will adversely impact NIJC's programming. In particular, the Rule (1) shortens briefing schedules at the BIA and mandates simultaneous briefing; (2) limits the BIA's remand authority; (3) changes the process for preserving access to voluntary departure; (4) eviscerates the ability of noncitizens to seek remand from the BIA; (5) limits the scope of remand before an immigration judge (IJ) when remand is ordered; (6) inserts EOIR's director, an unconfirmed political appointee, into a newly created oversight process; (7) eliminates the BIA's ability to order administrative closure or grant sua sponte motions to reopen; and (8) imposes timelines for appellate case processing.

23.  The human toll of these changes is hard to overstate. Curtailing due process in this manner and further politicizing EOIR guarantees that NIJC will be less able to help our clients to sufficiently present their defenses to removal, and for many the result will be summary removal. In particular, by eliminating the ability to seek remand, administrative closure, or sua sponte reopening, the Rule completely cuts off tools that NIJC and our clients have used to demonstrate eligibility for relief from removal. These changes fundamentally frustrate NIJC's mission of ensuring access to legal protection for noncitizens.

24.  NIJC is particularly harmed by various provisions in the Rule, as discussed below.

*Truncated Briefing Schedules*

25.  The Rule truncates briefing before the BIA in three ways. First, the Rule "reduce[s] the maximum allowable time for extensions of the briefing schedule for good cause shown from 90 days to 14 days." 85 Fed. Reg. at 81,588. Next, the Rule mandates both parties

file their briefs simultaneously. *Id.* Third, the Rule mandates reply briefs now must be filed within 14 and not 21 days. *Id.*

26.  Even before these Rules, the timeline for BIA representation was uncomfortably tight. NIJC worked diligently to overcome these issues for existing clients, despite the barriers. Rather than ameliorate these burdens, the Rule exacerbates existing issues and dramatically decreases the already-limited time we will have to prepare appeals.

27.  In many of NIJC's cases, we begin our representation in the first instance at the BIA. For those individuals who were *pro se* before the IJ and trying to obtain counsel for a BIA appeal, the Rule will make it nearly impossible for NIJC to represent them. The timeline for someone seeking appellate counsel works as follows:

   a.  Step One – Briefing Schedule Issued: The BIA issues—by mail—a schedule setting a briefing deadline that is three weeks out and provides the transcripts of the removal hearing. Because most IJ decisions are oral, the transcript will be the first glimpse at the IJ's reasoning. The timing for issuing a briefing schedule is unknown and arbitrary: it can take weeks, months, or even a year or more. This uncertainty makes it impossible for staff to budget their time to accommodate BIA briefing. Nothing in the Rule seeks to eliminate this arbitrary timing or address the inefficiency and uncertainty that it creates.

   b.  Step Two – Mailing: Because the BIA completes Step One by mail, rather than through and electronic filing system, it takes days or even a week to receive the transcript and briefing schedule. For example, in one recent case, *pro bono* attorneys working with NIJC received these materials just two days before the deadline. For a detained person, there is the added wait of getting mail through the jail's process. For detained and non-detained noncitizens alike, they must then pass these materials to a potential attorney for review, which requires further mailing. At best, the first week or even two of the noncitizen's appeal timeline will be spent mailing materials.[4]

   c.  Step Three – Case Assessment: NIJC accepts a case for appeal only after assessing the merits, which involves reviewing the transcripts and discussing the case with a supervisor. The BIA does not provide the Record of Proceedings— another inefficiency that the Rule ignores—so assessing a case may also entail an independent investigation of the country conditions, interviewing the noncitizen to try to ascertain what information was provided before the IJ, and potentially additional mailing as an attempt to reconstruct the record.

   d.  Step Four – Briefing: All or nearly all of an applicant's three-week briefing schedule will be consumed by the steps above, so counsel will have to seek an

---

[4] The Rule's claim that DHS is moving to an electronic case filing does nothing to address this concern in the foreseeable future, nor would it resolve the challenges for detained noncitizens who would not have easy access to an electronic case management system.

extension, but with no guarantee that it will be granted, particularly since granting the extension is already disfavored under recent EOIR policy changes. *See* EOIR, Policy Memorandum 20-01, Case Processing at the Board of Immigration Appeals (Oct. 1, 2019).[5] Under the Rule, NIJC counsel who agree to take on such representation will then have just a *maximum* of two weeks to research and write an appellate brief, no matter the complexity of the case or competing caseloads (which are significant), and no matter any extenuating circumstances.

28. This timeline will pose great hurdles for NIJC. Previously, NIJC has actively pursued cases for appellate representation before the BIA as a means of helping those clients win relief and, alternatively, to develop and preserve arguments for federal-court appeals, knowing that it may require federal-court intervention to obtain relief for an individual. Under the Rule, these goals are frustrated.

