# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHOLIC LEGAL IMMIGRATION
NETWORK, INC., *et al.*,

          Plaintiffs,

   v.

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, *et al.*

          Defendants.

Civil Action No. 1:21-cv-0094 (RJL)

**BRIEF OF ORGANIZATIONS ADVOCATING FOR THE RIGHTS OF SURVIVORS OF DOMESTIC VIOLENCE AND HUMAN TRAFFICKING AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AS TO THE ADMINISTRATIVE CLOSURE RULE**

**TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENT ....................................................................................... 1

INTEREST OF *AMICI CURIAE* ................................................................................. 1

SUMMARY OF POSITION OF *AMICI CURIAE* ..................................................... 6

ARGUMENT ................................................................................................................... 8

I.    THE TRUNCATED RULEMAKING PROCESS ALLOWED INADEQUATE TIME FOR COMMENTS THAT WERE UNLAWFULLY IGNORED IN THE FINAL RULE ......................................................................................................... 9

    A.    Truncating the Period for Comment in Half—During a Pandemic—Is Unreasonable, as it Deprived Amici a Meaningful Opportunity to Provide Comments ............................................................................................... 10

    B.    The Administrative Closure Rule's Failure to Respond to Comments Identifying Contravention to Statutory Law is Arbitrary and Capricious and Otherwise Not in Accordance With Law .................................................. 16

        1.    Congress Passed Legislation to Provide Noncitizen Survivors with Pathways to Legal Status and Gave USCIS Exclusive Jurisdiction to Adjudicate Such Applications ........................................... 17

        2.    Immigration Courts Must Be Able to Administratively Close Appropriate Cases to Allow USCIS Adequate Time to Process Applications ........................................................................... 21

II.   NONCITIZEN SURVIVORS AND COMMUNITIES WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY ......................................................... 24

    A.    The Administrative Closure Rule's Impact on Noncitizen Survivors Contravenes Congress's Intent in Passing Relief Statutes ........................... 24

    B.    The Final Rule's Impact on Communities and Law Enforcement Contravenes Congress's Intent in Passing Relief Statutes ........................... 26

III.  THE FINAL RULE'S RELIANCE ON CONTINUANCES AND MOTIONS TO DISMISS ARE INADEQUATE SUBSTITUTES FOR ADMINISTRATIVE CLOSURE ............................................................................................................. 28

IV.   THERE IS NO EFFICIENCY JUSTIFICATION FOR THE FINAL RULE ............. 30

CONCLUSION .............................................................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Chavez-Romero v. U.S. Att'y Gen.*,
  817 F. App'x 919 (11th Cir. 2020) ...............................................................26

*Hernandez-Serrano v. Barr*,
  981 F.3d 459 (6th Cir. 2020) .....................................................................11

*In re Martha Leticia Hernandez-Ascencio*,
  2018 WL 2761436 (BIA Mar. 27, 2018) ..................................................22

*L.D.G. v. Holder*,
  744 F.3d 1022 (7th Cir. 2014) ....................................................................2

*Matter of Avetisyan*,
  25 I & N Dec. 688 (BIA 2012) .......................................................22, 28, 29

*Matter of Castro-Tum*,
  27 I & N Dec. 271 (A.G. 2018) ..............................................................11, 30, 31

*Meza Morales v. Barr*,
  973 F.3d 656 (7th Cir. 2020) ................................................................11, 31

*Nicholas L.L. v. Barr*,
  No. 19-cv-2543, 2019 WL 4929795 (D. Minn. Oct. 7, 2019) ................20

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
  No. 20-cv-07721, 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020), appeal pending at No. 20-
  17490 (9th Cir.)...................................................................................11, 15, 16

*Romero v. Barr*,
  937 F.3d 282 (4th Cir. 2019) ................................................................11, 31

*State of Washington v. Trump*,
  No. 17-35105 (9th Cir. 2017) .....................................................................2

*Stevens v. Osuna*,
  877 F.3d 1293 (11th Cir. 2017) ...................................................................7

*Taylor v. McCament*,
  875 F.3d 849 (7th Cir. 2017) ....................................................................18

*The National Intimate Partner and Sexual Violence Survey (NISVS): 2010-2012 State Report*
(2017), https://www.cdc.gov/violenceprevention/pdf/NISVS-StateReportBook.pdf .............31

*United States v. Castleman*,
134 S. Ct. 1405 (2014) ................................................................................................2

## STATUTES

5 U.S.C. § 706(2) .........................................................................................................10

6 U.S.C. § 271(b) ......................................................................................................6, 20

8 U.S.C. § 1101(a)(15)(T)(i)(II) .....................................................................................26

8 U.S.C. § 1154(a)(1)(A)(v)(I) .......................................................................................26

8 U.S.C. § 1154(a)(1)(A)-(B) .........................................................................................18

8 U.S.C. § 1182 .............................................................................................................26

8 U.S.C. § 1182(a) ....................................................................................................25, 26

8 U.S.C. § 1229c(d) ......................................................................................................20

42 U.S.C .........................................................................................................17, 18, 20

1994 Violence Against Women Act, the Victims of Trafficking and Violence Protection Act......1

Administrative Closure Rule's Failure to Respond to Comments Identifying Contravention to
Statutory Law ..........................................................................................................16

Administrative Procedure Act..........................................................................................10

Battered Immigrant Women Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat.
1518, 1533-37 ...........................................................................................................18

Pub. L. 106–386 § 1502(a)(2)........................................................................................24

Pub L. No. 103-322, 108 Stat. 1902-55 .........................................................................16

Pub. L. No. 103-322, 108 Stat. 1902-55, § 40121 ..........................................................17

Pub. L. No. 106-386, 114 Stat. 1491 ..............................................................................18

Trafficking Victims Protection Act ...................................................................................4

Trafficking and Violence Protection Act...........................................................................19

Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386 (2000)..........................16

VAWA ........................................................................................................... *passim*

VAWA and the Trafficking Victims Protection Act .................................................4

Violence Against Women Act ................................................................................1

Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 812, 119 Stat. 2960, 3057 (2006) .........................................................20

Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 ..........20

**OTHER AUTHORITIES**

8 C.F.R. § 214.14(a)(12) (2020) ..........................................................................19

8 C.F.R. § 214.14(c)(1) .......................................................................................20

8 C.F.R. §§ 214.14(c)(1), 214.11(b), (d) ...............................................................7

8 C.F.R. § 239.2 .................................................................................................30

8 C.F.R. § 1003.29 .............................................................................................29

8 C.F.R. § 1239.2(c) ...........................................................................................30

145 Cong. Rec. H26 (daily ed. Oct. 21, 1999) (statement of Rep. Janice D. Schakowsky)............8

145 Cong. Rec. S444 (1999) ...............................................................................19

146 Cong. Rec. S10170 (2000) ...........................................................................19

72 Fed. Reg. 53,014 (Sept. 17, 2007) ...................................................................18

72 Fed. Reg. at 53,018 ........................................................................................18

85 Fed. Reg. 52,491 ...........................................................................................9

85 Fed. Reg. 75,925 (Nov. 27, 2020) ..................................................................29

85 Fed. Reg. 75,925 ...........................................................................................29

85 Fed. Reg. 75,940 ...........................................................................................29

85 Fed. Reg. 81,588 (December 16, 2020) ............................................................1

85 Fed. Reg. 81,590 ...........................................................................................7

85 Fed. Reg. at 81,642 ........................................................................................11

85 Fed. Reg. 81,642 ........................................................................................14, 15

85 Fed. Reg. 81,643 ............................................................................................................12

85 Fed. Reg. 84,160, 84,161 (Dec. 23, 2020) .................................................................12

Adiel Kaplan & Wilson Wong, *It's hard to flee from your domestic abuser during a coronavirus lockdown*, NBC News (May 17, 2020), https://www.nbcnews.com/health/health-care/it-s-hard-flee-your-domestic-abuser-during-coronavirus-lockdown-n1205641 ...........................13

Adrienne L. Fernandes-Alcantara & Lisa N. Sacco, Cong. Rsch Serv., IN11323 v.2, Domestic Violence in the Context of COVID-19, https://crsreports.congress.gov/product/pdf/IN/IN11323 .......................................................14

Andrea Hazen, *Intimate Partner Violence Among Female Caregivers of Children Reported for Child Maltreatment, Child Abuse and Neglect* (March 2004), https://doi.org/10.1016/j.chiabu.2003.09.016 .........................................................................28

ASISTA and AILA Letter to USCIS (May 29, 2019), https://www.aila.org/File/Related/19052943a.pdf; ...............................................................17

Centers for Disease Control and Prevention, *Sexual Violence, Stalking, and Intimate Partner Violence Widespread in the US* (2011), https://www.cdc.gov/media/releases/2011/p1214_sexual_violence.html. ...............................32

Christina Bain & Louise Shelley, *The Evolution of Human Trafficking During the COVID-19 Pandemic*, Council on Foreign Relations (Aug. 13, 2020), https://www.cfr.org/blog/evolution-human-trafficking-during-covid-19-pandemic ..............13

Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. F. 567, 568 (2019). .........................................................................................22, 31

Executive Order 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) ...........................................10, 21, 23

Executive Order 13563, 76 Fed. Reg. 3,821 (Jan. 18, 2011).............................................10

Dan Lieberman, *MS13 Members: Trump Makes the Gang Stronger*, CNN (July 28, 2017), https://www.cnn.com/2017/07/28/us/ms-13-gang-long-island-trump/index.html .................26

H.R. Rep. No. 103-395 (1993).........................................................................................18

https://beta.regulations.gov/comment/EOIR-2020-0004-0669........................................10

https://beta.regulations.gov/comment/EOIR-2020-0004-0952........................................31

https://beta.regulations.gov/comment/EOIR-2020-0004-1268........................................10

https://beta.regulations.gov/document/EOIR-2020-0004-0001/comment.............................14, 15

https://www.regulations.gov/document?D=EOIR-2020-0009-0275...........................................29

*Immigrant Communities and Crime Victims*, 85 The Police Chief 34 (Apr. 2018),
https://niwaplibrary.wcl.american.edu/wp-content/uploads/PoliceChief_April-
2018_Building-Trust-With-Immigrant-Victims.pdf ..................................................................6

James R. McHenry III, Policy Memorandum: Continuances (Jan. 8, 2021),
https://www.justice.gov/eoir/page/file/1351816/download .....................................................30

Jonathan Todres *et al., COVID-19 and Human Trafficking—the Amplified Impact on Vulnerable
Populations*, JAMA Network (Sept. 21, 2020),
https://jamanetwork.com/journals/jamapediatrics/fullarticle/2770536 ...................................14

Lindsey Bever, *Hispanics "Are Going Further into the Shadows" Amid Chilling Immigration
Debate, Police Say*, Wash. Post (May 12, 2017) ......................................................................27

Lomi Kriel, *ICE deported a key witness in investigation of sexual assault and harassment at El
Paso detention center*, Texas Tribune (Sept. 15, 2020),
https://www.texastribune.org/2020/09/15/ice-deport-witness-sexual-assault/ ........................27

Maegan Vazquez *et al., Trump administration pushes 'midnight regulations' after breaking
records for final-year rulemaking*, CNN (Dec. 6, 2020),
https://www.cnn.com/2020/12/06/politics/trump-midnight-regulations-record-
rulemaking/index.html ...........................................................................................................10

Meagan Flynn, *Houston's Chief Acevedo, Defiant and Introspective, Rails Against SB 4*,
Houston Press (Apr. 28, 2017), https://www.houstonpress.com/news/hpd-chief-acevedo-
lambasted-sb4-in-defiant-candid monologue-9394376 ...........................................................27

Megan L. Evans *et al., A Pandemic within a Pandemic—Intimate Partner Violence during
Covid-19*, New Eng. J. Med. (Dec. 10, 2020) .........................................................................13

Michelle J. Anderson, *A License to Abuse: The Impacts of Conditional Status on Female
Immigrants*, 102 Yale L.J. 1401, 21, 1427-28 (1993) .............................................................28

Monika Batra Kashyap, *Heartless Immigration Law: Rubbing Salt Into The Wounds of
Immigration Survivors of Domestic Violence*, 95 Tulane L. Rev. 51 (2020) ...................17, 26

Regulations.gov, https://www.regulations.gov/document?D=EOIR-2020-0004-0001 .................14

S. Rep. No. 103-138 (1993) .........................................................................................................18

USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/ .................20, 21

USCIS, Number of Form I-914, Application for T Nonimmigration Status By Fiscal Year,
Quarter, and Case Status,
https://www.uscis.gov/sites/default/files/document/reports/I914t_visastatistics_fy2020_qtr3.p
df ..........................................................................................................................................21

USCIS, Number of Form I-918, Petition for U Nonimmigration Status By Fiscal Year, Quarter, and Case Status, https://www.uscis.gov/sites/default/files/document/reports/I918u_visastatistics_fy2020_qtr3.pdf ................................................................................................................................. 20

USCIS Response Letter (July 5, 2019), https://www.aila.org/File/Related/19052943a.pdf ......... 17

USCIS, U Visa Demographic: Analysis of Data Through FY 2019, 5-6 (Mar. 2020), https://www.uscis.gov/sites/default/files/document/reports/U_Visa_Report_-_Demographics.pdf ............................................................................................................ 21, 22

USCIS, U Visa Demographics (Mar. 2020), https://www.uscis.gov/sites/default/files/document/reports/U_Visa_Report_-_Demographics.pdf ................................................................................................................ 18

USCIS. USCIS, U Visa Filing Trends: Analysis of Data Through 2019 (Apr. 2020), https://www.uscis.gov/sites/default/files/document/reports/Mini_U_Report-Filing_Trends_508.pdf ................................................................................................................. 20

USCIS, Victims of Human Trafficking: T Nonimmigrant Status, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-human-trafficking-t-nonimmigrant-status (last visited Jan. 10, 2021) ................................ 19

This action has been brought to declare unlawful and to prevent application and implementation of aspects of a final rule promulgated by the Department of Justice, Executive Office for Immigration Review. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (December 16, 2020) ("Administrative Closure Rule," or, at times "Final Rule"). The Administrative Closure Rule is arbitrary and capricious, not in accordance with several federal statutes (including the 1994 Violence Against Women Act, the Victims of Trafficking and Violence Protection Act, and their progeny), unsupported by the rulemaking record, and was promulgated without following procedures required by law. *Amici* have special expertise and interests directly related to the Administrative Closure Rule and bring their expertise before this Court.

## DISCLOSURE STATEMENT

*Amici* are nonprofit organizations and have no corporate parents. They are not publicly traded.

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are nonprofit organizations that serve and advocate on behalf of survivors of domestic violence, sexual assault, human trafficking, and other forms of gender-based violence. Based on their experience and expertise, *Amici* understand that noncitizen survivors of violence often face myriad barriers seeking justice and protection from abuse. *Amici* have extensive knowledge about the legal protections for noncitizen survivors provided by the Violence Against Women Act ("VAWA") of 1994 and its progeny, which Congress created to help address these barriers. These statutory protections—including the "U" nonimmigrant visa ("U Visa"), "T" nonimmigrant visa ("T Visa"), and VAWA self-petition—encourage survivors to seek justice

---

[1] *Amici* certify that this brief was authored entirely by counsel for *Amici* and not by counsel for any party, in whole or in part; no party or counsel for any party contributed money to fund preparing or submitting the brief; apart from *Amici*, its members, and its counsel, no other person contributed money to fund preparing or submitting the brief.

and gain independence and security.  For noncitizen survivors, meaningful access to these protections from removal or deportation is often the determining factor in whether they seek help, safety, and justice.  Survivors in removal proceedings rely on the immigration courts not to obstruct meaningful access to these critical protections that Congress purposefully and intentionally established, but for these courts to provide a safe forum for justice and exercise of rights provided under federal law.

**ASISTA Immigration Assistance** is a national organization dedicated to helping attorneys assist noncitizen survivors of violence with their immigration matters through comprehensive, cutting-edge technical assistance and resources.  ASISTA worked with Congress to create and expand routes to secure immigration status for survivors of domestic violence, sexual assault, and other crimes, which were incorporated in VAWA of 1994 and its progeny. ASISTA serves as liaison for the field with Department of Homeland Security ("DHS") personnel charged with implementing these laws, most notably Citizenship and Immigration Services ("USCIS"), Immigration and Customs Enforcement, and DHS's Office for Civil Rights and Civil Liberties.  ASISTA trains and provides technical support to local law enforcement officials, civil and criminal court judges, domestic violence and sexual assault advocates, and legal services, nonprofit, *pro bono* and private attorneys working with immigrant crime survivors.  ASISTA has previously filed amicus briefs with the United States Supreme Court and various federal courts of appeal.  *See, e.g., United States v. Castleman*, 134 S. Ct. 1405 (2014); *State of Washington v. Trump*, No. 17-35105 (9th Cir. 2017); *L.D.G. v. Holder*, 744 F.3d 1022 (7th Cir. 2014).

**Asian Pacific Institute on Gender-Based Violence (API-GBV)** is a national resource center on domestic violence, sexual violence, trafficking, and other forms of gender-based

violence in Asian and Pacific Islander and immigrant communities, and it serves a national network of advocates, community-based service programs, federal agencies, national and state organizations, legal, health, and mental health professionals, researchers, and policy advocates from social justice organizations.  API-GBV analyzes critical issues, promotes culturally relevant evidence-informed intervention and prevention, provides consultation, technical assistance and training, develops resources, conducts and disseminates research, and impacts systems of change through administrative advocacy and policy analysis.

