**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., *et al.*, <br><br>      *Plaintiffs*, <br><br> v. <br><br> EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, <br><br>      *Defendants*. | Case No.:  1:21-cv-00094 (RJL) |

**BRIEF OF AMICI CURIAE FORMER IMMIGRATION JUDGES AND MEMBERS OF THE BOARD OF IMMIGRATION APPEALS REGARDING CHANGES TO THE PROCEDURAL AND DECISIONAL FINALITY RULE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................ii

IDENTITY AND INTEREST OF AMICI CURIAE ..................................................................1

INTRODUCTION ...............................................................................................................1

ARGUMENT .....................................................................................................................3

    A.    The New Brief Extension and Simultaneous Briefing Rules Disadvantage Asylum Applicants and in Practice Will Undermine the Goals of Efficiency ...........................................................................................................4

    B.    Eliminating the Availability of Remanding a Case Based on New Evidence Unfairly Prejudices Applicants Seeking Relief.......................................................7

    C.    Limiting the Scope of a Board Remand to Disallow Immigration Judges From Considering Issues Beyond Those Specified in the Remand Ignores the Lengthy Timeline and Reality for Many Applications.......................................9

    D.    Giving Immigration Judges Authority to Contest BIA Decisions Not Only Disrupts Their Neutral Status as Judges, But Undermines the Integrity of the BIA........................................................................................................10

    E.    The Rule Improperly Revokes the Regulatory Authority of Immigration Judges and the Board to Order Administrative Closure...........................................12

    F.    The Rule's Creation of Arbitrary Deadlines and Timeframes Strips Immigration Judges of the Power to Control Their Own Dockets .......................17

    G.    The Elimination of *Sua Sponte* Authority Puts Too Much Weight on Expediency at the Expense of Asylum Applicants' Due Process Rights .............18

CONCLUSION.................................................................................................................19

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Matter of A-B-*,
    27 I&N Dec. 316 (A.G. 2018) ........................................................................................5, 11

*Ali v. Quarterman*,
    607 F.3d 1046 (5th Cir. 2010) ...........................................................................................14

*Matter of Amico*,
    19 I&N Dec. 652 (BIA 1988) .............................................................................................14

*Matter of Avetisyan*,
    25 I&N Dec. 688 (BIA 2012) ..............................................................................13, 14, 15

*Baez-Sanchez v. Sessions*,
    872 F.3d 854 (7th Cir. 2017) .............................................................................................15

*Matter of Castro-Tum*,
    27 I&N Dec. 271 (A.G. 2018) .............................................................................................5

*CitiFinancial Corp. v. Harrison*,
    453 F.3d 245 (5th Cir. 2006) .............................................................................................14

*Gonzalez-Caraveo v. Sessions*,
    882 F.3d 885 (2018)...........................................................................................................15

*Matter of Hashmi*,
    24 I&N Dec. 785 (BIA 2009) .............................................................................................14

*Matter of L-E-A-*,
    27 I&N Dec. 581 (A.G. 2019) .............................................................................................5

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936)...........................................................................................................13

*Lehman v. Revolution Portfolio L.L.C.*,
    166 F.3d 389 (1st Cir. 1999).............................................................................................14

*Penn-America Ins. Co. v. Mapp*,
    521 F.3d 290 (4th Cir. 2008) ............................................................................................14

**Federal Statutes**

8 U.S.C. § 1101(b)(4) (2017)....................................................................................................14, 15

Immigration Courts and the BIA by the Immigration and Nationality Act, 8
    U.S.C. § 1229(a) ........................................................................................................12

INA ..........................................................................................................................12, 14, 15

Trafficking and Violence Protection Act ...............................................................16

**Regulations**

8 C.F.R. 1003.1(e)(8)(i) ...........................................................................................17

8 C.F.R. 1003.3(c) .......................................................................................................4

8 C.F.R. § 245a.12(b)(1) (2017) ............................................................................16

8 C.F.R. § 1003.1(d)(7)(v) .....................................................................................7, 9

8 C.F.R. §§ 1003.2(a) and 1003.23(b)(1) ...........................................................18

8 C.F.R. § 1003.10(b) .........................................................................................13, 15

8 C.F.R. § 1214.2(a) (2017) ....................................................................................16

8 C.F.R. § 1214.3 (2017) .........................................................................................16

66 Fed. Reg. 29,661, 29,674 (June 1, 2001) .....................................................16

68 Fed. Reg. 9,823, 9,836 (Feb. 28, 2003) ........................................................16

78 Fed. Reg. 535, 577 (Jan. 3, 2013) (codified at 8 C.F.R. § 212.7(e)(4)(v)
    (2017)) ......................................................................................................................16

81 Fed. Reg. 50,243, 50,255 (July 29, 2016) .....................................................17

81 Fed. Reg. 81637 ......................................................................................................6

