**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., et al.,<br><br>        Plaintiffs,<br><br>  v.<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, et al.,<br><br>        Defendants. | Case No.: 1:21-cv-00094-RJL |

**BRIEF OF AMICI CURIAE 16 CITIES AND COUNTIES IN SUPPORT OF PLAINTIFFS' MOTION TO STAY AGENCY ACTION UNDER 5 U.S.C. § 705 AND/OR FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ............................................................ 1

ARGUMENT ...................................................................................... 2

    I.     THE RULE WILL HARM *AMICI*'S COMMUNITIES AND
          FRUSTRATE THEIR INVESTMENTS IN PROTECTING
          IMMIGRANT RESIDENTS ......................................................... 3

          A.    By Imposing Severe Procedural Burdens, The Rule Will Lead To
              The Unjust Removal Of Immigrants With Valid Claims For Relief
              From *Amici*'s Communities ................................................. 3

              1.    The Rule Precludes the BIA and IJs from Administratively
                  Closing Cases, Effectively Foreclosing Immigrants from
                  Pursuing Alternative Humanitarian Relief ................................. 4

              2.    The Rule Limits the Ability of the BIA and IJs To Remand
                  and Reopen Cases, Even Where Relief Has Become
                  Available or Where Immigrants Could Be Removed in
                  Error ................................................................................. 5

              3.    The Rule Condenses the Timeline for Appeal, Preventing
                  Effective Representation and Favoring Hasty Dismissals ............ 7

           B.    When Immigrants Are Unfairly Denied Procedural Safeguards
               And Unjustly Removed, Local Communities, Like *Amici*, Suffer............ 8

              1.    The Rule Will Lead to Increased Family Separation, Which
                  Will Result in Long-Term Harm to Children in Local
                  Communities ...................................................................... 8

              2.    The Rule Will Harm *Amici*'s Economies and Communities
                  as More Immigrants Face Unjust Removal ............................... 10

               3.    The Rule Undermines *Amici*'s Investments in Removal
                  Defense ............................................................................. 12

    II.    THE RULE SHOULD BE STAYED OR ENJOINED BECAUSE IT
          VIOLATES THE APA AND THE CONSTITUTION'S DUE PROCESS
          CLAUSE ............................................................................. 14

           A.    The Rule is Arbitrary And Capricious Because EOIR Failed To
               Consider The Unique Harms The Rule Would Cause Local
               Governments ...................................................................... 14

           B.    The Rule Also Violates Immigrants' Due Process Rights ...................... 17

CONCLUSION.................................................................................... 20

CERTIFICATE OF COMPLIANCE .......................................................... 22

LIST OF *AMICI CURIAE* ................................................................... 23

ADDITIONAL COUNSEL FOR *AMICI CURIAE*...................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bridges v. Wixon,*
326 U.S. 135 (1945) ...................................................................................18

*Catholic Legal Immigration Network, Inc. v. Executive Office for Immigration Review,*
2021 WL 184359 (D.D.C. January 18, 2021) ..............................................15, 17

*Department of Homeland Security v. Regents of the University of California,*
140 S. Ct. 1891 (2020) .............................................................................16, 17

*Escobar v. I.N.S.*
896 F.2d 564 (D.C. Cir. 1990) .........................................................................18

*Fuentes v. Shevin,*
407 U.S. 67 (1972) .......................................................................................20

*I.N.S. v. Cardoza-Fonseca,*
480 U.S. 421 (1987) .......................................................................................18

*Immigrant Legal Res. Ctr. v. Wolf,*
2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................................................16

*J.G. v. Warden, Irwin Cty. Detention Ctr.,*
2020 WL 6938013 (M.D. Ga. Nov. 16, 2020) ................................................19

*Landon v. Plasencia,*
459 U.S. 21 (1982) .......................................................................................17

*Mathews v. Eldridge,*
424 U.S. 319 (1976) .......................................................................................17

*Michigan v. E.P.A.,*
576 U.S. 743 (2015) .......................................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) .......................................................................................15

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.,*
2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ................................................16

*Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.,*
164 F.3d 713 (1st Cir. 1999) ...........................................................................20

*Romero v. Barr,*
937 F.3d 282 (4th Cir. 2019) ........................................................................4, 18

*Zadvydas v. Davis,* 533 U.S.
678 (2001) ....................................................................................................17

**Statutes**

5 U.S.C. § 551 *et seq.* ........................................................................................ 2

5 U.S.C. § 706(2)(B) ........................................................................................18

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

**Other Authorities**

Am. Immigration Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (Nov. 22, 2019), https://www.americanimmigrationcouncil.org/research/us-citizen-children-impacted-immigration-enforcement. ...................................................................... 9

Amy Maxmen, *Migrants and Refugees Are Good For Economies*, Nature (June 20, 2018), https://www.nature.com/articles/d41586-018-05507-0 ........................................11

Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. F. 567 (2020) ...................................................................19

Enrico Moretti, U.C. Berkeley Dep't of Econs., Social Returns to Education and Human Capital Externalities: Evidence from Cities 1 (1998), http://darp.lse.ac.uk/PapersDB/Moretti_(98).pdf ..................................................10

*Immigrants in California,* Am. Immigration Council, https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_california.pdf (last visited Jan. 28, 2021). .............................................10

*Immigration Unit*, San Francisco Public Defender, https://sfpublicdefender.org/services/immigration-unit/ (last visited Jan. 28, 2021) .........................................................................................................13

Jamila Henderson, et al., *A Profile of Frontline Workers in the Bay Area*, Bay Area Equity Atlas, https://bayareaequityatlas.org/essential-workers (last visited Jan. 28, 2021). ...........................................................................................10

Jennifer Stave, et al., *Evaluation of the New York Immigrant Family Unity Project* 55, Vera Inst. of Justice (Nov. 2017), new-york-immigrant-family-unity-project-evaluation.pdf ............................................................... 11, 13, 14

Jonathan Rothwell, The Brookings Institute, What Colleges Do for Local Economies: A Direct Measure Based on Consumption (2015), https://www.brookings.edu/research/what-colleges-do-for-local-economies-a-direct-measure-based-on-consumption/ ..............................................................10

