# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, <br><br> Defendants. | Civil Action No. 1:21-cv-00094-RJL |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION TO STAY AGENCY ACTION UNDER 5 U.S.C. § 705 AND/OR FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

   I.   Removal Proceedings............................................................................................................ 2

   II.  The Final Rule .................................................................................................................... 3

   III. This Lawsuit ....................................................................................................................... 4

STANDARD OF REVIEW ........................................................................................................ 5

   I.   5 U.S.C. § 705 – Relief Pending Review.......................................................................... 5

   II.  Rule 65 – Preliminary Injunction................................................................................... 6

ARGUMENT .............................................................................................................................. 6

   I.   Plaintiffs' Claims Are Not Justiciable. ............................................................................ 7

       A.  The INA Precludes Jurisdiction over Plaintiffs' Claims............................................ 7

       B.  Plaintiffs Do Not Have Standing. .............................................................................. 10

       C.  Plaintiffs Are Not Within the INA's Zone of Interests.............................................. 13

   II.  Plaintiffs Are Not Likely to Succeed on Their Claims. ................................................... 15

       A.  The Rule Is Consistent with the INA and its Implementing Regulations.................. 15

           1.  Allowing EOIR's Director to Adjudicate Appeals Is Consistent with the INA. .................................................................................................................... 16

           2.  The Long-Standing Background Check Requirement Does Not Conflict with the Withholding of Removal Statute. ......................................................... 19

           3.  The Rule Preserves the Right of Individuals in Removal Proceedings to Examine and Present Evidence.......................................................................... 20

           4.  Changes in the BIA's Briefing Schedule Do Not Deprive Individuals of Their Right to Counsel............................................................................................ 23

           5.  Permitting EOIR's Director to Adjudicate Cases Is Not Contrary to 8 C.F.R. § 1003.0(c). ...................................................................................................... 24

       B.  The Rule Is Neither Arbitrary Nor Capricious. ........................................................ 27

           1.  The Rule Promotes Efficiency and Explains How It Does So............................. 28

2.   The Department Appropriately Considered Relevant Facts and Data. ................. 31

3.   The Rule Is Not Internally Inconsistent. .................................................. 36

4.   The Department Did Not Ignore Significant Comments. .................................... 39

C.   The Rule Is Procedurally Valid. ..................................................................... 41

1.   The 30-Day Comment Period Provided Sufficient Opportunity for Public Participation. ........................................................................... 41

2.   The Department Complied with the Regulatory Flexibility Act. ......................... 43

III. Plaintiffs Cannot Establish Irreparable Harm or that the Equities Lie in Their Favor. .... 44

IV. Any Relief Must Be Sharply Limited. .............................................................. 45

CONCLUSION ..................................................................................................... 48

# TABLE OF AUTHORITIES

## Cases

*Adams v. Vance,*
    570 F.2d 950 (D.C. Cir. 1978) ................................................................................ 44

*American Immigration Lawyers Association (AILA) v. Reno,*
    199 F.3d 1352 (D.C. Cir. 2000) ...................................................................... 10, 15

*Ariz. Christian Sch. Tuition Org. v. Winn,*
    563 U.S. 125 (2011) ............................................................................................ 12

*ASPCA v. Feld Entm't, Inc.,*
    659 F.3d 13 (D.C. Cir. 2011) ................................................................. 11, 12, 13

*Ass'n of Oil Pipe Lines v. FERC,*
    876 F.3d 336 (D.C. Cir. 2017) ............................................................................. 38

*Asylum Seeker Advocacy Project v. Barr,*
    409 F. Supp. 3d 221 (S.D.N.Y. 2019) ................................................................. 8

*\*Ayuda, Inc. v. Reno,*
    7 F.3d 246 (D.C. Cir. 1993) ...................................................................... 9, 10, 15

*Bauer v. DeVos,*
    325 F. Supp. 3d 74 (D.D.C. 2018) ....................................................................... 5

*Bean Dredging, LLC v. United States,*
    699 F. Supp. 2d 118 (D.D.C. 2010) .................................................................... 27

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................................ 10

*Biovail Corp. v. FDA,*
    448 F. Supp. 2d 154 (D.D.C. 2006) .................................................................... 15

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) .............................................................................................. 9

*Cal. Ass'n of Private Postsecondary Sch. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018) .................................................................... 44

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) .............................................................................. 46

*Campos v. INS,*
    62 F.3d 311 (9th Cir. 1995) ................................................................................ 14

*Cement Kiln Recycling Coal. v. EPA*,
   255 F.3d 855 (D.C. Cir. 2001)................................................................. 43

*Chevron, U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984)............................................................................. 27

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003)............................................................... 42

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995)................................................................. 44

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)............................................................................. 13

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987)............................................................................. 14

*Coal. for Safe Nuclear Power v. U.S. Atomic Energy Comm'n*,
   463 F.2d 954 (D.C. Cir. 1972)............................................................... 29

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*,
   15 F. Supp. 2d 1 (D.D.C. 1997)............................................................... 6

*Dallas Safari Club v. Bernhardt*,
   453 F. Supp. 3d 391 (D.D.C. 2020)...................................................... 6, 44

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)........................................................................... 9

*Dia v. Ashcroft*,
   353 F.3d 228 (3d Cir. 2003) ............................................................ 17, 18

*Dist. of Columbia v. USDA*,
   444 F. Supp. 3d 1 (D.D.C. 2020)............................................................. 6

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) .............................................................. 15

*Enriquez-Gutierrez v. Holder*,
   612 F.3d 400 (5th Cir. 2010) ............................................................... 21

*Fair Empl. Council of Greater Wash., Inc. v. BMC Mktg.*,
   28 F.3d 1268 (D.C. Cir. 1994)............................................................... 11

*FAIR v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996)................................................................. 15

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)................................................................................ 27, 37

*\*Fla. EB5 Invs., LLC v. Wolf*,
   443 F. Supp. 3d 7 (D.D.C. 2020) ......................................................... 6, 44, 45

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015)................................................................... 7, 10

*G.S. v. Holder*,
   373 F. App'x 836 (10th Cir. 2010) .................................................................. 18

*Garcia-Martinez v. Sessions*,
   886 F.3d 1291 (9th Cir. 2018) ........................................................................ 36

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018).............................................................................. 10, 45

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020)........................................................................ 47

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)................................................................................. 11, 12

*Haynes v. Navy Fed. Credit Union*,
   841 F. Supp. 2d 221 (D.D.C. 2012) ............................................................... 15

*\*Hispanic Affairs Project v. Acosta*,
   901 F.3d 378 (D.C. Cir. 2018)........................................................... 37, 38, 41

*Hurd v. Dist. of Columbia*,
   864 F.3d 671 (D.C. Cir. 2017)......................................................................... 4

*Innovation Law Lab v. McAleenan*,
   924 F.3d 503 (9th Cir. 2019) .................................................................... 44, 45

*INS v. Doherty*,
   502 U.S. 314 (1992)........................................................................................ 16

*INS v. Legalization Assistance Project*,
   510 U.S. 1301 (1993)...................................................................................... 14

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) .................................................................... 8, 36

*Jackson v. Mabus*,
   808 F.3d 933 (D.C. Cir. 2015)........................................................................ 27

*Johnson v. Comm'n on Presidential Debates*,
No. 15-1580 (RMC), 2016 WL 4468153 (D.D.C. Aug. 24, 2016) ........................................ 4

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ........................................................................................................ 35

*Lexmark Int'l, Inv. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ........................................................................................................ 14

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ........................................................................................................ 46

*Malukas v. Barr*,
940 F.3d 968 (7th Cir. 2019) .......................................................................................... 33

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ........................................................................................................ 14

*Mendoza-Garcia v. Barr*,
918 F.3d 498 (6th Cir. 2019) .......................................................................................... 41

*Mid-Tex Elec. Co-op Inc. v. FERC*,
773 F.2d 327 (D.C. Cir. 1985) ........................................................................................ 43

*Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*,
498 U.S. 211 (1991) .......................................................................................................... 7

*Morales v. Barr*,
973 F.3d 656 (7th Cir. 2020) .......................................................................................... 31

*Morton v. Ruiz*,
415 U.S. 199 (1974) ........................................................................................................ 27

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................................................... 27, 28, 37, 38

*Mu Ju Li v. Mukasey*,
515 F.3d 575 (6th Cir. 2008) .......................................................................................... 17

*Munaf v. Geren*,
553 U.S. 674 (2008) .......................................................................................................... 6

*Nasrallah v. Barr*,
140 S. Ct. 1683 (2020) .................................................................................................... 16

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019) ...................................................................................... 42

*Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*,
  145 F.3d 1399 (D.C. Cir. 1998) ........................................................ 47

*Neb. DHHS v. DHHS*,
  435 F.3d 326 (D.C. Cir. 2006) .......................................................... 47

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) ......................................................... 37, 41

*New York v. U.S. DHS*,
  969 F.3d 42 (2d Cir. 2020) .............................................................. 46

*NIPNLG v. EOIR*,
  456 F. Supp. 3d 16 (D.D.C. 2020) ...................................................... 8

*NTEU v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ..................................................... 11, 12

*O.A. v. Trump*,
  404 F. Supp. 3d 109 (D.D.C. 2019) ..................................................... 8

*Ortiz-Alfaro v. Holder*,
  694 F.3d 955 (9th Cir. 2012) ........................................................... 18

*P.L. v. U.S. ICE*,
  No. 1:19-CV-01336, 2019 WL 2568648 (S.D.N.Y. June 21, 2019) ...................... 8

*PETA v. USDA*,
  797 F.3d 1087 (D.C. Cir. 2015) ........................................................ 11

*Ramirez-Alejandre v. Ashcroft*,
  319 F.3d 365 (9th Cir. 2003) ........................................................... 29

*\*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
  525 U.S. 471 (1999) ................................................................ 9, 46

*Safety-Kleen Corp. v. EPA*,
  Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324 (D.C. Cir. Jan. 19, 1996) ........ 6

*Sampson v. Murray*,
  415 U.S. 61 (1974) ..................................................................... 45

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947) .................................................................... 21

*Shinseki v. Sanders*,
  556 U.S. 396 (2009) .................................................................... 42

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ........................................................................................ 10

*Sure-Tan, Inc. v. NLRB*,
467 U.S. 883 (1984) ........................................................................................... 13

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ........................................................................................ 46

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
106 F. Supp. 3d 125 (D.D.C. 2015) .................................................................... 47

*U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*,
852 F.3d 1131 (D.C. Cir. 2017) .......................................................................... 47

*Va. Soc'y for Human Life v. FEC*,
263 F.3d 379 (4th Cir. 2001) .............................................................................. 46

*\*Vt. Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) .............................................................................. 7, 27, 42

*Warth v. Seldin*,
422 U.S. 490 (1975) ........................................................................................... 10

*Winter v. NRDC*,
555 U.S. 7 (2008) ........................................................................................... 6, 46

## Administrative Decisions

*Matter of Castillo-Perez*,
27 I. & N. Dec. 664 (A.G. 2019) ........................................................................ 18

*Matter of Cordero-Garcia*,
27 I. & N. Dec. 652 (BIA 2019) ......................................................................... 36

*Matter of J-J-*,
21 I. & N. Dec. 976 (BIA 1997) ......................................................................... 33

*Matter of J-Y-C-*,
24 I. & N. Dec. 260 (BIA 2007) ......................................................................... 29

*Matter of L-A-B-R-*,
27 I. & N. Dec. 405 (A.G. 2020) ........................................................................ 32

*Matter of S-O-G- & F-D-B-*,
27 I. & N. Dec. 462 (A.G. 2019) ........................................................................ 32

*Matter of W-Y-C- & H-O-B-*,
27 I. & N. Dec. 189 (BIA 2018) ......................................................................... 29

## Federal Statutes

28 U.S.C. § 509 ................................................................................................................ 4

28 U.S.C. § 510 ............................................................................................................. 2, 4

5 U.S.C. § 553 .................................................................................................................. 42

5 U.S.C. § 603 ............................................................................................................... 1, 5

5 U.S.C. § 603(b)(3) ......................................................................................................... 43

5 U.S.C. § 603(b)(4) ......................................................................................................... 43

5 U.S.C. § 604 ............................................................................................................... 1, 5

5 U.S.C. § 605(b) ............................................................................................................. 43

5 U.S.C. § 701 ................................................................................................................... 1

5 U.S.C. § 702 ................................................................................................................. 13

5 U.S.C. § 705 .......................................................................................................... passim

