# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHOLIC LEGAL IMMIGRATION NETWORK, INC., *et al.*, <br><br>     *Plaintiffs*, <br><br>  v. <br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, <br><br>     *Defendants*. | Case No.: 1:21-cv-00094 (RJL) |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO STAY AGENCY ACTION UNDER 5 U.S.C. § 705 AND/OR FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................................i

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION ..............................................................................................................1

ARGUMENT ......................................................................................................................1

I.      Defendants' Threshold Arguments Do Not Preclude Relief ..........................................1

      A.      Section 1252 Does Not Foreclose Federal-Question Jurisdiction. .......................1

      B.      The Court May Issue Injunctive Relief to Preserve Status or Rights Under Section 705..............................................................................................................4

      C.      Plaintiffs Have Article III Standing ......................................................................5

      D.      Plaintiffs Fall Within the Zone of Interests...........................................................8

II.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims ....................................10

      A.      Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Contrary to the INA and the Department's Regulations ......................................................10

      B.      Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Arbitrary and Capricious ....................................................................................................16

      C.      Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to Provide an Adequate Opportunity to Comment.....................................................22

      D.      Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to Comply with the Regulatory Flexibility Act ......................................................23

III.    Plaintiffs are Irreparably Harmed and the Weight of Equities Tips in Their Favor .........25

IV.    The Court Should Stay the Rule in Its Entirety .................................................................27

CONCLUSION....................................................................................................................30

CERTIFICATE OF SERVICE ..........................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
    469 F.3d 129 (D.C. Cir. 2006) ................................................................................5

*Aeronautical Repair Station Ass'n v. FAA*,
    494 F.3d 161 (D.C. Cir. 2007) ..............................................................................24

*\*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014) ......................................................................16, 18

*Ashtabula Cty. Med. Ctr. v. Thompson*,
    191 F. Supp. 2d 884 (N.D. Ohio 2002) ................................................................18

*Bauer v. DeVos*,
    325 F. Supp. 3d 74 (D.D.C. 2018) ..........................................................................4

*Block v. Community Nutrition Inst.*,
    467 U.S. 340 (1984) ................................................................................................3

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) ..............................................................................................18

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ..............................................................................................28

*\*Capital Area Immigrants' Rights Coal. v. Trump*,
    471 F. Supp. 3d 25 (D.D.C. 2020) ................................................................ *passim*

*Capitol Hill Baptist Church v. Bowser*,
    --- F. Supp. 3d ----, 2020 WL 5995126 (D.D.C. Oct. 9, 2020) ......................26, 27

*Casa de Md., Inc. v. Wolf*,
    No. 8:20-cv-02118, 2020 WL 5500165 (D. Md. Sept. 11, 2020) ..........................22

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003) ..............................................................................23

*\*CLINIC v. EOIR*,
    No. 20-cv-03812, 2021 WL 184359 (D.D.C. Jan. 18, 2021) ......................... *passim*

*Matter of Coelho*,
    20 I. & N. Dec. 464 (BIA 1992) ............................................................................25

*Colorado v. EPA*,
   445 F. Supp. 3d 1295 (D. Colo. 2020) ...................................................................5

*Cook Cty., Ill. v. McAleenan*,
   417 F. Supp. 3d 1008 (N.D. Ill. 2019) ...................................................................9

*Corley v. United States*,
   556 U.S. 303 (2009) .................................................................................................5

*DHS v. New York*,
   140 S. Ct. 599 (2020) (Gorsuch, J., concurring) .................................................30

*\*DHS v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) .................................................................................2, 3, 4, 17

*Dia v. Ashcroft*,
   353 F.3d 228 (3d Cir. 2003) ..................................................................................11

*Dist. of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................5, 28, 30

*E. Bay Sanctuary Covenant v. Barr*,
   964 F.3d 832 (9th Cir. 2020) .................................................................................29

*Fed'n for Am. Immig. Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996). .................................................................................9

*\*FCC v. Fox Tele. Stations, Inc.*,
   556 U.S. 502 (2009) ...............................................................................................19

*Florida EB5 Investments, LLC v. Wolf*,
   443 F. Supp. 3d 7 (D.D.C. 2020) ..........................................................................27

*G.S. v. Holder*,
   373 F. App'x 836 (10th Cir. 2010) ........................................................................11

*Gomez v. Trump*,
   --- F. Supp. 3d ----, 2020 WL 5367010 (D.D.C. Sept. 4, 2020) .....................29, 30

*Gozlon-Peretz v. United States*,
   498 U.S. 395 (1991) ...............................................................................................11

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020) .................................................................................21

*Guerrero-Lasprilla v. Barr*,
   140 S. Ct. 1062 (2020) .............................................................................................1

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).................................................................................5, 8

*Immigrant Legal Res. Ctr. v. Wolf*,
    No. 20-cv-05883, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020)....................................22, 29

*INS v. Legalization Assistance Project*,
    510 U.S. 1301 (1993) (O'Connor, J., in chambers)................................................9

*INS v. St. Cyr*,
    533 U.S. 289 (2001)...............................................................................4

*Jacinto-Castanon de Nolasco v. ICE*,
    319 F. Supp. 3d 491 (D.D.C. 2018).............................................................10

*\*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)............................................................................1, 2

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)....................................................................25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..............................................................................8, 9

*M.G.U. v. Nielson*,
    325 F. Supp. 3d 111 (D.D.C. 2018).............................................................10

*\*Madsen v. Women's Health Ctr.*,
    512 U.S. 753 (1994)..............................................................................28, 30

*Make the Road N.Y. v. McAleenan*,
    405 F. Supp. 3d 1 (D.D.C. 2019)...............................................................30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)..............................................................................3, 8, 9

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991)..............................................................................3

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...............................................................................18

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
    522 U.S. 479 (1998) (O'Connor, J., dissenting).................................................9, 25

*Nat'l Immig. Project of Nat'l Lawyers Guild v. EOIR*,
    456 F. Supp. 3d 16 (D.D.C. 2020).............................................................3, 29

*Nat'l Lifeline Ass'n v. FCC,*
    921 F.3d 1102 (D.C. Cir. 2019) ................................................................22

*Neb. Dep't of Health & Human Servs. v. HHS,*
    435 F.3d 326 (D.C. Cir. 2006) .........................................................29, 30

*Nw. Immigrant Rts. Project v. USCIS,*
    No. 19-cv-3282, 2020 WL 5995206 (D.D.C. Oct. 9, 2020) .............................7, 29

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) (en banc) ............................................10

*\*O.A. v. Trump,*
    404 F. Supp. 3d 109 (D.D.C. 2019) ...........................................2, 3, 7

*Ortiz-Alfaro v. Holder,*
    694 F.3d 955 (9th Cir. 2012) ..............................................................11

*Pangea Legal Servs. v. DHS,*
    No. 20-cv-7721, 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ..........................22

*Pavelic & LeFlore v. Marvel Entm't Grp.,*
    493 U.S. 120 (1989) (Scalia, J.) ...........................................................11

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
    797 F.3d 1087 (D.C. Cir. 2015) ....................................................5, 6

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ...........................................................................15

*Petry v. Block,*
    737 F.2d 1193 (D.C. Cir. 1984) .........................................................22

*\*Portland Cement Ass'n v. EPA,*
    665 F.3d 177 (D.C. Cir. 2011) ....................................................19, 22

*Prometheus Radio Project v. FCC,*
    652 F.3d 431 (3d Cir. 2011) .............................................................22

*Russello v. United States,*
    464 U.S. 16 (1983) ............................................................................24

*Safety-Kleen Corp. v. EPA,*
    Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324
    (D.C. Cir. Jan. 19, 1996) ....................................................................4

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ............................................................................16

*Tex. Children's Hosp. v. Burwell*,
   76 F. Supp. 3d 224 (D.D.C. 2014) ...................................................................26

*U.S. Association for Reptile Keepers, Inc. v. Jewell*,
   106 F. Supp. 3d 125 (D.D.C. 2015) .................................................................30

*U.S. Dep't of Air Force v. FLRA*,
   952 F.2d 446 (D.C. Cir. 1991) ........................................................................16

*Union Neighbors United, Inc. v. Jewell*,
   831 F.3d 564 (D.C. Cir. 2016) ..................................................................21, 30

*United States v. Turkette*,
   452 U.S. 576 (1981) ........................................................................................11

*Whitman-Walker Clinic, Inc. v. HHS*,
   --- F.3d ----, 2020 WL 5232076 (D.D.C. Sept. 2, 2020) ............................28, 30

*Wisc.'s Envtl. Decade, Inc. v. SEC*,
   882 F.2d 523 (D.C. Cir. 1989) ...................................................................18, 19

