# EXHIBIT B

**SUPPLEMENTARY DECLARATION OF LISA KOOP**
**NATIONAL IMMIGRANT JUSTICE CENTER**

1.      I, Lisa Koop, make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2.      I am an associate director of legal services at the National Immigrant Justice Center (NIJC), where I have worked since 2006. *See* Dkt. No. 9-6, ¶¶ 4-6. NIJC is a nonprofit organization that provides direct legal services to and advocates for immigrants through policy reform, impact litigation, and public education.[1] *Id*. at ¶¶ 7-18.

3.      In addition to the declaration that I have previously provided in this case, I am writing to further illustrate the substantive harm that NIJC has experienced since the Executive Office for Immigration Review's (EOIR's) new rule entitled, Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure came into effect. *See* 85 Fed. Reg. 81,588 (Dec. 16, 2020) (hereinafter, "the Rule").

**The Rule is Impeding NIJC's Efforts to Serve Noncitizens**

4.      In just one month, EOIR's new Rule is already adversely impacting NIJC's work and its clients' ability to pursue their bona fide claims for relief. NIJC and its clients have been harmed by various provisions of the Rule, as discussed below.

*Elimination of Sua Sponte Reopening*

5.      Even before the Rule came into effect, *sua sponte* reopening was an extraordinary, discretionary remedy "reserved for truly exceptional situations." *In Re G-D-,* 22 I. & N. Dec. 1132, 1133–34 (BIA 1999). NIJC has used this relief accordingly. Yet, the Rule's removal of *sua sponte* authority to reopen or reconsider cases, 85 Fed. Reg. at 81,591, has left NIJC and its clients without recourse to reopen their proceedings despite compelling circumstances and in some instance is complicating our ability to accept cases for representation.

6.      For example, NIJC is currently evaluating for representation the case of Isabel,[2] a 20-year-old woman from Honduras who will be unable to become a lawful permanent resident because of the Rule's bar on *sua sponte* reopening. Isabel first entered the U.S. as an infant and was ordered removed in 2001, when she was only 11 months old. Thereafter, Isabel continued living in the United States and was placed in foster care because her mother failed to protect her from ongoing sexual abuse, which resulted in her

---

[1] NIJC is a program of Heartland Alliance, a nonprofit social services organization that is headquartered in Chicago, Illinois.

[2] Client names listed in this declaration are pseudonyms.

becoming pregnant at the age of 12. Isabel is now the mother of two U.S. citizen children, ages seven and one.

7.    USCIS granted Isabel's application for Special Immigrant Juvenile Status (SIJS), a form of relief for minor noncitizens based on a finding that their parents abandoned, abused, or neglected them. Once granted, SIJS provides eligibility for adjustment of status to that of a lawful permanent resident. However, SIJS, in itself, provides no relief from removal, no eligibility for work authorization, no path for reopening prior removal orders, and no other immigration benefits.

8.    Despite her SIJS grant, Isabel cannot adjust her status to lawful permanent resident because of the removal order she received when as an infant. Prior to the Rule, NIJC would have filed a motion to reopen, arguing for *sua sponte* reopening in light of these exceptional circumstances. Because of the Rule, however, NIJC is faced with two options: it can conclude representation in this case is impracticable and decline representation to this young woman, which would frustrate its mission to protect and serve vulnerable noncitizens like Isabel. Or, NIJC can divert resources to develop novel arguments to give Isabel her best chance at obtaining relief, which will require much more cumbersome representation and potential federal court appeals on novel legal theories. NIJC is likely to choose the latter course, which will require hours of research, drafting, and supervision. Given its limited resources, these efforts will require NIJC to forego representation on other meritorious claims.

9.    Meanwhile, Isabel remains in legal limbo. She has no protection against removal and is unable to independently support her children. Without an injunction, she may remain in this position indefinitely.

10.    NIJC recently began representing another child client, Eden, who is similarly stuck in legal limbo as a result of the Rule.

11.    Eden entered the United States at the U.S-Mexico border in October 2015, when, as an unaccompanied minor, he was sent to a youth shelter operated by the government in San Antonio, Texas. From there, he was released to his sister in Indianapolis. However, Eden was never able to find counsel, and he did understand that he was required to file a *pro se* Motion to Change Venue to the immigration court serving Indianapolis. In October 2016, he was ordered removed *in absentia* by the immigration court in Texas because he did not attend a status hearing.

12.    In October 2018, Eden became a ward of the state, when his sister was no longer able to provide for him. He began working with a guardian ad litem, which helped him file an application for SIJS based on the neglect and abandonment of his father and death of his mother. USCIS granted his SIJS application in July 2020, and the guardian ad litem referred Eden's case to NIJC.

13.    NIJC decided to accept Eden's case for representation in October 2020, before the final Rule was issued, on the assumption that NIJC would assist Eden with *sua sponte*

reopening of his in absentia removal order in light of the exceptional circumstances and, once reopened, help him adjust status to a lawful permanent resident.

