1
2
3
4
5 UNITED STATES DISTRICT COURT

6 NORTHERN DISTRICT OF CALIFORNIA

7

8 CENTRO LEGAL DE LA RAZA, *et al*.,            Case No. 21-cv-00463-SI

9                             Plaintiffs,

10        v.                                 **ORDER GRANTING PLAINTIFFS'**
                                             **MOTION FOR PRELIMINARY**
11 EXECUTIVE OFFICE FOR                      **INJUNCTION**
   IMMIGRATION REVIEW, *et al*.,
12                                           Re: Dkt. No. 24
                              Defendants.
13

14

15                           **INTRODUCTION**

16        On December 16, 2020, the Department of Justice and the Executive Office of Immigration

17 Review, an agency within DOJ, issued a final rule that made sweeping changes to the procedures

18 and regulations governing immigration courts in this country. Appellate Procedure and Decisional

19 Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020)

20 ("the Rule"). In the Rule, EOIR stated that it was implementing "multiple changes to the processing

21 of appeals to ensure the consistency, efficiency, and quality of its adjudications." *Id*. at 81,588.

22 The Rule was one of many affecting the immigration system that were proposed and finalized during

23 2020, and in particular during the final months of the Trump administration.

24        Plaintiffs are four non-profit legal services agencies and organizations that represent

25 immigrants and refugees before the immigration courts. Plaintiffs contend that the Rule strips away

26 critical procedural protections for immigrants, impermissibly departs from long-standing practices

27 by restricting the authority of immigration judges to grant relief to noncitizens in removal

28 proceedings, and generally obstructs the ability of noncitizens and refugees to pursue relief from

United States District Court
Northern District of California

deportation, including humanitarian relief that Congress has explicitly provided for by statute, such as humanitarian visas for survivors of domestic violence and human trafficking.  Plaintiffs also contend that the changes implemented by the Rule will impede rather than promote efficiency.

Plaintiffs assert a number of claims under the Administrative Procedure Act and the Due Process Clause of the United States Constitution.  Plaintiffs contend that the agencies did not provide the public with sufficient time to comment on a rule of such magnitude, and that the Rule was the result of arbitrary and capricious decision-making.  Plaintiffs seek a preliminary injunction to enjoin the Rule from being implemented nationwide.

For the reasons that follow, the Court will GRANT plaintiffs' motion for a preliminary injunction enjoining defendants from implementing and enforcing the Rule.  Although technical and procedural in nature, the Rule imposed extensive changes with profound implications for noncitizens in removal proceedings before immigration courts and for the legal service providers who represent them.  Under these circumstances, the Court finds that plaintiffs have shown that they are likely to succeed on their claim that the 30 day public comment period provided for the Rule was inadequate under the APA, particularly in the context of the global COVID-19 pandemic and the numerous other concurrent regulatory changes to the immigration system, many of which directly intersect with the Rule at issue here.  Further, the Court finds that plaintiffs have shown they are likely to succeed on their claim that the agencies did not engage in reasoned decision-making when formulating the Rule by "fail[ing] to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 43 (1983), including that the changes implemented by the Rule will foreclose noncitizens from seeking humanitarian relief to which they may be entitled and will result in the deportation of noncitizens who have meritorious claims for relief.

///

///

United States District Court
Northern District of California

# BACKGROUND

## I. Relevant Legal Framework for Removal Proceedings

### A. Applicable Law

To understand how the Rule challenged in this case changes immigration practice and procedure, it is necessary first to provide an overview of the legal and regulatory framework that applies to noncitizens in removal proceedings. The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, is a comprehensive statutory scheme governing removal proceedings against noncitizens and creates a process through the immigration courts and the Board of Immigration Appeals ("BIA") to adjudicate charges of removability and to allow people to present defenses to removal and certain claims for relief. Noncitizens can be placed in removal proceedings for a variety of reasons, including by violating status requirements or entry conditions or committing certain criminal violations. *See generally id.* at § 1227 ("Classes of deportable aliens").

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). "[D]ue process requires that [removal] hearings be fundamentally fair." *Rosales v. Bureau of Immigration and Customs Enforcement*, 426 F.3d 733, 736 (5th Cir. 2005); *Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013) (en banc) ("It is well established that the Fifth Amendment guarantees non-citizens due process in removal proceedings."). Removal is a "particularly severe penalty" that can be imposed only after a "full and fair hearing." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (internal citation omitted).

The INA incorporates the United States' treaty obligations to refugees by providing that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §1231(b)(3)(A); *see also generally I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 427-29 (1987) (discussing Refugee Act of 1980). Noncitizens in removal proceedings can assert eligibility for asylum as a defense to removal, and noncitizens may also seek asylum affirmatively by filing an application with United States Citizenship and Immigration Services. *See* 8 C.F.R. §§ 208.2, 1208.2; *see also O.A. v. Trump*,

404 F. Supp. 3d 109, 121 (D.D.C. 2019) (discussing affirmative and defensive applications for asylum).

### B. Immigration Court Proceedings and BIA Appeals

The Executive Office for Immigration Review ("EOIR") is an agency within the U.S. Department of Justice ("DOJ") that oversees the immigration courts and the BIA. *See* 8 C.F.R. § 1003; *see also* https://justice.gov/eoir/about-office. There are approximately 460 immigration judges ("IJs") in 67 immigration courts nationwide, as well as 23 Appellate IJs who lead the BIA. *See* Opp'n at 1 (Dkt. No. 47). A separate agency, the United States Citizenship and Immigration Services ("USCIS"), is part of the Department of Homeland Security ("DHS") and is responsible for administering asylum applications through its asylum officers, as well as having exclusive jurisdiction to adjudicate various types of applications for visas and adjustments of status. *See* 6 U.S.C. § 271(b).

The INA requires an IJ presiding over a removal proceeding to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). "The determination of the immigration judge shall be based only on the evidence produced at the hearing." *Id.* at § 1229a(c)(1)(A). The INA also provides,

**(4) Alien's rights in proceeding**

In proceedings under this section, under regulations of the Attorney General—

(A) the alien shall have the privilege of being represented, at no expense to the Government, by counsel of the alien's choosing who is authorized to practice in such proceedings,

(B) the alien shall have a reasonable opportunity to examine the evidence against the alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government but these rights shall not entitle the alien to examine such national security information as the Government may proffer in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief under this chapter, and

(C) a complete record shall be kept of all testimony and evidence produced at the proceeding.

*Id.* at §1229a(b)(4). An order of removal issued by an IJ is not final until the BIA has affirmed the order or the time to appeal has expired. *Id.* at § 1101(a)(47)(B).

United States District Court
Northern District of California

Because the INA specifies that noncitizens may be represented (at no expense to the government) by counsel of their choosing, the EOIR maintains a List of Pro Bono Legal Service Providers that "shall be provided to individuals in removal proceedings before an immigration court." *Id.* § 1229(b)(2); 8 C.F.R. § 1003.61(b).[1] In fiscal year 2020, noncitizens were *pro se* in 69.6% of cases before IJs (135,161 cases out of a total of 194,108). *See* https://trac.syr.edu/phptools/immigration/nta/about_data.html.

The specific procedures and practices for administering removal proceedings are set forth in regulations. *See generally* 8 C.F.R. § 1003 *et seq.* Parties have 30 days to file a notice of appeal with the BIA from an adverse decision by an IJ; both the noncitizen and the government may appeal an IJ's decision to the BIA. *Id.* at § 1003.3(a)(1) (2021). The 30 day clock begins to run from the time the IJ issues an oral opinion or mails a written decision. *Id.* at § 1003.38(b) (2021).[2] At some point after a party files a notice of appeal, the BIA sends to the parties (1) a transcript of the proceedings before the IJ; (2) the IJ's order; and (3) the briefing schedule. *Id.* at § 1003.3(c)(1) (2021).[3] There is no set timetable for the BIA to mail these materials, and parties and their counsel

---

[1] Plaintiffs Centro Legal de la Raza ("Centro Legal") and Refugee and Immigrant Center for Education and Legal Services ("RAICES") are on the list of Pro Bono Legal Service Providers that EOIR provides to noncitizens in removal proceedings. Compl. ¶¶ 16, 19 (Dkt. No. 1); Patel Decl. (Centro Legal) ¶ 10 (Dkt. No. 24-2); Garza Decl. (RAICES) ¶ 8 (Dkt. No. 24-5).

[2] *Amicus Curiae* Former Immigration Judges and Former Members of the BIA state that "many IJ decisions are issued orally," and the written Memorandum of Decision is "a form simply indicating whether relief was granted or denied." *Amicus Curiae* Brief, Dkt. No. 43 at 6; *see also* Garza Decl. ¶ 24 ("Immigration judges generally announce and explain their decisions orally. The written order provided to the parties at the time of the hearing generally does not contain the reasons for the immigration judge's decision—only checked boxes to reflect which forms of relief were granted and/or denied. The transcribed version of the oral decision, received from the BIA at the same time as the full hearing transcript and briefing deadline, is very often the first time the respondent and attorney see the immigration judge's reasoning in writing.").

[3] The BIA does not mail copies of exhibits filed by either party in the proceedings before the IJ. *See* Patel Decl. ¶ 19. Plaintiffs state that when their organizations take an appeal for a noncitizen who appeared *pro se* in the immigration court, or take over an appeal of a case previously handled by another attorney, "[Centro Legal] lawyers have difficulty in obtaining these records and typically have to file Freedom of Information Act ('FOIA') requests for the records. These requests often take months to be fulfilled." *Id.* ¶ 20; *see also* Garza Decl. ¶¶ 26-27 ("Although it is possible to request an audiotape of the proceedings and a paper record from the immigration court, the paper record is sent to the BIA soon after a notice of appeal is filed. Once the record is with the BIA, attempting to obtain it in time to use for the appeal is generally futile.").

can wait weeks, months, or over a year between the time of the IJ's decision and when they receive these materials from the BIA.[4]

  The appealing party's opening brief is due to the BIA within 21 days from the date the BIA issues the transcript, order and briefing schedule. 8 C.F.R. § 1003.3(c)(1) (2021). The BIA does not follow the "mailbox rule," and does not currently permit electronic filing of briefs. *See generally* 85 Fed. Reg. 78,240, Executive Office for Immigration Review Electronic Case Access and Filing (proposed Dec. 4, 2020) (Notice of Proposed Rule proposing implementation of nationwide electronic filing and records system that is currently in pilot use in several immigration courts and the BIA).[5] Thus, because the 21 day briefing timeline is triggered by the date the BIA mails the transcript, order, and briefing schedule, and because the opening brief must be received by the 21 day deadline, individuals challenging immigration court orders in actuality have less than 21 days to prepare an opening brief, absent an extension.[6]

  The INA provides that a noncitizen may file one motion to reconsider within 30 days of a removal order. 8 U.S.C. § 1229a(c)(6)(B). A noncitizen may also file one motion to reopen within 90 days of a removal order, subject to certain limited exceptions. *Id.* at § 1229a(c)(7). "A motion to reconsider addresses whether an IJ made errors of law or fact, whereas a motion to reopen may be granted only upon a proffer of new evidence that 'is material and was not available and could not have been discovered or presented at the former hearing.'" *Ayala v. Sessions*, 855 F.3d 1012, 1020 (9th Cir. 2017) (quoting 8 C.F.R. § 1003.23(2), (3)). A noncitizen may seek judicial review of a

---

  [4] *See* Patel Decl. ¶ 17 ("The BIA may issue the briefing schedule weeks, months, or even a year after the conclusion of the immigration court proceedings."); Garza Decl. ¶ 25 ("The timing of a BIA schedule is also unpredictable. The briefing schedule might arrive anywhere between a few weeks and a year and a half after the immigration proceeding has concluded.").

  [5] At the hearing on plaintiffs' motion for a preliminary injunction, counsel for defendants stated that the proposed electronic filing system has not yet been implemented and that there is "no timetable" for its implementation. Thus, the paper- and mail-based system is currently in place.

  [6] *See* Patel Decl. ¶ 18 ("Around a week of this 21-day period is often lost to waiting for the U.S. Postal Service to deliver the immigration judge's order and transcript. Further time is lost due to the BIA's failure to acknowledge the mailbox rule, thus requiring that BIA briefs be received by the due date."); Garza Decl. ¶¶ 22-23 ("Because the BIA sends the immigration judge's order and the transcript by U.S. mail, it is common to lose at least a week of the 21 days allowed to file a BIA brief. RAICES attorneys often receive the briefing schedule and transcript just days before the due date of the brief. Likewise, the BIA does not recognize the mailbox rule, so BIA briefs must be *received* by the due date.").

United States District Court
Northern District of California

final order of removal issued by the BIA through a petition for review before a court of appeals. 8 U.S.C. § 1252(a).

### C. Humanitarian Relief Adjudicated Exclusively by USCIS

The INA provides other forms of humanitarian relief that are not adjudicated by IJs, but exclusively through USCIS. *See* 6 U.S.C. § 271(b). These forms of relief include self-petitions under the Violence Against Women Act ("VAWA"), U Visa petitions for victims of certain crimes, T Visa petitions for survivors of human trafficking, and Special Immigrant Juvenile ("SIJ") status. *See id.*; 8 C.F.R. § 214.14(c)(1) (U visas); 8 C.F.R. § 214.11(b), (d) (T visas); 8 U.S.C. § 1101(a)(27)(J) (SIJ). The Court briefly explains these forms of relief because plaintiffs and *amici* contend that one consequence of the Rule will be to significantly curtail (and effectively eliminate) the availability of such relief to noncitizens, including children, who are in removal proceedings before immigration judges and the BIA. *See generally* Brief of *Amicus Curiae* Organizations Advocating for the Rights of Survivors of Domestic Violence and Human Trafficking ("Domestic Survivor and Human Trafficking Organizations *Amicus Brief*") (Dkt. No. 27); *see also* Brief of *Amicus Curiae* Kids In Need of Defense at 4 ("KIND *Amicus Brief*") (Dkt. No. 29-2) (discussing forms of relief pursued by children and stating that "by statute, United States Citizenship and Immigration Services (USCIS) and not EOIR has initial or exclusive jurisdiction over most forms of relief available to children").

VAWA Self-Petitions: In 1994, Congress passed the Violence Against Women Act, Pub. L. No. 103-322, 108 Stat. 1902-55, § 40121 (codified as amended throughout sections of 28 and 42 U.S.C.). The legislative history of VAWA states that one of the purposes of the bill is to "permit[] battered immigrant women to leave their batterers without fearing deportation." H.R. Rep. No. 103-395, at H.R. 1133 (1993). VAWA created a "self-petition" process by which an individual may file a petition if she has suffered battery or extreme cruelty at the hands of an abusive citizen or lawful permanent resident spouse; if approved, the applicant may seek lawful permanent status. *See also Enriquez v. Barr*, 969 F.3d 1057, 1060 (9th Cir. 2020). Congress reauthorized VAWA in 2000,

2005 and 2013.[7]  As of January 2021, USCIS estimates that the processing time for a VAWA self-petition is between 18 and 23 months.  *See* USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times.

U Visas:  In the Battered Immigrant Women Protection Act of 2000, Congress created the U Visa "for any alien who is the victim of a qualifying crime in the United States and who assists law enforcement in the investigation or prosecution of that crime." *Taylor v. McCament*, 875 F.3d 849, 851 (7th Cir. 2017) (citing 8 U.S.C. § 1101(a)(15)(U)).  "The purpose of the U-visa program is to strengthen law enforcement efforts, while simultaneously offering protection to victims." *Id.*; *see also* 145 Cong. Rec. S444 (1999).  To be eligible for a U Visa, an applicant must demonstrate her cooperation with law enforcement in the investigation or prosecution of her abuser. *See* 8 C.F.R. § 214.14(a)(12) (2021).

At the end of 2019, nearly 152,000 principal U-Visa petitions and nearly 104,000 family members' U-Visa petitions were pending adjudication before USCIS.  USCIS, U Visa Filing Trends: Analysis of Data Through 2019 (Apr. 2020),  https://www.uscis.gov/sites/default/files/document/reports/Mini_U_Report-Filing_Trends/508.pdf. USCIS reports that the processing time to "receive a final decision" is "currently 5-10 years." *Id.*  "If filing trends continue, the pending queue and associated processing times will continue to grow significantly." *Id.*  Just to be placed on the U Visa waiting list takes an average of 58 months.  *See* USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/ (Vermont Service Center).

T Visas:  Congress created the T Visa under the Victims of Trafficking and Violence Protection Act.  "An alien is eligible for T-1 nonimmigrant status if the alien demonstrates that he or she 'is or has been a victim of a severe form of trafficking in persons,' 'is physically present in the United States or at a port-of-entry thereto,' 'has complied with any reasonable request for assistance' in an investigation or prosecution of an act involving trafficking of persons, and 'would

---

[7] *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, 1518 ("Battered Immigrant Women Protection Act of 2000"), (codified as amended in scattered sections of 8 and 42 U.S.C.); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 812, 119 Stat. 2960, 3057 (2006) (codified as amended at 8 U.S.C. § 1229c(d)); Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (codified in scattered sections of 42 U.S.C.).

United States District Court
Northern District of California

suffer extreme hardship involving unusual and severe harm upon removal.'" *Nicholas L. L. v. Barr*, File No. 19-cv-02543 (ECT/TNL), 2019 WL 4929795, at *2 (D. Minn. Oct. 7, 2019) (citing 8 C.F.R. §§ 214.11(b); § 214.11(f)–(i); 8 U.S.C. § 1101(a)(15)(T)).

As of January 2021, USCIS estimates that the processing time for T Visas is 19 to 29 months. *See* USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/ (Vermont Service Center).

Special Immigrant Juvenile Status: "Congress established SIJ status in 1990 in order to protect abused, neglected or abandoned children who, with their families, illegally entered the United States." *Osorio-Martinez v. Attorney General of United States of America*, 893 F.3d 153, 163 (3d Cir. 2018) (internal quotation marks and citations omitted); *see also* 8 U.S.C. § 1101(a)(27)(J). "Alien children may receive SIJ status only after satisfying a set of rigorous, congressionally defined eligibility criteria, including that a juvenile court find it would not be in the child's best interest to return to her country of last habitual residence and that the child is dependent on the court or placed in the custody of the state or someone appointed by the state." *Id.* (citing 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11(c)).

Obtaining SIJ status can be a lengthy process due to the need to first obtain a state juvenile court order as well as waiting periods imposed by annual per-country and per-category visa caps. *See generally* 8 U.S.C. § 1101(a)(27)(J)(i)-(ii) (juvenile court order requirement); *see, e.g.*, U.S. Dep't of State, *Visa Bulletin for January 2021*, https://tinyurl.com/yy2rova5 (stating *inter alia* that El Salvador, Guatemala, and Honduras are "oversubscribed" and that special immigrant visas for those countries are available for people who applied before March 1, 2018).

## II. The Rule

On August 26, 2020, DOJ and EOIR began the rulemaking process by publishing a notice of proposed rulemaking. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 52,491 (proposed Aug. 26, 2020) ("NPRM" or "the Proposed Rule"). The comment period on the Proposed Rule closed 30 days later on September 25, 2020. *Id.* The NPRM was signed by then-Attorney General William P. Barr. *Id.* at 52,514.

On December 16, 2020, DOJ and EOIR published the Final Rule in the Federal Register, with an effective date of January 15, 2021. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81,588 (Dec. 16, 2020) (the "Final Rule" or "the Rule"). The Final Rule was signed by then-Director of EOIR, James McHenry. *Id.* at 81,656.[8] The Rule states that "The Department issued this final rule pursuant to section 1103(g) of the [INA]." *Id.* at 81,588.

In the Final Rule, the Department clarified "the generally prospective temporal application of the rule":

> The provisions of the rule applicable to appellate procedures and internal case processing at the BIA apply only to appeals filed, motions to reopen or reconsider filed, or cases remanded to the Board by a Federal court on or after the effective date of the final rule. The provisions of the rule related to the restrictions on *sua sponte* reopening authority are effective for all cases, regardless of posture, on the effective date. The provisions of the rule related to restrictions on the BIA's certification authority are effective for all cases in which an immigration judge issues a decision on or after the effective date. The provisions of the rule regarding administrative closure are applicable to all cases initiated by a charging document, reopened, or recalendared after the effective date.