29. In addition, NIJC routinely relies on *pro bono* attorneys for BIA representation, as a means of maximizing NIJC's limited resources. This timeline will be impossible for a *pro bono* attorney who is generally unfamiliar with immigration law and must spend additional time, and receive additional mentoring from NIJC, to familiarize herself with the law. Even for experienced *pro bono* attorneys, the process of going through a law firm's conflict and case initiation process will likely take the entirety of the two-week briefing timeline. In the case mentioned above where the briefing schedule arrived just two days before the deadline, the *pro bono* firm, which had represented that client before the IJ, relied on five different attorneys and the help of NIJC counsel, to complete the brief on time. That kind of practice will become more necessary under the Rule and will be impossible for most *pro bono* partners, particularly those working in smaller firms.

30. All told, this Rule will drastically limit NIJC's ability to accept BIA appeals, which will in turn impact our ability to ensure that noncitizens get a fair day in court, whether or not they win their cases. This change will also impair NIJC's ability to pursue federal court appeals. When issues are unexhausted in BIA briefing or undeveloped, as they necessarily will be due to the impediments discussed above, our ability to file federal court challenges will be hindered.

31. Because NIJC will be less able to accept these cases, our *pro se* programs will face additional burdens. These programs are not designed to provide lengthy, substantive advice on how to present arguments on appeal. NIJC will have to develop new practice advisories to address the timing for appeals and will also have to develop more robust materials for *pro se* litigants who will be left to represent themselves. NIJC's staff will have to spend considerably more time with *pro se* litigants to explain the appeal process.

32. The impact of this change on noncitizens is obvious. Only 3% of individuals who represent themselves *pro se* at the IJ level file an appeal.[6] In other words, it is already difficult to appeal without counsel. By shortening the timeframe to prepare an appeal, the

---

[5] https://www.justice.gov/eoir/page/file/1206316/download.

[6] David Hausman, *The Failure of Immigration Appeals*, 164 U. Pa. L. Rev. 1177, 1193 (2016).

Rule will force more noncitizens to seek to appeal *pro se* and that *pro se* process will be all but impossible for unrepresented individuals to manage.

33. Shorter briefing deadlines will not make the BIA more efficient. As mentioned, it takes months, if not years, for the BIA to issue the briefing schedule, and the Rule does nothing to fix that problem. After we file our briefs, our clients' appeals remain pending for months or years. Denying noncitizens a reasonable opportunity to write their briefs has no rational relationship to the time it will then take the BIA to decide those cases. Trimming off a few weeks at the briefing stage of the appellate process hurts noncitizens and makes no meaningful improvement to the efficiency of the overall system.

34. The Rule's transition to concurrent briefing is likewise problematic. It unnecessarily complicates the briefing without any efficiency gains. In recent years, the government has filed many more BIA appeals. NIJC will now have to speculate about the arguments the government will make based on the limited and often incomplete information included in the notice of appeal and write a brief without knowing the extent of the arguments. This change will create significant inefficiencies in our briefing process and force us to write more, and more involved reply briefs, which are disfavored at the BIA and which now will also be demanded on a truncated timeline. These burdens will diminish the number of cases we are able to take. As is true with the shortened briefing schedule, this change will not make the BIA more efficient because it does not address the delays at the BIA that occur before the issuance of a briefing schedule and after a brief is filed, which make up the majority of existing delays at the BIA.

35. Other provisions in the Rule will further exacerbate these problems. For example, the Rule authorizes the BIA to affirm the IJ on any basis in the record, including on the basis of "undisputed" facts, which will require more argumentation on appeal. 85 Fed. Reg. at 81,590. Yet, the Rule also eliminates the requirement for immigration judges to review and correct errors in the transcript, which is desperately needed to clarify rushed, oral decisionmaking. *See id.* at 81,592. These aspects of the Rule make it even more difficult for counsel to brief appeals and undertake appellate representation.

### *Elimination of Ability to Seek Remand & Related Changes to Remand Authority*

36. The Rule also prohibits the BIA "from receiving new evidence on appeal, remanding a case for the immigration judge to consider new evidence in the course of adjudicating an appeal, or considering a motion to remand based on new evidence." 85 Fed. Reg. at 81,589. The Rule has eliminated (subject to largely irrelevant exceptions) a critical tool that is designed to preserve noncitizens' opportunity to receive full and fair consideration of their claims based on material evidence. In addition to harming noncitizens, this provision will further frustrate NIJC's mission, both as it relates to ensuring the due process of noncitizens and as it relates to accessing substantive immigration remedies.

37. NIJC relies on motions to remand to address material changes in a client's case while it is pending at the BIA, an approach that preserves time and resources. For example:

a.  NIJC represents Alex, a transgender man from Honduras.[7] When Alex's case was before the IJ, he identified as a gender nonconforming lesbian. During his BIA appeal, he came out as a transgender man, received a relevant diagnosis, and began taking testosterone. NIJC moved to remand to present this new, previously unavailable evidence to the IJ which directly relates to Alex's protection claim.

b.  NIJC files motions to remand in cases involving clients who become eligible for alternative immigration remedies while an appeal is pending, for example when a client marries a United States citizen or becomes eligible for SIJS or for survivor-based protection, such a T or U visa. For example, NIJC recently represented a child who was a dependent on her mother's asylum application, which was pending at the BIA. The mother's live-in boyfriend began molesting the daughter and the mother failed to protect her. The daughter was removed from the home by the state welfare agency. The child then became eligible for SIJS based on her mother's neglect and was in need of a motion to remand to the IJ in order to avoid a removal order and to present a new application based upon SIJS protection. Now, such motions will be unavailable no matter how meritorious our client's claim to such relief.