**Casa de Esperanza** provides emergency shelter and support services for women and children experiencing domestic violence, with a primary focus on mobilizing Latinas and Latino communities to end domestic violence.  Over the past three decades, Casa de Esperanza has expanded to offer critical and comprehensive services and support, ranging from family advocacy and shelter services to leadership development and community engagement initiatives. In 2009, Casa de Esperanza launched the National Latin@ Network for Healthy Families and Communities (NLN), which is a national resource center that provides training and technical assistance, research, and national policy advocacy focused on addressing and preventing domestic violence and sexual assault.  Casa de Esperanza also serves on the Steering Committee of the National Task Force to End Sexual and Domestic Violence.  Casa de Esperanza is committed to enhancing access to safety, well-being, and justice for all survivors of gender-based violence, including those from immigrant communities.

**Freedom Network USA (FNUSA)** is the largest alliance of human trafficking advocates in the United States, providing trafficking survivors in over 40 cities comprehensive legal and social services, including representation in immigration cases.  In total, FNUSA members serve over 2,000 trafficking survivors per year, including adults and minors, survivors of both sex and

labor trafficking, over 65% of whom are foreign national survivors. FNUSA provides training and advocacy to increase understanding of the wide array of human trafficking cases in the United States, was involved in the passage of the Trafficking Victims Protection Act, and has been a key advocate in each subsequent reauthorization of this Act. FNUSA has an interest in ensuring that survivors are fully protected and have access to the full array of immigration relief for which they are qualified.

**Futures Without Violence (FUTURES)**, is a national nonprofit organization that has worked for over thirty years to prevent and end violence against women and children around the world. FUTURES mobilizes concerned individuals; children's, women's, and civil rights groups; allied professionals; and other social justice organizations to end violence through public education and prevention campaigns, public policy reform, training and technical assistance, and programming designed to support better outcomes for women and children experiencing or exposed to violence. FUTURES joins with the other *Amici* because it has a long-standing commitment to supporting the rights and interests of women and children who are victims of violence regardless of their immigration, citizenship, or residency status. FUTURES co-founded and co-chaired the National Network to End Violence Against Immigrant Women working to help service providers, survivors, law enforcement, and judges understand how best to work collaboratively to bring justice and safety to immigrant victims of violence. Using this knowledge, FUTURES helped draft legislative recommendations that were ultimately included in VAWA and the Trafficking Victims Protection Act to assist immigrant victims of violence.

The **National Alliance to End Sexual Violence** is the voice in Washington for the 56 state and territorial sexual assault coalitions and over 1500 rape crisis centers working in their communities to address and end sexual violence. The programs in the network see the

widespread and devastating impacts of sexual violence on survivors every day—especially those who are more vulnerable like immigrant survivors.  The National Alliance to End Sexual Violence has an interest in making it less difficult for immigrant survivors to seek safety and justice.

The **National Coalition Against Domestic Violence (NCADV)** provides a voice to victims and survivors of domestic violence.  It strives to foster a society in which there is zero tolerance for domestic violence by influencing public policy, increasing public awareness of the impact of domestic violence, and providing programs and education that drive that change.

The **National Domestic Violence Hotline (The Hotline)**, first established in 1996 as a component of VAWA, provides lifesaving tools and immediate support to enable victims to find safety and live lives free of abuse.  Callers to The Hotline can expect highly trained, experienced advocates to offer compassionate support, crisis intervention information, educational services and referral services in more than 200 languages.  The Hotline offers free, confidential, and 24/7 support to survivors year round through text, chat, and phone services.  A substantial number of victims NDVH serves are immigrants or those who request help related to immigration-related issues.

The **National Network to End Domestic Violence (NNEDV)** is a network of the 56 state and territorial domestic violence and dual domestic violence and sexual assault coalitions and their over 2,000 member programs.  NNEDV serves as the national voice for millions of women, children, and men victimized by domestic violence.  NNEDV works with federal, state, and local policy makers and domestic violence advocates to secure and implement increased protections in VAWA and related federal legislation.  NNEDV supports legislation that protects immigrant domestic and sexual violence survivors and provides pathways for survivors to obtain

immigration status.  NNEDV is deeply concerned with survivor safety, including the vital role

that access to resources plays in their ability to escape and rebuild their lives after abuse.

**Her Justice** has been dedicated to making quality legal representation accessible to low-

income women in New York City in family, matrimonial, and immigration matters since 1993.

Her Justice recruits and mentors volunteer attorneys from New York City's law firms to stand

side-by-side with women who cannot afford to pay for a lawyer, giving them a real chance to

obtain legal protections that transform their lives.  Her Justice's immigration practice focuses on

representing immigrant survivors of gender-based violence pursuing relief under VAWA, many

of whom are in removal proceedings.  Her Justice has appeared before courts of appeal,

including the United States Supreme Court, in numerous cases as amicus.

*Amici* have a direct interest in this case because the challenged rule will have an

immediate and irreparable impact on noncitizen survivors of violence.

## SUMMARY OF POSITION OF *AMICI CURIAE*

Immigrant populations are particularly vulnerable to crimes such as domestic violence,

sexual assault, and human trafficking, with a primary reason being that they fear that they will be

deported for contacting law enforcement or other helping systems, and are thus unlikely to report

the crime.  *See Stacey Ivie et al., Overcoming Fear and Building Trust with Immigrant*

*Communities and Crime Victims*, 85 The Police Chief 34 (Apr. 2018),

https://niwaplibrary.wcl.american.edu/wp-content/uploads/PoliceChief_April-2018_Building-

Trust-With-Immigrant-Victims.pdf.  Threatening to get their victims deported if they seek help is

one of an abuser's most powerful weapons against victims.  *Id.*  Recognizing this reality,

Congress created pathways to legal status for victims to neutralize this weapon.  These pathways

include, but are not limited to, the U Visa, T Visa, and VAWA self-petitions.  *Id.*  USCIS, an

agency within DHS, has the sole jurisdiction to process and adjudicate these petitions.  *See* 6

U.S.C. § 271(b); 8 C.F.R. §§ 214.14(c)(1), 214.11(b), (d).  Due to massive, historically large backlogs, a pending application for relief before USCIS now often takes years to process.

The United States Department of Justice's ("DOJ") Executive Office for Immigration Review ("EOIR") has authority over removal or deportation proceedings, presided over by Immigration Judges ("IJs") and reviewed on appeal by the Board of Immigration Appeals ("BIA").  *See generally Stevens v. Osuna*, 877 F.3d 1293, 1304 (11th Cir. 2017) (explaining role of IJs and BIA).  Recognizing that different immigration-related proceedings operate across agencies and departments, IJs and BIA rely on an important docket management tool—administrative closure—to pause immigration court proceedings like removal or deportation proceedings while other agency proceedings simultaneously proceed.  This enables IJs, BIA, and the parties involved to avoid premature immigration proceedings and conserve resources.  It also avoids irreparable injury to victims of domestic violence, sexual assault, trafficking, and similar crimes.  As just one example, administrative closure enables IJs and BIA to pause a removal proceeding so that a backlogged USCIS may process a survivor's petition for relief under a visa program.  If the survivor's petition is approved, removal proceedings become moot.  If removal proceedings conclude before the survivor's petition is approved, the survivor will be deported, directly undermining the goals of VAWA and its progeny and causing irreparable and, in some cases, life-threatening harm.

The Administrative Closure Rule challenged in this action expressly forecloses authority for IJs or BIA to utilize administrative closure "unless a regulation promulgated by the Department of Justice or a previous judicially approved settlement expressly authorizes such an action."  85 Fed. Reg. 81,590.  Without administrative closure available as a docket management tool, unnecessary removal proceedings may forge ahead, leaving survivors at risk of unnecessary

deportation before USCIS is ever able to open their applications.  Through this procedural

stratagem, the new Administrative Closure Rule directly contravenes Congress's intention to

provide meaningful pathways to legal status for survivors, making survivors once again "choose

between a black eye and broken arm or a one-way ticket out of the country."  145 Cong. Rec.

H26, 577 (daily ed. Oct. 21, 1999) (statement of Rep. Janice D. Schakowsky).  While posing as a

mere procedural adjustment, the Administrative Closure Rule in fact substantively deprives

noncitizen survivors of avenues to relief from removal that were purposefully put in place by

Congress. By removing an IJ or BIA's general administrative closure tool, the fastest track—

EOIR immigration proceedings—will control the fate of survivors without due regard to the

Congressionally mandated pathways to legal status for noncitizen survivors of violence and

human trafficking.  Furthermore, by eliminating the administrative closure tool from

immigration proceedings, the Final Rule obstructs the efforts of law enforcement to root out

violent crimes, further thwarting Congress's effort to limit abusers' leverage over their

noncitizen victims and to help law enforcement prosecute the offenders.  By prohibiting IJs and

BIA from managing their dockets in a way that allows coordination among inter-agency

immigration proceedings, the Administrative Closure Rule sends a message to both crime

victims and law enforcement that perpetrators may once again use immigration courts as

weapons against their victims.  The Administrative Closure Rule is unlawful and should be

struck down.