85 Fed. Reg. 52507-08 ............................................................................................18

85 Fed. Reg. 81588 (Dec. 16, 2020) ......................................................................1

85 Fed. Reg. 81588 ............................................................................................2, 4, 5

85 Fed. Reg. 81589 ............................................................................................... 2, 7

85 Fed. Reg. 81590 ..........................................................................................*passim*

85 Fed. Reg. 81590–91 ..............................................................................................3

85 Fed. Reg. 81591 ........................................................................................... 17, 18

85 Fed. Reg. 81591–92 ..............................................................................................3

85 Fed. Reg. 81592 ...............................................................................................3, 4

85 Fed. Reg. 81595 ..................................................................................................4

85 Fed. Reg. 81596 ..................................................................................................5

85 Fed. Reg. 81652 ..................................................................................................9

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

*Amici curiae* are more than 30 former Immigration Judges ("IJs") and former members of the Board of Immigration Appeals ("BIA" or "Board) who remain keenly interested in the quality of decision-making coming from the agency.[2] *Amici* were appointed to serve at immigration courts around the United States, with the Board, and at senior positions with the Executive Office of Immigration Review ("EOIR"). From their many combined years of service, *amici* have intimate knowledge of the operation of the immigration courts, including the importance of allowing those who appear before us the opportunity to develop the factual record and legal arguments that may support their claims for protection under our immigration laws. As explained below, we are gravely concerned that this Procedural and Decisional Finality Rule, which appears to have been written and approved by officials more interested and experienced in bureaucratic efficiency than the procedures of a functioning system of justice, prioritizes efficiency over effectiveness.

## INTRODUCTION

In what the Department of Justice (the "Agency") classified as an effort to streamline the immigration court process, the Agency enacted a series of procedural changes that dramatically affected the ability of applicants and defense counsel to present their case shortly before the administration change. These changes either ignore or give short shrift to the practical concerns of the litigants and judges who must live with these new procedures. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588 (Dec. 16, 2020) (the "Procedural and Decisional Finality Rule" or "the Rule"). The Rule makes it

---

[1] No party's counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made such a monetary contribution. All parties have either consented to this filing of this brief, or have taken no position on the filing of this brief.

[2] *See* Appendix for *amicis* biographies.

more difficult for applicants and defense counsel to brief relevant issues and present evidence, creates new challenges for immigration judges to consider extraordinary changes in circumstances and to control the timing of their own docket, and severely limits the BIA's authority to make legally sound decisions and remain an apolitical rung in the immigration system. We are deeply concerned that the Agency did not address comments on these issues, ignored evidence counter to its proposals, and stuck to a course to remake asylum law and procedure that will undermine the ability of the immigration courts to provide a full and fair hearing to those who seek protection in the United States.

Overall, the Rule is a series of inter-related changes that fortifies a new and tougher reality for respondents (*i.e.*, aliens litigating in the immigration court system) and their counsel to present their case in the immigration courts and on appeal. *First*, under the guise of efficiency the Agency drastically limited the availability of brief extensions and mandated simultaneous briefing, which forces applicants and defense counsel to rush through a first brief and file additional briefing later.[3] *Second*, the Agency eliminated the availability of remanding a case based on new evidence to solve a supposed "gamesmanship" problem.[4] However, the previous solution was satisfactory—namely, denying the motion to remand when the evidence was originally available. *Third*, the Rule prohibits immigration judges from hearing all relevant evidence on remand when the scope was specifically limited.[5] This requirement forces immigration judges to wear blinders, ignoring the reality that immigration cases occur over a series of years where legal and personal events occur that could change an applicant's eligibility and cause the judge to revisit the wisdom of an earlier decision. *Fourth*, the Rule creates a mechanism that allows immigration judges to challenge

---

[3] 85 Fed. Reg. 81588.
[4] 85 Fed. Reg. 81589.
[5] 85 Fed. Reg. 81590.

appellate decisions, placing them in the posture of litigants rather than neutral arbiters, under the justification of "quality assurance."[6]  *Fifth*, the Agency eliminated immigration judges' tools of administrative closure and *sua sponte* authority that allowed them to have control over their own docket.[7]  *Sixth*, the Rule makes a variety of changes to the timing and adjudication of appeals, ignoring the fact that some cases, based on the complexity of the record, take longer to adjudicate than others.[8]  We discuss each independently and then explain, in the context of immigration court proceedings, how the Rules will likely limit development of the law and deny due process to those seeking protection in our country.  We believe that the Rule contains changes that continue to diminish the role and function of the BIA as an independent adjudicatory body free from political pressure.

## ARGUMENT

At base, the totality of the impact of the Rule places purported efficiency over a respondent's due process rights and shows a disregard for the orderly practice of immigration law. Further, although not the subject of this brief, it is important to note that the reduction of time for notice and comment for proposed rules severely undermines the ability for the public to digest and comment on rules.  Reducing the time from 60 or 90 days to just 30 days violates the intent of Congress to give full deliberation to regulatory changes.  As experienced adjudicators, we are in a unique position to contextualize these changes, but even with our experience, the breadth of these new regulations should allow for additional time to review and comment.  Despite this abbreviated window, 1,284 comments were received regarding the Rule.[9]  The majority of commenters

---

[6] 85 Fed. Reg. 81590.