L.A. Cty. Dep't of Consumer & Business Affairs, *Two-Year Report – Legal Representation for Los Angeles County Residents Facing Removal* 100 (Feb. 24, 2020) .............................................................................5, 6, 12, 13, 14

*Los Angeles*, Ctr. for the Study of Immigrant Integration, USC Dornsife College of Letters, Arts & Sciences, https://dornsife.usc.edu/assets/sites/731/docs/LOSANGELES_web.pdf (last visited Jan. 25, 2021). ...........................................................................9

Luis H. Zayas & Laurie Cook Hefron, *Disrupting Young Lives: How Detention and Deportation Affect US-Born Children of Immigrants*, Am. Pyschological Ass'n (2016), https://www.apa.org/pi/families/resources/newsletter/2016/11/detention-deportation.........................................................................................9

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

National Immigration Forum, *Immigrants as Economic Contributors: Refugees Are a Fiscal Success Story for America* (June 14, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-refugees-are-a-fiscal-success-story-for-america/ .....................................................................11

New York City Office of Civil Justice, *Annual Report* 13 (2019) ...................................9, 12, 13

Office of the New York State Comptroller, *The Role of Immigrants in the New York City Economy* (Nov. 2015), https://www.osc.state.ny.us/sites/default/files/reports/documents/pdf/2018-11/report-7-2016.pdf. ...................................................................................................................11

Press Release, San Francisco Office of the Mayor, Mayor Mark Farrell, Assemblymember Phil Ting and Supervisor Sandra Lee Fewer Announce Funding Efforts to Provide Universal Representation for Detained Northern California Immigrants (Mar. 1, 2018) ................................................................................12

*Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard*, MANATT (Oct. 11, 2018), https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population ................................................................................... 8

Raul Hinojosa-Ojeda et al., *Essential but Disposable: Undocumented Workers and their Mixed-Status Families, Modeling COVID-19 Economic Impacts and Government Relief Policies by Race and Immigration Status in Los Angeles County, California, and the United States*, UCLA N. Am. Integration & Development Ctr. & Mexican Instituto Nacional de Estadística y Geografía 10, 20 (Aug. 10, 2020), https://irle.ucla.edu/wp-content/uploads/2020/08/Essential-Undocumented-Workers-Final-w-Cover.pdf. ................................................................................................................ 1, 10, 11

*San Francisco*, Ctr. for the Study of Immigrant Integration, USC Dornsife College of Letters, Arts & Sciences, https://dornsife.usc.edu/assets/sites/731/docs/SANFRANCISCO_web.pdf (last visited Jan. 28, 2021)............................................................................................................. 9

Sophia Koropeckyj, et al., Am. Acad. of Arts & Sciences, The Economic Impact of Increasing College Completion 21 (2017), https://www.amacad.org/sites/default/files/publication/downloads/CFUE_Econ omic-Impact.pdf. ................................................................................................................9, 10

*Why We're Here*, S.F. Immigrant Legal Defense, https://sfildc.org (last visited Jan. 28, 2021) ........................................................................................................13

## Regulations

85 Fed. Reg. at 81588 ....................................................................................................*passim*

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are home to millions of immigrants and immigrant families, who are integral to the social fabric and future of *Amici*'s communities. Immigrants contribute more than $3 trillion GDP nationwide, and during the COVID-19 pandemic, immigrant workers have helped sustain essential sectors.[2] Immigrants also create jobs and build opportunities for others, including 2.8 million jobs in Los Angeles County alone.[3] And immigrants support families throughout the United States, with over 13 million U.S. citizen children depending on an immigrant parent.[4]

*Amici* recognize that it is critical to the well-being of the entire community to protect immigrants and their families from unjust removals of immigrant residents and to help immigrants to assert valid claims for immigration benefits or for relief from removal. For this reason, *Amici* have invested in a variety of initiatives to keep immigrants rooted in their communities, from citizenship classes at public libraries to direct legal services to help immigrants who otherwise could not afford representation in the visa application process or in removal proceedings.

But the challenged rule, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588 (Dec. 16, 2020) (the Rule), harms these interests. The Rule strips important due process protections from immigrants who appear

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel certifies that this brief was authored in full by *Amici* and its counsel, no party or counsel for a party authored or contributed monetarily to this brief in any respect, and no person or entity other than *Amici* and its counsel contributed monetarily to this brief's preparation or submission.

[2] Raul Hinojosa-Ojeda et al., *Essential but Disposable: Undocumented Workers and their Mixed-Status Families, Modeling COVID-19 Economic Impacts and Government Relief Policies by Race and Immigration Status in Los Angeles County, California, and the United States*, UCLA N. Am. Integration & Development Ctr. & Mexican Instituto Nacional de Estadistica y Geografia 10, 20 (Aug. 10, 2020), https://irle.ucla.edu/wp-content/uploads/2020/08/Essential-Undocumented-Workers-Final-w-Cover.pdf.

[3] *Id*. at 23.

[4] *Id*. at 18.

in immigration court and before the Board of Immigration Appeals (BIA), which in turn will mean that more immigrants' cases will be wrongly decided and more immigrants will be unable to assert, or to have immigration courts consider, valid bases for relief from removal or valid claims to immigration benefits. The Rule will thus cut off immigrants' ability to receive relief for which they otherwise would be eligible.

Fair process in immigration proceedings can have life or death consequences for *Amici's* immigrant residents and significant social and economic consequences for *Amici*. Access to a fair process and procedures through which the court can consider or reconsider immigrants' claims can mean the difference for many immigrant residents between being separated from their families and returned to a country where they may be killed, or living in safety and contributing to *Amici*'s communities. Fair process and procedures also help protect *Amici*'s investments in legal services and ensure effective representation for immigrant residents, thereby promoting the future prosperity of *Amici*'s communities. The Rule severely undercuts *Amici*'s investments in immigrant legal services and endangers *Amici*'s families and communities by eroding procedural protections for immigrants in removal proceedings. The Rule is also contrary to *Amici*'s interests in preventing arbitrary and capricious decisionmaking and protecting all residents from unlawful violations of their due process rights under the Fifth Amendment. For these reasons, the Rule should be stayed under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, or enjoined.