5 U.S.C. § 706(2) ............................................................................................................. 46

8 U.S.C. § 1101(a)(47)(B) ..................................................................................... 16, 17, 18

8 U.S.C. § 1101(a)(47)(B)(i) ....................................................................................... 16, 17

8 U.S.C. § 1103(g)(2) .................................................................................... 2, 16, 17, 25

8 U.S.C. § 1158(d)(4)(A) ................................................................................................ 14

8 U.S.C. § 1158(d)(7) ...................................................................................................... 14

8 U.S.C. § 1228(b) ........................................................................................................... 18

8 U.S.C. § 1229a .................................................................................................. 2, 14, 15, 18

8 U.S.C. § 1229a(b)(4)(A) ............................................................................................... 46

8 U.S.C. § 1229a(b)(4)(B) ......................................................................................... 20, 46

8 U.S.C. § 1229a(c)(1)(A) ............................................................................................... 46

8 U.S.C. § 1229a(c)(4)(B) ............................................................................................... 46

8 U.S.C. § 1229a(c)(7) ..................................................................................................... 29

8 U.S.C. § 1229a(c)(7)(C)(ii) ................................................................ 20

8 U.S.C. § 1231(b)(3) ............................................................................ 19

8 U.S.C. § 1252 ...................................................................................... 15

8 U.S.C. § 1252(a) ............................................................................. 3, 14

8 U.S.C. § 1252(a)(1) ............................................................................ 17

8 U.S.C. § 1252(a)(5) ..................................................................... passim

8 U.S.C. § 1252(b)(9) ..................................................................... passim

8 U.S.C. § 1252(d) ................................................................................... 9

8 U.S.C. § 1252(d)(1) ............................................................................ 29

8 U.S.C. § 1362 ................................................................................ 23, 24

## Federal Regulations

8 C.F.R. § 1003.0 ..................................................................................... 2

8 C.F.R. § 1003.0(b)(ix) ........................................................................ 25

8 C.F.R. § 1003.0(c) ........................................................................ 24, 26

8 C.F.R. § 1003.1(a)(1) ............................................................................ 2

8 C.F.R. § 1003.1(b) ............................................................................ 2, 3

8 C.F.R. § 1003.1(d)(1) .......................................................................... 16

8 C.F.R. § 1003.1(d)(3)(iv) .................................................................... 20

8 C.F.R. § 1003.1(d)(3)(iv)(B) ............................................................... 21

8 C.F.R. § 1003.1(d)(7) .......................................................................... 18

8 C.F.R. § 1003.3(a)(1) ............................................................................ 3

8 C.F.R. § 1003.3(c) .............................................................................. 24

8 C.F.R. § 1003.47 ................................................................................ 19

8 C.F.R. § 1292.18 ................................................................................ 25

8 C.F.R. § 3.1(d)(1) (1995) .................................................................... 17

*Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure,*
85 Fed. Reg. 52,491 (Aug. 26, 2020) ............................................................. passim

*Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure,*
85 Fed. Reg. 81,588 (Dec. 16, 2021) ............................................................. passim

*Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals,*
70 Fed. Reg. 4,743 (Jan. 31, 2005) ...................................................................... 19

*Executive office for Immigration Review Electronic Case Access and Filing,*
85 Fed. Reg. 78,240 (Dec. 4, 2020) ...................................................................... 40

*Good Cause for Continuance in Immigration Proceedings,*
85 Fed. Reg. 75,925 (Nov. 27, 2020) .................................................................... 32

*Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal,*
85 Fed. Reg. 75,942 (Nov. 27, 2020) .................................................................... 32

*Organization of the Executive Office for Immigration Review,*
85 Fed. Reg. 69,465 (Nov. 3, 2020) ...................................................................... 24

*Recognition of Organizations and Accreditation of Non-Attorney Representatives,*
81 Fed. Reg. 92,346 (Dec. 19, 2016) ..................................................................... 25

**Miscellaneous**

H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) .................................................... 47

S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945) ........................................................ 47

**INTRODUCTION**

Plaintiffs are five legal services organizations[1] that challenge the legality of an administrative Rule promulgated by the nation's immigration court system—that is, the Executive Office for Immigration Review (EOIR) of the Department of Justice. *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 85 Fed. Reg. 81,588 (Dec. 16, 2020) (Rule). Plaintiffs' complaint alleges that the Rule violates the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 603-04, and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Compl. ¶¶ 5-11.

On February 1, 2021, Plaintiffs filed the instant Motion to Stay Agency Action Under 5 U.S.C. § 705 And/Or for a Preliminary Injunction [ECF No. 9]. Plaintiffs seek an Order requiring EOIR's adjudicators—approximately 460 immigration judges (IJs) in 67 immigration courts nationwide as well as the 23 Appellate IJs who lead the Board of Immigration Appeals (Board or BIA)—to *reverse* the already implemented regulatory changes, yet the sole injury Plaintiffs allege they will suffer is that they will expend resources to provide training on the Rule and they may be unable to serve as many people, which will frustrate their missions. *See* Mot. 38-44; Compl. ¶¶ 335-50.

The Court should deny Plaintiffs' Motion, as Plaintiffs' request for a stay of the Rule under 5 U.S.C. § 705 comes too late for either the Department or the Court to grant because the effective date passed before Plaintiffs sought a stay. Furthermore, the Court should deny Plaintiffs' request for the extraordinary remedy of granting a preliminary injunction because their claims are not

---

[1] Plaintiffs are Catholic Legal Immigration Network, Inc. (CLINIC), Brooklyn Defender Services (BDS), Florence Immigrant and Refugee Rights Project (FIRRP), HIAS, and the National Immigrant Justice Center (NIJC).

justiciable, and they do not meet the requirements for an injunction. Specifically, Plaintiffs' Motion should be denied for the following reasons:

- First, district court review is unavailable here because the INA provides a comprehensive judicial review scheme that bars Plaintiffs' suit, *see infra* pp. 7-10;

- Second, Plaintiffs' claims are not justiciable because they do not have standing and they fall outside the INA's zone of interests, *see infra* pp. 10-15;

- Third, Plaintiffs are not clearly entitled to relief because the Rule is consistent with the INA and its implementing regulations, *see infra* pp. 15-27, the Rule is neither arbitrary nor capricious, *see infra* pp. 27-41, and the Department provided adequate opportunity for the public to comment on the Rule and complied with the RFA, *see infra* pp. 41-43; and

- Fourth, Plaintiffs cannot show that the balance of harms warrants drastic and immediate injunctive relief, *see infra* pp. 44-45.

Plaintiffs are free to urge EOIR to reconsider the Rule, but entry of the requested preliminary injunction would improperly constrain EOIR's discretion to fashion rules governing its procedures.

## BACKGROUND

### I. Removal Proceedings.

The Attorney General has the authority to "establish such regulations . . . as the Attorney General determines to be necessary" for carrying out the INA and may "delegate such authority." 8 U.S.C. § 1103(g)(2). Under 28 U.S.C. § 510, he may also "authoriz[e] the performance by any other officer, employee, or agency of [DOJ] of any function of the Attorney General."

EOIR is a creature of regulation. It is a regulatory body headed by a Director who is appointed by the Attorney General to oversee the nation's immigration courts and the BIA. 8 C.F.R. §§ 1003.0, 1003.1(a)(1), (b). EOIR conducts removal proceedings, the broad contours of which are set forth in the INA. *See* 8 U.S.C. § 1229a. The specific procedures and practices for administering removal proceedings are governed by regulation. *See generally* 8 C.F.R. part 1003.

IJs conduct removal proceedings, and their decisions are reviewed by the BIA, which is also a creature of regulation. *See* 8 C.F.R. § 1003.1(b). Both the noncitizen and counsel for the government may appeal an IJ decision to the BIA. *See* 8 C.F.R. § 1003.3(a)(1). A noncitizen may seek judicial review of a final order of the BIA through a petition for review before a court of appeals. 8 U.S.C. § 1252(a).

## II.    The Final Rule.

On August 26, 2020, the Department published a Notice of Proposed Rulemaking (NPRM) notifying the public of its intention to amend various procedural regulations. *Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure*, 85 Fed. Reg. 52,491 (Aug. 26, 2020). The NPRM proposed the following:

(1) shortening the maximum extension the BIA can grant for a brief from 90 to 14 days, 85 Fed. Reg. at 52,498;

(2) making all appeal briefing of IJ decisions simultaneous, *id.* at 52,498-99;

(3) ending the practice of remanding to the IJ solely for background checks or to provide advisals regarding voluntary departure, *id.* at 52,499-500;

(4) limiting the scenarios in which the BIA can consider motions to remand, clarifying the standard for remand, and providing that the BIA can affirm a decision based on any valid reason supported by the record, *id.* at 52,500-01;

(5) clarifying that the BIA may limit or qualify the scope of a remand while also divesting itself of jurisdiction over the case, *id.* at 52,502;

(6) allowing IJs to certify BIA remand or reopening decisions to the Director as part of a quality assurance process, *id.* at 52,502-03;

(7) clarifying that the regulations "provide no freestanding authority for [IJ]s or Board members to administratively close immigration cases absent an express regulatory or judicially approved settlement basis," *id.* at 52,503-04;

(8) limiting the use of IJs and the BIA's authority to reopen or reconsider sua sponte to correcting clerical errors or ministerial mistakes or reissuing decisions if service was defective, *id.* at 52,505 & n.34;

(9) eliminating the BIA's ability to certify cases to itself, *id.* at 52,507;

(10) implementing adjudication timelines for BIA appeals, including referring cases to the Director if the case has remained pending for more than 335 days, *id.*

at 52,507-08; and

(11) revising the process for record completion to decrease unwarranted delays, *id.* at 52,508-09.

The comment period for the NPRM ended on September 25, 2020, with 1,284 comments received. Commenters included non-profit organizations, law firms, and members of Congress, among others. 85 Fed. Reg. at 81,592. During the 30-day comment period, each of the Plaintiffs in this action had an opportunity to—and did—submit a comment in response to the NPRM.[2]

On December 16, 2020, the final Rule was signed by then-EOIR Director James McHenry.[3] 85 Fed. Reg. at 81,588. The Rule became effective January 15, 2021. *Id.* Notably, the authority to issue the Rule had been delegated to Director McHenry on November 17, 2020, by then-Attorney General William P. Barr in Attorney General Order No. 4910-2020; the Order invoked 28 U.S.C. §§ 509[4] and 510 and "delegate[d] to the Director, [EOIR], until January 20, 2021, the authority to issue regulations related to immigration matters within the jurisdiction of the [EOIR]."[5]

## III.    This Lawsuit.

---

[2] *See* https://www.regulations.gov/document?D=EOIR-2020-0004-0950 (CLINIC); https://www.regulations.gov/document?D=EOIR-2020-0004-1261 (BDS); https://www.regulations.gov/document?D=EOIR-2020-0004-0632 (FIRRP); https://www.regulations.gov/document?D=EOIR-2020-0004-0643 (HIAS); https://www.regulations.gov/document?D=EOIR-2020-0004-0971 (NIJC).

[3] On January 31, 2021, Mr. McHenry stepped down from his position as EOIR Director, and Jean King became the Acting EOIR Director. This leadership change has no impact on the question of whether Mr. McHenry lawfully issued the Rule while he was still serving as EOIR Director.

[4] Section 509 sets forth the functions vested in the Attorney General.

[5] Defendants ask that the Court take judicial notice of Attorney General Order No. 4910-2020, a copy of which is attached to the Declaration of Christina P. Greer, filed herewith. *See Johnson v. Comm'n on Presidential Debates*, No. 15-1580 (RMC), 2016 WL 4468153 (D.D.C. Aug. 24, 2016) (a court may take judicial notice of public records and government documents available from reliable sources); *Hurd v. Dist. of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (holding that a court can "take judicial notice of 'a fact that is not subject to reasonable dispute' if it either 'is generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (quoting Fed. R. Evid. 201(b))).