**Statutes, Regulations, and Rules**

Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*

   § 604 .................................................................................................................24

   § 605(b) ......................................................................................................23, 24

Adminsitrative Procedure Act, 5 U.S.C. § 705 ....................................................4, 5

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*

   § 1101 .....................................................................................................8, 10, 11

   § 1103(g)(2) .....................................................................................................11

   § 1158(d)(4) .......................................................................................................8

  § 1184(p) .............................................................................................................8

   § 1229(b)(2) .....................................................................................................24

   § 1229a(b)(2) .....................................................................................................8

   § 1231(b)(3) .....................................................................................................13

   § 1252 ....................................................................................................... *passim*

   § 1443(h) ............................................................................................................8

28 U.S.C. § 1331 ...............................................................................................................1

8 C.F.R.

    § 1003.0(c) .........................................................................................................15, 16

    § 1003.1(d) .........................................................................................................11, 13

61 Fed. Reg. 18,900 (Apr. 29, 1996) ..........................................................................19

84 Fed. Reg. 44,537 (Aug. 26, 2019) ..........................................................................15

85 Fed. Reg. 69,465 (Nov. 3, 2020) ............................................................................15

85 Fed. Reg. 81,588 (Dec. 16, 2020) .................................................................. *passim*

**Other Authorities**

Att'y Gen. Order No. 4910-2020, ECF No. 35-2 ........................................................15

## INTRODUCTION

Plaintiffs request a stay of or injunction against enforcement of a hastily issued Rule that upends more than 40 years of practice before the Executive Office of Immigration Review ("EOIR"). Courts have repeatedly rejected Defendants' arguments related to justiciability, irreparable harm, and delay, and Defendants failed to rebut Plaintiffs' showing that the Rule was contrary to law, arbitrary and capricious, and issued without required procedures. The Court should therefore stay or enjoin the Rule in its entirety.

## ARGUMENT

### I.    Defendants' Threshold Arguments Do Not Preclude Relief

### A.  Section 1252 Does Not Foreclose Federal Question Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1331. Plaintiffs are nonprofit organizations bringing quintessential Administrative Procedure Act ("APA") claims against rulemaking of general applicability, not respondents in removal proceedings. As such, contrary to Defendants' suggestion, *see* Mem. in Opp'n to the Mot. to Stay, ECF No. 35 ("Opp."), 7-10, neither 8 U.S.C. § 1252(a)(5) nor 8 U.S.C. § 1252(b)(9) applies here.

The jurisdictional question begins with "the presumption favoring judicial review of administrative action." *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1069 (2020) (quoting *Kucana v. Holder*, 558 U.S. 233, 251 (2010)). Against that backdrop, §§ 1252(a)(5) and (b)(9) are clear. The former provides that a petition before a court of appeals is the "sole and exclusive means for judicial review *of an order of removal*." 8 U.S.C. § 1252(a)(5) (emphasis added). Because Plaintiffs do not seek "judicial review of an order of removal," § 1252(a)(5) does not apply.

Section 1252(b)(9) is equally inapplicable, as it applies only where "the legal questions in [the] case *arise from*" a noncitizen's removal proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830,

841 & n.3 (2018) (plurality opinion) (emphasis altered). It is settled law that legal issues that arise from agency rulemaking, not from any particular removal proceeding, are "too remote" to be governed by § 1252(b)(9). *Id.* As the Supreme Court held last term:

> Section 1252(b)(9) bars review of claims arising from actions or proceedings brought to remove an alien. That targeted language is not aimed at this sort of case. As we have said before, § 1252(b)(9) does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined.

*DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1907 (2020) (quotation marks and alterations omitted). Defendants seek support by isolating *Regents*' reference to "the process by which removability will be determined," Opp. 9, but ignore the opinion's explicit limitation of § 1252(b)(9) to issues "arising from" specific actions or proceedings brought to remove a noncitizen, *Regents*, 140 S. Ct. at 1907.

Numerous courts in this District have rejected arguments that these sections bar challenges to rulemaking. *See, e.g.*, *CLINIC v. EOIR*, No. 20-cv-03812, 2021 WL 184359, at *7 (D.D.C. Jan. 18, 2021) ("courts have uniformly read 'arising from' to delineate between claims that 'directly regard[] the removal hearing and collateral issues,'" such as "when a rule of general applicability is challenged outside the context of a removal proceeding" (quoting *SPLC v. DHS*, No. 18-cv-760, 2020 WL 3265533, at *15 (D.D.C. June 17, 2020)); *Capital Area Immigrants' Rights Coal.* ("*CAIR Coal.*") *v. Trump*, 471 F. Supp. 3d 25, 39-40 (D.D.C. 2020), *appeal filed*, No. 20-5273 ("[F]undamentally, the text of Section 1252 provides no support for the proposition that organizations may not facially challenge under the APA immigration-related regulations that harm their own interests."); *O.A. v. Trump*, 404 F. Supp. 3d 109, 128 (D.D.C. 2019), *appeal filed*, No. 19-5272 (Sections 1252(b)(9) and (a)(5) do not preclude "a facial challenge to the validity of a

regulation of general applicability based on the administrative record generated in rulemaking").[1] Even the case Defendants cite, *see* Opp. 8, explains that § 1252(b)(9) does not apply when "a plaintiff challenges the validity of a regulation of general applicability based on the administrative record generated in rulemaking." *Nat'l Immig. Project of Nat'l Lawyers Guild v. EOIR*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020) (quoting *O.A.*, 404 F. Supp. 3d at 128).

Defendants claim that § 1252 "explicitly provides that noncitizens, and only noncitizens, who have exhausted their administrative remedies may challenge issues arising in [removal] proceedings." Opp. 9. But, again, defects in generally applicable rulemakings do not arise from removal proceedings.[2] Thus, Supreme Court and other courts have recognized the ability of organizations to bring challenges to unlawful regulations or policies in circumstances like this one. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 497-98 (1991) (exercising jurisdiction over immigration-related policy despite the invocation of a jurisdiction channeling provision and acknowledging a "critical difference" between an individualized determination and a "challenge to the procedures for making such determinations"); *see also Regents*, 140 S. Ct. at 1903-04 (noting that every court before it had rightly "rejected the Government's threshold arguments that the

---

[1] Defendants' only response to *O.A.*'s lengthy analysis is to assert that the administrative record for a removal proceeding could include the administrative record for related rulemakings. Opp. 8, n.7. Even if Defendants were correct that the administrative record for the challenged rulemaking could be made part of the record in each removal case where it was relevant—even though Defendants have not made any suggestions as to how such a process would be feasible or identified any examples of courts ever doing so—that approach is no answer to the many other reasons supporting the Court's conclusion. *O.A.*, 404 F. Supp. 3d at 126-41.

[2] Defendants cite *Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984), but that case dealt with the right of third parties to challenge specific milk marketing orders, not generally applicable rulemaking. Moreover, the Supreme Court has rejected an overbroad reading of *Block* and the argument that "in authorizing one person to bring one kind of suit . . . , Congress barred another person from bringing another kind of suit seeking another form of relief." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 223 (2012).

[challenges to the termination of DACA] were unreviewable under the APA and that the INA deprived the courts of jurisdiction").

As the Supreme Court noted in *INS v. St. Cyr*, 533 U.S. 289 (2001), each subsection of § 1252(b), including (b)(9), applies "only 'with respect to review of an order of removal under subsection (a)(1).'" *Id.* at 313 (quoting 8 U.S.C. § 1252(b)). This case, by contrast, is a wholesale APA challenge to an agency regulation, and the legal questions Plaintiffs raise do not "arise from" any individual's removal proceeding. Accordingly, the "targeted language" of § 1252(b)(9) "is not aimed at this sort of case." *Regents*, 140 S. Ct. at 1907.

## B. The Court May Issue Injunctive Relief to Preserve Status or Rights Under Section 705

Defendants suggest in their Introduction and Standard of Review (though not in their Argument) that the Court cannot grant relief under 5 U.S.C. § 705 because the Rule's effective date has passed. Opp. 1, 5. This is incorrect. Section 705 provides two different grants of authority, one to agencies and one to courts. Congress limited agencies' authority to "postpon[ing] the effective date of action taken by [them]," but provided courts with significantly broader equitable powers, authorizing them to "issue all necessary and appropriate process to postpone the effective date of an agency action *or to preserve status or rights pending conclusion of the review proceedings*." 5 U.S.C. § 705 (emphasis added).