14.     However, now that the Rule went into effect, NIJC is unable to provide these services. It is confronted with the same catch-22 described above: it can either terminate its representation of Eden on the basis that there are no viable options to adjust status, or it can divert significant resources to developing new or alternative legal defense strategies that are unlikely to succeed.

15.     NIJC represents numerous clients in situations similar to Isabel's and Eden's. In most cases, NIJC will have to forego representation where *sua sponte* reopening would have been the only viable claim for relief, leaving those potential clients without recourse and frustrating NIJC's mission to advocate for their rights. For other cases, NIJC will have to expend its limited resources in developing and litigating alternate, novel arguments that may give its clients a chance to reopen their cases despite the Rule's restrictions.

*Remand Restrictions*

16.     Similarly, NIJC and its clients are being actively harmed by the Rule's limitations on the BIA's ability to remand proceedings for additional factfinding. *See* 85 Fed. Reg. at 81,651 (new 8 C.F.R. § 1003.1(d)(3)(iv)(D)); *see also* Dkt.  No. 1, ¶¶ 111-21. Because of this restriction, NIJC's ability to pursue relief for its clients will be limited; it will need to divert additional resources to those cases it is able to pursue, and its clients will be exposed to removal and other harms.

17.     One such case is that of Gloria, a transgender woman from El Salvador who came to the U.S. seeking asylum in 2018. Since then, she has been litigating her claims for asylum, withholding of removal, and protection under the Convention Against Torture before EOIR and the Tenth Circuit Court of appeals. In July 2019, rather than filing a brief in the Tenth Circuit, the Government sought and received a remand to the Agency for further factual findings related to the applicability of certain bars to asylum. The BIA in turn remanded her case for additional factfinding to the immigration judge. These developments all occurred before the Rule's effective date in January 2021.

18.     On remand, however, the IJ again denied relief. Though the IJ did reevaluate some findings (and did make a positive credibility finding where she had previously made a negative one), there was no new evidentiary hearing, and there were no new submissions. In other words, the new fact finding that was previously contemplated did not happen. Because Gloria's second appeal postdates the Rule's effective date, the BIA will be limited in its ability to order remand to conduct the factfinding that was clearly contemplated by the original remand from the Tenth Circuit.

19.     Before the Rule, NIJC would have requested that the BIA correct the IJ's failure to address its directives and, once again, remand for further factfinding. Instead, NIJC will be precluded from making such arguments, requiring it to divert resources to raise alternate arguments as well as to develop novel arguments regarding the propriety of the

Rule's provisions within the context of removal proceedings. This will require numerous hours of research, drafting, and supervision. Moreover, because the BIA will have no authority to rule on such procedural arguments, a further appeal to the Tenth Circuit is nearly certain. Such an appeal will require hundreds of hours from both NIJC staff and its *pro bono* partners, limiting the number of additional matters NIJC can undertake.

20.     The possibility of additional appellate proceedings, which may take years to resolve, is particularly troubling in Gloria's case. During the pendency of her Tenth Circuit appeal, Gloria was removed. She now lives in a migrant shelter in Mexico, struggling to meet her basic necessities and particularly vulnerable to violence and death as a transgender migrant woman living in a country with pervasive transphobic violence and relentless targeting of migrants by criminal cartels.

21.     Notably, Gloria's case is not unique. As part of its impact litigation practice, NIJC litigates a number of petitions for review before U.S. Courts of Appeals every year. Because many of these cases involved previously *pro se* petitioners, NIJC often argues for remand for additional factfinding, acknowledging that the courts of appeals, as appellate bodies, do not have the findings required to make a final adjudication on the merits. As this case illustrates, however, such a remand would be futile in light of the new Rule. The dichotomy between judicial appellate practice and this Rule's limitations on the BIA will create confusion and require additional litigation, thus frustrating NIJC's mission and requiring it to divert its resources to challenge this issue.

*Elimination of Administrative Closure*

22.     The Rule's prohibition on administrative closure, *see* 8 C.F.R. §§ 1003.1(d)(1)(ii), 1003.10(b), is similarly harming NIJC and its clients.

23.     For example, NIJC has existing clients for whom it would have liked to have sought administrative closure, but now cannot. Oscar is one such client. He is a young man who has received SIJS status and who is seeking adjustment of status, with USCIS. Oscar is detained and NIJC had intended to seek administrative closure once it received a receipt notice from USCIS regarding his adjustment application. That process would have been possible in the Seventh Circuit, where Oscar is detained because of *Meza Morales v. Barr*, 973 F. 3d 656 (7th Cir. 2020). If NIJC had been able to seek administrative closure, we would have had a firmer basis on which to advocate for Oscar's release from detention. Unfortunately, the USCIS receipt notice for Oscar's adjustment application arrived after the Rule's effective date, which meant an application for administrative closure is no longer viable. Now, NIJC must pursue a petition for a writ of habeas corpus, counsel the client as his mental health continues to deteriorate in detention, and appear at periodic hearings to ask for ongoing continuances while USCIS adjudicates his claim, a process that is likely to take a year or more.