*Id.* at 81,588.[9] Thus, depending on which aspects of the Rule are at issue and the posture of a particular case, EOIR is applying either prior regulations or the newly-amended regulations.

---

[8] On November 17, 2020, the Attorney General signed a non-public order delegating to the Director of the EOIR, the AG's authority to issue regulations related to immigration within the jurisdiction of the EOIR pursuant to 28 U.S.C. §§ 509 and 510. Attorney General Order No. 4910-2020 (Dkt. No. 47-2). The Attorney General's Order states, "Pursuant to the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509 and 510, I hereby delegate to the Director, Executive Office for Immigration Review . . . the authority to issue regulations related to immigration matters within the jurisdiction of the Executive Office of Immigration Review." *Id.*

[9] On February 2, 2021, President Biden announced an Executive Order entitled "Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans." Exec. Order 14012 (Feb. 2, 2021), 86 Fed. Reg. 8,2777 (Feb. 5, 2021). That Executive Order directs the Secretary of State, the Attorney General, and the Secretary of Homeland Security to "review existing regulations, orders, guidance documents, policies, and any other similar agency actions (collectively, agency actions)" and "identify barriers that impede access to immigration benefits and fair, efficient adjudications of these benefits and make recommendations on how to remove these barriers, as appropriate and consistent with applicable law." *See* Igra Reply Decl. Ex. A (Dkt. No. 54-1). At the hearing, counsel for the government stated that DOJ was reviewing the Rule challenged in this case pursuant to the Executive Order, and that the review would take "time."

### A. 30 Day Comment Period

The Department received 1,284 comments on the Proposed Rule, including from plaintiffs Immigrant Legal Resource Center ("ILRC"), Tahirih Justice Center ("Tahirih"), and RAICES; the majority of comments "expressed opposition to the rule, either in whole or in part." *Id.* at 81,588, 81,592.[10] The Department received many requests to extend the comment period, including requests from numerous commenters who believed a minimum 60 day period was needed "for a complex rule like the NRPM." *Id.* at 81,642. Commenters also stated that the 30 day comment period was insufficient in the context of the COVID-19 pandemic, "which, commenters explained, has strained commenters' ability to prepare comments due to unique childcare, work-life, and academic difficulties." *Id.* In addition, "commenters stated that there was insufficient time to prepare responses to this rule due to other items that were published or released during the comment period, such as the Department's NPRM related to asylum procedures that the Department published in the final days of the comment period and the Attorney General's decision in *Matter of A-C-A-A-*, 28 I. & N. Dec. 84 (A.G. 2020)." [11] *Id.*; *see also e.g.*, Igra Decl., Ex. 2 at 2-3 (American Immigration Lawyers Association comment); Ex. 3 at 7 (Tahirih comment); Ex. 4 at 2-3 (Pangea Legal Services comment); Ex. 5 at 15 (Immigrant Justice Network comment).

The Department dismissed these concerns:

---

[10] Plaintiff Centro Legal states that it was unable to submit a comment because the comment period was limited to 30 days. Patel Decl. ¶ 14.

[11] The proposed rule regarding asylum procedures is discussed *infra*. *Matter of A-C-A-A-* was issued by the Attorney General on September 24, 2020, two days before the comment period on the Rule closed. In that case, the BIA had dismissed an appeal by the DHS challenging an IJ's determination that the respondent had established a nexus between her membership in a particular social group ("Salvadoran females") and past persecution by her parents, and thus that she was eligible for asylum. *See Matter of A-C-A-A-*, 28 I. & N. Dec. 84, 84-85 (A.G. 2020). Pursuant to 8 C.F.R. § 1003.1(h)(1)(i) (2020), then-Attorney General Barr directed the BIA to refer the case to him for review of the BIA's decision. *Id.* at 84. The Attorney General vacated the BIA's decision and remanded the case for review by a three-member panel of the BIA. The Attorney General instructed that "[i]n conducting its review of an alien's asylum claim, the [BIA] must examine *de novo* whether the facts found by the immigration judge satisfy all of the statutory elements of asylum as a matter of law," and "the Board should not accept the parties' stipulations to, or failures to address, any of the particular elements of asylum—including, where necessary, the elements of a particular social group. Instead, unless it affirms without opinion under 8 C.F.R. § 1003.1(e)(4)(i), the Board should meaningfully review each element of an asylum claim before affirming such a grant, or before independently ordering a grant of asylum." *Id.*

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As an initial point, the Department notes that a far more sweeping regulatory change to the BIA's procedures also had only a 30-day comment period, 67 FR at 54879, but that there is no evidence that period was insufficient. Further, commenters did not suggest or indicate what additional issues the comment period precluded them from addressing; to the contrary, the comments received reflect both a breadth and a level of detail which suggests that the period was more than sufficient. *Cf. City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) ("In [showing prejudice] in the context of a violation of notice-and-comment requirements, petitioners may be required to demonstrate that, had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale for the revised rule."). Additionally, to the extent that commenters referred to other proposed rulemakings as a basis for asserting the comment period should have been longer, their comparisons are inapposite. No other proposed rulemaking cited by commenters addressed a small, discrete set of procedures which are already well-established and with which aliens and practitioners have been quite familiar with [sic] for decades. In short, the Department acknowledges and has reviewed commenters' concerns about the 30-day comment period, but those comments are unavailing for all of the reasons given herein.

The Department believes the 30-day comment period was sufficient to allow for meaningful public input, as evidenced by the 1,284 public comments received, including numerous detailed comments from interested organizations. The APA does not require a specific comment period length, see generally 5 U.S.C. 553(b)-(c), and although Executive Order 12866 recommends a comment period of at least 60 days, a 60-day period is not required. Instead, Federal courts have presumed 30 days to be a reasonable comment period length. For example, the D.C. Circuit has stated that "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (*citing Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)).

Further, litigation has mainly focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances. *See, e.g., N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Florida Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988) (15-day comment period); *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1321 (8th Cir. 1981) (7-day comment period). Here, the significant number of detailed public comments is evidence that the 30-day period was sufficient for the public to meaningfully review and provide informed comment. *See, e.g., Little Sisters of the Poor Saints Peter and Paul Home*, 140 S. Ct. at 2385 ("The object [of notice and comment], in short, is one of fair notice." (citation omitted)).

The Department also believes that the COVID-19 pandemic has no effect on the sufficiency of the 30-day comment period. Employers around the country have adopted telework flexibilities to the greatest extent possible, and the Department believes that interested parties can use the available technological tools to prepare their comments and submit them electronically. Indeed, nearly every comment was received in this manner. Further, some of the issues identified by commenters—e.g., childcare—would apply regardless of the length of the comment period and would effectively preclude rulemaking by the Department for the duration of the COVID-19 outbreak. The Department finds no basis to suspend all rulemaking while the COVID-19 outbreak is ongoing.

The Department acknowledges that particular commenters may have faced individual personal circumstances which created challenges to commenting, but that assertion is true of every rulemaking. Further, there is no evidence of a systemic inability of commenters to provide comments based on personal circumstances, and commenters' assertions appear to reflect a desire to slow the rulemaking due to policy disagreements rather than an actual inability to comment on the rule.

Overall, based on the breadth and detail of the comments received, the Department's prior experience with a 30-day comment period for a much more sweeping change to BIA procedures, the rule's codification of established law with which practitioners and aliens are already familiar, the discrete and clear nature of the issues presented in the NPRM, the electronic receipt of most comments, and the essential nature of legal services even during the outbreak of COVID-19, the Department maintains that a 30-day comment period was ample for the public to comment on this rule. In short, none of the circumstances alleged by commenters appears to have actually limited the public's ability to meaningfully engage in the notice and comment period, and all available evidence provided by commenters indicates that the comment period was sufficient.

85 Fed. Reg. at 81,642-643.

## B.    Changes Implemented by the Rule

According to EOIR, the Rule implements "multiple changes to the processing of appeals to ensure the consistency, efficiency, and quality of its adjudications." *Id*. at 81,588. The Rule also "amend[s] the regulations to make clear that there is no freestanding authority of line immigration judges or BIA members to administratively close cases." *Id.* The following changes are challenged by plaintiffs in this case:[12]

### 1.    Changes to Appellate Briefing Schedule

The Rule makes four changes to the appellate briefing schedule. First, it reduces the maximum allowable time for an extension for the filing of the opening brief from 90 to 14 days. 85 Fed. Reg. at 81,654; 8 C.F.R. § 1003.3(c)(1) (2021). Second, it limits the parties to a single extension, and the amended regulations emphasize that "[n]othing in this paragraph (c)(1) shall be construed as creating a right to a briefing extension for any party in any case, and the Board shall

---

[12] Plaintiffs' motion for preliminary injunction primarily focuses on three aspects of the Rule—the changes to the appellate briefing schedule, the limitations on the BIA's administrative closure authority, and the limitations on the BIA's *sua sponte* reopening authority. Because plaintiffs contend that the 30 day comment period was insufficient for a Rule of this magnitude, the Court summarizes here all of the changes challenged by plaintiffs.

United States District Court
Northern District of California

not adopt a policy of granting all extension requests without individualized consideration of good cause." 8 C.F.R. § 1003.3(c)(1) (2021). Third, the Rule eliminates consecutive briefing for non-detained BIA appeals, instead requiring simultaneous opening briefs.[13] 85 Fed. Reg. at 81,636; 8 C.F.R. § 1003.3(c)(1) (2021). Fourth, the Rule shortens the amount of time for submitting reply briefs from 21 days to 14 days; further, reply briefs "shall be permitted only upon leave of the Board and only if filed within 14 days of the deadline for the initial briefs." 8 C.F.R. § 1003.3(c)(1) (2021). EOIR explained that "due to the growing BIA caseload, the Department finds it necessary to implement these briefing scheduling reforms to ensure that appeals are adjudicated in a timely manner." 85 Fed. Reg. at 81,635; *see also* 85 Fed. Reg. at 52,492-493.

Plaintiffs claim that these changes "will effectively deprive noncitizens of the right to appeal to the BIA, the right to counsel of their choosing (at no expense to the Government), and a reasonable opportunity to present arguments and evidence" and that EOIR's justifications for the changes are irrational and arbitrary and contrary to the facts. Compl. ¶¶ 197-212. Plaintiffs allege that prior to the Final Rule, the BIA's mail-based system, unpredictable briefing schedules, and the short timeline to file a brief already limited the ability of noncitizens to obtain counsel on appeal, and that the Rule will make it "almost impossible" to obtain effective representation in BIA appeals. *Id.* ¶ 199. Plaintiffs also claim that defendants did not consider how the Rule's new briefing procedures interact with other changes in the Rule described *infra*, such as the BIA's new ability to affirm on any basis in the record, as well as the Attorney General's recent decision in *Matter of A-C-A-A-* which disallows the BIA's reliance on immigration court level stipulations. *Id.* ¶ 212.

### 2. Limitations on Administrative Closure Authority

The Rule amends the regulations at 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) to generally

---

[13] EOIR instituted concurrent briefing for detained cases in 2002. *See* 67 Fed. Reg. 54,878, 54,895, Board of Immigration Appeals: Procedural Reforms to Improve Case Management (Aug. 26, 2002). At that time, DOJ had initially proposed simultaneous briefing for detained and non-detained cases, but in response to "commenters [who] expressed concern that the practice of simultaneous briefing, coupled with a shorter time frame, raises due process concerns because it would be unfairly burdensome to immigration practitioners and *pro se* litigants", DOJ retained a sequential briefing schedule for non-detained cases. *See id.*

United States District Court
Northern District of California

1  prohibit immigration judges or the BIA from using administrative closure.   "[A]dministrative

2  closure is a docketing tool that has been used by IJs and the BIA since at least the late 1980s."

3  *Romero v. Barr*, 937 F.3d 282, 287 (4th Cir. 2019); *see also* Elizabeth Montano, The Rise and Fall

4  of Administrative Closure in Immigration Courts, 129 Yale L.J. F. 567, 570-74 (2020) (discussing

5  history of use of administrative closure).   Immigration judges and the BIA have used administrative

6  closure as a "procedural tool" "to temporarily remove a case from an Immigration Judge's active

7  calendar or from the Board's docket."   *Matter of Avetisyan*, 25 I. & N. Dec. 688, 690, 692 (BIA

8  2012).    Judges used administrative closure "to await an action or event that is relevant to

9  immigration proceedings but is outside the control of the parties or the court and may not occur for

10  a significant or undetermined period of time," *id.* at 692, "including to permit a noncitizen to pursue

11  alternative relief—such as a U visa—from USCIS."  *Meza Morales v. Barr*, 973 F.3d 656, 664 (7th

12  Cir. 2020) (Barrett, J.).   Administrative closure prevents "two coordinate offices in the executive

13  branch [from] simultaneously adjudicating collateral applications" and can "help advance a case

14  toward resolution."  *Id.* at 665; *see also Romero*, 237 F.3d at 289 & n.7 ("[T]he BIA has issued

15  numerous decisions authorizing IJs to administratively close cases for a variety of reasons related

16  to conservation of court resources, such as when a petitioner is awaiting processing of a visa petition

17  by DHS, or is awaiting the resolution of a direct appeal of a criminal conviction, . . . . or when DHS

18  and the respondent have agreed on the possibility of alternate case resolution.") (internal citations

19  omitted).   After a case was administratively closed, either party could reactivate the case by filing a

20  motion to re-calendar.  *See id.* at 287-88.

21      "[I]n *Matter of Castro-Tum*, the Attorney General employed administrative adjudication to

22  overrule *Avetisyan* and hold that immigration judges and the Board lack the authority to

23  administratively close cases 'except where a previous regulation or settlement agreement has

24  expressly conferred it.'"  *Meza Morales*, 973 F.3d at 664 (quoting *Matter of Castro-Tum*, 27 I. & N.

25  Dec. 271, 283 (A.G. 2018)).   The Fourth and Seventh Circuits disagreed with the Attorney General's

26  interpretation of the regulations, holding that the applicable version of 8 C.F.R. § 1003.10(b) granted

27  IJs broad authority to take "any action" that is "appropriate and necessary for the disposition of . . .

28  cases," and that administrative closure is one such "action."  *See Meza Morales*, 973 F.3d at 656;

United States District Court
Northern District of California

*Romero*, 937 F.3d at 292 (concluding "that the plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) unambiguously confers upon IJs and the BIA the general authority to administratively close cases").  The Sixth Circuit reached a different result in *Hernandez-Serrano v. Barr*, 981 F.3d 459, 464 (6th Cir. 2020), holding that the regulations did not provide IJs and the BIA with the authority to administratively close cases and upholding the Attorney General's decision in *Castro-Tum*.

The Rule implements *Castro-Tum* by amending the regulations at 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) to generally prohibit IJs and the BIA from using administrative closure.[14]  The Department justified the change by stating that "indefinitely delaying immigration court proceedings in order to allow aliens to pursue speculative relief that may take years to resolve does not comport with EOIR's mission to expeditiously adjudicate cases before it."  85 Fed. Reg. at 81,598.  The Department also stated that it was "necessary to provide this clarification to resolve competing interpretations of 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) that have resulted in the inconsistent nationwide application of administrative closure authority," citing the split between the Sixth Circuit's decision in *Hernandez-Serrano* and the Fourth and Seventh Circuits in *Romero* and *Meza Morales*.  *Id*.  The Department also explained that "the agency believes general administrative closure authority improperly allows immigration judges to determine which immigration cases should be adjudicated and which ones should not" and that "administrative closure has at times been used to effectively terminate cases through indefinite delay."  *Id*. at 81,599.

Plaintiffs claim that the elimination of administrative closure will lead to the deportation of noncitizens with meritorious claims for relief, including noncitizens who are pursuing relief before USCIS, and that it will prevent organizations like plaintiffs from seeking hardship waivers of unlawful presence for their clients.  Compl. ¶¶ 134-38, 156-57.  Plaintiffs also claim that defendants

---

[14]  As a result of the Rule, 8 C.F.R. § 1003.1(d)(1)(ii) (2021) now provides that "[n]othing in this paragraph (d)(1)(ii) shall be construed as authorizing the Board to administratively close or otherwise defer adjudication of a case unless a regulation promulgated by the Department of Justice or a previous judicially approved settlement expressly authorizes such an action"; *see also* 8 C.F.R. § 1003.10(b) (2021) (similar language regarding authority of IJs).  IJs and the BIA "may" still administratively close cases in discrete circumstances, including under certain conditions for people who wish to apply for a T visa, such as "[w]ith the concurrence of Service counsel" and upon a showing of eligibility for T nonimmigrant status.  *See* 8 C.F.R. § 1214.2 (2021).

16

did not adequately address the reliance interests at issue because there are many people who are currently in removal proceedings before EOIR who are also pursuing relief before USCIS or state courts while their cases are administratively closed. *Id.* ¶ 151-53. Plaintiffs also allege that the Department's justification for eliminating administrative closure is arbitrary and capricious because administrative closure promotes efficient management of court dockets and is not inconsistent with the prior regulations. *Id.* ¶¶ 139-50. Plaintiffs assert that even EOIR's own consultants "recommended working with DHS 'to administratively close cases awaiting adjudication in other agencies or courts' as a way to improve EOIR's processes.'" *Id.* ¶ 146.[15]

### 3. Limitation of *sua sponte* reopening authority

Existing law limits noncitizens to filing one motion to reopen, which must be filed no later than 90 days after the final order of removal, and one motion to reconsider, which must be filed no later than 30 days after the final order of removal. 8 C.F.R. § 3.2(c)(2) (2021). Those limitations were put in place in 1996 pursuant to a rule implemented by DOJ as required by the Immigration Act of 1990. *See Dada v. Mukasey*, 554 U.S. 1, 13 (2008); 61 Fed. Reg. 18,900, 18,901 (Apr. 29,

---

[15] Plaintiffs quote recommendations made by EOIR's consultant Booz Allen Hamilton in 2017. EOIR commissioned a year-long study by Booz Allen Hamilton to evaluate the immigration court system and make recommendations on how to improve efficiency and address the growing backlog of cases. *See* Booz Allen Hamilton, Department of Justice, Executive Office for Immigration Review, Legal Case Study Summary Report (Apr. 6, 2017), https://bit.ly/35td6yo ("Booz Allen Hamilton Report"). According to the report, the consultants analyzed official documents provided by EOIR, analyzed data from Fiscal Years 2000-2015, visited 18 immigration courts and conducted approximately 150 interviews with court personnel and external stakeholder (such as DHS personnel and immigration lawyers), and gathered data from a five-week time study in which judicial and court staff participated. *See id.* at 7-8.

The report states that "[t]he study team found that immigration courts struggle with inefficient practices and case processing due to understaffing, issues related to workforce culture and careers, deficient or ineffective processes, and external dependencies." *Id.* at 3. Booz Allen Hamilton made numerous recommendations in those four areas. In the area of "external dependencies," Booz Allen Hamilton recommended that EOIR "[l]aunch dialogue with DHS to identify policy improvements between DHS and EOIR that would streamline caseload. For example, this could include cross-agency screening and policy to administratively close cases awaiting adjudication in other agencies or courts" as a way to improve EOIR's efficiency. *See id.* at 26.

At the hearing on plaintiffs' motion for a preliminary injunction, defense counsel stated that she had confirmed with EOIR that the EOIR-commissioned Booz Allen Hamilton Report was not considered by defendants in connection with the promulgation of the Rule in this case and that the Report is not part of the administrative record.

United States District Court
Northern District of California

1996).