c.  NIJC has filed motions to remand to correct ineffective assistance of counsel. NIJC *currently* represents a man from Peru for whom the IJ indicated that the denial of relief was based in large part on prior counsel's performance. NIJC set other priority projects aside to file a motion to remand for this client, but because it was received on January 15, 2021—the Rule's effective date—it will not be considered. NIJC will have to await a likely removal order and refile that motion as a motion to reopen. That timing will also require NIJC to seek a stay of removal for this client and potentially a circuit court appeal as well.

d.  NIJC routinely seeks remand in cases involving mentally ill clients, particularly when the relevance of the applicant's illness was not made clear while the case was before the IJ. This approach is expressly contemplated by the permanent injunction in *Franco-Gonzalez v. Holder*, No. 10-cv-02211-DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013). NIJC has sought remand from the BIA under *Franco* on multiple occasions and won protection from removal for those clients on remand.

38. Importantly, the Rule bars remands even when there is a change in law affecting a client's eligibility for relief. For example, NIJC currently represents clients who were granted withholding of removal but denied asylum under a regulation known as the transit ban because they failed to seek protection *en route* to the United States. This limit on asylum was enjoined and then vacated. *See East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 838–39 (9th Cir. 2020) (enjoining transit ban); *CAIR Coalition v. Trump*, 471 F. Supp. 3d 25, 31 (D.D.C. 2020) (vacating interim final rule); *see also* Asylum Eligibility and Procedural Modifications; 85 Fed. Reg. 82,260 (Dec. 17. 2020) (reissuing

[7] The names of clients listed in this declaration are pseudonyms.

the interim final rule as a final rule). The Rule prevents an applicant from seeking remand to avoid harm based on an illegal provision, even if that provision is later vacated.[8]

39. Contrary to the Rule's suggestion, motions to remand are not an attempt at gamesmanship or an effort to avoid finality. 85 Fed. Reg. at 81,605. To the contrary, motions to remand are a critical tool for correcting injustice or exposing information that truly was previously unavailable. Notably, though NIJC represented approximately 80 individuals before the BIA in 2020, we filed only about 25 motions to remand to the IJ from the BIA in the past *five years*. In other words, though traditional appellate representation before the BIA is relatively common, NIJC utilizes motions to remand only in the most necessary of circumstances, where we can meet the "heavy burden" demanded by BIA precedent and demonstrate that evidence is both "material" and "previously unavailable." *See Matter of Coelho*, 20 I. & N. Dec. 464 (BIA 1992). Under the Rule, a motion to remand is impossible. This change severely undermines NIJC's mission to protect and defend a noncitizen's access to legal relief and eliminates a critical tool that noncitizens use to present new evidence.

40. EOIR pursued this change in the name of efficiency, but NIJC's experience is that this change will make proceedings *less* efficient for all parties involved, including, especially legal advocates like NIJC and their clients. Individuals in circumstances like the ones described above will still be able to file motions *to reopen*, but they will have to wait to do so until the BIA has already expended time adjudicating the underlying claim on the merits and issued an order of removal. The purpose of a motion to remand is to stave off the BIA's need to review a case on appeal when new, material information will make adjudication more straightforward. The Rule's elimination of this critical procedural device makes little sense and will force NIJC and its clients to shoulder the burden of additional appellate proceedings that would not previously have been necessary.

41. For those who do pursue reopening where they would have previously pursued remand, the wait will be months or years, meaning that NIJC will take significantly longer to complete cases, which will preclude acceptance of new matters. Additionally, the time and number bars to motions to reopen will make the stakes of filing a motion to reopen based on new evidence much higher. NIJC will now have to make difficult decisions about when to use a client's *only* opportunity to seek reopening. The Rule thus incentivizes clients to wait to put new, significant evidence in front of an adjudicator.

42. Instead of promoting efficiency, the Rule seems designed to push requests like the ones identified above into the context of motions to reopen, which were set to be curtailed by separate rulemaking. *See* Motions To Reopen and Reconsider; Effect of Departure; Stay of Removal, 85 Fed. Reg. 75,942 (Nov. 27, 2020).[9] The combined effect of that Rule and this one makes it clear that EOIR seeks to foreclose the ability of noncitizens to present

---

[8] The Rule contains an exception for changes in law affecting *removability*, but that is of no use to our many clients who are removable but eligible for relief from removal.

[9] This proposed rule was not finalized by the previous administration and its current status is unclear.

new, previously unavailable evidence. This is especially true in conjunction with the Rule's elimination of administrative closure and *sua sponte* reopening, which also work against noncitizens' ability to seek new forms of relief.