## ARGUMENT

*Amici* respectfully request this Court grant Plaintiffs' Motion to Stay Agency Action

under 5 U.S.C. § 705 and/or for a Preliminary Injunction pending the Court's final adjudication

of plaintiffs' claims.[2]  As demonstrated below, EOIR engaged in a truncated rulemaking process to limit public comment.  EOIR compounded this error by ignoring comments made in response to its Notice of Proposed Rulemaking and by adopting a rule that is contrary to the purpose and intent of several federal statutes.  The Administrative Closure Rule is arbitrary, capricious and otherwise violates federal law.  Noncitizen survivors, law enforcement organization, and communities will suffer irreparable harm under the Administrative Closure Rule.

## I.    THE TRUNCATED RULEMAKING PROCESS ALLOWED INADEQUATE TIME FOR COMMENTS THAT WERE UNLAWFULLY IGNORED IN THE FINAL RULE

EOIR issued the NPRM on August 26, 2020, and provided a mere 30 days—in the middle of a pandemic—for the public to comment on a far-reaching rule of general applicability. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (proposed Aug. 26, 2020) ("NPRM").  The shortened comment period is grossly inadequate under these pandemic circumstances.  Beyond the pandemic, the topics in the NPRM impact human trafficking, domestic violence, sexual assault, and unlawful immigration status—facets of our society that purposefully operate outside the purview of the public—making communication between survivors and advocates challenging in the best of times.  *Amici* and similarly situated organizations that submitted comments in response to the NPRM provide a necessary voice to survivors forced to live in the shadows, and the NPRM failed to offer a meaningful comment period for those voices to be heard.

---

[2] The Final Rule changed multiple aspects of the immigration regulations, but this brief focuses solely on the Final Rule's rejection of IJs and BIA administrative closure authority.

**A.     Truncating the Period for Comment in Half—During a Pandemic—Is Unreasonable, as it Deprived *Amici* a Meaningful Opportunity to Provide Comments**

The customary period for commenting on proposed rules is 60 days, but without providing any reason, EOIR provided merely 30 days for public comment on a complex twelve-component proposed rule.[3]  In light of the compound nature and magnitude of the topics addressed in the NPRM and the impact of the pandemic, a 30-day comment period is insufficient to meet the requirements of the Administrative Procedure Act, or "APA," 5 U.S.C. § 706(2).

The NPRM provided no explanation, let alone a justification, as to why the comment period was only half of what is required under Executive Order 12866, 58 Fed. Reg. 51,735 (Oct. 4, 1993), and Executive Order 13563, 76 Fed. Reg. 3,821, 3,822 (Jan. 18, 2011), although the imminent end to the outgoing Administration likely provides the real reason.  The Trump Administration has "finalized more federal rules in its last year than any other recent President," "limiting the time for public comment" as a transparent tool simply to disregard what is supposed to take place in the rulemaking process.  Maegan Vazquez *et al., Trump administration pushes 'midnight regulations' after breaking records for final-year rulemaking*, CNN (Dec. 6, 2020), https://www.cnn.com/2020/12/06/politics/trump-midnight-regulations-record-rulemaking/index.html.  The only apparent reasons why a truncated comment period was employed were because (a) the Trump Administration was coming to a close, and (b) the Trump Administration had no intention of altering the proposed rule in light of comments received in response.  In other words, having determined in advance to adopt the rule regardless of the nature and scope of comments, EOIR compounded its violation of the APA by truncating the comment

---

[3] Some of *Amici* submitted comments:  https://beta.regulations.gov/comment/EOIR-2020-0004-1268 (ASISTA) and https://beta.regulations.gov/comment/EOIR-2020-0004-0669 (API-GBV).

period.  Both reasons are unlawful, and this tactic alone renders the rule unlawful, in violation of the APA.

Even absent a pandemic, a 30-day comment period is unreasonable for the Administrative Closure Rule.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-07721, 2020 WL 6802474, at \*19 (N.D. Cal. Nov. 19, 2020), appeal pending at No. 20-17490 (9th Cir.) (concluding it was "troubled" by a 30-day comment period and granting motion for temporary restraining order).  This NPRM's 30-day comment period is even more troubling.

First, immigration regulations have faced immense change this year in light of the tsunami of regulatory changes proposed, and advocates of noncitizen survivors face additional obstacles in providing a voice to the affected population.  *See* ASISTA Comment, at 2 (noting organizations had to balance pandemic reality with "the demands of responding to constant and complex changes to immigration policy"); API-GBV Comment, at 2 (noting organizations are responding to numerous DHS regulatory changes, "which will have profound impacts on how they work with immigrant survivors" in addition to proposals "by the Department of Housing and Urban Development about survivors' access to shelter").  Such proposed sweeping agency changes to policy and practice must be subject to meaningful comment.  And, the comments must be taken into account in the final rule and the rule modified or changed to reflect the rulemaking record.

Second, the NPRM was not, as EOIR described it, "a small, discrete set of procedures." 85 Fed. Reg. at 81,642.  The administrative closure component of the Final Rule alone is an attempt to codify an Attorney General decision that set off a federal circuit-split.  *See Matter of Castro-Tum*, 27 I & N Dec. 271 (A.G. 2018).  *Compare Hernandez-Serrano v. Barr*, 981 F.3d 459 (6th Cir. 2020), *with Meza Morales v. Barr*, 973 F.3d 656 (7th Cir. 2020), and *Romero v.*

*Barr*, 937 F.3d 282 (4th Cir. 2019).  Of course, administrative closure is only one of twelve

components to the Final Rule sharing the same 30-day comment period.  These changes are

substantive, not merely procedural, and deprive survivors of pathways to removal relief provided

by Congress.  EOIR knows full well—or at least should have, had it read *Amici's* comments—

that administrative closure is key to ensuring the multi-agency immigration system can function.

Lastly, the elephant in the room of 2020, the pandemic, created an additional reason why

a 30-day comment period is unlawful under the circumstances.  EOIR's attempts to downplay

the impact of the pandemic by claiming commenters were able to "adopt[] telework flexibilities

to the greatest extent possible" and that commenters face childcare "issues" regardless of the

comment period, 85 Fed. Reg. 81,643, ignore the real-world impact that the deadly virus has on

public participation in all forms of direct democracy.  As a prime example of DOJ and EOIR

speaking out of both sides of their mouths to get midnight regulations to the finish line, DOJ

described the pandemic in another finalized rule published on December 23, 2020, as "causing

tremendous human and economic hardship across the United States. . . . The ongoing public

health crisis will continue to weigh on economic activity, employment, and inflation in the near

term, and poses considerable risks to the economic outlook over the medium term."  Security

Bars and Processing, 85 Fed. Reg. 84,160, 84,161 (Dec. 23, 2020).  DOJ and EOIR cannot have

it both ways.

Noncitizen survivors already face myriad barriers accessing services and assistance, and

the COVID-19 pandemic exacerbated these barriers.  Abusers and perpetrators of crime often

threaten noncitizen survivors that reaching out for help will result in separation from their

children or in deportation.  In this crisis, these threats take on new force as survivors face

increased uncertainty and confusion.  Meanwhile, risks of human trafficking have increased as

economic pressures cause individuals to lose jobs, homes, or health insurance. Christina Bain & Louise Shelley, *The Evolution of Human Trafficking During the COVID-19 Pandemic*, Council on Foreign Relations (Aug. 13, 2020), https://www.cfr.org/blog/evolution-human-trafficking-during-covid-19-pandemic (noting traffickers exploit vulnerabilities created by pandemic). Sexual exploitation is also increasing as a result of the pandemic, demonstrated by increased reports that landlords are extorting their tenants for sex in lieu of rent payments. *Id*. ("[H]uman trafficking has become a major lucrative crime in a pandemic-rocked world with supply chains cut off for other forms of illicit activities."). During the pandemic, victims are forced to lock down with their abusers or perpetrators because of stay-at-home orders, preventing access to resources and help. Adiel Kaplan & Wilson Wong, *It's hard to flee from your domestic abuser during a coronavirus lockdown*, NBC News (May 17, 2020), https://www.nbcnews.com/health/health-care/it-s-hard-flee-your-domestic-abuser-during-coronavirus-lockdown-n1205641. Victims of intimate partner violence often receive help not because they self-report, but because community services intervene. Without community interactions, such as a doctor seeing signs of physical abuse during a regular medical visit, advocates are struggling to connect with victims during the pandemic. Megan L. Evans *et al.*, *A Pandemic within a Pandemic—Intimate Partner Violence during Covid-19*, New Eng. J. Med. (Dec. 10, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2024046.

       The pandemic itself created enormous obstacles for any organization or individual, but especially for those that work directly with survivors of domestic violence, violent crimes, and human trafficking. Resource organizations are navigating a new world of service provisions with too few resources. *See* ASISTA Comment, at 2. The pandemic has caused an increased rate of domestic violence and augmented the complexity and challenges of serving survivors.