[7] 85 Fed. Reg. 81590–91.

[8] 85 Fed. Reg. 81591–92.

[9] 85 Fed. Reg. 81592.

expressed opposition to the Rule, specifically outlining their concerns that the Rule would negatively implicate due process to applicants.[10]  Despite the Agency's response that "nothing in the [R]ule eliminates either an alien's right to notice or an alien's opportunity to be heard on a case before the Board," there is no doubt that these changes will frustrate justice for both the government and the applicants.[11]  Additionally, the Agency's attempt to consider each of the individual changes in isolation diminishes their overall impact on the immigration system.[12]  For all of these reasons, we felt compelled to file this brief and share our centuries of combined experience in adjudicating asylum applications and appeals.

### A.    The New Brief Extension and Simultaneous Briefing Rules Disadvantage Asylum Applicants and in Practice Will Undermine the Goals of Efficiency

Most egregiously, the Rule drastically "reduce[s] the maximum allowable time for an extension of the briefing schedule for good cause shown from 90 days to 14 days"[13] and mandates simultaneous briefing on all cases.  Instead of increasing efficiency, these changes will penalize both the government and defense counsel by providing them less time for the drafting and filing of their appellate briefs and practically guarantee the need for at least one party to file a second reply brief to respond to any simultaneously-filed brief.  The Agency justified this change by noting the unprecedented increase in the number of appeals received by and pending before the BIA, cutting weeks from the current briefing schedule for parties and mandating simultaneous briefing. While the crushing backlog at the BIA is no doubt a cause for concern, it is a result of the Agency's

---

[10] 85 Fed. Reg. 81592.

[11] 85 Fed. Reg. 81595.

[12] 85 Fed. Reg. 81595 (stating that "[e]ach of the Department's rules stands on its own, includes explanations of their basis and purpose, and allows for public comment, as required by the APA" in combination with "the interplay and impact of all of these rules is speculative at the present time due to both ongoing and expected future litigation—which may allow all, some, or none of the rules to ultimately take effect").

[13] 85 Fed. Reg. 81588; new 8 C.F.R. 1003.3(c) (eff. Jan. 16, 2021).

own policymaking.[14]  The Agency concludes that these changes do not truly affect an applicant's substantive rights,[15] but this demonstrates a lack of understanding or experience with how the appeals process works.  Both the changes in the timing and manner of briefing will only cause greater confusion amongst the immigration courts and the BIA.

Prior to the Rule's enactment, parties were automatically granted a 21-day briefing extension upon request (requests for additional extensions were considered on a case-by-case basis).  The new Rule specifically indicates that extension requests should ***not*** be automatically granted.[16]  Contrary to the Agency's position, this change will not encourage efficiency.  Indeed, a policy of automatic extension for the asking would be more in line with the Agency's stated goal of increased efficiency, as it would prevent the need for an already understaffed BIA to assign resources to making case-by-case extension determinations.  It would also provide more predictability to litigants.

The Agency's suggestion that briefing extensions are unnecessary is out of touch with reality.  In prior practice, the appealing party was granted 21 days to file its brief, starting from the date the BIA mailed the notice and transcripts of the immigration court proceedings (which is available only at that time).  Accordingly, litigants receive less time—sometimes *far* less time—to review the transcript and prepare the brief.  Under the new Rule, this already tight schedule will become even more onerous, and the Agency failed to consider the impact mail delays caused by

---

[14] Specifically, immigration judges must adjudicate cases very quickly to conform with agency-imposed completion quotas; there are many new immigration judges, thus leading to more decisions and more appeals; the Attorney General eliminated the judges' ability to administratively close cases and vacated precedent decisions that served as a basis for many stipulated grants of asylum that did not require appeal to the BIA.  *See Matter of Castro-Tum*, 27 I&N Dec. 271 (A.G. 2018); *Matter of A-B-,* 27 I&N Dec. 316 (A.G. 2018); *Matter of L-E-A-,* 27 I&N Dec. 581 (A.G. 2019).

[15] 85 Fed. Reg. 81596.

[16] 85 Fed. Reg. 81588.

cuts to the U.S. Postal Service will have on the parties. The days lost due to mail slowdowns will create a significant shortening of the remaining briefing time for both parties.