## ARGUMENT

*Amici* adopt and concur in Plaintiffs' legal arguments and write separately to urge the Court to enjoin the Rule because of its harmful ramifications on local governments and communities like *Amici*'s, and because the Rule is arbitrary and capricious and violates immigrants' due process rights.

The Rule's several procedural changes will preclude immigrants from raising valid claims for relief and will demand greater resources from advocates providing removal defense. As a result, many immigrants will be removed despite the potential for immigration relief. This will gravely harm local communities: children in *Amici*'s communities who depend on immigrant parents will suffer the life-long trauma of family separation; *Amici* will lose vital contributors to their economies and cultural life; and *Amici*'s significant investments in removal defense will be frustrated because as each case demands further resources, *Amici* will be able to serve fewer immigrants in need of representation.

The Rule also violates the APA and immigrants' due process rights. The Executive Office for Immigration Review (EOIR) failed to acknowledge the practical ramifications of the Rule on local economies and communities—even after *Amici* raised these concerns to EOIR in public comments. This failure renders the Rule arbitrary and capricious. The Rule's heightened procedural burdens also violate immigrants' due process rights by unjustifiably depriving them of their right to raise valid claims for immigration relief. For these reasons, along with those raised by Plaintiffs, this Court should stay or enjoin the Rule.

## I.    THE RULE WILL HARM *AMICI*'S COMMUNITIES AND FRUSTRATE THEIR INVESTMENTS IN PROTECTING IMMIGRANT RESIDENTS

### A.    By Imposing Severe Procedural Burdens, The Rule Will Lead To The Unjust Removal Of Immigrants With Valid Claims For Relief From *Amici*'s Communities

The Rule imposes procedural burdens on immigration court and BIA proceedings that will inevitably result in the unjust and unfair removal of immigrants who otherwise would be eligible for relief. *First*, the Rule generally precludes administrative closure, a tool often used to put removal proceedings on hold so that immigrants can pursue alternative relief from U.S. Citizenship and Immigration Services (USCIS). 85 Fed. Reg. at 81590-91. *Second*, the Rule

limits the ability of the BIA and immigration judges (IJs) to remand or reopen a case, even where a potential avenue for relief subsequently becomes available. *Id*. at 81589-90. *Third*, the Rule shortens the timeline for appeals, which will hinder advocates' ability to present a full defense and prompt hasty dismissals. *Id*. at 81588, 91-92. Each of these procedural restrictions will hurt residents in *Amici*'s communities who have valid claims for relief that will be more difficult for them to assert and for courts to consider.

1.    **The Rule Precludes the BIA and IJs from Administratively Closing Cases, Effectively Foreclosing Immigrants from Pursuing Alternative Humanitarian Relief**

The Rule's elimination of most uses of administrative closure will result in harsh consequences for the most vulnerable immigrants. Administrative closure has long been a crucial tool for the BIA and IJs to ensure just results for immigrants in removal proceedings who are eligible for forms of humanitarian relief over which USCIS has exclusive jurisdiction—including children who are pursuing Special Immigrant Juvenile Status (SIJS), crime victims pursuing U-visas, trafficking victims pursuing T-visas, and others. The BIA and IJs historically have used administrative closure to pause removal proceedings while immigrants pursue their applications with USCIS. *See Romero v. Barr*, 937 F.3d 282, 286-87 (4th Cir. 2019). These applications sometimes take considerable time for USCIS to decide, for reasons that are no fault of the immigrants who apply.

If the BIA and IJs cannot administratively close removal proceedings, many immigrants eligible for humanitarian relief will be effectively cut off from receiving such relief. The consequences could be devastating, as applications for humanitarian relief provide an important path to protection for many vulnerable immigrants from unsafe conditions in their native countries. For example, in Los Angeles County, Catherine, a 15-year-old orphaned girl, pursued SIJS status because she had been trafficked by her aunt in Guatemala and would face grave risk

of harm if removed there.[5] Catherine is building a safe life in Los Angeles where she can pursue her education and contribute to the County's economy and community. The Los Angeles Justice Fund is helping Catherine and nearly 100 applicants like her apply for humanitarian relief.

Without administrative closure, applicants like these could face removal before their applications have been processed *even though they are eligible for humanitarian relief*, and even though administrative closure for years provided an effective and efficient way for immigration courts to allow time for these applications to be considered. The Rule's elimination of this critical procedural mechanism will thrust many immigrants back into the life-threatening situations they struggled to escape, for no reason other than a lack of inter-agency coordination.

### 2. The Rule Limits the Ability of the BIA and IJs To Remand and Reopen Cases, Even Where Relief Has Become Available or Where Immigrants Could Be Removed in Error

The Rule also sets forth one-sided restrictions on the ability of the BIA or IJs to remand or reopen cases that will prevent immigrants from receiving relief if they become eligible because of a change in law or fact. The BIA and IJs generally have used remand and reopening to allow a deficient record to be further developed, to consider new facts that come to light, and to reevaluate claims if there is a pertinent change in law. But the Rule precludes the BIA from using remand for further fact-finding or issue development, except to allow the *government* to introduce facts *in support* of removal. 85 Fed. Reg. at 81589-90. The Rule also would remove the BIA's and IJs' ability to reopen or reconsider a decision *sua sponte* if a change in law or fact arises after the 90-day deadline that immigrants have to move to reopen their case. *Id.* at 81591.