On January 11, 2021, Plaintiffs filed this suit. Plaintiffs allege that the Rule "is not in accordance with the INA," Compl. ¶¶ 351-56, "is arbitrary and capricious," *id.* ¶¶ 357-65, was promulgated without providing "an adequate opportunity to comment," *id.* ¶¶ 366-69, was unlawfully promulgated by the EOIR Director, *id.* ¶¶ 370-75, was issued without compliance with the RFA, 5 U.S.C. §§ 603-04, *id.* ¶¶ 376-84, and violates the Due Process Clause, *id.* ¶¶ 385-94. Although Plaintiffs' Complaint alleges that the Rule "grafts a laundry list of unjustifiable procedural changes onto" the immigration court system, changes they allege "cut off avenues to legal relief and result in deportation despite eligibility for protection," Compl. ¶¶ 2-3, Plaintiffs' own alleged injuries are quite different, as none of them is subject to the Rule. Indeed, Plaintiffs' only alleged injury is that the Rule will affect their resources; more specifically, in their Motion, they argue that they are irreparably harmed because they will need to divert resources to provide training on the Rule, and they may be unable to serve as many people, which will frustrate their missions. *Id.* ¶¶ 335-50.

## STANDARD OF REVIEW

### I.    5 U.S.C. § 705 – Relief Pending Review.

Plaintiffs have moved for a stay under 5 U.S.C. § 705, which provides, in relevant part, that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may . . . postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "[A] stay under § 705 should be imposed for one—and only one—reason: to maintain the status quo in order to allow judicial review of the *underlying regulation* to proceed in a 'just' manner." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 106-07 (D.D.C. 2018) (emphasis added). Moreover, as the D.C. Circuit has explained, Section 705 is intended to "postpone the effective date of *a not yet effective rule*, pending judicial review." *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App.

LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996)[6] (emphasis added). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Dist. of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). These factors are discussed below.

## II.     Rule 65 – Preliminary Injunction.

A preliminary injunction is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008). A party seeking such relief "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "Although [the D.C.] Circuit has taken no position on the 'sliding scale approach,' the movant must, at a minimum, 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (emphasis in original) (internal citations omitted) (Leon, J.).

Where, as here, "an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal quotation marks omitted), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020).

### ARGUMENT

Plaintiffs' claims conflict with the authority vested in the Department by the INA and recognized by well-established law. *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543

---

[6] This decision is not available on Westlaw.

(1978) ("[T]his much is absolutely clear. Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation omitted)). The Department "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures . . . and priorities." *See Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 230 (1991). Plaintiffs' attempts to interfere with that discretion are unavailing, and they show neither that they are clearly entitled to relief nor that extreme or very serious damage will result from the denial of an injunction—the standard applicable when requesting a mandatory injunction that would alter, rather than preserve the status quo.

## I.      Plaintiffs' Claims Are Not Justiciable.

"The merits on which a plaintiff must show a likelihood of success encompass not only substantive theories but also establishment that the action is justiciable." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). The Court should deny Plaintiffs' request for a stay or a preliminary injunction because Plaintiffs' claims are not justiciable

### A.      The INA Precludes Jurisdiction over Plaintiffs' Claims.

Plaintiffs make specific legal arguments contending that the Rule violates the INA and its regulations in the abstract. But these are the types of claims that EOIR adjudicators and federal appellate judges consider every day in administrative and judicial proceedings. In such proceedings, the types of claims raised in this briefing as to how the Rule might or might not apply are made concrete because adjudicators apply the relevant law to specific facts, and consider the claims in the concrete context of those facts. Indeed, these principles animate our jurisdictional arguments set forth below that, based on Congress's express design, claims like these are to be channeled to individualized removal proceedings and judicial review.

The INA provides that "the sole and exclusive means for judicial review of an order of removal" is "a petition for review filed with an appropriate court of appeals." 8 U.S.C. § 1252(a)(5). The INA further bars jurisdiction to "review all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove" a noncitizen other than through "judicial review of a final order." *Id.* § 1252(b)(9). "Taken together, § 1252(a)(5) and § 1252(b)(9) mean that *any* issue— whether legal or factual—arising from *any* removal-related activity can be reviewed *only* through the [petition for review] process." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (emphasis in original). That includes "challenging policies and practices" that are to be "applied during the course of a removal proceeding," *NIPNLG v. EOIR*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020); *see also J.E.F.M.*, 837 F.3d. at 1035; *Asylum Seeker Advocacy Project v. Barr*, 409 F. Supp. 3d 221, 225 (S.D.N.Y. 2019) (Section 1252(b)(9) bars challenges, including challenges by organizations, to process for issuing removal orders where relief plaintiffs seek would indirectly "challenge [] the removal orders" issued under that process); *P.L. v. U.S. ICE*, No. 1:19-CV-01336, 2019 WL 2568648, *3 (S.D.N.Y. June 21, 2019) (similar).[7]

Plaintiffs here challenge procedures and practices that apply exclusively in removal proceedings. But, as the Supreme Court has explained, Section 1252(b)(9) channels review of all

---

[7] Another judge in this district has recognized an exception to this jurisdictional bar, ruling that the INA did not preclude "a facial challenge to the validity of a regulation of general applicability based on the administrative record generated in rulemaking." *O.A. v. Trump*, 404 F. Supp. 3d 109, 128 (D.D.C. 2019). That Court's decision, however, was based on the faulty premise that the administrative rulemaking record relevant to the regulation could *not* be included as part of the administrative record compiled in connection with a petition for review. *See id.* at 134. Nevertheless, even if there is such an exception, it would not salvage Plaintiffs' claims because Plaintiffs' challenge to the Rule's lawfulness is based on the Rule's application in removal proceedings—which are the only proceedings in which this Rule applies—and thus, Plaintiffs' challenges must be raised through a petition for review in a case where the Rule is applied. *NIPNLG*, 456 F. Supp. 3d at 29.

such "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals, following exhaustion of administrative remedies. *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 483, 485 (1999). Thus, the INA precludes review before this district court. *Cf. DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("§ 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of the process by which . . . removability will be determined" (internal quotation omitted)).

The fact that Plaintiffs are organizations rather than individual aliens raising APA claims does not change this. First, 8 U.S.C. § 1252(b)(9) consolidates review of "*all* questions of law" arising from removal proceedings into a petition for review, 8 U.S.C. § 1252(b)(9) (emphasis added), and does so "[n]otwithstanding any other provision of law," including the APA, *id.* § 1252(a)(5). Second, "[w]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 344-51 (1984). As the D.C. Circuit has held, where the statutory review scheme provides, as here, that claims challenging removal proceedings "may only be brought in court by individual aliens after the INS' statutory interpretation is applied to them, their application for [relief] is denied, and they are subject to deportation orders," "an organizational plaintiff could not undermine the statutory scheme by suing to challenge 'generic' INS policies or statutory interpretations that bear on an alien's [removal]." *Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993). In short, because the statute explicitly provides that noncitizens, and only noncitizens, who have exhausted their administrative remedies may challenge issues arising in those proceedings, *see* 8 U.S.C. § 1252(d)—including application of a rule to them in those proceedings—Congress

must be understood to have precluded "organizational plaintiffs[]" from raising pre-enforcement challenges to "INS policies or statutory interpretations." *Ayuda*, 7 F.3d at 250; *cf. American Immigration Lawyers Association (AILA) v. Reno*, 199 F.3d 1352, 1359 (D.C. Cir. 2000) (reviewing Section 1252 and concluding that "Congress must have contemplated that lawsuits challenging [removal orders] would be brought, if at all, by individual aliens who . . . were aggrieved by the statute's implementation").

### B.      Plaintiffs Do Not Have Standing.

"A party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." *Food & Water Watch*, 808 F.3d at 912. To satisfy standing under Article III, Plaintiff must demonstrate they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "Foremost among these requirements is injury in fact": "the 'invasion of a legally protected interest' that is 'concrete and particularized.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). Where an organization sues on its own behalf, it must establish standing in the same manner as an individual. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975). "It is well-established that 'each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'" *Food & Water Watch*, 808 F.3d at 912 (quoting *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997))

Plaintiffs here are organizations that claim to have standing based on potential frustration of their missions and costs they believe they will incur if the Rule remains in effect. Mot. 38-44. That is insufficient.[8] The Supreme Court recognized in *Havens Realty Corp. v. Coleman*, 455 U.S.

---

[8] Plaintiffs do not assert standing based on injury to their members.

363, 379 (1982), that an organization may be able to establish standing where there is a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitutes far more than simply a setback to the organization's abstract social interests." But in that case, "[f]ederal law vested [the organization] with a specific legal right to truthful, non-discriminatory housing information, and [defendant's] racially disparate misinformation targeted [the organizational plaintiff] along with the individuals it was aiding." *PETA v. USDA*, 797 F.3d 1087, 1100 (D.C. Cir. 2015) (Millett, J., dubitante). The INA does the opposite by channeling review of any application of its provisions into removal proceedings. *See supra* pp. 7-10.

Even putting aside Congress's unmistakable intent to limit review to the paths created in the INA, the D.C. Circuit has imposed a two-part inquiry to determine *Havens* standing: (1) "whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission," and, if so, (2) "whether the plaintiff used its resources to counteract that injury." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). The injury to the mission is a critical element to establishing this type of organizational standing; otherwise, the diversion of resources is a purely self-inflicted injury that will not suffice. *See Fair Empl. Council of Greater Wash., Inc. v. BMC Mktg.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994). Plaintiffs do not satisfy this test.

To satisfy the first element, the government's conduct must "directly conflict with the organization's mission." *NTEU v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Plaintiffs summarize their missions as "help[ing] immigrants seeking safety and security in the United States to vindicate their legal rights and pursue relief . . . ." Mot. 38. Plaintiffs claim that the Rule "frustrates these missions by making representation of immigrants in removal proceedings costlier

and more time- and labor-intensive." *Id.* But Plaintiffs merely speculate that the Rule will result in fewer clients to serve and some additional administrative efforts to comply with the Rule; they do not adequately identify ways in which the Rule would frustrate their missions. *See NTEU*, 101 F.3d at 1434 ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient.").

Importantly, nothing in the Rule prevents Plaintiffs from continuing to represent clients in removal proceedings or helping them "vindicate their legal rights" or "pursue relief," and Plaintiffs do not allege otherwise. For example, Plaintiffs speculate that the expedited briefing schedule and limits on extensions "will interfere with Plaintiffs' ability to form attorney-client relationships with many of the noncitizens they would otherwise serve," Mot. 39, but as explained below, the changes to the briefing schedule are not drastic—more than one extension has always been disfavored, and the average length of an extension was previously 21 days, just seven days more than provided in the Rule. Even if Plaintiffs must alter their processes, they have not demonstrated that the Rule is in direct conflict with their missions to represent individuals—which they may continue to do. *See* CLINIC Decl. ¶ 5; BDS Decl. ¶ 6; FIRRP Decl. ¶ 10; HIAS Decl. ¶ 7; NIJC Decl. ¶ 7. Thus, it is "'entirely speculative' whether the challenged practice will actually impair the[ir] activities." *ASPCA*, 659 F.3d at 25, 27 (quoting *NTEU*, 101 F.3d at 1430). The supposed harm may be "a setback to [their] abstract social interests," *Havens*, 455 U.S. at 379, but it is not a cognizable injury for Article III standing. A contrary standard would afford a legal organization standing to challenge any rule that alters the legal landscape, which would eviscerate Article III and turn courts into "Council of Revision, conferring on itself the power to invalidate laws at the behest of anyone who disagrees with them." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011).

Even if Plaintiffs could meet the first requirement for organizational standing, Plaintiffs

have failed to demonstrate that they meet the second requirement of using "resources to counteract that injury." *ASPCA*, 659 F.3d at 25. Plaintiffs first claim they will be able to assist fewer clients under the new Rule because each case will require more work. CLINIC Decl. ¶ 55; BDS Decl. ¶ 65; FIRRP Decl. ¶ 80; HIAS Decl. ¶ 60; NIJC Decl. ¶ 83. This claim is speculative and lacking in detail. Plaintiffs make broad claims as to the likely impact of the Rule but do not provide any specifics as to what percentage of their clients it will actually affect. Not every decision is a denial or appealed to the BIA, and before the Rule, not every case was remanded, administratively closed, or involved a request for sua sponte reopening.

Plaintiffs next claim that because they will inevitably be forced to represent fewer clients, they will likely face less funding through grants and other sources of funding that depend on or consider the number of individuals served. Mot. 39-40; CLINIC Decl. ¶ 55; BDS Decl. ¶ 65; FIRRP Decl. ¶¶ 80, 82, 83; HIAS Decl. ¶ 61; NIJC Decl. ¶¶ 83-84. But this concern is speculative given the many contingencies that Plaintiffs recognize must happen before there is a financial injury and thus insufficient to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Finally, Plaintiffs lack standing because they are not subject to the Rule and have no legally protected interest in maintaining their current organizational structure or in the Rule's application to third parties. Plaintiffs have no "judicially cognizable interest" in "enforcement of the immigration laws" against someone else or to challenge the government's provision of benefits to a third party. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).