Defendants nonetheless suggest that the limitation on *agency* stays also applies to *judicial* stays. Both of their citations, however, considered stays issued by agencies, not by courts.[3] Neither one imposes the same limitation on the broader relief Congress authorized courts to provide. Nor

---

[3] *See Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996) ("That statute permits *an agency* to postpone the effective date of a not yet effective rule, pending judicial review." (emphasis added)); *Bauer v. DeVos*, 325 F. Supp. 3d 74, 106-07 (D.D.C. 2018).

could they, as doing so would render the additional express grant of authority "to preserve status or rights" above and beyond the authority to "postpone the effective date of an agency action," 5 U.S.C. § 705, superfluous. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant. . . ." (quotation and brackets omitted)). In any event, this issue is academic because Plaintiffs alternatively requested a preliminary injunction. *Cf. Colorado v. EPA*, 445 F. Supp. 3d 1295, 1300 (D. Colo. 2020) ("[T]he distinction between [Federal Rule of Civil Procedure] 65 and § 705 is mostly technical because a § 705 stay is a provisional remedy in the nature of a preliminary injunction. . . .").

### C.  Plaintiffs Have Article III Standing

Plaintiffs have demonstrated that they have been injured by agency action and that they have used their resources to address that harm. *See People for the Ethical Treatment of Animals* ("*PETA*") *v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). Plaintiffs meet both parts of this test, which originates in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[4]

Plaintiffs have demonstrated numerous ways in which the Rule frustrates their missions of representing and advocating for as many noncitizens as possible, as well as the affirmative steps they must take to address those harms. The Rule will make it impossible for them to take on clients that they otherwise would have represented, will make their representation of ongoing clients more

---

[4] Defendants begin by asserting that the jurisdictional limits of § 1252 mean that the test announced in *Havens* does not apply in the immigration context because organizations cannot challenge changes to immigration law. Opp. 10-11. The Court in *CAIR Coalition* considered this same argument and was "unpersuaded." 471 F. Supp. 3d at 39. There, as here, "Defendants have cited no case in which a court precluded an organization from challenging an immigration-related rule under the APA as a matter of law." *Id.* Nor do Defendants acknowledge that the D.C. Circuit has applied *Havens* "in a wide range of circumstances." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (collecting cases).

laborious and time-intensive, and will require that their educational materials—whether for *pro bono* partners, affiliates, or *pro se* litigants—be reworked. *See* Compl., ECF No. 1, ¶¶ 337-43; CLINIC Decl., ECF No. 9-2, ¶¶ 34-38; BDS Decl., ECF No. 9-3, ¶¶ 28-38; FIRRP Decl., ECF No. 9-4, ¶¶ 27, 33-44; HIAS Decl., ECF No. 9-5, ¶¶ 21-25; NIJC Decl., ECF No. 9-6, ¶¶ 25-35 (describing reduction in direct representation and *pro se* assistance, diminished capacity for *pro bono* recruitment, training, and mentorship, and diversion of resources to prepare new training materials and provide technical assistance). Plaintiffs have also documented concrete ways in which the Rule will impact funding and programming. For example, CLINIC has explained that the Rule jeopardizes the existence of two of its programs, the BIA Pro Bono Project and the Motions to Reopen Project. CLINIC Decl. ¶¶ 36-37, 43, 50.

Defendants' two main retorts lack merit.[5] First, they claim these injuries are speculative and in service of this litigation, Opp. 12, but the undisputed evidence from multiple, detailed declarations belies that contention. The concrete injuries Plaintiffs suffer are caused not by this litigation, but by the Rule's impairment of their ongoing operations in serving as many noncitizens as possible. For example, BDS described how its removal defense practice depends on funding sources that require it to maintain certain caseloads, at a fixed cost per case, and that it will lose some of that funding as the Rule makes each case more labor intensive in numerous ways. BDS Decl. ¶¶ 29, 50. Similarly, the Florence Project outlined how the inability to seek remand will impede its representation of clients whom they have been appointed to represent because of competency limitations, jeopardizing the associated funding. FIRRP Decl. ¶ 46. FIRRP further

---

[5] Defendants incorrectly assert that finding organizational standing would allow organizations to challenge "any rule that alters the legal landscape." Opp. 12. Not so. Standing requires an organization to challenge actions that frustrate its mission and show that it deployed resources to counteract that frustration. *See PETA*, 797 F.3d at 1094. Not every change in law that an organization dislikes will affect its activities in the manner shown here.

explained how the Rule will force its "attorneys to fully and zealously litigate cases on appeal applying invalidated law or outdated facts, only to subsequently file motions to reconsider or reopen once there is a final order of removal," a "wildly inefficient" use of resources. *Id.* ¶ 48. All five Plaintiffs described in detail how their current *pro bono* programs will be curtailed and require dramatic restructuring. CLINIC Decl. ¶¶ 34-38; BDS Decl. ¶ 35; FIRRP Decl. ¶¶ 34, 38-39; HIAS Decl. ¶¶ 15-25; NIJC Decl. ¶¶ 17, 27-29. There is no dispute that the Rule will apply to the work of Plaintiffs and the people they serve, and the way that impact will play out is explained in detailed and undisputed affidavits from immigration practitioners with significant experience. Like other courts in this District, this Court should reject Defendants' claims that these explanations are speculative. *See, e.g.*, *CLINIC*, 2021 WL 184359, at *13; *Nw. Immigrant Rts. Project v. USCIS*, No. 19-cv-3282, 2020 WL 5995206, at *30, *32 (D.D.C. Oct. 9, 2020) *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021); *CAIR Coal.*, 471 F. Supp. 3d at 41.

NIJC has also provided a supplemental declaration discussing specific injuries that have come to pass in recent weeks. Supp. NIJC Decl., attached as Ex. B, ¶¶ 5-27. NIJC explains how the inability to seek administrative closure, the limits on remand authority, and the foreclosure of *sua sponte* reopening have impaired representation of existing clients and made its ability to take on new ones harder. *Id.* NIJC also explained that, with CLINIC, it has already begun revising its training materials and practice advisories to account for the Rule's changes. *Id.* ¶ 28.

Defendants' other main argument, that Plaintiffs are still able to help some clients, Opp. 12, is correct, but immaterial. Courts have never required an organization to prove that is it entirely hamstrung by challenged actions; a direct conflict is one in which a defendant's actions cause a 'perceptibl[e] impair[ment]' of the organization's mission that makes its 'overall task more difficult.'" *O.A.*, 404 F. Supp. 3d at 143 (quoting *Nat'l Treasury Emps. Union v. United States*,

101 F.3d 1423, 1429 (D.C. Cir. 1996)). "Organizations satisfy the first prong of [*Havens*] if they show 'that their activities have been impeded' in some way." *CAIR Coal.*, 471 F. Supp 3d at 40 (quoting *Abigail All. for Better Access*, 469 F.3d at 133). Plaintiffs more than clear that hurdle.

### D.  Plaintiffs Fall Within the Zone of Interests

Plaintiffs are nonprofit organizations whose missions are to serve noncitizens on a *pro bono* or low-cost basis, putting them squarely within the zone of interests of the INA. The zone of interests test "is not especially demanding," and the "benefit of any doubt goes to the plaintiff," foreclosing only those suits wherein "a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (internal citations and quotations omitted). As long as a plaintiff is "arguably within the zone of interests to be protected or regulated by the statute," the test is satisfied. *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 224 (quotation omitted).

Plaintiffs easily clear this hurdle. First, the INA expressly contemplates a role for nonprofit service providers. *See* 8 U.S.C. § 1229a(b)(2) (requiring that noncitizens in removal proceedings be provided a list of pro bono attorneys); *id.* § 1443(h) (requiring the Attorney General to work with "relevant organizations" to "broadly distribute information concerning" the immigration process); *id.* § 1158(d)(4)(A)-(B) (requiring the distribution of a list of service providers to asylum seekers along with an advisal about the right to counsel); *id.* § 1101(i)(1) (referral to legal services for T visa applicants); *id.* § 1184(p)(3)(A) (same for U visa applicants). Each plaintiff has shown how the Rule will frustrate its ability to provide these legal services. *See* Compl. ¶¶ 336-48; CLINIC Decl. ¶¶ 30, 54-46; BDS Decl. ¶¶ 27, 62-66; FIRRP Decl. ¶¶ 27-31; HIAS Decl. ¶¶ 59-62; NIJC Decl. ¶¶ 82-91. Against this backdrop, courts in this District have had "no trouble"

finding that legal service organizations serving noncitizens, specifically including Plaintiff CLINIC, fall within the zone of interests because their "daily work is governed by the INA" and because "the INA contemplates an important role for organizations like Plaintiffs," *CLINIC*, 2021 WL 184359, at *10 (citing *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *10).