24.     NIJC's client Mayra is in a similar situation. She has lived in the United States since she
        was 10 years old and is the mother of three U.S. citizen children. Maria has suffered
        multiple instances of sexual abuse, starting at the age of three. This trauma led to drug
        use, and as a result, Mayra was detained by immigration authorities. She has been in
        immigration detention since July 2020. Mayra has applied for a U-Visa with USCIS, and
        has concurrently obtained a waiver of her grounds of inadmissibility from an immigration
        judge. Mayra need only wait for USCIS to adjudicate her U visa application, but it will
        take many months if not longer for USCIS to make its initial determination as to her U
        Visa application. Given the pendency of her U Visa application and without the
        possibility of seeking administrative closure, NIJC has been requesting continuances
        every few weeks. But the IJ has discretion, and indeed will eventually be expected, to
        deny such continuances.

25.     Before the Rule, NIJC planned to pursue administrative closure in Mayra's case, which
        would have prevented Mayra from being removed while her U visa application remains
        pending, avoid the need for NIJC staff to appear in court every few weeks to request a
        continuance, and support judicial efficiency. Moreover, as in Oscar's case, a grant of
        administrative closure would have facilitated efforts to end Mayra's prolonged detention.

26.     NIJC is also harmed by the lack of administrative closure in the non-detained context.
        NIJC represents Monica and her two minor children, who are all in removal proceedings.
        NIJC applied for protection for Monica under the Violence Against Women Act
        (VAWA) based on abuse that she suffered at the hands of her U.S. Citizen spouse,
        including violence so severe she was forced to flee to a shelter with her children.  Monica
        recently received notice from USCIS that it had made a *prima facie* determination that
        she qualifies for VAWA protections. NIJC had hoped to use this *prima facie*
        determination as the basis to advocate for administrative closure for Monica, since it will
        take 12 to 17 months for the VAWA application to receive final adjudication.  Because of
        the Rule, administrative closure is not available and Monica must proceed on other forms
        or release, including asylum and VAWA cancellation of removal, in advance of her
        merits hearing in 2022.  These forms of relief are labor intensive and that work will more
        than likely be moot once the VAWA petition is adjudicated by USCIS.  But because the
        case cannot be administratively closed, NIJC must prepare all forms of relief at once even
        though it is a waste of the Court's resources and NIJC's resources for this case to remain
        open.

27.     In all of these cases, NIJC's resources will be diverted to continuing to unnecessarily
        litigate those cases while concurrently representing those clients before USCIS.

*Overarching Injuries*

28.     In addition to the case examples above, the Rule has also required NIJC to divert
        resources in other respects. In particular, NIJC has begun working in collaboration with
        CLINIC, also a plaintiff in this case, to produce legal education materials regarding the
        impact of the Rule. Those materials will include a practice advisory, a video webinar, and
        potentially tools for use by *pro se* litigants. NIJC will rely on these materials to educate

*pro bono* attorneys and train staff. The work of compiling these educational materials will be substantial, likely hundreds of hours. This work is necessary for NIJC to maintain the same level of service that it has previously provided to its *pro bono* attorneys in the form of case support and legal education.

## Disruptions Caused by Multiple Regulator Changes

29.   Additionally, given the Government's position regarding the purported delays in our case filing, I am providing the following context as to NIJC's experiences in recent months.

30.   The flurry of new regulations has been extraordinarily disruptive to NIJC's practice. With every new regulation, we have had to scramble to educate ourselves and our staff as to the impact of the rule and to get applications on file for clients to avoid harm flowing from it. Even though most new regulations have been enjoined, NIJC still had to take action to preserve our clients' rights before learning of an injunction.

31.   By way of just one example, the USCIS Fee Rule—which drastically increased fees for a number of immigration applications—was scheduled to take effect on October 2, 2020, just a week after the comment period for the instant Rule closed. *See USCIS Fee Schedule & Changes to Certain Other Immigration Benefit Request Requirements*, 85 Fed. Reg. 46,788 (final rule published Aug. 3, 2020). This meant that we were rushing to file applications for our clients before the fees for those applications became prohibitively expensive, all while trying to process the implications of the instant Rule and contribute to NIJC's comment on it.

32.   The burden of this approach was especially high in December 2020 and January 2021 after the Omnibus Asylum Rule was finalized, with an effective date of January 11, 2021. *See Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274 (final rule published Dec. 11, 2020). To combat this Rule, NIJC had to advance the filing of many asylum applications. As a result, from December 11, 2020, to January 8, 2021, NIJC filed 110 asylum applications. We did so despite year-end holidays and the pandemic, and with most of our staff working from home. I cannot recall a time in my career at NIJC when we have been compelled to do such a high volume of work in such a short period of time in order to stave off injury from a government action.

33.   Though the harm from this Rule is not as fast-flowing, it is just as profound. The Rule disrupts decades of immigration practice and eliminates many of the procedures that we as lawyers have relied upon so serve our clients.

Dated February 19, 2021

_____
Lisa Koop

6