The 1996 limitations on motions to reopen and motions to reconsider did not disturb the longstanding authority of the IJs and the BIA to reopen or reconsider a case "on its own motion" or in response to a motion by either party. *See Dada*, 554 U.S. at 12-13 (discussing history of reopening as "a judicial creation later codified by federal statute" and citing decisions using reopening as early as 1917). "In 1958, when the BIA was established, the Attorney General promulgated a rule for the reopening and reconsideration of removal proceedings, 8 C.F.R. § 3.2 . . . ." *Id.* at 13. Under that regulation,[16] which was in place until eliminated by the Final Rule in this case, IJs and the BIA had discretionary powers "to reopen proceedings *sua sponte* in exceptional circumstances," such as where a "fundamental change" in law materially impacts a noncitizen's case. *See Matter of J-J-*, 21 I. & N. Dec. 976, 984 (BIA 1997) (discussing *sua sponte* authority); *Matter of X-G-W-*, 22 I. & N. Dec. 71, 73-74 (BIA 1998) (holding BIA would exercise its *sua sponte* authority to reopen proceedings to allow noncitizen to obtain asylum because of "marked change in the refugee law," under which noncitizen became eligible for relief).

The Rule prohibits IJs and the BIA from reopening or reconsidering a case *sua sponte* except to correct minor mistakes such as typographical errors or defects in service. *See* 85 Fed. Reg. at 81,654-655; 8 C.F.R. §§ 1003.2(a), 1003.2(b), 1003.23(b)(1) (2021). EOIR explained,

> [T]he rule promotes fairness due to "the lack of a meaningful standard to guide a decision whether to order reopening or reconsideration of cases through the use of sua sponte authority, the lack of a definition of 'exceptional situations' for purposes of exercising sua sponte authority, the resulting potential for inconsistent application or even abuse of this authority, the inherent problems in exercising sua sponte authority based on a procedurally improper motion or request, and the strong interest in finality" by withdrawing an authority subject to inconsistent and potentially abusive usage.

85 Fed. Reg. at 81,628 (quoting NPRM, 85 Fed. Reg. at 52,505).

Plaintiffs claim that "[d]efendants' elimination of *sua sponte* authority is arbitrary and capricious because, among other things, they failed to consider that some noncitizens will be forever barred from reopening their removal orders, resulting in wrongful deportations." Compl. ¶¶ 180-

---

[16] The prior regulations provided that the Board had the authority "to reopen or reconsider on its own motion in any case in which we have rendered a decision." 8 C.F.R. §§ 3.2(a), 3.23(b)(1) (2020).

83.  Plaintiffs also claim that EOIR's justifications for eliminating *sua sponte* authority are arbitrary and capricious and lack factual support.  *Id.* ¶¶ 185-95.

### 4.    Limits on BIA's Remand Authority

The Rule restricts the BIA's authority to remand for factfinding, for consideration of changes in the law, and for consideration of new evidence.  EOIR justified these changes by stating that they would promote efficiency and eliminate "an inconsistently applied and confusing procedural avenue that is redundant given [the] clearer established mechanisms" of motions to reopen and motions to reconsider.  85 Fed. Reg. at 81,610-611 (addressing comments regarding changes to remands for consideration of changes in the law and new evidence); *see also id.* at 81,604-607 (discussing and responding to comments about Rule's prohibition on BIA's authority to remand for factfinding).

The new regulations permit a remand for factfinding only as follows:

Except as provided in paragraph (d)(6)(iii) or (d)(7)(v)(B)[17] of this section, the Board shall not remand a direct appeal from an immigration judge's decision for additional factfinding unless:

(1) The party seeking remand preserved the issue by presenting it before the immigration judge;

(2) The party seeking remand, if it bore the burden of proof before the immigration judge, attempted to adduce the additional facts before the immigration judge;

(3) The additional factfinding would alter the outcome or disposition of the case;

(4) The additional factfinding would not be cumulative of the evidence already presented or contained in the record; and

(5) One of the following circumstances is present in the case:

(i) The immigration judge's factual findings were clearly erroneous;

(ii) The immigration judge's factual findings were not clearly erroneous, but the immigration judge committed an error of law that requires additional factfinding on remand; or

---

[17]  These sections permit remands for DHS to present new evidence at any time based on identity, law enforcement or security investigations, or to remand "to address a question over jurisdiction over an application or the proceedings or a question regarding a ground or grounds of removability specified in section 212 or 237 of the Act."  8 C.F.R. §§ 1003.1(d)(6)(iii), (d)(7)(v)(B) (2021).

United States District Court
Northern District of California

(iii) Remand to DHS is warranted following de novo review.

8 C.F.R. § 1003.1(d)(3)(iv)(D) (2021); 85 Fed. Reg. at 81,651.[18]

Under the new regulations, the BIA may remand for consideration of changes in the law only if "that change has vitiated all grounds of removability," 8 C.F.R. § 1003.1(d)(7)(ii)(C) (2021); 85 Fed. Reg. at 652, and "the [BIA] shall not receive or review new evidence submitted on appeal, shall not remand a case for consideration of new evidence received on appeal, and shall not consider a motion to remand based on new evidence." 8 C.F.R. § 1003.1(d)(7)(v)(A) (2021); 85 Fed. Reg. at 81,652.

The Rule also eliminates the BIA's practice of remanding a case based on the "totality of the circumstances." 85 Fed. Reg. at 81,652; 8 C.F.R. § 1003.1(d)(7)(ii)(B) (2021). Plaintiffs assert that the BIA "often uses that standard for remands if it is clear that a person did not understand the proceedings, or that the immigration judge relied on a mistaken belief or engaged in blatant misconduct." Compl. ¶ 175.

Plaintiffs claim that the restrictions on remands are inconsistent with the ordinary operation of appellate courts and will needlessly accelerate the removal of people with meritorious claims for relief. Plaintiffs claim that the restrictions on remand for factfinding are arbitrary and capricious because "they illogically require the noncitizen or their advocate to predict the immigration judge's legal or factual errors before a decision is rendered." *Id.* ¶ 159. In addition, plaintiffs and *amici* contend that the Rule enacts one-sided restrictions on remands because only the government is permitted to seek remand to introduce facts in support of removal. Plaintiffs also claim that these restrictions conflict with safeguards for mentally ill or incompetent noncitizens, which require remand when competency concerns arise. *See id.* ¶ 160. Plaintiffs allege that the restrictions on remands for changes in the law are "profoundly unfair" because remand is not permitted if the change in the law adds a new type of relief from removal. *Id.* ¶ 161. Plaintiffs allege that the bar on remands for the introduction of new evidence is particularly arbitrary and unfair "because [it

---

[18] The prior regulation provided that "A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand. If further factfinding is needed in a particular case, the Board may remand the proceedings to the immigration judge." 8 C.F.R. § 1003.1(d)(3)(iv) (2020).

United States District Court
Northern District of California

will] force people who are eligible for relief to be ordered removed, and in some cases actually removed, before they can fully present their claims" because the "Rule requires individuals to wait until their removal orders become final and then file motions to reopen, instead of filing motions to remand while their cases are pending." *Id.* ¶¶ 162-63. Plaintiffs also allege, *inter alia*, that the harms imposed by the limitations on remands are exacerbated by the Rule's elimination of *sua sponte* motions to reopen as well as proposed changes to motions to reopen in the Motion to Reopen NPRM, a proposed rulemaking described *infra*. *Id.* ¶¶ 170-71.

### 5. Limits on Scope of Remand

The Rule amends the regulations to provide, "[i]n any case in which the Board has qualified or limited the scope or purpose of the remand, the immigration judge shall not consider any issues outside the scope or purpose of that order, unless such an issue calls into question the immigration judge's continuing jurisdiction over the case." 85 Fed. Reg. at 81,652; 8 C.F.R. § 1003.1(d)(7)(iii) (2021). DOJ stated that the "rule is intended to alleviate confusion for immigration judges regarding the scope of a remand" and that the prior practice "encourages the re-litigation of issues already addressed by an immigration judge" and "undermines finality by allowing a second chance to argue and appeal issues to the Board that the Board has already ruled upon once." 85 Fed. Reg. at 81,615.

Plaintiffs claim that the Rule prevents supplementing the record upon remand if there is a change in the law or circumstances while a person is waiting for a new hearing on remand, which they assert could range anywhere from months to several years. Compl. ¶ 173.

### 6. Authority for BIA to Take Administrative Notice of Facts

The Rule permits the BIA to take "administrative notice" of facts "not reasonably subject to dispute," including "[t]he contents of official documents outside the record," "[f]acts that can be accurately and readily determined from official government sources and whose accuracy is not disputed," and "[u]ndisputed facts contained in the record." 85 Fed. Reg. at 81,651; 8 C.F.R. § 1003.1(d)(3)(iv)(A) (2021). "If the Board intends to rely on an administratively noticed fact outside of the record . . . as the basis for reversing an immigration judge's grant of relief or protection

from removal, it must provide notice to the parties of its intent and afford them an opportunity of not less than 14 days to respond to the notice." 85 Fed. Reg. at 81,651; 8 C.F.R. § 1003.1(d)(3)(iv)(B) (2021).

Plaintiffs claim that these changes are inconsistent with the requirement that factfinding take place in the trial court, *see* 8 U.S.C. § 1229a(a)(3), (b)(1); 8 C.F.R. § 1003.1(d)(3) (2021), and that they deprive noncitizens the opportunity to be heard and present evidence on facts that they reasonably dispute. Compl. ¶¶ 215-25. Plaintiffs also claim that official documents or government sources may contain incorrect or disputable material and that this is a "serious problem the agency failed to adequately consider." *Id.* ¶ 217.

### 7.  Authority for BIA to Affirm on Any Basis in the Record

The Rule amended the regulations to provide that, "The Board may affirm the decision of the immigration judge or the Department of Homeland Security on any basis supported by the record, including a basis supported by facts that are not reasonably subject to dispute, such as undisputed facts in the record." 8 C.F.R. § 1003.1(d)(3)(v) (2021); 85 Fed. Reg. at 81,651.

Plaintiffs claim that this change will allow "impermissible factfinding by the BIA and deprives noncitizens of the opportunity to challenge those determinations in the first instance." Compl. ¶ 226. Plaintiffs allege that the "Rule effectively permits a second adjudication of cases on issues the parties did not address in the appeal because it does not limit the 'bases' upon which the BIA may affirm." *Id.* ¶ 227. Plaintiffs also claim that the Attorney General's recent decision in *Matter of A-C-A-A-* (barring the BIA from relying on parties' stipulations) compounds the problem because under the combination of *A-C-A-A-* and the Rule, "the BIA could find that an element that was uncontested below was nonetheless insufficiently proven, and then affirm the immigration judge's denial on that basis, without ever giving the noncitizen an opportunity to address the issue." *Id.* ¶ 228.

### 8.  Changes to the Availability of Remand for Voluntary Departure

The Rule eliminates the BIA's ability to remand a case to an IJ "solely to consider a request

22

for voluntary departure" or to provide instructions (i.e., "advisals") for complying with a grant of voluntary departure.[19] 85 Fed. Reg. at 81,589; 8 C.F.R. §§ 1003.1(d)(7)(iv) (2021), 1240.26(k)(l) (2021). Instead, the Rule authorizes the BIA to decide a request of voluntary departure as long as it was preserved below. *Id*. The Rule requires that when the BIA grants voluntary departure, the BIA is responsible for advising the recipient of the terms of the voluntary departure order and that bond be posted within ten days of the order if served by mail or five days if served electronically. 8 C.F.R. § 1240.26(k)(4) (2021).

Plaintiffs claim that evaluating whether an individual is eligible for voluntary departure involves intensive fact finding and that the Rule allows the BIA to consider these issues in the first instance and to do so on an incomplete factual record. Compl. ¶ 232. Plaintiffs claim that because some forms of relief, such as withholding of removal or relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture") do not require a showing of "good moral character," the record that is developed before the IJ may not address the moral character issues relevant to voluntary departure. *Id*. ¶ 233. "But under the Rule, immigration judges must develop the record on voluntary departure for all applicants who are apparently eligible so that the BIA can make decisions with respect to voluntary departure in the first instance. This is terribly inefficient because it forces all immigration judges to develop a voluntary departure record in case DHS appeals a grant of some other relief, and the BIA sustains." *Id*. ¶ 234.

---

[19] Voluntary departure "is a discretionary form of relief that allows certain favored aliens— either before the conclusion of removal proceedings or after being found deportable—to leave the county willingly." *Dada*, 554 U.S. at 8; *see also* 8 U.S.C. § 1229c. "Voluntary departure . . . allows the Government and the alien to agree upon a *quid pro quo*. From the Government's standpoint, the alien's agreement to leave voluntarily expedites the departure process . . . [and] eliminates some of the costs and burdens associated with litigation over the departure. . . . [and] by departing voluntarily, the alien facilitates the possibility of readmission." *Dada*, 554 U.S. at 11. To qualify for voluntary departure, a noncitizen must show, *inter alia*, five years of "good moral character"; in making the moral character assessment "[t]he IJ is required to weigh favorable and unfavorable factors by 'evaluat[ing] all of them, assigning weight or importance to each one separately and then to all of them cumulatively.'" *Campos-Granillo v. I.N.S.*, 12 F.3d 849, 852 (9th Cir. 1993), *as amended* (Feb. 16, 1994) (citation omitted).

The "advisals" include the fact of the conversion of the voluntary departure order into a removal order for failure to comply, the impact of filing a motion to reopen or reconsider on a grant of voluntary departure, as well as any additional terms "beyond those specifically enumerated." 8 C.F.R. § 1240.26(c)(3).

Plaintiffs also allege that the Rule "creates a risk of inadvertent non-compliance because the Rule requires the BIA to give advisals about the consequences of failing to comply with voluntary departure but does not explain how the BIA will do this in the context of a paper-based appellate process in which the citizen never appears in person.  By contrast, in-person advisals by an immigration judge are conducted in the noncitizen's native language and permit the noncitizen to ask questions."  *Id*. ¶ 235.  Plaintiffs also claim that the "Rule's five- or ten-day bond requirement is woefully insufficient when  such substantial rights are at stake."  *Id*. ¶ 237.

### 9.      Immigration Judge Quality Assurance Certification of a BIA Decision

The Rule establishes a "Quality Assurance" "procedure for an immigration judge to certify BIA decisions reopening or remanding proceedings for further review by the Director in situations in which the immigration judge alleges that the BIA made an error."  85 Fed. Reg. at 81,590; 8 C.F.R. § 1003.1(k) (2021).

> The certification process is limited only to cases in which the immigration judge believes the BIA erred in the decision by: (1) A typographical or clerical error affecting the outcome of the case; (2) a holding that is clearly contrary to a provision of the INA, any other immigration law or statute, any applicable regulation, or a published, binding precedent; (3) failing to resolve the basis for appeal, including being vague, ambiguous, internally inconsistent; or, (4) clearly not considering a material factor pertinent to the issue(s) before the immigration judge.

85 Fed. Reg. at 81,590; 8 C.F.R. § 1003.1(k)(1)(i)-(iv) (2021)).  To "ensure a neutral arbiter between the immigration judge and the BIA, the Director will review any such certification orders" and the Director may dismiss the certification and return the case to the IJ or remand the case back to the BIA for further proceedings.  85 Fed. Reg. at 81,590; 8 C.F.R. § 1003.1(k)(3) (2021).  The Rule states that "[t]his quality assurance process is a mechanism to ensure that BIA decisions are accurate and precise—not a mechanism solely to express disagreements with BIA decisions or to lodge objections to particular legal interpretations."  85 Fed. Reg. at 81,590; *see also generally id.* at 81,625-628 (discussing and responding to comments about quality assurance process).

Plaintiffs allege that this new procedure establishes a substantive process of reviewing and reversing BIA decisions and "thus falls squarely within [8 C.F.R.] section 1003.0(c)'s prohibition

1    on Directorial adjudication without delegation by the Attorney General." Compl. ¶ 256.[20]  Plaintiffs

2    allege that no existing delegation authorizes the Director to review BIA decisionmaking as required

3    by the "quality assurance certification process" *id*. ¶ 261, and that the new process is arbitrary and

4    capricious, inconsistent with finality and timely adjudication, and converts immigration judges into

5    advocates seeking to overturn BIA decisions in the cases they are adjudicating.  *Id*.  ¶¶ 262-72.

6

7                    **10.        Referral of Pending BIA Appeals to EOIR Director**

8            With certain exceptions, the Rule "instructs the [BIA] Chairman to refer appeals pending

9    beyond 335 days to the Director for adjudication."   85 Fed. Reg. at 81,591; 8 C.F.R.

10   § 1003.1(e)(8)(v) (2021).   The 335 day time period begins with the filing of the notice of appeal.

11   85 Fed. Reg. at 81,622.  Defendants justified the change as necessary to ensure timely disposition

12   of cases and otherwise consistent with the Director's authority.  *See generally id*. at 81,619-622

13   (discussing and responding to comments).

14           Plaintiffs claim that this provision conflicts with the INA, conflicts with the prohibition on

15   the Director adjudicating cases absent a specific delegation of authority from the Attorney General,

16   and is arbitrary and capricious.  Compl. ¶¶ 274-86.  Plaintiffs also note that the median time from a

17   notice of appeal to a BIA decision is approximately 323 days, and that as a result of COVID-19-

18   related delays, it has become increasingly common for appeals to remain pending for 335 days or

19   more. *Id*. ¶ 279; *see also* 85 Fed. Reg. at 81,619 (acknowledging "323-day median case appeal time

20   period").

21

22           [20] 8 C.F.R. § 1003.0(c) (2021), titled "Limit on the authority of the Director," provides:

23

24           Except as provided by statute, regulation, or delegation of authority from the
             Attorney General, or when acting as a designee of the Attorney General, the Director
25           shall have no authority to adjudicate cases arising under the Act or regulations or to
             direct the result of an adjudication assigned to the Board, an immigration judge, the
26           Chief Administrative Hearing Officer, or an Administrative Law Judge.  When
             acting under authority described in this paragraph (c), the Director shall exercise
27           independent judgment and discretion in considering and determining the cases and
             may take any action consistent with the Director's authority as is appropriate and
28           necessary for the disposition of the case.  Nothing in this part, however, shall be
             construed to limit the authority of the Director under paragraph (a) or (b) of this
             section.

United States District Court
Northern District of California

**11.** **Changes to Remands for Identity, Law Enforcement, or Security Investigations or Examinations**

Background checks (also called "biometrics") are required for most forms of immigration relief. *See* 8 C.F.R. § 1003.47(b) (2021) (listing forms of immigration relief which require background checks). The Rule requires the BIA to "hold" a noncitizen's case for up to 180 days until DHS reports the results of the background check, instead of remanding to an IJ. 85 Fed. Reg. at 81,651; 8 C.F.R. § 1003.1(d)(6)(ii) (2021). Noncitizens must await instruction from DHS to complete background checks. *Id.* If the noncitizen fails to respond to DHS's instructions within 90 days (or 120 days, with an extension), the application will be deemed abandoned. *Id.*

Plaintiffs claim that this new process harms noncitizens and provides no recourse if an application is wrongfully deemed abandoned. Plaintiffs allege that "[t]hese changes abandoned safeguards which previously required DHS to notify the respondent *in person at an immigration court hearing* of the background check requirements and provide instructions for compliance, and for the immigration judge to 'specify for the record when the respondent receives' this information, along with a warning about the consequences for failing to do so." Compl. ¶ 246 (quoting 8 C.F.R. § 1003.47(d) (2020)).

**12.** **Elimination of BIA's Self-Certification Authority**

Prior to the Rule, IJs and the BIA could certify cases to the BIA, and the BIA had the discretion to review cases by certification pursuant to 8 C.F.R. § 1003.1(c) (2020). Plaintiffs assert that the BIA historically used this authority "to cure untimely appeals or other filing defects based on extraordinary circumstances, and to review decisions that were not appealed despite clear errors or misconduct committed by the immigration judge." Compl. ¶ 249.

The Rule withdraws the BIA's delegated authority to review cases by self-certification "due to concerns over the lack of standards for such certifications, the lack of a consistent application of the 'exceptional' situations criteria for purposes of utilizing self-certification, the potential for lack of notice of the BIA's use of certification authority, the overall potential for inconsistent application

and abuse of this authority, and the strong interest in finality." 85 Fed. Reg. at 81,591.

Plaintiffs claim that defendants do not have a reasoned basis for eliminating the BIA's self-certification authority, that defendants do not adequately explain their refusal to consider obvious alternatives like issuing a clearer standard of what constitutes "exceptional situations," and that defendants failed to consider the impact of the Rule's impact on *pro se* and detained individuals. Compl. ¶¶ 250-53.