43. NIJC is also harmed by the accompanying provisions (a) expanding the BIA's factfinding authority, (b) narrowing the circumstances when a case can be remanded to an IJ for further factfinding, and (c) limiting the scope of the IJ's authority to review issues on remand. Under these provisions, the BIA may "take administrative notice" of "undisputed" facts and introduce evidence into the record. 85 Fed. Reg. at 81,590. At the same time, the BIA generally *may not* remand for further fact finding, unless the facts are required to ascertain jurisdiction or it "*would* alter the case's outcome," among other criteria that will often be impossible to satisfy. *Id.* (emphasis added). The Rule also limits the IJ's authority on remand to address only the precise issue(s) that were the subject of the remand. *Id.*

44. These changes hurt NIJC's clients because the BIA is not a factfinder; it does not take testimony or have the ability evaluate the accuracy of certain facts. The Rule claims that this ability will be limited to "official government sources" and those "whose accuracy is not disputed." 85 Fed. Reg. at 81,603. But the Rule contains no meaningful way for the BIA to engage the adversarial process necessary to determine if a document "is not disputed." For example, NIJC and its *pro bono* attorneys regularly object to the admission of reports produced by the U.S. Department of State on the grounds that they do not accurately reflect human rights conditions in the countries from which our clients flee.

45. Allowing the BIA to give uncontested weight to such documents deprives NIJC's clients of their right to challenge evidence. The Immigration & Nationality Act (INA) guarantees noncitizens a right to confront evidence against them. 8 U.S.C. § 1229a(b)(4). For NIJC's clients, the responsibility for preserving this right rests largely on our staff. Now staff will have to prepare and anticipate the need to respond to additional evidence that the BIA believes to be adverse.

46. Staff will also have to change the way that they brief appeals to show that certain additional factfinding "would" change the outcome of a case. This approach will be especially problematic in cases involving credibility or other factual determinations. For example, if the BIA finds that an IJ's credibility finding is not supported by the reasons offered, the BIA is now empowered, and indeed expected to form its own credibility finding, without ever having observed the witnesses. NIJC staff will now have to file an appeal brief—refraining from submitting new evidence—while also arguing that the IJ should be permitted to engage in further factfinding because it "would" be dispositive. The Rule imposes the illogical requirement of requiring NIJC staff to argue why further factfinding is needed without offering an opportunity to illustrate what that factfinding would yield.

47. NIJC will have to retrain staff on how to brief cases at the BIA and will have to develop new training materials for *pro bono* attorneys to account for these changes. And as the

BIA departs more and more from the role of a traditional appellate body, NIJC will be less able to rely on a *pro bono* attorney's knowledge of appellate practice and will have to provide new, specialized trainings to account for the changes that this Rule imposes, which render the BIA a hybrid trial-appellate body.

48. Limits on an IJ's authority when a case is on remand are also problematic. Under the Rule, an IJ can no longer consider intervening facts—whether they are a complete change in government in an applicant's country or a significant change in an applicant's personal circumstances—when a case is on remand. This limit exists even if a case has been pending on appeal for years, as is common. The result of this Rule is that noncitizens who clearly qualify for certain forms of relief will be barred from seeking them. Because of this change, NIJC will need to file a subsequent appeal *and* seek a motion to reopen to broaden the IJ's authority to cover dispositive applications for relief. In some cases, this approach will not be possible, and in others it will not be advisable. In all circumstances, this Rule change will require significant extra and resources as NIJC works to preserve access to legal relief for which our clients otherwise qualify.

49. These combined changes are *even more* problematic since DHS is now allowed to seek unlimited remands based on new evidence from background checks. DHS may submit new evidence—including, for example, unsworn evidence of gang activity, a type of evidence that has been routinely found to be unreliable—at any time. Yet, our clients cannot submit any evidence in rebuttal or seek an alternative immigration remedy that they may not have needed to pursue before that background evidence was introduced into the record.

50. The elimination of remands will result in premature and wrongful orders of removal, even where individuals qualify for immigration remedies contemplated by Congress and included in the INA. Preserving access to these congressionally created remedies will demand substantial additional resources in each case, making NIJC unable to serve as many clients.

*Elimination of Administrative Closure*

51. NIJC will also be harmed by the Rule's elimination of "authority for immigration judges or Board members to administratively close immigration cases." 85 Fed. Reg. at 81,590. The Seventh Circuit—where the majority of NIJC's clients reside—has countenanced the use of administrative closure even after the Attorney General eliminated it in 2018. *Meza Morales v. Barr*, 973 F.3d 656 (7th Cir. 2020) (rejecting *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018)). The Seventh Circuit aptly described administrative closure as "a procedural device that temporarily takes a removal case off of an immigration judge's calendar, preventing it from moving forward," which enabled a "noncitizen to pursue alternative relief—such as a U visa—from USCIS." *Meza Morales*, 973 F.3d at 664 (internal citations omitted).

52. This procedural device has been vital for NIJC's clients seeking relief that must be adjudicated outside of removal proceedings. In particular, NIJC routinely assists clients

in applications for U-Visas (available to survivors of crime), T-Visas (available to survivors of trafficking), and protection under the Violence Against Women Act (VAWA) (providing benefits to certain survivors of domestic violence). Another critical immigration remedy, SIJS, requires state court and USCIS adjudication, and NIJC seeks administrative closure while children who qualify for SIJS pursue that protection.