*See* Adrienne L. Fernandes-Alcantara & Lisa N. Sacco, Cong. Rsch Serv., IN11323 v.2, Domestic Violence in the Context of COVID-19, https://crsreports.congress.gov/product/pdf/IN/IN11323.  Eighty-nine percent of survivor-serving programs needed emergency stimulus funding to support survivors at the same time that forty percent reported increased demands on their services.  *Id.*; *see also* Jonathan Todres *et al.*, *COVID-19 and Human Trafficking—the Amplified Impact on Vulnerable Populations*, JAMA Network (Sept. 21, 2020), https://jamanetwork.com/journals/jamapediatrics/fullarticle/2770536. As API-GBV specifically noted in its comments, it was unable to communicate effectively with domestic violence shelters and service providers for purposes of informing its comments to the NPRM because of the pandemic.  See API-GBV Comment, at 2.  Commenters deserved more than a 30-day comment period.

    EOIR's post hoc justifications for the comment period only demonstrate that the 30-day comment period was unreasonable.  EOIR's reliance on the *quantity* of comments in response to the NPRM is an inappropriate metric, 85 Fed. Reg. 81,642, since many of the comments here expressly complained that the commenters were unable to respond adequately to the NPRM due to time restraints but opted to submit incomplete comments rather than no comment at all.  *Amici* reviewed every comment made publicly available.  *See Administrative Closure Rule*, Docket No. EOIR-2020-0004, https://beta.regulations.gov/document/EOIR-2020-0004-0001/comment.[4] Attached as Exhibit A is a spreadsheet identifying each set of comments that specifically

---

[4] *Amici* reviewed 1,280 publicly available comments.  Although the Final Rule indicates that there were 1,287 comments to the NPRM, the notice posted on the website advises that "agencies may choose to redact, or withhold, certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign.  This can result in discrepancies between this count and those displayed when conducting searches on the Public Submission document type."  *See* Regulations.gov, https://www.regulations.gov/document?D=EOIR-2020-0004-0001.  *Amici* also note that this website is currently undergoing a new beta rollout, and thus the website has two different appearances depending on the day of the week that the user accesses the website, but *Amici* assumes the substantive information is the same regardless of which format is displayed.

discussed administrative closure and identifying whether the comments also objected to the truncated comment period. Ex. A. First, only 235 comments of the 1,280 available specifically discussed administrative closure. *Id.* (noting comments in rows 3 through 236 opposed the specific proposal and row 237 supported the specific proposal; chart does not include comments that only discussed other aspects of the NPRM or made generalized comments about the rule as a whole). Two-hundred thirty-five is the appropriate number to consider when determining whether the quantity of comments on administrative closure provides any indication of commenters' ability to respond. This is less than half the comments received in *Pangea*. *See* 2020 WL 6802474, at *19-21 (noting 581 comments were received in the "troubling" 30-day window). Furthermore, of the 235 responses that specifically discussed administrative closure, 122, over half, made objections to the length of the comment period. *Id.* (noting comments in rows 3 through 124 both opposed administrative closure and objected to length of comment period).

Next, EOIR erroneously claims "commenters did not suggest or indicate what additional issues the comment period precluded them from addressing," 85 Fed. Reg. 81,642, but *Amici* did express what adequate time could have added to their comments. *See, e.g.*, API-GBV Comment, at 2 (noting inability to provide sufficient details in comments due to insufficient time to respond). Furthermore, comments of *Amici* and similar organizations in response to the NPRM must be considered in the context of the organization's mission and its role. ASISTA's founders, for example, worked with Congress in the passage of the VAWA. It serves as a liaison for the field with DHS personnel charged with implementing federal law dealing explicitly with survivor-based forms of immigration relief. ASISTA's comments noted explicitly that time constraints imposed by the truncated comment period allowed ASISTA to include "only a

fraction of the substantive issues we would have liked to address." ASISTA Comments, at 2.

The truncated comment period thus precluded valuable input from trusted organizations like

ASISTA. The circumstances here are extraordinary, yet EOIR deprived the public of even the

ordinary 60-day comment period. "Troubling," indeed. *Pangea Legal Servs*., 2020 WL

6802474, at *19. The appropriate remedy is to halt implementation of the Administrative

Closure Rule and re-solicit comments using a normalized response period.

> **B.    The Administrative Closure Rule's Failure to Respond to Comments Identifying Contravention to Statutory Law is Arbitrary and Capricious and Otherwise Not in Accordance With Law**

EOIR arbitrarily and capriciously failed to take into account comments in response to the

NPRM, including comments from *Amici*. In addition to ignoring the rulemaking record, in

violation of the APA, the Final Rule—through its prohibition of IJ and BIA's inherent

administrative closure authority—contravenes Congress's framework providing accessible

pathways to legal status for noncitizen survivors. The Administrative Closure Rule is not merely

a procedural device; by and through operation of this new generalized rule, substantive

protections in various federal statutes, including VAWA, will be impaired or impeded.

As *Amici* explained in their comments, "Congress sought to limit the ability of abusers to

leverage immigration laws and the fear of deportation against their victims" by passing

legislation to end a perpetrator's "full and complete control" over their victim. *See* API-GBV

Comment, at 4. These statutes include VAWA of 1994, Pub L. No. 103-322, 108 Stat. 1902-55,

and the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386,

(2000). *See* API-GBV, Comment at 3-4. The Administrative Closure Rule has no answer to this

critical point, i.e., that EOIR's proposed administrative closure changes contravene Congress's

"goals of these vital federal protections" by disrupting immigration courts' ability to remain in-

step with USCIS proceedings. *Id*. The Administrative Closure Rule does not even engage in a

discussion of these statutes' important role in our immigration or larger legal system. As the commenters demonstrated, the administrative closure changes will incapacitate these statutory protections, placing IJs and BIA in the role of facilitating abusers' and traffickers' ability to exploit the immigration system and render communities unsafe. EOIR is also not the department in charge of processing these pathways for legal status, and it is therefore critical that it give due regard to the experts in the field. DHS and USCIS rely on *Amici*, like ASISTA, as liaisons between survivors and the immigration system. As just one example, in 2019, ASISTA and a partner organization worked directly with USCIS to alter USCIS's roll out of new U Visa forms in order to better serve law enforcement and victims of crime. *See* ASISTA and AILA Letter to USCIS (May 29, 2019), https://www.aila.org/File/Related/19052943a.pdf; USCIS Response Letter (July 5, 2019), https://www.aila.org/File/Related/19052943a.pdf. The relationship between agencies executing the immigration laws and organizations speaking for survivors is critical to effectuating Congress's intent to combat the nexus between violent crimes and immigrant populations. EOIR's disregard of *Amici's* sounding the alarm demonstrates EOIR's neglect of the rulemaking process and the resulting Administrative Closure Rule's substantive contravention of these federal statutes.

1. **Congress Passed Legislation to Provide Noncitizen Survivors with Pathways to Legal Status and Gave USCIS Exclusive Jurisdiction to Adjudicate Such Applications**

Congress has made great advances over decades to deliver meaningful protections and pathways to ensure victims' ability to access safety and justice. *See* Monika Batra Kashyap, *Heartless Immigration Law: Rubbing Salt Into The Wounds of Immigration Survivors of Domestic Violence*, 95 Tulane L. Rev. 51, 52 (2020). In 1994, Congress passed its first piece of federal legislation specifically designed to address domestic violence, VAWA of 1994, Pub. L. No. 103-322, 108 Stat. 1902-55, § 40121 (codified as amended throughout sections of 28 and 42

U.S.C.).  *See* S. Rep. No. 103-138, at 41–42 (1993).  The legislative history demonstrates Congress's acknowledgement of immigrant women's unique vulnerabilities to domestic violence: "Many immigrant women live trapped and isolated in violent homes, afraid to turn to anyone for help.  They fear both continued abuse if they stay with their batterers and deportation if they attempt to leave."  H.R. Rep. No. 103-395, at 26-27 (1993).  Congress specifically intended to prevent abusers from using the immigration system "as a means to control or abuse." *Id*. at 37.  To disrupt a survivor's binary choice between violence and deportation, VAWA included the "VAWA self-petition," which, if approved, provides the survivor with a green card (legal permanent residence).  8 U.S.C. § 1154(a)(1)(A)-(B).

Six years later, Congress again recognized the need to provide meaningful pathways to legal status for survivors in the Battered Immigrant Women Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1518, 1533-37, during its reauthorization of VAWA, Pub. L. No. 106-386, 114 Stat. 1491 (codified as amended in scattered sections of 8 and 42 U.S.C.).  *See* New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53,014 (Sept. 17, 2007).  To achieve this goal, Congress created the U Visa "for any alien who is the victim of a qualifying crime in the United States and who assists law enforcement in the investigation or prosecution of that crime."  *Taylor v. McCament*, 875 F.3d 849, 851 (7th Cir. 2017).  "Congress wanted to encourage aliens who are victims of criminal activity to report the criminal activity to law enforcement and fully participate in the investigation and prosecution of the perpetrators of such criminal activity."  72 Fed. Reg. at 53,018 (Supplementary Information) (citing 114 Stat. § 1513(a)(1)(B)); USCIS, U Visa Demographics (Mar. 2020), https://www.uscis.gov/sites/default/files/document/reports/U_Visa_Report_-_Demographics.pdf (U Visa provides law enforcement with a tool to investigate and prosecute crimes by providing

victims who report them protection).  To be eligible for a U Visa, the applicant must demonstrate

her cooperation with law enforcement in the investigation or prosecution of her abuser.  *See* 8

C.F.R. § 214.14(a)(12) (2020).