In addition, the Agency ignores the fact that parties are not provided with the transcripts of the immigration court hearing—which in some cases contains the oral decision of the immigration judge—until the briefing schedule is set. As a result, the intervening 15-20 months from the time a notice of appeal is filed with the BIA until the agency mails the parties the transcript, IJ decision, and briefing schedule often cannot be spent preparing the briefing. This is particularly true in the many cases where pro bono attorneys agree to represent respondents on appeal after the respondent appeared either *pro se* or with another lawyer before the immigration court. Given that many IJ decisions are issued orally, the respondent is left with only a Memorandum of Decision (a form simply indicating whether relief was granted or denied), and new appellate counsel is left with little to digest before receiving the briefing schedule and transcript less than three weeks before briefing is due. Considering the complexity of asylum and most other IJ determinations, this change will result in rushed briefing, emergency requests for extensions and unfairness to the litigants—all to save the BIA 21 days. We take particular issue with the Agency's conclusion that "a briefing extension request filed just before or on the date a brief is due suggest[s] that many extension requests are merely last-minute delay tactics."[17] Given the 21-day initial briefing period, and the delay from mailing, even an extension request filed *immediately* upon receipt would arrive "just before" the brief is due.

The Agency's decision to require simultaneous briefing on all cases, including those involving non-detained respondents, is likewise inefficient and against the interests of justice.[18] In

---

[17] 81 Fed. Reg. 81637.

[18] We acknowledge that simultaneous briefing for detained cases is required for detained respondents, justified by the impetus to shorten detention. The Rule does not address whether this is in fact an efficient process. The BIA Practice Manual at 4.7(a)(ii) states the current rule for detained Respondents as: (ii) Detained cases. –

its desire to save 21 days (a drop in the bucket compared to the years-long immigration process), the Agency now requires that parties simultaneously file their briefs. The Rule ignores the problems identified by commenters inherent in requiring one party to reply to an opponent's arguments *before* it has read them. Among the problems this presents is a potential waiver of arguments not raised on appeal.

In practice, simultaneous briefing does not solve any problem it aims to fix, but instead creates inefficiencies for the parties and the Board. Simultaneous briefing virtually guarantees the need for at least one party to file a *second* brief after receiving and reviewing the other party's simultaneously-filed brief. This creates unnecessary additional work for at least one of the parties, and also requires the Board to consider an extra brief (along with the motion for leave to file that brief, as the BIA Practice Manual does not provide an automatic right to file a reply brief).

### B. Eliminating the Availability of Remanding a Case Based on New Evidence Unfairly Prejudices Applicants Seeking Relief

It also concerns us that the Rule eliminates the Board's ability to remand a case based on new evidence. This is a prime example of the Rule placing efficiency concerns well ahead of justice and due process. By amending 8 C.F.R. § 1003.1(d)(7)(v), the Rule prohibits the BIA "from receiving new evidence on appeal, remanding a case from the immigration judge to consider new evidence on appeal, remanding a case for the immigration judge to consider new evidence in the course of adjudicating an appeal, or considering a motion to remand based on new evidence."[19] Due to the expansive nature of this regulatory change, new evidence that was not previously available or changes in law that occur over the course of the proceedings could never support a

---

When an appeal is filed in the case of a detained alien, the alien and DHS are both given the same 21 calendar days in which to file their initial briefs. The Board will accept reply briefs filed by DHS or by the alien within 14 days after expiration of the briefing schedule. No such provisions exist in the Rule to allow for reply briefs.

[19] 85 Fed. Reg. 81589.

remand.  As this Court well knows, immigration law is complex; the case law is constantly changing due to litigation in the federal courts.  However, under the Rule, the BIA could not allow a remand based on new grounds of relief available to a noncitizen who benefits from a change in law.  This does not comport with due process or the rule of law.

The Agency reasons that these changes will ensure the presentation of all available evidence at the immigration court stage and the efficient resolution of appeals.  Instead, the Rule ignores the important and far more prevalent situations where there are valid reasons for reopening to present new evidence, such as changes in the law, evidence that was previously unavailable, and changes in circumstances that result in eligibility for a new form of relief.  The Agency baldly accuses respondents of withholding evidence in the first instance and "gamesmanship."  That has not been our experience.  And to the extent gamesmanship does occur, it is properly dealt with by denying the motion to remand in specific cases where the evidence was not previously unavailable.

As former immigration judges, we heard cases that, through no fault of the respondents, took years to resolve, including cases that were pending at the BIA for months or years.  In many of those cases, respondents experienced significant life changes, some of which resulted in actions taken by DHS affecting eligibility.  Under the Rule, these changes can no longer be considered in determining whether to remand a case or when a case is actually remanded.  In real life, over long periods of time, respondents marry, divorce, have children, and change employment status.  As a result, noncitizens can become eligible for relief through, for example, immediate relatives in the United States or noncitizens with derivative asylum status through a spouse or parent.  All of these relevant changes would be meaningless because the respondents would be foreclosed from reopening their removal orders.  Of course, the finality of proceedings is important—but more so is the integrity of the proceedings.  If an injustice is committed, we should not strip judges of the

ability to resolve that injustice. All of these life events can impact the availability or lack of availability of immigration benefits. Therefore, such changes should be considered in the course of a motion to remand if appropriate, and subsequently, on remand if granted.