The Rule thus strips the BIA and IJs of the ability to respond to new circumstances that could open a path to immigration relief. Restrictions on remand and reopening will hurt

---

[5]L.A. Cty. Dep't of Consumer & Business Affairs, *Two-Year Report – Legal Representation for Los Angeles County Residents Facing Removal* 100 (Feb. 24, 2020) (LAJF Report).

immigrants like Cynthia, a mother of three U.S. citizen children who has lived in Los Angeles County for over 15 years, and who is seeking asylum on the basis of domestic violence with the help of the Los Angeles Justice Fund.[6] The legal test for asylum claims premised on domestic violence has shifted throughout the course of her proceedings and continues to change.[7] If there is a further change in law that requires Cynthia to make a new showing to support her case when it is already on appeal, the BIA would need the discretion to remand to allow her to demonstrate her eligibility for relief. Otherwise, Cynthia could be removed from her children, despite a potentially meritorious claim for relief.

Restrictions on remand and reopening also will prevent immigrants from presenting valid claims for immigration relief in the first instance. Mr. A, an indigenous man who has lived in the United States for 15 years with his wife and U.S. citizen child and who fears returning to his home country because of his ethnicity, hired a man known to be a lawyer in his community after being detained. In fact, the man had been disciplined for the unauthorized practice of law. The New York Legal Assistance Group took on Mr. A's case, filed an appeal with the BIA, and argued that Mr. A had been defrauded and prevented from filing an asylum application. The BIA remanded and Mr. A was released pending a final hearing on his asylum claim. Had Mr. A's case been filed after the Rule, however, he would not have been able to present his claim for asylum.

If the BIA and IJs cannot remand or reopen a case to allow new evidence or changed legal circumstances, many immigrants will be removed for no reason other than poor luck and timing. Instead of receiving the relief for which they are eligible, these immigrants will be

---

[6]*Id.* at 97.
[7]*Id.*

uprooted from their families and communities and returned to the precarious conditions from which they fled.

### 3.    The Rule Condenses the Timeline for Appeal, Preventing Effective Representation and Favoring Hasty Dismissals

The Rule compresses the timeline for appellate proceedings, which will burden advocates as well as the BIA. The Rule imposes a simultaneous, rather than consecutive, briefing schedule for immigration appeals and reduces the maximum allowable extension from 90 days to only 14 days. 85 Fed. Reg. at 81588. This simultaneous briefing schedule is a significant departure from almost every other appellate adjudication system in the United States and will require immigrants' advocates to brief arguments without understanding how the government has framed the issue. In order to reply to the government's arguments, advocates will have to rely on the 14-day extension, which in practice likely will only allow 9-10 days for drafting the brief because of common delays in mail service. This compressed timeline will make appeals highly resource-intensive and will limit immigrants' ability to respond to arguments made by the government for their removal. Thus, immigrants will not have the ability to present their claims fully before the BIA.

The Rule also shortens the BIA's time to evaluate appeals. The Rule requires the BIA to evaluate appeals for summary dismissal within 14 days; issue decisions on summary dismissals within 30 days; and take no more than 90 days to issue a final decision on most other appeals. *Id*. at 81591-92. This compressed timeframe will increase pressure to review cases quickly rather than accurately and thus will result in higher rates of erroneous removals of immigrants whose appeals required more searching review. Especially when combined with a simultaneous briefing schedule that deprives the BIA of full briefing by the advocates of each others' arguments, the BIA will return higher rates of removal, including in cases where the immigrant

had a valid claim for relief. These higher rates will not reflect the merits of the cases, but rather the Rule's arbitrary constraints.

### B. When Immigrants Are Unfairly Denied Procedural Safeguards And Unjustly Removed, Local Communities, Like *Amici*, Suffer

The Rule will lead to the removal of immigrants who have valid defenses and claims for relief because its procedural changes prevent immigrants from presenting those valid defenses and claims for relief. These avoidable removals will cause harmful ripple effects throughout local communities, including *Amici*. *First*, children in mixed-status families will suffer detrimental effects from the removal of an immigrant parent, which in turn will dampen their future potential and contribution to their communities. *Second*, local economies will suffer as they lose the contribution of valuable immigrant workers. *Third*, local governments that have invested in removal defense will serve fewer immigrants because the Rule demands greater resources to serve each client.

### 1. The Rule Will Lead to Increased Family Separation, Which Will Result in Long-Term Harm to Children in Local Communities

The Rule will lead to the removal of immigrants who have resided in the United States for several years and built families here. Nationwide, over 50 million people live in mixed-status families—in which some members are U.S. citizens or lawful permanent residents and some members are undocumented immigrants—including over 13 million U.S. citizen children. In Los Angeles County alone, roughly one third of all County residents live in a noncitizen or mixed-status family.[8] Nearly 60 percent of County children—over 1.2 million children total— have at least one immigrant parent, and 44 percent of County households are headed by an

---

[8] *See Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard*, MANATT (Oct. 11, 2018), https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population.

immigrant.[9]  In San Francisco, approximately 54 percent of children have at least one immigrant

parent, and 34 percent of households are headed by an immigrant.[10]  Nearly 60 percent of New

Yorkers share households with at least one immigrant, including about one million in mixed-

status households.[11]  These families, particularly children, depend on their immigrant members

for their continued well-being.

Children will suffer traumatic and lifelong consequences when immigrant parents are

unjustly removed from their families as a result of the Rule's procedural restrictions.  Children in

mixed-status families already accumulate a psychological toll living under the ever-present threat

that a parent could be removed.[12]  If parents are removed from their families, the children are

even more likely to experience toxic stress, which negatively impacts brain development and

leads to the development of mental health conditions such as depression and post-traumatic

stress disorder, as well as physical conditions such as cancer, stroke, diabetes, and heart disease

in adulthood.[13]  Poorer health and educational outcomes for these children in turn will lead to

reduced potential for future success.[14]  This will harm not only these children, but also the local

---

[9]*Los Angeles*, Ctr. for the Study of Immigrant Integration, USC Dornsife College of Letters, Arts & Sciences, https://dornsife.usc.edu/assets/sites/731/docs/LOSANGELES_web.pdf (last visited Jan. 25, 2021).

[10]*San Francisco*, Ctr. for the Study of Immigrant Integration, USC Dornsife College of Letters, Arts & Sciences, https://dornsife.usc.edu/assets/sites/731/docs/SANFRANCISCO_web.pdf (last visited Jan. 28, 2021).