## C.   Plaintiffs Are Not Within the INA's Zone of Interests.

An APA plaintiff must show it is "aggrieved . . . within the meaning of a relevant statute." 5 U.S.C. § 702, meaning "the interest sought to be protected" must "be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke v. Sec. Indus. Ass'n*,

479 U.S. 388, 396 (1987). A plaintiff "suing under the APA *must satisfy*" the zone-of-interests test. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). Thus, in an APA case the plaintiff *lacks a valid cause of action* if he is not "within the class of plaintiffs Congress has authorized to sue." *Lexmark Int'l, Inv. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014). Here, "using traditional principles of statutory interpretation," it is clear Plaintiffs are not within that class. As explained, the INA supplies a cause of action to challenge issues arising from removal proceedings under 8 U.S.C. § 1229a *only to individuals subject to removal proceedings*, and only through judicial review in the courts of appeals following administrative proceedings, 8 U.S.C. §§ 1252(a), (a)(5), (b)(9). None of these jurisdictional provisions allow for suits by anyone not subject to removal proceedings, much less by legal service organizations.[9]

Organizations therefore cannot be within the INA's zone of interests. When confronted with a similar challenge brought by "organizations that provide legal help to immigrants," Justice O'Connor concluded that the relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of [such] organizations," and the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers). The D.C. Circuit has thus held that immigrant advocacy organizations are outside the immigration statutes'

---

[9] To be sure, 8 U.S.C. § 1158(d)(4)(A) says that "[a]t the time of filing an application for asylum, the Attorney General shall . . . advise the alien of the privilege of being represented by counsel." But that provision on its face protects only the interests of individuals seeking asylum, and a nearby provision states that it creates no "substantive or procedural right . . . enforceable by any party against the United States." 8 U.S.C. § 1158(d)(7); *see Campos v. INS*, 62 F.3d 311, 313 (9th Cir. 1995) (holding such language takes claimants outside the INA's "zone of interests"). The provision does not place legal services organizations within the zone of interests of the INA.

zone of interests. *See, e.g.*, *FAIR v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996); *accord Ayuda*, 7 F.3d at 250 (explaining that if statute explicitly provides only for noncitizens, to challenge removal proceedings, then "organizational plaintiffs" may not raise such claims); *AILA*, 199 F.3d at 1359 (explaining that the INA, specifically 8 U.S.C. § 1252, evinces Congressional intent that only "aliens aggrieved by the statute" my sue to challenge its application).[10]

## II.   Plaintiffs Are Not Likely to Succeed on Their Claims.

"It is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits. If the movant fails to do so, inquiry into the remaining factors is unnecessary, for the injunctive relief must be denied on that ground alone." *Haynes v. Navy Fed. Credit Union*, 841 F. Supp. 2d 221, 223 (D.D.C. 2012); *see Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 159 (D.D.C. 2006) ("absent a substantial indication of likelihood of success on the merits, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review") (internal citations and quotation marks omitted). Accordingly, Plaintiffs' failure to establish a substantial likelihood of success on the merits of their claims is fatal to their request for a stay or preliminary injunction.

### A.   The Rule Is Consistent with the INA and its Implementing Regulations.

Plaintiffs contend that the Rule "contravenes numerous provisions of the INA, as well as EOIR's governing regulations." Mot. 18. Plaintiffs are mistaken. Although the INA provides for removal proceedings generally, *see* 8 U.S.C. § 1229a, it does not set forth procedural rules governing those proceedings. Such rules have instead been promulgated by the Department of Justice. *See* 8 C.F.R. part 1000 *et seq.* The Rule at issue here is one in a long line of rules that have shaped the form of removal proceedings, consistent with the INA's grant of rulemaking authority

---

[10] While the Ninth Circuit held otherwise in *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020), it did not consider *FAIR*, 93 F.3d at 903, which is controlling in this Circuit.

and authority to administer the INA. 8 U.S.C. § 1103(g)(2). Plaintiffs' claims that the Rule contradicts the INA or other regulations, either facially or when they are applied, all fail.

### 1.   Allowing EOIR's Director to Adjudicate Appeals Is Consistent with the INA.

Plaintiffs argue that the INA requires the BIA to issue final orders of removal, and thus the provision of the Rule allowing the EOIR Director to adjudicate cases is contrary to law. Mot. 18 (citing 8 U.S.C. § 1101(a)(47)(B)). To the contrary, the EOIR Director's authority to adjudicate appeals is consistent with the INA. Under 8 U.S.C. § 1103(g)(2), Congress granted the Attorney General broad authority to "establish such regulations . . . as the Attorney General determines to be necessary" for carrying out the INA and "delegate such authority" as he sees fit. That is exactly what he did when he created the BIA, which is "simply a regulatory creature of the Attorney General, to which he has delegated much of his authority."[11] *INS v. Doherty*, 502 U.S. 314, 327 (1992) (plurality opinion). Under Section 1103(g)(2), the Attorney General could designate a different authority, like the EOIR Director, to adjudicate appeals and issue final orders of removal. 85 Fed. Reg. at 81,621 ("the Department emphasizes the clear, direct intent of Congress in statutorily authorizing such delegations, and the Attorney General is acting within the bounds of his statutory authority by issuing the rule") (citing 8 U.S.C. § 1103(g)(2)).

Plaintiffs' claim that the Rule conflicts with 8 U.S.C. § 1101(a)(47)(B)(i), which provides that a removal order shall become final upon "a determination by the [BIA] affirming" the removal order, Mot. 18; Compl. ¶ 279, is without merit.[12] Plaintiffs fail to cite any authority to support their contention that when Congress enacted the definition of a final order of deportation, it intended to

---

[11] *See* 8 C.F.R. § 1003.1(d)(1) ("The Board shall function as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it.").

[12] For purposes of Section 1101(a)(47)(B)(i), the terms "final order of deportation" and "final order of removal" are interchangeable. *Nasrallah v. Barr*, 140 S. Ct. 1683, 1690 (2020).

constrain the Attorney General's authority under Section 1103(g)(2) by precluding him from designating the Director to adjudicate cases that had been pending for a lengthy period of time. 85 Fed. Reg. at 52,508.

The fact that Congress referred to the "Board" in 8 U.S.C. § 1101(a)(47)(B)(i) does not suggest otherwise. Congress only sought to define when a deportation order becomes final. That is important because immigration law requires that a deportation order be final before an individual can obtain judicial review of it. 8 U.S.C. § 1252(a)(1); *e.g.*, *Mu Ju Li v. Mukasey*, 515 F.3d 575, 577 (6th Cir. 2008). When Section 1101(a)(47)(B)(i) was enacted in 1996, the BIA was (and still is) the regulatory body tasked by the Attorney General to hear appeals of IJs' decisions and issue final orders. 8 C.F.R. § 3.1(d)(1) (1995). So, it makes perfect sense that Congress mentioned the BIA in that statute as a shorthand reference to when a deportation order becomes final, not to limit the Attorney General's statutory authority. Thus, the statutory definition of finality cannot be read as preventing the Attorney General from creating a different administrative scheme to address specific problems, such as delays in BIA dispositions. *See Dia v. Ashcroft*, 353 F.3d 228, 237 (3d Cir. 2003) (upholding Attorney General's "streamlining" procedures for BIA appeals and reasoning that Section 1101(a)(47)(B) "says absolutely nothing about procedures to be employed by the BIA . . . it seems clear that Congress has left all procedural aspects of the BIA, especially how it hears cases, entirely to the Attorney General's discretion"); *see also* 8 U.S.C. § 1103(g)(2); *Vt. Yankee*, 435 U.S. at 543. Practically speaking, therefore, whenever the Director decides cases in accordance with the new regulation, she would be exercising decision-making authority by and on behalf of the BIA, and her decisions would thus be "final" under Section 1101(a)(47)(B)(i) to the same extent as BIA decisions.

Plaintiffs' argument is also undermined by the fact that for decades the Attorney General,

through his certification authority, has had the discretion to review BIA decisions and issue final orders of removal from which a noncitizen can seek judicial review; but Plaintiffs do not claim that this practice violates the INA. *See* 8 C.F.R. § 1003.1(d)(7) ("The decision of the Board shall be final except in those cases reviewed by the Attorney General in accordance with paragraph (h) of this section."); *Matter of Castillo-Perez*, 27 I. & N. Dec. 664 (A.G. 2019) (Attorney General's decision affirming BIA was final order of removal). Indeed, as courts have noted, Section 1101(a)(47)(B) provides an incomplete definition of a final order of deportation because it does not address certain circumstances, including when DHS issues a removal order. *See Ortiz-Alfaro v. Holder*, 694 F.3d 955, 958 (9th Cir. 2012) ("this statutory definition of finality does not dictate a clear answer here because there is no way to appeal the reinstatement of a removal order to the BIA"); *G.S. v. Holder*, 373 F. App'x 836, 841 (10th Cir. 2010) (Section 1101(a)(47)(B) "provides no helpful guidance" in determining the finality of a DHS removal order pursuant to 8 U.S.C. § 1228(b)). In short, these examples highlight Plaintiffs' strained reading of the statute.

Finally, a review of the INA as a whole also supports the Government's position. While Congress in the INA has described the duties and responsibilities of IJs, 8 U.S.C. § 1229a (discussing IJs' role in removal proceedings), it has not done the same for the BIA, which clearly leaves wide latitude to the Attorney General and EOIR to define how appellate responsibilities will be exercised. *Dia*, 353 F.3d at 237 ("INA says nothing whatsoever regarding the procedures of an administrative appeal, or, for that matter, any other procedures employed by the BIA."). In sum, if the Attorney General has the power to create the BIA, define its responsibilities, and define how those responsibilities will be carried out—including setting time deadlines for case adjudications—it is also within the Attorney General's Congressionally delegated authority to establish a different procedure for deciding cases when the Board is unable to meet those deadlines,

authority he appropriately delegated to the EOIR Director—who supervises the Board—as explained below.

2.    **The Long-Standing Background Check Requirement Does Not Conflict with the Withholding of Removal Statute.**

Plaintiffs assert that the Rule contradicts 8 U.S.C. § 1231(b)(3)'s prohibition on removing "an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country" on account of a protected ground because the Rule instructs the BIA to deem an application abandoned if the applicant does not comply with background check requirements and does not allow for reopening sua sponte based on intervening law or facts. Mot. 18-19. Plaintiffs are incorrect. Background checks have long been a requirement for applications for protection from removal. *See* 8 C.F.R. § 1003.47. It has also long been the case that the agency deems an application for protection abandoned if the applicant fails to comply with the background check. *See Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals*, 70 Fed. Reg. 4,743 (Jan. 31, 2005) (adding Section 1003.47 allowing for background checks and deeming an application abandoned if the noncitizen fails to comply with instructions provided by DHS).

Notably, under Plaintiffs' argument, background checks could not be required at all—the agency could not have any recourse if an applicant fails to comply with the background check for any reason. Such a result is absurd. The background check requirement is a reasonable part of the application process enacted by regulation, and the specter of an application being deemed abandoned if a noncitizen fails to fulfill this requirement of the application process is likewise reasonable and not contrary to the INA.

Similarly, the Department's decision to limit the availability of sua sponte reopening authority does not conflict with the INA. Indeed, Congress contemplated when motions to reopen

should be allowed for those who wish to seek asylum or protection from removal and provided that such motions may be filed if it is "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered." 8 U.S.C. § 1229a(c)(7)(C)(ii). Congress, in its judgment, decided not to allow for reopening based on a change in law or personal circumstances for those who remain in the United States after being ordered removed. Plaintiffs are thus wrong to claim that the agency's decision to limit motions to reopen to those allowed by statute is inconsistent with the statute.

### 3. The Rule Preserves the Right of Individuals in Removal Proceedings to Examine and Present Evidence.

Plaintiffs argue that the Rule "undermines" the noncitizen's right to examine the evidence against them and to present evidence on their own behalf. Mot. 19 (citing 8 U.S.C. § 1229a(b)(4)(B)). Plaintiffs' arguments in that regard simply lack merit.