Defendants' contrary arguments are incorrect. Opp. 13-15. They cite a one-justice opinion for the proposition that immigration laws protect the interests of noncitizens and not organizations. Opp. 14 (citing *INS v. Legalization Assistance Project* ("*LAP*"), 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers)). That opinion is "both non-precedential and concededly 'speculative,'" and any persuasive force it may have once had was abrogated by the Court's subsequent "articulation in *Match-E-Be-Nash-She-Wish Band* and *Lexmark* of the current, more flexible understanding of the zone of interests test in APA cases." *Cook Cty., Ill. v. McAleenan*, 417 F. Supp. 3d 1008, 1021 (N.D. Ill. 2019); *cf. Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 505 (1998) (O'Connor, J., dissenting) (acknowledging that the Supreme Court had adopted "a quite different approach to the zone-of-interests test" than Justice O'Connor had advocated). Courts in this District have accordingly rejected the Government's attempt to rely on *LAP*. *See, e.g.*, *CAIR Coal.*, 471 F. Supp. 3d at 43.

Defendants also rely on *Federation for American Immigration Reform, Inc.* ("*FAIR*") *v. Reno*, 93 F.3d 897, 900-04 (D.C. Cir. 1996). Opp. 15. *FAIR* did not involve legal service providers, but rather an advocacy organization "dedicated to ensuring that levels of legal immigration are consistent with the absorptive capacity of the local areas where immigrants are likely to settle." *FAIR*, 93 F.3d at 899 (quotation omtted). The D.C. Circuit held that the organization's mission bore no more than a "marginal[] rela[tionship]" to the INA, as the INA did not "even hint at a concern about regional impact" of immigration. *Id.* at 900-01. *FAIR* is thus wholly irrelevant.

## II.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims

Defendants are wrong that Plaintiffs must meet a "higher standard" because the Rule's effective date has passed. Opp. 6. That rule does not apply where the requested preliminary injunction "would preserve, rather than alter . . . the 'last uncontested status which preceded the pending controversy.'" *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 498 (D.D.C. 2018) (quoting *Consarc Corp. v. U.S. Treasury Dep't*, 71 F.3d 909, 913 (D.C. Cir. 1995); *accord, e.g.*, *M.G.U.* v. *Nielson*, 325 F. Supp. 3d 111, 118 (D.D.C. 2018); *see also O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) ("[I]t is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions. Such an injunction restores, rather than disturbs, the status quo ante, and is thus not an exception to the rule."). The requested injunction merely requires the BIA and IJs to apply the familiar procedures they used for decades before the Rule, and were using when this suit was filed last month. Indeed, in many respects, they are *still* using the procedures changed by the Rule; some of the Rule's changes were prospective, meaning that EOIR is applying the previous rules in some cases and the new rules in others. An injunction would thus not call for a "positive act," Opp. 6, but merely restrain EOIR from altering the status quo ante.

Accordingly, the traditional four-factor test applies to Plaintiffs' motion. In any event, Plaintiffs' claims and harms readily satisfy even a heightened standard.

### A.   Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Contrary to the INA and the Department's Regulations

*The Rule Improperly Permits the EOIR Director to Adjudicate Appeals.* Defendants' attempt to wave away the unambiguous text of 8 U.S.C. § 1101(a)(47)(B), which provides that an order of removal becomes final upon a determination by the BIA, is contrary to the basic rule of statutory interpretation that "[a] specific provision controls over one of more general application."

*Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991). Defendants would flip that canon on its head, asking the Court to conclude that Congress's general assignment to the Attorney General of authority to make regulations and delegate his authority in § 1103(g)(2) overcomes the command of § 1101(a)(47)(B) requiring final determination by the BIA. This approach should be rejected.

Defendants suggest that Congress may have *intended* to authorize the Attorney General to ignore § 1101(a)(47)(B), notwithstanding the text it actually enacted. Opp. 16-17. This approach to statutory construction is even more dangerous. "If the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *United States v. Turkette*, 452 U.S. 576, 580 (1981) (internal citation and quotation omitted). Defendants do not claim that the statutory language is unambiguous, nor that Congress clearly expressed—or even implicitly suggested—an intent to the contrary. Instead, they baldly ask this Court to replace Congress's clear language with what the Executive branch wishes Congress said. *See, e.g.*, *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989) (Scalia, J.) ("Our task is to apply the text, not to improve upon it.").

Defendants' other case citations are insubstantial. Opp. 17-18. *Dia v. Ashcroft* notes that Congress left "procedural aspects *of the BIA*" to the Attorney General's discretion, 353 F.3d 228, 237 (3d Cir. 2003) (emphasis added), but it does not suggest that the Attorney General can simply supplant the BIA. *Ortiz-Alfaro v. Holder*, 694 F.3d 955 (9th Cir. 2012), and *G.S. v. Holder*, 373 F. App'x 836 (10th Cir. 2010), dealt with enforcement actions that the parties agreed were not subject to § 1101(a)(47) at all. And the Attorney General's authority to review a Board decision before it becomes final, *see* 8 C.F.R. § 1003.1(d)(7), merely affects when the "determination by the BIA" required by § 1101(47)(B)(i) becomes final; it does not purport to replace that requirement.

*The Rule Disregards Mandatory Protections from Removal.* Defendants mischaracterize Plaintiffs' argument that the Rule contradicts the withholding of removal statute and the United States' *non-refoulement* obligations. Opp. 19. Plaintiffs have not claimed that background checks were new creations of this Rule, nor denied that a failure to comply with such background checks could previously constitute abandonment of an application for relief. *Id.* Nor do Plaintiffs suggest a scheme where background checks might not be mandatory. *Id.*

Instead, Plaintiffs' objection is to the Rule's new and significantly different procedures for handling background checks. These procedures will convert grants of mandatory protection like withholding of removal into denials of that protection for "abandonment" if a grantee misses their background check appointment. The INA and U.S. treaty obligations against *non-refoulement* require more before a noncitizen's fear-based relief can be revoked in this arbitrary manner. Mem. in Supp. of Pls.' Mot. to Stay, ECF No. 9-1 ("Mot."), 11, 18-19. Before the Rule, a case would be remanded to the IJ and set for a hearing to discuss background checks, allowing the IJ to discern a reasonable time for their completion given the applicant's particular circumstances, and DHS was required to notify the respondent in person of the background check requirements. DHS had to provide instructions for compliance, and the IJ was required to "specify for the record when the respondent receives" this information, along with a warning about the consequences of failing to do so. Compl. ¶ 191. Now, a noncitizen who has *already been granted relief* will receive a single written notice from DHS (using often incomprehensible legalese and in what may be a foreign language), received by U.S. mail months or years after their appeal was filed, without the opportunity to contest notice or ask questions about the process. That notice will start a strict 90-day clock for the completion of background checks. *See* 85 Fed. Reg. 81,588, 81,588 (Dec. 16, 2020). The unfairness of this procedure is exacerbated by the asymmetry allowing the BIA to

remand if DHS is responsible for the failure to complete a background check, whereas the noncitizen is afforded no such flexibility. *Id.* at 81,652 (new 8 C.F.R. § 1003.1(d)(6)(iii)).

Similarly, the absence of a specific statute requiring reopening to seek withholding of removal based on a change of law or circumstances does not make it lawful to categorically eliminate that opportunity. *See* Opp. 19-20. The express prohibition on removal to persecution or torture, *see* 8 U.S.C. § 1231(b)(3), suffices to require its availability. *See* Compl. ¶ 213.

*The Rule Eviscerates Rights to Examine and Present Evidence.* Defendants appear to misunderstand Plaintiffs' arguments about the various ways the Rule undermines noncitizens' rights to examine and present evidence. For example, noncitizens receive notice and an opportunity to respond to facts "noticed" by the BIA only when the BIA *reverses* an IJ decision based on those facts. 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(B)). Defendants completely fail to justify, or even acknowledge, the BIA's new ability to *affirm* the IJ based on those noticed facts, without giving the noncitizen notice or an opportunity to respond, and even by summary affirmance without opinion. *See* Compl. ¶¶ 160-68, 296-97. Moreover, Defendants' assertion that the *parties* may not submit evidence at the BIA level, *see* Opp. 21, is irrelevant to the fact that the BIA may now, of its own accord, notice potentially disputable facts that were not developed or even considered by the IJ or the parties below, *see* Compl. ¶¶ 145-59. This aspect of the Rule is not harmless. Parties to an appeal do not ordinarily "anticipate" addressing issues that did not form the basis of the IJ's decision. Opp. 21. But Plaintiffs now must brief and cross-appeal factual disputes that were not at issue below, creating backlogs and inefficiencies. *See* Compl. ¶¶ 166-67.