### 13. Mandatory Timelines and Other Changes for Adjudication of BIA Appeals

The Rule imposes mandatory internal deadlines for adjudicating BIA appeals, including deadlines for initial screening and dispositions of summary dismissals and determinations of whether cases will be adjudicated by a single BIA member or a three-member panel. 85 Fed. Reg. at 81,652-53; 8 C.F.R. § 1003.1(e)(8)(i) (2021). The Rule also eliminates the requirement for IJs to review the transcript of an oral decision to correct mis-transcribed language or other errors before it is sent to the parties. 85 Fed. Reg. at 81,638; 8 C.F.R. § 1003.5 (2021).

Plaintiffs claim that "these arbitrary adjudication timelines pressure[] screeners to review cases quickly rather than thoroughly" and that the result will be "erroneous summary dismissals and [affirmance without opinion]." Compl. ¶ 288. Plaintiffs also claim that the elimination of the transcript review is "particularly counterproductive" because EOIR's own consultants "reported that issuance of oral decisions actually *contributes* to inefficiencies in adjudicating cases because it prevents both the parties and the BIA from deliberating on the issues of the case." *Id*. ¶ 290 & n.43 (citing Booz Allen Hamilton Report at 18, 25).

### III. Other Rulemaking in 2020

Throughout 2020, the DOJ, DHS, and EOIR promulgated and finalized a flurry of rules affecting the immigration system. The complaint identifies twelve rules, not including the Rule challenged in this lawsuit, that were promulgated and/or finalized during 2020. *See* Compl. ¶¶ 75-

87, 116 n.19. [21] Plaintiffs assert that the following five rules intersect with the Rule at issue in this case in a variety of ways:

- Omnibus Asylum Rule: On June 15, 2020, DOJ and DHS promulgated a rule that was finalized on December 11, 2020, Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264 (proposed June 15, 2020); 85 Fed. Reg. 80,274 (Dec. 11, 2020). This rule, referred to as the "Omnibus Asylum Rule," amended regulations regarding credible fear determinations "to establish streamlined proceedings under a clarified standard of review." 85 Fed. Reg. at 80,274. The Omnibus Asylum Rule also amended regulations regarding asylum, statutory withholding of removal, and withholding and deferral of removal. *Id.* As relevant here, the rule restricted the discretion of an immigration judge or the BIA to consider motions to reopen to seek asylum based on a change in country conditions. *See* 85 Fed. Reg. at 36,285; 85 Fed. Reg. at 80,360-361. This rule was set to go into effect on January 11, 2021, but was enjoined by Judge Donato of this Court in *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-09253 JD, 2021 WL 75756, at *1 (N.D. Cal. Jan. 8, 2021) ("*Pangea II*").

- Asylum Procedures Rule: On September 23, 2020, EOIR and DOJ proposed a rule that was finalized on December 16, 2020, Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 59,692 (proposed Sept. 23, 2020); 85 Fed. Reg. 81,698 (Dec. 16, 2020). This rule, referred to as the "Asylum Procedures Rule," amended regulations governing asylum and withholding of removal, and as relevant here, established a 15-day filing deadline for filing asylum applications and requires immigration judges to reject an asylum application as incomplete if it does not include a response to each of the required questions contained in the asylum application form or is unaccompanied by the required materials. 85 Fed. Reg. at 81,698-699. This rule was scheduled to go into effect on January 15, 2021, but was enjoined by a district court in the District of Columbia, *Nat'l Immigrant Justice Ctr. v. EOIR*, Case

---

[21] Ten of the twelve had 30 day comment periods; the only two that had 60 day comment periods were the "EAD Rules," *see* 84 Fed. Reg. 47,148 (NPRM for Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants); 84 Fed. Reg. 62,374 (NPRM for Asylum Application, Interview, and Employment Authorization).

United States District Court
Northern District of California

No. 1:21-cv-00056-RBW, Dkt. No 11 (D.D.C. Jan. 14, 2021).

- EOIR Fee Rule:  On February 28, 2020, DOJ and EOIR promulgated a rule that was finalized on December 18, 2020, Executive Office for Immigration Review; Fee Review, 85 Fed. Reg. 11,866 (proposed Feb. 28, 2020); 85 Fed. Reg. 82,750 (Dec. 18, 2020).  The rule, referred to as the "EOIR Fee Rule," increased fees for certain applications, appeals and motions, and as relevant here, increased the fee from $110 to $975 for BIA appeals, and from $110 to $895 for BIA motions to reopen or reconsider.  This rule was scheduled to take effect on January 19, 2021, but was enjoined by a district court in the District of Columbia, *Catholic Legal Immigr. Network v. Exec. Office for Immigr. Review* ("*CLINIC*"), Case No. 20-cv-03812 (APM), 2021 WL 184359, at *1 (D.D.C. Jan. 18, 2021).

- Continuance NPRM:  On November 27, 2020, DOJ and EOIR issued a notice of proposed rulemaking, Good Cause for a Continuance in Immigration Proceedings, 85 Fed. Reg. 75,925 (proposed Nov. 27, 2020).  The comment period closed December 28, 2020.  *Id*.  The proposed rule "provide[s] a clearer definition of 'good cause' and the situations in which it is shown to warrant a postponement, continuance, or adjournment in immigration proceedings."  *Id*. The proposed rule "would define 'good cause' to require the requesting party to demonstrate a particular and justifiable need for a continuance, and to make clear that the burden is on the requesting party"; "would codify scenarios in which 'good cause' is not shown"; and "would further build on the general standards regarding good cause and codify standards or guidelines for adjudicating requests for continuances in four common situations . . . ."  *Id*. at 75,925-926.  Plaintiffs assert that if finalized and implemented, the proposed rule will restrict the availability of continuances in immigration court.

- Motion to Reopen NPRM:  Also on November 27, 2020, DOJ and EOIR issued a notice of proposed rulemaking, Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal, 85 Fed. Reg. 75,942 (proposed Nov. 27, 2020).  The comment period closed on December 28, 2020.  *Id*.  The proposed rule amends EOIR regulations "governing the filing and adjudication of motions to reopen and reconsider and to add regulations governing requests for discretionary stays of removal."  *Id*.  Plaintiffs assert that if finalized and

United States District Court
Northern District of California

United States District Court
Northern District of California

implemented, the proposed rule will significantly heighten the standards and burdens of proof for adjudicating statutory motions to reopen, including claims regarding ineffective assistance of counsel.

## IV.  Procedural Background

Plaintiffs filed this action on January 19, 2021, and on January 22, 2021, plaintiffs filed a motion for a preliminary injunction.  Dkt. No. 24 ("Mot.).  Plaintiffs are four non-profit organizations serving immigrants and refugees, including noncitizens in removal proceedings. Compl. ¶¶ 16-19.  Plaintiffs are Centro Legal de la Raza ("Centro Legal"); Immigrant Legal Resource Center ("ILRC"); Tahirih Justice Center ("Tahirih"); and Refugee and Immigrant Center for Education and Legal Services ("RAICES").  Centro Legal and ILRC are based in the San Francisco Bay Area, Tahirih is headquartered in Falls Church, Virginia with offices in five states including San Bruno, California, and RAICES is headquartered in San Antonio, Texas with six offices in Texas.  *Id.*  ILRC, Tahirih and RAICES state that they are "national" nonprofits.  *Id.*; *see also generally* Patel. Decl., Quinn Decl., Huang Decl., & Garza Decl.

Defendants are the EOIR; the DOJ; James McHenry, Director of EOIR[22]; and Jeffrey Rosen, the Acting Attorney General of the United States.[23]

The complaint alleges violations of the Administrative Procedures Act ("APA") and the Due Process Clause of the United States Constitution.  Plaintiffs bring five claims for relief asserting: (1) that the Rule is arbitrary and capricious under the APA; (2) that defendants violated the APA by failing to provide adequate notice and opportunity to comment, failing to analyze the Rule's federalism implications as required by Executive Order No. 13132, and failing to comply with the requirements of the Regulatory Flexibility Act; (3) that defendants violated the APA by acting in excess of statutory jurisdiction and authority, including the claim that Director McHenry did not have the authority to issue the Rule and that McHenry cannot delegate additional authority to

---

[22] Defendants state that on January 31, 2021, Mr. McHenry stepped down from his position as EOIR Director, and that Jean King became the Acting EOIR Director.

[23] On March 10, 2021, the Senate confirmed Merrick Garland as Attorney General.

himself; (4) that the Rule violates the APA because it is contrary to law as set forth in the INA, international law and treaties, and the Due Process Clause; and (5) that the Rule violates the Due Process Clause because it obstructs access to rights that the Due Process Clause and the INA provide for noncitizens in the immigration courts and the BIA.

On February 8, 2021, the case was reassigned to the undersigned Judge. Defendants filed an opposition, Dkt. No. 47 ("Opp'n"), and plaintiffs filed a reply brief, Dkt. No. 54 ("Reply"). The Court also received and granted five motions for leave to file *amicus curiae* briefs in support of plaintiffs' motion. The *amicus curiae* briefs were filed by (1) ten organizations advocating for the rights of survivors of domestic violence and human trafficking (Dkt. No. 27-1); (2) Kids in Need of Defense, a non-profit organization whose offices provide free legal services to unaccompanied immigrant children (Dkt. No. 29-2); (3) 30 former Immigration Law Judges and former members of the BIA (Dkt. No. 43); (4) 28 cities and counties (Dkt. No. 32-1); and (5) four Bay Area public defender offices, two law school clinics, and two legal service providers, (Dkt. No. 36-1).

On March 9, 2021, the Court held a hearing via zoom videoconference at which both sides appeared. Plaintiffs' motion for a preliminary injunction is now ripe for review.

## LEGAL STANDARDS

### I. Injunctive Relief

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). In order to obtain a preliminary injunction, the plaintiff "must make a 'threshold showing' of four factors." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 844 (9th Cir. 2020) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam)). The plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citations omitted). Alternatively, plaintiffs may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met. *All. for the*

United States District Court
Northern District of California

*Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011). "These factors are evaluated on a sliding scale." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) (citing *All. for the Wild Rockies*, 632 F.3d at 1131-34).

The parties dispute whether plaintiffs are seeking a mandatory or prohibitory injunction, and thus whether plaintiffs are subject to a heightened burden of proof. "A mandatory injunction orders a responsible party to take action, while a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) (internal quotation marks and citation omitted). "A mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks and citation omitted). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id*. (holding portion of injunction that required defendants to recall products and pay restitution was mandatory and portion of injunction enjoining defendants from selling infringing products was prohibitory).

Defendants contend that because the Rule went into effect on January 15, 2021, plaintiffs are seeking a mandatory injunction because they are seeking to change the status quo. The Court disagrees. As the Ninth Circuit has explained, "the 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Arizona Dream Act Coalition*, 757 F.3d at 1061. "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy[.]'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (affirming preliminary injunction enjoining Disney from using infringing logo and finding the status quo ante "existed before Disney began using its allegedly infringing logo"); *see also Arizona Dream Act Coalition*, 757 F.3d at 1061 (an injunction "to prohibit enforcement of a new law or policy, . . . is prohibitory"); *Al Otro Lado v. Wolf*, __ F.Supp.3d __, No. 17-cv-02366-BAS-KSC, 2020 WL 6384357, at *6 (S.D. Cal. Oct. 30, 2020) ("Actions required to reinstate the status quo ante litem do not convert

32

prohibitive orders into mandatory relief."). Here, the last uncontested status preceding the current controversy is the status quo that existed prior to the implementation of the Rule, and thus plaintiffs seek a prohibitory injunction.

## II. The Administrative Procedures Act

The APA provides, in relevant part, that

> The reviewing court shall--
> . . . **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--
> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> . . .
> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> **(D)** without observance of procedure required by law; . . . .

5 U.S.C. § 706(2); *see also E. Bay Sanctuary Covenant*, 950 F.3d at 1271.

## DISCUSSION

## I. Jurisdiction

As a threshold matter, defendants contend that the INA precludes jurisdiction over plaintiffs' claims. Defendants cite two provisions of the INA, 8 U.S.C. § 1252(a)(5) and 8 U.S.C. § 1252(b)(9). Section 1252 is titled "Judicial Review of Orders of Removal." Section 1252(a)(5) provides,

> (5) Exclusive means of review
>
> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter, except as provided in subsection (e). For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms "judicial review" and "jurisdiction to review" include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, sections 1361 and 1651 of such title, and review pursuant to any other provision of law (statutory or nonstatutory).

8 U.S.C. § 1252(a)(5).

Section 1252(b)(9) provides,

United States District Court
Northern District of California

(9) Consolidation of questions for judicial review

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).

Defendants cite cases interpreting these provisions for the proposition that "any issue—whether legal or factual—arising from any removal-related activity can be reviewed only through [the] petition for review process," including "challenging policies and practices" that are to be "applied during the course of a removal proceeding." Opp'n at 4 (quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016), and *Nat'l Immigration Project of Nat'l Lawyers Guild v. EOIR*, 456 F. Supp. 3d 16, 29 (D.D.C. 2020)). In *J.E.F.M.*, the Ninth Circuit held that a district court did not have jurisdiction over claims by minors in removal proceedings that they were entitled to have attorneys represent them at government expense because those claims "arise from removal proceedings" and "[r]ight-to-counsel claims are routinely raised in petitions for review filed with a federal court of appeals." *J.E.F.M.*, 837 F.3d at 1033. In *National Immigration Project of the National Lawyers Guild*, the district court held it did not have jurisdiction over access-to-counsel and due process claims challenging immigration court and detention facility policies implemented in response to the COVID-19 pandemic, finding that those claims "arise from the course of removal hearings." *Nat'l Immigr. Proj.*, 456 F. Supp. 3d at 29.

However, "claims that are independent of or collateral to the removal process do not fall within the scope of § 1252(b)(9)." *J.E.F.M.*, 837 F.3d at 1032; *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("*Regents*") (explaining 8 U.S.C. § 1252(b)(9) is a "targeted" and "narrow" provision that is "certainly not a bar where . . . the parties are not challenging any removal proceedings."); *Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (plurality) (holding § 1252(b)(9) did not preclude jurisdiction over noncitizens' claims challenging prolonged detentions and explaining that "when confronted with capacious phrases like 'arising from,'" the Court has "eschewed 'uncritical literalism' leading to results that 'no sensible person

34

could have intended.'")[24]; *see also Nielson v. Preap*, 139 S. Ct. 954, 962, 976-85 (2019) (plurality) (holding § 1252(b)(9) did not strip jurisdiction over noncitizens' claims challenging detention pursuant to mandatory detention rules). The Ninth Circuit has instructed that "the distinction between an independent claim and indirect challenge 'will turn on the substance of the relief that a plaintiff is seeking.'" *Martinez v. Napolitano*, 704 F.3d 620, 622, 623 (9th Cir. 2012) (holding section 1252(a)(5) prohibited APA claims brought by a plaintiff who challenged "the procedure and substance of the BIA's determination that he was ineligible for asylum, withholding of removal, and relief under the CAT" because "the BIA's rejection of Martinez's arguments on these claims, was the basis of its removal order [and] [i]f Martinez had prevailed on any one of them, the BIA would not have affirmed the removal order.").

Courts have held the INA does not bar jurisdiction "when a rule of general applicability is challenged outside the context of a removal proceeding." *CLINIC*, 2021 WL 184359, at *7. In *CLINIC*, the court rejected the government's argument—identical to that asserted by defendants here—that sections 1252(a)(5) and 1252(b)(9) barred APA claims challenging the EOIR Fee Rule, explaining that "[w]hile the fees in the Final Rule may be associated with filings that occur because of removal proceedings, the questions presented to the court do not 'arise from' removal proceedings. . . . Rather, Plaintiffs' legal challenges to the Final Rule originate in an entirely separate agency action: a 'rulemaking of general applicability.'" *Id.* at *8 (citing *Jennings*, 138 S. Ct. at 841 n.3); *see also O.A.*, 404 F. Supp. 3d at 128, 132-33 (rejecting the government's argument that sections 1252(a)(5) and 1252(b)(9) divested the court of jurisdiction over APA claims challenging a rule barring the granting of asylum to noncitizens who entered the United States from Mexico outside a designated port of entry); *see also Nat'l Immig. Proj.*, 456 F. Supp. 3d at 29 (citing *O.A.* and noting that "[t]he only exception to this [jurisdictional] bar that has been recognized in this

---

[24] As other courts have noted, "'While *Jennings* was a plurality decision, because Justice Breyer, joined by Justices Ginsburg and Sotomayor in dissent, "would have read section 1252(b)(9) even more narrowly[,] . . . [a]t least five Justices . . . agreed that section 1252(b)(9) does not clearly bar challenges collateral to the removal proceeding.'" *CLINIC*, 2021 WL 184359, at *7 n.2 (quoting *S. Poverty Law Ctr. v. U.S. Dep't of Homeland Security*, Civil Action No. 18-769 (CKK), 2020 WL 3265533, at *15 (D.D.C. June 17, 2020) (holding section 1252(b)(9) did not bar jurisdiction over the plaintiffs' conditions of confinement claims because those claims are collateral to the removal process)).

United States District Court
Northern District of California

circuit is if a plaintiff challenges 'the validity of a regulation of general applicability based on the administrative record generated in rulemaking.").

The Court concludes that plaintiffs' claims are independent of or collateral to the removal process and thus that the INA does not preclude jurisdiction over plaintiffs' claims. Plaintiffs "do not seek review of an 'order of removal,' nor do they challenge anything that has occurred in the course of a removal proceeding." *O.A.*, 404. F. Supp. 3d at 128. As in *CLINIC* and *O.A.*, plaintiffs are challenging "the validity of a regulation of general applicability based on the administrative record generated in the rulemaking," *id.*, and they raise claims that cannot be raised in an individual removal proceeding, such as "whether the Attorney General and the [EOIR Director] acted lawfully when they . . . promulgated the Rule without providing a timely opportunity for public notice and comment," *id.* at 133, whether McHenry had the authority to sign the Final Rule, as well as whether DOJ and EOIR complied with the Regulatory Flexibility Act.

Further, the relief plaintiffs seek demonstrates that they assert an independent claim rather than an indirect challenge to a removal order. Plaintiffs seek a declaration that the Rule is arbitrary and capricious under 5 U.S.C. § 706(2)(A) and without observance of procedure required by law under 5 U.S.C. § 706(2), as well as an injunction against the implementation and enforcement of the Rule. This relief is not directed at overturning or challenging a noncitizens' removal order, and demonstrates that plaintiffs' claims are independent of and collateral to the removal process.[25]

## II.     Adequacy of Comment Period

Plaintiffs' second claim for relief alleges that defendants violated the APA by providing only a 30 day comment period. Plaintiffs contend that the 30 day comment period denied the public a

---

[25] At the preliminary injunction hearing, counsel for the government cited a case that was not mentioned in the briefing, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), for the proposition that the INA's comprehensive enforcement and administrative review scheme precluded jurisdiction over plaintiffs' claims. *Thunder Basin* held that "the statutory-review scheme in the Federal Mine Safety and Health Amendments Act of 1977 . . . prevent[ed] a district court from exercising subject-matter jurisdiction over a pre-enforcement challenge to the Act." *Id.* at 203. The Court has reviewed *Thunder Basin* and finds that it does not alter this Court's conclusion that plaintiffs' claims are independent of and collateral to the removal process and therefore that this Court has jurisdiction.

United States District Court
Northern District of California

meaningful opportunity to comment on a rule of this magnitude, particularly in light of the challenges presented by the COVID-19 pandemic and the barrage of rulemaking and policy changes throughout 2020. Plaintiffs also argue that the staggered rulemaking prevented the public from considering and commenting on the interplay of numerous intersecting policy changes, and that the agency's piecemeal rulemaking also resulted in an arbitrary and capricious failure by the agency to consider the cumulative impact of multiple related and interlocking policy changes.