53. I estimate that many, if not the majority of NIJC's clients, are seeking an immigration remedy that must be adjudicated by USCIS. When these applicants are also in removal proceedings (a common result for clients who were encountered at or near the border or by immigration officials in the interior), administrative closure is crucial to allowing them to pursue relief before USCIS without also having to defend themselves in removal proceedings that will last for years.

54. NIJC's client Diane provides an apt example. After entering the United States, Diane was kidnapped and sexually assaulted while waiting for a public bus. She immediately reported the crime and submitted to a medical exam. Thanks to Diane's cooperation, the perpetrator was identified and charged in a 62-count indictment. The criminal prosecution is ongoing and Diane is fully cooperating in it. Diane applied for a U-Visa as the victim of a violent crime, but it will take more than five years for her to receive that benefit. *See Meza Morales*, 973 F.3d at 659 (describing the U-Visa waitlist). Meanwhile, Diane is also in removal proceedings. Because administrative closure was not available to Diane from May 2018 to May 2020 under *Castro-Tum*, NIJC has had to file annual motions to continue, which, fortunately in this case, the IJ has reviewed and granted to date because Diane's ongoing presence in the United States is critical to the prosecution.[10] Compared to cases in similar postures where NIJC has sought and been granted administrative closure, the process of repeatedly filing motions to continue adds to the immigration court backlogs, displaces other matters that could be resolved during the time the judge considers Diane's motions to continue, and requires NIJC to expend time and resources filing motions to continue.

55. Because of this Rule, NIJC will again be unable to seek administrative closure. In addition, cases that were previously closed are vulnerable to being re-calendared. The result will be that NIJC staff will be required to attend many more immigration court hearings, simply to ask for continuances—which are less and less likely to be granted— while the applicant waits for adjudication from USCIS. In the likely event that a continuance is denied, NIJC will have to present the case on the merits, involving submission of evidence and testimony. The Rule will therefore require NIJC to prepare many more cases for a merits hearing before an IJ, which forces it to divert time and staff resources away from other priority tasks.

56. The Rule will also require NIJC to brief and litigate otherwise unnecessary removal cases before EOIR. For example, many of NIJC's SIJS and U-Visa clients also qualify,

---

[10] Based on a numbers of policies implemented by EOIR in recent years, continuances are more and more disfavored at the immigration court level. *See* EOIR Dir. James McHenry, Continuances: Procedural Memorandum (Jan. 8, 2021), https://bit.ly/38udq1T.

alternatively, for asylum or withholding of removal. The availability of administrative closure previously meant that NIJC could pursue those remedies in immigration court only if doing so became necessary, without using resources or occupying the court's time in deciding a case when a different, better remedy might be available. (Withholding of removal results in a removal order and does not confer a pathway to citizenship, so it is usually in a client's interest to pursue more stable immigration remedies when eligible.) Now, NIJC will need to represent these clients in these proceedings *and* in their parallel USCIS and/or state court proceeding. This change will dramatically increase the amount of work that any one of these cases requires.

57.    If these clients are ordered removed by an IJ before USCIS grants relief, the client will either have to accept a premature removal order or pursue an appeal. There is no intermediate step. As a result, this change is likely to *increase* not decrease the amount of casework before the BIA.

58.    The Rule will expand, potentially significantly, the number of clients for whom NIJC must represent both before USCIS *and* the immigration court. Not only will this bifurcated representation create more work for NIJC, it will also make it more complicated for NIJC to place cases with *pro bono* attorneys. It is our experience that *pro bono* attorneys prefer to take cases where the procedural steps are clear and a grant or denial of relief is the final outcome. With a much more complicated procedural posture, which will potentially require multiple forms of relief and appearances both before EOIR *and* USCIS, I anticipate *pro bono* interest in these cases will decline. Even if it does not decline, the mentorship process for these cases will become much more cumbersome and onerous for NIJC, reducing our overall capacity and drawing resources and attention away from other priority tasks.

59.    Importantly, this Rule will also make it impossible for NIJC to predict with any certainty how much work it will be taking on when it determines which clients to represent. NIJC frequently accepts cases for representation before USCIS when the applicant is not in removal proceedings. If those clients get placed into removal proceedings, which can be the result of a minor traffic violation or simply being encountered by DHS personnel, NIJC will suddenly be in a position of having to take on long-term removal proceedings for these clients even when that is beyond the scope of our original retainer. NIJC will have to re-work our guidance to clients about the consequences of being placed into removal proceedings; revisit how and if we will be able to represent clients in removal proceedings when such representation was not part of our original representation plan; and account for the fact that we will be able to serve significantly fewer clients.

*Elimination of Sua Sponte Reopening*

60.    NIJC will also be harmed by the provision in the Rule that "removes the Attorney General's previous general delegation of *sua sponte* authority to the BIA and immigration judge to reopen or reconsider cases." 85 Fed. Reg. at 81,591. These motions are another vital tool for curing errors and injustices that may have occurred during removal

proceedings or seeking relief based on a later change in circumstances outside the parameters of the time and number limitations for a statutory motion to reopen.