> This legislation proposes to assist these crime victims in three
> fundamental ways: Providing a means for immediate protections from
> their abusers, such as through access to shelters; easier access to the
> courts and to the legal assistance necessary to keep their abusers away
> from them: and removing the "catch-22s" that sometimes literally
> compel women to stay with their abusers—such as … immigrant women
> who are sometimes faced with a similar insidious "choice".… This bill
> fixes aspects of this problem that leave an abused woman with such a
> horrible, unfair and immoral choice.

145 Cong. Rec. S444 (1999) (Sen. Joseph R. Biden, Jr.).

The T Visa created under the Victims of Trafficking and Violence Protection Act shares a

similar story as the U Visa, providing law enforcement with a tool to investigate and prosecute

human trafficking by providing victims with protection.  See USCIS, Victims of Human

Trafficking: T Nonimmigrant Status, https://www.uscis.gov/humanitarian/victims-of-human-

trafficking-and-other-crimes/victims-of-human-trafficking-t-nonimmigrant-status (last visited

Jan. 10, 2021).

> One of the most important of these provisions expands assistance and
> protection to victims of severe forms of trafficking, ensuring that they
> receive appropriate shelter and care, and are able to remain in the United
> States to assist in the prosecution of traffickers. Relief from deportation
> is also critical for victims who could face retribution or other hardship if
> removed from the United States.

146 Cong. Rec. S10170 (2000) (Sen. Joseph Kennedy III).

"An alien is eligible for [a T Visa] if the alien demonstrates that he or she is or has been a

victim of a severe form of trafficking in persons, is physically present in the United States or at a

port-of-entry thereto, has complied with any reasonable request for assistance in an investigation

or prosecution of an act involving trafficking of persons, and would suffer extreme hardship

involving unusual and severe harm upon removal." *Nicholas L.L. v. Barr*, No. 19-cv-2543, 2019

WL 4929795, at *2 (D. Minn. Oct. 7, 2019) (quotation marks omitted) (quoting 8 C.F.R. §

214.11(b)).

Congress maintained its support for survivor pathways by reauthorizing VAWA in 2005

and 2013. *See* Violence Against Women and Department of Justice Reauthorization Act of

2005, Pub. L. No. 109-162, § 812, 119 Stat. 2960, 3057 (2006) (codified as amended at 8 U.S.C.

§ 1229c(d)); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127

Stat. 54 (codified in scattered sections of 42 U.S.C.).

USCIS has exclusive jurisdiction for processing petitions under these programs. *See* 6

U.S.C. § 271(b); 8 C.F.R. § 214.14(c)(1) (U Visa); *id.* § 214.11(b), (d) (T Visa). Through no

fault of survivors and wholly outside survivors' control, USCIS suffers from backlogs that

already delay and undermine the effectiveness of these critical pathways. At the end of 2019,

nearly 152,000 principal U-Visa petitions and nearly 104,000 family members' U-Visa petitions

were pending adjudication before USCIS. USCIS, U Visa Filing Trends: Analysis of Data

Through 2019 (Apr. 2020),

https://www.uscis.gov/sites/default/files/document/reports/Mini_U_Report-

Filing_Trends_508.pdf. As a result, USCIS reports that current processing time to simply

"receive a final decision" is "currently 5-10 years." *Id.* "If filing trends continue, the pending

queue and associated processing times will continue to grow significantly." *Id.* Indeed, 2020

shows even higher numbers of pending petitions. USCIS, Number of Form I-918, Petition for U

Nonimmigration Status By Fiscal Year, Quarter, and Case Status,

https://www.uscis.gov/sites/default/files/document/reports/I918u_visastatistics_fy2020_qtr3.pdf.

Even to be placed on the U Visa waitlist will take on average 58 months. USCIS, Check Case

Processing Times, https://egov.uscis.gov/processing-times/ (Vermont service center).  Pending T

visas also increased from 1,169 applications in 2013 to 4,218 applications in 2019.  USCIS,

Number of Form I-914, Application for T Nonimmigration Status By Fiscal Year, Quarter, and

Case Status,

https://www.uscis.gov/sites/default/files/document/reports/I914t_visastatistics_fy2020_qtr3.pdf.

As of January 2021, USCIS estimates that the processing time for T Nonimmigrant Status is 19

to 29 months.  USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/

(Vermont service center).  VAWA petitions (I-360) have also increased from 7,532 applications

in 2013 to 24,458 applications in 2019.  As of this month, January 2021, USCIS estimates that

the processing time for a VAWA self-petition is between eighteen and twenty-three months.

USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/.

> The Administrative Closure Rule obstructs Congressional intent by designing EOIR
> proceedings to act out-of-step with USCIS proceedings, despite its obligation to ensure its
> regulations do not contravene another agency's obligations.  Executive Order 12866, 58 Fed
> Reg. 51,735 (Oct. 4, 1993).

### 2. Immigration Courts Must Be Able to Administratively Close Appropriate Cases to Allow USCIS Adequate Time to Process Applications

Nearly 79 percent of principal petitioners seeking a U Visa have no lawful status in the

United States, a staggeringly high number of individuals who could face deportation or removal

proceedings at any time while their U Visa petitions are pending.  USCIS, U Visa Demographic:

Analysis of Data Through FY 2019, 5-6 (Mar. 2020),

https://www.uscis.gov/sites/default/files/document/reports/U_Visa_Report_-_Demographics.pdf.

In fact, in 2018, 15 percent of petitioners were in U Visa and immigration proceedings

simultaneously, and 33 percent of U Visa petitioners reported that they were previously in

removal or deportation proceedings. *Id*. at 6.  IJ and BIA's administrative closure authority enabled this bifurcated system to function because IJs and BIA could administratively close immigration proceedings in appropriate circumstances while USCIS processed such applications, avoiding counterproductive and potentially irreparable deportations or removals.

As the BIA recognized, administrative closure merely pauses the proceedings without resolution "to await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time." *Matter of Avetisyan*, 25 I & N Dec. 688, 692 (BIA 2012).  By providing IJs with a method to pause proceedings to allow those other forms of relief to play out, IJs are also able to prioritize other cases that are ready for disposition.  Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. F. 567, 568 (2019).[5]

Consider two real-life examples.  F. and her 8-year-old daughter were in the midst of asylum proceedings when F. walked in on her boyfriend touching her daughter.  F.'s asylum proceedings were administratively closed, sparing F., her counsel, and the Government from exerting resources on the upcoming asylum hearing while F. and her counsel pursued a U Visa. On the other hand, A. entered the United States, fleeing gang violence in her country of origin. While in the United States, she was attacked by her partner, and she contacted the police. Despite her U-Visa petition, she was unable to secure administrative closure of her immigration case, so the IJ adjudicated her case, denying her asylum-based relief even though her two

---

[5] Administrative closures cannot be invoked at whim by IJs. Rather, an IJ must apply a six-factor test focused on the "efficient management of the resources of the Immigration Courts and the Board." *Avetisyan*, 25 I. & N. Dec. at 694.  Administrative closures are not utilized where the respondent is unlikely to succeed on such a petition or application for relief, so it is not a tool that can be invoked merely to stall removal proceedings. *Avetisyan*, 25 I. & N. Dec. at 696 (incorporating factor of "likelihood the respondent will succeed on any petition, application, or other action he or she is pursuing outside of removal proceedings" into test for administrative closure); *see, e.g.*, *In re Martha Leticia Hernandez-Ascencio*, 2018 WL 2761436, at *1 (BIA Mar. 27, 2018) (IJ properly denied administrative closure where relief for U visa appeared unlikely).

children were granted asylum.  A. appealed her case to BIA, and her appeal was dismissed.  A. then appealed to the United States Court of Appeals for the Sixth Circuit, where the case remains pending.  All the while, A. awaits adjudication by USCIS on her U Visa, and her two asylee children risk being separated from their mother, as they would jeopardize their own asylee status if they were to return their country-of-origin with her in the event of her deportation.  The Administrative Closure Rule will exacerbate cases like A.'s and impose a rule of general applicability, to thousands of fact-specific cases.

In order to function properly, "each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations and those of other Federal agencies."  Executive Order 12866, 58 Fed Reg. 51,735 (Oct. 4, 1993).  As some *Amici* pointed out in their comments, *see, e.g.*, API-GBV Comment, at 4–5 and ASISTA Comment, at 3–4, the Administrative Closure Rule is inconsistent and incompatible with the inter-agency, inter-department regulatory scheme designed to provide meaningful relief from deportation for survivors as well as support law enforcement efforts to investigate and prosecute criminal activity:  "Survivors of sexual and domestic violence who are self-petitioning pursuant to VAWA or seeking U Visas [or] trafficking victims pursuing T Visas … will face removal before USCIS adjudicates their applications for relief, which can take years while USCIS works its way through a massive, historic backlog."  API-GBV Comment, at 5.  As applied to noncitizen survivors, the use of administrative closure is essential to pausing proceedings when a removal proceeding could be affected by a decision on a visa application by USCIS.  ASISTA Comment, at 3.