Perhaps most troubling is that the language of the Rule unfairly favors the government over asylum applicants. The Rule under 8 C.F.R. § 1003.1(d)(7)(v) reads "[s]ubject to paragraph (d)(7)(v)(B) of this section, the Board shall not receive or review new evidence submitted on appeal, shall not remand a case for consideration of new evidence received on appeal, and shall not consider a motion to remand based on new evidence. A party seeking to submit new evidence shall file a motion to reopen in accordance with applicable law."[20] The exceptions set forth at subsection (B) are extremely limited and include new evidence about identity and background investigations.[21] Thus, the Agency is creating exceptions for the consideration of new evidence from DHS but not from respondents. It allows DHS to investigate non-citizens without end, and seek remand if an adverse issue is uncovered, but if new relief materializes, new threats to an alien's life are made, a conviction is overturned, or the law changes to the benefit of a respondent, a remand is nevertheless prohibited. Such a rule eviscerates due process in removal proceedings and undermines finality, by allowing DHS to perpetually hold the threat of reopening over respondents.

**C.    Limiting the Scope of a Board Remand to Disallow Immigration Judges From Considering Issues Beyond Those Specified in the Remand Ignores the Lengthy Timeline and Reality for Many Applications**

The Agency also eliminated the ability of immigration judges to consider issues beyond the express scope of the remand.[22] Effectively, this ignores the fact that immigration proceedings often occur for many years, and during those years, various life events worth considering occur.

---

[20] 85 Fed. Reg. 81652.

[21] 85 Fed. Reg. 81652.

[22] 85 Fed. Reg. 81590.

In our experience, immigration judges do not easily reopen a record, but are willing to do so when compelling reasons—such as a material change in circumstances or law—arise. As discussed above, during the pendency of the applicant's immigration proceedings, major life events—such as marriage, divorce, birth of children, or death of relatives—may occur and are often relevant to eligibility for relief. In addition, some respondents have criminal convictions overturned during the course of their proceedings, which affects removability and eligibility for relief as well.

Moreover, immigration law changes with regularity due to federal court litigation. Under the Rule, immigration judges are prohibited from considering changes in the law if the BIA limits the scope of the remand—setting up a lengthy appellate process, perhaps to the very U.S. Court of Appeals that issued the rule change. The Rule ignores the reality of immigration court proceedings and the lives of those who appear in immigration court. It strips any semblance of fairness from proceedings by requiring immigration judges to wear blinders in remanded cases. In cases where the law has changed, an immigration judge should not be prohibited from considering whether the change in law impacts the respondent's case simply because the BIA remanded for a different purpose. The Rule constrains an immigration judge's ability to apply the rule of law and afford due process in remanded removal proceedings.

**D.    Giving Immigration Judges Authority to Contest BIA Decisions Not Only Disrupts Their Neutral Status as Judges, But Undermines the Integrity of the BIA**

Among the changes that concern us, we are particularly worried about the unprecedented role the new Rule gives to immigration judges to contest the appellate review of their own decisions. Granting the authority to immigration judges "to ensure the quality of BIA decision-making," the Rule would allow an immigration judge to "certify" a BIA decision with which she

10

disagreed to the EOIR Director to decide whether the case should be reopened or remanded.[23]  This Rule places the immigration judge in the role of a litigant, undermines the authority and integrity of the BIA's codification procedures, and circumvents the regular order of appeals.[24]  Included in the regular order of appeals is the notion that the immigration judge's decision must be wholly contained within her written opinion.  Permitting an immigration judge to follow and then challenge the Board's review negates this principle, turning the immigration judge into an advocate for her position rather than the author of a reasoned decision.

As former judges, we certainly understand that an adjudicator whose decision is overturned on appeal or who receives a remand may disagree with the decision of the appellate body (sometimes vehemently so).  But we also understand that the appellate process, which limits the judge's involvement to the decision she issued, is fundamental to our system of jurisprudence. While the commentary states that the process "is limited only to cases in which the immigration judge articulates a specific error allegedly committed by the Board within a narrow set of criteria,"[26] inviting an immigration judge to make an argument that specifies BIA error places immigration judges in the position of advocate rather than arbiter.  Furthermore, it places the EOIR Director, a political appointee, in a role adverse to the Board.

The Rule leaves unanswered many important questions raised by this unprecedented deviation from longstanding appellate procedure.  For instance, the Agency does not specify the

---

[23] *See* 85 Fed. Reg. 81590.