[11]New York City Office of Civil Justice, *Annual Report* 13 (2019) (NYC OCJ Report).

[12]Luis H. Zayas & Laurie Cook Hefron, *Disrupting Young Lives: How Detention and Deportation Affect US-Born Children of Immigrants*, Am. Pyschological Ass'n (2016), https://www.apa.org/pi/families/resources/newsletter/2016/11/detention-deportation.

[13]Am. Immigration Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (Nov. 22, 2019), https://www.americanimmigrationcouncil.org/research/us-citizen-children-impacted-immigration-enforcement.

[14]Sophia Koropeckyj, et al., Am. Acad. of Arts & Sciences, The Economic Impact of Increasing College Completion 21 (2017), https://www.amacad.org/sites/default/files/publication/downloads/CFUE_Economic-Impact.pdf (demonstrating a correlation between higher rates of college graduation and GDP growth).

communities like *Amici* that benefit from their success. When children achieve greater educational outcomes, particularly college graduation, this translates to wage increases for everyone in the work force, faster GDP growth, and greater investment in local goods and services.[15] The Rule harms these interests, however, by increasing unjust removals of parents from their children.

### 2. The Rule Will Harm *Amici*'s Economies and Communities as More Immigrants Face Unjust Removal

*Amici* also will lose the economic and social contributions of the immigrants who are unjustly removed. Nationwide, 23 million immigrant workers contribute over $3 trillion in GDP and nearly $6 trillion in total economic output.[16] In Los Angeles County, immigrant workers constitute one third of the total labor force; contribute $251 billion to the gross state product, $452 billion in economic output, and $75.8 billion in taxes; and support 2.8 million jobs.[17] In the San Francisco area, immigrants comprise 37 percent of the labor force,[18] and approximately 41 percent of Bay Area business owners in 2018 were immigrants.[19] In New York City, immigrants account for 43 percent of the city's work force and nearly one third of the total gross product, and they contribute over $1 billion in state and local taxes.[20]

---

[15]*Id.*; Enrico Moretti, U.C. Berkeley Dep't of Econs., Social Returns to Education and Human Capital Externalities: Evidence from Cities 1 (1998), http://darp.lse.ac.uk/PapersDB/Moretti_(98).pdf; Jonathan Rothwell, The Brookings Institute, What Colleges Do for Local Economies: A Direct Measure Based on Consumption (2015), https://www.brookings.edu/research/what-colleges-do-for-local-economies-a-direct-measure-based-on-consumption/.

[16]Hinojosa-Ojeda, *supra* note 2, at 20.

[17]*Id.* at 20, 22-23.

[18]Jamila Henderson, et al., *A Profile of Frontline Workers in the Bay Area*, Bay Area Equity Atlas, https://bayareaequityatlas.org/essential-workers (last visited Jan. 28, 2021).

[19]*Immigrants in California*, Am. Immigration Council, https://www.americanimmigrationcouncil.org/sites/default/files/research/immigrants_in_california.pdf (last visited Jan. 28, 2021).

[20]Jennifer Stave, et al., *Evaluation of the New York Immigrant Family Unity Project* 55, Vera Inst. of Justice (Nov. 2017), new-york-immigrant-family-unity-project-evaluation.pdf (NYIFUP

Undocumented immigrants, in particular, are making significant contributions to local economies and communities, despite great hardship. Undocumented workers generate $500 billion in labor income and contribute over $1 trillion to the GDP, even though they are disproportionately concentrated in the lowest-paying jobs.[21] Throughout the COVID-19 pandemic, nearly 80 percent of undocumented immigrants have worked in essential sectors.[22] Refugees—who have fled violence in their home countries—soon build roots in their new communities and contribute $22 billion in net fiscal benefits to state and local governments.[23] Indeed, research has shown that refugees and migrants provide substantial benefits to their host countries: a 2018 student that analyzed 30 years of data from Western Europe concluded that after spikes in immigration, host countries' economies improved and unemployment rates dropped.[24]

If vital members of local communities are removed when they otherwise could have been eligible for relief, their loss will be felt throughout *Amici*'s communities. Los Angeles County will lose residents like Daniel, an immigrant who was paralyzed from the waist down in a violent shooting and who now volunteers at rehabilitation centers and teaches students in medical schools about living with a disability. With the help of the Los Angeles Justice Fund, Daniel

---

Report); Office of the New York State Comptroller, *The Role of Immigrants in the New York City Economy* (Nov. 2015), https://www.osc.state.ny.us/sites/default/files/reports/documents/pdf/2018-11/report-7-2016.pdf.
[21]Hinojosa-Ojeda, *supra* note 2, at 15, 21.
[22]*Id.* at 10.
[23]*See* National Immigration Forum, *Immigrants as Economic Contributors: Refugees Are a Fiscal Success Story for America* (June 14, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-refugees-are-a-fiscal-success-story-for-america/.
[24]Amy Maxmen, *Migrants and Refugees Are Good For Economies*, Nature (June 20, 2018), https://www.nature.com/articles/d41586-018-05507-0 (summarizing the results of a study by the Paris School of Economics).

was able to have his removal order terminated, but only after his case was reopened when an IJ read the outpouring of letters of support from the community commending Daniel's character, volunteerism, and civic spirit.[25] Had the Rule been in place, the IJ would not have been able to consider Daniel's significant civic contributions and reopen his case *sua sponte*, and the County would have lost his contributions.