Plaintiffs first argue that remands based on unfavorable evidence from background checks deprive noncitizens of the right to respond to such information. Mot. 19. That is incorrect. If the BIA decided to remand a case to the IJ in that situation, the noncitizen would have "the opportunity to file evidence in response" before the IJ. 85 Fed. Reg. at 81,609. Remand is appropriate in these circumstances because the immigration court, unlike the BIA, has the ability to receive evidence and decide factual issues. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (with limited exceptions "[t]he Board will not engage in factfinding in the course of deciding cases"); *see also* 85 Fed. Reg. at 81,617 (without remand, noncitizens "would not have an opportunity to present relevant evidence in response" to unfavorable background information).

Plaintiffs next assert that the Rule will permit the BIA to take administrative notice of factual information in official government documents, including those documents offered by DHS, without providing noncitizens an "opportunity to respond" to such documents. Mot. 9. This too

lacks merit. Regardless of the source of the information, "[i]f the Board intends to rely on an administratively noticed fact outside of the record . . . as the basis for reversing an immigration judge's grant of relief or protection from removal, it *must* provide notice to the parties of its intent and afford them an opportunity of not less than 14 days to respond."[13]  8 C.F.R. § 1003.1(d)(3)(iv)(B) (emphasis added). Furthermore, the Rule "does not permit either party to submit new evidence [for administrative notice on appeal]." 85 Fed. Reg. at 81,604. Thus, if either DHS or the noncitizen wants the BIA to take administrative notice of information contained within official documents, those documents must already be part of the record. As documents already in the record, the appealing party must anticipate the need to address that information in her brief. Further notice of its existence is not required. "The Department already expects an appealing party to address all relevant issues on appeal; otherwise, the party risks summary dismissal of the appeal." 85 Fed. Reg. at 81,608 (citations omitted). When a noncitizen is the appellant, she must both attack the original basis for denial and establish her general eligibility for the specific relief or protection sought. *Id.* ("a party choosing to address some issues but not others on appeal does so at its own risk"). The Rule does not alter those obligations.

Plaintiffs' concerns that the Rule "permits the BIA to deem a grant of relief abandoned, or

---

[13] Plaintiffs assert that this obligation to provide notice and opportunity to respond only applies when the BIA "explicitly" relies on the administratively noticed fact as the basis for reversal; however, that assertion is simply wrong. No form of the word "explicit" appears in the Rule's administrative notice section. Moreover, Plaintiffs fail to explain how the BIA could secretly rely on facts in official government documents to support its decision without risking reversal in the Court of Appeals. Agency decisions are judged "solely by the grounds invoked by the agency," and the agency must "set forth" the basis for its decision "with such clarity as to be understandable." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). If the agency decision cannot be sustained without the administratively noticed fact, the BIA must identify that fact or risk reversal. Finally, regardless of whether the Rule requires notice and an opportunity to respond, the BIA's decision to rely on administratively noticed facts, is reviewable by the Court of Appeals. *See Enriquez-Gutierrez v. Holder*, 612 F.3d 400, 409 (5th Cir. 2010) ("[w]e review an agency's decision to take administrative notice for abuse of discretion").

convert a grant of voluntary departure into a removal order, if the noncitizen fails to comply with certain written instructions served by U.S. mail" without providing the noncitizen an opportunity to argue non-receipt of those instructions, are equally misplaced. Mot. 20. These concerns were raised during the comment period, and the Rule was adjusted to cover both circumstances. If the noncitizen's application requires updated background information, the BIA will place the case "on hold" while the information is obtained. 85 Fed. Reg. at 81,588. If "DHS is unable to independently update any required identity, law enforcement, or security investigations, DHS shall provide a notice to the alien with appropriate instructions . . . and simultaneously serve a copy of the notice with the BIA." *Id.* at 81,588-89. Originally, the noncitizen had 90 days from the date the BIA placed the case on hold to provide the requested information and, regardless of the actions of DHS or the BIA, the application would be deemed abandoned if the noncitizen filed to provide the information within the 90-day period. *Id.* at 81,588. Now the 90-day time period begins "running at the time DHS submits the instructions notice to" the noncitizen. *Id.* at 81,589. Additionally, if the applicant shows good cause for failing to comply within the 90-day period, she may receive a 30-day extension of the compliance period. *Id.* at 81,652.

The time period for posting a voluntary departure bond has been similarly adjusted. Originally, the noncitizen was required to post a voluntary departure bond within five days of the date of the BIA's decision to grant that privilege. *Id.* at 81,641. Because commenters raised concerns that noncitizens could not meet the five-day deadline when the BIA's order was served by mail, the Department adjusted the Rule to allow the noncitizen ten business days from the date of the decision to post the bond. *Id.* Plaintiffs' motion fails to explain why these changes are inadequate to address their concerns.

Finally, contrary to Plaintiffs' assertions, the Rule does not eliminate a noncitizen's ability

to submit additional evidence. Mot. 20. It simply changes the procedure for that submission from a motion to remand to a motion to reopen. 85 Fed. Reg. at 81,589 ("[p]arties who wish to have new evidence considered . . . may file a motion to reopen in accordance with the standard procedures for such motions"). Plaintiffs' motion does not explain why a motion to reopen is an inadequate vehicle for introducing new evidence after a case is on appeal. Furthermore, limiting the BIA's authority to grant voluntary departure to cases where the noncitizen first requested voluntary departure before the IJ is neither arbitrary nor capricious. Mot. 20. That limitation necessarily follows from current practice. "An alien who seeks voluntary departure as a form of relief from removal must apply for it in the first instance before the immigration judge; otherwise, the alien's opportunity to seek such relief will be deemed waived, both by the immigration judge and by the Board on appeal." 85 Fed. Reg. at 81,589 (citations omitted). Thus, the applicant must have both raised the claim below and presented evidence to support the claim. *Id.* Similarly, "the alien must raise the issue of voluntary departure eligibility on appeal; otherwise, it would be waived." *Id.* Contrary to Plaintiffs' suggestion, requiring a litigant to "preserve the issue" and "adduce [the] additional facts" necessary to support voluntary departure is not unduly burdensome. Compl. ¶¶ 115, 173. It simply represents the challenge faced by any litigant, represented or otherwise, who decides to pursue alternative forms of relief.

### 4. Changes in the BIA's Briefing Schedule Do Not Deprive Individuals of Their Right to Counsel.

Plaintiffs claim that the Rule's changes to the briefing schedule before the BIA "directly interfere[] with the right to be meaningfully represented by counsel by severely restricting the timeframe under which appellate counsel must be identified, agree to representation, learn the case, and prepare a brief," in violation of 8 U.S.C. § 1362. Mot. 21. Plaintiffs are incorrect. The initial 21-day deadline for filing briefs, in effect since 2002, was not altered, 85 Fed. Reg. at 52,494,

81,636, and the BIA has traditionally only granted 21-day extensions, regardless of the time requested. 85 Fed. Reg. at 81,588 (citing BIA Practice Manual at Ch. 4.7(c)(i)). Likewise, the one-extension limit codified in the Rule is consistent with current policy "not to grant second briefing extension requests." *Id.* (citing BIA Practice Manual at 65). With a 14-day extension, litigants have up to 35 days between when the BIA issues a briefing schedule and when the briefs must be received by the BIA. 85 Fed. Reg. at 81,637. The BIA "can [also] ask for supplemental briefing if it finds that the briefs submitted are inadequate," *id.*, and "consider a late-filed brief as a matter of discretion, pursuant to 8 C.F.R. § 1003.3(c)." 85 Fed. Reg. at 52,498. As the Rule notes, it "does not limit or restrict any alien's ability to obtain representation in accordance with section . . . 1362." 85 Fed. Reg. at 81,597. Indeed, nothing in the Rule, regulations, or INA prohibit someone facing removal proceedings from seeking or obtaining representation (or a representative to take a case) before a briefing schedule is entered.

### 5.    Permitting EOIR's Director to Adjudicate Cases Is Not Contrary to 8 C.F.R. § 1003.0(c).

Plaintiffs claim that the authority conferred on the Director to refer and certify cases for adjudication is contrary to 8 C.F.R. § 1003.0(c), which generally prohibits the Director from, inter alia, adjudicating "cases arising under the [INA or regulations[.]" Mot. 24. Plaintiffs are incorrect. That regulation contains an explicit exception which disclaims any intent "to limit the authority of the Director under paragraph (b)" of Section 1003.0, and the Rule was promulgated in reliance on a delegation of authority from the Attorney General falling within that provision.

Plaintiffs concede that the Director may adjudicate cases, despite the general prohibition in 8 C.F.R. § 1003.0(c), and note the existing grant of authority to adjudicate cases that have been pending beyond certain time limitations. *See* Mot. 23-24 (citing *Organization of the Executive Office for Immigration Review*, 85 Fed. Reg. 69,465, 69,473-74 (Nov. 3, 2020)). This particular

24

grant of authority from the Attorney General to the Director constitutes "such other authorit[y] as the Attorney General may provide," *see* 8 C.F.R. § 1003.0(b)(ix), and unquestionably supersedes 8 C.F.R. § 1003.0(c)'s general prohibition on adjudications by the Director. Likewise, the Director was granted adjudicatory authority in prior administrations relating to accreditation-of-representative determinations. *See* 8 C.F.R. § 1292.18; *Recognition of Organizations and Accreditation of Non-Attorney Representatives*, 81 Fed. Reg. 92,346, 92,357 (Dec. 19, 2016).

So too here, the authority to adjudicate cases pending past a certain time limit or to consider cases on certification from an IJ is based on a proper delegation of authority from the Attorney General to the Director. On November 17, 2020, the Attorney General delegated authority to the Director to "issue regulations related to immigration matters within the jurisdiction of the Executive Office for Immigration Review." Attorney General Order No. 4910-2020. When the Director signed this Rule, he exercised that delegated authority. *See* 85 Fed. Reg. at 81,650 (citing A.G. Order No. 4910-2020). Under the statute and regulations, the Attorney General has authority to promulgate a rule giving the Director authority to adjudicate cases in whatever circumstances he deems appropriate, *see, e.g.*, 8 U.S.C. § 1103(g)(2) ("The Attorney General shall establish such regulations, . . . review such administrative determinations in immigration proceedings, . . . and perform such other acts as [he] determines to be necessary for carrying out this section."); 8 C.F.R. § 1003.0(b)(ix), as well as the authority to delegate "such authority," 8 U.S.C. § 1103(g)(2). The Attorney General, having delegated his rulemaking authority to the Director, the Director in turn was thus fully empowered with the authority of the Attorney General to promulgate regulations governing the procedures and rules that apply to immigration adjudications, including providing the Director with adjudicatory authority in the class of cases covered by the Rule. Plaintiffs could not conceivably argue that the Attorney General himself would have been barred from

promulgating the Rule, or that his having done so would be a conflict between the provisions of the Rule and 8 C.F.R. § 1003.0(c). Likewise, there can be no argument that the Director, in acting under a clear delegation of authority from the Attorney General, was so barred.

Plaintiffs only mention the Attorney General's delegation of authority in passing, but minimize its import because "that Order did not delegate the authority to adjudicate cases, designate [the Director] to adjudicate cases in the Attorney General's stead, or purport to override 8 C.F.R. § 1003.0(c)." Mot. 25 n.16. This argument misses the point. The Attorney General could have delegated such authority explicitly, but nothing barred him from delegating more general authority to promulgate regulations addressing the full panoply of concerns under EOIR's province. Nothing in the Attorney General's order limited the scope of issues on which the Director was entitled to promulgate regulations, and thus there is no argument that the Rule somehow transgressed the scope of the Order's delegation of authority.

Plaintiffs also "not[e] that this new authority is likely to apply to an enormous percentage of appeals before the BIA." Mot. 24. Even if true, that would be beside the point insofar as the Attorney General's and Director's authority to promulgate the Rule was concerned. There is no statutory limitation on the Attorney General's authority to issue rules governing procedures and adjudications before EOIR, and the Director, in exercising that delegated authority, was not limited to issuing a Rule of only narrow or limited scope. But Plaintiffs are, in any event, incorrect. The Rule contains numerous exceptions regarding cases that are not proper subjects of referral to the Director for adjudication, *see* 85 Fed. Reg. at 81,622, a point Plaintiffs ignore in attempting to maximize the scope of the Rule's reach. Likewise, there is no indication that the Director must refer each and every case that would otherwise fall within the purview of the Rule; the Rule is implementing a case management system to ensure prompt and efficient adjudication of cases, and

common-sense standards will govern implementation of the Rule's prescriptions. *See, e.g.*, *id.* at 81,622 ("the BIA should exercise default appellate adjudicatory authority in immigration cases and that referral of cases to the Director should be the exception, rather than the rule").