Contrary to Defendants' suggestions, Opp. 22-23, Plaintiffs have repeatedly explained why channeling all new evidence into motions to reopen filed after the BIA's ruling is an inadequate substitute for motions to remand. *See* Compl. ¶¶ 123, 310; Mot. 40-41. Noncitizens with new fear-

based evidence, for example, will be required to wait months or years until the direct appeal results in a final order of removal. This wait will often mean that they never get to present the new evidence at all because they will face imminent removal upon the issuance of the BIA's decision, considerably curtailing their ability to pursue reopening. *See* Compl. ¶¶ 123-26.

Defendants likewise overlook that it will be nearly impossible for noncitizens, especially *pro se* respondents, to develop the record for voluntary departure or to merit a remand from a direct appeal in the manner the Rule contemplates. *See, e.g.*, *id.* ¶¶ 115, 173; FIRRP Decl. ¶¶ 49-50. Plaintiffs do not argue that noncitizens need not apply for voluntary departure before the IJ, *see* Opp. 23; they argue that there are a number of scenarios where the record will not be developed sufficiently to allow the BIA to adjudicate that claim in the first instance. *See* Compl. ¶¶ 115, 173; Mot. 20. Thus, noncitizens will be foreclosed from voluntary departure relief or remands from direct appeals, despite not having a full and fair opportunity to present their claims.

*The Rule Conflicts with Noncitizens' Right to Counsel*. Defendants simply regurgitate the Rule's description of the BIA briefing schedule and then conclude that the Rule does not interfere with the statutory right to meaningful representation by counsel. *See* Opp. 23. These conclusory points aside, Defendants fail to engage with the vast majority of Plaintiffs' claims describing why the Rule *does* materially affect the ability to retain counsel.

In their complaint and motion, Plaintiffs describe at length how the unalterable timelines implemented by the Rule, on top of already-existing barriers, will make it nearly impossible for the 70% of noncitizens unrepresented before the IJ to obtain appellate counsel. *See* Compl. ¶ 51 n.4; Mot. 20-22. Plaintiff CLINIC, which runs the BIA Pro Bono Project, submitted evidence describing how the Rule will severely restrict CLINIC from finding *pro bono* counsel for *pro se* individuals in the Project. *See* CLINIC Decl. ¶¶ 34-36 ("*[P]ro bono* counsel will have just over

two weeks to review a completely new file, research complex and unfamiliar legal issues outside their normal area of practice, and write a comprehensive brief. Almost no *pro bono* volunteer would take a case under these circumstances."); *see also, e.g.*, HIAS Decl. ¶¶ 21-25; NIJC Decl. ¶¶ 27-32. Plaintiffs thus have explained in detail how the Rule will deprive many noncitizens of access to counsel, a reality that is not changed by Defendants' repeated, conclusory disavowal of that harm. *Cf. CLINIC*, 2021 WL 184359, at *12 ("[W]hen multiple legal service providers raised the alarm that [the Rule] would adversely impact their organizations and would depress their capacities to provide pro bono and low-cost legal services, the APA required EOIR to acknowledge those concerns and respond to them in a meaningful way, not blithely dismiss them.").

*The Rule Is Contrary to 8 C.F.R. § 1003.0(c)*. Section 1003.0(c) explicitly limits the EOIR Director's adjudicatory authority to situations where it has been "provided by statute, regulation, or delegation of authority from the Attorney General, or when acting as a designee of the Attorney General." No statute provides the EOIR Director with adjudicatory authority in the situations covered by the Rule; the Attorney General has issued no regulation providing that authority; and the Attorney General has not delegated that authority or designated the EOIR Director to wield it. The power that Mr. McHenry assigned to himself and his successors contravenes § 1003.0(c).

Defendants principally rely on a secret delegation made public only after the filing of this litigation. *See* Att'y Gen. Order No. 4910-2020, ECF No. 35-2. But that delegation did not purport to set aside the explicit limitation of § 1003.0(c). The requirement that regulations, delegations, and designations come "from the Attorney General" was promulgated through the APA's procedures, including both an interim final rule and a notice-and-comment rulemaking. *See* 85 Fed. Reg. 69,465 (Nov. 3, 2020); 84 Fed. Reg. 44,537 (Aug. 26, 2019). It cannot be superseded by secret delegation. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (the APA

"mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance"). The fact that the Attorney General has explicitly provided adjudicative authority in two specific circumstances, *see* Opp. 24-25, does not support Defendants' argument; to the contrary, it shows the kind of specific Attorney General action that is necessary to depart from § 1003.0(c), which has not been provided here.

Defendants attempt to downplay the volume of cases that will be reassigned to the Director, claiming that "there is no indication that the Director must refer each and every case that would otherwise fall within the purview of the Rule." Opp. 26. This is a flat misstatement of the Rule, which expressly provides that "the Chairman *shall* refer" covered cases to the Director and "the Director *shall* exercise" adjudicative authority over those cases, authority the Director "may not further delegate." 85 Fed. Reg. at 81,653 (emphasis added). *See U.S. Dep't of Air Force v. FLRA*, 952 F.2d 446, 450 (D.C. Cir. 1991) ("[R]egulations speaking in categorical terms, using words such as shall, are generally interpreted to be mandatory or imperative, not merely precatory.") (internal citation and quotation omitted).[6]

### B.  Plaintiffs Are Likely to Succeed on Their Claim That the Rule Is Arbitrary and Capricious

Defendants' response to Plaintiffs' arbitrary and capricious claims ignores two blackletter propositions of administrative law: that conclusory statements do not satisfy the requirement of reasoned analysis, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014), and that the agency cannot rely on rationales not stated in the record, *SEC v. Chenery Corp.*, 318 U.S. 80,

---

[6] Contrary to Defendants' insistence, Opp. 26, this issue is not irrelevant: to the extent § 1003.0(c) is ambiguous, the fact that the Attorney General explicitly described the adjudicative authority he conferred on the Director as "limited to only a narrow subset of EOIR cases" weighs against any construction that would allow the Director to hear cases far beyond that narrow subset without direct authorization. *See* Mot. 23-24 n.15 (quoting 85 Fed. Reg. at 69,475). As to Defendants' assertion that the Rule's exceptions mitigate this conflict, *see infra* p.18.

87 (1943). Ignoring these requirements, Defendants respond to Plaintiffs' arguments by offering non sequiturs, misstating the Rule's provisions, and inventing new bases for their decisions. These arguments do nothing to refute Plaintiffs' showing that the Rule is arbitrary and capricious.

*Failures to Rationally Connect Facts to Decision.* As explained in Plaintiffs' motion, Defendants' efficiency rationale runs counter to the evidence in the record and is not supported by a reasoned explanation. *See* Mot. 25-28. Defendants have no tenable response. As in the Rule, they point to procedural devices that apply only in the narrowest of circumstances to justify their refusal to consider the effects on efficiency (and other interests, such as fairness) in the mine run of cases.

For example, Defendants say that "the Rule clearly explains that a material change in fact or law still provides a basis for remand while the appeal is pending," such that "the Rule does not require the agency to inefficiently issue a decision only to then reopen proceedings if there is an identified, material error." Opp. 28-29. In actuality, the Rule allows the BIA to remand due to material changes in fact or law *only if* the change affects jurisdiction or entirely vitiates removability—prohibiting the BIA from remanding due to evidence that, for example, makes relief from removal newly available. *See* Mot. 26; Compl. ¶¶ 112-13, 121. Thus, the Rule *does* require the BIA to complete appellate proceedings on outdated facts or law and only then entertain a "motion to reopen to submit new evidence after proceedings have concluded." 85 Fed. Reg. at 81,611 n.37. In their brief, as in the Rule itself, Defendants cannot explain how prohibiting remands in such cases advances efficiency and therefore fail to justify it at all. *Cf. Regents*, 140 S. Ct. at 1911 (agency action arbitrary and capricious where rationale only supports one part of change). Defendants' other arguments with respect to motions to remand fall back on citations to unreasoned, conclusory statements in the Rule or NPRM that do not address the actual workings of the Rule, *see, e.g.*, Opp. 29 (citing 85 Fed. Reg. at 81,607), or provide non sequiturs about

17

administrative exhaustion that have nothing to do with how to efficiently handle material changes in fact or law that occur after the first stage of administrative proceedings, *see id.*

Defendants similarly rely on conclusory statements to defend the Rule's provision transferring nearly 50 percent of cases from the BIA to the Director for decision. Though the Rule stated that the Director would only review "a narrow subset of EOIR cases," 85 Fed. Reg. at 81,622, that claim is belied by plain math and the Rule's text. *See* Mot. 26-27; *see also, e.g.*, *Ashtabula Cty. Med. Ctr. v. Thompson*, 191 F. Supp. 2d 884, 897 (N.D. Ohio 2002) (action arbitrary and capricious where "[o]nly the fuzziest of math could support the Secretary's assumption"). And while Defendants say that four limited exceptions in the final Rule mitigate "potential volume concerns," Opp. 30, neither their brief nor the Rule attempts to explain why the rare circumstances covered by the exceptions make a significant difference. *See* 85 Fed. Reg. at 81,622. The arithmetic is clear and runs dramatically "counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), so "conclusory statements will not do." *Amerijet*, 753 F.3d at 1350.