In opposition to plaintiffs' motion, defendants assert that the 30 day comment period "was sufficient to provide the public an opportunity to comment, given that 1,284 comments were received" and because plaintiffs "fail to show any prejudice." Opp'n at 5. Defendants also assert that any reliance on Executive Orders 12866 and 13563 "is misplaced" because those executive orders do not create any rights or benefits. *Id.* at n. 5. In their brief opposing plaintiffs' motion for a preliminary injunction, defendants do not address plaintiffs' arguments about the impact of staggered rulemaking or the COVID-19 pandemic.

The APA states, in relevant part,

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

. . .

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

5 U.S.C. § 553.

"After providing the required notice, the agency must provide for a comment process." *California ex rel. Becerra v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1172 (N.D.

Cal. 2019). "Among the purposes of the APA's notice and comment requirements are '(1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'" *Id.* (citations omitted.) "It does not matter that notice and comment could have changed the substantive result; the public interest is served from proper process itself." *California v. Azar*, 911 F.3d 558, 581-82 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, 139 S. Ct. 2716 (2019).

### A. 30 Days is Already Short for a Rule of this Scope

The Court concludes that plaintiffs have shown that they are likely to succeed on their claim that the notice process defendants used to promulgate the Rule was deficient under the APA because (1) the public was deprived of the opportunity to meaningfully review the proposed rule and provide informed comment, and (2) the staggered nature of this rulemaking in conjunction with other related rules resulted in an arbitrary and capricious failure to consider the combined impact of numerous intersecting policy changes.

The Court reaches this conclusion for several reasons. First, 30 days for a rule of this magnitude is already short.[26] *See Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) ("When substantial rule changes are proposed, a 30-day comment period is generally the *shortest* time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment.") (emphasis added). As plaintiffs and *amici* note, the NPRM was not, as EOIR described it, "a small, discrete set of procedures," 85 Fed. Reg. at 81,642, but a multi-faceted proposed rule that codified an Attorney General decision (*Matter of Castro-Tum*) that was the subject of a federal circuit split and implemented extensive changes to the

---

[26] In addition, as commenters noted, the 30 day comment period included Labor Day, a federal holiday, on Monday, September 7, 2020, and overlapped with the comment periods for the Asylum Procedures Rule and two other proposed rules affecting immigration promulgated by DHS. *See, e.g.*, Igra Decl. Ex. 6 (comment stating that "EOIR's choice not to provide a 60 [day] comment period is particularly damaging giving the multiple other immigration-related proposals that have overlapping comment periods with this rule" citing other rulemaking); *see also id*. Ex. 2 (similar).

United States District Court
Northern District of California

immigration court system that altered long-established policy and practice. Among other changes, the Rule significantly restricts or eliminates IJs' and the BIA's ability to administratively close cases and reopen or reconsider a case *sua sponte*; significantly limits the BIA's ability to remand cases; alters the appellate review process by allowing immigration judges to challenge BIA decisions; allows the BIA to affirm on any basis in the record and to engage in factfinding; grants authority to the EOIR director to resolve appeals pending more than 335 days; and dramatically changes the schedule and manner for appellate briefing. In light of the breadth and import of the new regulations, a 30 day comment period is extremely limited, a point noted by numerous commenters. *See, e.g.*, Igra Decl. Ex. 14 (Comment of Round Table of Former Immigration Judges, stating "[t]he reduction of time to 30 days violates the intent of Congress to give full deliberation to regulatory changes. As experienced adjudicators, we are in a unique position to contextualize these changes, but even with our experience, the breadth of the proposed regulations should allow for additional time to review and comment."). DOJ did not identify any exigent circumstances requiring a compressed comment period. *Cf. Florida Power & Light Co. v. U.S.*, 846 F.2d 765, 772 (D.C. Cir. 1988) (holding 15-day comment period was sufficient where "the Commission notes that Congress gave it only ninety days to report and forty-five more days to enact a final rule"). "While there is no bright-line test for the minimum amount of time allotted for the comment period, at least one circuit has recognized that 90 days is the 'usual' amount of time allotted for a comment period[.]" *Becerra*, 381 F. Supp. 3d at 1177 (quoting *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 453 (3d Cir. 2011), and internal citation omitted).

Moreover, in the NPRM and the Final Rule, defendants acknowledged that the Rule "constitutes a 'significant regulatory action,'" and stated that they "drafted the rule consistent with the principles of Executive Orders 12866 and 13563 . . . ." 85 Fed. Reg. at 81,463; *see also* 85 Fed. Reg. at 52,509 ("The Department has determined that this rule is a 'significant regulatory action' under section 3(f) of Executive Order 12866 . . . The Department certifies that this regulation has been drafted in accordance with the principles of Executive Order 12866 and Executive Order 13563."). While not binding, those executive orders state that "a comment period . . . should generally be at least 60 days." Exec. Order No. 13563, 76 Fed. Reg. 3821, 3821-22 (Jan. 18, 2011);

*see also* Exec. Order 12866, 58 Fed. Reg. 51735 § 6(a)(1) (Oct. 4, 1993). Thus, it is curious that EOIR certified that the Rule had been drafted in accordance with Executive Orders 12866 and 13563 and yet departed from those executive orders by providing a truncated 30 day comment period.

Defendants argue that because most of the plaintiffs here commented on the NPRM, plaintiffs cannot show they were harmed by the length of the notice period. Yet in *Riverbend Farms*, on which defendants rely, the Ninth Circuit cautioned that

> we must exercise great caution in applying the harmless error rule in the administrative rulemaking context. . . . An agency is not required to adopt a rule that conforms in any way to the comments presented to it. . . . Thus, if the harmless error rule were to look solely to result, an agency could always claim that it would have adopted the same rule even if it had complied with the APA procedures. To avoid gutting the APA's procedural requirements, harmless error analysis in administrative rulemaking must therefore focus on the process as well as the result. We have held that the failure to provide notice and comment is harmless only where the agency's mistake "clearly had no bearing on the procedure used or the substance of decision reached."

*Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992) (citations omitted). In any event, numerous commenters explained that there were topics they could not fully address because of the short comment period, and plaintiffs have submitted declarations explaining why they were unable to comment at all (Centro Legal), or why they were unable to provide meaningful comments on all of the issues important to them (ILRC, Tahirih, RAICES). *See* Patel Decl. (Centro Legal) ¶ 14; Quinn Decl. (ILRC) ¶¶ 22-24; Huang Decl. (Tahirih) ¶¶ 14-16; Garza Decl. (RAICES) ¶ 10.

### B. Impact of COVID-19 Global Pandemic

Second, the already-short 30 day comment period must be evaluated against the backdrop of the global COVID-19 pandemic. EOIR entirely dismissed the impact of the pandemic, stating that "the COVID-19 pandemic has no effect on the sufficiency of the 30-day comment period" because "[e]mployers around the country have adopted telework flexibilities to the greatest extent possible," "interested parties can use the available technological tools to prepare their comments and submit them electronically," and childcare concerns – raised by a number of commenters – "would apply regardless of the length of the comment period." 85 Fed. Reg. at 81,643. EOIR also stated that a 30 day comment period was sufficient because EOIR had provided a 30 day comment

United States District Court
Northern District of California

period when it proposed changes to BIA appeals in 2002, *see* 85 Fed. Reg. at 81,642.

These statements are wholly divorced from the reality of the COVID-19 pandemic which has caused significant and numerous hardships throughout society. EOIR disregarded the numerous comments from people and organizations who discussed the particular strains imposed by the COVID-19 pandemic on their ability to respond to the NPRM in 30 days, including technological and other challenges of working in a remote environment; the numerous and increased difficulties in performing immigration work due to restrictions imposed by the pandemic, including closures of immigration courts and USCIS and ICE offices, and COVID-19 spreading in jails and ICE detention facilities; and the increased burdens associated with new and heightened family and childcare obligations, including employees whose children were distance learning from home.[27] In addition,

---

[27] *See, e.g.*, Igra Decl. Ex. 3 at 7 (Tahirih comment, stating that the "30-day period has also proven insufficient in practice" because "all employees continue to perform mandatory telework, many while simultaneously caring for babies, toddlers, and/or school-age children. As a result, full-time Tahirih employees were expected to work no more than 32 hours per week during the comment period, with the expectations for part-time employees—two of whom were crucial to the drafting of these comments—reduced proportionally."); Ex. 4 at 2 (Pangea comment, stating that "Pangea's staff has been working from home since the pandemic began, which presents unprecedented difficulties in our immigration advocacy and direct representation work . . . Staff face losses in productivity and increased childcare and similar burdens as they attempt to provide competent representation to clients without access to office technology. . . . Immigration courts, USCIS offices, and ICE offices have been closed and reopened with short notice, increasing the workload of Pangea's staff as it navigates these changes. Jails and ICE detention facilities are COVID-19 hotspots, causing Pangea to invest significant resources in advocating for clients' immediate release. . . . In short, the global pandemic has had a significantly deleterious impact on Pangea's ability to respond to these regulations on short notice."); Ex. 5 at 15 (Immigrant Justice Network comment, stating that "immigration procedures have been regularly shifting in response to the new circumstances brought on by the pandemic. Practitioners have been required to expend additional time and resources to keep up-to-date with changes to immigration law and practice and to readily inform clients of the ever-changing legal landscape. The organizations have been working remotely and have more limited and inconsistent access to clients, physical documents, information, and technology needed to fully analyze and comment on the proposed rule, with minimal advance warning. Normal business operations have been dramatically disrupted, including those of DOJ and other federal agencies. The ongoing national emergency related to COVID-19 will thus prevent commenters from submitting thorough, detailed analyses within the restrictive 30-day timeframe proposed by the Agency."); Ex. 7 at 4 (Center for Gender & Refugee Studies comment, stating that staff is teleworking and "Many of us have family responsibilities which exacerbate the difficulties of working full-time from our homes. Elementary and secondary schools in our area did not re-open for in-person instruction in August and are entirely distance learning, so parents on our staff are responsible for making alternate arrangements to care for their children and support their education. . . . These factors have impeded our ability to analyze the Rule more thoroughly, research all potentially relevant international law and domestic law sources, and provide fully responsive comments."); Ex. 16 at 2 (Community Legal Services in East Palo Alto comment, stating that the "shortened comment period presents particular challenges" due to the pandemic, that staff are working at home, some staff have had family members contract COVID-19 and have needed to

1    government entities commented that their ability to respond to the proposed rule in 30 days was

2    severely hampered by the COVID-19 pandemic.[28]   An agency must "respond to 'relevant and

3    significant' comments," *Delaware Dep't of Nat. Res. & Envtl. Control v. E.P.A.*, 785 F.3d 1, 15

4    (D.C. Cir. 2015), and cannot simply "[n]od[] to concerns raised by commenters only to dismiss them

5    in a conclusory manner." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020).

6        As plaintiffs note, other parts of the federal government have acknowledged the difficulties

7    of conducting business during the pandemic.  *See, e.g.*, Debt Collection Practices (Regulation F);

8    Extension of Comment Period, 85 Fed. Reg. 30,890-891 (May 21, 2020) (in NPRM where initial

9    60 day comment period had already been extended by 30 days "in light of the challenges posed by

10   the COVID-19 pandemic," granting an additional 90 day extension of comment period because "the

11   Bureau agrees that the pandemic makes it difficult to respond to the SNPRM thoroughly and

12   determine when stakeholders will be able to do so"); *see also* http://www.supremecourt.gov/orders/

13   courtorders/031920zr_dlo3.pdf (extending the deadline to file any petition for writ of certiorari from

14   90 days to 150 days).  Indeed, the federal government described the pandemic in another finalized

15   rule published on December 23, 2020 as "causing tremendous human and economic hardship across

16   the United States. . . . The ongoing public health crisis will continue to weigh on economic activity,

17   employment, and inflation in the near term, and poses considerable risks to the economic outlook

18   over the medium term."  Security Bars and Processing, 85 Fed. Reg. 84,160-161 (Dec. 23, 2020).

19

20       **C.    "Staggered" Rulemaking**

21       Finally, the Court has serious concerns about the piecemeal method in which the

22   _____

23   assist with care, and because schools and daycare have been closed, many staff have needed to care
     for children in addition to their work duties). These are just a few examples of the comments
24   submitted regarding the insufficiency of the 30 day comment period and the impact of the COVID-
     19 pandemic.

25       [28] For example, the County of Los Angeles, Department of Consumer and Business Affairs,
26   stated that "[t]he shortened comment period is inappropriate given the importance and complexity
     of the Proposed Rule, and it presents particular challenges because the public, including key
27   stakeholders like the County, are battling the COVID-19 pandemic.  Not only are the County's
     resources diverted as it manages its public health response, but its resources have been depleted by
28   the worsening economic crisis."  Igra Decl. Ex. 8 at 7; *see also id*. Ex. 18 (Comment by Mayor of
     City of Minneapolis).

United States District Court
Northern District of California

Departments published this NPRM and other related proposed rules. Indeed, a number of significant policy and regulatory changes were announced in the final days of the comment period or after the comment period had closed, and those changes directly intersect with this Rule in a variety of ways. The limited 30 day comment period for this Rule combined with the timing of these other rules deprived the public of the opportunity to consider how these rules intersected and impacted the Rule, and also raise serious questions about whether the agency "meaningfully addressed the interaction of these rules." *Casa de Maryland, Inc. v. Wolf*, __ F. Supp. 3d __, Civil Action No. 8:20-cv-02118-PX, 2020 WL 5500165, at *26 (D. Md. Sept. 11, 2020) (finding plaintiffs were likely to succeed on APA claims challenging rulemaking process where DHS staggered notice and comment period for two interrelated asylum rules because DHS "never meaningfully addressed the interaction of these rules, [and] it also never accounted for those comments cutting to the heart of the adverse impact the rules visit in combination."); *Immigrant Legal Res. Ctr. v. Wolf*, __ F. Supp. 3d __, Case No. 20-cv-05883-JSW, 2020 WL 5798269, at *14 (N.D. Cal. Sept. 29, 2020) (finding plaintiffs were likely to succeed on APA claims because "[b]y failing to consider the combined impact of these rules, DHS either failed to consider an important aspect of the problem and disregarded 'inconvenient facts' about the combined impact of these rules, or DHS reached a conclusion that defies common sense") (internal citations omitted).

The EOIR Fee Rule, which was finalized on December 18, 2020, dramatically increased the fee for BIA appeals (from $110 to $975) and for motions to reopen and reconsider (from $110 to $895). In the Final Rule in this case, EOIR denied "any sort of nefarious purpose" of promulgating multiple related rules in 2020, and stated that "the interplay and impact of all of these rules [the EOIR Fee rule and "other multiple proposed rules in 2020"] is speculative at the present time due to both ongoing and expected future litigation—which may allow all, some, or none of the rules to ultimately take effect—and the availability of fee waivers, 8 C.F.R. § 1103.7(c), which may offset the impact of some of the increases." 85 Fed. Reg. at 81,594. Thus, EOIR expressly did not consider the interplay and impact of the EOIR Rule and other rules on the Rule in this case.[29] An agency

---

[29]   EOIR also stated, "Moreover, even if all rules were in effect, the Department has concluded that the benefits of the instant rule discussed in the NPRM, e.g., 85 FR at 52509 and

United States District Court
Northern District of California

1    cannot shirk its obligation to "consider an important aspect of the problem," such as the interplay of

2    other administrative rules that directly impact this Rule, by asserting that any such impact is

3    "speculative" due to ongoing and expected future litigation.

4        The Omnibus Asylum Rule, finalized on December 11, 2020, restricted the discretion of IJs

5    or the BIA to consider motions to reopen based on changed country conditions by providing that

6    "adjudicators should consider as a significant adverse factor the failure to file such a motion within

7    one year of the change in country conditions." 85 Fed. Reg. at 36,264. However, in the Final Rule,

8    EOIR repeatedly referred to the availability of motions to reopen based on changed country

9    conditions when responding to comments about the elimination of the BIA's *sua sponte* reopening

10   authority. *See, e.g.*, 85 Fed. Reg. at 81,629 (responding to comments about unaccompanied minor

11   children by stating that "[t]he Department further emphasizes that safeguards for [unaccompanied

12   minor children] seeking asylum remain in place on motions to reopen that are premised on changed

13   country conditions"); *id*. at 81,832 (responding to comments that elimination of *sua sponte*

14   reopening violated the United States' obligations under international law by stating that "this rule

15   does not affect the ability of aliens to file a motion to reopen to apply for asylum or statutory

16   withholding of removal based on changed country conditions and supported with new, material

17   evidence"); *id*. at 81,634-635 (responding to comments that the rule provides DHS with preferable

18   treatment by stating that "there is not a limitation when the motion to reopen is for the purpose of

19   applying or reapplying for asylum or withholding of removal based on changed country conditions

20   'if such evidence is material and was not available and could not have been discovered or presented

21   at the previous hearing.'").

22       The Asylum Procedures Rule was promulgated on September 23, 2020, three days before

23   the end of the comment period on the Rule. The Asylum Procedures Rule established a 15-day

24   filing deadline for noncitizens applying for asylum and withholding of removal in removal

25   proceedings, in addition to numerous other changes to the procedures for the submission and

26   _____

27   herein—as well as the benefits discussed in the other rules, e.g., 85 FR at 11870—ultimately
     outweigh any combined impact the rules may have on aliens, particularly vis-[a]-vis fee increases

28   for appeals and motions to reopen." *Id*. This conclusory statement is devoid of any analysis of the
     "combined impact the rules may have."

consideration of applications for asylum, statutory withholding of removal, and protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture. *See* 85 Fed. Reg. at 81,699. The elimination of the authority to *sua sponte* reopen cases forecloses an avenue of relief for noncitizens who miss the 15-day filing deadline. Numerous commenters expressed the concern that they were unable to assess the interaction between the Final Rule and the Asylum Procedures Rule because the Asylum Procedures Rule was promulgated just days before the end of the comment period. *See, e.g.*, Igra Dec. Ex. 2 at 2 (American Immigration Lawyers Association comment); Ex. 4 at 2 (Pangea comment); Ex. 6 at 2 (individual comment); Ex. 10 at 3 (National Immigration Law Center comment).

*Matter of A-C-A-A-*, 28 I. & N. Dec. 84 (A.G. 2020), was issued on September 24, 2020, two days before the end of the comment period. This Attorney General decision intersects with the Rule because it significantly expands the scope of issues that will need to be briefed on appeals to the BIA. Commenters stated that it was difficult to assess the interplay between *A-C-A-A-* and the Final Rule because of the timing and short comment period. *See, e.g.*, Igra Decl. Ex. 6 at 2 (individual comment).

The Continuance NPRM and Motion to Reopen NPRM were both promulgated on November 27, 2020, after the close of the comment period. The Continuance NPRM proposes to "provide a clearer definition of 'good cause' and the situations in which it is shown to warrant a postponement, continuance, or adjournment in immigration proceedings." 85 Fed. Reg. at 75,925. Among a number of proposed changes, the Continuance NPRM "would codify scenarios in which 'good cause' is not shown. . . . [including] where the continuance: Would not materially affect the outcome of the proceedings; is requested by a party who has not demonstrated a likelihood of obtaining relief in a collateral matter, where such relief is the basis for the request. . . . " *Id*. In addition, the Continuance NPRM would amend 8 C.F.R. § 1003.29 to provide that "a continuance request to apply for a non-immigrant visa . . . does not demonstrate good cause unless . . . [t]he alien demonstrates that final approval of the visa application . . . will occur within six months of the request for a continuance." 85 Fed. Reg. at 75,940.

The Continuance NPRM directly intersects with the Rule in this case because EOIR pointed

45

to the availability of continuances in responding to comments raising concerns about impact of the elimination of administrative closures on noncitizens who were seeking collateral relief from USCIS. *See, e.g.*, 85 Fed. Reg. at 81,598 n.24 ("the Department notes that there are other potential tools available to respondents with pending relief or actions outside of EOIR, including requesting a continuance or working with DHS counsel to file a motion to dismiss. *See* 8 CFR 1003.29, 1239.2(c)"); *see also id.* at 81,647 ("In addition, in the context of the changes regarding administrative closure, the Department emphasizes that the alien may continue to proceed with their relief applications before USCIS and seek continuances before EOIR").[30]

Similarly, the Motion to Reopen NPRM proposes a number of changes to "clarify" how motions to reopen or reconsider are adjudicated, including *inter alia* "establish[ing] uniform procedural and substantive requirements for the filing of motions to reopen based on a claim of ineffective assistance of counsel," and "clarify[ing] that immigration judges and the BIA may not automatically grant a motion to reopen or reconsider that is jointly filed, that is unopposed, or that is deemed unopposed because a response was not timely filed." 85 Fed. Reg. at 75,951,[31] 75,949.