61. Under the Rule, with very limited exceptions, now a noncitizen's only option is to file a statutory motion to reopen, which must be filed within 90 days of the final order. 8 C.F.R. § 1003.23. As a result, noncitizens who later become eligible for relief—for example, noncitizens who obtain an approved immediate immigrant relative petition, an approved application for SIJS, or an approved VAWA self-petition—would be excluded from reopening their removal orders unless the process of obtaining that status concluded within 90 days of the IJ's final order—even if the BIA proceedings stretch on far longer, and no matter how clear the equities or eligibility for relief.

62. Eliminating access to this remedy will be devastating in many cases. For example, Erick fled to the United States as an unaccompanied child and was placed in the custody of the Office of Refugee Resettlement (ORR). ORR released him to the care of a cousin, but his cousin abused and neglected Erick before kicking him out of the house. Homeless and 16 years old, Erick was able to find a home with another relative in a different state. After moving, however, Erick lacked the resources and information to change venue or travel to Florida, where his case was previously docketed. An IJ ordered Erick's removal *in absentia* in early 2019. Later, Erick was detained and transferred back to ORR custody where he learned for the first time of his removal order. Erick, through his NIJC counsel, filed a motion to reopen so that Erick could seek asylum. The IJ denied the motion without addressing the arguments presented. On appeal, the BIA exercised its *sua sponte* authority to reopen the case, enabling Erick to seek asylum.

63. Ultimately, because the rules for a statutorily authorized motion to reopen are narrow— nearly all motions must be filed within 90 days, and applicants may only file one motion, 8 C.F.R. § 1003.23—the availability of *sua sponte* reopening is critical for any circumstance that cannot be raised within 90 days. In addition, to qualify for tolling of the 90-day deadline, applicants must demonstrate "due diligence," but given the narrow interpretation that courts have given to that phrase, many noncitizens will not be able to make such a showing. For example, ignorance of immigration laws, inability to communicate in English, and/or inability to obtain counsel are very real hurdles for filing timely motions, but these factors are rarely viewed as warranting tolling. As such, *sua sponte* motions to reopen are vital for those noncitizens who irrefutably qualify for an immigration remedy if EOIR considers their claims.

64. The Rule's inclusion of an exception when DHS joins a motion will rarely help. I have nearly twenty years of immigration practice in removal defense, and instances where DHS has agreed join motions to reopen are infrequent. It is far more common for DHS to refuse to join motions to reopen or to not respond to such requests at all. As such, I can confidently state that this exception will not ameliorate the harm that this Rule will pose to NIJC or its clients.

65. In combination with the Rule's elimination of administrative closure and the BIA's remand authority—as well as its elimination of the BIA's self-certification authority,

which was previously used to correct minor filing defects, such as a late filing based solely on U.S. mail delays, 85 Fed. Reg. at 81,591—noncitizens may be effectively precluded from seeking relief at all and prematurely removed from the United States.

66.   As with the other changes, the elimination of *sua sponte* reopening authority will mean significant changes in how NIJC goes about serving clients. We will have to retrain staff and *pro bono* attorneys on BIA motions practice and removal defense strategies. We will also have to divert resources to preventing the removal of noncitizens, including by filing motions to stay, both in federal court and before the BIA. Here too, NIJC's mission of establishing and defending the legal rights of immigrants will be definitively frustrated by this Rule because clients who otherwise clearly qualify for immigration benefits established by Congress will be unable to seek those benefits.

*Voluntary Departure Authority*

67.   As with other provisions, NIJC is concerned by the Rule's changes to the BIA's consideration of requests for voluntary departure. Under the Rule, the BIA is now prohibited from remanding to the IJ for the limited purpose of assessing voluntary departure and instead can now address those requests, *de novo*. 85 Fed. Reg. at 81,589.

68.   Voluntary departure is a highly factual inquiry, traditionally only conducted by the IJ. It requires, among other things, a finding that the noncitizen is "a person of good moral character" with "the means to depart the United States." 8 U.S.C. § 1229c(b)(1). The Rule seems to *assume* that the record will be developed to answer these questions, allowing the BIA to simply adjudicate such a request on a paper record.

69.   In NIJC's experience, that assumption will often be false. For example, if the IJ granted a motion to terminate in a case where there were no pending applications for relief and the BIA then overturns the termination, there will have been no record developed on whether the noncitizen is eligible for voluntary departure or deserves it as a matter of discretion.

70.   Likewise, where a noncitizen was granted relief by the IJ but the BIA overturns that grant, the record will often not have been developed regarding removal or voluntary departure, making it impossible for the BIA to appropriately adjudicate the question. For example, the record in an asylum case will generally be focused on why an applicant *cannot* go to his home country, and not on why voluntary departure to that country should be permitted if the applicant must return. Yet, even in this instance, the BIA is authorized to consider the request instead of remanding to the IJ, and to issue a removal order if it deems the request waived or otherwise not satisfied.

71.   The element requiring an applicant to demonstrate the means to depart the United States could also change while a case is pending at the BIA. An applicant could save for the voluntary departure expenses during the year or more he is waiting for a decision by the BIA. As such, he could potentially demonstrate means to depart even if he could not have done so before the IJ. The Rule inappropriately eliminates EOIR's ability to adjudicate such a request on current facts.