Thus, the final Administrative Closure Rule is contrary to the explicit intent of Congress:  "Providing battered immigrant women and children who were experiencing domestic violence at

home with protection *against deportation* allows them to obtain protection orders against their abusers and frees them to cooperate with law enforcement and prosecutors in criminal cases brought against their abusers and the abusers of their children without fearing that the abuser will retaliate by withdrawing or threatening withdrawal of access to an immigration benefit under the abuser's control." Pub. L. 106–386 § 1502(a)(2) (emphasis added).

In sum, EOIR's Administrative Closure Rule is arbitrary and capricious, contrary to the rulemaking record, and otherwise unlawful, because it will not only thwart other agencies' efforts to carry out immigration laws but also thwart *Congress's* intent to ensure noncitizen survivors may safely report violent crimes without fear of deportation or removal.

## II.    NONCITIZEN SURVIVORS AND COMMUNITIES WILL SUFFER IMMEDIATE AND IRREPARABLE INJURY

The Administrative Closure Rule unlawfully creates substantial risk of deportation or removal before survivors' pending USCIS applications receive a fair opportunity for adjudication. Congress sought to protect survivors from deportation and removal. Deportation and removal constitute immediate and irreparable injury that will result unless the Administrative Closure Rule is enjoined or stayed.

### A.    The Administrative Closure Rule's Impact on Noncitizen Survivors Contravenes Congress's Intent in Passing Relief Statutes

Without administrative closure, IJs and BIA will be unable to prevent their own proceedings from outpacing USCIS Proceedings, frustrating Congress's purpose in passing survivor-based immigration relief to prevent deportation of survivors. A survivor deported before her pending visa application is approved faces additional obstacles, including:

> (a)    The impact of loss of access to the United States courts and criminal justice system (including, but not limited to, the ability to obtain and enforce orders of protection, criminal investigations and prosecutions, and family law proceedings or court orders regarding child support, maintenance, child custody, and visitation);

(b)     The abuser's family, friends, or others acting on behalf of the abuser in the home country who would physically or psychologically harm the survivor or the survivor's child(ren);

(c)     The survivor's needs and/or needs of the survivor's child(ren) for social, medical, mental health or other supportive services for victims of domestic violence that are unavailable or not reasonably accessible in the home country;

(d)     The existence of laws and social practices in the home country that punish the survivor or the survivor's child(ren) because they have been victims of domestic violence or have taken steps to leave an abusive household;

(e)     Abusers traveling to the home country and, in many instances, the inability or unwillingness of authorities in the home country to protect the survivor and/or the survivor's children from future abuse.

API-GBV Comment, at 5.

In one real-life example, a 12-year-old and 7-year-old were cooperating with law enforcement in the investigation of their trafficker. Their mother did not have legal status, so the children appeared for their immigration proceedings alone, terrified of being in court. Because their case was administratively closed over a year ago, they did not need to fear deportation to a country where they had no support. Nor do they have to face stressful court appearances to secure sequential continuances. Instead, they were able to focus on helping law enforcement and healing from their trauma while their T-Visa applications await processing with USCIS. As API-GBV pointed out in its Comment, it has first-hand experience with another noncitizen survivor who avoided unnecessary removal and 1-10 years of unnecessary separation from their U.S.-citizen spouse and children *because* administrative closure facilitated coordination between immigration proceedings and U-Visa processing. *See* API-GBV Comment, at 5.

If a survivor is deported while her U Visa is pending, the removal itself triggers additional grounds for inadmissibility under 8 U.S.C. § 1182(a). Under this section, "aliens who are inadmissible under the following paragraphs [including "aliens previously removed"] are

ineligible to receive visas and ineligible to be admitted to the United States." *Id.* (emphasis

added); *id.* § 1182(a)(9). To overcome this ineligibility, the survivor must seek a waiver, and

because waivers are discretionary, a waiver is not guaranteed. *See Chavez-Romero v. U.S. Att'y

Gen.*, 817 F. App'x 919, 922 n. 4 (11th Cir. 2020) (U Visa petitioners "must be admissible under

8 U.S.C. § 1182"). Waivers can also be prohibitively expensive. *See Kashyap, supra*, at 75

(estimating the cost of one waiver application at $930). Thus, completed removal proceedings

create *another* obstacle to realizing the benefits of a U Visa, another example of the

Administrative Closure Rule's utter disregard for Congress's intent to make such relief

accessible and end deportation as a weapon for abusers.

The situation is even grimmer for a T Visa applicant. If EOIR were to remove a

trafficking victim while her application was pending, she instantly loses her eligibility for T-Visa

status, as such status requires the applicant to be physically present in the United States. *See* 8

U.S.C. § 1101(a)(15)(T)(i)(II). VAWA applicants face new obstacles to their applications upon

removal because they bear the burden to show their spouse subjected them to qualifying abuse

"in the United States," which becomes infinitely more difficult when they are removed from the

United States. *See* 8 U.S.C. § 1154(a)(1)(A)(v)(I).

**B.** **The Final Rule's Impact on Communities and Law Enforcement Contravenes Congress's Intent in Passing Relief Statutes**

When noncitizen crime victims fear interaction with the criminal justice system, everyone

suffers. For example, those engaging in organized criminal gang activity are strengthened by

immigrant vulnerability to deportation because witnesses will not come forward, significantly

diminishing the ability of law enforcement to take dangerous criminals off the street. See Dan

Lieberman, *MS13 Members: Trump Makes the Gang Stronger*, CNN (July 28, 2017),

https://www.cnn.com/2017/07/28/us/ms-13-gang-long-island-trump/index.html; Meagan Flynn,

*Houston's Chief Acevedo, Defiant and Introspective, Rails Against SB 4*, Houston Press (Apr. 28, 2017), https://www.houstonpress.com/news/hpd-chief-acevedo-lambasted-sb4-in-defiant-candid monologue-9394376.  Witnesses to other crimes will no longer report.  Lindsey Bever, *Hispanics "Are Going Further into the Shadows" Amid Chilling Immigration Debate, Police Say*, Wash. Post (May 12, 2017), https://www.washingtonpost.com/news/post-nation/wp/2017/05/12/immigration-debate-might-be-having-a-chilling-effect-on-crime-reporting-in-hispanic-communities-police-say.  Without Congress's protections, which are meant to assure noncitizen survivors that they will not be deported after assisting law enforcement but before they have an opportunity to be heard by USCIS, survivors will not speak out.  When survivors are too afraid to speak out, law enforcement suffers and communities may become unsafe.  Any erosion of trust between noncitizen survivors and law enforcement would take years to rebuild.

Law enforcement organizations also need victims of violence to be present to testify. There have already been reports of survivors being deported before they have an opportunity to present their cases before USCIS, including a survivor in Texas who was deported after alleging sexual assault and harassment in a detention center in El Paso.  Lomi Kriel, *ICE deported a key witness in investigation of sexual assault and harassment at El Paso detention center*, Texas Tribune (Sept. 15, 2020), https://www.texastribune.org/2020/09/15/ice-deport-witness-sexual-assault/.  These reports only validate perpetrators' threats of deportation against their noncitizen victims, further chilling crime reporting.  Compare that to another real-life example in which a trafficking victim, the father of a 5-year-old boy, was able to have his immigration proceedings administratively closed so he could cooperate with the U.S. Attorney's Office and Federal Bureau of Investigation, as well as care for his son who had resided in the trafficker's home.  The

trafficker's family in the father's country of origin was also vengeful about the father's cooperation, and deportation would have placed the father in great danger and further jeopardized his ability to cooperate with law enforcement.

When removal proceedings remove a survivor who would have otherwise been approved for survivor-based relief, children are put in danger. Deportation leaves two possible outcomes for the deported survivors' children. The children may either be separated from the survivor and remain in the U.S., either with an abusive parent or in foster care at the taxpayers' expense, or be deported along with their mother to her home country to face tightened financial and physical risks. Michelle J. Anderson, *A License to Abuse: The Impacts of Conditional Status on Female Immigrants*, 102 Yale L.J. 1401, 21, 1427-28, fn. 127 (1993). The Centers for Disease Control and Prevention report that in homes with partner-based violence, there is a thirty to sixty percent chance of simultaneous child abuse. *See* Andrea Hazen, *Intimate Partner Violence Among Female Caregivers of Children Reported for Child Maltreatment, Child Abuse and Neglect*, 30, 302, 1–319 (March 2004), https://doi.org/10.1016/j.chiabu.2003.09.016. If survivors report abuse only to face swift deportation proceedings that cannot be adequately paused for concurrent USCIS proceedings, their children's safety will be further compromised.