[24] It was precisely this type of procedure, which has been highly criticized as irregular, that was involved in the Attorney General's decision in *Matter of A-B-*, 27 I&N Dec. 316 (A.G. 2018).  In that case, the BIA had reversed a decision denying asylum to a woman who had survived domestic violence and remanded to the IJ with instructions to order a biometrics check, and to grant the application dependent on the biometrics check.  The IJ, who expressed disagreement with precedents authorizing asylum for domestic violence victims, was suspected of using back channels to bring the case to the attention of the Attorney General, who certified it to himself despite no opposition to the grant of asylum by either of the parties.  *See*, Center for Gender and Refugee Studies, Backgrounder and Briefing on *Matter of A-B-*, (Aug. 2018), https://cgrs.uchastings.edu/matter-b/back-grounder-and-briefing-matter-b.  This new regulation appears to be a retroactive device to authorize conduct that was publicly perceived and criticized as improper.

rights of a respondent who was granted relief by the Board, presumably by defeating arguments by DHS, but is now faced with an adverse immigration judge.  Nor does the Rule specify the timeframe in which the Director must render a decision, which could result in prolonged detention as the BIA decision remains un-final.  Such a result would be patently unfair and a further example of the ways in which the Agency has created new procedures that fail to afford due process.

### E.    The Rule Improperly Revokes the Regulatory Authority of Immigration Judges and the Board to Order Administrative Closure

The Rule also removes any "freestanding authority for immigration judges or Board members to administratively close immigration cases absent an express regulatory or judicially approved settlement basis to do so"[25] and contravenes adjudicators' ability to manage their own proceedings.  The authority of immigration judges and the Board to administratively close cases was not created by the Board's precedent or prior decision by the Attorney General, but rather derives from their regulatory authority as adjudicators to manage their proceedings.  This authority, like the inherent powers of federal courts, necessarily results from the creation and regulation of Immigration Courts and the BIA by the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229(a), and implementing regulations.  The INA and regulations that govern these institutions authorize administrative closure and, in some cases, specifically require it.  Immigration judges, like federal judges, need a broad range of tools, including administrative closure, to efficiently use judicial resources in the orderly disposition of cases.  Stripping immigration judges and the BIA of the power to order administrative closure, which they have used judiciously for decades, only impedes efficiency in the adjudication of removal proceedings.

The regulatory authority of immigration judges to manage their calendars mirrors the inherent authority of Article III judges to manage their dockets through the use of administrative

---

[25] 85 Fed. Reg. 81590.

closure.  Article III judges possess an inherent authority to manage their dockets.  In 1936, the U.S. Supreme Court acknowledged this authority, explaining that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  "How this can best be done," the Court observed, "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Id.* at 254–55 (citations omitted).  Administrative closure is one of the many tools federal judges have used to maintain this balance.

To fully understand the importance of administrative closures—and make the complete analogy to Article III jurisdiction—we must take a look at the old regulation and past case law. Similarly, immigration judges previously possessed the authority to take "any action" that is "appropriate and necessary for the disposition" of cases before them.  8 C.F.R. § 1003.10(b).  In 2012, consistent with longstanding practice, the BIA acknowledged that this authority includes "the authority to regulate the course of [a] hearing."  *Matter of Avetisyan*, 25 I&N Dec. 688, 691 (BIA 2012).  To regulate the course of a hearing, the BIA explained, "an Immigration Judge or the [BIA] may find it necessary or, in the interest of justice and fairness to the parties, prudent to defer further action for some period of time."  *Id.*  How this can best be done, the BIA observed, requires the immigration judge to "exercise his or her independent judgment and discretion" and "assess[ ] factors that are particularly relevant to the efficient management of" resources.  *Id.* at 691, 695. Administrative closure is one of the many tools immigration judges have used to achieve this efficient management of administrative resources.

By referring to administrative closure as a "docket-management tool," federal courts have recognized that—like the power to stay proceedings—the power to order administrative closure is

13

"incidental" to a court's inherent authority to control its docket. *Ali v. Quarterman*, 607 F.3d 1046, 1047 n.2 (5th Cir. 2010) (citation omitted); *Penn-America Ins. Co. v. Mapp*, 521 F.3d 290, 295 (4th Cir. 2008) (citation omitted); *see also CitiFinancial Corp. v. Harrison*, 453 F.3d 245, 250 (5th Cir. 2006) (referring to administrative closure as a "case-management tool"). The U.S. Court of Appeals for the First Circuit has explained that administrative closure "is used in various districts throughout the nation in order to shelve pending, but dormant, cases." *Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 392 (1st Cir. 1999). In *Lehman*, the First Circuit "endorse[d] the judicious use of administrative closings by district courts in circumstances in which a case, though not dead, is likely to remain moribund for an appreciable period of time." *Id.* For decades, immigration adjudicators have similarly used administrative closure as a docket-management tool. *See Matter of Avetisyan*, 25 I&N Dec. at 695; *Matter of Hashmi*, 24 I&N Dec. 785, 791 n.4 (BIA 2009); *Matter of Amico*, 19 I&N Dec. 652, 654 n.1 (BIA 1988); *see also* Memorandum for All Immigration Judges, et al., from Brian M. O'Leary, Chief Immigration Judge, EOIR, Re: Operating Policies and Procedures Memorandum 13-01: Continuances and Administrative Closure at 3 (Mar. 7, 2013) available at www.justice.gov/sites/default/files/eoir/legacy/2013/03/08/13-01.pdf [hereinafter O'Leary Memo]. Regulations establishing and governing immigration judges ratify their inherent authority to order administrative closure.