### 3.    The Rule Undermines *Amici*'s Investments in Removal Defense

The Rule will undercut *Amici*'s significant investments to support direct legal services to immigrants who cannot afford representation. Because *Amici* recognize the vital importance of immigrant residents to their families and local communities, several have made significant investments in pro bono legal services for immigrants. Los Angeles County and the City of Los Angeles, for example, have jointly invested $5 million dollars in the Los Angeles Justice Fund.[26] New York City has invested nearly $60 million annually through multiple legal services programs, including the New York Immigrant Family Unity Project, the first publicly funded legal services program specifically for detained immigrants.[27] San Francisco has invested over $11.1 million in immigration legal defense[28] to help sustain programs like the San Francisco Public Defender's Immigration Unit and the San Francisco Legal Defense Collaborative.[29]

---

[25] LAJF Report, *supra* note 5, at 97.
[26] *Id*. at 8.
[27] NYC OCJ Report, *supra* note 11, at 37. Other programs include the Immigrant Opportunity Initiative, which provided legal assistance in over 15,000 complex cases in 2019, including removal defense, *id*. at 13, 36; the Immigrant Child Advocates' Relief Effort, which serves unaccompanied minor children, *id*. at 37-38; and the Rapid Response Legal Collaborative, which provides emergency assistance to those at imminent risk of deportation who may not have the right to see an IJ or otherwise are facing a fast-track to removal, *id*. at 14.
[28] Press Release, San Francisco Office of the Mayor, Mayor Mark Farrell, Assemblymember Phil Ting and Supervisor Sandra Lee Fewer Announce Funding Efforts to Provide Universal Representation for Detained Northern California Immigrants (Mar. 1, 2018).
[29] *Immigration Unit*, San Francisco Public Defender, https://sfpublicdefender.org/services/immigration-unit/ (last visited Jan. 28, 2021); *Why We're Here*, S.F. Immigrant Legal Defense, https://sfildc.org (last visited Jan. 28, 2021).

*Amici*'s investments help their communities, including by serving long-time residents, children, families with U.S. citizen children, and immigrants who are particularly vulnerable. New York City's Family Immigrant Unity Project has represented over 1,500 immigrants who had lived in the United States for over 15 years on average and who are parents to nearly 2,000 children in the United States.[30] New York City's Immigrant Child Advocates' Relief Effort represents over 2,500 immigrant youth in removal proceedings annually.[31] The Los Angeles Justice fund has served over 500 clients, who on average had lived in the County for over a decade and over 80 percent of whom were eligible for fear-based protections or asylum.[32] Twenty-four percent of the immigrants served were children at the time Los Angeles Justice Fund attorneys first began to represent them.[33]

These local initiatives have been extremely successful: Forty-eight percent of immigrants represented by the Los Angeles Justice Fund or New York Immigrant Family Unity Project have achieved positive outcomes in their cases, compared with only four to five percent of immigrants without legal representation—up to an 1100 percent increase in success.[34] And what that success means is that immigrants who successfully assert a valid claim for immigration benefits or a valid claim of relief from removal are able to remain with their families and contribute to *Amici*'s communities. Indeed, New York City's provision of legal representation to immigrants in removal proceedings has led to hundreds of workers gaining or maintaining work authorization, translating into nearly $1 million in additional state and local tax revenue.[35]

---

[30]NYIFUP Report, *supra* note 20, at 5, 10, 20.
[31]NYC OCJ Report, *supra* note 11, at 36-37.
[32]LAJF Report, *supra* note 5, at 4, 8.
[33]*Id.* at 4.
[34]*Id.*; NYIFUP Report, *supra* note 20, at 9.
[35]NYIFUP Report, *supra* note 20, at 58.

- 13 -

But *Amici*'s local initiatives do not come close to meeting demand. The Los Angeles Justice Fund could provide representation to less than a third of the immigrants who were screened in consultations.[36] An average case can demand between 15 and 20 attorney hours per month.[37]

The Rule will drastically increase the hours and expense of each removal defense by adding new procedural hurdles. By eliminating administrative closure, the Rule will remove a key tool for managing dockets and force advocates to devote additional hours to manage proceedings before USCIS and EOIR simultaneously. The Rule's condensed timeline for appeals will prevent attorneys from managing multiple cases effectively because with simultaneous briefing and only a 14-day extension, advocates will need to concentrate more attention per case in the short-term. The Rule's restrictions on remand and reopening also will mean that advocates must devote more time and resources to each case to try to ensure, as best possible, that issues are preserved for appeal. Under these additional pressures, the legal services organizations in which *Amici* have invested will be forced to reduce the number of clients they serve in order to provide effective representation.

## II.    THE RULE SHOULD BE STAYED OR ENJOINED BECAUSE IT VIOLATES THE APA AND THE CONSTITUTION'S DUE PROCESS CLAUSE

### A.    The Rule is Arbitrary And Capricious Because EOIR Failed To Consider The Unique Harms The Rule Would Cause Local Governments

The Rule is arbitrary and capricious because it was promulgated without consideration of the severe ramifications on families, the future prosperity of local communities, and local governments' investments in removal defense that *Amici* set forth above. *First*, the Rule failed to consider the important reliance interests of immigrants' families and children, whose

---

[36] LAJF Report, *supra* note 5, at 4.
[37] *Id.* at 30.

livelihoods and prospects for long-term success depend on family unity. *Second*, the Rule did not consider the reliance interests of local communities, like *Amici*, whose economies rely on the contributions of immigrant residents and whose government systems depend on the trust of immigrant communities. *Third*, the Rule did not consider the reliance interests of locally funded immigrant legal services organizations, who have limited resources and whose core missions will be undercut by the Rule.

When an agency fails to consider important impacts of a rule or serious reliance interests that are harmed by a change in policy, it is arbitrary and capricious in violation of the APA. "Federal administrative agencies are required to engage in 'reasoned decisionmaking.'" *See Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015). An agency action is arbitrary and capricious where the agency has "entirely failed to consider an important aspect" of the issue before it. *See Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Particularly where an agency changes established rules and procedures in the immigration context, it must consider a variety of reliance interests, not only the interests of the directly impacted immigrants, but also the consequences for their families and the local governments that rely on their contribution and that therefore invest in initiatives that provide immigrants with legal services. *See Catholic Legal Immigration Network, Inc. v. Executive Office for Immigration Review*, 2021 WL 184359, at *12 (D.D.C. January 18, 2021) (holding that EOIR acted arbitrarily and capriciously "when it ignored the impact" that a procedural rule change "would have on legal service providers and their capacity to provide representation"); *Immigrant Legal Res. Ctr. v. Wolf*, 2020 WL 5798269, at *15-16 (N.D. Cal. Sept. 29, 2020) (rejecting Department of Homeland Security's argument that an agency need only consider the reliance interests of those "directly affected" by a proposed action, and finding that the interests of legal

- 15 -

services organization plaintiffs who served asylum applicants affected by a rule change must be considered); *see also Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 2020 WL 6802474, at *16 (N.D. Cal. Nov. 19, 2020).