### B.     The Rule Is Neither Arbitrary Nor Capricious.

Plaintiffs cannot show that the law clearly supports their position that the Rule is "arbitrary and capricious." Mot. 25-34. "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency[.]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). "[This] standard of review is highly deferential to the agency," *Bean Dredging, LLC v. United States*, 699 F. Supp. 2d 118, 126 (D.D.C. 2010), and to survive the 'arbitrary and capricious' standard, the agency need only articulate "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs.*, 463 U.S. at 43. "The question is not what [the reviewing court] would have done, nor whether [the court] agree[s] with the agency action. Rather, the question is whether the agency action was reasonable and reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015).

The Rule is especially deserving of deference because it sets forth procedures to administer the INA. It is well established that "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843 (1984) (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). Indeed, in the absence of a statutory mandate, the Department of Justice, not the courts, determines the agency's procedural rules, particularly rules regarding the manner in which cases are adjudicated. *Vt. Yankee*, 435 U.S. at 524 ("Agencies are free to grant additional procedural rights in the exercise

of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them."). Additionally, for a court to overturn agency practice or procedure, it is not enough that a different procedure could work better or might better suit the nature of the agency's work; in the absence of an indication that the procedure adopted is constitutionally infirm, unsupportable under a statutory delegation of authority, or is in some other manner unlawful, the agency procedure must be permitted to stand unless and until it is reconsidered by the agency itself. *Id.* at 548-549 (courts should engage in limited "review and not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good").

Plaintiffs claim that the Rule is arbitrary and capricious because it "failed to substantiate its core assertion that the Rule would improve efficiency," Mot. 26, "failed to consider other important aspects of the problem," *id.* at 29, is "riddled with internal inconsistencies," *id.* at 32, and "ignored significant comments," *id.* at 33. To the contrary, the Rule is a reasoned exercise of the Department's broad discretion to set its own procedures, and Plaintiffs' scatter-shot disagreements with the Rule do not render it otherwise.

### 1.    The Rule Promotes Efficiency and Explains How It Does So.

Plaintiffs are wrong to assert that the Rule "failed to substantiate its core assertion that the Rule would improve efficiency." Mot. 26. Plaintiffs argue that the Rule does not increase efficiencies because the BIA will have "to see an appeal through to its conclusion on the basis of outdated facts and then reopen the case and adjudicate it again." *Id.* As a threshold matter, the agency—not Plaintiffs—is in the best position to know which of various options will be more efficient, and that judgment should not be substituted. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Nevertheless, the Rule clearly explains that a material change in fact or law still provides a basis for remand while the appeal is pending. 85 Fed. Reg. at 81,611; *see id.* (noting there is no reason

to allow "an irrelevant change in law [to] form the basis for a remand"); *id.* at 81,607 (noting that the BIA could remand if it determines "that either the [IJ]'s factual findings were clearly erroneous or that remand is warranted following de novo review"). Thus, Plaintiffs are incorrect—the Rule does not require the agency to inefficiently issue a decision only to then reopen proceedings if there is an identified, material error. 85 Fed. Reg. at 81,607, 81,611; *see* Mot. 26.

Additionally, it is not less efficient to require an appeal to run its course without arguments based on new evidence being presented along the way. Mot. 26. To be sure, separating the BIA's consideration of exhausted arguments on direct appeal from collateral or new arguments presented in a motion to reopen will "ensure that appeals are adjudicated in a timely fashion without undue remands and consistent with the applicable law." 85 Fed. Reg. at 52,500-01 (citing *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 376 (9th Cir. 2003) (discussing the BIA's inconsistent treatment of supplemental evidence submitted on appeal)); *see also* 85 Fed. Reg. at 81,611 (recognizing that motions to remand are often "redundant" to statutory motions to reopen or reconsider).

Moreover, the Rule does not preclude a noncitizen from raising a new claim or issue, it just directs that such claims or issues should be raised in a motion to reopen, as the statute provides. 8 U.S.C. § 1229a(c)(7). In fact, the Rule upholds the well-established principles of exhaustion and waiver. *See* 8 U.S.C. § 1252(d)(1) (requiring administrative exhaustion in petitions for review); *Coal. for Safe Nuclear Power v. U.S. Atomic Energy Comm'n*, 463 F.2d 954, 955 (D.C. Cir. 1972) ("Efficient interaction between courts and agencies requires that as a general rule all procedures before the agency be exhausted prior to judicial review."); *see also Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 191-92 (BIA 2018) (requiring an applicant to exhaust a particular social group before the IJ); *Matter of J-Y-C-*, 24 I. & N. Dec. 260, 266 n.1 (BIA 2007) (noting that an issue not

raise before an IJ is waived); 85 Fed. Reg. at 52,501. Likewise, to the extent Plaintiffs argue that pleadings will be "longer" and will thus slow decisionmaking, Mot. 26, their argument assumes litigants do or should not already present all available arguments before the agency. To be sure, this regulation obligates parties (including DHS, 85 Fed. Reg. at 81,605, 81,610), to put their best evidence and arguments forward before the IJ, and not be allowed to adjust or alter their claims if not initially successful. 85 Fed. Reg. at 81,605.

Plaintiffs further claim that "the Rule [failed to] grapple[] with the impact on efficiency from its massive transfer of adjudicative authority from the BIA to the" Director. Mot. 26-27. The Rule did address efficiency concerns—Plaintiffs simply disagree with the rationales Rule provides. Contrary to Plaintiffs' repeated assertions that the Rule mandates that "virtually all appeals pending more than 335 days" will be referred to the Director, the Rule itself contains numerous exceptions that, in the considered judgment of the agency, will mean that adjudications will be referred to the Director in only rare cases. *See* 85 Fed. Reg. at 81,622 ("the Director's scope of review is limited to only a narrow subset of EOIR cases"); *id.* (adding four additional exceptions in recognition of potential volume concerns); *id.* ("referral of cases to the Director should be the exception, rather than the rule"). And a case that has not been adjudicated in 335 days is not being resolved efficiently. If the Rule did not grapple more with the hypothetical issues Plaintiffs raise in a conclusory fashion, it is because the claims of adverse "impact[s] on efficiency," Mot. 26, are overblown and untethered to the scope of the Rule as promulgated.

Plaintiffs also argue that the Rule should reflect their belief that administrative closure improves efficiency and facilitates timely resolution of cases, Mot. 27-29, but their disagreements with the agency's policy and about the inferences drawn from data are not grounds for invalidating the Rule. *See, e.g.*, 85 Fed. Reg. at 81,647-48; *see also id.* at 81,599 ("the use of administrative

closure is not solely responsible for [the backlog of cases]," but noting the "need for prompt adjudication of pending cases has only increased"). As the Seventh Circuit recognized, the Department may eliminate the freestanding authority for administrative closure by amending the regulation—and the Rule does exactly that. *See Morales v. Barr*, 973 F.3d 656, 667 (7th Cir. 2020). In addition, Plaintiffs' argument that the Department was obliged to address a report prepared by Booz Allen Hamilton, Mot. 27 (citing page 26 of the report), is misplaced. That report recommended that EOIR: "Launch [a] dialogue with DHS to identify policy improvements between DHS and EOIR that would streamline caseload. For example, this could include cross-agency NTA-screening and policy to administratively close cases awaiting adjudication in other agencies or courts." But this recommendation, aside from being no more than a broad outline, does not advocate for freestanding administrative closure to indefinitely suspend cases and effectively terminate them; rather, the recommendation is consistent with the purpose of the Rule to direct the flow of cases to a final resolution. Thus, it was not arbitrary or capricious for the Department to decline to specifically address a report that was already in line with the Department's analysis.

### 2. The Department Appropriately Considered Relevant Facts and Data.

Plaintiffs claim that the Department "failed to consider other important aspects of the problem," Mot. 29, but they fail to identify any relevant "aspect" the Department failed to consider. Plaintiffs argue that the Rule failed to consider the potential inability of noncitizens to pursue relief, where the availability of administrative closure is limited. Mot. 30. But the Department addressed these concerns, responding that most cases that are administratively closed remain unresolved and indefinitely suspended, *i.e.*, rather than facilitate relief "that may take years to resolve," administrative closure buries cases and in many instances results in "a decision not to apply the Nation's immigration laws at all." 85 Fed. Reg. at 81,598 (internal quotation marks omitted); *see also* 85 Fed. Reg. at 81,648 (addressing data relied upon by commentators and

concluding that administrative closure does not facilitate the efficient resolution of cases). Moreover, the Department noted that "there are other potential tools available to [noncitizens] with pending relief or actions outside of EOIR, including requesting a continuance [to pursue non-speculative relief] or working with DHS counsel to file a motion to dismiss."[14] *Id.* at 81,598 n.24; *see also Matter of L-A-B-R-*, 27 I. & N. Dec. 405, 414-15 (A.G. 2020).

Inasmuch as Plaintiffs claim that an EOIR memo and two NPRMs affecting the availability of continuances and collateral motions suggest the Department's response to the Rule is based on "a premise the agency itself has already planned to disrupt," Mot. 29, this contention lacks merit. The EOIR memo reiterated established law and did not purport to direct IJs to issue particular outcomes that derogate from current practice. *See* EOIR Policy Memorandum PM 21-13, Continuances (Jan. 8, 2021). Similarly, the NPRM relating to continuances proposes to codify case law expounding on the already applicable "good cause" standard and provide clarification on the standard to promote uniformity. *Good Cause for Continuance in Immigration Proceedings*, 85 Fed. Reg. 75,925, 75,925-26, 75,931-38 (Nov. 27, 2020). Likewise, the NPRM relating to collateral motions allows, "[c]onsistent with current practice," for the agency to consider motions to reopen that are jointly filed with DHS, including such motions seeking dismissal or termination. *Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal*, 85 Fed. Reg. 75,942, 75,949 (Nov. 27, 2020) (indicating that the proposed rule's provisions relating to reopening and termination of cases are consistent with existing law (internal citations omitted). Notably, neither

---

[14] This Court should similarly reject Plaintiffs' contention that the Department failed to address the Rule's potential effect on the efficiency of immigration proceedings, *see* Mot. 27, where such concern was one of the main considerations of the Rule, *see, e.g.*, 85 Fed. Reg. at 81,649 ("[T]he rule was proposed to address multiple legal and policy concerns with the use of administrative closure, to provide clearer delineation regarding the appropriateness of its usage, and *to address efficiency-issues that it has wrought, particularly to the extent that it has contributed to docket churning and unnecessary delays in adjudicating cases*." (emphasis added)).

the continuance NPRM nor the collateral motions NPRM has been finalized.

Plaintiffs claim that the Department ignored its "explicit intention" that the sua sponte authority "coexist" with the motion to reopen time and number limitations. Mot. 30. But the Department addressed this issue, explaining that the agency has repeatedly misused its sua sponte authority by entertaining "motion[s] to reopen sua sponte," an "oxymoron," 85 Fed. Reg. at 81,632. *See Malukas v. Barr*, 940 F.3d 968, 970 (7th Cir. 2019) ("[r]eopening in response to a motion is not sua sponte"). The Rule explains that the agency's "frequent misapplication" of this authority "strongly counsel[s] in favor of withdrawing it." 85 Fed. Reg. at 52,505; *id.* at 81,628.

The Department also reasonably explained how the Rule promotes finality in immigration proceedings and is consistent with Congress's intent to limit motions to reopen. 85 Fed. Reg. at 52,493, 81,628-29. As it noted, the sua sponte authority was not meant to be used to "circumvent timing and numerical limits." *Id.* at 81,630 (citing *Matter of J-J-*, 21 I. & N. Dec. 976, 984 (BIA 1997)). But the way it has been applied encourages noncitizens to file "motion[s] to reopen sua sponte," 85 Fed. Reg. at 81,632, in order to get around those limits to reopening, thus "severely undermin[ing]" finality. *Id.* at 52,493. The Department balanced these objectives with that of allowing sua sponte reopening in certain circumstances and decided to remove the sua sponte authority, noting that there remain "multiple, significant avenues" for reopening proceedings, *id.* at 81,633. *See id.* at 81,629-30 (any benefit in allowing untimely reopening to adjust status is clearly outweighed by finality concerns); *id.* at 52,505-06 (a noncitizen may ask DHS to join in a motion to reopen, which is not subject to the time and number limitations); *id.* at 52,506, 81,629, 81,630, 81,633 (noncitizens may seek equitable tolling of the time and number limitations in certain instances); *see also* 8 C.F.R. §§ 1003.2(c)(3)(v)-(vi), 1003.23(b)(4)(v) (creating exceptions to the reopening limitation for compelling circumstances involving an intervening change of law

rendering the noncitizen no longer removable or when an individual presents a supported claim of U.S. citizenship) (discussed at 85 Fed. Reg. at 52,506). Therefore, the Department did not act arbitrarily and capriciously or ignore important aspects of the problem when removing the sua sponte authority.