As to administrative closure, Defendants do not attempt to explain how the Rule advanced efficiency, tacitly conceding that they cannot make "a rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). Their belated attempt to distinguish their consultant's report noting that administrative closure can help "streamline [EOIR's] caseload," Opp. 31 (quotation omitted), is plainly inappropriate, as the Court "cannot accept . . . rationalizations first advanced by counsel in this litigation" or "entertain[] arguments not relied upon by the agency" during the rulemaking. *Wisc.'s Envtl. Decade, Inc. v. SEC*, 882 F.2d 523, 528 (D.C. Cir. 1989). Instead of making any such argument in the Rule, Defendants refused to acknowledge the report's existence at all. And even if their newfound

rationale were cognizable, it would be inadequate; the fact that the report didn't recommend exact parameters for the use of administrative closure is irrelevant to the fact that it generally identified administrative closure a means of *improving* efficiency, a fact that the Rule failed to discuss.

*The Rule Fails to Consider Important Aspects of the Problem.* Defendants assert that they considered all of the unquestionably "important aspects of the problem" that Plaintiffs identified, *see* Mot. 29-32, but most of their examples of the Rule's purported consideration cite only to conclusory statements or non sequiturs. *See, e.g.*, Opp. 33-34. A review of the citations themselves makes clear that these cursory snippets amounted to "next to nothing," which does not satisfy an agency's obligations. *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 553 (2009).[7]

To the extent Defendants provide additional detail, their arguments are meritless. To defend the Rule's failure to consider the interaction between the Rule and "contemporaneous and closely related rulemaking[s]," *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011), Defendants suggest that that failure did not matter because two of the contemporaneous rules, on Defendants' litigation view, would only codify existing caselaw. Opp. 32. This is false, *see* Compl. ¶¶ 310-11, and an improper post hoc rationalization, *see Wisc.'s Envtl. Decade*, 882 F.2d at 528. Nor do Defendants make *any* attempt to justify their failure to discuss the interaction with the several other rules Plaintiffs and commenters identified. *See* Compl. ¶¶ 301-15, Mot. 29-30.

Defendants are similarly unable to defend their failure to provide a "reasoned explanation . . . for disregarding," *Fox*, 556 U.S. at 516, the fact that they relied on the existence of the *sua sponte* safety valve when they established a limit on motions to reopen in the first place. *See* Mot. 30; 61 Fed. Reg. 18,900, 18,902 (Apr. 29, 1996). Defendants claim that the Rule

---

[7] *See, e.g.*, 85 Fed. Reg. at 81,629-30 (citing the Department's "inten[t] to promote consistency and efficiency in proceedings" without explaining how the specific change does so, and finding commenters' arguments "unpersuasive" without explaining why).

"addressed this issue" by saying that "motion[s] to reopen sua sponte" are an "oxymoron," Opp.

33 (quoting 85 Fed. Reg. at 81,632). This is not an explanation of why the considerations that

drove Defendants' previous view are no longer important or are overshadowed by their new

concerns. Defendants similarly fail to engage with Plaintiffs' arguments that the alleged

"significant avenues," *id.*, do not actually address the concerns identified, because those avenues

are inapplicable in the vast majority of cases. *See* Compl. ¶ 201.

As to reliance interests, Defendants state that Plaintiffs "fail to address *their own* reliance

interests," Opp. 35, but this is wrong. *See, e.g.*, Compl. ¶¶ 205, 244; HIAS Decl. ¶ 34. And while

Defendants suggest that the reliance interests of noncitizens themselves could be litigated in

individual removal proceedings, that possibility has nothing to do with whether the agency

adequately considered those interests in the Rule. As Defendants' citations to the Rule show, their

analysis was at best conclusory and unresponsive to the commenters' concerns. *See* Opp. 35-36

(quoting 85 Fed. Reg. at 81,645, 81,647, 81,657). Defendants' suggestion is also impossible in

many cases, such as in removal proceedings that have already been closed but would (but for the

Rule) be eligible for *sua sponte* reopening.

*The Rule is Internally Inconsistent.* Defendants' rebuttal to the Rule's internal

inconsistencies is similarly meritless. They argue that the IJ "quality certification" process does

not conflict with IJs' role as "neutral arbiters," *id.* 36-37, but do not attempt to reconcile their

argument with the Rule's assertion that BIA remands for factfinding somehow "abdicat[e] [BIA's]

role as an impartial or neutral arbiter," 85 Fed. Reg. at 81,605. The point is not simply that the

quality certification process is improper (although it is, *see* Compl. ¶¶ 255-77), but that Defendants'

use of different standards to evaluate rules they desired and rules they disliked is arbitrary and

capricious. As to the inconsistencies in how the Rule discusses data and the correctness of BIA

opinions, *see* Opp. 37-39; Mot. 33, the text of the Rule simply does not bear out their claims. *Compare, e.g.*, 85 Fed. Reg. at 81,627 n.50 ("[T]here is no accepted way of determining whether an adjudicator's decision is normatively 'correct.'") *with id.* n.52 (asserting that prior practices had not "ensured that the Board issues a quality or correct decision in every case").

*The Rule Ignores Significant Comments and Alternatives.* Finally, Defendants claim that they "responded to each comment" that Plaintiffs identified, Opp. 39, but do not acknowledge— let alone show how they satisfy—the D.C. Circuit's holding that it is insufficient to "[n]od[] to concerns raised by commenters only to dismiss them in a conclusory manner." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). At most, Defendants repeat the same non sequiturs and conclusory assurances in the Rule, which are inadequate for the reasons stated in Plaintiffs' motion and Complaint. *See, e.g.*, Mot. 33-34; Compl. ¶¶ 104-05 (discussing impact on the BIA Pro Bono Project and *pro bono* representation); *id.* ¶¶ 89-93, 102 (discussing disproportionate impact on *pro se* respondents and their ability to obtain representation).

Defendants' responses to two of the many alternatives proposed by commenters are similarly insufficient. *See* Opp. 40. For example, the issue is not whether staffing models are set by regulation, but whether Defendants adequately considered whether changes to staffing (as suggested by numerous commenters, Defendants' consultant, the Government Accountability, and others) was a superior alternative to the changes in the Rule.[8] *See, e.g.*, *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 577 (D.C. Cir. 2016).

---

[8] Defendants' reference to the Rule's conclusory statement that adjudication by the Director would not decrease efficiency because the Director "may employ sufficient staff as needed to carry out EOIR's functions," 85 Fed. Reg. at 81,621, only underscores the point. If Defendants can rely on the ability to increase staffing in the Director's office as evidence that adjudication by the Director can be more efficient than BIA adjudication, then Defendants needed to explain why increasing staffing at the BIA would not have the same effect.

### C. Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to Provide an Adequate Opportunity to Comment

Defendants next posit that the 30-day comment period was sufficient, relying principally on *National Lifeline Association v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019). *National Lifeline* said only that a 30-day comment period is "*generally* the shortest time period sufficient" for review and comment. *Id.* (emphasis added). Because it dealt with a 14-day period, it had no occasion to weigh in on when a 30-day (or longer) period would be insufficient. Moreover, it relied for that proposition on *Petry v. Block*, which explained that while 30 days is "the shortest period in which parties can meaningfully review a proposed rule and file an informed response . . . , there is scarcely anything talismanic about that particular length of time" and it can be "an inadequate time to allow people to respond to proposals that are complex." 737 F.2d 1193, 1201 (D.C. Cir. 1984) (quoting Admin. Conference of the U.S., *A Guide to Federal Agency Rulemaking* 124 (1983)).[9]

A 30-day comment period is particularly suspect where, as here, Defendants used a "'staggered' method in which [they] published this NPRM and several other related proposed rules." *Pangea Legal Servs. v. DHS*, No. 20-cv-7721, 2020 WL 6802474, at *22 (N.D. Cal. Nov. 19, 2020). Courts have repeatedly vacated rules where a 30-day comment period was used in such a staggered rulemaking, a body of caselaw that Defendants do not distinguish or even acknowledge. *See id.*; *Casa de Md., Inc. v. Wolf*, No. 8:20-cv-02118, 2020 WL 5500165, at *26 (D. Md. Sept. 11, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-05883, 2020 WL 5798269, at *14 (N.D. Cal. Sept. 29, 2020). Given that the D.C. Circuit expressly requires agencies to analyze "contemporaneous and closely related rulemaking[s]," *Portland Cement*, 665 F.3d at 187, the same

---

[9] *National Lifeline* also relied on *Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011), which held a 28-day comment period insufficient and noted—on the very page *National Lifeline* cited—that the "usual" comment period was "90 days."

result should follow here. Defendants attempt to minimize this issue by noting that Plaintiffs could have "raised any comment in issue on those other rulemakings," Opp. 42, but that misses the point: Plaintiffs were denied the opportunity to comment on how those rulemakings affected *this* Rule.