---

[30] Plaintiffs allege that "the Rule's reliance on continuances is also disingenuous because on January 8, 2021, Defendant McHenry issued a memo restricting access to continuances . . . ." Compl. ¶ 154. *See* Memorandum from EOIR Dir. James McHenry to the EOIR (Jan. 8, 2021), https://bit.ly/38udq1T. Defendants assert that McHenry's memo "reiterated established law and did not purport to direct particular outcomes that derogate from applicable law and rules." Opp'n at 17 n. 10. The government also asserts that the Continuance NPRM did not change existing law. That assertion begs the question of why the Continuance NPRM was promulgated if it in fact did not change existing law.

[31] The new proposed requirements for a motion to reopen based upon ineffective assistance of counsel include that a noncitizen file the following items:

First, it would require an affidavit or written statement executed under penalty of perjury that details the agreement between counsel and the individual. The affidavit or written statement must include the actions to be taken by counsel and the representations counsel did or did not make regarding such actions. Moreover, to ensure that the alien fully understands what he is alleging, the affidavit or written statement must also identify who drafted it, if the alien did not, and contain an acknowledgment by the alien that the affidavit or written statement had been read to the alien in a language the alien speaks and understands, and that the alien, by signing, affirms that he understands and agrees with the language of the affidavit or written statement.

A copy of any representation agreement must be included with the affidavit or written statement, or the individual should explain its absence and provide any reasonably available evidence regarding the scope of the agreement and reasons for its absence.

1      The Motion to Reopen NPRM directly relates to the Rule in this case because the Department

2  cited the ability to file motions to reopen, including joint motions, when justifying the elimination

3  of the BIA's authority to *sua sponte* reopen cases, as well as the limitations on the BIA's ability to

4  remand to consider new evidence. *See, e.g.*, 85 Fed. Reg. at 81,629 ("Nevertheless, aliens who

5  reach agreement with DHS regarding the validity of their changed claim may jointly file a motion

6  to reopen with DHS regardless of the amount of time that has passed since the underlying final

7  order. . . . The rule does not affect that pre-existing exception to the time and number limitations on

8  motions to reopen.  In addition, the deadline for filing a motion to reopen by aliens who have been

9  the victims of fraud, ineffective assistance of counsel, and other harms may be subject to equitable

10  tolling."); *id.* at 81,647 ("Similarly, aliens may continue to utilize motions to reopen, including those

11  filed as joint motions or those based on equitable tolling, in lieu of filing improper motions to reopen

12

13  _____

        The proposed rule would allow the BIA or an immigration judge to excuse the
14  requirement to submit an affidavit or written statement, and accompanying evidence
    regarding the representation agreement, as a matter of discretion in the case of a
15  motion filed by a pro se alien.

16      Second, the proposed rule would require evidence of the individual's notice to
    counsel informing him the allegations and that a motion to reopen based on such
17  allegations will be filed.  The individual must provide evidence of the date and
    manner in which he or she provided such notice, as well as counsel's response, if
18  any. If there were no response, the individual must say so.  The proposed rule would
    provide two exceptions to this requirement: When prior counsel is deceased, or when
19  the alien exercised reasonable diligence in the attempt to locate prior counsel but was
    unable to do so.

20      Third, the proposed rule would require that the alien file a complaint with the
21  appropriate disciplinary authorities and with EOIR disciplinary counsel.  For
    attorneys in the United States, the alien must file a complaint with the disciplinary
22  authority of a State, possession, territory, or Commonwealth, or of the District of
    Columbia, that licensed the attorney to practice law.  For accredited representatives
23  as defined in 8 CFR part 1292, the individual must file a complaint with the EOIR
    disciplinary counsel pursuant to 8 CFR 1003.104.  For persons whom the individual
24  reasonably but erroneously believed to be an attorney or accredited representative as
    defined in 8 CFR part 1292, and who was retained for the purpose of representation
25  in immigration proceedings, the individual must file a complaint with an appropriate
    federal, State, or local law enforcement agency that has authority to address matters
26  involving unauthorized practice of law or immigration-related fraud.  In all cases, the
    individual must file a complaint with EOIR disciplinary counsel.  The individual
27  must include with the motion to reopen a copy of the complaint(s) and any
    subsequent related correspondence, unless the counsel is deceased.

28  *Id.* at 75,951-952.

47

sua sponte."); *id.* at 81,589 ("Parties who wish to have new evidence considered in other circumstances may file a motion to reopen in accordance with the standard procedures for such motions . . . .").

In sum, because numerous intertwined proposed rules were promulgated at different times, including after the close of the comment period in this case, the true impact of the Final Rule was obscured and the public was deprived of a meaningful opportunity to comment. Further, by failing to consider the combined impact of all of these rules, EOIR "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 43 (1983) ("*State Farm*"); *see also N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (explaining, "because the Department did not provide a meaningful opportunity for comment, and did not solicit or receive relevant comments regarding the substance or merits of either set of regulations, we have no difficulty in concluding that the Department 'ignored important aspects of the problem[,]'" and finding rule was arbitrary and capricious under the APA); *see also Portland Cement Ass'n v. E.P.A.*, 655 F.3d 177, 187 (D.C. Cir. 2011) ("[A]n agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking.").

## III. Arbitrary and Capricious

Plaintiffs' first claim for relief alleges that the Rule is arbitrary and capricious under the APA. "[T]he touchstone of arbitrary and capricious review . . . is reasoned decisionmaking." *E. Bay Sanctuary Covenant*, 964 F.3d at 849 (internal quotation marks and citations omitted). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Agency action is also arbitrary and capricious if, "[w]hen an agency changes course," it fails to take into account "that longstanding policies may have

engendered serious reliance interests[.]" *Regents*, 140 S. Ct. at 1913 (internal quotation marks and citations omitted). Although an agency is not required to "consider all policy alternatives in reaching [its] decision[,]" where the agency is "not writing on a blank slate, . . . it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1914-15 (internal quotation marks and citations omitted).

Before turning to the three specific changes implemented by the Rule that plaintiffs challenge in their briefing as examples of arbitrary and capricious decisionmaking, the Court makes the following finding that is generally applicable to the Rule. DOJ and EOIR stated that the changes implemented by the Rule were designed to "ensure the consistency, efficiency, and quality of its adjudications," and the departments repeatedly referred to the backlog at the immigration courts and the need to improve "efficiency" as justifications for the various proposed changes. *See, e.g.*, 85 Fed. Reg. 81,588, 81,593, 81,598, 81,599-601, 81,603-606, 81,610, 81,631, 81,648.

However, although EOIR had recently commissioned a year-long study by Booz Allen Hamilton to analyze the immigration court system and to make recommendations on how to address the backlog and improve efficiency, nowhere in the NPRM or the Final Rule is there any discussion of that study or any of its findings or recommendations. Indeed, government counsel expressly stated at the hearing that the report was *not* considered by DOJ and EOIR in conjunction with the rulemaking and that the report is not part of the administrative record.[32] As noted *supra*, the Booz Allen Hamilton report made a number of findings regarding factors contributing to the backlog, as well as specific recommendations about how EOIR could streamline and improve procedures and enhance efficiency, including recommendations that touch upon issues directly impacted by the Rule, such as administrative closure, the lack of electronic filing, and oral decisions. *See generally* Booz Allen Hamilton Report, *supra*, at 19-26 (discussing findings and recommendations about, *inter alia*, understaffing, delays in hiring, technology, oral decisions, interpretation issues, and

---

[32] The government's lawyer also could not explain why EOIR had not considered the Booz Allen Hamilton Report in this rulemaking, nor did she have any information about what, if anything, the agency had done as a result of the report.

United States District Court
Northern District of California

external dependencies such as "ballooning caseload," "immigration trends," "recent surge in assignments of IJs to detained dockets," "biometric screening delays" and "hiring and budgetary freezes").

Whether the EOIR consultant's findings and recommendations are sound and should be adopted is not the question before the Court. Rather, this Court is tasked with evaluating whether DOJ and EOIR engaged in reasoned decisionmaking in proposing and adopting numerous sweeping changes that are purportedly aimed at improving efficiency. The fact that EOIR did not even mention or consider the report it specifically commissioned to analyze the very concerns that purportedly animate the Rule raises significant questions as to whether the agency "entirely failed to consider an important aspect of the problem [and] offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. If EOIR disagrees with the findings and recommendations of its consultant, that is the agency's prerogative. However, as a matter of process and reasoned decisionmaking, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Delaware Dep't of Nat. Res. & Envtl. Control*, 785 F.3d at 11 (internal quotation marks and citations omitted). "To be regarded as rational, an agency must also consider significant alternatives to the course it ultimately chooses." *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). Here, for reasons that are unexplained, EOIR apparently chose to exclude from consideration in its rulemaking process a report that presented "significant alternatives to the course it ultimately cho[se]" to improve efficiency and reduce the case backlog in the immigration court system. *Id.* This approach does not comport with the APA.

The Court now turns to the three changes that were the focus of the preliminary injunction briefing: changes to the briefing schedule, restrictions on administrative closure, and the elimination of *sua sponte* reopening.

### A.    Changes to Briefing Schedule

Plaintiffs contend that in changing the briefing schedule for BIA appeals, DOJ and EOIR failed to consider numerous important aspects of the problem. Plaintiffs assert that the changes to

the appellate briefing schedule will lead to less effective representation and will make it so onerous to mount appeals that noncitizens will be effectively deprived of the right to appeal to the BIA, the right to counsel of their choosing (at no expense to the government), and a reasonable opportunity present arguments and evidence to the BIA. Plaintiffs also claim that defendants' justifications for the changes (such as to prevent "gamesmanship") are arbitrary, irrational and without factual support, and that rather than resulting in purported efficiencies, these changes will create inefficiencies because requests for extensions must be evaluated for individualized good cause and simultaneous briefing will result in more requests to file reply briefs. Plaintiffs also assert that the delays in adjudication at the BIA are not attributable to the time spent briefing. In addition, plaintiffs contend that defendants did not consider how the new briefing procedures interact with other changes in the Rule, such as the BIA's new authority under the Rule to affirm on any basis in the record, discussed *supra*, and, after *Matter of A-C-A-A-*, the requirement that the BIA cannot rely on parties' stipulations.

Defendants largely reiterate the agency's efficiency justifications for the changes to the briefing schedule. For example, defendants state that "the Rule highlighted the lack of any reason or incentive for a noncitizen to 'wait until a briefing schedule has been issued or a brief is due before retaining representation,' as well as the Department's expectation 'that most aliens whose cases are on appeal will obtain representation as quickly as possible, especially in cases in which the respondent files the Notice of Appeal.'" Opp'n at 20-21 (quoting 85 Fed. Reg. at 52,498). Similarly, defendants assert that the agency did "seriously weigh alternative solutions that would enhance efficiency, such as e-filing" because "the Rule states that the Department expects that 'in early 2021, registered attorneys . . . will be able to immediately view and download documents for cases with electronic records of proceeding, which will mitigate commenters' concerns about mail service and its potential effect on briefing schedule timing.'" Opp'n at 21 (quoting 85 Fed. Reg. at 81,638).

The Court concludes that plaintiffs have shown a likelihood of success on the merits regarding whether defendants "entirely failed to consider an important aspect of the problem," *see State Farm,* 463 U.S. at 43, when implementing the changes to the briefing schedule. The two

51

examples cited above demonstrate why.[33]  The agency repeatedly maintained that noncitizens and their lawyers would not be impacted by the significantly compressed briefing schedule by asserting that there was no reason why a noncitizen would wait until a briefing schedule had been issued to seek representation for a BIA appeal.  However, as numerous commenters explained, the vast majority of individuals appearing before immigration courts are *pro se*, many do not speak English, and—of critical importance—because of the EOIR's own procedures, which remain unchanged by the Rule, IJs often issue their orders orally; it is generally not until the BIA issues and *mails* the briefing schedule, transcript, and a copy of the IJ's order, that the noncitizen has the documents necessary in order to seek representation.  *See, e.g.*, Igra Decl. Ex. 25 at 3-8 (National Immigrant Justice Center comment); Ex. 26 at 35 (APBCO comment); *see also* Patel Decl. ¶¶ 19-20; Garza Decl. ¶¶ 21-30.[34]  For the same reasons, as numerous practitioners as well as former immigration judges commented, it is generally not possible to begin writing the appellate brief prior to receiving the transcript, order and briefing schedule.  *See, e.g.*, Igra Decl. Ex. 9 at 5-10 (CLINIC comment); 14 at 26 (Roundtable of Former Immigration Judges comment); *see also* Garza Decl. ¶ 28 ("Preparing BIA briefs without the transcript is incredibly difficult.  It is essentially 'practicing in the dark.'  Drafting a BIA brief before receiving the immigration judge's order and the transcript is simply not a feasible option."); *see also Amicus Curiae* Brief of Former Immigration Judges at 4-7.[35]

---

[33] As such, the Court finds it unnecessary to address every specific argument and example raised by the parties.  However, as a general matter, the Court finds the agency did not provide a reasoned basis for the scheduling changes, including the imposition of simultaneous briefing.

[34] Indeed, the practice of issuing oral decisions was the subject of one of the Booz Allen Hamilton Report's recommendations.  The Report found that "[l]imitations inherent in oral decisions make it difficult for respondents, BIA and circuit courts to examine the IJ's reasoning upon appeal in complicated cases" and the Report recommended implementing processes to increase the issuance of written decisions.  Booz Allen Hamilton Report, *supra* at 25.

[35] At the hearing, counsel for the government asserted that noncitizens and lawyers could obtain the audiotapes of immigration court proceedings through a Freedom of Information Act request, and thus be able to secure representation for appeal and/or prepare appellate briefs prior to the issuance of the transcript, order and briefing schedule.  Particularly in the context of a Rule that is purportedly driven by efficiency concerns, this suggestion strains credulity.  Numerous commenters and plaintiffs in this case explained why a FOIA request is a lengthy, inefficient process.  *See, e.g.*, Igra Decl. Ex. 4 at 14 (Pangea comment stating "It often takes weeks or even months for EOIR's FOIA office to respond to a FOIA request and provide a copy of the EOIR file

United States District Court
Northern District of California

Further, the agency completely disregarded the fact that the challenges of briefing on a compressed timetable are compounded by the BIA's mail-based system, failure to follow the "mailbox rule," and unpredictable briefing schedules.  The agency's reliance on the *future* implementation of an electronic filing system to abate the concerns of a paper- and mail-based system is entirely unavailing and a quintessential example of arbitrary and capricious decisionmaking.  As discussed *supra*, at the hearing on this matter on March 9, 2021, counsel for the government stated that the electronic filing system <u>had not yet been implemented and that there was "no timetable" for doing so</u>.  As such, the agency's dismissal of commenters' concerns about the compressed briefing schedule and restrictions on extensions based upon a not-yet implemented electronic filing system does not demonstrate a "rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43.

Moreover, the agency entirely dismissed the impact of imposing the briefing schedule changes during the COVID-19 pandemic, a concern raised by numerous commenters.[36]  The agency stated,

> [T]he Department recognizes the challenges caused by the pandemic.  However, those challenges are largely inapplicable to the BIA which has maintained generally regular operations during the COVID-19 outbreak because it typically receives briefs by mail or expedited courier service, and it began accepting briefs by email during the pandemic until after it was cleared to enter Phase Two of the Department's plan for returning to normal operations.  Moreover, the BIA is scheduled to adopt ECAS[37] in early 2021.  Consequently, these challenges do not warrant maintaining the regulatory maximum length for a briefing extension, particularly since the BIA has

---

to appellate counsel.  In several cases, Pangea has been unable to obtain a copy of the EOIR file before the briefing deadline, even after a 21-day extension is granted."); Patel Decl. ¶ 20 ("When Centro Legal takes an appeal for a detained noncitizen who appeared *pro se* in the immigration court, or takes over an appeal of a case previously handled by another attorney, our lawyers have difficulty obtaining these records and typically have to submit [FOIA] requests for the records. These requests often take months to be fulfilled.  Given the necessity of reviewing and referencing the record when briefing an appeal, immigration attorneys are often required to seek an extension of time for BIA briefs, even if their client is detained.").

[36] Indeed, several commenters decried the changes as "unconscionable" during the context of the pandemic.  *See, e.g.*, Igra Decl. Ex. 25 at 9 (National Immigrant Justice Center comment). Other commenters noted that due to remote working, employees are not in the office to regularly process the mail.  *See, e.g.*, Igra Decl. Ex. 9 at 9 (CLINIC comment).

[37] ECAS is the electronic EOIR Court & Appeals System that the BIA has not yet adopted.

United States District Court
Northern District of California

1    shortened that length already by policy—which has remained in effect during the
     COVID-19 outbreak—with no noted adverse effects or challenges.

2    85 Fed. Reg. at 81,637 (internal footnote omitted).

3         Implementing shortened deadlines and simultaneous briefing, in conjunction with all of the

4    other changes discussed *passim*, would be extremely burdensome at any time (particularly on

5    detained noncitizens), for all of the reasons stated by plaintiffs and commenters.  However, to

6    implement these changes during a global pandemic, before an electronic case filing system has been

7    implemented and at time when the U.S. Postal Service is experiencing historic backlogs[38]—without

8    any consideration for how these factors would impact the ability of noncitizens and their

9    representatives to comply with truncated briefing schedules—demonstrates that the agency "entirely

10   failed to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.

11

12   **B.    Administrative Closure**

13        Plaintiffs and *amici*[39] contend that the elimination of administrative closure will lead to the

14   deportation of noncitizens who have meritorious claims for relief pending before USCIS, such as

15   through VAWA self-petitions and applications for U and T  visas and SIJ status.  They also contend

16   that, particularly when combined with other changes implemented through the Rule, such as the

17   elimination of motions to remand for new evidence and *sua sponte* motions to reopen, the

18   elimination of administrative closure will make it impossible for many noncitizens to pursue various

19   forms of relief that Congress has made available through statutes, and will lead to refoulement of

20   noncitizens in violation of the United States' treaty obligations.[40]  Plaintiffs also contend that the

21

22        [38]  The United States Postal Service experienced historic backlogs and delays throughout
     2020 and continuing to the present, an issue that numerous commenters raised and that has been

23   widely reported by the media.  *See, e.g.*, Igra Decl. Ex. 25 at 9 (National Immigrant Justice Center
     comment); Quinn Klinefelter, "There's No End in Sight": Mail Delivery Delays Continue Across

24   the Country, NPR (Jan. 22, 2021), http://npr.org/2021/01/22/959273022/theres-no-end-in-sight-
     mail-delivery-delays-continue-across-the-country.  The mails delays were noted by commenters.

25   *See, e.g.*, Igra Decl. Ex. 25 at 9 (National Immigrant Justice Center comment).

26        [39]  The briefs filed by *amicus curiae* Domestic Violence and Human Trafficking Survivor

27   Organizations and KIND provide numerous specific real-life examples of how administrative
     closure has been used in cases to allow survivors of domestic violence and human trafficking,
     including children, to pursue claims for relief before USCIS and state courts.

28        [40]  "Refoulement occurs when a government returns aliens to a country where their lives or

54

justifications provided for the Rule do not withstand scrutiny because administrative closure enhances immigration court efficiency, and they note that EOIR's own consultant Booz Allen Hamilton recommended that EOIR work with DHS "to identify policy improvements . . . include[ing] to administratively close cases awaiting adjudication in other agencies or courts." Booz Allen Hamilton Report, *supra* at 26. Plaintiffs also argue that the use of administrative closure was not inconsistent with the prior regulations, as the Fourth and Seventh Circuits found in *Romero*, 937 F.3d at 292, and *Meza Morales*, 973 F.3d at 665; that administrative closure is not the same as the exercise of prosecutorial discretion; and that the agency failed to consider the effect of the Rule on the availability of hardship wavers of unlawful presence under 8. U.S.C. § 1182(a)(9)(B)(v).