15

72. To account for this change, NIJC will have to make significant changes to our representation and our advice to *pro se* noncitizens. Much more frequently, we will now have to affirmatively seek voluntary departure before the IJ, even when doing so is at odds with the application—like asylum or withholding of removal—that is the client's primary form of relief. This will require significant litigation resources, further reducing the efficiency of proceedings and limiting the number of clients that NIJC can represent. NIJC will also be in a position of having to advise clients and *pro se* individuals to save money to demonstrate the financial means for voluntary departure months or years after the proceedings before the IJ, when that limited amount of money is otherwise necessary for their survival in the United States during the pendency of their other claims.

73. Voluntary departure is critical to NIJC's mission of ensuring access to legal remedies. For example, an applicant who receives voluntary departure can avoid having return to his home country and wait there for 10 years abroad before returning to the United States on an approved family petition. For example, NIJC's client David entered the United States as an unaccompanied minor and was placed in removal proceedings. His father was already living in the United States and had married a United States citizen. David's stepmother filed a family petition for David with USCIS, which was approved. To regularize his status through his stepmother, David had to return to his home country to obtain his visa. To avoid bars that would have prevent his return, David had to leave the United States prior to accruing unlawful presence and without a removal order. NIJC was able to move for voluntary departure for David before the immigration judge, establish his eligibility, and secure an order for voluntary departure from the judge. David was able to depart the United States and return months later as a lawful permanent resident. Any change making voluntary departure more difficult of obtain will frustrate NIJC's mission of preventing unnecessary family separation and it will increase the wait that some clients face for various forms of relief.

74. Another collateral change to voluntary departure is also problematic. Now, noncitizens will have just "ten business days to post a voluntary departure bond" if the notice is mailed and only *five* days for electronic service. 85 Fed. Reg. at 81,641. Applicants will need to keep the amount of their voluntary departure bond—often a significant amount of money—on hand for the entire duration of an appeal, which could be years and which is likely to end unexpectedly. Clients would then need to arrange transportation to a government office to post the bond, which is often a significant obstacle for many NIJC clients who do not have drivers' licenses, live in rural areas hours away from the ICE offices, and have no access to public transportation. I expect that this change will cause many of NIJC's clients who otherwise qualify for voluntary departure to lose that right, and face a removal order and possibly 10 years' banishment from the United States, simply because they cannot pay the bond in the very brief timeframe that the Rule allows. This change also puts NIJC in the untenable position of having to find sources of funds or even advance funds to clients (an ethically fraught consideration) to enable them to take advantage of voluntary departure.

*Other Miscellaneous Rule Changes*

75. Other provisions of the Rule also harm NIJC's mission and frustrate our ability to serve clients.

76. For one, the Rule eliminates the remand for the completion of background checks and allows the BIA to resolve outstanding biometrics issues and grant or deny relief outright. Now, "the Board shall deem the application abandoned" unless the client complied with biometrics requirement within 90 days. 85 Fed. Reg. at 81,652. While the Rule requires DHS to send the individual notice, it does not permit individuals to challenge the fact that they did not *receive* notice and therefore may not have been able to comply or to seek more time to comply.

77. This provision harms NIJC's clients because they may never receive or understand the notice, and this change will therefore result in the *ex post facto* denial of granted applications, without a meaningful opportunity to contest that result. NIJC will now have to take additional steps to explain this risk to clients and adjust our case monitoring—a process that is already time consuming—to prevent prejudice to our clients on these grounds.

78. This provision also undermines two common forms of protection that NIJC pursues: withholding of removal and protection under the Convention Against Torture. Under the INA, "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country." 8 U.S.C. § 1231(b)(3). But that is what this provision does. A background check is only relevant in an instance where the client has been awarded relief; DHS does not perform background checks on individuals it intends to remove. In cases where the BIA has affirmed or awarded CAT or withholding relief, the Rule's instruction to treat the award of such relief as "abandoned" based on a missed background check undermines the statutory mandate to refrain from removing those who qualify for these protections.

79. Additionally, the Rule allow IJs who disagree with a BIA remand, to certify the case to the EOIR Director, a non-judicial official, in numerous circumstances, including when an IJ believes a decision is "vague, ambiguous, internally inconsistent; or [] clearly not considering a material factor pertinent to the issue(s)." 85 Fed. Reg. at 81,653.

80. Far from promoting "quality assurance," this change undermines the integrity of the BIA and eliminates any notion that the IJ (or the BIA) is a neutral arbiter. This Rule harms NIJC because it converts IJs into advocates for their underlying decisions and precludes the parties from an opportunity to contest or respond to the certification. If the certification is granted, NIJC will be forced to find a way to intervene in order to preserve the record, despite no clear process to do so. If it is not granted, then noncitizens will have to appear before an IJ who is already predisposed against the hearing. In either situation, the Rule invites uncertainty and unfairness, possibly precluding clients from obtaining relief altogether.

81. The Rule also imposes mandatory adjudicatory timelines that will lead to erroneous dismissals and delegates appeals pending beyond 335 days to the EOIR director. 85 Fed. Reg. 81,591. Imposing arbitrary timeframes will rush adjudicators to render ill-informed decisions. Likewise, vesting power in the EOIR Director deprives clients of a fair and impartial adjudicator. These changes encourage wrongful denials, resulting in more appeals, more work, and more uncertainty for NIJC.