## III.  THE FINAL RULE'S RELIANCE ON CONTINUANCES AND MOTIONS TO DISMISS ARE INADEQUATE SUBSTITUTES FOR ADMINISTRATIVE CLOSURE

Administrative closure became commonly used within immigration courts because a continuance was an ineffective and inefficient method for pausing immigration proceedings while a respondent's USCIS application was processed. *See Avetisyan*, 25 I. & N. Dec. at 697. Forcing IJs and BIAs to repeatedly continue proceedings further exacerbates backlogs and wastes agency, advocate, and survivor resources. Similarly, relying on the prosecuting

government official to move to dismiss proceedings is an inadequate substitute for IJ and BIA authority to manage their own dockets and ensure coordination among proceedings.

Administrative closure encourages efficiency as it frees up docket space and resources for cases that are ripe, sparing the court, the parties, the attorneys, and the interpreters from unnecessarily premature proceedings. Continuances require regular reports by the parties to the immigration court, which then necessitate review by the immigration court, consuming more resources. Re-opening an administratively closed case is no great undertaking for the prosecuting officer should it wish to move ahead with its prosecution. The officer need only file a motion—a far lesser burden than repeated rounds of briefing on whether another continuance is needed. *Avetisyan*, 25 I. & N. Dec. at 695.

EOIR's reliance on continuances as an adequate substitute for administrative closure provides yet another example of EOIR moving the goal posts for noncitizen survivors. On November 27, 2020—after the comment period had passed for this NPRM—EOIR proposed changing the applicable standards to granting a continuance in immigration proceedings. Good Cause for a Continuance in Immigration Proceedings, 85 Fed. Reg. 75,925 (Nov. 27, 2020). EOIR expects continuances to provide an adequate substitute for administrative closure when the very nature of continuances is in flux. To be clear, that proposed regulation would alter 8 C.F.R. § 1003.29 to provide that "a continuance request to apply for a non-immigrant visa … does not demonstrate good cause unless … [t]he alien demonstrates that final approval of the visa application … will occur within six months of the request for a continuance." 85 Fed. Reg. 75,940. Given the timelines for USCIS processing, a continuance is of no use to survivors waiting on U Visas, T Visas, and VAWA-based relief. *See* Texas Rio Grande Legal Aid's Comment to 85 Fed. Reg. 75,925, Docket ID No. EOIR-2020-0009-0275 (Dec. 23, 2020) at 18,

https://www.regulations.gov/document?D=EOIR-2020-0009-0275 ("[t]rafficking survivors will almost never be able to demonstrate that their T Visa applications will be adjudicated within six months").[6]

The Administrative Closure Rule speculates that, in lieu of administrative closure, respondents can "work[] with DHS counsel to file a motion to dismiss" under 8 C.F.R. § 1239.2(c). This is far from an adequate substitute.

First, 8 C.F.R. § 1239.2(c) only allows a "government counsel" or a "designated official" to move for such relief, preventing a respondent from moving to dismiss herself. 8 C.F.R. § 1239.2(c). Thus, a survivor respondent is at the mercy of the very prosecuting officer who issued the notice to appear in immigration proceedings in the first place. Nor could an IJ *sua sponte* dismiss in an effort to manage its own docket, as an IJ is not a qualifying official to whom the rule applies. *See id*. (citing list of officials in 8 C.F.R. § 239.2(a)). EOIR should not delegate docket management responsibility to the prosecuting official in immigration proceedings.

Second, the regulation only permits a motion to dismiss "on the grounds set out under 8 C.F.R. § 239.2." *Id*. § 1239.2(c). Those grounds do not involve any considerations of efficiency or parallel USCIS proceedings. *See id.* § 239.2. In sum, the Administrative Closure Rule effectuates a substantive deprivation of rights, without any currently adequate substitute procedure.

## IV.    THERE IS NO EFFICIENCY JUSTIFICATION FOR THE FINAL RULE

Four months after the Attorney General issued *Castro-Tum*, effectively ordering IJs and BIA to stop using administrative closure, immigration court backlogs increased by almost 55,000

---

[6] On January 8, 2021, the Director of EOIR issued a policy memorandum again altering the nature and function of continuances. James R. McHenry III, Policy Memorandum: Continuances (Jan. 8, 2021), https://www.justice.gov/eoir/page/file/1351816/download.

cases. *Montano, supra*, 129 Yale L.J. F. at 579. Sixteen months later, in September 2019, the backlog stood at 1,023,767 cases, an increase of over 250,000 cases.[7] There is, accordingly, no "efficiency" justification for the Administrative Closure Rule, as attempted by EOIR.

In fact, the data demonstrate the opposite and lead to an inference that the Administrative Closure Rule is being used as a weapon to increase immigration case backlogs, enable deportations and removal, and use 5- to 10-year U-Visa backlog as a deterrent to the exercise of statutory rights. The Administrative Closure Rule is in line with the Trump Administration's effort to build a regulatory wall to eliminate paths to safety for immigration survivors; the 30-day public comment period acted as a mere procedural fig-leaf for an equally pernicious policy change. In fact, elimination of administrative closure is *contributing* to EOIR's inefficiency. Given what the Final Rule will mean for noncitizen survivors and the Final Rule's failure to address that harm, the rationale for the final rule appears to more closely align with the former President's public statements on immigration than on the proffered reason of "efficiency."[8]

Unfortunately, domestic violence, sexual violence, and human trafficking are not rare occurrences. One in three women and one in six men experience some form of sexual violence in a lifetime[9] and more than 12 million men and women experience rape, physical violence, or stalking by an intimate partner each year in the United States.[10] Noncitizen survivors in

---

[7] Two federal courts of appeals that rejected *Castro-Tum,* thus enabling IJs and BIA in those federal circuits to use administrative closure, issued their decisions on August 29, 2019 and June 26, 2020, so any reinstatement of this important procedure is not reflected in those backlog statistics. *See Romero*, 937 F.3d 282; *Meza Morales*, 973 F.3d 656.

[8] *See* Tahirih Justice Center's Comment, EOIR Docket No. 19-0022 (Sept. 25, 2020), at 4-5, https://beta.regulations.gov/comment/EOIR-2020-0004-0952 (collecting public comments by President Donald Trump on immigration matters, including one in which he referred to asylum seekers as "infest[ing]" the United States). Because President Trump's Twitter account was deleted, *Amici* is unable to provide direct citations to those tweets.

[9] Centers for Disease Control and Prevention, *The National Intimate Partner and Sexual Violence Survey (NISVS): 2010-2012 State Report* (2017), https://www.cdc.gov/violenceprevention/pdf/NISVS-StateReportBook.pdf.

[10] Centers for Disease Control and Prevention, *Sexual Violence, Stalking, and Intimate Partner Violence Widespread in the US* (2011), https://www.cdc.gov/media/releases/2011/p1214_sexual_violence.html.

deportation or removal proceedings face dire consequences if an IJ or BIA is unable to use administrative closure to allow the survivor's pending visa application to process. The impact on survivors is clearly life-altering and, too often, life threatening.

Congress intended communities to have law enforcement that can effectively combat violent crimes. So long as domestic violence, sexual violence, and human trafficking continue, law enforcement will investigate and prosecute the offenders, relying on survivors to come forward and assist those efforts. As Congress well understands, the safety of the public depends on noncitizen survivors knowing they may report crimes without fear of removal or deportation.

## CONCLUSION

The Administrative Closure Rule allows perpetrators of violence to use the immigration system against their victims. The challenged rule is arbitrary and capricious and contrary to the spirit and intent of federal law. *Amici* respectfully ask the Court to stop defendants from turning the immigration system into a game of mousetrap for survivors, and grant Plaintiffs' Motion, ECF No. 9.

Dated: February 5, 2021                    Respectfully submitted,

                                           MORGAN, LEWIS & BOCKIUS LLP


                                           By: */s/ Paul A. Zevnik*
                                               Paul A. Zevnik (D.C. Bar No. 952465)
                                               paul.zevnik@morganlewis.com
                                               MORGAN, LEWIS & BOCKIUS LLP
                                               1111 Pennsylvania Avenue, NW
                                               Washington, DC  20004
                                               Telephone: (202) 739-3000
                                               Facsimile:  (202) 739-3001

                                               Katherine A. Vaky* (Pa. Bar No. 329291)
                                               MORGAN, LEWIS & BOCKIUS LLP
                                               One Oxford Centre, Thirty-Second Floor
                                               Pittsburgh, PA  15219
                                               Telephone:  (412)560-3300
                                               Facsimile:  (412) 560-7001

                                               Attorneys for *Amici Curiae*


*\*pro hac vice* application forthcoming

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 5, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that a true and correct copy of the document was served on all counsel of record through the Court's CM/ECF system.

<u>*/s/ Paul A. Zevnik*</u>
Paul A. Zevnik

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7(o), which incorporates Federal Rule of Appellate Procedure 29(a)(4)(G) and by extension Federal Rule of Appellate Procedure 32(g), counsel hereby certifies that counsel has moved for an extension of the 25-page limit to 32 pages, and this brief complies with that request.

*/s/ Paul A. Zevnik*
Paul A. Zevnik