The legal framework establishing immigration judges indicates that they possess the same authority to manage their dockets as federal judges, including the authority to order administrative closure. In the INA, Congress defined an immigration judge as "an attorney whom the Attorney General appoints as an administrative *judge* . . . qualified to conduct specified classes of proceedings." 8 U.S.C. § 1101(b)(4) (2017) (emphasis added). Specifically, Congress authorized immigration judges to "conduct proceedings for deciding the inadmissibility or deportability of an

alien." *Id.* at § 1229a(a)(1). Consistent with its designation of immigration judges as judges authorized to conduct proceedings, Congress granted immigration judges the power to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." *Id.* at § 1229a(b)(1). Furthermore, Congress authorized immigration judges to issue subpoenas and impose civil monetary sanctions for contempt—tools also used by Article III judges to ensure the smooth operation of court proceedings. *Id.*

Building on this statutory authorization, the relevant regulation promulgated under the INA specifically grants immigration judges the authority to "exercise their independent judgment and discretion." 8 C.F.R. § 1003.10(b) (2017). This regulatory provision further provides that, "[i]n deciding the individual cases before them," immigration judges "may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases." *Id.*; *see also id.* at § 1003.1(d)(1)(ii) (granting the same authority to the BIA). By regulatory and statutory design, then, immigration judges are independent adjudicators with the authority to take a broad range of actions to appropriately manage the cases before them. *See Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 893 (2018) (explaining that immigration judges' authority to order administrative closure is supported by these federal regulations). Such actions include administrative closure. *Matter of Avetisyan*, 25 I&N Dec. 688, 691–92 (BIA 2012); *accord Baez-Sanchez v. Sessions*, 872 F.3d 854 (7th Cir. 2017) (holding that 8 C.F.R. § 1003.10(b) is "a declaration that [immigration judges] may exercise all of the Attorney General's powers 'in the cases that come before them,' unless some other regulation limits that general delegation").

Administrative closure is essentially a stay of proceedings, during which a case is removed from the immigration judge's calendar or the BIA's docket. *See id.* at 692. The duration of such

closure is set by the completion of a process separate and apart from removal proceedings, but nonetheless potentially relevant to the outcome of the proceedings. When immigration judges administratively close a case that cannot move forward until an outside process is completed, it allows them to focus on other cases before their court without having to repeatedly recalendar inactive proceedings.

The Agency has recognized the utility and inherent authority of administrative closure by issuing a number of regulations involving the use of administrative closure. In 2001, for example, DOJ directed immigration judges to administratively close cases in which the immigrant "appears eligible to file for relief under [Legal Immigration Family Equity] Legalization." 8 C.F.R. § 245a.12(b)(1) (2017); 66 Fed. Reg. 29,661, 29,674 (June 1, 2001). Similarly, in 2003, DOJ promulgated a regulation instructing immigration judges to administratively close cases in which the immigrant "appears eligible for V nonimmigrant status." 8 C.F.R. § 1214.3 (2017); 68 Fed. Reg. 9,823, 9,836 (Feb. 28, 2003). Another regulatory provision allows victims of severe forms of human trafficking to request administrative closure of removal proceedings "to allow the alien to pursue an application for T nonimmigrant status," relief created by the Victims of Trafficking and Violence Protection Act. 8 C.F.R. § 1214.2(a) (2017); 68 Fed. Reg. 9,823, 9,836 (Feb. 28, 2003).

Likewise, in 2013, DHS amended regulations regarding waivers of certain grounds of inadmissibility to explicitly allow immigrants, after removal proceedings had been administratively closed, to file an application for a provisional unlawful presence waiver. 78 Fed. Reg. 535, 577 (Jan. 3, 2013) (codified at 8 C.F.R. § 212.7(e)(4)(v) (2017)). If the case has not been administratively closed, it is prohibited from evaluating the immigrant's application for a provisional unlawful presence waiver (titled Form I-601A). Accordingly, in such cases, without

the power of administrative closure to pause removal proceedings to allow these waiver applications to be processed, immigration judges would be forced to unnecessarily hear cases in which an immigrant may otherwise be eligible for relief—in other words, immigration judges could expend time and resources adjudicating the case and entering an order of removal, only to have USCIS grant a provisional unlawful presence waiver after the fact.

Underscoring its endorsement of administrative closure, in 2016 DHS explicitly rejected a commenter's suggestion that it eliminate the requirement that removal proceedings be administratively closed before an immigrant can apply for a provisional waiver of inadmissibility. 81 Fed. Reg. 50,243, 50,255 (July 29, 2016).  In response to the comment, DHS stated that DOJ "instructs its immigration judges to use available docketing tools to ensure fair and timely resolution of cases."  *Id.*  DHS further stated that it "believes that current processes provide ample opportunity for eligible applicants to seek a provisional waiver, while improving the allocation of government resources and ensuring national security, public safety, and border security."  *Id.*  Both in the context of waivers of inadmissibility and in general, the use of administrative closure to manage the immigration court's docket is vital to allocating judicial resources efficiently.