Indeed, just months before Defendants promulgated the Rule, the Supreme Court ruled that an agency ***must*** consider the consequences of a rule not only on those directly affected, but also on others in their families and communities, along with local governments like *Amici*. In June 2020 in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), the Court ruled that rescission of the DACA program—another Trump Administration attack on immigrants—was arbitrary and capricious in part because DHS did not consider the consequences that "would radiate outward to DACA recipients' families, including their 200,000 U.S.-citizen children . . . [and] States and local governments [that] could lose $1.25 billion in tax revenue each year." 140 S. Ct. at 1914 (internal quotation marks omitted).

Here too, EOIR entirely ignored the potential harm to local communities when it finalized the Rule—even after these concerns were put before EOIR in public comments. Los Angeles County, for example, detailed at length how local governments would be harmed by the unjust removal of valuable members of their communities and how the County's significant investment in immigrant legal services would be undercut. New York City and the City of Minneapolis similarly explained how the Rule would harm their local economies, undermine their investments in removal defense, and damage immigrant communities' trust in the legal system and other public systems. Yet, the finalized Rule did not acknowledge any of these potential harms.

Rather, EOIR's response to public comments simply stated, without explanation, that the Rule's procedural changes complied with statutory and constitutional rights, and EOIR failed to

implement any substantive changes to address local governments' concerns. *See* 85 Fed. Reg. at 81592-81649. The APA imposes an obligation that agencies at the very least respond to relevant and significant public comments, a requirement that is not particularly demanding. *Catholic Legal Immigration Network, Inc.*, 2021 WL 184359 at *12. Yet, EOIR did not engage with local governments' concern that families and children will suffer when immigrants are unjustly removed. EOIR also failed to address the concern that local communities will be harmed by the removal of immigrants who contribute to their economies and civic and cultural life. And EOIR did not even acknowledge, much less consider, the harm to legal services organizations. Because EOIR failed to engage with the consequences for immigrants, their families, their communities, and local governments like *Amici* that "would radiate outward" from the Rule's procedural changes, the Rule is arbitrary and capricious. *Regents*, 140 S. Ct. at 1914.

### B.    The Rule Also Violates Immigrants' Due Process Rights

The Rule also is unlawful because it will deny immigrants the full and fair proceedings they are guaranteed by the Due Process Clause. The Constitution's Due Process Clause protects immigrants in removal proceedings and guarantees them the right to fair proceedings. *See Zadvydas v. Davis*, 533 U.S. 678, 693-94 (2001). To evaluate the constitutional sufficiency of proceedings, courts weigh three factors: (1) the significance of the interest at stake to the individual who is subject to the proceedings; (2) the risk that the individual will be erroneously deprived that interest as a result of the procedures; and (3) the government's interest in using the challenged procedures instead of additional or different procedures. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). A rule that violates the Due Process Clause should be stayed or enjoined on that basis and also because it is "contrary to constitutional right" in violation of the APA. 5 U.S.C. § 706(2)(B).

As to the first factor, the Rule undoubtedly implicates a significant interest because

- 17 -

"deportation may result in the loss 'of all that makes life worth living.'" *Bridges v. Wixon*, 326 U.S. 135, 147, 154 (1945) (holding that the liberty of an individual is at stake in a deportation case). The Supreme Court and D.C. Circuit have recognized that "the right to stay and live and work in this land of freedom is a weighty one" and thus "[t]he right to remain in the country is equally protected by due process." *Escobar v. I.N.S.* 896 F.2d 564, 570 (D.C. Cir. 1990) (internal quotation marks omitted); *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the alien makes the claim that he or she will be subject to death or persecution if forced to return to his or her home country.").

As to the second factor, the Rule's severe restrictions on appellate procedures will significantly increase the risk of erroneous removal of immigrants otherwise eligible for relief. Without administrative closure, many immigrants in removal proceedings will be unjustly deported despite their applications for humanitarian and other immigration relief from USCIS. *See supra* I.A.1; *Romero*, 937 F.3d at 286-87 (noting that administrative closure primarily has been used to allow immigrants in removal proceedings to seek relief from USCIS for which they may be eligible). And without procedural protections like discretion to remand or reopen cases, many immigrants who would have been able to demonstrate eligibility for relief will not be able to present their case. *See supra* I.A.2. Indeed, the Rule makes illusory the very benefits and grounds for relief that are written into the immigration law: it blocks the efficacy of benefits like SIJS, U-visas, T-visas, and VAWA visas because under the Rule, even immigrants who qualify for these visas will not be able to benefit from them because the Rule's changes will block

immigrants from pursuing these grounds for relief.[38]

Third, the government's so-called efficiency interest does not justify the need for the Rule's restricted procedures, rather than past procedures or alternatives that are more protective of immigrants' significant liberty interests. Although EOIR claims that the Rule serves its interests in "ensur[ing] the consistency, efficiency, and quality of [immigration] adjudications," 85 Fed. Reg. at 81588, the Rule will serve none of these interests. The Rule will undermine rather than further the quality of immigration adjudication because it will lead to the unnecessary removal of immigrants who otherwise would be eligible for immigration relief. *Cf. J.G. v. Warden, Irwin Cty. Detention Ctr.*, 2020 WL 6938013, at *7 (M.D. Ga. Nov. 16, 2020) (noting that the government's interest should be avoiding, rather than increasing, unnecessary detention of immigrants in removal proceedings because this wastes taxpayers' money and harms judicial efficiency). The Rule will not yield consistency because changes in substantive immigration law will apply only to cases that are proceeding before an IJ, as the BIA will have limited ability to remand for reconsideration. 85 Fed. Reg. at 81591. Finally, the elimination of administrative closure will undercut efficiency by removing a crucial tool for the BIA and IJs to manage their dockets; indeed, since EOIR has attempted to restrict administrative closure, the backlog of immigration cases has only continued to skyrocket.[39] EOIR simply fails to demonstrate that the Rule will promote its interests better than past procedures. To the extent the Rule promotes some efficiency, "mere 'administrative burden' alone cannot ordinarily serve as a rationale for outweighing serious due process rights to fair adjudications." *Penobscot Air Servs., Ltd. v. Fed.*

---

[38]*See* Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. F. 567, 579-81 (2020) (describing how administrative closure protects the rights of immigrants applying for humanitarian relief including U-visa applications).
[39]*See id.* at 567, 579.