Plaintiffs also claim that the Rule failed to consider "a number of other significant aspects of the problem." Mot. 31. But the Department addressed the items they listed—that Plaintiffs disagree with the response does not render the Rule arbitrary and capricious. For example, the Rule addressed pro se individuals. 85 Fed. Reg. at 81,593 n.12, 81,596-97 & nn.22-23, 81,605, 81,606 & n.33, 81,617 (discussing pro se individuals); *Contra* Mot. 31. It also discussed individuals subject to removal who fear returning. 85 Fed. Reg. at 81,632 ("[T]his rule does not affect the ability of aliens to file a motion to reopen to apply for asylum or statutory withholding of removal based on changed country conditions and supported with new, material evidence."). *Contra* Mot. 31. Plaintiffs do not indicate what the Rule should have addressed concerning detained individuals, but to the extent they are concerned about the briefing schedule provisions applying to detained individuals, the Rule noted that "existing regulations already prioritize such cases." 85 Fed. Reg. at 81,624. Plaintiffs claim that the Department was required to address one organization's opinion that DHS does not join in motions to reopen as often as the organization would like, Mot. 31, but fail to explain the comment's relevance or importance. Similarly, Plaintiffs fault the Rule for not addressing its impact on two programs but then do not indicate what the Rule should have considered. Mot. 31. And finally, Plaintiffs' claim that the Rule failed to grapple with the fact that it "forecloses relief for some noncitizens," *id.*, is based on the faulty premise that anyone is entitled to a procedural mechanism to provide more time or file a motion outside of those provided by statute. At bottom, Plaintiffs' disagreements with the Department's policy choices and responses

do not render the Rule arbitrary and capricious.

Plaintiffs' contention that that the Department failed to consider the "reliance interests" of noncitizens in removal proceedings, *see* Mot. 31-32, is unavailing. To begin with, Plaintiffs fail to address *their own* reliance interests, or discuss or otherwise identify any such purported reliance interest in their motion. Additionally, it is not reasonable for an individual to rely on an agency's exercise of discretion for which there are no governing standards, such as sua sponte reopening. *See* 85 Fed. Reg. at 52,505 (collecting cases); *see also id.* at 52,496-97, 52,503, 81,645 (describing administrative closure as akin to the exercise of prosecutorial discretion). Moreover, Plaintiffs do not explain how the Rule upsets reliance interests given that the Department "clarif[ied] the generally prospective temporal application of the rule." *Id.* at 81,588 (explaining how the various parts of the Rule have prospective impact); *id.* at 81,645 (reasoning that "concerns about putative reliance interests are misplaced" because "the rule applies, in general, only prospectively, so it does not disturb cases that have already been administratively closed").

Furthermore, Plaintiffs' argument is belied by the fact that the Rule addressed comments raising retroactivity concerns at various points in the commentary. For example, with regard to the removal of sua sponte authority, the Department explained that the filing of an untimely motion to reopen does not give a noncitizen a "vested" right because "there is no right to sua sponte reopening or even to file such a cognizable motion" and that there are other available options. 85 Fed. Reg. at 81,647; *id.* (providing similar response with regard to the Rule's clarification of administrative closure). Plaintiffs make no attempt to explain how the Rule "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also* 85 Fed. Reg. at 81,657 ("Hypothetical effects on procedural choices and tactical

decisions related to an alien's claims in future cases, including those that have not even been filed or reopened, are not impositions on an alien's legal rights in a manner that has retroactivity concerns."); 85 Fed. Reg. at 81,645 ("all changes in the law may impact matters of attorney strategy in interactions with clients, but that is an insufficient basis to decline to change the law").

Finally, Plaintiffs—in alleging that the Department failed to discuss "the reliance interests of the millions of individuals in removal proceedings," Mot. 31—overlook the fact that these individuals may, and indeed should, raise any such arguments in their administrative and judicial proceedings. *See J.E.F.M.*, 837 F.3d. at 1035; *Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1294-96 (9th Cir. 2018) (addressing whether new agency rule should be applied retroactively to petitioner); *Matter of Cordero-Garcia*, 27 I. & N. Dec. 652, 657 (BIA 2019) (same); 8 U.S.C. §§ 1252(a)(5), (b)(9) (requiring channeling of all removal-related claims through removal proceedings). These issues will need to be litigated in the context of fact-specific individual cases; otherwise it would be very difficult to define in advance a class of people who will have acquired a vested interest or demonstrated reliance on the prior law. As the Rule explained, commenters' "broad and generalized concerns about alleged downstream effects are wholly speculative and do not account for either the case-by-case nature of adjudication or the fact-intensive nature of many cases." 85 Fed. Reg. at 81,647.

### 3.      The Rule Is Not Internally Inconsistent.

Plaintiffs' suggestion that the Rule is arbitrary and capricious because it is "riddled with internal inconsistencies" misses the mark and evinces a misunderstanding of the relevant Supreme Court precedent. Mot. 32-33.

Plaintiffs first argue that the Rule is inconsistent as to the agency's role as a neutral arbiter. Mot. 32. Plaintiffs' argument misconstrues the Rule. Plaintiffs are wrong that the Rule allows "IJs to ask the EOIR Director to reverse the BIA if an IJ thinks the BIA should have come out a different

way" and that this is inconsistent with the Rule's justification for another provision that intends to uphold the BIA's role as a neutral arbiter. *Id.* The Rule allows IJs to certify BIA cases in discrete situations, none of which are mere disagreement with the outcome as Plaintiffs claim. *See* 85 Fed. Reg. at 81,653-54 (text of the regulation setting forth four circumstances, including a clerical error affecting the case's outcome, the decision being contrary to established law, vagueness or failure to resolve the issues, or failure to consider a material factor). And doing so does nothing to the BIA's or the IJ's role as a neutral arbiter.

Furthermore, the "Rule's approach to data" is not inconsistent. Mot. 33. Specifically, the Department did not "brush[] off" comments about the lack of data regarding remands for IJ factfinding, *id.*, but instead asserted that granular data on the number of outcome-determinative BIA remands did not exist in light of the fact-specific nature of case-by-case adjudications. 85 Fed. Reg. at 81,606 n.31. Likewise, the Department did not "fault[]" commenters for not providing granular data themselves, Mot. 33, but instead responded to commenter criticism that specific data was not provided by noting that commenters had not even identified what metrics could have been used to produce such figures. 85 Fed. Reg. at 81,644 n.74. Thus, these footnotes are not inconsistent, but rather both respond that specific data is untraceable and unidentifiable.

Moreover, the Department's assertion that specific data is unidentifiable does not render the Rule arbitrary or capricious. *See Motor Vehicle Mfrs.*, 463 U.S. at 57. Indeed, the D.C. Circuit has not required a precise data set to support an agency's policy. *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 392 (D.C. Cir. 2018) (a "less than perfect" dataset "does not amount to arbitrary decision-making"). Rather, "[s]o long as the agency 'explained the available evidence' and rationally connected the facts to the choice made, it acted reasonably and its determination will be upheld." *Id.* (quoting *New York v. EPA*, 413 F.3d 3, 31 (D.C. Cir. 2005)); *see also Fox Television*,

556 U.S. at 515 (stating that the agency must acknowledge a change in policy and demonstrate that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better" than the prior policy).

Here, the Department evaluated the increase in the number of pending cases, noting that there had been "a 70 percent increase [of appeals of IJ decisions] over the previous high in the last five fiscal years" and concluded that certain actions, including limiting unnecessary and overbroad remands, was necessary to increase efficiencies and reduce the time it takes for a case to reach final adjudication. 85 Fed. Reg. at 52,492. One such efficiency was to reduce the number of remands to an IJ for collateral issues or matters that the BIA could resolve itself. *See* 85 Fed. Reg. at 52,492, 81,605-06. Two other policy changes to support consistency and efficiency are the constraints on sua sponte reopening and administrative closure. *See* 85 Fed. Reg. at 81,644. For each of these changes, the Department explained the problem and provided a reason for the policy change—rationally connecting the fact to the choice it made. *Hispanic Affairs Project*, 901 F.3d at 392. And although the Department noted that granular data was unavailable to demonstrate the number of cases the limitations would impact, the Department nevertheless explained the reasoning behind its belief that its new policy is better. *Ass'n of Oil Pipe Lines v. FERC*, 876 F.3d 336, 342 (D.C. Cir. 2017) (requiring that the agency "has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made'") (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

Plaintiffs' final claim that two footnotes in the Rule are inconsistent regarding quality control is incorrect. Mot. 33. The two footnotes are indeed consistent. Footnote 50 states that whether the result of a case is "'correct' . . . is often solely based on the narrative seeking to be advanced by the evaluator, and there is no accepted way of determining whether an adjudicator's

decision is normatively 'correct.'" 85 Fed. Reg. at 81,627 n.50. Footnote 52 deals with an entirely different question. In response to commenters' suggestion of publishing BIA decisions online as an alternative for quality assurance, the Rule notes that the Department could not make such decisions public without redactions and that such redactions "would necessarily inhibit the ability to determine whether those decisions were of sufficient quality." 85 Fed. Reg. at 81,627 n.52. Plaintiffs see inconsistency where none exists.

### 4.    The Department Did Not Ignore Significant Comments.

Plaintiffs argue that the Department "ignored significant comments." Mot. 33. The Department responded to each comment Plaintiffs identify. Their disagreement with the Department's response does not warrant setting aside the Rule.

Plaintiffs claim that the Department ignored comments that "the Rule would cripple the EOIR BIA Pro Bono Project" given the new briefing deadlines. *Id.* To the contrary, the Rule pointed out that the Pro Bono Project reviews cases for referral upon the filing of the Notice of Appeal, rather than the briefing schedule, that "in any litigation, newly retained counsel takes a client as he or she finds him," and even before the Rule, "there [wa]s no entitlement to a briefing extension . . . even for newly retained counsel." 85 Fed. Reg. at 81,636-37. The Department hardly "dismissed" concerns regarding pro bono representation, Mot. 34, but rather noted that: (1) roughly 86 percent of noncitizens "whose cases are considered by the Board have representation," 85 Fed. Reg. at 81,606; (2) "under current practice, pro bono volunteers who accept a case typically receive a copy of the alien's file before a briefing schedule is issued and, like all representatives, may request an extension," *id.* at 81,637; and (3) "there is no evidence that shortening the length of a briefing extension, which is already a disfavored practice and not guaranteed . . . will have any negative impact on representation before the BIA, particularly pro bono representation," *id.*

As the Rule explains, "because the Board expects any extension request to be for the

purpose of completing or finalizing a brief—rather than drafting it from the beginning—there is no justification for a lengthy extension period." *Id.* at 52,498. The Rule also highlighted that "reducing the amount of time for an extension will decrease the likelihood of gamesmanship associated with simultaneous briefing in which one party files a last-minute extension request and then has a lengthy period of time to review and address arguments made in the opposing party's brief that was already filed consistent with the prior deadline." *Id.* To the extent Plaintiffs argue that the shortened briefing schedule adversely impacts pro se litigants, Mot. 34, 39, the Department expressly noted that the BIA may apply "certain procedural doctrines, such as equitable tolling, [to] excuse noncompliance with filing deadlines for pro se aliens." 85 Fed. Reg. at 81,597.

Plaintiffs argue the Department failed to "acknowledge many of the alternatives commenters proposed," such as, relevant here, "staffing changes," or "deferring changes until an electronic filing system is in place." Mot. 34. But the Rule states that "internal staffing models are not generally the topic of regulations," and that, in any event, the EOIR Director "may employ sufficient staff as needed to carry out EOIR's functions," 85 Fed. Reg. at 81,621, and the Department expects that "in early 2021, registered attorneys and accredited representatives will be able to immediately view and download documents for cases with electronic records of proceeding, which will mitigate commenters' concerns about mail service and its potential effect on briefing schedule timing." *Id.* at 81,638; *see Executive office for Immigration Review Electronic Case Access and Filing*, 85 Fed. Reg. 78,240 (Dec. 4, 2020) (proposed rule that would implement electronic filing and records applications for all cases before the immigration courts and the BIA).