In these circumstances, Defendants' inability to articulate any affirmative reason for adopting a comment period so much shorter than the 60 days provided by the governing Executive Orders is damning. *See* Mot. 35-36 (collecting authority).[10] All Defendants can do is repeat the Rule's demonstrably false assertion that Plaintiffs and other commenters do not "indicate with any specificity" which other issues they would have raised. Opp. 42. This is flatly incorrect. *See* Mot. 36 (citing comments identifying issues that could not be addressed during the time period); CLINIC Decl. at ¶ 71 (identifying issues CLINIC would have addressed); BDS Decl. at ¶ 25 (same for BDS). Nor do Defendants provide any reason to believe that the comments prevented by the shortened period were so insubstantial that they *could not* have caused Defendants to reconsider the Rule. *See City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (requiring only that comments "could have invalidated" Defendants' rationale, not that they necessarily would have).

### D.  Plaintiffs Are Likely to Succeed on their Claim That Defendants Failed to Comply with the Regulatory Flexibility Act

Defendants concede that the "head of the agency" must "certif[y]" that the Rule will not impact small entities in order to waive the otherwise required analysis of impacts to small entities under the Regulatory Flexibility Act ("RFA"). Opp. 43; 5 U.S.C. § 605(b). They assert that Mr. McHenry's signature satisfied this requirement, Opp. 43, but the Rule stated only that "the Department … has determined" that the Rule complied with the RFA, not that Defendant McHenry

---

[10] The fact that the Executive Orders do not create a binding obligation or private cause of action against the United States, *see* Opp. 42, does not provide an affirmative reason to ignore them, much less support an unreasoned, arbitrary selection of a shortened comment period.

certified compliance. 85 Fed. Reg. at 81,650. The "Department" is not the legal equivalent of the head of the agency, and "determined" is not the legal equivalent of a personal certification. Had Congress been satisfied with a general "agency" statement on compliance it would have said so. *Compare* 5 U.S.C. § 604 (permitting the "agency" to prepare the RFA analysis) *with id.* § 605(b) (requiring the "head of the agency" to "certif[y]" compliance to waive RFA analysis under § 604); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Defendants do not dispute that they normally make exactly such a specific certification, *see* Mot. 37, nor do they explain why they did not do so here.

Additionally, Defendants' required "statement providing the factual basis for [an RFA] certification" was arbitrary and capricious. 5 U.S.C. § 605(b); Mot. 37. Citing outdated caselaw, Defendants claim that they were not required to consider "indirect effects" on small entities such as Plaintiffs because the Rule regulates individuals, not entities. Opp. 43 (quotation omitted). But Defendants ignore subsequent Circuit precedent that expressly distinguished Defendants' cases in comparable circumstances to those faced by Plaintiffs here. *See Aeronautical Repair Station Ass'n v. FAA*, 494 F.3d 161, 176-77 (D.C. Cir. 2007) (holding small entities can be a party affected by or otherwise regulated by a Rule by virtue of their contractual relationships to their clients). Here, the Rule addresses substantial procedural changes that principally impact Plaintiffs, organizations that Congress intended to play an integral part in ensuring due process in removal proceedings, *see* 8 U.S.C. § 1229(b)(2), and whose contracts with Congress, local governments, and clients require them to participate in the proceedings governed by the Rule. The Rule thus directly impacts Plaintiffs' work in ways that Defendants fail to acknowledge.

**III.    Plaintiffs are Irreparably Harmed and the Weight of Equities Tips in Their Favor**

Defendants fail to rebut Plaintiffs' showing that Plaintiffs are irreparably harmed by the Rule or that the weight of the equities tips in Plaintiffs' favor.

*First*, an injunction would not intrude into the "efficient administration of the immigration laws." Opp. 44-45 (quotation omitted). This claim assumes that the Rule advances efficiency, when many of its provisions do the opposite. *See supra* Part II.B; Mot. 26-29. And to the degree this argument takes aim at the fact that the Rule has been in place for a month, it dramatically overstates the problem. Many of the changes implemented by the rule upend more than forty years of immigration court practice. *See, e.g.*, *Matter of Coelho*, 20 I. & N. Dec. 464, 471 (BIA 1992) (tracing the BIA's remand authority back to before 1982). As noted above, the requested injunction would merely have the BIA and IJs follow the same procedures that they had been following for decades and were using until last month—and, indeed, are still applying to varying extents in pre-existing cases—until this case can be resolved on the merits. *See supra* p. 10.

*Second*, Defendants summarily dismiss Plaintiffs' harms as "speculations" and mere "inconveniences." Opp. 45. But the D.C. Circuit has held that obstacles that "make it more difficult for [organizations] to accomplish their primary mission . . . provide injury for purposes both of standing and irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). As explained, the Rule makes representation of immigrants in removal proceedings costlier and more time- and labor-intensive, which will reduce Plaintiffs' overall capacity, impair their ability to locate and train *pro bono* counsel, jeopardize their funding, and overburden their *pro se* assistance programs. *See* Mot. 38-44; Compl. ¶¶ 337-48; *see, e.g.*, CLINIC Decl. ¶¶ 30, 54-56; BDS Decl. ¶¶ 27, 62-67; FIRRP Decl. ¶¶ 27-31; HIAS Decl. ¶¶ 59-62; NIJC Decl. ¶¶ 82-91. These harms are neither speculative nor redressable after the fact. Indeed, Defendants do not even

acknowledge the several recent cases within this district that have rejected Defendants' exact argument, granting preliminary relief to Plaintiff CLINIC and similar organizations on comparable facts. *See* Mot. 39 (collecting cases); *CLINIC*, 2021 WL 184359, at *13-14.

*Third*, harkening back to their jusiticablity arguments, Defendants suggest that Plaintiffs' harms are not immediate because noncitizens may challenge their removal proceedings in petitions for review. Opp. 45. As explained above, Plaintiffs' harms do not stem from any specific removal proceeding. To the contrary, the harm comes from "[t]he cumulative impact of the Final Rule," which impairs "Plaintiffs' 'ability to serve their [existing] clients" and "will lead to decreased representation"—all of which constitutes "irreparable [harm] to both Plaintiffs and the immigrant populations they represent. *CLINIC*, 2021 WL 184359, at *13-14 (quoting *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *30-31)). Plaintiffs are likewise harmed by Defendants' failure to consider their comments or provide a proper notice and comment period, *see* Mot. 43, which is outside the scope of removal proceedings. Nor does the fact that some individual noncitizens could conceivably challenge some issues related to the Rule's deficiencies when their proceedings finally conclude mitigate the irreparable harm that occurs in the meantime. *See* Mot. 42-43.

*Finally*, Plaintiffs' did not "delay" seeking a preliminary injunction. Opp. 45. Delay only undercuts irreparable harm when it is "extensive" or "unexplained," or "rendered the dispute moot." *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 n.9 (D.D.C. 2014) (collecting cases). Here, Plaintiffs filed suit less than a month after the Rule's publication. *See, e.g.*, *Capitol Hill Baptist Church v. Bowser*, --- F. Supp. 3d ----, 2020 WL 5995126, at *11 (D.D.C. Oct. 9, 2020) (rejecting argument that six-month delay belied claim of irreparable harm). Defendants do not cite,

and Plaintiffs are not aware of, *any* cases where a 26-day delay between a challenged action and a lawsuit was found to be dilatory.[11]

To the extent this could even be considered a delay, it is not "unexplained." In the last few weeks of December 2020, Defendants and DHS issued six final rules and two proposed rules spanning more than 400 pages of the Federal Register on related subjects, as well as various precedential decisions and policy changes, Compl. ¶¶ 62, 313—all of which Plaintiffs were required to process and respond to as legal service providers, *see* CLINIC Decl. ¶¶ 61-71 (noting barrage of changes to EOIR); BDS Decl. ¶ 25 (same); Supp. NIJC Decl. ¶¶ 29-33 (describing work needed to respond to changes for existing clients). This period also included the Christmas and New Year's holidays and an unprecedented civil disturbance that shut down much of Washington, D.C., where many of Plaintiffs' counsel are located, for several days. As to the time from filing the complaint to filing the instant motion, Plaintiffs spent much of that time "seeking an amicable resolution before rushing to the courthouse," which is "the sort of behavior that courts ordinarily encourage," *Capitol Hill Baptist Church*, 2020 WL 5995126, at *11. Additionally, Defendants first made public the delegation of authority to Mr. McHenry, *see* ECF No. 35-2, two days after the complaint's filing, which necessitated reconsideration of some of Plaintiffs' claims. In sum, Plaintiffs acted diligently and the timing does not weigh against an injunction.