Defendants assert that the Rule "reflects a balance between the need for resolution of immigration cases while still providing avenues for administrative closure in discrete circumstances" and that the Rule "also encourages the separation of EOIR from the function of the DHS prosecutor in determining which immigration cases should or should not be adjudicated." Opp'n at 16. Defendants contend that "other procedural remedies—such as continuances—may be used to seek non-speculative relief," and that the Rule adds clarity to an unsettled area of law due to the federal circuit split after *Matter of Castro-Tum* regarding the authority of IJs and the BIA to use administrative closure.

The Court concludes that plaintiffs have shown that they are likely to succeed on the merits of their claim that DOJ and EOIR engaged in arbitrary and capricious decisionmaking with regard to the restrictions on administrative closure. Although EOIR justified the near-elimination of administrative closure partially on efficiency grounds, EOIR did not meaningfully address the extensive contrary evidence showing that administrative closure enhances efficiency. *See generally Avetisyan*, 25 I. & N. Dec. at 695 (stating that administrative closure facilitates "efficient management of the resources" of the immigration courts by allowing IJs and the BIA to manage their dockets), including comments submitted by former immigration judges. *See also* Igra Decl.

---

liberty will be threatened on account of race, religion, nationality, membership of a particular social group, or political opinion. The United States is obliged by treaty and implementing statute . . . to protect against refoulement of aliens arriving at our borders." *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1087-88 (9th Cir. 2020) ("*Innovation Law Lab II*").

Ex. 14 at 12 (Round Table of Former Immigration Judges comment stating "[w]e strongly oppose the proposed amendments . . . that generally eliminate administrative closure. . . . The rationale provided in the proposed regulations is not consistent with our collective experience as adjudicators who used administrative closure as an important and effective tool for docket management); Ex. 20 at 1-2 (National Association of Immigration Judges comment stating "administrative closure is an important tool for Immigration Judges to efficiently and fairly manage their dockets"); *see also Amicus Curiae* Brief of Former Immigration Judges at 11-16. Indeed, the Fourth Circuit found that the Attorney General's efficiency justification in *Matter of Castro Tum*—the same efficiency rationale cited in the NPRM and Final Rule—was "internally inconsistent":

> Although one of its purported concerns is efficient and timely administration of immigration proceedings, it would in fact serve to lengthen and delay many of these proceedings by: (1) depriving IJs and the BIA of flexible docketing measures sometimes required for adjudication of an immigration proceeding, as illustrated by Avetisyan, and (2) leading to the reopening of over 330,000 cases upon the motion of either party, straining the burden on immigration courts that *Castro-Tum* purports to alleviate.

*Romero*, 937 F.3d at 297. And as noted *supra*, the EOIR's consultants recommended that EOIR work with DHS to explore developing policies regarding administrative closure, and yet EOIR did not discuss or consider that recommendation in its rulemaking.

Further, the Department dismissed and minimized concerns raised by numerous commenters that the elimination of administrative closure would lead to the deportation of noncitizens with meritorious claims for relief, including in violation of the United States' non-refoulement obligations under international law. The Department stated that administrative closure would "remain available" in certain situations, *see* 85 Fed. Reg. at 52,503, but the Department did not meaningfully engage with the hundreds of comments expressing alarm that the changes would effectively eliminate the availability of administrative closure for the vast majority of noncitizens in removal proceedings, including people for whom Congress has specifically crafted humanitarian relief. *See Michigan v. EPA*, 576 U.S. 743, 753 (2015) (noting agencies are required to "pay[ ] attention to the advantages and the disadvantages of agency decisions").

Similarly, the agency's response to comments that the Rule conflicted with other provisions of the INA, as interpreted by DHS, raises serious questions about whether the agency adequately

considered other important aspects of the issue:

> The Department also disagrees with commenters that this rule conflicts with section 212(a)(9)(B)(v) of the Act, 8 U.S.C. 1182(a)(9)(B)(v), as interpreted by DHS in 8 CFR 212.7(e)(4)(iii), which makes a person in removal proceedings ineligible for a provisional unlawful presence hardship waiver[41] unless the proceedings are administratively closed. Regulations solely promulgated by and binding on DHS do not confer independent authority on immigration judges or the Board, and DHS does not have the power to provide immigration judges with the general authority to grant administrative closure or to prohibit EOIR from interpreting its own regulations, so any interpretation of § 212.7(e)(4)(iii) attempting to do so would be erroneous. . . . The Department has considered the interplay of EOIR and DHS's regulations regarding provisional unlawful presence waivers and has decided to continue with a general prohibition on administrative closure in immigration proceedings before EOIR. DHS chose to limit the eligibility for provisional unlawful presence waivers as a matter of policy. *See* 78 FR at 544 (explaining that DHS chose to limit eligibility to aliens with administratively closed removal proceedings in order to be "consistent with [DHS's] established enforcement priorities"). DHS may choose to update their regulations as a result of the Department's amendments regarding administrative closure authority, but any concerns with DHS's policy decisions are outside the scope of this rule.

85 Fed. Reg. at 81,599. Notwithstanding DHS's previous determination that "individuals granted voluntary departure will not be eligible for provisional waivers," 81 Fed. Reg. at 50,256, EOIR stated in the Rule that eliminating administrative closure would not have "any impact on an alien's ability to obtain an order of voluntary departure and then a provisional waiver before departing to receive the final waiver abroad." 85 Fed. Reg. at 81,601. The agency did not provide a "reasoned basis" for its conclusion that eliminating closure would not impact the ability of a noncitizen was in removal proceedings to obtain a provisional unlawful presence hardship waiver. *See also Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020) (finding policy arbitrary and capricious where it failed to consider how the policy affected certain statutory mandates).

---

[41] Under 8 U.S.C. § 1182(a)(9)(B), an individual who has accrued more than 180 days of unlawful presence in the United States and then leaves the United States is generally inadmissible for a specified period after the individual's departure. Under the provisional unlawful presence hardship waiver process, the Secretary of DHS has discretion to waive this ground of inadmissibility if the Secretary finds that denying the applicant's admission to the United States would result in extreme hardship to the applicant's United States citizen or lawful permanent resident spouse or parent. 8 U.S.C. § 1182(a)(9)(B)(v); *see also* 8 C.F.R. § 212.7(e); 81 Fed. Reg. 50,244, Expansion of Provisional Unlawful Presence Waivers of Inadmissibility (July 29, 2016). The regulations provide that those in removal proceedings may apply for and be granted provisional waivers only if their removal proceedings have been and remain administratively closed. *See* 8 C.F.R. § 212.7(e)(4)(v) (2021).

C.    **Elimination of *Sua Sponte* Reopening**

Plaintiffs and *amici* contend that *sua sponte* reopening is essential to prevent injustice because it may be the sole mechanism for many noncitizens to obtain relief from removal orders, such as lawful permanent residents with removal orders based on criminal convictions who may have grounds to reopen their cases based upon a change of law, post-conviction relief, or a pardon. *See generally Amicus Curiae* Brief of Public Defender Officers, Law School Clinics, and Other Legal Services Providers (Dkt. No. 36-1); *Amicus Curiae* Brief of 28 Cities and Counties (Dkt. No. 32-1). Plaintiffs assert that *sua sponte* reopening is also important for those who become eligible to adjust to lawful permanent status after receiving their removal orders, such as an individual who marries a U.S. citizen.

Plaintiffs contend that defendants' elimination of *sua sponte* authority is arbitrary and capricious because, *inter alia,* defendants failed to consider the problem that the Rule blocks relief for some noncitizens no matter how compelling their claims and equities; defendants did not explain EOIR's assertion that the long-standing practice may be subject to "possible abuse"; the efficiency and finality justifications are contrary to the evidence; and the agency departed from long-standing practice without satisfying their obligation to assess whether there were reliance interests at stake.

Defendants respond that the departments provided reasonable justifications for removing *sua sponte* authority, asserting that the practice circumvented congressional limits on motions to reopen because the BIA and IJs rarely used "genuine sua sponte authority" and instead usually invoked such authority in response to a noncitizen's motion. *See* 85 Fed. Reg. at 52,505; 85 Fed. Reg. at 81,628 (stating the Rule "seeks to end the practice of the Board [and IJs] taking allegedly sua sponte action in response to a motion and to thereby reduce the incentive for filing such procedurally improper motions."). Defendants assert that the Department adequately explained that the use of *sua sponte* authority may "facilitate[] inconsistent application and possible abuse, due to the lack of a meaningful standard to evaluate" such authority. *Id.* at 81,630. Defendants also argue that the departments "acknowledged that the rule would no longer provide an avenue" to sua sponte reopen on an untimely motion even in sympathetic cases, but that there are still remedies for noncitizens who present compelling cases, such as asking DHS to join in a motion to reopen and

United States District Court
Northern District of California

seeking equitable tolling.  *See id.* at 81,629-633.  Defendants assert that the departments balanced the objectives of promoting finality, consistency and efficiency in immigration proceedings with that of allowing reopening in certain circumstances.  Finally, in a theme that runs throughout the NPRM and Final Rule (and defendants' briefing), defendants cite the agency's assertion that "there is no right to sua sponte reopening or even to file such a cognizable motion. . . Thus, these changes do not remove any 'vested rights' from aliens."  *Id.* at 81,647; *see also id.* at 81,633 ("[T]he Department again reiterates both that an alien has no right to sua sponte reopening and that the concept of a motion to reopen sua sponte is an oxymoron.  Thus, the withdrawal of the delegation of the BIA's sua sponte reopening authority is not 'harsh'—regardless of any other changes— because there is no right to the exercise of such authority in the first instance.").  At the hearing on plaintiffs' motion, counsel for the government similarly asserted that because *sua sponte* reopening (and administrative closure) were discretionary devices, the government was not required to evaluate reliance concerns.

The Court concludes that plaintiffs have shown a likelihood of success on the merits of their claim that the elimination of *sua sponte* authority was arbitrary and capricious.  As an initial matter, the Court is extremely troubled by the agency's contention that because "an alien has no right to *sua sponte* reopening," the agency was not required to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Regents*, 140 S. Ct. at 1915.  "When an agency changes course, [as DOJ and EOIR did here], it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Id.* at 1913 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

Here, IJs and the BIA have had the regulatory authority to *sua sponte* reopen or reconsider since 1958 (and earlier, as a matter of judicial creation), *see Dada*, 554 U.S. at 12-13.  Indeed, when time and number limits on motions to reopen were imposed in 1996, the agency declined to include a "good cause" exception on the ground that "*sua sponte* authority to reopen removal proceedings accomplished the same goal."  *Avila-Santoyo v. U.S. Atty. Gen.*, 713 F.3d 1357, 1363 (11th Cir. 2013); *see also* 61 Fed. Reg. 18,900, 18,901, Executive Office for Immigration Review; Motions

United States District Court
Northern District of California

and Appeals in Immigration Proceedings (Apr. 29, 1996) (stating that a "good cause" exception was not necessary because "section 3.2(a) of the rule provides a mechanism that allows the Board to reopen or reconsider sua sponte and provides a procedural vehicle for the consideration of cases with exceptional circumstances."). The government's contention that the agency was free to dismiss any reliance interests because there is no right to discretionary *sua sponte* reopening is akin to the government's losing argument in *Regents* that DHS did not need to consider potential reliance interests when it eliminated DACA – i.e., "DACA recipients have no 'legally cognizable reliance interests' because . . . the program 'conferred no substantive rights' and provided benefits only in two-year increments." *Regents*, 140 S. Ct. at 1913. The Court found that "[t]hese disclaimers are surely pertinent in considering the *strength* of any reliance interests, but that [reliance] consideration must be undertaken by the agency in the first instance, subject to normal APA review." *Id.* at 1913-14 (emphasis added). "[B]ecause DHS was not 'writing on a blank slate,' . . . it *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915. Here, EOIR was not "writing on a blank slate," as IJs and the BIA have had the authority to *sua sponte* reopen and reconsider for many decades, and as noted *supra*, EOIR justified the 1996 limits on motions to reopen and reconsider by pointing to *sua sponte* authority.

The Court is also troubled by the agency's justifications for eliminating *sua sponte* reopening and reconsideration authority, particularly given the reality that its elimination will foreclose the only avenue of relief for some noncitizens who would otherwise be eligible for relief from removal. The agency stated,

> [T]he rule promotes fairness due to "the lack of a meaningful standard to guide a decision whether to order reopening or reconsideration of cases through the use of sua sponte authority, the lack of a definition of 'exceptional situations' for purposes of exercising sua sponte authority, the resulting potential for inconsistent application or even the abuse of this authority, the inherent problems in exercising sua sponte authority based on a procedurally improper motion or request, and the strong interest in finality" by withdrawing an authority subject to inconsistent and potentially abusive usage.

85 Fed. Reg. at 81,625 (quoting 85 Fed. Reg. at 52,505). However, as commenters noted, the agency did not provide any examples of inconsistent application or abuse. Moreover, the agency did not

provide a cogent explanation for why it could not articulate or clarify a "meaningful standard" to govern when "exceptional situations" would permit *sua sponte* reopening or reconsideration.  In contrast, DOJ and EOIR have issued numerous other proposed rules, including the Continuance NPRM and the Motion to Reopen NPRM, in which the agency has "clarified" various standards, including standards for "good cause" for continuances and the requisite showing for ineffective assistance of counsel.  Here, the agency did not explain why, if the lack of a meaningful standard was the problem, it could not articulate such a standard.  *See State Farm*, 463 U.S. at 48-49 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner").

## IV.     Regulatory Flexibility Act

Plaintiffs' second claim for relief alleges that defendants violated the APA by failing to comply with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-12.  Compl. ¶¶ 296-302, 347-53.  The RFA requires federal administrative agencies to analyze "the impact of the proposed rules on small entities."  *Id.* § 603(a).[42]  The analysis shall contain:

> (1) a description of the reasons why action by the agency is being considered;
>
> (2) a succinct statement of the objectives of, and legal basis for, the proposed rule;
>
> (3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;
>
> (4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
>
> (5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

*Id.* § 603(b).  "An agency may dispense with the regulatory analysis if it certifies 'that the rule will

---

[42]     The RFA defines "small entities" to include small businesses, small non-profit organizations, and small governmental jurisdictions.  5 U.S.C. § 601(3)-(6).  A non-profit qualifies as a "small entity" under the RFA if it is "independently owned and operated and is not dominant in its field . . . ."  *Id.* § 601(4).   Plaintiff Centro Legal asserts it is a "small entity" within the meaning of the RFA.  *See* Compl. ¶¶ 17, 297.  Defendants do not challenge whether plaintiff Centro Legal is a "small entity" within the meaning of the RFA, and instead contend that the Rule does not regulate small entities.

not, if promulgated, have a significant economic impact on a substantial number of small entities.'" *Cement Kiln Recycling Coalition v. E.P.A.*, 255 F.3d 855, 868 (D.C. Cir. 2001) (quoting 5 U.S.C. § 605(b)). "If the head of the agency makes a certification [under 5 U.S.C. § 605(b)], the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification." 5 U.S.C. § 605(b).

The proposed and final Rule did not conduct an analysis under the RFA because "the Department" determined that the Rule "will not have a significant economic impact on a substantial number of small entities." 85 Fed. Reg. 81,650; *see also* 85 Fed. Reg. 52,509 (NPRM). The Department concluded the Rule "will not economically impact representatives of aliens in immigration proceedings" because the Rule "does not limit the fees they may charge or the number of cases a representative may ethically accept under the rules of professional responsibility." 85 Fed. Reg. 81,646. The Department found that "any effects on employment of practitioners due to changes in those procedures are both minimal and incidental or ancillary at most. . . ." *Id.* at 81,645-646.

Plaintiffs allege that the Rule's regulatory flexibility analysis does not comply with the RFA because, *inter alia*, defendants did not publish a "statement providing the factual basis" for the EOIR's conclusion that the Rule does not significantly impact small entities, and that to the contrary, the Rule imposes "significant, adverse impacts . . . on the number of cases that small entities are able to handle, their ability to secure ongoing funding, and other consequences—all points the commenters raised." Compl. ¶¶ 299-300. Plaintiffs cite numerous comments that discussed the enormous impact of the Rule on nonprofits serving noncitizens in removal and other immigration proceedings.[43] *See also* Patel Decl. at ¶¶ 11-32 (describing negative impact of the Rule on Centro

---

[43] *See, e.g.*, Igra Decl. Ex. 1 at 12 (ILRC comment, stating that the changes imposed by the Rule "will create a staggering cost to legal advocates offering representation" to noncitizens and "make it nearly impossible for nonprofit organizations . . . to take appeals pro bono."); Ex. 4 at 11 (Pangea comment, stating that "the proposed rule would upend ordinary appellate practice and make it nearly impossible for nonprofit organizations like Pangea to take appeals pro bono"); Ex. 9 at 30-31 (CLINIC comment, stating *inter alia* that "the NPRM fails to analyze adequately the impact the proposed rule would have on small entities" and that the "changes would dramatically affect how small law offices, both private attorneys and non-profit organizations would be able to accept cases,

1 Legal's ability to fulfill its mission and provide *pro se* assistance, with likely concomitant decrease

2 in funding).

3       Defendants contend that plaintiffs "lack a cause of action to enforce the RFA . . . because

4 they are not 'small entities' that are 'directly regulated by' the Rule, and thus, they 'do not have an

5 injury contemplated within the zone of interest of the RFA.'" Opp'n at 5 (quoting *U.S. Citrus*

6 *Science Council v. U.S. Dep't of Agric.*, 312 F. Supp. 3d 884 (E.D. Cal. 2018) (holding domestic

7 lemon growers were indirectly regulated small entities who did not have statutory authority to

8 challenge under RFA a rule that regulated and allowed imports of lemons from Argentina)).

9 Defendants also assert that any RFA claim would fail on the merits because defendants made a

10 "good faith effort" to comply by certifying that the Rule would not have a significant economic

11 impact on a substantial number of small entities and providing the factual basis for that certification.

12 Opp'n at 6.

13       The Court concludes that plaintiffs have raised serious questions going to the merits of their

14 RFA challenge. As an initial matter, the Court finds that Centro Legal has the authority to bring

15 such a claim. Centro Legal has shown that it likely meets the statutory definition of a "small entity"

16 under the RFA, and that the Rule "will apply" to it, 5 U.S.C. § 603(b)(5), because it must comply

17 with the changes implemented by the Rule, such as the changes to the briefing schedule. *Cf. U.S.*

18 *Citrus Science Council*, 312 F. Supp. 3d at 912 (noting that "the specified remedies for prevailing

19 in a challenge under the RFA include 'deferr[al of] enforcement of the rule against small entities"

20 and that the domestic lemon growers could not challenge rule allowing lemon imports because

21 "Plaintiffs and other small entities affected by the Rule would not be subject to deferred

22 enforcement—nothing is being enforced against them at all."); *see also Aeronautical Repair Station*

23 *Ass'n Inc. v. F.A.A.*, 494 F.3d 161, 177 (D.C. Cir. 2007) (holding contractors and subcontractors

24 could bring RFA challenge to regulations that were "immediately addressed" to employer air

25 carriers because regulations "impos[ed] responsibilities directly on the contractors and

26 subcontractors"). In addition, Centro Legal is on the list of *pro bono* legal service providers that

27

28                 manage their dockets, and, in some instances, charge fees.").

United States District Court
Northern District of California

1    EOIR is required to provide to noncitizens.  *See* 8 U.S.C. § 1229(b)(2).

2          Plaintiffs have raised serious questions as to whether the agency complied with the RFA.

3    The statute provides that an agency can forgo the RFA analysis "if the head of the agency certifies"

4    that a rule will not significantly impact small entities and publishes that certification in the Federal

5    Register with the final rule "along with a statement providing the factual basis for such

6    certification."  5 U.S.C. § 605(b).  Here, the final Rule states that an unspecified person at "the

7    Department . . . has determined that this rule will not have a significant economic impact on a

8    substantial number of small entities," incorporating by reference the Department's responses to

9    comments regarding the RFA.  85 Fed. Reg. at 81,650; *see also id.* at 81,645-646.