## Overall Harm of the Rule on NIJC's Operations

82. In addition to the harms to NIJC's mission and services described above, the Rule will pose an overarching adverse impact on NIJC.

83. First, the Rule will require us to devote more resources to fewer cases, meaning we will serve fewer clients. Two prominent circumstances where this will arise are due to the elimination of motions to remand and administrative closure. Even where we could convert a motion to remand into a motion to reopen, we can only seek that relief once a client has received a removal order, and the issuance of that order will require us to undertake significant and urgent steps to stay the removal of the client and enable the filing of the motion to reopen. And without administrative closure we will have to engage in dual-track representation before EOIR and USCIS and prepare relief applications to submit to EOIR even where that relief will not be necessary following a positive adjudication from USCIS.

84. This change will impact our funding. NIJC's funding comes from various sources, including private foundations and local (state or county) governments. NIJC routinely reports on the number of individuals we serve, and several funders make decisions regarding the renewal of grants based on performance metrics like the number of clients represented. Funders also consider the impact of NIJC's work, not only on the individual client but also on the overall immigrant community. For these funders, appellate representation—including at the BIA—is critical to ensuring that NIJC is able to pursue appeals that are most likely to positively affect immigrant communities. The Rule jeopardizes these funding streams because NIJC will be unable to represent as many clients and will face various hurdles to avoid summary dismissals.

85. Second, the Rule will drastically impair our ability to place cases with *pro bono* attorneys. As mentioned above, the Rule will make appellate representation significantly more compressed, complicated, and burdensome. And the elimination of available remedies, such as administrative closure, *sua sponte* reopening, and remand authority, will make the tasks for *pro bono* attorneys considerably less clear and more time-consuming. This lack of clarity will make it harder to convince *pro bono* attorneys to take on cases, and it will increase the work that NIJC must do to mentor these cases when we do place them.

86. Third, the Rule will burden NIJC's *pro se* services. For example, the elimination of remands for voluntary departure means that NIJC will often find itself having to explain the terms of voluntary departure, a task that previously fell to IJs but now will be

achieved via a complicated, written advisal in a language that the client may not understand. We will need to dramatically increase our staff devoted to providing *pro se* services to serve an additional number of *pro se* clients.

87.    Fourth, the Rule complicates NIJC's education efforts. The Rule is one of dozens of changes to the immigration system, particularly in the last two years, and the changes have made the immigration system virtually unrecognizable. NIJC must engage in massive re-education and re-training for staff, the communities we serve, and the volunteer advocates who help us increase our impact. This work will also require the creation and revision of *pro se* and *pro bono* training materials. In addition, it will require more resources dedicated to supervision to ensure that staff, communities, and volunteer advocates are properly employing the new practices.

88.    Fifth, the onslaught of last minute regulations in 2020, and especially those finalized in December 2020, will significantly complicate NIJC's policy work. The bifurcated rulemaking that has occurred will considerably complicate and increase NIJC's efforts to restore the immigration system to its previous state, much less to advocate for needed improvements. These challenges will be particularly prominent in NIJC's ongoing advocacy surrounding access to counsel.

89.    Finally, and most fundamentally, the Rule undermines the very core of NIJC's mission: to ensure that all immigrants receive a fair day in court. The Rule attacks commenters for raising due process concerns, falsely claiming that such arguments were results oriented. 85 Fed. Reg. at 81,595. The Rule likewise accused advocates of being duplicitous, advocating for an equal system when actually preferring a system that favors noncitizens. *See, e.g.*, *id.* Neither accusation accurately reflects NIJC's position. As to the first, NIJC is interested in ensuring that immigrants—whether or not they prevail on their applications for relief—receive notice and a fair opportunity to be heard, as due process and the INA require. By cutting off previously available procedural protections and some substantive avenues to relief, this Rule undermines that mission in myriad ways.

90.    NIJC is likewise interested in a fair system within EOIR. Removal proceedings are adversarial, and DHS functions as a prosecutor in a system rife with numerous inherent power imbalances. Fairness and equity in the immigration system do not demand *equality* between DHS and the noncitizens whom they seek to deport. By purporting to apply all provisions equally (which, the Rule does not do; it makes remand allowances for DHS and takes those allowances away for noncitizens), the Rule eliminates many of the safeguards that have long existed to enable noncitizens to correct the injustices that inevitably will occur in some cases. Moreover, the Rule politicizes EOIR in a way that undermines independent decisionmaking.

91.    In sum, these measures significantly curtail the due process rights of NIJC's clients, and harm NIJC's mission of safeguarding those very same due process rights. These changes are made in the purported name of efficiency and finality when, in many ways, they will make the system less efficient. And any purported efficiency "gains" will come at the

cost of removing noncitizens who would otherwise qualify for an immigration remedy that Congress created, which would allow them to remain in the United States.

Executed on: January 29, 2021 in Goshen, Indiana.

_____
Lisa Koop
National Immigrant Justice Center
    Associate Director of Legal Services
224 S. Michigan Avenue, Suite 600
Chicago, Illinois 60604
lkoop@heartlandalliance.org
(312) 660-1321