**F.     The Rule's Creation of Arbitrary Deadlines and Timeframes Strips Immigration Judges of the Power to Control Their Own Dockets**

In addition to eliminating administrative closure authority, the Rule also strips appellate immigration judges of other tools to manage their dockets.  For example, the Rule "amends 8 C.F.R. 1003.1(e)(8)(i) to harmonize the time limits for adjudicating cases so that both the 90- and 180-day deadlines are set from the same starting point—when the record is complete."[26] Additionally, the Rule "established specific time frames for review by the screening panel, processing of transcripts, issuance of briefing schedules, and review by a single BIA member to

---

[26] 85 Fed. Reg. 81591.

determine whether a single member or a three-member panel should adjudicate the appeal. . . ."[27] While we support creating efficiencies in an overwhelmed system, we strongly oppose arbitrary deadlines that impact appellate immigration judges' ability to accurately and fairly perform their duties.

The Agency cites to the increasing backlog of cases at the immigration courts and the BIA as justification for its creation of deadlines and timeframes.[28]  However, as immigration judges and appellate immigration judges who have served under many administrations, we understand that each time the Agency changes priorities and sets new deadlines and timeframes, the backlog increases rather than decreases.  Furthermore, setting arbitrary deadlines and timeframes that must be consistent in every case ignores the reality of the BIA docket.  While some appeals are simple and can be adjudicated quickly, other cases are exceptionally complex with large convoluted records.  As such, appellate immigration judges are professionals and should be trusted to make decisions about how to prioritize vastly different cases.  Setting strict deadlines will lead to mistakes and even more federal court appeals, which will ultimately increase the backlog.

G.    **The Elimination of *Sua Sponte* Authority Puts Too Much Weight on Expediency at the Expense of Asylum Applicants' Due Process Rights**

The Rule's elimination of the delegation of *sua sponte* reopening authority under 8 C.F.R. §§ 1003.2(a) and 1003.23(b)(1) would offend notions of justice.  Indeed, *sua sponte* reopening authority is a necessary tool for immigration judges and the Board to ensure that due process is the guiding principle of our system, rather than expediency and finality.  As former immigration judges, each of us faced compelling motions to reopen which failed to meet the regulatory requirements, but also did not present extraordinary circumstances for *sua sponte* reopening, and

---

[27] 85 Fed. Reg. 81591.
[28] 85 Fed. Reg. 52507-08.

those motions were denied.  Similarly, we have adjudicated motions to reopen that—to provide
due process to the unusual respondent in extraordinary circumstances—were appropriately granted
under the Court's *sua sponte* authority.  *Sua sponte* reopening authority is an especially important
power for adjudicators weighing the claims of an unrepresented respondent.  In our experience,
many cases that are appropriately reopened under a Judge's *sua sponte* authority are the result of
unrepresented respondents unknowingly failing to complete a ministerial task, such as timely
submitting a change of address form, resulting in cascading immigration consequences, often for
years.  The purpose of the Immigration Court system is rather due process for those appearing
before it.  Stripping adjudicators of the ability to reopen the extraordinary case that is otherwise
final, and does not otherwise meet the stringent standards for reopening, makes the system less
fair.

We reject in the strongest possible terms the rationale for the Rule that *sua sponte* authority
should not exist because of its "potential for inconsistent usage and abuse."  From our decades of
experience, we know that the Department of Justice carefully vets and hires immigration judges
and Board members precisely because of their ability to exercise sound judgment and discretion,
in accordance with the Constitution and binding laws.  Collectively, we have decided many tens
of thousands of cases, and are keenly aware that each one represents a person's life, and not simply
a completion number on a dashboard.  Each of us appreciated that *sua sponte* authority was to be
exercised in truly extraordinary circumstances and was not meant as a general cure for filing
defects, and we adjudicated motions accordingly.

## CONCLUSION

The new Rule purports to address problems of backlogged courts, but ultimately causes
more problems than it solves.  Under the guise of promoting efficiency, the Rule turns due process

on its head; a trade-off not supported by asylum laws passed by Congress or any sense of fairness to vulnerable asylum seekers.

   For these reasons, *amici* urge this Court to enjoin the new Rule.


Dated: February 5, 2021      Respectfully submitted,

                 AKIN GUMP STRAUSS HAUER & FELD LLP


                 By: */s/ John R. Jacob*
                    John R. Jacob (D.C. Bar No. 444412)
                    AKIN GUMP STRAUSS HAUER & FELD, LLP
                    ROBERT S. STRAUSS TOWER
                    2001 K Street, NW
                    Washington, DC 200006-1037
                    Tel: 202.887.4582
                    Fax: 202.887.4288
                    jjacob@akingump.com