*Aviation Admin.*, 164 F.3d 713, 724 n.8 (1st Cir. 1999); *see also Fuentes v. Shevin*, 407 U.S. 67, 90 n.22 (1972) ("Procedural due process is not intended to promote efficiency."). In short, EOIR cannot justify the Rule's disregard for immigrants' due process rights.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court grant Plaintiffs' motion and stay or enjoin the Rule.

Dated:  February 8, 2021                    O'MELVENY & MYERS LLP


                                            By:  */s/ Meaghan VerGow*
                                            Meaghan VerGow
                                            D.C. Bar No. 977165
                                            mvergow@omm.com
                                            O'MELVENY & MYERS LLP
                                            1625 Eye Street, NW
                                            Washington, DC 20006-4061
                                            Telephone:  +1 202 383 5300
                                            Facsimile:   +1 202 383 5414
                                            *Counsel of Record*

                                            Margaret L. Carter*
                                            mcarter@omm.com
                                            Daniel R. Suvor*
                                            dsuvor@omm.com
                                            O'MELVENY & MYERS LLP
                                            400 S. Hope Street, 18th Floor
                                            Los Angeles, CA 90071
                                            Telephone: +1 213 430 6000
                                            Facsimile: +1 213 430 6407
                                            **Pro hac vice* pending

                                            Attorneys for *Amicus Curiae*
                                            County of Los Angeles

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7(o)(5), I certify that this brief complies with the page limitation set forth in Local Rule Local Civil Rule 7(o)(4) because it does not exceed 25 pages. I certify that this document complies with the typeface requirements of Local Civil Rule 5.1(d).

Dated: February 8, 2021                     O'MELVENY & MYERS LLP


By:  */s/ Meaghan VerGow*
    Meaghan VerGow
    D.C. Bar No. 977165
    mvergow@omm.com
    O'MELVENY & MYERS LLP
    1625 Eye Street, NW
    Washington, DC 20006-4061
    Telephone: +1 202 383 5300
    Facsimile:  +1 202 383 5414
    *Counsel of Record*

Attorneys for *Amicus Curiae*
County of Los Angeles

## LIST OF *AMICI CURIAE*

*City of Albuquerque, New Mexico*

*City of Chicago, Illinois*

*City of Columbus, Ohio*

*Cook County, Illinois*

*City of Dallas, Texas*

*City of Denver, Colorado*

*City of Los Angeles, California*

*County of Los Angeles, California*

*City of New York, New York*

*City of Oakland, California*

*City of Philadelphia, Pennsylvania*

*City of Sacramento, California*

*City of Saint Paul, Minnesota*

*City and County of San Francisco, California*

*City of Seattle, Washington*

*City of Somerville, Massachusetts*

## ADDITIONAL COUNSEL FOR *AMICI CURIAE*

ESTEBAN A. AGUILAR, JR.
City Attorney, City of Albuquerque
P.O. Box 2248
Albuquerque, New Mexico 87103

*Attorney for the City of Albuquerque, New Mexico*

CELIA MEZA
Acting Corporation Counsel
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, Illinois 60602

*Attorney for the City of Chicago, Illinois*

ZACH KLEIN
Columbus City Attorney
77 North Front Street, 4th Floor
Columbus, Ohio 43215

*Attorney for the City of Columbus, Ohio*

JESSICA M. SCHELLER
Chief, Advice, Business & Complex
Litigation Division
Cook County State's Attorney's Office
500 Richard J. Daley Center
Chicago, Illinois 60602

*Attorney for Cook County, Illinois*

CHRISTOPHER J. CASO
Dallas City Attorney
1500 Marilla Street, Room 7DN
Dallas, Texas 75201

*Attorney for the City of Dallas, Texas*

KRISTIN BRONSON
Denver City Attorney
1435 Bannock Street
Denver, CO 80202

*Attorney for City of Denver, Colorado*

MICHAEL N. FEUER
City Attorney
200 North Main Street
Los Angeles, California 90012

*Attorney for the City of Los Angeles, California*

JAMES E. JOHNSON
Corporation Counsel, City of New York
100 Church Street
New York, New York 10007

*Attorney for the City of New York, New York*

BARBARA J. PARKER
City Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612

*Attorney for the City of Oakland, California*

DIANA P. CORTES
Acting City Solicitor, City of Philadelphia
1515 Arch Street, 17th Floor
Philadelphia, Pennsylvania 19102

*Attorney for the City of Philadelphia, Pennsylvania*

SUSANA ALCALA WOOD
City Attorney, City of Sacramento
915 I Street, Fourth Floor
Sacramento, California 95814

*Attorney for the City of Sacramento, California*

LYNDSEY M. OLSON
City Attorney, City of Saint Paul
400 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, Minnesota 55102

*Attorney for the City of Saint Paul, Minnesota*

DENNIS J. HERRERA
City Attorney
City Hall Room 234
One Dr. Carlton B. Goodlett Place
San Francisco, California 94102

*Attorney for the City and County of San Francisco, California*

PETER S. HOLMES
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097

*Attorney for the City of Seattle, Washington*

FRANCIS X. WRIGHT, JR.
City Solicitor, City of Somerville
93 Highland Avenue
Somerville, Massachusetts 02143

*Attorney for City of Somerville, Massachusetts*