Plaintiffs also speculate that requiring a separate motion to reopen will disproportionately impact pro se individuals. Mot. 34 (citing Compl. ¶ 136). But the limitations on the BIA's remand authority do not preclude noncitizens from presenting any claim of error to the BIA. *See* 85 Fed.

Reg. at 81,596, 81,611 ("Nothing in the rule prohibits the BIA from remanding a case when an [IJ] has made an error of law, a legal question of jurisdiction has arisen, or an [individual] is no longer removable[.]"); *see id.* at 81,593 n.12 (stating that the Rule "neither singles out [pro se individuals] for particular treatment under the Board's procedures, nor does it restrict or alter any of the many procedural avenues such [individuals] already have available to them in advancing their cases"). The Rule also has no impact on a noncitizen's rights or abilities to obtain representation. *Id.* at 81,597.

Additionally, as the Rule discussed, it does not alter the existence of the BIA's pro bono program and resources that the agency provides to pro se litigants (*id.* at 81,597 n.22), the ability for the agency to construe pro se filings liberally (*id.* at 81,597 n.23), the IJ's duty to develop the record in pro se cases (*id.* at 81,597 (citing *Mendoza-Garcia v. Barr*, 918 F.3d 498, 504 (6th Cir. 2019) (collecting cases regarding the IJ's duty to develop the record)), or the agency's ability to excuse noncompliance with, for example, filing deadlines. 85 Fed. Reg. at 81,597. In the end, the Rule does not "ignore" criticisms or concerns that "the changes in practice before the BIA will reduce the already low number of individuals who can obtain counsel"; rather, the Rule explicitly disagrees with Plaintiffs' speculations about its impact on the pro se population. Such disagreement does not establish arbitrary or capricious rulemaking. *Hispanic Affairs Project*, 901 F.3d at 392 ("So long as the agency 'explained the available evidence' and rationally connected the facts to the choice made, it acted reasonably and its determination will be upheld." (quoting *New York*, 413 F.3d at 31)).

### C.     The Rule Is Procedurally Valid.

#### 1.     The 30-Day Comment Period Provided Sufficient Opportunity for Public Participation.

Plaintiffs' claims that the Department did not provide sufficient time to comment also fail.

Mot. 35-37. The APA sets forth the procedures for informal rulemaking: the agency must provide notice of the proposed rulemaking and "give interested persons an opportunity to participate . . . through submission of written data, views, or arguments." 5 U.S.C. § 553. The D.C. Circuit has stated that, although a 30-day period is often the "shortest" period that will satisfy the APA, such a period is generally "sufficient for interested persons to meaningfully review a proposed rule and provide informed comment," even when "substantial rule changes" are proposed. *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019). Furthermore, the time for comment is left to an agency's reasonable discretion. *See, e.g.*, *Vt. Yankee*, 435 U.S. at 543. And the Department received 1,284 comments during the comment period. *See* 85 Fed. Reg. at 81,642.

Plaintiffs also fail to show any prejudice. "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). Plaintiffs fail to show any prejudice because each of the five Plaintiffs submitted detailed comments. Plaintiffs claim that "commenters were unable to fully opine on the Rule's interaction with the various rulemakings and decisions issued during the comment period or the subsequently issued NPRMs on inextricably related subjects." Mot. 37; Compl. ¶¶ 302-14, 327. Importantly, however, Plaintiffs do not indicate with any specificity what issues they would have raised "that could have invalidated the rationale for the revised rule." 85 Fed. Reg. at 81,642 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003)). And in the case of other rulemakings, they do not explain why they could not have raised any issues in comments on those other rulemakings. Finally, Plaintiffs' reliance on Executive Order Nos. 12866 and 13563 is misplaced. Mot. 35. Those orders are "intended only to improve the internal management of the Federal Government and do[] not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." EO 12866, § 10; see EO 13563, § 7(d).

## 2.     The Department Complied with the Regulatory Flexibility Act.

Finally, Plaintiffs are wrong that the Rule violates the RFA. Mot. 37. Plaintiffs first allege that the Rule's RFA discussion was not conducted by the "head of the agency" and so was not sufficient. *Id.* But the EOIR Director, exercising rulemaking authority delegated from the Attorney General, signed the Rule, which includes a certification that the Rule "will not . . . have a significant economic impact on a substantial number of small entities" accompanied by "a statement providing the factual basis of such certification." 5 U.S.C. § 605(b); 85 Fed. Reg. at 81,650. It is unclear from Plaintiffs' motion and complaint what aspect of this certification they find improper. Mot. 37; Compl. ¶ 319. The Director of EOIR is the head of EOIR, and he exercised the authority of the Attorney General, who is the head of the Department. To the extent Plaintiffs fault the Rule for providing the factual basis in the form of a response to a comment, Compl. ¶ 319, the RFA certification specifically incorporates that response, 85 Fed. Reg. at 81,650.

Plaintiffs further argue that the Department failed to support the certification with "reasoned analysis, making it arbitrary and capricious" because the Rule "brushed off the interests of small entities." Mot. 32, 37. Circuit precedent demonstrates that Plaintiffs' claims are indeed irrelevant to the RFA analysis because Plaintiffs are not regulated by the Rule. The Circuit has "consistently rejected the contention that the RFA applies to small businesses indirectly affected by the regulation of other entities." *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001). This line of authority is rooted in the plain text of the statute, which is "limited to small entities subject to the proposed regulation," and demonstrates no coverage as to "indirect effects" that regulations may have on small entities not directly regulated. *Mid-Tex Elec. Co-op Inc. v. FERC*, 773 F.2d 327, 342-43 (D.C. Cir. 1985) (citing 5 U.S.C. § 603(b)(3), (4)). The Plaintiff organizations here are not directly regulated by the Rule's procedural changes and thus are not small entities under the RFA.

43

**III.    Plaintiffs Cannot Establish Irreparable Harm or that the Equities Lie in Their Favor.**

"The requirement of showing irreparable harm is an independent requirement [of a preliminary injunction]: if a plaintiff does not demonstrate that it is likely to suffer irreparable harm in the absence of preliminary relief, the Court may deny the motion without considering the other factors." *Fla. EB5 Invs.*, 443 F. Supp. 3d at 11 (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Moreover, "[e]ven if the other three factors entering the calculus merit such relief," "[a] movant's failure to show any irreparable harm is [still] grounds for refusing to issue a preliminary injunction." *Dallas Safari Club*, 453 F. Supp. 3d at 398. "The D.C. Circuit has set a high standard for irreparable injury. The injury must be unrecoverable; it must be both certain and great; [and] it must be actual and not theoretical." *Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (citations and quotation marks omitted); *Fla. EB5 Invs.*, 443 F. Supp. 3d at 11-12 ("A preliminary injunction is not appropriate unless 'the injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." (alternation and emphasis in original)).

A preliminary, mandatory injunction ordering the agency to return to a prior state of operation after the Rule's effective date would harm the United States and the public. The requested "injunctive relief [would] deeply intrude[] into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), including the "efficient administration of the immigration laws," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019). Here, Plaintiffs must demonstrate "that extreme or very serious damage will result from the denial of the injunction." *Dallas Safari Club*, 453 F. Supp. 3d at 398 (internal quotation omitted).

Plaintiffs fail to show any "extreme" or "very serious damage" will result absent the Court

ordering the agency to return to a prior state of operations. The only harms the organizational Plaintiffs allege to themselves are speculations about caseloads, funding, and the possible operational impact of the new Rule. *See* Mot. 38-44. But those harms do not establish irreparable injury—much less extreme or very serious damage. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough."). Even if credited, those inconveniences do not outweigh the harm imposed by undermining the "efficient administration of the immigration laws," *Innovation Law Lab*, 924 F.3d at 510 (internal quotation omitted), and certainly are not immediate, especially given the review provisions specified by Congress in 8 U.S.C. § 1252(b)(9) available to any noncitizen to whom the Rule's provisions are applied.

Finally, "Plaintiff[s'] delay in seeking a preliminary injunction . . . directly undercuts [the] argument that . . . harm is so imminent that" emergency relief is necessary. *See Fla. EB5 Invs.*, 443 F. Supp. 3d at 11 (holding that the plaintiff's "delay in seeking a preliminary injunction . . . undercuts its asserted harms" where "the Department . . . made clear the Rule would go into effect on November 21, 2019 [and] plaintiff waited until five days after the Rule went into effect . . . to attempt to challenge it."). EOIR issued the Rule on December 16, 2020. *See* 85 Fed. Reg. at 81,588. Yet, Plaintiffs waited until January 21—36 days after the Rule was published and six days after it went into effect—to approach Defendants to ask for an administrative stay under 5 U.S.C. § 705.

## IV.  Any Relief Must Be Sharply Limited.

Even if this Court were to grant relief, universal relief would be inappropriate, and any relief must be tailored to the specific claims made and the organizational Plaintiffs here.

First, under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill*, 138 S. Ct. at 1934, and the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen*

*v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Plaintiffs bear the burden of showing that something short of the nationwide injunction they seek will not fully redress their particular injuries. *See Winter*, 555 U.S. at 20. Here, any relief must be tailored to remedying Plaintiffs' alleged resource-allocation harms.

Plaintiffs nevertheless demand that this Court enjoin the Rule as to every person who may have the Rule applied to them. *See generally* Mot. But for individuals to whom the Rule would apply, relief should come, if at all, in their removal proceedings, 8 U.S.C. §§ 1229a(b)(4)(A)-(B), (c)(1)(A), (c)(4)(B), and in later petitions for review in the federal courts of appeal, 8 U.S.C. § 1252(a)(5), (b)(9); *see AADC*, 525 U.S. at 485 (Section 1252(b)(9) channels judicial review of all "decisions and actions leading up to or consequent upon final orders of deportation," including "non-final order[s]," into one proceeding exclusively before a court of appeals). So any injunction cannot extend to individuals in removal proceedings affected by the Rule.

Second, nothing in the APA indicates that a nationwide injunction is appropriate at this preliminary stage. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). But no part of that text specifies whether any action, if found likely to be invalid, should be set aside on its face or as applied to the challenger. In the absence of a clear statement to the contrary, this Court should adopt the reasonable reading of the "set aside" language. *See, e.g.*, *New York v. U.S. DHS*, 969 F.3d 42, 87-89 (2d Cir. 2020); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *Va. Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power."). The APA itself should be read to limit interim relief to the parties before it. *See* 5 U.S.C. § 705 (relief pending

review is appropriate only "to the extent necessary to prevent irreparable injury").

Indeed, the APA's very reference to actions for "declaratory judgments" makes clear that no injunction—much less a nationwide one—is compelled by the APA when agency action is held unlawful. *See* 5 U.S.C. § 705; H.R. Rep. No. 1980, 79th Cong., 2d Sess. 42 (1946) (referring to possibility of suits for declaratory relief to "determine the validity or application of a rule or order"); *see also* S. Rep. No. 752, 79th Cong., 1st Sess. 26 (1945). A different result is not compelled under *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998), or *Grace v. Barr*, 965 F.3d 883, 887 (D.C. Cir. 2020). Those cases dealt with *final* judgments, "where the court had already held that the rule at issue was unlawful and should be vacated." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 128 (D.D.C. 2015), *aff'd sub nom. U.S. Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir. 2017). However, in adjudicating a *preliminary* injunction motion, "the Court has not finally determined that the [action] is unlawful," so "the need for narrow tailoring . . . is particularly important," and any "injunction should be limited in scope to protect only" parties to the case. *Id.* at 126, 129; *see Neb. DHHS v. DHHS*, 435 F.3d 326, 330 (D.C. Cir. 2006) (district court erred by not limiting injunction to plaintiff alone).

## CONCLUSION

For these reasons, the Court should deny Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney

BRIAN BOYNTON
Acting Assistant Attorney General

BRIAN P. HUDAK
Acting Chief, Civil Division

AUGUST E. FLENTJE
Special Counsel

APRIL DENISE SEABROOK
Assistant United States Attorney

DAVID M. McCONNELL
Director

PAPU SANDHU
Assistant Director

*s/ Christina P. Greer*
CHRISTINA P. GREER
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8770
Email: Christina.P.Greer@usdoj.gov

MATTHEW A. CONNELLY
JESSICA A. DAWGERT
KOHSEI UGUMORI
Senior Litigation Counsels

Dated: February 16, 2021

*Attorneys for Defendants*

48