## IV.    The Court Should Stay the Rule in Its Entirety

Defendants suggest that "universal relief would be inappropriate" and that any remedy should be "[s]harply [l]imited." Opp. 45. But they acknowledge, as they must, that "the rule in equity is that injunctions 'be no more burdensome to the defendant than necessary to provide

---

[11] *Florida EB5 Investments, LLC v. Wolf*, 443 F. Supp. 3d 7 (D.D.C. 2020) is not to the contrary. There, plaintiffs waited nearly four months to challenge a rule. *Id.* at 13.

complete relief to the plaintiffs.'" *Id.* (quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994)). Given Defendants' inability to suggest any "tailoring" that could be appropriate, the only order that could provide complete relief to the plaintiffs is an order setting aside the entire Rule.

As explained above, the Rule's changes impair Plaintiffs' ability not only to represent respondents directly but to refer *pro se* respondents to volunteer counsel, train those counsel, and provide assistance to respondents who do not find counsel. *See* Mot. 14-15, 38-40. An injunction limited to cases in which Plaintiffs provide direct representation would not address these injuries. Similarly, Plaintiff CLINIC has affiliates in 48 states, and NIJC's practice spans many states and jurisdictions, Mot. 15, making a geographical limitation impossible. Therefore, an injunction prohibiting Defendants from applying the challenged Rule in any case until the conclusion of this litigation is "necessary to provide complete relief to the plaintiffs." *Madsen*, 512 U.S. at 765.

When needed to afford complete relief, courts routinely enjoin the government from implementing policies found to be likely unlawful. *See, e.g.*, *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 49 (D.D.C. 2020) (collecting cases). "The D.C. Circuit has confirmed that the 'broad discretion' district courts enjoy when awarding equitable relief includes the authority to issue nationwide injunctions." *Whitman-Walker Clinic, Inc. v. HHS*, --- F.3d ----, 2020 WL 5232076, at *43 (D.D.C. Sept. 2, 2020) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408-09 (D.C. Cir. 1988)). This is because "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Therefore, "upon demonstrating the illegality of an agency action of general applicability, 'a single plaintiff, so long as he is injured by the rule, may obtain 'programmatic' relief that affects the rights of parties not before the court.'" *Whitman-Walker Clinic*, 2020 WL 5232076, at *43 (quoting *Nat'l Mining Ass'n*, 145 F.3d at 1409).

This is particularly the case in the immigration context, where the government has an "interest in establishing a 'uniform Rule of Naturalization.'" *CLINIC*, 2021 WL 184359, at *15, and there is a "strong interest in the uniform application of immigration law and policy," *Gomez v. Trump*, --- F. Supp. 3d ----, 2020 WL 5367010, at *37 (D.D.C. Sept. 4, 2020) (quotation omitted). *See also E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 857 (9th Cir. 2020) (noting that the Fifth and Ninth Circuits both view nationwide injunctions as "uniquely appropriate in immigration cases").

Courts have specifically found nationwide injunctions necessary to avoid the types of harm at issue here. *See, e.g.*, *E. Bay Sanctuary Covenant*, 964 F.3d at 856 (where plaintiffs "assist asylum seeker throughout the lifetime of their cases" and do not "operate in a fashion that permits neat geographic boundaries," "the loss of potential clients jeopardizes funding streams that are tied to the number of [clients] a Plaintiff organization [assists]," and plaintiffs "would have to redesign centralized workshops and templates," "a limited injunction would not offer 'complete relief' from the harms plaintiffs suffer from their inability to represent, and to protect" noncitizens); *Immig. Legal Res. Ctr.*, 2020 WL 5798269, at *20 (issuing nationwide injunction where "the Final Rule interferes with [Plaintiffs'] organizational missions and is likely to cause them to lose funding"). Courts in this Circuit have repeatedly done the same. *See, e.g.*, *CLINIC*, 2021 WL 184359, at *15; *Nw. Immigrant Rts. Project*, 2020 WL 5995206, at *31. Defendants do not even acknowledge these cases, much less distinguish them.

The only cases within the D.C. Circuit that Defendants cite for support are unhelpful to them. Their sole D.C. Circuit case dealt with a plaintiff whose complaint requested an injunction of a particular application of a policy announcement, rather than requesting vacatur of the announcements themselves. *Neb. Dep't of Health & Human Servs. v. HHS*, 435 F.3d 326, 329-30 (D.C. Cir. 2006). Given that the plaintiff did not try to "make out a case for continuing relief,"

broader vacatur was inappropriate. *Id.* at 330. And in *U.S. Association for Reptile Keepers, Inc. v. Jewell*, the court limited the injunction to plaintiffs and their members only after determining that there was "no evidence of irreparable harm to persons other than Plaintiffs or members of USARK before the Court." 106 F. Supp. 3d 125, 128-29 (D.D.C. 2015).[12] Here, Plaintiffs have put forward ample evidence of harm to others, such as their clients and the *pro se* individuals they assist.

The debate over whether courts can issue relief "that transcends the cases before them," *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Mem.) (Gorsuch, J., concurring), is thus not implicated here. All that is required here is an application of the basic, uncontroversial proposition that equitable relief may be as broad as is "necessary to provide complete relief to the plaintiffs." *Madsen*, 512 U.S. at 765. Because Plaintiffs' injuries can be avoided only by enjoining Defendants from implementing the challenged Rule at all, and Defendants have not identified any means of tailoring, a complete injunction is appropriate. *Cf. Make the Road*, 405 F. Supp. 3d 1 at 69 (D.D.C. 2019), *rev'd on other grounds*, 962 F.3d 612 ("[A]lthough DHS actively promotes this limited-injunction proposal, it has offered little help as this Court has attempted to envision what the proposed 'sharply limited' injunction would look like in this context, as a practical matter.").

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enjoin the implementation of the Rule pending the resolution of these proceedings.

---

[12] To the extent *Reptile Keepers* limited *National Mining Association* to permanent injunctions, it conflicts with more recent decisions. *See Whitman-Walker*, 2020 WL 5232076, at *43-44; *Dist. of Columbia*, 444 F. Supp. 3d at 47-55; *Gomez*, 2020 WL 5367010, at *36-37; *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 66-72 (D.D.C. 2019), *rev'd on other grounds sub nom. Make the Road N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020). These thorough analyses are far more persuasive than the largely unreasoned two-sentence conclusion in *Reptile Keepers*.

Dated: February 19, 2021                    Respectfully submitted,

                                   By:   *s/ Jeffrey Dubner*
                                         _____

Mary Van Houten Harper (D.C. Bar No.        Jeffrey Dubner (D.C. Bar No. 1013399)
1045137)*                                   Benjamin Seel (D.C. Bar No. 1035286)
NATIONAL IMMIGRANT JUSTICE CENTER           Sean A. Lev (D.C. Bar. No. 449936)
1099 New York Ave. NW                       DEMOCRACY FORWARD FOUNDATION
Washington, DC 20001                        P.O. Box 34553
(312) 660-1370                              Washington, DC 20043
mharper@heartlandalliance.org               (202) 448-9090
                                            jdubner@democracyforward.org
Sarah Thompson (D.D.C. Bar No.              bseel@democracyforward.org
CA00073)                                    slev@democracyforward.org
NATIONAL IMMIGRANT JUSTICE CENTER
PO Box. 124975                              Keren Zwick (D.D.C. Bar. No. IL0055)
San Diego, CA 92101                         Mark Fleming
(312) 660-1370                              Tania Linares Garcia
sthompson@heartlandalliance.org             NATIONAL IMMIGRANT JUSTICE CENTER
                                            224 S. Michigan Ave., Suite 600
                                            Chicago, IL 60604
*Admitted pro hac vice*                     (312) 660-1370
                                            kzwick@heartlandalliance.org
                                            mfleming@heartlandalliance.org
                                            tlinaresgarcia@heartlandalliance.org


                                            *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Jeffrey B. Dubner, hereby certify that on February 19, 2021, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

Dated: February 19, 2021                    By: *s/ Jeffrey B. Dubner*
                                            Jeffrey B. Dubner
                                            DEMOCRACY FORWARD FOUNDATION
                                            P.O. Box 34553
                                            Washington, DC 20043