10         In light of the scope of the Rule and the numerous significant changes to longstanding

11   procedures governing immigration practice and procedure, coupled with the many comments from

12   organizations stating that they would suffer significant deleterious economic impacts as a result of

13   the Rule, the Court is troubled by this cursory statement of a "factual basis."  *Compare N.C.*

14   *Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647, 651-53 (E.D. Va. 1997) (holding the factual basis

15   was inadequate because the government did not conduct any analysis and made no showing as to

16   why similar quotas would have no impact), *with Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F.

17   Supp. 2d 1075, 1114-15 (E.D. Cal. 2004) (finding that certification complied because it defined and

18   discussed the small wholesalers impacted by the rule and made predictions about the likely impact

19   of the rule); *Associated Builders & Contractors, Inc. v. Shiu*, 30 F. Supp. 3d 25, 47 (D.D.C.), *aff'd,*

20   773 F.3d 257 (D.C. Cir. 2014) (holding the agency's certification of 'no impact' was reasonable

21   because the agency "justified its conclusion" by estimating the cost on all contractors as well as

22   small entities).

23         In sum, under the facts presented here, the Court concludes that plaintiffs have shown

24   "serious questions going to the merits" of their claim that defendants failed to comply with the

25   requirements of the RFA.  *See All. for the Wild Rockies*, 632 F.3d at 1134-35.

26

27   **V.     Delegation of Authority to EOIR Director**

28         Plaintiffs' third claim for relief alleges that defendants violated the APA by taking agency

action in excess of statutory jurisdiction or authority because "[t]he Attorney General's purported delegation of rulemaking authority to the Director of EOIR pursuant to Attorney General Order Number 4910-2020 violated longstanding principles of administrative law and improperly delegated authority to Director McHenry." Compl. ¶ 362. Plaintiffs allege that "Director McHenry also has no statutory or regulatory authority to issue final rules independent of this unlawful delegation," and that "the Director of EOIR cannot use any purported delegation to delegate additional authority to himself." *Id.* ¶¶ 362-63. Specifically, plaintiffs note that the Rule grants the EOIR Director new authority to adjudicate BIA appeals that have been pending for more than 365 days, as well as new authority to review BIA decisions in which the immigration judge alleges that the BIA made an error. *Id.* ¶¶ 364, 366.

Plaintiffs argue that EOIR Director McHenry lacked authority to sign the Final Rule because the Attorney General's November 17, 2020 order delegated his authority under the general delegation statutes, 28 U.S.C. §§ 509 and 510, instead of the specific delegation statute in the INA under 8 U.S.C. § 1103(g)(2).[44] Section 509 states, "All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General," with a few enumerated exceptions that are not relevant here. 28 U.S.C § 509. Section 510 states in its entirety, "The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." *Id.* at § 510. The INA's delegation provision, 8 U.S.C. § 1103(g)(2), provides, "The Attorney General shall establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section." 8 U.S.C. § 1103(g)(2).

---

[44] The Attorney General's November 17, 2020 Order states, "Pursuant to the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509 and 510, I hereby delegate to the Director, Executive Office for Immigration Review . . . the authority to issue regulations related to immigration matters within the jurisdiction of the Executive Office of Immigration Review." Attorney General Order 4910-2020 (Dkt. No. 47-2).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs contend that any delegation of rulemaking authority from the Attorney General to

2    the EOIR director must be made pursuant to 8 U.S.C. § 1103(g)(2), not the general delegation

3    provisions of 28 U.S.C. §§ 509 and 510 because "[t]he Attorney General's broad delegation

4    authority does not apply where Congress has specifically and separately allocated enforcement

5    authority over a certain action or set of actions." *N.S. v. Hughes*, No. 1:20-CV-101-RCL, 2020 WL

6    4260739, at *5 (D.D.C. July 24, 2020) (holding Attorney General did not properly delegate authority

7    to U.S. Marshal Service to make civil immigration arrests pursuant to 28 U.S.C. §§ 509 and 510

8    because Congress "used the INA to carefully ensure that trained immigration officers were

9    responsible for making civil immigration arrests" and rejecting argument that government could

10   validate delegation under 8 U.S.C. § 1103 "because the Attorney General did not refer to that

11   authority in any meaningful way when he issued the order").   Plaintiffs contend Congress expressly

12   intended 8 U.S.C. § 1103(g) to be the sole source of any delegated authority to EOIR by pointing to

13   6 U.S.C. § 521, which states, "[EOIR] shall be subject to the direction and regulation of the Attorney

14   General under section 1103(g) of Title 8." Dkt. No. 54 at 7.

15        In addition, plaintiffs contend that the Rule violated the APA because the Proposed Rule did

16   not afford the public notice and an opportunity to comment on "the impropriety of allowing the

17   Director to delegate sweeping authority *to himself* beyond that provided by law." Mot. at 8.

18   Plaintiffs argue that because the Attorney General signed the Proposed Rule and then delegated

19   authority to McHenry after the close of the comment period, "the Rule prevented Plaintiffs from

20   meaningfully commenting on the *substance* of the delegation," which gave the EOIR Director

21   "expansive authority" to adjudicate BIA appeals through the Final Rule that the EOIR Director

22   signed himself. Reply at 8. Plaintiffs argue that "[a]lthough commenters were on notice that the

23   Rule would delegate authority from the Attorney General to the EOIR Director 'regarding the

24   efficient disposition of appeals,' they did not have notice of the fact that the Attorney General would

25   (1) be delegating *all* rulemaking authority to the Director, and (2) that the Director *himself* would

26   be issuing the final Rule." *Id*.

27        Defendants respond that the Attorney General's general delegation of authority was proper

28   under the general delegation statutes, that the language of the Attorney General's delegation order

66

is expansive enough to encompass an implied reference to 8 U.S.C. § 1103(g)(2), and that *N.S.* is distinguishable because there the court held that "the general delegation power described in [28 U.S.C. §] 510 was insufficient to permit the Attorney General to give the [Marshals] authority over civil immigration arrests, as that would have represented a departure from the INA." *N.S.*, 2020 WL 4260739, at *5. Defendants also argue that there is no requirement that the public be provided an opportunity to comment on the delegation order as that is a "classic example or a rule of agency organization or procedure which is generally exempt from notice and comment under 5 U.S.C. § 553(b)(A)," Opp'n at 9, and the public was provided notice of the fact that the NPRM proposed "a delegation of authority from the Attorney General to the EOIR Director ('Director') regarding the efficiency disposition of appeals." 85 Fed. Reg. at 52,492.

The Court finds that plaintiffs have raised serious questions about whether, under the specific facts of this case, the manner in which the Attorney General delegated his authority to McHenry violated the APA. The Court is troubled by the fact that the Proposed Rule was signed by the Attorney General and that the Attorney General did not delegate rulemaking authority to the EOIR Director until November 17, 2020 – after the comment period had closed on September 25, 2020. That non-public order purported to delegate authority pursuant to 28 U.S.C. §§ 509 and 510, and yet the Final Rule signed by EOIR Director McHenry states that McHenry's authority derives from 8 U.S.C. § 1103(g). At the very least, the manner in which the delegation occurred was sloppy. Of particular concern to the Court, the Final Rule signed by the EOIR Director gave the EOIR Director significantly expanded authority to adjudicate BIA appeals. 85 Fed. Reg. 81,590-592. While the NPRM—as signed by Attorney General Barr—disclosed the proposed grant of additional authority to the EOIR Director to review BIA appeals, the NPRM did not disclose that the EOIR Director would be issuing the final rule and therefore, considering the public's comments. The procedural requirements of the APA are intended to foster "an exchange of views, information, and criticism between interested persons and the agency." *Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 36 (D.C. Cir. 1977). The Court finds that plaintiffs have raised serious questions as to whether that process was impeded by the fact that the public was not told that the EOIR Director, and not the Attorney General, would be responding to public comments on the propriety of granting additional authority

the EOIR Director.   Under the totality of these circumstances, plaintiffs have raised serious questions as to whether they and the public were given the opportunity to meaningfully participate in the rulemaking process because plaintiffs were foreclosed from commenting on the propriety of the EOIR Director using delegated authority to grant himself additional powers.

## VI.     Balance of Equities and Public Interest

A plaintiff seeking a preliminary injunction must establish likelihood of success on the merits, irreparable harm, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest.  *E. Bay Sanctuary Covenant*, 950 F.3d at 1271.  "When the government is a party, the last two factors (equities and public interest) merge."  *Id.* (citing *Nikn v. Holder*, 556 U.S. 418, 435 (2009)).

Plaintiffs have submitted declarations attesting to the harm that they have suffered and will suffer as a result of the Rule.  *See* Patel Decl. (Centro Legal) ¶¶ 11-12, 16-22, 26, 31-32; Quinn Decl. (ILRC) ¶¶ 25, 27-30, 42, 48; Huang Decl. (Tahirih) ¶¶ 5, 13, 26-28, 32-33, 35-36, 40-46; Garza Decl. (RAICES) ¶¶ 4. 9, 13-14, 17-19, 29-37, 44-46, 70, 75.  The injuries include being required to devote greater resources to completely revising education materials and conducting new trainings, and expending significantly more resources on cases.  *Id.*  The Rule will make it much more difficult for plaintiffs to take BIA appeals for people that they did not represent in immigration court, and will make referring matters to pro bono counsel more difficult and costly.  *Id.*  As a result, more noncitizens will be unrepresented and less likely to obtain relief to which they are entitled.  In sum, plaintiffs have been forced to "divert resources away from [their] core programs to address the new policy," *E. Bay Sanctuary Covenant*, 950 F.3d at 1280, and will experience "ongoing harms to [their] organizational missions."  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d at 854; *see also CLINIC*, 2021 WL 184359, at *13 (holding plaintiff legal service providers had demonstrated irreparable harm in challenge to EOIR Fee Rule based on declarations attesting to diversion of resources, decrease in the cases that plaintiffs and pro bono partners can take, and general frustration of mission).

The Court finds that the public interest would be served by an injunction in several ways.

United States District Court
Northern District of California

First, "[t]he public interest is served by compliance with the APA: 'The APA creates a statutory scheme for informal or notice-and-comment rulemaking reflecting a judgment by Congress that the public interest is served by a careful and open review of proposed administrative rules and regulations.' [Citation.] It does not matter that notice and comment could have changed the substantive result; the public interest is served from proper process itself." *Azar*, 911 F.3d at 581-82; *see also E. Bay Sanctuary Covenant*, 950 F.3d at 1280-81. Here, Centro Legal was deprived of the opportunity to comment on the NPRM, the other plaintiffs were not able to provide as fulsome comments as they wished, and the public more broadly was deprived of this opportunity by the too-short notice period.

Second, "the public has an interest in ensuring that we do not deliver aliens into the hands of their persecutors . . . and preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *E. Bay Sanctuary Covenant*, 950 F.3d at 1281 (internal quotation marks and citations omitted). Plaintiffs and *amici* have raised significant questions about whether noncitizens who have meritorious claims for humanitarian relief will be foreclosed from seeking such relief as a result of Rule. Indeed, defendants do not really dispute that point, but rather justify the Rule on the efficiency and finality grounds articulated in the Rule.

Defendants argue that enjoining the Rule would undermine the "efficient administration of the immigration laws." Opp'n at 22 (citing *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019)).[45] The Court agrees that "the government and the public have an interest in the 'efficient administration of the immigration laws.'" *E. Bay Sanctuary Covenant*, 950 F.3d at 1282. The government and the public also have an interest in the fair administration of the immigration laws, as President Biden has recently declared in the Executive Order directing a review of existing regulations, policies, and agency actions. In any event, plaintiffs have raised serious questions about

---

[45] The *Innovation Law Lab* order cited by defendants was a decision by the motions panel granting the government's emergency motion for a stay of the injunction. When the Ninth Circuit subsequently revisited the injunction on the merits, it found that the balance of equities and public interest favored the plaintiffs, and that the government's interest was "diminished by the likelihood . . . that the [challenged rule] is inconsistent with" the statute. *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1093-94 (9th Cir. 2020) ("*Innovation Law Lab II*"), *stay granted sub nom. Wolf v. Innovation Law Lab*, 140 S. Ct. 1564 (2020), *cert. granted sub nom., Wolf v. Innovation Law Lab*, --- S. Ct. --- -, 2020 WL 6121563 (Oct. 19, 2020).

whether the Rule in fact promotes efficiency, as well as whether, to the extent that it does, such efficiencies come at the expense of Due Process. Further, because the Rule provides that certain changes apply only prospectively and other changes apply to all pending cases, EOIR is currently applying a cumbersome set of dual regulations that brings into question the extent to which the current system is operating "efficiently." Moreover, defendants have not articulated how their operations will be seriously disrupted by returning to a set of procedures that had been in place for years if not decades.

## IV.  Scope of Relief

Plaintiffs request the Court enjoin the Rule's implementation nationally. Defendants urge that any injunction must be "tailored to the specific claims made and the organizational Plaintiffs here." Opp'n at 23.

The Ninth Circuit has cautioned prudence in issuing nationwide injunctions and recently has narrowed the scope of several district court orders after finding that nationwide relief was not appropriate. *See, e.g., Azar*, 911 F.3d at 584 (upholding injunction regarding contraceptive mandate but limiting its scope to the plaintiff states because "[o]n the present record, an injunction that applies only to the plaintiff states would provide complete relief to them" and the record was insufficiently developed on the harm to other states); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018) ("*San Francisco I*") (agreeing with district court that injunction was appropriate to enjoin executive order that would withhold federal grants from "sanctuary jurisdictions" but finding record insufficiently developed on the harm outside California and remanding question to district court). Some of the many problems with nationwide injunctions include foreclosing adjudication of the issue by a number of different courts and judges, depriving non-parties of the right to litigate in other forums, and forum shopping.[46] *Azar*, 911 F.3d at 583. The Court also evaluates today's question mindful that "the proper scope of injunctions against

---

[46] The Court is aware of one other case that is pending in the district court for the District of Columbia that challenges the same Final Rule. *See CLINIC et al. v. EOIR et al.*, Case No. 1:21-cv-00094-RJL (D.D.C. 2021). Judge Leon held a hearing on the plaintiffs' motion for a preliminary injunction on March 4, 2021, and indicated that it may be some time before he issues a decision given the scope of the issues presented there.

agency action is a matter of intense and active controversy." *Innovation Law Lab II*, 951 F.3d at 990 (citations omitted).

Under the particular circumstances presented here, the Court finds that nationwide relief is appropriate. First, 5 U.S.C. § 705 states, in part, ". . . On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." When a court holds a rule invalid under the APA, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant*, 950 F.3d at 1283. "Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an 'entire' regulatory program." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990)). Nor will it work for the Court to strike certain portions of the Rule while letting other parts stand. "Our typical response is to vacate the rule and remand to the agency; we ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule." *Id.* (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 494 (D.C. Cir. 1989)) (internal quotation marks omitted)).[47]

Moreover, the Ninth Circuit has explained that relief may look different in the immigration context because "there is an important need for uniformity in immigration policy." *Id.* (internal quotation marks and citations omitted). "Different interpretations of executive policy across circuit or state lines will needlessly complicate agency and individual action in response to the United States's changing immigration requirements. For these reasons, in immigration cases, we consistently recognize the authority of district courts to enjoin unlawful policies on a universal basis." *Id.* at 1284 (internal quotation marks, alterations, and citations omitted).

In a number of the recent cases in which the Ninth Circuit limited the scope of nationwide injunctions, the plaintiffs were cities, counties, or states whose operation "permits neat geographic

---

[47] Plaintiffs' procedural challenges affect all of the Rule. *See Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *19-20 (enjoining entire challenged rule rather than just those portions of the rule most impacting plaintiffs' clients, because "plaintiffs are likely to show that Mr. McAleenan's and Mr. Wolf's appointments impact the validity of the Final Rule in its entirety").

1   boundaries," *see City & County of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020) ("*San*

2   *Francisco II*"), and where the record had not been developed as to the rule's impact outside those

3   jurisdictions.  Based on those records, the appellate court limited the injunctions to application

4   within the plaintiffs' boundaries.  *Azar*, 911 F.3d at 584; *San Francisco I*, 897 F.3d at 1244-45.

5   Subsequent Ninth Circuit decisions have distinguished those cases from ones "involving plaintiffs

6   that operate and suffer harm in a number of jurisdictions, where the process of tailoring an injunction

7   may be more complex."  *See San Francisco II*, 965 F.3d at 766 (citing *East Bay Sanctuary Covenant*,

8   950 F.3d at 1282-83).

9           Plaintiffs here operate across the country.  ILRC is a national non-profit headquartered in

10  San Francisco with offices in Washington, D.C., and in San Antonio, Austin, and Houston, Texas.

11  Quinn Decl. ¶ 3.  Tahirih is a national nonprofit that operates from locations in Falls Church,

12  Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

13  Huang Decl. ¶ 2.  RAICES is a national nonprofit headquartered in San Antonio, Texas, with offices

14  in Austin, Corpus Christi, Dallas, Fort Worth, Houston and San Antonio.  Garza Decl. ¶¶ 5-6.

15  Centro Legal is located in Oakland, California and provides immigration legal services to detained

16  and non-detained individuals in California, as well as national advocacy work.  Patel Decl. ¶¶ 3-4.

17  Plaintiffs serve noncitizens in removal proceedings, and they have at least a portion of their funding

18  (sometimes a large portion) tied to how many noncitizens they serve or how much training and

19  technical assistance they can provide to the community.  *See* Patel Decl. ¶ 30; Quinn Decl. ¶¶ 44-

20  47; Huang Decl. ¶ 12.  In other words, plaintiffs "represent [immigrants] broadly. . . .  One fewer

21  [immigrant] client . . . results in a frustration of purpose (by preventing the organization from

22  continuing to aid [immigrant] applicants who seek relief), and a loss of funding (by decreasing the

23  money it receives for completed cases)."  *See East Bay Sanctuary Covenant*, 950 F.3d at 1282-83.

24          In sum, there are a number of reasons why under the facts of this case, nationwide relief is

25  warranted.  First, because plaintiffs have shown a likelihood of success that the Rule is invalid under

26  the APA, the proper remedy is to enjoin the Rule.  Second, because there is a need for uniformity in

27  immigration policies.  Finally, and perhaps most importantly to the scope of the injunction, because

28  nationwide relief is needed to remedy the irreparable harm that plaintiffs, who operate throughout

United States District Court
Northern District of California

1  the country and who serve immigrants throughout the country, have shown they will suffer if the

2  Rule is not enjoined, and where defendants have not proposed a workable alternative. The Court

3  will grant the motion for a preliminary injunction and will enjoin implementation and enforcement

4  of the Rule nationwide.

### CONCLUSION

For the reasons set forth above, the Court GRANTS plaintiffs' motion for a nationwide preliminary injunction. Pursuant to Federal Rule of Civil Procedure 65(c), the Court finds in its discretion that it is not proper to impose any security for the preliminary injunction because of the significant public interest underlying this action. *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 868–69 (N.D. Cal. 2018).

Accordingly, IT IS HEREBY ORDERED that:

1. Pending final adjudication of this matter, Defendants Executive Office for Immigration Review; James A. McHenry, in his official capacity under the title of Director, Executive Office for Immigration Review; United States Department of Justice; and Monty Wilkinson, in his official capacity as Acting United States Attorney General, and all persons acting under their direction, ARE ENJOINED from Implementing or enforcing the Rule or any portion thereof.

2. Pending final adjudication of this matter, the effectiveness of the Rule IS STAYED.

3. This preliminary injunction and stay shall take effect immediately and shall remain in effect pending trial in this action or further of this Court.

4. The posting of security is waived.

**IT IS SO ORDERED**.

Dated: March 10, 2021

SUSAN ILLSTON
United States District Judge

*United States District Court*
*Northern District of California*