# EXHIBIT A

Appellate Procedures and Decisional Finality in Immigration Proceedings;
Administrative Closure, 88 Fed. Reg. 62,242 (Sept. 8, 2023)

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Parts 1001, 1003, 1239, and 1240**

[Docket No. EOIR 021–0410; AG Order No. 5738–2023]

**RIN 1125–AB18**

### Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** In December 2020, the Department of Justice issued a final rule (the "AA96 Final Rule") establishing novel limits on the authority of immigration judges and the Board of Immigration Appeals ("BIA" or "Board") to manage their dockets and efficiently dispose of cases. Among other changes, the AA96 Final Rule would have required the BIA to set simultaneous briefing schedules for every appeal, limited the authority of immigration judges and the BIA to temporarily pause cases while the United States Citizenship and Immigration Services ("USCIS") adjudicates a noncitizen's pending visa application, and restricted the BIA's discretion to remand matters to immigration judges in light of legal and factual errors. The AA96 Final Rule was enjoined shortly after its issuance in March 2021, and it has not been in effect since that date. After careful reconsideration, the Department proposes to restore longstanding procedures in place prior to the AA96 Final Rule, including administrative closure, and to clarify and codify other established practices. Given the aforementioned injunction, the proposed regulatory language largely reflects the currently operative status quo. The Department believes that this rule will promote the efficient and expeditious adjudication of cases, afford immigration judges and the BIA flexibility to efficiently allocate their limited resources, and protect due process for parties before immigration judges and the BIA.

**DATES:** Electronic comments must be submitted, and written comments must be postmarked or otherwise indicate a shipping date on or before November 7, 2023. The electronic Federal Docket Management System at *www.regulations.gov* will accept electronic comments until 11:59 p.m. Eastern Time on that date.

**ADDRESSES:** If you wish to provide comments regarding this rulemaking, you must submit comments, identified by the agency name and reference RIN 1125–AB18 or EOIR Docket No. 021–0410, by one of the two methods below.

• *Federal eRulemaking Portal: www.regulations.gov.* Follow the website instructions for submitting comments.

• *Mail:* Paper comments that duplicate an electronic submission are unnecessary. If you wish to submit a paper comment in lieu of electronic submission, please direct the mail/shipment to: Raechel Horowitz, Chief, Immigration Law Division, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041. To ensure proper handling, please reference the agency name and RIN 1125–AB18 or EOIR Docket No. 021–0410 on your correspondence. Mailed items must be postmarked or otherwise indicate a shipping date on or before the submission deadline.

**FOR FURTHER INFORMATION CONTACT:** Raechel Horowitz, Chief, Immigration Law Division, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041, telephone (703) 305–0289.

**SUPPLEMENTARY INFORMATION:**

### I. Public Participation

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this proposed rule via one of the methods and by the deadline stated above. The Department of Justice ("Department") also invites comments that relate to the economic, environmental, or federalism effects that might result from this proposed rule. Comments that will provide the most assistance to the Department in developing these procedures will reference a specific portion of the proposed rule; explain the reason for any recommended change; and include data, information, or authority that support such recommended change.

Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifying information (such as your name, address, etc.) voluntarily submitted by the commenter.

If you want to submit personally identifying information (such as your name, address, etc.) as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFYING INFORMATION" in the first paragraph of your comment and identify what information you want redacted.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment. You also must prominently identify the confidential business information to be redacted within the comment. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.*

Personally identifying information located as set forth above will be placed in the agency's public docket file, but not posted online. Confidential business information identified and located as set forth above will not be placed in the public docket file. The Department may withhold from public viewing information provided in comments that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *www.regulations.gov.* To inspect the agency's public docket file in person, you must make an appointment with the agency. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for agency contact information.

### II. Legal Authority

The Department issues this proposed rule pursuant to section 103(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1103(g), as amended by the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135 (as amended). Under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA. HSA 1102, 116 Stat. at 2273–74; INA 103(g)(2), 8 U.S.C. 1103(g)(2).

### III. History and Background

On August 26, 2020, the Department published a notice of proposed rulemaking ("NPRM" or "proposed

rule'') that proposed to amend the Executive Office for Immigration Review (''EOIR'') regulations regarding the handling of appeals to the Board. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 52491 (Aug. 26, 2020) (''AA96 NPRM''). The Department proposed multiple changes to the processing of appeals to ''ensure the consistency, efficiency, and quality of its adjudications.'' *Id.* at 52491. In addition, the Department proposed to amend the regulations to expressly state that immigration judges and Appellate Immigration Judges[1] have no ''freestanding'' authority to administratively close cases. *Id.* Finally, the Department proposed to delete inapplicable or unnecessary provisions regarding the forwarding of the record of proceeding on appeal. *Id.*[2] The AA96 NPRM set forth a 30-day comment period, stating that any public comments must be submitted by September 25, 2020. *Id.* The Department received 1,287 comments during the comment period.[3]

On December 16, 2020, the Department published a final rule, wherein it responded to comments received during the notice-and-comment period and adopted the regulatory language proposed in the AA96 NPRM with minor changes. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 81588 (Dec. 16, 2020) (''AA96 Final Rule''). The AA96 Final Rule's effective date was January 15, 2021, *id.* at 81588, but the rule was enjoined on March 10, 2021, in litigation described in further detail below. *See Centro Legal de la Raza* v. *Exec. Off. for Immigr. Rev.,* 524 F. Supp. 3d 919 (N.D. Cal. 2021).

---

[1] Historically, Department rules, including the AA96 Final Rule, used the term ''Board member'' to refer to members of the Board. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 81588, 81590 (Dec. 16, 2020). The Department has begun using the term ''Appellate Immigration Judge'' to refer to members of the Board, and that is the term used in this NPRM. Although ''Board member'' and ''Appellate Immigration Judge'' are synonymous, *see* 8 CFR 1003.1(a)(1)–(2), the Department believes that ''Appellate Immigration Judge'' is a more accurate description of the role of members of the Board. *See* Organization of the Executive Office for Immigration Review, 84 FR 44537, 44539 (issued as interim final rule) (Aug. 26, 2019).

[2] In addition, the Department proposed to update outdated references to the former Immigration and Naturalization Service (''INS''). 85 FR at 52507 n.36.

[3] The Department posted 1,284 of the comments received for public review. The Department did not post three of the comments received because they were either non-substantive or duplicates of other comments that were posted.

## A. Briefing Schedule Changes at the Board of Immigration Appeals

### 1. Before Promulgation of the AA96 Final Rule

Prior to the AA96 Final Rule, the regulations specified that appeals involving detained noncitizens[4] were subject to a simultaneous briefing schedule, wherein both parties had 21 days to file simultaneous briefs, unless the Board specified a shorter period. 8 CFR 1003.3(c)(1) (2019). The regulations permitted parties subject to a simultaneous briefing schedule to submit reply briefs within 21 days of the deadline for the initial brief, when permitted by the Board. *Id.* For cases involving non-detained noncitizens, the regulations provided for a consecutive briefing schedule. The appellant had 21 days to file an initial brief, unless the Board specified a shorter period, and the appellee then had an equivalent amount of time, including any extensions granted to the appellant, to file a reply brief. *Id.*

Appellate Immigration Judges were authorized, upon written motion, to extend the filing deadline of an initial brief or a reply brief for up to 90 days for good cause shown. *Id.* Appellate Immigration Judges generally granted briefing extensions in 21-day increments but would also grant longer extensions for good cause shown. The regulations also authorized Appellate Immigration Judges to request supplemental briefing from parties after the briefing deadline expired. *Id.*

### 2. Changes Made by the AA96 Final Rule

The AA96 Final Rule amended 8 CFR 1003.3(c)(1) to require a simultaneous briefing schedule for all cases before the Board, regardless of the noncitizen's detention status. 85 FR at 81588. The AA96 Final Rule also reduced the allowable time to extend a briefing schedule from a maximum of 90 days to a maximum of 14 days and limited all parties to one briefing extension. *Id.* at 81654 (''If an extension is granted, it is granted to both parties, and neither party may request a further extension.''). The AA96 Final Rule specified that no party was entitled to a briefing extension as a matter of right and that briefing extensions should only be granted upon an ''individualized consideration of good cause.'' *Id.* The

---

[4] For purposes of the discussion in this preamble, the Department uses the term ''noncitizen'' colloquially and synonymously with the term ''alien'' as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3). This NPRM is also proposing to define the term ''noncitizen'' to be synonymous with the term ''alien,'' as explained later in this preamble.

AA96 Final Rule also shortened the maximum amount of time for submitting reply briefs from 21 days to 14 days, and only when the Board permitted filing of a reply brief. *Id.*

### B. Administrative Closure Authority

### 1. Before Promulgation of the AA96 Final Rule

Prior to the AA96 Final Rule, 8 CFR 1003.1(d)(1)(ii) (2019) and 1003.10(b) (2019) stated that EOIR adjudicators ''may take any action consistent with their authorities under the [INA] and the regulations as is appropriate and necessary for the disposition'' of the case. Although the regulations have never explicitly stated that EOIR adjudicators have general administrative closure authority, numerous courts of appeals and the Board have interpreted ''any action'' to include using docket management tools such as administrative closure. *See Romero* v. *Barr,* 937 F.3d 282, 292 (4th Cir. 2019) (explaining that ''[8 CFR] 1003.10(b) and 1003.1(d)(1)(ii) unambiguously confer[ ] upon [immigration judges] and the BIA the general authority to administratively close cases''); *Meza Morales* v. *Barr,* 973 F.3d 656, 667 n.6 (7th Cir. 2020) (Barrett, J.) (concluding that ''[8 CFR] 1003.10(b) grants immigration judges the power to administratively close cases''); *Arcos Sanchez* v. *Att'y Gen.,* 997 F.3d 113, 122 (3d Cir. 2021) (explaining ''that the plain language establishes that general administrative closure authority is unambiguously authorized by these regulations''); *Matter of Avetisyan,* 25 I&N Dec. 688, 692 (BIA 2012) (stating that EOIR adjudicators may utilize continuances or administrative closure ''to temporarily remove a case from an Immigration Judge's active calendar or from the Board's docket''). *But see Hernandez-Serrano* v. *Barr,* 981 F.3d 459, 466 (6th Cir. 2020) (concluding that ''[8 CFR] 1003.10(b) and 1003.1(d) do not delegate to [immigration judges] or the Board the general authority to suspend indefinitely immigration proceedings by administrative closure'' (internal quotation marks omitted)); *Garcia-DeLeon* v. *Garland,* 999 F.3d 986, 991–93 (6th Cir. 2021) (subsequently ruling that immigration judges and the Board do have authority to grant administrative closure to permit a noncitizen to apply for a provisional unlawful presence waiver).

Since 1958, regulations have authorized EOIR adjudicators to exercise their discretion as may be ''appropriate and necessary'' for the disposition of a case. Miscellaneous Amendments to Chapter, 23 FR 2670,

2671 (Apr. 23, 1958) ("Subject to any specific limitation prescribed by the act and this chapter, special inquiry officers shall also exercise the discretion and authority conferred upon the Attorney General by the act as is appropriate and necessary for the disposition of such cases."); [5] *see also Hernandez-Serrano,* 981 F.3d at 464 ("As early as 1958, regulations granted the predecessors to [immigration judges] (called 'special inquiry officers') and the Board authority to take actions 'appropriate and necessary for the disposition of' their cases."). In 2000, the Department published an NPRM that proposed more expansive authority: that EOIR adjudicators could take "any action" appropriate and necessary for the disposition of a case. *See* Authorities Delegated to the Director of the Executive Office for Immigration Review, the Chairman of the Board of Immigration Appeals, and the Chief Immigration Judge, 65 FR 81434, 81436–37 (Dec. 26, 2000). The Department adopted this regulatory language for Board members in 2002, and for immigration judges in 2007.[6]

Since at least the 1980s,[7] immigration judges and the Board have exercised their authority to use administrative closure as a docketing tool, where appropriate, to remove cases from their active dockets and to regulate the course of proceedings. *See Arcos Sanchez,* 997 F.3d at 116–17 (recognizing that adjudicators have used administrative closure dating back to the 1980s).

In 1984, the EOIR Office of the Chief Immigration Judge issued an Operating Policies and Procedures Memorandum ("OPPM") setting forth options available to immigration judges in cases where noncitizens failed to appear for their hearings, including the option to administratively close cases. EOIR, OPPM 84–2: *Cases in Which Respondents/Applicants Fail to Appear for Hearing,* 1984 WL 582760 (Mar. 7,

1984). The OPPM included language specifying that administratively closed cases were to be considered "no longer pending before the Immigration Judge," and that no further action would be taken until "the case is presented for re-calendaring and further proceedings." *Id.* at \*2. The OPPM provided a non-exhaustive list of factors for immigration judges to consider such as adequacy of notice; likelihood that a deportation order, if entered in absentia, would be enforced; the nature of charges; and the need for parties to be present. *Id.* at \*1.

The most significant development in the exercise of administrative closure came in 1986, shortly after President Reagan signed into law the Immigration Reform and Control Act of 1986, Public Law 99–603, 100 Stat. 3359. The Immigration Reform and Control Act created a pathway to lawful status for certain undocumented noncitizens who had entered the United States prior to January 1, 1982. Immigration judges used administrative closure to pause removal proceedings while noncitizens pursued this newly available pathway to lawful status. *See, e.g., Veliz* v. *Caplinger,* No. 96–1508, 1997 WL 61456, at \*1 (E.D. La. Feb. 12, 1997) (noting that the removal proceedings before the agency were administratively closed to allow noncitizens to apply for legalization under the Immigration Reform and Control Act).

As administrative closure became more common, the Board began to address questions related to its use. For example, in 1988, the Board published a decision in which it determined that an immigration judge improperly exercised administrative closure authority. *Matter of Amico,* 19 I&N Dec. 652, 654 (BIA 1988) (determining that the immigration judge's decision to administratively close a case rather than hold proceedings in absentia was "inappropriate" because administrative closure would have permitted the noncitizen to avoid an order of deportation by failing to appear). In its decision, the Board clarified that administratively closing a case "does not result in a final order" and "is merely an administrative convenience which allows the removal of cases from the calendar in appropriate situations." *Id.* at 654 n.1. In 1990, the Board published *Matter of Lopez-Barrios* and *Matter of Munoz-Santos,* both of which held that an immigration judge could not administratively close a case if either party to the proceedings opposed closure. *Matter of Lopez-Barrios,* 20 I&N Dec. 203 (BIA 1990), *overruled by Matter of Avetisyan,* 25 I&N Dec. at 697; *Matter of Munoz-Santos,* 20 I&N Dec.

205 (BIA 1990), *overruled by Matter of Avetisyan,* 25 I&N Dec. at 697.[8]

Over the next decade, the Department entered into binding settlement agreements and issued numerous regulations that required immigration judges and the Board to administratively close cases or provided that parties could request administrative closure in a variety of specified situations. *See, e.g., Barahona-Gomez* v. *Ashcroft,* 243 F. Supp. 2d 1029, 1035 (N.D. Cal. 2002) ("[I]f the [Respondent] fails to appear for the scheduled hearing . . . the case shall be administratively closed, following which, should the Respondent come forward, the hearing shall be recalendared[.]"); *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 796, 805 (N.D. Cal. 1991) ("*ABC*") (ordering that proceedings before EOIR be administratively closed, generally, for class members); Adjustment of Status for Certain Nationals of Nicaragua and Cuba, 63 FR 27823, 27830 (May 21, 1998) (implementing administrative closure procedures for noncitizens who appeared eligible to adjust status under the Nicaraguan Adjustment and Central American Relief Act of 1997 ("NACARA")) (8 CFR 245.13(d)(3) (1999)); Adjustment of Status for Certain Nationals of Haiti, 64 FR 25756, 25769 (May 12, 1999) (requiring EOIR adjudicators to exercise administrative closure in cases where noncitizens appeared to be eligible to file an application for adjustment of status under the Haitian Refugee Immigration Fairness Act of 1998 ("HRIFA") and met various other requirements) (8 CFR 245.15(p)(4) (2000)); Executive Office for Immigration Review; Adjustment of Status for Certain Nationals of Nicaragua, Cuba, and Haiti, 66 FR 29449, 29452 (May 31, 2001) (providing that a noncitizen for whose case an immigration judge or the Board has granted a motion to reopen under particular statutes may move to have proceedings administratively closed to seek adjustment of status) (8 CFR 245.13(m)(1)(ii) (2002)); V Nonimmigrant Classification; Spouses and Children of Lawful Permanent Residents, 66 FR 46697, 46700 (Sept. 7, 2001) ("If the [noncitizen] appears eligible for V nonimmigrant status, the

---

[5] Initially, the adjudicators who reviewed and decided deportation cases were known as special inquiry officers. INA 101(b)(4), 8 U.S.C. 1101(b)(4) (1952). These adjudicators later became known as immigration judges. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4) (defining "immigration judge"); Immigration Judge, 38 FR 8590 (Apr. 4, 1973) ("The term 'immigration judge' means special inquiry officer.").

[6] Although the same NPRM proposed this regulatory authority for both the Board and immigration judges, the regulatory language was codified for the Board and immigration judges in separate final rules. *See* Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 FR 54877, 54902–904 (Aug. 26, 2002); Authorities Delegated to the Director of the Executive Office for Immigration Review, and the Chief Immigration Judge, 72 FR 53673, 53677–78 (Sept. 20, 2007).

[7] Indeed, EOIR records indicate that administrative closure was used as early as 1974.

[8] These decisions did not suggest that adjudicators did not have the authority to administratively close cases. Rather, they, as well as numerous subsequent administrative decisions, addressed when using administrative closure might be "appropriate" under the regulations. *See* 8 CFR 236.1 (1958) (permitting adjudicators to exercise authorities only as "appropriate and necessary"); *see also* 8 CFR 1003.1(d)(1)(ii) (2019); 8 CFR 1003.10(b) (2019).

immigration judge or the Board, whichever has jurisdiction, shall administratively close the proceeding or continue the motion indefinitely.'') (8 CFR 214.15(l) (2002)); New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for ''T'' Nonimmigrant Status, 67 FR 4783, 4797 (Jan. 31, 2002) (stating that T-visa applicants may request administrative closure) (codifying language later moved to 8 CFR 1214.2(a)); Adjustment of Status for Certain Aliens from Vietnam, Cambodia, and Laos in the United States, 67 FR 78667, 78673 (Dec. 26, 2002) (authorizing certain nationals of Vietnam, Cambodia, and Laos to move for administrative closure pending their applications for adjustment of status, but preventing the immigration judge or the Board from ''defer[ring] or dismiss[ing] the proceeding'' without the former Immigration and Naturalization Service's consent) (codifying language later moved to 8 CFR 1245.21(c)).

Since 2011, the U.S. Department of Homeland Security (''DHS'') has issued a number of enforcement priority memoranda, some of which have subsequently been rescinded, that included discussions of when U.S. Immigration and Customs Enforcement (''ICE'') attorneys should exercise prosecutorial discretion in pursuing removal, which noncitizens were considered priorities for removal, and methods for implementing those priorities as to noncitizens who were already in removal proceedings, including by filing joint motions to administratively close proceedings. *See, e.g.,* Memorandum for All Field Office Directors et al., from John Morton, Director, ICE, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* at 2 (Jun. 17, 2011) (describing prosecutorial discretion as a decision ''not to assert the full scope of the enforcement authority available to the agency''), *https://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf;* Memorandum for Tae D. Johnson, Acting Director, ICE, from Alejandro N. Mayorkas, Secretary, DHS, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), *https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw.pdf.*

Many pending removal-related cases before EOIR and the federal courts at the time potentially fell under the memoranda's criteria for low priorities for removal. *Cf. In re Immigr. Petitions for Rev. Pending in U.S. Ct. of Appeals*

*for Second Cir.,* 702 F.3d 160, 160 (2d Cir. 2012) (''[The petitioner] is one of more than a thousand cases in our Court that are actually or potentially subject to a future decision by the Government as to whether it will or can remove petitioners if their petitions are denied.''). The use of administrative closure served to facilitate the exercise of prosecutorial discretion by allowing DHS counsel to request that certain low-priority cases be removed from immigration judges' active calendars and the Board's docket, thereby allowing adjudicators to focus on higher priority cases.

In 2012, the Board published *Matter of Avetisyan,* which overruled the Board's prior precedent in *Matter of Lopez-Barrios* and *Matter of Munoz-Santos.* In *Matter of Avetisyan,* the Board established that EOIR adjudicators could administratively close proceedings over a party's objection and set forth a list of factors that adjudicators should consider when determining whether administrative closure was appropriate.[9] 25 I&N Dec. at 688. In so holding, the Board stated that EOIR adjudicators' authority to administratively close proceedings stemmed from their general regulatory authority, under 8 CFR 1003.10(b) and 1003.1(d)(1)(ii), to take any appropriate and necessary action. *Id.* at 691. The Board found that an EOIR adjudicator's determination to administratively close a case over DHS's objection would not undermine DHS's prosecutorial discretion, as prosecutorial discretion related to DHS's decision to commence removal proceedings. *Id.* at 694. In contrast, the Board determined that once jurisdiction over removal proceedings vests with EOIR, the EOIR adjudicator has the authority to regulate the course of proceedings, including to administratively close cases where appropriate. *Id.*

The Board also explained that EOIR adjudicators should independently weigh all relevant factors in determining whether to administratively close a case, including but not limited to:

(1) the reason administrative closure is sought; (2) the basis for any opposition to administrative closure; (3) the likelihood the respondent will succeed on any petition, application, or other action [the respondent] is pursuing outside of removal proceedings; (4) the anticipated duration of the closure; (5) the responsibility of either party, if any, in contributing to any current or anticipated delay; and (6) the ultimate outcome of removal proceedings (for example, termination of the proceedings or entry of a removal order) when the case is recalendared before the Immigration Judge or the appeal is reinstated before the Board.

*Id.* at 696. The Board later held that ''the primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits.'' *Matter of W–Y–U–,* 27 I&N Dec. 17, 20 (BIA 2017).

In 2013, DHS published a final rule that allowed certain noncitizens in removal proceedings to apply for provisional unlawful presence waivers of inadmissibility while still in the United States, but only if their removal proceedings had been administratively closed and not recalendared at the time they filed for the waiver. Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 FR 535, 577 (Jan. 3, 2013) (codifying language that was later moved to 8 CFR 212.7(e)(4)(iii)).[10] DHS further articulated that administrative closure is an appropriate and common procedural tool for dispensing with non-priority cases. *Id.* at 544 (''Under its prosecutorial discretion (PD) policies, ICE has been reviewing cases pending

---

[9] Notably, before *Matter of Avetisyan* overruled the Board's prior precedent on this issue, the Board had encouraged DHS to consider moving for administrative closure rather than multiple continuances in ''appropriate circumstances, such as where there is a pending prima facie approvable visa petition.'' *Matter of Hashmi,* 24 I&N Dec. 785, 791 n.4 (BIA 2009); *see also Matter of Rajah,* 25 I&N Dec. 127, 135 n.10 (BIA 2009). The Board described administrative closure as ''an attractive option in these situations, as it will assist in ensuring that only those cases that are likely to be resolved are before the Immigration Judge.'' *Matter of Hashmi,* 24 I&N Dec. at 791 n.4. The Board also noted that administrative closure could ''avoid the repeated rescheduling of a case that is clearly not ready to be concluded.'' *Id.*

[10] Pursuant to INA 212(a)(9)(B), 8 U.S.C. 1182(a)(9)(B), noncitizens who are inadmissible because they accrued more than 180 days of unlawful presence while in the United States and subsequently depart the United States may seek waiver of this ground of inadmissibility. Prior to the DHS rulemaking, such noncitizens, if not eligible to adjust status within the United States, had to request a waiver at their consular interview after leaving the United States and triggering the ground of inadmissibility. 78 FR at 536. In 2013, DHS established the provisional unlawful presence waiver process. *Id.* It began allowing noncitizens who are immediate relatives (spouses, children, and parents) of U.S. citizens to apply for a waiver while remaining in the United States, and, upon provisional approval, travel abroad to attend their consular interview for an immigrant visa, thus mitigating the likelihood that such individuals would be required to wait outside of the United States, apart from their immediate relatives, while the waiver was adjudicated. *Id.* In 2016, to further improve administrative efficiency, DHS expanded the provisional unlawful presence waiver process to all noncitizens statutorily eligible for an immigrant visa and a waiver of inadmissibility based on unlawful presence in the United States. Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 FR 50244 (July 29, 2016).

before EOIR and all incoming cases to ensure that they are aligned with the agency's civil enforcement priorities and that ICE is effectively using its finite resources. For cases that ICE determines are not enforcement priorities, it exercises its discretion where appropriate, typically by moving for administrative closure."). That same year, the Office of the Chief Immigration Judge encouraged immigration judges to use administrative closure where the parties reached an "alternate case resolution" through prosecutorial discretion. *See* EOIR, OPPM 13–01: *Continuances and Administrative Closure* at 4 (Mar. 7, 2011) (rescinded), *https://www.justice.gov/sites/default/files/eoir/legacy/2013/03/08/13-01.pdf.*

In 2017, the effectiveness of administrative closure for streamlining EOIR's cases was briefly referenced in a study conducted by an outside consultant. *See* EOIR, Booz Allen Hamilton, *Legal Case Study: Summary Report* at 26 (Apr. 6, 2017) (recommending that the Department engage in discussions with DHS to explore the development of policies regarding administrative closure as one way to improve processing efficiency).[11]

In 2018, the longstanding practice of administrative closure stopped when the Attorney General issued *Matter of Castro-Tum,* overruling *Matter of Avetisyan* and all Board precedents inconsistent with the Attorney General's decision. *Matter of Castro-Tum,* 27 I&N Dec. 271, 271 (A.G. 2018), *overruled by Matter of Cruz-Valdez,* 28 I&N Dec. 326 (A.G. 2021). In *Castro-Tum,* the Attorney General held that EOIR adjudicators lack the general authority under the regulations to administratively close cases and, as a result, lack the authority to administratively close cases unless a regulation or a settlement agreement expressly provided such authority. *Id.* at 272.

*Matter of Castro-Tum* has been rejected by the majority of those courts of appeals that have considered it. The Third, Fourth, and Seventh Circuits rejected *Matter of Castro-Tum,* holding that the pre-AA96 regulations unambiguously provide EOIR adjudicators with general authority to administratively close cases. *See Romero,* 937 F.3d at 297 (concluding that 8 CFR 1003.10(b) and

1003.1(d)(1)(ii) "unambiguously confer upon [immigration judges] and the BIA the general authority to administratively close cases"); *Arcos Sanchez,* 997 F.3d at 122 ("[W]e hold that the plain language establishes that general administrative closure authority is unambiguously authorized by these regulations."); *Meza Morales,* 973 F.3d at 667 n.6 (concluding that 8 CFR 1003.10(b) "grants immigration judges the power to administratively close cases"). The Sixth Circuit reached a different conclusion, finding that the pre-AA96 regulations do not confer such general authority. *Hernandez-Serrano,* 981 F.3d at 466 (citing *Matter of Castro-Tum,* 27 I&N Dec. at 272). However, the Sixth Circuit subsequently clarified that "administrative closure for the limited purpose of permitting noncitizens to apply for provisional unlawful presence waivers" was an "appropriate and necessary" act under 8 CFR 1003.1(d)(1)(ii) and 1003.10(b), as codified prior to the AA96 Final Rule. *Garcia-DeLeon,* 999 F.3d 986 at 992–93.

Recently, the Second Circuit held that neither the immigration judge nor the BIA abused its discretion in relying on *Matter of Castro-Tum*—which was in effect at the time of the agency's adjudications—to deny a noncitizen's motion for administrative closure. *Garcia* v. *Garland,* 64 F.4th 62, 76 (2d Cir. 2023). The Second Circuit concluded that the pre-AA96 regulations were ambiguous as to whether they authorized general administrative closure and deferred to the Attorney General's interpretation in *Matter of Castro-Tum. See id.* at 72–75. However, the Second Circuit noted that—after the BIA issued its decision in the case—the Attorney General issued *Matter of Cruz-Valdez,* 28 I&N Dec. at 326, which overruled *Matter of Castro-Tum. Garcia* v. *Garland,* 64 F.4th at 69. In *Cruz-Valdez,* the Attorney General explained that "three courts of appeals have rejected *Castro-Tum,*" that *Castro-Tum* "departed from long-standing practice," and that the matter was the subject of an ongoing rulemaking. *See Matter of Cruz-Valdez,* 28 I&N Dec. at 328–29 (directing EOIR adjudicators to continue applying the standard for administrative closure set forth in *Matter of Avetisyan* and *Matter of W–Y–U-,* except in jurisdictions where a court of appeals has held otherwise, while the Department reconsiders the AA96 Final Rule). Against this backdrop, the Second Circuit left open the possibility that other interpretations of the regulations could also be permissible. *See Garcia* v. *Garland,* 64 F.4th at 69 (noting that "the Attorney General has

supplanted *Matter of Castro-Tum* with a new interpretation of the applicable regulations").

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule amended 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) and related provisions to expressly state that EOIR adjudicators do not have "freestanding authority" to administratively close cases before EOIR. 85 FR at 81651, 81655. Rather, the AA96 Final Rule expressly limited administrative closure authority to express grants of such authority by regulation or judicially approved settlement. *See, e.g.,* 8 CFR 1214.2(a), 1214.3, 1240.62(b), 1240.70(f)–(h), 1245.13(d)(3)(i), 1245.15(p)(4)(i), 1245.21(c); *Barahona-Gomez,* 243 F. Supp. 2d at 1035–36 (discussing settlement agreement requiring immigration judges and the Board to administratively close class members' cases).

The AA96 Final Rule was consistent with the Attorney General's holding in *Matter of Castro-Tum,* 27 I&N Dec. at 284, that 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) do not provide for general administrative closure authority.[12] The AA96 Final Rule asserted that general administrative closure authority improperly allows immigration judges to determine which immigration cases should be adjudicated and which ones should not. 85 FR at 81599. The AA96 Final Rule stated that general authority to administratively close cases was improper because "in practice, unlike continuances, administrative closure has at times been used to effectively terminate cases through indefinite delay." *Id.*

C. Termination and Dismissal

As discussed above, the regulations in place prior to the AA96 Final Rule conferred on EOIR adjudicators the general authority to "take any action consistent with their authorities under the Act and regulations" as "appropriate and necessary" for the disposition" of such cases. 8 CFR 1003.1(d)(1)(ii), 1003.10(b). The regulations further state that immigration judge orders "shall direct the respondent's removal from the United States, or the termination of the proceedings, or other such disposition of the case as may be appropriate." 8 CFR 1240.12(c). Further, immigration judges are "authorized to

---

[11] The Department has considered the various proposals made in the report. For example, in 2021, EOIR finalized a rule implementing electronic filing at all immigration courts and the BIA. *See* Booz Allen Hamilton, *Legal Case Study: Summary Report* at 23; Executive Office for Immigration Review Electronic Case Access and Filing, 86 FR 70708 (Dec. 13, 2021) ("ECAS Rule").

[12] Moreover, the AA96 Final Rule cited the Attorney General's explanation that general administrative closure authority conflicts with regulatory requirements to resolve matters in a "timely" fashion. 85 FR 81588 (Dec. 16, 2020) at 81599.

issue orders in the alternative or in combination as [they] may deem necessary.'' *Id.*

The regulations, as published prior to and unchanged by the AA96 Final Rule, provide immigration judges with explicit authority to terminate or dismiss removal proceedings after the commencement of proceedings in certain circumstances. With respect to dismissal, 8 CFR 1239.2(c) provides that after commencement of proceedings, government counsel or certain enumerated officers under 8 CFR 239.1(a) may move to dismiss proceedings on grounds set forth in 8 CFR 239.2(a), which include where: (1) the respondent is a national of the United States; (2) the respondent is not deportable or inadmissible under immigration laws; (3) the respondent is deceased; (4) the respondent is not in the United States; (5) the Notice to Appear was issued for the respondent's failure to file a timely petition as required by section 216(c) of the Act, but the respondent's failure to file a timely petition was excused in accordance with section 216(d)(2)(B) of the Act; (6) the Notice to Appear was improvidently issued; or (7) circumstances of the case have changed after the Notice to Appear was issued to such an extent that continuation is no longer in the best interest of the government. 8 CFR 1239.2(c). Dismissal of proceedings is without prejudice to DHS or the noncitizen. *Id.*

With respect to termination, 8 CFR 1239.2(f) provides that ''[a]n immigration judge may terminate removal proceedings to permit the [noncitizen] to proceed to a final hearing on a pending application or petition for naturalization when the [noncitizen] has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors[.]'' 8 CFR 1239.2(f). The regulation also provides that ''in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings.'' *Id.*

The regulations also confer authority on immigration judges to dismiss or terminate proceedings in other discrete circumstances. *See, e.g.,* 8 CFR 1216.4(a)(6) (authorizing termination upon joint motion of the parties for failure to properly file a Petition to Remove the Conditions on Residence, Form I–751); 8 CFR 1235.3(b)(5)(iv) (authorizing termination where U.S. citizenship, permanent residence, or asylee or refugee status is found in claimed status review proceedings); *id.*

at 1235.3(b)(5)(iv) (authorizing termination where U.S. citizenship, permanent residence, or asylee or refugee status is found in claimed status review proceedings); *id.* at 1238.1(e) (authorizing termination upon DHS motion in order for DHS to commence administrative removal under section 238 of the Act); *see also id.* at 1245.13(l) (deeming proceedings terminated upon the granting of adjustment of status for certain Nicaraguan and Cuban nationals).[13]

Additionally, the Board has held that the immigration judge may terminate proceedings when there is a proper reason to do so, such as where DHS cannot meet its burden to sustain charges of removability ''or in other specific circumstances consistent with the law and applicable regulations.'' *Matter of Sanchez-Herbert,* 26 I&N Dec. 43, 45 (BIA 2012); *see also Matter of Lopez-Barrios,* 20 I&N Dec. at 204.

In 2018, the Attorney General held that, under the regulations, EOIR adjudicators lacked the ''inherent authority'' to terminate proceedings except as expressly authorized. *Matter of S–O–G– & F–D–B–,* 27 I&N Dec. 462, 463 (A.G. 2018). In reaching that conclusion, the Attorney General relied

heavily on the decision in *Matter of Castro-Tum. See id.* at 463, 466. However, the Attorney General subsequently overruled *Matter of S–O–G– & F–D–B–,* explaining that ''[t]he precedential basis for that opinion ha[d] been significantly eroded by the overruling of *Castro-Tum*,''[14] and that it ''imposed 'rigid procedural requirements that would undermine . . . fair and efficient adjudication' in certain immigration cases.'' *Matter of Coronado Acevedo,* 28 I&N Dec. 648, 651 (A.G. 2022) (quoting *Matter of A–C–A–A–,* 28 I&N Dec. 351, 351 (A.G. 2021)). Accordingly, *Matter of Coronado Acevedo* held that ''immigration judges and the Board should be permitted to consider and, where appropriate, grant termination'' in certain limited circumstances pending the outcome of a rulemaking to reconsider the regulations at issue in both *Matter of Castro-Tum* and *Matter of S–O–G– & F–D–B–. Id.* at 652.

### D. Sua Sponte Reopening or Reconsideration and Self-Certification

#### 1. Before Promulgation of the AA96 Final Rule

EOIR adjudicators have long had the authority to *sua sponte* reopen or reconsider cases, under rules promulgated in 1958 that remained in effect until the issuance of the AA96 Final Rule. *See* Miscellaneous Amendments to Chapter, 23 FR 9115, 9117 (Nov. 26, 1958); 8 CFR 1003.2(a)(1) and 1003.23(b)(1) (2019).[15] However, even prior to 1958, courts recognized such authority. *See Dada* v. *Mukasey,* 554 U.S. 1, 12–13 (2008) (discussing

---

[13] Although codified separately in the regulations, termination and dismissal authority have been referenced interchangeably by EOIR. *See, e.g., Matter of Coronado Acevedo,* 28 I&N Dec. 648, 648 n.1 (A.G. 2022) (''This labeling distinction is not material when a movant asks an immigration judge or the Board to end a case pursuant to a provision that does not use one of those labels. Except where a distinction between the two terms exists in regulations, this opinion refers to 'termination' and 'dismissal' interchangeably.''); *Matter of Vizcarra-Delgadillo,* 13 I&N Dec. 51, 55 (BIA 1968) (holding that the immigration judge had authority to *terminate* proceedings as ''improvidently begun'' in a case where INS moved for dismissal and both parties agreed to the motion to dismiss); *Matter of G–N–C,* 22 I&N Dec. 281, 284 (BIA 1998) (using the term ''dismissal'' and ''termination'' interchangeably in a case involving an INS motion for dismissal of proceedings under former 8 CFR 239.2(c)); *Matter of W–C–B–,* 24 I&N Dec. 118, 122 (BIA 2007) (stating that once jurisdiction vests with an immigration judge, a Notice to Appear cannot be cancelled but instead DHS must ''move for dismissal of the matter, *i.e.,* request termination of the removal proceeding'' under 8 CFR 239.2(c)); *Matter of Andrade Jaso & Carbajal Ayala,* 27 I&N Dec. 557, 559 (BIA 2019) (holding that the ''immigration judge properly granted the DHS's motion to dismiss the proceedings without prejudice'' under 8 CFR 1239.2(c)); *see also* 78 FR 535 (Jan. 3, 2013) at 544 (preamble to a DHS final rule stating that ''[i]f the Form I–601A is approved for [a noncitizen] whose proceedings have been administratively closed, the [noncitizen] should seek termination or dismissal of the proceedings, without prejudice, by EOIR . . . or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility''). While used interchangeably, the regulations limit dismissal to only those cases where DHS has moved for dismissal. Nevertheless, both termination and dismissal result in concluding removal proceedings without entering an order of removal.

[14] In particular, the Fourth Circuit has indicated that it ''fail[ed] to see how the general power to terminate proceedings'' would be inconsistent with the ''authorities bestowed by the INA.'' *Gonzalez* v. *Garland,* 16 F.4th 131, 141–42 (4th Cir. 2021) (''We have found no provisions stating that the [immigration judge] or BIA *cannot* terminate removal proceedings, and the Government does not cite to any.''). Further, in that case, the Fourth Circuit rejected the Government's position that section 240(c)(1)(A) of the Act, 8 U.S.C. 1229a(c)(1)(A), which states that ''[a]t the conclusion of the proceeding, the immigration judge shall decide whether [a noncitizen] is removable from the United States,'' precludes termination. *Gonzalez,* 16 F.4th at 141. Specifically, the court concluded that a statutory requirement that an immigration judge decide whether a noncitizen is removable does not limit the immigration judge's actions after making that determination, and that there are circumstances where delay or termination after such determination may be appropriate. *Id.*

[15] The 1958 rule amended, inter alia, part 3.2 of Title 8 of the CFR. Following the creation of DHS in 2003 after the passage of the HSA, EOIR's regulations were moved from Chapter I of Title 8 to Chapter V. Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 FR 9824 (Feb. 28, 2003). Part 3.2 was subsequently duplicated for EOIR at part 1003.2. *Id.* at 9830.

reopening as "a judicial creation later codified by federal statute" and citing decisions using reopening as early as 1916).

As originally implemented by the Department, the *sua sponte* authority of immigration judges and Appellate Immigration Judges was not limited by time or number requirements. In 1996, however, the Department issued a rule establishing time and number limitations on motions to reopen to implement statutory changes made by the Immigration Act of 1990, Public Law 101–649, 104 Stat. 4978. Immigration Act of 1990, sec. 545(d), 104 Stat. at 5066 ("[T]he Attorney General shall issue regulations with respect to . . . the period of time in which motions to reopen and to reconsider may be offered in deportation proceedings, which regulations include a limitation on the number of such motions that may be filed and a maximum time period for the filing of such motions[.]"); Executive Office for Immigration Review; Motions and Appeals in Immigration Proceedings, 61 FR 18900 (Apr. 29, 1996). At the time, the Department declined to include a "good cause" exception to the time and number limitations for motions to reopen filed by a party in proceedings because the same goal was accomplished by *sua sponte* authority. 61 FR at 18902; *see also Avila-Santoyo* v. *U.S. Att'y Gen.,* 713 F.3d 1357, 1363 (11th Cir. 2013) (same).

Additionally, prior to the AA96 Final Rule, the Board had the authority to self-certify cases. 8 CFR 1003.1(c) (2019). Under this authority, the Board could, in its discretion, review decisions of an immigration judge and DHS by its own certification. 8 CFR 1003.1(b)–(c) (2019). The Board could exercise this authority even in cases where a party's appeal was untimely or defective, after determining that the parties were given a fair opportunity to make representations before the Board. *Id.*

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule revised the regulations to limit the longstanding general *sua sponte* authority to reopen or reconsider cases and established that *sua sponte* reopening or reconsideration could only be used to correct typographical errors or defects in service. 85 FR at 81654–55 (8 CFR 1003.23(b)(1)). The AA96 Final Rule also limited exceptions to the time and numerical limits on filing a motion to reopen to cases where a change in fact or law post-dating the entry of a final order vitiated the grounds for removal and the movant demonstrated diligence

in pursuing the motion. *Id.* (8 CFR 1003.23(b)(4)(v)). The Department chose to apply these restrictions on immigration judges' and the Board's *sua sponte* reopening authority to all pending cases. *Id.* at 81646–47. The Department explained that this rescission was needed because *sua sponte* authority had been used improperly. *Id.* at 81628. Additionally, the Department explained that the Attorney General rescinded his delegation of *sua sponte* authority to reopen or reconsider given the lack of a meaningful standard to guide a decision whether to order reopening or reconsideration of cases through the use of *sua sponte* authority. *Id.*

The AA96 Final Rule also amended 8 CFR 1003.1(c) to remove the Board's authority to self-certify cases in order to accept untimely or defective appeals in exceptional circumstances. The Department explained that the change was necessary due to similar concerns such as the lack of standards for the use of the self-certification authority, inconsistent applications resulting from the lack of a defined standard for determining when "exceptional" circumstances exist, the potential for lack of notice to the parties when the Board elected to use its self-certification authority, the potential for inconsistent application and abuse of self-certification authority, and the strong interest in finality of EOIR's adjudications. *Id.* at 81591.

*E. Board Findings of Fact— Administrative Notice*

1. Before Promulgation of the AA96 Final Rule

Prior to the AA96 Final Rule, the regulations generally precluded the Board from engaging in fact-finding in the course of deciding appeals. 8 CFR 1003.1(d)(3)(iv) (2019). However, the regulations authorized the Board to take "administrative notice of commonly known facts such as current events or the contents of official documents." *Id.*

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule expanded the regulations regarding administrative notice in several ways. First, in addition to permitting the Board to take administrative notice of the content of official documents and current events, the rule further permitted the Board to take administrative notice of "[f]acts that can be accurately and readily determined from official government sources and whose accuracy is not disputed" and "[u]ndisputed facts contained in the record." 85 FR at 81651

(8 CFR 1003.1(d)(3)(iv)(A)(3), (4)). The AA96 Final Rule went on to state that where the Board intends to rely on administratively noticed facts to reverse an immigration judge's grant of relief or protection from removal, the Board is required to notify the parties of its intent and provide them at least 14 days within which to respond to the notice. *Id.* (8 CFR 1003.1(d)(3)(iv)(B)). However, the AA96 Final Rule did not require the Board to notify the parties if it relied on an administratively noticed fact to uphold an immigration judge's denial. *See id.* (8 CFR 1003.1(d)(3)(v)).

*F. Board Findings of Fact—Voluntary Departure*

1. Before Promulgation of the AA96 Final Rule

Voluntary departure is a discretionary form of relief that "allows certain favored [noncitizens] . . . to leave the country willingly" either before the conclusion of removal proceedings or after being found deportable. *Dada,* 554 U.S. at 8. A noncitizen must apply for voluntary departure in the first instance before an immigration judge; otherwise, the opportunity to seek such relief will be deemed waived. *See, e.g., Matter of J–Y–C–,* 24 I&N Dec. 260, 261 n.1 (BIA 2007) (declining to consider claim raised for the first time on appeal). Likewise, the noncitizen must raise the issue of voluntary departure in any appeal to the Board; otherwise, it will be deemed waived. *See Matter of Cervantes,* 22 I&N Dec. 560, 561 n.1 (BIA 1999) (refusing to address an issue not raised on appeal).

Prior to the AA96 Final Rule, the regulations described an immigration judge's authority to grant voluntary departure but did not articulate the Board's authority to do so. *See generally* 8 CFR 1240.26 (2019). The regulations stated that in limited circumstances, the Board could reinstate an order of voluntary departure when removal proceedings had been reopened for a purpose other than solely requesting voluntary departure. 8 CFR 1240.26(h) (2019).[16] The Board could remand cases to the immigration court to consider whether a noncitizen was eligible for voluntary departure or for the

---

[16] Although the regulations have never explicitly stated that the Board has the authority to grant voluntary departure, the Eleventh Circuit has stated that the Board has the authority to grant or deny voluntary departure in the first instance pursuant to its general (pre-AA96) regulatory authority under 8 CFR 1003.1(d)(3)(ii) to "review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo." *Blanc* v. *U.S. Att'y Gen.,* 996 F.3d 1274, 1278 (11th Cir. 2021) ("At the agency level, the Board of Immigration Appeals itself can grant—or deny—voluntary departure.").

immigration judge to review whether a noncitizen had received proper voluntary departure advisals. *See Matter of Gamero,* 25 I&N Dec. 164, 168 (BIA 2010) (concluding that ''a remand is the appropriate remedy when the mandatory advisals have not been provided by the Immigration Judge'').

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule delegated explicit authority to the Board to consider issues relating to the immigration judge's decision on voluntary departure de novo and to issue final decisions on requests for voluntary departure based on the record evidence. 85 FR at 81652, 81655 (8 CFR 1003.1(d)(7)(ii)(E); 1240.26(k)). The AA96 Final Rule barred the Board from remanding a case to the immigration court solely to consider a request for voluntary departure or for the immigration judge's failure to provide advisals following a grant of voluntary departure. *Id.* at 81652.

Specifically, the AA96 Final Rule provided that the Board could issue an order of voluntary departure, with an alternate order of removal, where: (1) the noncitizen requested voluntary departure before the immigration judge; (2) the notice of appeal specified that the noncitizen was appealing an immigration judge's denial of voluntary departure and raised specific factual and legal challenges on this issue; and (3) the Board determined that the noncitizen was otherwise eligible for voluntary departure. *Id.* The AA96 Final Rule mandated that if the Board did not grant the request for voluntary departure, it would be required to deny the request. *Id.*

The AA96 Final Rule further provided that in instances where the Board determined that the immigration judge incorrectly denied a noncitizen's request for voluntary departure or failed to provide appropriate advisals, it would be required to consider the request for voluntary departure de novo and, if warranted, it must enter an order granting voluntary departure with an alternate order of removal. *Id.* at 81655.

Furthermore, the AA96 Final Rule specified that in cases where DHS appealed an immigration judge's decision, the Board could not grant voluntary departure unless: (1) the noncitizen requested voluntary departure before the immigration judge and provided or proffered evidence to support the request; (2) the immigration judge either granted voluntary departure or did not rule on the request; and (3) the noncitizen otherwise met the

statutory and regulatory criteria for voluntary departure. *Id.*

Lastly, the AA96 Final Rule specified that the Board could impose conditions that it deemed necessary to ensure the noncitizen's timely departure from the United States and required the Board to provide written advisals of such conditions and other duties associated with voluntary departure. *Id.* at 81655–56. The noncitizen could accept the grant of voluntary departure or could decline by providing written notice within five days of receipt of the Board's decision, failing to timely post any required bond, or otherwise failing to comply with the Board's order. *Id.* at 81656.

*G. Board Remand Authority— Additional Findings of Fact*

1. Before Promulgation of the AA96 Final Rule

The Board does not engage in fact-finding when adjudicating appeals of immigration judges' decisions. 8 CFR 1003.1(d)(3)(i). Accordingly, under the pre-AA96 regulations, a party asserting that the Board could not properly resolve an appeal without further fact-finding would file a motion to remand. 8 CFR 1003.1(d)(3)(iv) (2019).

Generally, motions to remand are subject to the same substantive requirements as motions to reopen, particularly where a party seeks remand during the pendency of a direct appeal to present new evidence or to apply for a newly available form of relief not considered by the immigration judge. *See Rodriguez* v. *INS,* 841 F.2d 865, 867 (9th Cir. 1987) (substantive requirements of a motion to remand are the same as a motion to reopen); *Matter of Coelho,* 20 I&N Dec. 464, 471 (BIA 1992) (explaining ''where a motion to remand is really in the nature of a motion to reopen or a motion to reconsider, it must comply with the substantive requirements for such motions''). Additionally, prior to the AA96 Final Rule, the Board had regulatory authority to *sua sponte* remand a case for further fact-finding where necessary. 8 CFR 1003.1(d)(3)(iv) (2019); *see also Matter of S–H–,* 23 I&N Dec. 462, 466 (BIA 2002) (exercising *sua sponte* remand authority).

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule restricted the Board's authority to remand for further fact-finding or consideration of new evidence. 85 FR at 81651 (8 CFR 1003.1(d)(3)(iv)(C)–(D)). First, the AA96 Final Rule provided that the Board may only grant motions to remand for further

fact-finding when: (1) the party seeking remand preserved the issue before the immigration judge; (2) the party seeking remand attempted to adduce the additional facts before the immigration judge, if it bore the burden of proof; (3) additional fact-finding would alter the outcome of the case; (4) additional fact-finding would not be cumulative of the evidence already presented or contained in the record; and (5) either the immigration judge's factual findings were clearly erroneous, the immigration judge committed an error of law that required additional fact-finding on remand, or remand to DHS was warranted following a de novo review. *Id.* (8 CFR 1003.1(d)(3)(iv)(D)). Second, the AA96 Final Rule prohibited the Board from *sua sponte* remanding a case for further fact-finding except when necessary to determine whether the immigration judge had jurisdiction over the case. *Id.* (8 CFR 1003.1(d)(3)(iv)(C)).

The AA96 Final Rule provided exceptions to these general restrictions on remand authority under 8 CFR 1003.1(d)(6)(iii) and (d)(7)(v)(B). 85 FR at 81651–52. Under paragraph (d)(6)(iii), DHS could move the Board to remand the record to the immigration judge to consider whether, in light of new information gained by identity, law enforcement, or security investigations or examinations, any pending applications for relief or protection should be denied. *Id.* If DHS failed to report the results of such investigations or examinations, the regulations directed the Board to remand the case to the immigration judge for further proceedings under 8 CFR 1003.47(h). *Id.* Paragraph (d)(7)(v)(B) reiterated that the Board was not limited in remanding a case based on new evidence or information gained from identity, law enforcement, or security investigations or examinations; to address a question of jurisdiction over an application or proceedings; or to address a question regarding grounds of removability in sections 212 or 237 of the Act, 8 U.S.C. 1182, 1227. 85 FR at 81652.

*H. Board Remand Authority—Errors in Fact or Law*

1. Before Promulgation of the AA96 Final Rule

Prior to the AA96 Final Rule, the regulations broadly authorized the Board to remand cases ''as . . . appropriate, without entering a final decision on the merits of the case.'' 8 CFR 1003.1(d)(7) (2019). However, as the AA96 Final Rule explained, the regulation granted this authority without any further guidance or instructions regarding when the Board

could order a remand instead of issuing a final order. 85 FR at 81589.

## 2. Changes Made by the AA96 Final Rule

The AA96 Final Rule restricted the Board's authority to remand for errors in fact or law or consideration of material changes in fact or law. *Id.* at 81652 (8 CFR 1003.1(d)(7)(ii)). Specifically, the AA96 Final Rule provided that the Board could not remand a case without first identifying the standard of review that it had applied, as well as the specific error or errors made by the immigration judge. *Id.* The Board also could not remand a case based on a "totality of the circumstances" standard of review or based on a legal argument that was not presented in 8 CFR 1003.1(d)(7)(ii)(D) through (E), with certain exceptions. *Id.*

Additionally, the AA96 Final Rule barred the Board from remanding a case *sua sponte,* unless the remand solely involved a question of jurisdiction. *Id.* As discussed above, the Board also could not remand a case solely for consideration of voluntary departure or as the result of the failure to give required advisals for a grant of voluntary departure. *Id.* Moreover, the AA96 Final Rule generally barred remanding based on any legal arguments that did not pertain to an "issue of jurisdiction over an application or the proceedings," or to "material change[s] in fact or law" underlying a removability ground or grounds that occurred after the date of the immigration judge's decision and substantial evidence indicated that the material change would vitiate all grounds of removability. *Id.*

### I. Background Check

#### 1. Before Promulgation of the AA96 Final Rule

In 2005, the Department implemented regulations covering background and security investigations in proceedings before immigration judges and the Board. *See* Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals, 70 FR 4743 (Jan. 31, 2005) ("Background Check Rule") (issued as interim final rule). The Background Check Rule amended Department regulations to ensure that the necessary identity, law enforcement, and security investigations (hereinafter "background checks") are promptly initiated and have been completed by DHS prior to the granting of certain forms of relief or protection from removal. 8 CFR 1003.1(d)(6) (2019).

Under the framework implemented by the Background Check Rule, applicants for relief or protection from removal in proceedings before EOIR have an obligation to comply with applicable requirements to provide biometrics and other biographical information, and failure to comply with such requirements within the time allowed constitutes abandonment of the application, with certain exceptions. *Id.;* 8 CFR 1003.47(c), (d).

Prior to the AA96 Final Rule, the Board could address incomplete or outdated background checks by either remanding the case to the immigration judge or placing adjudication of the case on hold until background checks were completed or updated. 8 CFR 1003.1(d)(6)(ii)(A), (B) (2019). However, the Board was not required to remand or hold a case if dismissing the appeal or when denying the relief sought. 8 CFR 1003.1(d)(6)(iv) (2019).

#### 2. Changes Made by the AA96 Final Rule

The AA96 Final Rule limited the Board's authority to remand a decision with incomplete or outdated background checks. 85 FR at 81651 (8 CFR 1003.1(d)(6)(ii)–(iii)). Under the new framework, the Board was only permitted to place such cases on hold and to notify the parties about the hold, including certain advisals about the consequences for failure to comply with background check requirements. *Id.*

Further, the AA96 Final Rule required the Board to deem an application for relief from removal abandoned if a noncitizen failed to comply with background check procedures within 90 days of DHS's instruction notice under 8 CFR 1003.1(d)(6)(ii), unless the noncitizen demonstrated good cause prior to the end of the 90-day period, or if the noncitizen was detained. *Id.* at 81651–52 (8 CFR 1003.1(d)(6)(iii)). If the noncitizen demonstrated good cause within the 90-day period, the Board could give the noncitizen one extension of up to 30 additional days to comply. *Id.* at 81652. The AA96 Final Rule further required that the Board adjudicate the remainder of the appeal within 30 days after an application was deemed abandoned and enter an order of removal or a grant of voluntary departure, as appropriate. *Id.*

Regarding motions to remand, the AA96 Final Rule permitted DHS to file a motion to remand if it obtained relevant information when completing or updating background checks so that the immigration judge could consider whether, in light of the new information, any pending applications for relief or protection should be denied.

*Id.* Additionally, the AA96 Final Rule instructed the Board to remand the case to the immigration judge if DHS failed to report the results of background checks within 180 days of the Board's notice. *Id.*

### J. Adjudication Timelines

#### 1. Before Promulgation of the AA96 Final Rule

Prior to the AA96 Final Rule, the regulations provided for a case management system that set forth, in relevant part, procedures for initial screening for cases appealed to the Board and general guidance regarding a decision's timeliness. 8 CFR 1003.1(e)(1), (8) (2019). Regarding initial screening, the regulations established that cases would be referred to a screening panel for review and that appeals subject to summary dismissal must be "promptly dismissed." 8 CFR 1003.1(e)(1) (2019). However, the Board did not have a concrete timeline for such review or dismissal. *Id.* As for timeliness, the regulations provided that in all cases, other than those subject to summary dismissal, the Appellate Immigration Judge or panel should issue a decision on the merits "as soon as practicable," prioritizing cases involving detained noncitizens. 8 CFR 1003.1(e)(8) (2019). The regulations further set forth a 90-day decision deadline for cases adjudicated by a single Appellate Immigration Judge, beginning upon completion of the record on appeal, and a 180-day deadline for cases adjudicated by a three-member panel, beginning once an appeal was assigned to the three-member panel. 8 CFR 1003.1(e)(8)(i) (2019). However, the Board Chairman [17] could extend those deadlines in exigent circumstances. 8 CFR 1003.1(e)(8)(ii) (2019). The Chairman could also suspend the regulatory deadlines and indefinitely hold a case or group of cases in anticipation of an impending decision by the United States Supreme Court, a United States Court of Appeals, the Board sitting *en banc,* or impending Department regulations. 8 CFR 1003.1(e)(8)(iii) (2019). Moreover, the Chairman was required to notify the EOIR Director and the Attorney General if an Appellate Immigration Judge consistently failed to meet the assigned deadlines or adhere to the case management system, as well as to prepare an annual report assessing the timeliness of the disposition of cases by

---

[17] The Board Chairman, or the Chairman, is also known as the "Chief Appellate Immigration Judge." *See* Organization of the Executive Office for Immigration Review, 85 FR 69465, 69466 (Nov. 3, 2020) (final rule).

each Appellate Immigration Judge. 8 CFR 1003.1(e)(8)(v) (2019).

## 2. Changes Made by the AA96 Final Rule

The AA96 Final Rule imposed numerous internal deadlines for adjudicating Board appeals. 85 FR at 81652–53 (8 CFR 1003.1(e)). For example, the rule required the Board screening panel to review cases within 14 days of the filing of a Notice of Appeal, the filing of a motion, or the receipt of a remand from a federal court. *Id.* (8 CFR 1003.1(e)(1)). Following an initial review, the Board had to adjudicate requests for summary dismissal no later than 30 days after the filing of the Notice of Appeal, subject to limited exceptions, and interlocutory appeals within 30 days of the filing of the appeal, unless referred to a three-member panel. *Id.* After the screening panel completed its review, the Board would then have seven days to order a transcript and would be required to set a briefing schedule within seven days after the transcript was provided, subject to limited exceptions. *Id.* at 81653 (8 CFR 1003.1(e)(8)).

The AA96 Final Rule also required that the Board assign each case to a single Appellate Immigration Judge within seven days of the completion of the record on appeal. *Id.* The single Appellate Immigration Judge would then determine whether to adjudicate the appeal independently or to designate the case for decision by a three-member panel. *Id.*

The AA96 Final Rule did not alter the completion deadlines of 90 days for a single-member decision and 180 days for a three-member decision. 85 FR at 81653 (8 CFR 1003.1(e)(8)(i)). However, the AA96 Final Rule changed the 180-day time period for completion of a three-member decision to begin earlier, upon completion of the record, rather than beginning the clock after the case was assigned to a three-member panel, and added that the Chairman's determination as to whether exigent circumstances warranted extension of those deadlines would be subject to concurrence by the EOIR Director. *Id.*

The AA96 Final Rule also limited the "rare circumstances" under which the Chairman could place cases on hold to only those groups of cases that would be substantially impacted by an impending decision by the United States Supreme Court or the Board sitting *en banc* and removed the ability to hold cases to await an impending decision by a United States Court of Appeals or impending Department regulations. 8 CFR 1003.1(e)(8)(iii). The AA96 Final Rule also required the concurrence of

the EOIR Director to hold cases under this provision. *Id.* at 81653 (8 CFR 1003.1(e)(8)(iii)). The AA96 Final Rule limited such holds to a maximum of 120 days. *Id.* The AA96 Final Rule also imposed additional reporting requirements on the Chairman for transcription processes and cases involving extensions, holds, or other delays. *Id.* at 81653 (8 CFR 1003.1(e)(8), (8)(v)).

Furthermore, the AA96 Final Rule required that all cases that remained pending for more than 335 days after receipt of a filed appeal or motion, or remand from a federal court, would be referred to the EOIR Director for a decision unless subject to an extension, hold, deferral, or remand. *Id.* at 81653 (8 CFR 1003.1(e)(8)(v)). The Director would then exercise delegated authority from the Attorney General identical to that of the Board, including the authority to issue precedential decisions or refer cases to the Attorney General. *Id.* However, the AA96 Final Rule limited further delegation of such authority from the EOIR Director to other individuals. *Id.*

## K. Director's Authority To Issue Decisions

### 1. Before Promulgation of the AA96 Final Rule

Until 2019, the EOIR Director had no authority to adjudicate cases arising under the Act, including appeals before the Board. *See* 8 CFR 1003.0(c) (2018). Instead, the regulations simply provided that for cases not completed within the relevant time limits and not subject to any exceptions, the Chairman should self-refer them or refer them to the Vice Chairman for completion within 14 days. Alternatively, the Chairman could refer them to the Attorney General. 8 CFR 1003.1(e)(8) (2018).

In 2019, the Department established a narrow discretionary authority for the EOIR Director to decide appeals in certain circumstances. *See* Organization of the Executive Office for Immigration Review, 84 FR 44537, 44539–40 (Aug. 26, 2019) (issued as an interim final rule), 85 FR 69465, 69466 (Nov. 3, 2020) (final rule); *see also* 8 CFR 1003.1(e)(8)(ii) (authorizing the EOIR Director to decide an appeal that exceeded the 90- and 180-day regulatory time limits unless the Chairman self-referred the case or referred the case to the Vice Chairman); 8 CFR 1003.0(c) (providing that the EOIR Director may not adjudicate cases arising under the Act "[e]xcept as provided by statute, regulation, or delegation of authority from the Attorney General, or when acting as a designee of the Attorney

General"). The Department subsequently codified, at the final rule stage, language stating that the EOIR Director's authority to decide appeals in certain circumstances under 8 CFR 1003.1(e)(8)(ii) could not be further delegated. 85 FR at 69480–81; 8 CFR 1003.0(b)(2)(ii) ("The Director may not delegate the authority assigned to the Director in [8 CFR] 1003.1(e)(8)(ii) . . .").

### 2. Changes Made by the AA96 Final Rule

The AA96 Final Rule authorized the EOIR Director to decide cases in two distinct circumstances. First, the rule directed the Chairman to refer any case still pending 335 days after an appeal or motion was filed or a remand was received to the EOIR Director for adjudication. 85 FR at 81653 (8 CFR 1003.1(e)(8)(v)). Under the AA96 Final Rule, the following categories of cases were not subject to the EOIR Director's adjudication authority: (1) cases subject to a hold under 8 CFR 1003.1(d)(6)(ii); (2) cases subject to an extension under 8 CFR 1003.1(e)(8)(ii); (3) cases subject to a hold under 8 CFR 1003.1(e)(8)(iii); (4) cases whose adjudication had been deferred by the EOIR Director pursuant to 8 CFR 1003.0(b)(1)(ii); (5) cases that were remanded by the EOIR Director under 8 CFR 1003.1(k) in which 335 days had elapsed following remand; and (6) cases that were administratively closed prior to 335 days after the appeal was filed pursuant to a regulation promulgated by the Department or a previous judicially approved settlement that authorized such an action but for which the administrative closure caused the pendency of the appeal to exceed 335 days. *Id.* (8 CFR 1003.1(e)(8)(v)(A)–(F)).

Second, the rule established a procedure for an immigration judge to certify a Board decision to the EOIR Director when the immigration judge believed the Board made one or more enumerated errors. *Id.* (8 CFR 1003.1(k)). This authority is discussed in further detail in the section on the "Quality Assurance Certification" provision.

For cases referred to the EOIR Director, the EOIR Director would exercise delegated authority from the Attorney General identical to that of the Board, including the authority to issue precedential decisions and the authority to refer cases to the Attorney General for review. *Id.* (8 CFR 1003.1(e)(8)(v)). The AA96 Final Rule prohibited the EOIR Director from further delegating this authority. *Id.* Of note, the AA96 Final Rule did not amend the existing regulatory provision reiterating that 8

CFR 1003.1(e)(8) did not confer substantive or procedural rights enforceable before any immigration judge, the Board, or any court of law or equity, 8 CFR 1003.1(e)(8)(vi), which, under the AA96 Final Rule, included case referrals to the EOIR Director.

*L. Quality Assurance Certification*

1. Before Promulgation of the AA96 Final Rule

Prior to the AA96 Final Rule, various options were available to ensure quality case adjudications. If a party were dissatisfied with a Board decision, the party could file a motion to reconsider. 8 CFR 1003.2(a). Alternatively, the noncitizen could file a petition for review of a final order of removal with a federal court of appeals. INA 242(a)(1), 8 U.S.C. 1252(a)(1). In addition, DHS could seek to certify a Board decision to the Attorney General for review, 8 CFR 1003.1(h)(1)(iii), or the Attorney General could self-certify a Board decision for review, 8 CFR 1003.1(h)(1)(i). The Board could also reconsider or reopen a decision by exercising its *sua sponte* authority. 8 CFR 1003.2(a) (2019) (providing that ''[t]he Board may at any time reopen or reconsider on its own motion'' any Board decision). The process by which an immigration judge could certify a decision to the EOIR Director did not exist prior to the AA96 Final Rule. *See generally* 8 CFR 1003.23(b) (2019).

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule did not change some of the existing options to ensure quality case adjudications discussed above, including a party's ability to file a motion to reconsider with the Board, the ability to file a petition for review of a final order of removal with a federal court of appeals, and the case referral options outlined in 8 CFR 1003.1(h).[18] In addition to these options, the AA96 Final Rule implemented a quality assurance certification, wherein the immigration judge could forward a case by certification to the EOIR Director for further review if the Board decision: (1) contained a typographical or clerical error that affected the outcome of the case; (2) was clearly contrary to an immigration law or statute, applicable regulation, or published binding precedent; (3) was ''vague, ambiguous, internally inconsistent, or otherwise did not resolve the basis for the appeal''; or (4) did not consider a material factor pertinent to the issues before the

immigration judge. 85 FR at 81653–54 (8 CFR 1003.1(k)(1)). To certify a decision, the immigration judge was required to issue an order of certification within 30 days of the Board decision, or within 15 days if the noncitizen was detained, specifying the regulatory basis for the certification, summarizing the underlying factual basis, and providing notice of the certification to both parties. *Id.* at 81653 (8 CFR 1003.1(k)(2)).

For such cases, the EOIR Director would exercise delegated authority from the Attorney General identical to that of the Board. *Id.* (8 CFR 1003.1(k)(3)). The Director could dismiss the certification and return the case to the immigration judge or remand the case back to the Board. *Id.* The Director could not, however, issue an order of removal, grant a request for voluntary departure, or grant or deny an application for relief or protection from removal. *Id.* The AA96 Final Rule further barred the quality assurance certification process from being used solely to express general disapproval or disagreement with the outcome of a Board decision. *Id.* at 81654 (8 CFR 1003.1(k)(4)).

*M. Forwarding of Record on Appeal*

1. Before Promulgation of the AA96 Final Rule

The pre-AA96 regulation provided that, when a transcript of an oral decision was required, an immigration judge would review the transcript and approve the decision within 14 days of receipt (or within seven days following an immigration judge's return from leave or a detail). 8 CFR 1003.5(a) (2019). Further, the regulation required the transcript to be forwarded to the Board upon its request or order. *Id.* The regulation instructed the Chairman and Chief Immigration Judge to determine the most effective and expeditious way to transcribe proceedings before immigration judges, including reducing the time necessary to produce transcripts and improving the quality of such transcripts. *Id.*

2. Changes Made by the AA96 Final Rule

The AA96 Final Rule amended 8 CFR 1003.5(a) so that immigration judges would not need to forward the record to the Board if the Board already had electronic access to the record. 85 FR at 81654 (8 CFR 1003.5(a)). The AA96 Final Rule also removed the requirement that immigration judges review transcripts of oral decisions, which included review of, potential revisions to, and approval of the transcript. *Compare* 8 CFR 1003.5(a)

(2019) (''Where transcription of an oral decision is required, the immigration judge shall review the transcript and approve the decision . . .''), *with* 85 FR at 81654 (8 CFR 1003.5(a)) (omitting that requirement).

The AA96 Final Rule did not alter the requirement that the EOIR Director, in consultation with the Chairman and Chief Immigration Judge, determine the most effective and expeditious way to transcribe proceedings. 85 FR at 81654 (8 CFR 1003.5(a)). Indeed, it directed the Chairman and Chief Immigration Judge to ''ensure,'' *id.* (8 CFR 1003.5(a)), rather than simply ''improve,'' 8 CFR 1003.5(a) (2019), the quality of such transcripts.

The AA96 Final Rule also amended 8 CFR 1003.5(b) by removing language describing DHS procedures regarding appeals from DHS decisions that are within the BIA's appellate jurisdiction and stated that those procedures were not applicable to EOIR adjudicators. 85 FR at 81654 (8 CFR 1003.5(b)).

*N. Centro Legal de la Raza Litigation*

On March 10, 2021, the United States District Court for the Northern District of California granted a nationwide preliminary injunction barring the Department from implementing or enforcing the AA96 Final Rule or any portion thereof and staying the effectiveness of the rule under 5 U.S.C. 705. *Centro Legal de la Raza* v. *Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919 (N.D. Cal. 2021). The preliminary injunction and stay of the rule's effectiveness remain in effect.[19] In granting the preliminary injunction and stay under 5 U.S.C. 705, the court determined that plaintiffs were likely to ultimately succeed on several substantive and procedural challenges raised with respect to the AA96 Final Rule. *Id.* at 954–76.[20]

---

[18] The AA96 Final Rule limited the Board's *sua sponte* authority to reopen or reconsider a decision as discussed in Section III.D of this preamble.

[19] In addition to this preliminary injunction, the United States District Court of the District of Columbia granted a stay of the implementation of the AA96 Final Rule on April 3, 2021, determining that the 30-day comment period associated with the rulemaking was procedurally insufficient. *See Catholic Legal Immigration Network, Inc.* v. *Exec. Off. for Immigr. Rev.*, No. 21–00094, 2021 WL 3609986 (D.D.C. Apr. 4, 2021).

[20] Procedurally, the court stated that plaintiffs were likely to succeed on their claim that the Department's 30-day notice-and-comment period was insufficient under the Administrative Procedure Act (''APA'') due to the rule's complexity, the COVID–19 pandemic, and other concerns. *Centro Legal de la Raza*, 524 F. Supp. 3d at 954–58. The court also raised ''serious concerns'' with the Department's ''staggered rulemaking'' approach, explaining that because ''numerous intertwined proposed rules were promulgated at different times, including after the close of the comment period in this case, the true impact of the [AA96 Final Rule] was obscured and the public was deprived of a meaningful opportunity to comment.'' *Id.* at 958, 962.

## 1. "Arbitrary and Capricious" Challenges

Substantively, the court determined that the plaintiffs demonstrated a likelihood of success on the merits of their arguments that the AA96 Final Rule's changes to the briefing schedule for BIA appeals, administrative closure, and *sua sponte* reopening and reconsideration authority were arbitrary and capricious. *Id.* at 963–71. The court also made a generally applicable finding that EOIR's failure to adequately consider the Booz Allen Hamilton report that EOIR "specifically commissioned to analyze the very concerns that purportedly animate" the AA96 Final Rule raised significant APA concerns. *Id.* at 963.

### i. Changes to BIA Briefing Schedule

The court found that there was a substantial likelihood that the AA96 Final Rule's changes to the briefing schedule for BIA appeals are arbitrary and capricious because the Department failed to adequately consider the impact on pro se individuals and how the changes would operate, in conjunction with existing BIA practices and procedures, to create difficulties for noncitizens and their attorneys in meeting briefing deadlines. *Id.* at 964–66. The court was not persuaded by the Department's position that noncitizens need not wait until the BIA briefing schedule had been issued to seek representation for an appeal because, the court stated, "the vast majority of individuals appearing before immigration courts are pro se," [21] and many face language barriers. *Id.* at 965. Additionally, the court noted that, "of critical importance[,]" immigration judges often issue oral decisions; accordingly, noncitizens may not have the documents necessary to seek representation until after the Board issues and mails the briefing schedule, transcript, and a copy of the immigration judge's order. *Id.* The court stated that the Department failed to address how challenges to the compressed briefing schedule might be exacerbated by the Board's mail-based system, failure to follow the "mailbox rule," and unpredictable briefing schedules.[22] *Id.* The court also found

the Department's reliance on future implementation of an electronic filing system unpersuasive. *Id.* The court further stated that the Department failed to consider the challenges that the COVID–19 pandemic may present to compliance with the compressed briefing schedule. *Id.* at 966.

### ii. Administrative Closure

The court also determined that plaintiffs were likely to succeed on their argument that the AA96 Final Rule's restrictions on administrative closure are arbitrary and capricious. First, the court found that, although the Department cited efficiency reasons for promulgating the rule, it failed to meaningfully address the existence of "extensive contrary evidence showing that administrative closure enhances efficiency." *Id.* at 967. The court also noted that EOIR's consultants had previously recommended that EOIR work with DHS to explore developing policies regarding administrative closure, and yet EOIR did not discuss or consider that recommendation in its rulemaking. *Id.* The court further stated that the Department improperly dismissed and minimized commenter concerns that eliminating administrative closure could lead to the removal of noncitizens with meritorious claims for relief or protection, including removal in violation of the United States' non-refoulement obligations under international law. *Id.* at 968. The court explained that, although the Department cited the availability of administrative closure in some circumstances, it did not adequately address the issue that administrative closure would no longer be available for "the vast majority of noncitizens in removal proceedings, including people for whom Congress has specifically crafted humanitarian relief." *Id.*

Additionally, the court determined that the Department did not adequately engage with commenter concerns that the AA96 Final Rule conflicted with section 212(a)(9)(B)(v) of the Act, 8 U.S.C. 1182(a)(9)(B)(v), as DHS has interpreted it. *Id.; see also* 8 CFR 212.7(e)(4)(iii) (rendering an individual in removal proceedings ineligible for an unlawful presence hardship waiver unless the proceedings are administratively closed); *see also Garcia-DeLeon*, 999 F.3d at 993 ("We conclude that immigration judges and the BIA retain the authority to grant administrative closure so that noncitizens may apply for a provisional unlawful presence waiver.").

The court noted that, although DHS had previously determined that individuals who have been granted

voluntary departure would not be eligible for such provisional waivers, *see* Expansion of Provisional Unlawful Presence Waivers of Inadmissibility, 81 FR 50244, 50256 (July 29, 2016), EOIR nevertheless asserted in the AA96 Final Rule that eliminating general authority to administratively close cases would have no bearing on a noncitizen's "ability to obtain an order of voluntary departure and then a provisional waiver before departing to receive the final waiver abroad." 85 FR at 81601. The court determined that the Department did not provide a "reasoned basis" for this position. *Centro Legal de la Raza*, 524 F. Supp. 3d at 969.

### iii. Sua Sponte Reopening and Reconsideration Authority

The court also determined that the Department's decision to eliminate adjudicators' *sua sponte* reopening and reconsideration authority was likely arbitrary and capricious. The court expressed that it was "extremely troubled" by the Department's contention that, because there is no right to *sua sponte* reopening, the Department was not required to assess commenter concerns about any reliance interests or weigh such interests against competing policy concerns. *Id.* at 970; *see also Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.,* 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (internal quotation marks omitted)).

The court similarly expressed concerns with the Department's justifications for eliminating *sua sponte* reopening and reconsideration in light of "the reality that its elimination will foreclose the only avenue of relief for some noncitizens who would otherwise be eligible for relief from removal." *Centro Legal de la Raza*, 524 F. Supp. 3d at 971. For example, the Department asserted that the rule would promote fairness by withdrawing an authority that may be subject to inconsistent and potentially abusive usage and could undermine finality in proceedings. *Id.* However, the court found that the Department failed to provide examples of inconsistent application or abuse and did not adequately explain why "it could not articulate or clarify a meaningful standard to govern" when "'exceptional situations' would permit *sua sponte* reopening or reconsideration." *Id.; see also Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48–49 (1983) ("[A]n agency must cogently

---

[21] EOIR data reports an 86% representation rate for "all completed appeals," a 90% representation rate for "all pending appeals," and a 45% representation rate for "overall pending" adjudications. *See* EOIR, *Adjudication Statistics: Current Representation Rates, https:// www.justice.gov/eoir/page/file/1062991/download* (data generated Apr. 21, 2023).

[22] The court noted that the "U.S. Postal service is experiencing historic backlogs" due to the COVID–19 pandemic. *Centro Legal de la Raza*, 524 F. Supp. 3d at 966.

explain why it has exercised its discretion in a given manner.'').

2. Regulatory Flexibility Act Challenge

The court determined that the plaintiffs raised serious questions that the AA96 Final Rule violated the Regulatory Flexibility Act (''RFA''), which requires federal agencies to analyze the impact of proposed rules on small entities. *Centro Legal de la Raza,* 524 F. Supp. 3d at 971–74; *see also* 5 U.S.C. 601–12. Specifically, the court determined that the plaintiff, Centro Legal de la Raza, was likely a small entity under the RFA and that the AA96 Final Rule would apply to it because it would be required to comply with the changes implemented by the rule. *Centro Legal de la Raza,* 524 F. Supp. 3d at 973. Further, the court expressed doubt that the AA96 Final Rule's ''cursory'' statement that the rule would not have a substantial impact on small entities was a sufficient factual basis to avoid engaging in an RFA analysis, particularly in light of the scope of the AA96 Final Rule and the numerous comments from organizations claiming that the AA96 Final Rule would economically impact them. *Id.* at 974.

3. Delegation of Rulemaking Authority to the EOIR Director

Lastly, the court determined that the plaintiffs had raised serious questions regarding whether the AA96 Final Rule's delegation of rulemaking authority to the EOIR Director, based on the specific facts of that case, violated the APA. *Centro Legal de la Raza,* 524 F. Supp. 3d at 976. The court was troubled by the manner by which the delegation occurred. *Id.* Specifically, the court stated that while the Attorney General signed the AA96 NPRM, the Attorney General did not delegate rulemaking authority until after the close of the NPRM's comment period and did so through a non-public order. *Id.* The court also expressed particular concern that the AA96 Final Rule, signed by the EOIR Director pursuant to the delegated rulemaking authority, significantly expanded the EOIR Director's authority to adjudicate Board appeals. *Id.* The court stated that although the AA96 NPRM—as signed by the Attorney General—proposed expanding the EOIR Director's authority in this manner, the NPRM did not disclose that the EOIR Director would issue the final rule and, thus, would ultimately be in charge of considering the public's comments about expanding the EOIR Director's own authority. *Id.*

**IV. Description of Proposed Regulatory Changes**

The Department has carefully reconsidered the AA96 Final Rule, the comments received on the AA96 Proposed Rule, the issues identified in the *Centro Legal de la Raza* decision, and other experience gained since that decision. The Department now proposes to restore the longstanding procedures in place prior to the AA96 Final Rule, subject to several changes. For the reasons described below, the Department believes that these amendments will promote the efficient and expeditious adjudication of cases, afford immigration judges and the BIA flexibility to efficiently allocate their limited resources, and protect due process for parties before immigration judges and the Board.

*A. Briefing Schedule Changes*

The Department proposes to rescind changes that the AA96 Final Rule made to briefing schedules before the Board.

Specifically, the Department proposes to restore regulatory language, in effect before the promulgation of the AA96 Final Rule, that would re-establish longstanding consecutive briefing schedules for non-detained noncitizens and simultaneous briefing schedules for detained noncitizens. 8 CFR 1003.3(c)(1) (proposed). The proposed language states that those subject to a simultaneous briefing schedule would have 21 days to submit simultaneous briefs unless the Board specifies a shorter period. *Id.* The proposed language also states that in appeals involving simultaneous briefing, the Board may permit parties to file reply briefs within 21 days of the deadline for the initial briefs. *Id.*

Those subject to a consecutive briefing schedule would again have 21 days to file initial briefs, unless the Board specifies a shorter period. *Id.* Parties would have the same amount of time to file reply briefs as was provided for filing the initial brief, including any extensions.[23] *Id.* The Board would also again be authorized to grant one or more extensions for filing briefs or reply briefs for up to 90 days for good cause

shown. *Id.* The Board could also, in its discretion, request supplemental briefings from parties after the briefing deadline has expired. *Id.* The Board would remain authorized to consider untimely filed briefs. *Id.*

As stated in the AA96 Final Rule, there is ''no entitlement'' to a briefing schedule under the Act. *See* 85 FR at 81636. Indeed, the Act does not enumerate the procedures that apply to the Board's adjudication of appeals. Nevertheless, a noncitizen, with certain limited exceptions, is entitled to seek appellate review before the Board of an immigration judge's decision and, in some cases, a decision of a DHS officer.[24] 8 CFR 1003.3(a)(1)–(2). As part of that review, the noncitizen is entitled to certain rights under the Act, including the right to have legal representation before the Board (at no expense to the government). INA 292, 8 U.S.C. 1362. The Department believes that truncating the briefing schedule that had been in place for over 20 years, *see* Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 FR 54878, 54895 (Aug. 26, 2002) (discussing changes to 8 CFR 3.3(c)), could impact a noncitizen's ability to adequately prepare their case for appeal or secure legal representation to do so, and create undue confusion for pro se noncitizens and practitioners appearing before EOIR. Concerns about adequate preparation time are particularly relevant given the possibility of unique and unaccounted-for future issues, similar to the COVID–19 pandemic, which may present new obstacles to seeking and securing representation, as well as preparing and submitting briefs. *See Centro Legal de la Raza,* 524 F. Supp. 3d at 965–66 (''[T]he agency completely disregarded the fact that the challenges of briefing on a compressed timetable are compounded by the BIA's mail-based system, failure to follow the 'mailbox rule,' and unpredictable briefing schedules. . . Moreover, the agency entirely dismissed the impact of imposing the briefing schedule changes during the COVID–19 pandemic, a concern raised by numerous commenters.'').

The Department notes that it has now implemented electronic filing procedures for registered attorneys through the EOIR Courts & Appeals System, *see* ECAS Rule, 86 FR 70708, which may mitigate some concerns about mail service and its potential effect on briefing schedule timing

---

[23] In the ECAS Rule, the finalized regulatory language reverted 8 CFR 1003.3(c)(2) (Appeal from decision of a DHS officer) to pre-AA96 standards. *See* ECAS Rule, 86 FR at 70721. Specifically, the ECAS Rule removed the maximum 14-day period for the filing of a single permitted reply brief, the 14-day limitation on extensions, and procedures for filing supplemental briefs implemented by the AA96 Final Rule. *Id.* The ECAS Rule retained the AA96 Final Rule's technical edits to replace ''Service'' with ''DHS'' where appropriate, *id.,* and this NPRM proposes additional minor, technical changes, as discussed at Section IV.O of this preamble.

[24] Examples of DHS officer decisions subject to appellate review before the Board include denials of waivers under INA 212(d)(3), 8 U.S.C. 1182(d)(3), and denials of visa petitions made on a Form I–130.

because parties will be able to view and download documents for cases with electronic records of proceeding. However, the Department has not yet fully implemented electronic filing and case access for pro se noncitizens, *see* 86 FR at 70709–10, and therefore believes that the current availability of electronic filing in most, but not all, circumstances is insufficient to address concerns about the AA96 Final Rule's truncated briefing schedules. Indeed, briefing schedules that allow adjudicators the flexibility to establish deadlines as appropriate for a particular case, within given parameters, are a fixture of legal practice. For example, in the federal courts, Rule 31 of the Federal Rules of Appellate Procedure establishes a "good cause" exception to its specified time frame. Fed. R. App. P. 31(a)(1) (explaining that "a reply brief must be filed at least 7 days before argument, unless the court, for good cause, allows a later filing"). Similarly, Rule 12 of the Federal Rules of Civil Procedure also builds flexibility into its established timeframes. Fed. R. Civ. P. 12(a)(1)(C) ("A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.").

Upon reconsideration, the Department believes that the Board should have the discretion to manage briefing schedules and extensions. An inflexible rule that requires all briefs to be filed within 35 days would be unable to accommodate the continually changing landscape that may affect parties' ability to seek and retain counsel, as well as to prepare and submit briefs within a specified period of time. To the extent that shorter briefing schedules or, conversely, extensions for both initial and reply briefs, might be appropriate given the particular facts and circumstances of an individual case, the Board is optimally situated to make such determinations on a case-by-case basis to ensure that briefing schedules do not impede access to the appellate process and the right to counsel. *Cf. Meza Morales,* 973 F.3d at 665 ("'[T]imeliness' is not a hard and fast deadline; some cases are more complex and simply take longer to resolve. Thus, not all mechanisms that lengthen the proceedings of a case prevent 'timely' resolution."). Under the proposed rule, the Board would again have the discretion to specify shorter briefing schedules as it deems appropriate.

Numerous organizations and commenters on the AA96 Final Rule, including those who administer the Board Pro Bono Program, claimed that the policies set forth in the AA96 Final Rule would have (and in some cases already have had) an impact on their ability to provide appellate representation. *See* Complaint, *CLINIC* v. *EOIR,* No. 21–CV–094 (D.D.C. Jan. 11, 2021); Plaintiffs' Motion for a Preliminary Injunction, *Centro Legal de la Raza* v. *EOIR,* No. 21–CV–00463 (N.D. Cal. Jan. 22, 2021). This proposed rule is intended to remove the possibility that reducing the total amount of time that a noncitizen has to file an appeal brief would impede access to the appellate process and the fair and efficient adjudication of appeals for at least some pro se individuals and those seeking representation.

The Department also proposes to amend the briefing schedule, with respect to motions to reopen or reconsider before the BIA, to extend the deadline to submit a reply brief from 13 days to 21 days. 8 CFR 1003.2(g)(3) (proposed). The Department currently sees no reason to distinguish between applicable deadlines for reply briefs for appeals and for motions to reopen or reconsider.

## B. Administrative Closure Authority— Immigration Judges and the Board

The Department proposes to remove the AA96 Final Rule's language that would, if effectuated, limit an EOIR adjudicator's authority to administratively close cases. Instead, this NPRM proposes to explicitly state that EOIR adjudicators have the general authority to administratively close, and to recalendar,[25] individual cases pursuant to a party's motion. The proposed rule would also set forth factors that adjudicators should consider, as the circumstances of the case warrant, in adjudicating such motions. The Department believes that the proposed changes will improve the efficiency and fairness of EOIR proceedings.

As described above, there is a long history of EOIR adjudicators utilizing administrative closure as a helpful tool for managing dockets at both the immigration courts and the Board. *See Garcia-DeLeon,* 999 F.3d at 989 ("For at least three decades, immigration judges and the BIA regularly administratively closed cases."); *Matter of Avetisyan,* 25 I&N Dec. at 690 ("Administrative closure is a procedural tool created for the convenience of the Immigration Courts and the Board."). Indeed, the Attorney General acknowledged this

---

[25] The Department notes that the term "reinstate" has been used interchangeably with "recalendar" before the Board. *See, e.g., Matter of Avetisyan,* 25 I&N Dec. at 692. However, consistent with longstanding practice and to avoid confusion, the Department is using "recalendar" for both the immigration courts and the Board in this regulation.

longstanding practice in overruling *Matter of Castro-Tum. See Matter of Cruz-Valdez,* 28 I&N Dec. at 329 ("Because *Castro-Tum* departed from long-standing practice, it is appropriate to overrule that opinion in its entirety . . . ."). In *Matter of Cruz-Valdez,* the Attorney General restored administrative closure authority, specifically directing immigration judges and the Board to apply the standard for administrative closure set forth in *Matter of Avetisyan* and *Matter of W–Y–U–* while the Department reconsiders the AA96 Final Rule. *Id.*

Additionally, circuit court case law undercuts the AA96 Final Rule's assertion that administrative closure is unsupported by the law and that *Matter of Avetisyan* was wrongly decided. *See Romero,* 937 F.3d at 294–95 (holding that the regulations "unambiguously confer upon [immigration judges] and the [Board] the general authority to administratively close cases"); *Meza Morales,* 973 F.3d at 667 (concluding that *Matter of Castro-Tum* was contrary to the unambiguous meaning of the regulations and that immigration judges and the Board are "not precluded from administratively closing cases when appropriate"); *Arcos Sanchez,* 997 F.3d at 122 (holding that "the plain language establishes that general administrative closure authority is unambiguously authorized by these regulations"); *see also Zelaya Diaz* v. *Rosen,* 986 F.3d 687, 691–92 (7th Cir. 2021) (applying *Meza Morales*).

Although two circuit courts have rejected challenges to *Matter of Castro-Tum,* both left open the possibility that the regulations could permissibly be interpreted to permit administrative closure in at least some circumstances. In *Garcia* v. *Garland,* 64 F.4th 62 (2d Cir. 2023), the Second Circuit held that the pre-AA96 regulations were ambiguous as to whether they authorized general administrative closure and deferred to the Attorney General's interpretation in *Matter of Castro-Tum.* In reaching that conclusion, the Second Circuit did not interpret 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) (2018) to foreclose general administrative closure authority. Rather, the Second Circuit focused narrowly on the text of those regulations and held that it was not unreasonable for the Attorney General in *Matter of Castro-Tum* to interpret them as not explicitly authorizing general administrative closure. *See id.* at 73–74. The Second Circuit acknowledged EOIR adjudicators' use of administrative closure since at least 1990, however, *id.* at 66, and recognized that before *Castro-Tum,* whether to allow administrative

closure was "a matter reserved to the discretion of the Immigration Judge or the Board." *Id.* at 76 n.13.

The Sixth Circuit agreed with *Matter of Castro-Tum* that the regulatory language prior to the AA96 Final Rule does not provide EOIR adjudicators a free-standing authority to administratively close cases. *See Hernandez-Serrano,* 981 F.3d at 466. However, it later clarified that immigration judges and the Board have the authority to grant administrative closure to permit a noncitizen to apply for a provisional unlawful presence waiver, even though this authority was not explicitly stated in the regulations. *See Garcia-DeLeon,* 999 F.3d at 992–93. As such, the AA96 Final Rule introduced novel restrictions on EOIR adjudicators' long-standing authority to manage the cases before them, including through the use of administrative closure when appropriate. *See Matter of Cruz-Valdez,* 28 I&N Dec. at 328–29 (stating that the AA96 Final Rule "effectively codified *Castro-Tum*[,]" which "departed from long-standing practice . . .").

Although several courts of appeals have determined that the authority to administratively close cases was clearly encompassed in the regulations prior to the AA96 Final Rule, that authority was not explicitly stated. As the decisions from the Second and Sixth Circuits make clear, this lack of explicit language has led to debate and confusion over the full scope of EOIR adjudicators' authority to manage cases before them. *See, e.g., Garcia* v. *Garland,* 64 F.4th 62 at 74 (concluding the pre-AA96 regulations "do not unambiguously permit [general] administrative closure."); *Hernandez-Serrano,* 981 F.3d at 466 (holding that the regulations prior to the AA96 Final Rule did not give adjudicators the general authority to administratively close cases); *see also Garcia-DeLeon,* 999 F.3d at 992–93 (concluding that an application for a provisional unlawful presence waiver "is a limited circumstance where administrative closure is 'appropriate and necessary' under [8 CFR] 1003.10(b) and 1003.1(d)(1)(ii)"). It is in the interests of the Department and the public to have a clear understanding of the scope of an adjudicator's authority. Accordingly, the Department proposes to amend the regulations to make an EOIR adjudicator's long-standing authority to administratively close cases explicit in the regulations.

Additionally, the court in *Centro Legal de la Raza* identified a number of issues with the AA96 Final Rule's changes made with respect to administrative closure. 524 F. Supp. 3d at 966–69. Specifically, the court noted that the Department failed to adequately consider or meaningfully address: (1) the impact that the AA96 Final Rule would have on the vast majority of applicants for administrative closure or how it would affect noncitizens with meritorious claims for relief; (2) commenter concerns that the AA96 Final Rule's restriction on administrative closure conflicted with the inadmissibility waiver provision at section 212(a)(9)(B)(v) of the INA, 8 U.S.C. 1182(a)(9)(B)(v), as it has been interpreted by DHS; and (3) the existence of "extensive contrary evidence showing that administrative closure enhances efficiency." *Id.* In this NPRM, the Department proposes further rulemaking on this topic to address these concerns.

The Department believes that codifying general administrative closure authority will serve the interests of the Department and the public in fairness and administrative efficiency. Immigration judges and the Board have used administrative closure as a safeguard to ensure fairness and to postpone cases in appropriate circumstances, such as cases involving certain juvenile noncitizens or those with mental competency issues. *See Matter of Avetisyan,* 25 I&N Dec. at 691 (stating that EOIR adjudicators may determine that it is "necessary or, in the interests of justice and fairness to the parties, prudent to defer further action for some period of time"). Retaining the AA96 Final Rule's restrictions on administrative closure could limit the ability of noncitizens to pursue certain statutory immigration benefits and forms of discretionary relief, including: (1) Special Immigrant Juvenile status, INA 101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J); (2) visas for victims of certain crimes who are cooperating with law enforcement (U visas), INA 101(a)(15)(U), 8 U.S.C. 1101(a)(15)(U); (3) visas for certain family-sponsored immigrants (*e.g.,* "Petition for Alien Relative" (Form I–130)), INA 203(a), 8 U.S.C. 1153(a); (4) adjustment of status as a VAWA self-petitioner, INA 204, 8 U.S.C. 1154; (5) Temporary Protected Status ("TPS"), INA 244, 8 U.S.C. 1254a; and (6) provisional unlawful presence waivers, 8 CFR 212.7(e)(4)(iii). USCIS approval of any of these benefits would generally eliminate the need for continued removal proceedings. Moreover, a removal order entered by an immigration judge and affirmed by the Board could cut off the noncitizen's ability to obtain such benefit or relief. Additionally, if EOIR moves forward with removal proceedings while a prima facie eligible application for relief is pending before DHS, the outcome of the case may ultimately depend upon which agency is the first to issue a final administrative decision. Administrative closure, therefore, allows for the full consideration of a noncitizen's application for relief without exposing the noncitizen to the risk of removal. *See Meza Morales,* 973 F.3d at 665 (acknowledging the Attorney General's efficiency justification in *Matter of Castro-Tum* but stating that cases must also be "disposed of fairly, and granting a noncitizen the opportunity to pursue relief to which she is entitled may be appropriate and necessary for a fair disposition").

Without administrative closure, by contrast, individuals are often unable to sufficiently postpone their proceedings before EOIR and, as a result, often are issued a removal order from EOIR that impedes the ability of USCIS to grant relief unless the individual files a motion to reopen with EOIR to have that order lifted. Requiring individuals to file motions to reopen and accompanying stay of removal requests, if necessary, creates additional procedural hurdles that increase the risk of removal while a potentially valid request for relief is pending with USCIS. Moreover, such procedural hurdles are significantly more challenging to overcome if the individual is physically removed from the United States and must pursue a motion to reopen from abroad.

In addition, upon reconsideration, the Department is now of the belief that the procedures set forth in the AA96 Final Rule would not improve efficient adjudication and may, in some cases, undermine the efficiency of certain adjudications. *See Centro Legal de la Raza,* 524 F. Supp. 3d at 968 ("Indeed, the Fourth Circuit found that the Attorney General's efficiency justification in *Matter of Castro Tum*— the same efficiency rationale cited in the NPRM and Final Rule—was 'internally inconsistent.' ").

In particular, speed in adjudicating an individual case is not the only factor that bears on administrative efficiency. *But see* AA96 Final Rule at 81598 (characterizing administrative closure as creating delays that conflict with EOIR's mission to expeditiously adjudicate cases before it). Efficiency also encompasses consideration of prioritization and allocation of resources among different cases. *Cf. Meza Morales,* 973 F.3d at 665 ("[T]he . . . requirement that cases be resolved in 'timely' fashion does not foreclose administrative closure. For one thing, 'timeliness' is not a hard and fast

deadline; some cases are more complex and simply take longer to resolve. Thus, not all mechanisms that lengthen the proceedings of a case prevent 'timely' resolution.''); *Arcos Sanchez,* 997 F.3d at 123 (''The authority to administratively close cases, within the appropriate and necessary context of each case, can and does permit [immigration judges] and the Board to answer the questions before them in a timely and impartial manner consistent with the Act and the regulations. Or in other words, delay in the case through administrative closure does not, by definition, prevent the timely disposition of the case and resolution of questions.''). Moreover, as pointed out in *Meza Morales,* the Department is tasked with the dual imperatives to adjudicate cases with both speed and fairness—the combination of which offers a better measure of administrative efficiency than speed alone. 973 F.3d at 665.

In addition, as observed by the Second Circuit, ''it is wasteful to commit judicial resources to immigration cases when circumstances suggest that, if the Government prevails, it is unlikely to promptly effect the petitioner's removal.'' *In re Immigr. Petitions,* 702 F.3d at 160. Relatedly, it would be wasteful to commit judicial resources to cases where there are pending alternative resolutions to the case that would obviate the need for, or significantly narrow the issues in, removal proceedings. *See Meza Morales,* 973 F.3d at 665 (''Unsurprisingly . . . an immigration judge might sometimes conclude, in exercising the discretion granted by [8 CFR 1003.10], that it is appropriate and necessary to dispose of a case through administrative closure.''); *Matter of Hashmi,* 24 I&N Dec. 785, 791 n.4 (BIA 2009) (noting that administrative closure could ''avoid the repeated rescheduling of a case that is clearly not ready to be concluded''). Given EOIR's overburdened dockets, as well as the growing backlog of pending cases, it is imperative that EOIR effectively allocate its limited resources—including docket time—to first adjudicate those cases where there are no pending alternative resolutions to removal. To do otherwise would expend precious judicial resources on a practically ''empty exercise tantamount to issuing an advisory opinion'' where such resources could instead be used to adjudicate those cases where no alternative resolutions may be possible. *See In re Immigr. Petitions,* 702 F.3d at 161 (internal quotations omitted).

Procedurally, administrative closure is often more efficient than repeatedly postponing proceedings through multiple continuances, which requires repeatedly reserving hearing time on the immigration court's docket. Notably, before *Matter of Avetisyan,* the Board had encouraged DHS to consider moving for administrative closure rather than multiple continuances in ''appropriate circumstances, such as where there is a pending prima facie approvable visa petition.'' *Matter of Hashmi,* 24 I&N Dec. at 791 n.4; *see also Matter of Rajah,* 25 I&N Dec. 127, 135 n.10 (BIA 2009). The Board described administrative closure as ''an attractive option in these situations, as it will assist in ensuring that only those cases that are likely to be resolved are before the Immigration Judge.'' *Matter of Hashmi,* 24 I&N Dec. at 791 n.4. The Board also noted that administrative closure could ''avoid the repeated rescheduling of a case that is clearly not ready to be concluded.'' *Id.*

With respect to those cases that could result in motions to reopen being filed with EOIR because of insufficient time to postpone the conclusion of proceedings for noncitizens to pursue pending relief outside of EOIR, the AA96 Final Rule framework would also create significant inefficiencies, as the immigration courts and the Board must adjudicate both the initial removal proceedings and the subsequent motion to reopen, as well as any stay of removal requests. Administrative closure could put such cases on hold until any related matters pending outside of EOIR are adjudicated, which, in turn, would allow the immigration judge or the Board to put that adjudication time towards another case before EOIR.

Similarly, some statutes necessarily delay EOIR proceedings while noncitizens pursue collateral applications before USCIS. For example, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (''TVPRA''), Public Law 110–457, 122 Stat. 5044, mandates that USCIS has initial jurisdiction over any asylum applications filed by unaccompanied children in removal proceedings before EOIR. *See* INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (codifying the TVPRA's requirement). Under such circumstances, administrative closure of proceedings while USCIS considers any applications for asylum would likely be more efficient than repeatedly setting aside docket time for future hearings that are then continued. *Matter of Hashmi,* 24 I&N Dec. at 791 n.4 (noting that administrative closure could ''assist in ensuring that only those cases that are likely to be resolved are before the [i]mmigration [j]udge'' and prevent ''the repeated rescheduling of a case'' that is unready to be concluded).

The AA96 Final Rule asserted that administrative closure, and in particular administrative closure over a party's objection, ''failed as a policy'' because of an increased backlog of immigration cases after *Matter of Avetisyan* was decided. 85 FR at 81599 (quoting AA96 NPRM, 85 FR at 52504). However, to the extent that eliminating administrative closure was designed to control the backlog of cases, EOIR's pending case data does not support a conclusion that eliminating administrative closure led to such a result. Between May 17, 2018, when *Matter of Castro-Tum* was issued, and July 15, 2021, when *Matter of Cruz-Valdez* was issued, the backlog of pending cases at EOIR increased from 796,791 on September 30, 2018, to 1,408,669 on September 30, 2021.[26] Even accounting for the pandemic and looking only to the end of FY 2019, the number of pending cases at EOIR increased from 796,791 to 1,088,499.[27]

While no single factor alone was responsible for the increase in the backlog, numerous factors may have contributed, including: a general increase in the number of proceedings initiated by DHS; increasing complexity in immigration cases; fluctuating numbers of defensive asylum applications filed in and adjudicated by EOIR; external factors requiring court closures that generally result in cancellation of non-detained hearings, such as the COVID–19 pandemic-related closures and an appropriations lapse between December 2018 and January 2019; and the limited number of appropriated immigration judge positions. *See* Congressional Research Service, R47077, *U.S. Immigration Courts and the Pending Cases Backlog,* at 19–30 (Apr. 25, 2022); EOIR, Congressional Budget Submission for FY 2023 (Mar. 2022) (''Over the years, several factors have contributed to record growth in both the number of pending immigration cases and the time required to adjudicate them. . . . Recently, this caseload increase has been exacerbated by the closures and reductions in service associated with the COVID–19 pandemic, as well as the consistent rise in the number of new NTAs that DHS has filed before the immigration court over the last five years, even with the reduction in filings over FY 2020 and FY 2021 (from a high of almost 550,000 in FY 2019).'').

---

[26] *See* EOIR, *Adjudication Statistics, Pending Cases, New Cases, and Total Completions, https://www.justice.gov/eoir/page/file/1242166/download* (data generated Apr. 21, 2023).

[27] *Id.*

Additionally, as discussed above, the growing backlog of cases is one significant reason it is important for EOIR adjudicators to be able to efficiently manage their dockets to first adjudicate those cases that are ripe for review, where removal is a priority, or where there are no pending alternative resolutions to removal. Administrative closure is a critical tool that helps EOIR adjudicators manage their dockets. *See Cruz-Valdez,* 28 I&N Dec. at 326 (noting that administrative closure has become "a routine 'tool used to regulate proceedings' and 'manage an Immigration Judge's calendar (or the Board's docket)' " (quoting *Avetisyan,* 25 I&N Dec. at 694)); *Arcos Sanchez,* 997 F.3d at 123 ("[D]elay in the case through administrative closure does not, by definition, prevent the timely disposition of the case and resolution of questions . . . Without the general authority to administratively close appropriate cases when necessary, the [immigration judges] and the Board . . . may be less effective in managing cases."); *Romero,* 937 F.3d at 292–93 ("[D]ocket management actions such as administrative closure [ ] often facilitate . . . case resolution . . . As illustrated by *Matter of Avetisyan* and other BIA cases, administrative closure is 'appropriate and necessary' in a variety of circumstances.").

Indeed, an outside consultant previously recommended that EOIR explore administrative closure as a potential tool that could enhance the efficiency for EOIR proceedings without compromising fairness. EOIR, Booz Allen Hamilton, *Legal Case Study: Summary Report* at 26 (Apr. 6, 2017). Specifically, the consultant, after engaging in a year-long study of EOIR operations, identified numerous external factors that contribute to delays in adjudications. *See generally id.* Among other things, the consultant recommended that the Department engage in discussions with DHS to explore the development of policies regarding administrative closure as one way to improve processing efficiency. *Id.* at 26.

Separately, while the AA96 Final Rule asserted that administrative closure would place the EOIR adjudicator in the position of the prosecutor, 85 FR at 81599, upon reconsideration, the Department now concurs with the reasoning in *Matter of Avetisyan,* which "considered the respective roles and responsibilities of the DHS, the Immigration Judges, and the Board in removal proceedings" and concluded that "[a]lthough administrative closure impacts the course removal proceedings may take, it

does not preclude the DHS from instituting or pursuing those proceedings and so does not infringe on the DHS's prosecutorial discretion." 25 I&N Dec. at 694.[28] Indeed, administrative closure is similar to the widespread practice of stays of proceedings in federal court, which are often utilized to avoid unnecessary litigation. *See, e.g., Ayanian* v. *Garland,* 64 F.4th 1074, 1078–79 (9th Cir. 2023) (explaining that the court previously granted a motion to stay appellate proceedings "to allow time to examine grounds for a possible alternative to litigation").

The AA96 NPRM stated that administrative closure precludes DHS from pursuing removal proceedings while the administrative closure order is in effect. 85 FR at 52503. However, either party can file a motion to recalendar a case at any time. Thus, if, for example, an individual's case has been administratively closed while the individual's prima facie eligible application for adjustment of status is pending before DHS and DHS has a strong interest in concluding proceedings, DHS need only complete adjudication of the application before it and file a motion to recalendar the case, actions well within its control. If the EOIR adjudicator grants the motion to recalendar, the case will proceed.

Therefore, for the reasons discussed above, the Department proposes regulatory language explicitly providing that immigration judges' and the Board's authority to take "any action" includes administratively closing cases. *See* 8 CFR 1003.1(d)(1)(ii) (proposed),

1003.10(b) (proposed).[29] The Department's proposed language emphasizes that the phrase "any action" is intended to be interpreted broadly to include the general authority to take actions regardless of whether they are explicitly described by regulation by stating that "[s]uch actions include," but are not limited to, administrative closure, so long as such actions, are "necessary or appropriate" and are otherwise consistent with governing statutes and regulations. *Id.*

The Department does not believe that existing regulations that expressly authorize administrative closure in certain circumstances are sufficient to capture the numerous scenarios where it may be necessary or appropriate for EOIR adjudicators to administratively close proceedings based upon the particular facts of any given case. *See, e.g.,* 8 CFR 1214.2(a) (referencing administrative closure for T visa applicants); 1214.3 (referencing administrative closure for V visa applicants); 1240.62(b) (referencing administrative closure for certain *American Baptist Church* (ABC) class members); 1240.70(f)–(h) (referencing administrative closure for ABC class members, among others); 1245.13(d)(3)(i) (referencing administrative closure for certain nationals of Nicaragua and Cuba); 1245.15(p)(4)(i) (referencing administrative closure for Haitian Refugee Immigration Fairness Act of 1998 ("HRIFA") applicants); 1245.21(c) (referencing administrative closure for certain nationals of Vietnam, Cambodia, and Laos). Limiting administrative closure to these discrete scenarios would not permit EOIR adjudicators to consider other important factors that may render a case ripe for administrative closure. Thus, using administrative closure only in these enumerated circumstances would limit

---

[28] The AA96 NPRM asserted that the Board, in *Matter of Avetisyan* departed, without explanation, from its prior precedent in *Matter of Chamizo,* 13 I&N Dec. 435 (BIA 1969), *Matter of Quintero,* 18 I&N Dec. 348 (BIA 1982), and *Matter of Roussis,* 18 I&N Dec. 256 (BIA 1982). 85 FR at 52503. However, upon further examination, the Department is now of the opinion that the AA96 NPRM's reliance on those cases for the proposition that administrative closure infringes upon DHS's prosecutorial discretion was inapposite. Notably, none of those cases involved administrative closure. Further, *Matter of Chamizo* cannot reasonably be read to implicate DHS's prosecutorial discretion authority, as that case was about the impropriety of an immigration judge granting voluntary departure without entering an alternative order of removal, as was required by the Act and pertinent regulations at the time. 13 I&N Dec. at 437. As to *Matter of Quintero* and *Matter of Roussis,* those cases are most logically read to stand for the proposition that an immigration judge is not permitted to take an action that is within the exclusive jurisdiction of or otherwise committed to the discretion of the former INS District Director. *Matter of Quintero,* 18 I&N Dec. at 350; *Matter of Roussis,* 18 I&N Dec. at 258. Accordingly, *Matter of Avetisyan* is not inconsistent with those cases because the administrative closure of a case does not usurp authority from DHS or require that DHS take or refrain from taking any specific action otherwise committed to its discretion.

[29] As discussed above, the Department finds persuasive the reasoning of several circuit courts that have determined that this authority was previously inherent but not explicitly stated in the regulations as they existed prior to the AA96 Final Rule. *See Romero,* 937 F.3d at 294–95 (holding that the regulations "unambiguously confer upon [immigration judges] and the BIA the general authority to administratively close cases" but stating that even if ambiguous, "the Attorney General's reading of the regulations does not warrant deference because it amounts to an 'unfair surprise' "); *Meza Morales,* 973 F.3d at 667 (concluding that *Matter of Castro-Tum* was contrary to the unambiguous meaning of the regulations and that immigration judges and the Board are "not precluded from administratively closing cases when appropriate"); *Arcos Sanchez,* 997 F.3d at 122 (holding that "the plain language establishes that general administrative closure authority is unambiguously authorized by these regulations"); *see also Zelaya Diaz* v. *Rosen,* 986 F.3d at 691–92 (applying *Meza Morales*).

administrative closure's efficacy as a docket-management tool. Nor do the regulations explicitly authorize administrative closure in common scenarios where administrative closure may be necessary or appropriate, such as where noncitizens may have pending applications for relief before DHS.

The Department proposes revising the phrase "appropriate and necessary" to read "necessary or appropriate" to emphasize that adjudicators may choose to administratively close cases, or take other actions, even if such action is not required.[30] For example, administrative closure may be appropriate even where other docket management tools, such as continuances, may be available. *See Meza Morales,* 973 F.3d at 665 ("Administrative closure is plainly an 'action.' . . . in cases in which two coordinate offices in the executive branch are simultaneously adjudicating collateral applications, closing one proceeding might help advance a case toward resolution."); *Matter of Avetisyan,* 25 I&N Dec. at 691 (stating that adjudicators may determine that it is "necessary or, in the interests of justice and fairness to the parties, prudent to defer further action for some period of time"); *Matter of Hashmi,* 24 I&N Dec. at 791 n.4 (noting that administrative closure could "avoid the repeated rescheduling of a case that is clearly not ready to be concluded"). As another example, the Sixth Circuit recently determined that, although a noncitizen could theoretically apply for an unlawful presence waiver from outside of the United States if EOIR did not administratively close their case (a prerequisite for applying for a provisional unlawful presence waiver in the United States pursuant to 8 CFR 212.7(e)(4)(iii)), administrative closure was still appropriate because it "increases the likelihood that noncitizens will obtain legal status and resolve their immigration proceedings." *Garcia-DeLeon,* 999 F.3d at 992; *see id.* ("True, a noncitizen in removal proceedings whose case[ ] is not administratively closed may still submit an I–601 Waiver of Inadmissibility after they complete their consular interview and are determined inadmissible. This old path, however, deterred noncitizens in removal proceedings from obtaining legal status as permanent residents.").

The Department also proposes to amend the term "disposition" to read "disposition or alternative resolution" of a case. 8 CFR 1003.1(d)(1)(ii) (proposed), 1003.10(b) (proposed). The Department proposes this amendment to establish that actions other than those that lead to a final disposition in a case may still be necessary or appropriate for resolution of the case.[31] *See Arcos Sanchez,* 997 F.3d at 117 ("Administrative closure allows an [immigration judge] or the Board to 'temporarily pause removal proceedings' and place the case on hold because of a pending alternative resolution or because events outside the control of either party may affect the case.").

Moreover, the Department proposes to amend 8 CFR 1003.1(d)(1)(ii) (proposed) and 1003.10(b) (proposed) to explain that the adjudicator should determine whether the use of administrative closure meets the relevant standard in accordance with 8 CFR 1003.1(*l*) (proposed) or 1003.18(c) (proposed), as applicable. The Department notes that some of the factors proposed for administrative closure may be similar to factors proposed for other authorities such as termination. *Compare* 8 CFR 1003.1(*l*) (proposed Board administrative closure provision), *and* 1003.18(c) (proposed immigration judge administrative closure provision), *with* 8 CFR 1003.1(m) (proposed Board termination provision), *and* 1003.18(c) (proposed immigration judge termination provision). Thus, an adjudicator should decide which of these tools, if any, to use based upon the specific facts of each particular case in an exercise of the adjudicator's independent judgment and discretion. 8 CFR 1003.1(d)(1)(ii), 1003.10(b). Furthermore, the Department also proposes to clarify that the administrative closure authority would not be limited by the existence of any other regulations authorizing or requiring administrative closure. *See, e.g.,* 8 CFR 1214.2(a), 1214.3, 1240.62(b), 1240.70(f)–(h), 1245.13, 1245.15(p)(4)(i), and 1245.21(c).

As discussed above, the Department proposes to add regulatory language that would define administrative closure and set forth guidance to assist adjudicators with determining whether administrative closure is necessary or appropriate for the disposition or alternative resolution of a case. 8 CFR 1003.1(*l*)(1), (3) (proposed), 1003.18(c)(1), (3) (proposed). Such guidance is consistent with established precedent prior to *Matter of Castro-Tum. See Matter of Avetisyan,* 25 I&N Dec. at 688. Additionally, the proposed language would also define recalendaring and set forth guidance for adjudicators to consider when determining whether it is appropriate to recalendar a case. 8 CFR 1003.1(*l*), (*l*)(2) (proposed), 1003.18(c), (c)(2) (proposed).

Specifically, the proposed rule would define administrative closure as "the temporary suspension of a case." 8 CFR 1003.1(*l*) (proposed), 1003.18(c) (proposed); *see Matter of Avetisyan,* 25 I&N Dec. at 695 (stating that it is an "undisputed fact that administrative closure does not result in a final order"). Accordingly, the regulations would describe administrative closure as an act that would remove a case from the Board's or immigration court's active docket or calendar until the case is recalendared. 8 CFR 1003.1(*l*) (proposed), 1003.18(c) (proposed).[32] The proposed rule would specify that an EOIR adjudicator "shall grant a motion to administratively close or recalendar filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition, unless [the adjudicator] articulates unusual, clearly identified, and supported reasons for denying the motion." [33] 8 CFR 1003.1(*l*)(3)

---

[30] The Department would like to make this distinction clear in light of *Hernandez-Serrano,* which stated that the *Romero* "court's conclusion— that any action for the disposition of the case is read most naturally to encompass actions of whatever kind appropriate for the resolution of a case—reads out of the regulations the requirement of necessity." 981 F.3d at 464 (cleaned up).

[31] The Department would like to make this distinction clear in light of *Hernandez-Serrano,* which stated that "the regulations expressly limit their delegation to actions 'necessary for the disposition' of the case . . . [a]nd that more restricted delegation cannot support a decision not to decide the case for reasons of administrative 'convenience' or the 'efficient management of the resources of the immigration courts and the BIA.'" 981 F.3d at 464. *But see Meza Morales,* 973 F.3d at 665 ("Unsurprisingly, then, an immigration judge might sometimes conclude, in exercising the discretion granted by 8 CFR 1003.10, that it is appropriate and necessary to dispose of a case through administrative closure.").

[32] The regulations also specify that immigration judges may manage their dockets through the use of continuances. 8 CFR 1003.29. Continuances keep the case on the immigration judge's active docket and are used "to await additional action required of the parties" to ready the case for final adjudication "that will be, or is expected to be, completed within a reasonably certain and brief amount of time." *Matter of Avetisyan,* 25 I&N Dec. at 691. By comparison, administrative closure is a tool that removes a case from an immigration judge's active docket, normally to await some collateral event whose outcome is not yet known and may not be known within a definitive time period, that may impact the course of removal proceedings, and requires a party to move to recalendar in order to re-initiate adjudication. *Id.* at 692.

[33] In practice, immigration judges are encouraged to resolve administrative closure issues as early as possible in a case by affirmatively asking parties whether they wish for cases to be administratively closed. *See* EOIR, *Director's Memorandum 22–03, Administrative Closure* (Nov. 22, 2021) at 3–4. The Department notes that a motion to administratively
Continued

(proposed), 1003.18(c)(3) (proposed). This language adopts the standard articulated in BIA precedent in the context of joint and affirmatively unopposed motions to continue. *See Matter of Hashmi,* 24 I&N Dec. at 791 ("The [motion to continue should be granted] by the Immigration Judge in the absence of unusual, clearly identified, and supported reasons for not doing so."). The Department believes that it is appropriate to extend this standard to motions for administrative closure or recalendaring, as well as motions to terminate, as discussed in Section IV.C of this preamble, to help promote greater administrative efficiency and eliminate needless confusion for adjudicators and parties.

Moreover, the Department believes that where a motion to administratively close or recalendar a case either is filed jointly or is affirmatively unopposed, a denial of such a motion serves no adversarial interest and that, absent other very compelling reasons, the interests in administrative efficiency dictate granting the motion. *See Matter of Yewondwosen,* 21 I&N Dec. 1025, 1026 (BIA 1997) (stating that the parties' "agreement on an issue or proper course of action should, in most instances, be determinative"); *see also Badwan* v. *Gonzales,* 494 F.3d 566, 568 (6th Cir. 2007) (noting that when the government expressed "'no objection to opposing counsel's request' . . . the government's position demonstrate[d] at a minimum that, as between the parties to the case, no adversarial interest was served by the denial" of the noncitizen's motion); *Meza Morales,* 973 F.3d at 665 (discussing the interests served by the administrative closure of cases). By requiring the adjudicator to articulate on the record unusual, clearly identified, and supported reasons for denying a joint or affirmatively unopposed motion, the Department acknowledges that rare circumstances might arise when, in the adjudicator's judgment, administrative closure or recalendaring might be inappropriate. Thus, the standard provides adjudicators the flexibility to address the complexities of an individual case, while requiring the adjudicator to issue a reasoned explanation that provides the parties with due notice of the basis for a denial. 8 CFR 1003.1(l)(3) (proposed), 1003.18(c)(3) (proposed).

In the case of motions to administratively close or recalendar proceedings that are neither presented jointly nor affirmatively unopposed, the proposed rule would permit EOIR

adjudicators, having considered the totality of the circumstances, to grant such a motion over any party's objection. 8 CFR 1003.1(l)(3) (proposed), 1003.18(c)(3) (proposed); *see Matter of Avetisyan,* 25 I&N Dec. at 694 (holding that EOIR adjudicators may administratively close proceedings over a party's objection). The proposed rule would specify that, though administrative closure may be appropriate where a petition, application, or other action is pending outside of EOIR proceedings, there is no requirement of a pending petition, application, or other action for a case to be administratively closed. 8 CFR 1003.1(l)(3) (proposed), 1003.18(c)(3) (proposed). The proposed rule would specify that any other regulations that separately authorize or require adjudicators to administratively close cases in specific circumstances do not impact the adjudicator's general authority to administratively close cases. 8 CFR 1003.1(l)(1) (proposed), 1003.18(c)(1) (proposed); *see Meza Morales,* 973 F.3d at 667 (construing the term "any action" broadly).

In all cases where only one party moves for administrative closure or recalendaring, and the motion is not affirmatively unopposed, the proposed rule would require adjudicators to weigh the totality of the circumstances, taking into consideration all relevant factors, including any relevant factors from a nonexhaustive list, before determining whether, in their discretion, administrative closure or recalendaring [34] is appropriate. The nonexhaustive list of factors relevant to administrative closure includes: (1) the reason administrative closure is sought; (2) the basis for any opposition to administrative closure; (3) any requirement that a case be administratively closed for a petition, application, or other action to be filed with, or granted by, DHS; (4) the likelihood the noncitizen will succeed on any petition, application, or other action that the noncitizen is pursuing, or that the noncitizen states in writing or on the record at a hearing that they plan to pursue, outside of proceedings before the adjudicator; (5) the anticipated duration of the administrative closure; (6) the responsibility of either party, if any, in contributing to any current or anticipated delay; and (7) the ultimate anticipated outcome of the case. 8 CFR 1003.1(l)(3)(i) (proposed),

1003.18(c)(3)(i) (proposed); *see Matter of Avetisyan,* 25 I&N Dec. at 696 (listing factors for consideration relevant to administrative closure).

When considering whether it would be appropriate to administratively close a case, the EOIR adjudicator must weigh the totality of the listed factors to the extent they are applicable. *See Matter of Avetisyan,* 25 I&N Dec. at 696 ("[I]t is appropriate for an Immigration Judge or the Board to weigh all *relevant* factors presented . . .") (emphasis added). Accordingly, the existence or absence of any one factor is not dispositive of the immigration judge's determination. *Cf. Hernandez-Castillo* v. *Sessions,* 875 F.3d 199, 209 (5th Cir. 2017) (explaining that *Matter of Avetisyan* only required the BIA to evaluate the "relevant factors presented in the case" and did not require the BIA to "evaluate every factor in detail"). For example, there is no requirement that the noncitizen must be pursuing, or must plan to pursue, a petition, application, or other action outside of proceedings as a prerequisite for an immigration judge to administratively close a case. Instead, the immigration judge in such a case would consider the other factors that are applicable to the particular facts and circumstances of the case in order to determine whether to grant or deny administrative closure. Ultimately, the immigration judge's or the Board's determination whether to grant administrative closure is a discretionary decision. The Department notes that the proposed administrative closure factors differ from those set forth in *Matter of Avetisyan* by adding a factor for consideration: whether the need for administrative closure is a prerequisite to a petition, application, or other action being filed with, or granted by, DHS. The Department is proposing this factor in light of the fairness and efficiency interests that would be served by allowing a noncitizen to pursue relief that may be available, and that may resolve a case, without expending unnecessary EOIR and party resources on litigation.

With respect to the second factor for consideration, the Department proposes to make it clear that adjudicators should consider whether there is any opposition to administrative closure, in addition to the basis for any such opposition. An EOIR adjudicator may administratively close a case based on a joint motion, a motion that is unopposed, or over any party's opposition. The principle that an adjudicator, having considered the totality of the circumstances, may administratively close a case over a party's objection is consistent with

---

[34] *See Matter of W–Y–U–,* 27 I&N Dec. 17, 18 n.4 (BIA 2017) (stating that the same factors should be considered for recalendaring as for administrative closure).

close a case before the immigration court may be made in writing or, alternatively, orally in court.

*Matter of Avetisyan. See* 25 I&N Dec. at 694 (stating that ''neither an Immigration Judge nor the Board may abdicate the responsibility to exercise independent judgment and discretion in a case by permitting a party's opposition to act as an absolute bar to administrative closure of that case when circumstances otherwise warrant such action'').

The Department notes that one reason administrative closure is sought could be a representation by DHS that it wishes for a particular case to be administratively closed based on an exercise of prosecutorial discretion. As described above, administrative closure has long been used to facilitate DHS's exercise of prosecutorial discretion, *see* Section III.B.1 of this preamble, and it generally would be inefficient for EOIR to otherwise press forward with proceedings in such cases. *See, e.g., United States* v. *Texas,* 143 S. Ct. 1964, 1972 (2023) (''In light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution strategies.''). The Department believes that an EOIR adjudicator's role as a neutral arbiter is better served by devoting resources to those cases where DHS has expressed a continued interest in effectuating an order of removal. In other words, an EOIR adjudicator may grant administrative closure solely for equitable considerations in order to suspend the proceedings before EOIR, such as DHS's determination that it will not use its limited resources to proceed with removal proceedings against a particular noncitizen at that time.

On the other hand, the Department notes that a noncitizen may, at times, oppose a motion for administrative closure due to the noncitizen's desire to seek immigration relief available in proceedings before EOIR. *See Matter of W–Y–U–,* 27 I&N Dec. at 20 (''The respondent is opposed to the continuation of administrative closure and has requested recalendaring of the proceedings. He has explained that he wants to pursue his application for asylum to its resolution.''). As set out in the proposed rule, the noncitizen's objection to administrative closure in such a situation would be considered as a factor in the analysis but would not by itself be dispositive. The Department notes that DHS may also have valid reasons for objecting to administrative closure where, for example, it is clearly unlikely that an individual will obtain relief in other proceedings. *See, e.g.,* Jesus Garcia-Garcia, A092–286–960 (BIA May 28, 2009) (non-precedential) (''DHS

has continued to oppose administrative closure by reason of the respondent's failure to meet the eligibility requirements [for a 212(c) waiver].'').

The Department seeks comments regarding whether the proposed rule should include any further protections for noncitizens who wish to have their cases adjudicated despite DHS's desire to seek administrative closure, including whether the rule, if finalized, should provide that, where one party opposes administrative closure, the primary consideration for the adjudicator is whether the party opposing closure has provided a persuasive reason for the case to proceed. *See Matter of W–Y–U–,* 27 I&N Dec. at 20, n.5 (holding that ''the primary consideration for an Immigration Judge in determining whether to administratively close . . . proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits,'' but ''continu[ing] to hold that neither party has absolute veto power over administrative closure requests'' (quotation omitted)). As noted above, there may be situations where DHS opposes administrative closure.

With respect to the fifth and sixth factors for consideration—the anticipated duration of the closure and the responsibility of either party, if any, in contributing to any current, anticipated, or continuing need for delay—the Department notes that adjudicators should consider both the noncitizen's and DHS's responsibility for any delay. DHS's responsibility for any delay may include DHS's failure to resolve the noncitizen's pending applications or requests for relief that, if granted, may obviate the need for removal proceedings or significantly narrow the issues before EOIR. Moreover, the potential duration of the administrative closure while awaiting DHS adjudication, for example, of a pending application before USCIS, should not weigh against the decision to administratively close proceedings.

Although the Department generally agrees with *Matter of W–Y–U–'s* determination that the factors for administrative closure and recalendaring should be similar, recalendaring requires slightly different considerations than the initial decision to administratively close a case because, at the time an EOIR adjudicator may be considering recalendaring, there may be more available information regarding developments in the case that have happened during the administrative closure. Such information could aid adjudicators in their decisions. For

example, while considering administrative closure, EOIR adjudicators can only anticipate the duration of the requested administrative closure; however, for recalendaring, adjudicators will have more definitive knowledge about the length of time that the case has actually been administratively closed. As another example, when considering recalendaring, EOIR adjudicators would have the benefit of knowing whether parties have taken important steps towards achieving the purpose of the administrative closure—such as filing for relief with another agency—or knowing whether another agency has completed adjudication of alternative forms of relief. In addition, EOIR adjudicators would have additional information about any new positive or negative factors, such as subsequent criminal history, that would weigh for or against recalendaring a case. Therefore, the proposed rule sets out a separate list of relevant factors that adjudicators should consider, as the circumstances of the case warrant, when evaluating a motion to recalendar.

The nonexhaustive list of factors for recalendaring includes: (1) the reason recalendaring is sought; (2) the basis for any opposition to recalendaring; (3) the length of time elapsed since the case was administratively closed; (4) if the case was administratively closed to allow the noncitizen to file a petition, application, or other action outside of proceedings before the adjudicator, whether the noncitizen filed the petition, application, or other action and, if so, the length of time that elapsed between when the case was administratively closed and when the noncitizen filed the petition, application, or other action; (5) if a petition, application, or other action that was pending outside of proceedings has been adjudicated, the result of that adjudication; (6) if a petition, application, or other action remains pending outside of proceedings, the likelihood the noncitizen will succeed on that petition, application, or other action; and (7) the ultimate anticipated outcome if the case is recalendared. 8 CFR 1003.1(*l*)(3)(ii) (proposed), 1003.18(c)(3)(ii) (proposed). Additionally, the proposed rule would permit EOIR adjudicators, having considered the totality of the circumstances, to recalendar a case over any party's objection. 8 CFR 1003.1(*l*)(3) (proposed), 1003.18(c)(3) (proposed).

The Department emphasizes that the proposed list of factors for recalendaring is non-exhaustive, with no single factor necessarily dispositive. For example, with respect to the fourth factor—

measuring the duration between the administrative closure of the case and the time when the noncitizen filed a petition, application, or other action with DHS—the Department notes that the length of time is not, on its face, determinative. The Department is aware that some petitions, applications, or other actions are more complex or require more time, and that the passage of time is not necessarily a reflection of a lack of diligence or an intent to unnecessarily delay proceedings. Rather, the adjudicator may consider this as one of many factors, including whether the noncitizen has not exercised diligence in applying for collateral relief with DHS or is seeking to unnecessarily delay proceedings.

Given the complexity of these issues, the Department specifically requests public comment on whether the specified factors for adjudicators to consider in adjudicating motions to administratively close and motions to recalendar cases are appropriate and whether the proposed factors should be revised in any way. Specifically, the Department seeks public input on whether the proposed rule should specify that a request for administrative closure to allow for the adjudication of a petition, application, or other action should generally be granted as long as the noncitizen demonstrates a reasonable likelihood of success on the merits, and that the noncitizen has been reasonably diligent in pursuing such relief. The Department also seeks comment on whether the proposed rule should set out specific scenarios in which administrative closure may be appropriate where there is no petition, application, or other action pending outside EOIR proceedings. Moreover, the Department seeks comment on whether administrative closure should be upon the motion of a party or whether it might be necessary or appropriate in certain situations for an immigration judge or a Board member to administratively close a case without having received a written motion and, if on appeal, in situations in which parties do not generally have the opportunity to make an oral motion before the Board.

## C. Termination and Dismissal

The Department proposes to amend its regulations at 8 CFR 1003.1(d)(1)(ii) (pertaining to Appellate Immigration Judges) and 8 CFR 1003.10(b) (pertaining to immigration judges) to make clear that EOIR adjudicators' authority to "take any action consistent with their authorities under the Act and the regulations that is necessary or appropriate for the disposition or alternative resolution of such cases"

includes the authority to terminate or dismiss proceedings.[35] The Department believes that the termination or dismissal of proceedings in appropriate situations is consistent with immigration judges' and Appellate Immigration Judges' statutory authority and duties. *See Matter of Coronado Acevedo,* 28 I&N Dec at 651–52; *Gonzalez,* 16 F.4th at 141 ("[W]e fail to see how the general power to terminate proceedings is inconsistent with the authorities bestowed by the INA.") (cleaned up); *see also* 8 CFR 1240.12(c) (indicating that an immigration judge's order "shall direct the respondent's removal from the United States, or the termination of proceedings, or other such disposition of the case as may be appropriate").

As an initial matter, while the terms "dismissal" and "termination" have been used interchangeably in case law in some instances, *see, e.g., Matter of Coronado Acevedo,* 28 I&N Dec. at 648 n.1; *Matter of G–N–C–,* 22 I&N Dec. 281, 284 (BIA 1998), the Department proposes to more clearly delineate the circumstances in which the immigration judge's order disposing of a case should be an order of dismissal as compared with circumstances in which the immigration judge's order disposing of a case should be an order of termination. *See* 8 CFR 1239.2(b) (proposed).

The proposed rule would specify that EOIR adjudicators may only enter an order to dismiss proceedings upon a motion by DHS seeking dismissal pursuant to 8 CFR 1239.2(c) for the reasons specified in 8 CFR 239.2(a). *See* 8 CFR 1239.2(b) (proposed). The Department proposes that a motion to dismiss proceedings for a reason other than those authorized by paragraph (c) should be deemed a motion to terminate and adjudicated pursuant to 8 CFR 1003.1(m) (proposed) or 1003.18(d) (proposed). *Id.*

The Department further proposes to amend 8 CFR 1003.1(d)(1)(ii) and 1003.10(b) to explain that an adjudicator should determine whether the use of termination or dismissal meets the appropriate standard in accordance with the provisions in 8 CFR 1003.1(m) (proposed), 1003.18(d) (proposed), or 1239.2(c) (dismissal provision). The Department reiterates that some of the factors proposed for termination may be

similar to factors proposed for administrative closure; however, as previously stated, the adjudicator will exercise their independent judgment and discretion to decide which of these tools to use, if any, based upon the specific facts of each particular case. 8 CFR 1003.1(d)(ii), 1003.10(b).

Substantively, the Department does not propose to modify the dismissal grounds referenced by 8 CFR 1239.2(c). However, the Department believes that it is important for immigration judges and Appellate Immigration Judges to have the authority to terminate proceedings in circumstances outside of those explicitly identified in existing regulations, which do not expressly capture all situations where EOIR adjudicators' exercise of that authority may be necessary or appropriate for the disposition of a case. *See Matter of Coronado Acevedo,* 28 I&N Dec. at 651–52 (noting situations not explicitly enumerated in the regulations in which EOIR adjudicators have commonly deemed termination of proceedings to be an appropriate disposition of the case). In such circumstances, these proposed termination grounds can promote efficiency and fairness and help immigration judges and Appellate Immigration Judges better manage their calendars and dockets. *See id.* at 651 (indicating that precluding termination of proceedings in certain common situations not accounted for in the regulations "would undermine the fair and efficient adjudication" of cases in some instances) (citing *Matter of A–C–A–A–,* 28 I&N Dec. 351, 351 (A.G. 2021)).

Accordingly, the Department proposes to codify EOIR adjudicators' termination authority as detailed below. The proposed rule distinguishes between EOIR adjudicators' authority to terminate removal, deportation, and exclusion proceedings and their authority to terminate all other types of proceedings. *See* 8 CFR 1003.1(m) (proposed), 1003.18(d) (proposed). Although the issue of termination is likely to occur most frequently in the context of removal, deportation, and exclusion proceedings, the Department is cognizant that issues related to termination may also arise in other types of proceedings, including asylum-only proceedings (8 CFR 1208.2(c)(1)) and withholding-only proceedings (8 CFR 1241.8(e)).[36] However, because the

---

[35] The Department notes that termination is a case "disposition" under 8 CFR 1003.1(d)(1)(ii) and 1003.10(b), not an "alternative resolution," and is only referred to as such throughout this NPRM. *Gonzalez,* 16 F.4th at 141 ("Termination of proceedings certainly falls within this court's reading of 'any action'; indeed, termination actually ends a proceeding rather than merely facilitating its end.") (cleaned up).

[36] The Department identifies these types of proceedings as examples only. The proposed rule's framework for termination of other proceedings in 8 CFR 1003.1(m)(2) (proposed) and 8 CFR 1003.18(d)(2) (proposed) applies to all proceedings other than removal, deportation, and exclusion proceedings, though the Department anticipates

scope of these proceedings is more limited than the scope of removal, deportation, and exclusion proceedings, many of the grounds for termination of removal, deportation, and exclusion proceedings will be inapplicable to or inappropriate for other types of proceedings.[37] The Department thus believes it is appropriate to provide separate and distinct termination authority for other types of proceedings.

The proposed rule categorizes EOIR adjudicators' termination authority as follows: (1) mandatory termination in removal, deportation, or exclusion proceedings, 8 CFR 1003.1(m)(1)(i) (proposed), 1003.18(d)(1)(i) (proposed); (2) discretionary termination in removal, deportation, or exclusion proceedings, 8 CFR 1003.1(m)(1)(ii) (proposed), 1003.18(d)(1)(ii) (proposed); and (3) mandatory and discretionary termination in other proceedings, 8 CFR 1003.1(m)(2) (proposed), 1003.18(d)(2) (proposed).

The proposed rule identifies specific circumstances where termination would be required, and others where termination would be discretionary. The proposed rule would require termination in removal, deportation, or exclusion proceedings where: (1) no charge of deportability, inadmissibility, or excludability can be sustained; (2) fundamentally fair proceedings are not possible because the noncitizen is not mentally competent and adequate safeguards are unavailable; (3) the noncitizen has, since the initiation of proceedings, obtained United States citizenship; (4) the noncitizen has, since the initiation of proceedings, obtained lawful permanent resident status,

refugee status, asylee status, or nonimmigrant status under INA 101(a)(15)(S), (T), or (U), 8 U.S.C. 1101(a)(15)(S), (T), or (U), that has not been revoked or terminated, and the noncitizen would not have been deportable, inadmissible, or excludable as charged if the noncitizen had obtained such status before the initiation of proceedings;[38] (5) termination is required as provided in 8 CFR 1245.13(*l*); (6) termination is otherwise required by law; or (7) the parties jointly filed a motion to terminate, or one party filed a motion to terminate and the other party affirmatively indicated its non-opposition, unless the adjudicator articulates unusual, clearly identified, and supported reasons for denying the motion. 8 CFR 1003.1(m)(1)(i) (proposed), 1003.18(d)(1)(i) (proposed).

Regarding the mandatory grounds for termination of removal, deportation, or exclusion proceedings, the Board has held that termination of removal, deportation, or exclusion proceedings is appropriate where DHS cannot sustain the charges of removability. *Matter of Sanchez-Herbert,* 26 I&N Dec. at 44; *see Matter of Ortega-Quezada,* 28 I&N Dec. 598, 604 (BIA 2022) ("Because the respondent is not removable as charged, we will sustain the appeal and terminate the proceedings."). Furthermore, if the noncitizen has obtained one of the statuses enumerated above, and the noncitizen would not have been deportable, inadmissible, or excludable as charged if the status had been obtained prior to the initiation of proceedings, there would be no need to continue with the proceedings based upon charges that would not have been sustainable. Moreover, the Department proposes to make clear that termination is required where fundamentally fair removal, deportation, or exclusion proceedings are not possible because the noncitizen lacks mental competency and adequate safeguards are unavailable. 8 CFR 1003.1(m)(1)(i)(B) (proposed), 1003.18(d)(1)(i)(B) (proposed); *cf. Matter of M–A–M–,* 25 I&N Dec. 474, 483 (BIA 2011) ("In some cases, even where the court and the parties undertake their best efforts to ensure appropriate safeguards, concerns may remain. In these cases, the Immigration Judge may pursue alternatives with the parties."). In

addition, the Department further proposes to make clear that it is not limiting termination authority, as specified in the existing regulations or as otherwise required by constitutional, statutory, or binding case law. 8 CFR 1003.1(m)(1)(i)(E)–(F) (proposed), 1003.18(d)(1)(i)(E)–(F) (proposed).

Finally, the proposed rule would mandate that EOIR adjudicators grant joint motions to terminate removal, deportation, or exclusion proceedings, or motions to terminate such proceedings by one party to which the other party has affirmatively indicated its non-opposition, unless the adjudicator articulates unusual, clearly identified, and supported reasons for denying the motion. 8 CFR 1003.1(m)(1)(i)(G) (proposed), 1003.18(d)(1)(i)(G) (proposed); *cf. Matter of Hashmi,* 24 I&N Dec. at 791 (stating that in considering a noncitizen's motion to continue, "[i]f the DHS affirmatively expresses a lack of opposition, the [motion should be granted] by the Immigration Judge in the absence of unusual, clearly identified, and supported reasons for not doing so"); *see also Matter of Yewondwosen,* 21 I&N Dec. at 1026 (stating that the parties' "agreement on an issue or proper course of action should, in most instances, be determinative"); Badwan, 494 F.3d at 568 (noting that when the government expressed " 'no objection to opposing counsel's request' . . . the government's position demonstrate[d] at a minimum that, as between the parties to the case, no adversarial interest was served by the denial" of the noncitizen's motion). However, the Department notes that either party retains the ability to timely rescind its participation in a joint termination motion or its affirmative non-opposition to termination should circumstances change, such as the discovery of new relevant evidence.

The proposed "unusual, clearly identified, and supported" language is based on the *Hashmi* standard for joint and affirmatively unopposed motions to continue, and also matches the proposed language in this rule for joint or affirmatively unopposed motions for administrative closure. *See* Section IV.B of this preamble. The Department believes that it is appropriate to extend this standard to motions for termination, which will help promote greater administrative efficiency and eliminate needless confusion for adjudicators and parties.

In requiring that the adjudicator articulate on the record unusual, clearly identified, and supported reasons for denying a joint or affirmatively unopposed motion to terminate, the Department acknowledges that rare

---

[37] As an illustrative example, withholding-only proceedings involve noncitizens subject to reinstatement of prior removal orders under INA241(a)(5), 8 U.S.C. 1231(a)(5), and noncitizens subject to expedited removal under INA238(b), 8 U.S.C. 1228(b). *See* 8 CFR1208.2(c)(2). The scope of review in withholding-only proceedings is limited to adjudication of whether the noncitizen is eligible for withholding of removal or protection under the Convention Against Torture pursuant to INA 241(b)(3), 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.2(c)(3)(i). Indeed, during withholding-only proceedings, "all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief." *Id.* Because of this explicit limitation in the scope of the proceedings, many of the grounds for termination of removal, deportation, and exclusion proceedings do not apply to withholding-only proceedings. *See also id.* (discussing limited scope of review in asylum-only proceedings); *cf. Matter of D–M–C–P–,* 26 I&N Dec. 644, 647 (BIA 2015) (stating that EOIR adjudicators lack the "jurisdiction to consider whether [asylum-only] proceedings were improvidently instituted pursuant to a referral under the [Visa Waiver Program]").

[38] This proposed provision is not intended to amend an EOIR adjudicator's discretion to reopen cases. Where such lawful immigration status is obtained after the conclusion of removal proceedings, reopening and termination may well be appropriate; however, this proposed authority relates solely to termination, and the Department is not suggesting that reopening would be required.

circumstances might arise where, in the adjudicator's judgment, termination might be inappropriate, even when the motion is presented jointly or is affirmatively unopposed. Thus, the standard provides adjudicators needed flexibility to address the complexities of an individual case, while also requiring due notice to the parties of the reasons for the denial. 8 CFR 1003.1(m)(1)(i)(G) (proposed), 1003.18(d)(1)(i)(G) (proposed).

Additionally, the proposed rule would allow for discretionary termination of removal, deportation, or exclusion proceedings in the following specific circumstances: (1) where an unaccompanied child, as defined in proposed 8 CFR 1001.1(hh), states an intent, either in writing or on the record at a hearing, to seek asylum with USCIS, and USCIS has initial jurisdiction over the application pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C); (2) where the noncitizen demonstrates prima facie eligibility for relief from removal or lawful status based on a petition, application, or other action that USCIS has jurisdiction to adjudicate, including naturalization or adjustment of status; (3) where the noncitizen is a beneficiary of Temporary Protected Status, deferred action, or Deferred Enforced Departure;[39] (4) where USCIS has granted a provisional unlawful presence waiver pursuant to 8 CFR 212.7(e); (5) where termination is otherwise authorized by 8 CFR 1216.4(a)(6) or 1238.1(e); (6) where the parties have filed a motion to terminate as described in 8 CFR 214.14(c)(1)(i) or 214.11(d)(1)(i); or (7) under other comparable circumstances, as discussed in further detail below. Termination is up to the adjudicator's discretion in these circumstances, and the adjudicator may consider any basis for opposition to termination in making their determination.

The Department proposes these discretionary grounds for termination of removal, deportation, or exclusion proceedings for the following reasons. A number of these grounds focus on circumstances where alternative relief may be available to the noncitizen that would end the need for continued proceedings, thereby saving EOIR adjudicatory resources for other cases.

These include: (1) a noncitizen demonstrating prima facie eligibility for relief from removal or for a lawful status based on a petition, application, or other action that USCIS has jurisdiction to adjudicate; (2) an unaccompanied child, as defined in proposed 8 CFR 1001.1(hh), intending to apply for asylum with USCIS; and (3) a beneficiary of Temporary Protected Status, deferred action, or Deferred Enforced Departure. *See Matter of Coronado Acevedo,* 28 I&N Dec. at 651–52 (explaining that EOIR adjudicators commonly exercised termination authority when termination was necessary for noncitizens "to be eligible to seek immigration relief before USCIS"). With respect to termination where a noncitizen has demonstrated prima facie eligibility for relief from removal or for a lawful status based on a petition, application, or other action that USCIS has jurisdiction to adjudicate, the Department notes that EOIR adjudicators must make such determinations based on the particular facts of a given case and the Department does not intend this proposed ground for discretionary termination to authorize a general practice of terminating proceedings involving prima facie eligibility for asylum. Rather, consistent with 8 CFR 1208.2(b), the default rule that EOIR adjudicators continue to exercise authority over asylum applications filed by noncitizens in removal proceedings would continue to apply.

In addition, where an immigrant visa is immediately available to a noncitizen and USCIS has granted a provisional unlawful presence waiver after the noncitizen filed a Form I–601A, *Application for Provisional Unlawful Presence Waiver,* it may be appropriate to terminate proceedings so the noncitizen can depart the United States to obtain a visa through consular processing without becoming inadmissible on another basis. *See* 78 FR at 544 (stating that "[i]f the Form I–601A is approved for [a noncitizen] whose proceedings have been administratively closed, the [noncitizen] should seek termination or dismissal of the proceedings, without prejudice, by EOIR . . . or risk becoming ineligible for the immigrant visa based on another ground of inadmissibility"); *see also Matter of Coronado Acevedo,* 28 I&N Dec. at 651 (suggesting that termination of proceedings may be appropriate where "the pendency of removal proceedings [could] cause[ ] adverse immigration consequences for a respondent who must travel abroad to obtain a visa").

The proposed rule would also authorize immigration judges and Appellate Immigration Judges to terminate removal, deportation, or exclusion proceedings in the exercise of discretion in other comparable circumstances when similarly necessary or appropriate for the disposition or alternative resolution of the case. 8 CFR 1003.1(m)(1)(ii)(G) (proposed), 1003.18(d)(1)(ii)(G) (proposed). The Department recognizes that there may be other circumstances not explicitly stated in the proposed rule in which termination may also be appropriate that are similar in nature to the explicit grounds in the proposed rule authorizing termination. Moreover, similar to the mandatory grounds for termination of removal, deportation, or exclusion proceedings, the Department proposes to clarify that this proposed rule is not intended to limit any pre-existing regulations authorizing termination under certain circumstances. *See* 8 CFR 1003.1(m)(1)(ii)(E)–(F) (proposed), 1003.18(d)(1)(ii)(E)–(F) (proposed). This proposed standard would provide sufficient flexibility such that EOIR adjudicators may terminate a case if it presents similar circumstances to the enumerated grounds for termination and is otherwise necessary or appropriate.

At the same time, this provision would implement important guardrails to limit adjudicators' termination authority. *See* 8 CFR 1003.1(m)(1)(G) (proposed) (precluding termination by the Board for purely humanitarian reasons unless DHS expressly consents to termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion), 1003.18(d)(1)(ii)(G) (proposed) (same for immigration judges); *see also* 8 CFR 1003.1(m)(2)(iii) (proposed) (providing that in proceedings other than removal, deportation, or exclusion proceedings, nothing in the proposed regulatory provisions authorizes the Board to terminate proceedings where prohibited by another regulatory provision), 1003.18(d)(2)(iii) (proposed) (same for immigration judges). The Department acknowledges that termination of removal, deportation, or exclusion proceedings is inappropriate in certain circumstances. The proposed rule would not change the longstanding principle that immigration judges and Appellate Immigration Judges have no authority to review or second-guess DHS's exercise of prosecutorial discretion, including its decision whether to commence removal proceedings. *See, e.g., Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520 (BIA 2011)

---

[39] The President may authorize Deferred Enforced Departure pursuant to the President's constitutional authority to conduct the foreign relations of the United States. *See Deferred Enforced Departure,* USCIS, *https://www.uscis.gov/humanitarian/ deferred-enforced-departure.* The Department notes that Deferred Enforced Departure "is not a specific immigration status," but noncitizens who are covered by Deferred Enforced Departure "are not subject to removal from the United States for a designated period of time." *See id.*

(holding that an immigration judge could not second-guess DHS exercise of prosecutorial discretion to place an arriving noncitizen directly in removal proceedings rather than the expedited removal process); *Matter of J–A–B– & I–J–V–A–*, 27 I&N Dec. 168, 170 (BIA 2017) (explaining that immigration judges and the Board do not have the authority to review a DHS decision to initiate removal proceedings in a particular case); *Matter of G–N–C–*, 22 I&N Dec. at 284 (stating that the decision to institute deportation proceedings is not a decision that the immigration judge or Board may review because it is an exercise of prosecutorial discretion); *see also Cortez-Felipe* v. *INS*, 245 F.3d 1054, 1057 (9th Cir. 2001) (observing that neither immigration judges nor the Board possess the authority to review DHS's ''discretion regarding when and whether to initiate [removal] proceedings'' (citing authorities)). Similarly, an adjudicator may not terminate removal, deportation, or exclusion proceedings for purely humanitarian reasons unless DHS expressly consents to such termination, joins in a motion for termination, or affirmatively states its non-opposition to a motion for termination on such a basis. *See Lopez-Telles* v. *INS*, 564 F.2d 1302, 1303 (9th Cir. 1977) (holding that immigration judges have no statutory or inherent power to terminate deportation proceedings over the objection of INS to provide humanitarian relief not authorized by the statute to a deportable noncitizen).

Moreover, in light of these proposed standards governing termination of proceedings, the Department proposes to remove and reserve 8 CFR 1239.2(f) as newly proposed language would cover the circumstances currently addressed in that subsection. *Compare* 8 CFR 1003.1(m)(1)(ii)(B) (proposed) (authorizing termination by the Board where a noncitizen demonstrates prima facie eligibility for relief from removal or for a lawful status based on a petition, application, or other action that USCIS has jurisdiction to adjudicate, including naturalization or adjustment of status), *and* 1003.18(d)(1)(ii)(B) (proposed) (same authorization for immigration judges), *with* 8 CFR 1239.2(f) (authorizing an immigration judge to terminate a noncitizen's removal proceedings in order to pursue a pending application or petition for naturalization).

Finally, although such scenarios may be rare, the proposed rule also explicitly provides for termination in proceedings other than removal, deportation, or exclusion. *See* 8 CFR 1003.1(m)(2) (proposed), 1003.18(d)(2) (proposed).

Such proceeding types include, among others, withholding-only, asylum-only, credible fear, reasonable fear, rescission, and claimed status. The Department believes that providing immigration judges and the Board with termination authority in these limited proceedings will ensure that adjudicators are not limited from reaching a proper resolution, as determined by the specific facts of each case.

Substantively, as with removal, deportation, and exclusion proceedings, the proposed rule requires immigration judges and the Board to terminate these other proceedings where the parties have jointly filed a motion to terminate, or one party has filed a motion to terminate and the other party has affirmatively indicated its non-opposition, unless the adjudicator articulates unusual, clearly identified, and supported reasons for denying the motion. *See* 8 CFR 1003.1(m)(2)(i) (proposed), 1003.18(d)(2)(i) (proposed). The proposed rule further requires immigration judges and the Board to terminate these other proceedings when required by law, including by statute, regulation, or binding Board or court decision. *Id.* In all other circumstances, the proposed rule provides adjudicators with the general discretionary authority to terminate these proceedings where necessary or appropriate for the disposition or alternate resolution of the case, subject to the same limitations as in removal proceedings. 8 CFR 1003.1(m)(2)(ii) (proposed), 1003.18(d)(2)(ii) (proposed). Finally, the proposed rule specifies that nothing in the new provision allows adjudicators to terminate proceedings where prohibited by another regulatory provision; in other words, this new provision is not intended to trump other regulatory provisions governing these proceedings. 8 CFR 1003.1(m)(2)(iii) (proposed), 1003.18(d)(2)(iii) (proposed).

The Department notes that, in some scenarios in these other proceedings, alternative options to termination are available. For example, it may be that an applicant in withholding-only proceedings is mentally incompetent and adequate safeguards are unavailable, but the adjudicator believes it would be inappropriate to terminate the proceedings because doing so would leave the applicant without any protection from removal, such as when, for example, a noncitizen is subject to reinstatement of a prior removal order under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), and eligible only for withholding of removal. In such a situation, administrative closure would be available and would allow for the

case to be recalendared in the future if appropriate.

The Department seeks public comment on whether the proposed termination standards are warranted and whether these standards should be broadened, narrowed, or altered. Additionally, the Department seeks comment on the evidence that would best support certain proposed grounds for termination, for example, whether evidence of filings with USCIS should be required in some cases. The Department also seeks comment on the proposed framework in 8 CFR 1239.2(b) that would distinguish between the exercise of dismissal authority, which applies to a decision on a DHS motion to dismiss for the reasons specified in 8 CFR 239.2(a), and termination authority, which applies when an EOIR adjudicator terminates proceedings for the reasons specified in proposed 8 CFR 1003.1(m) and 1003.18(d).

Further, the Department seeks public comment on whether the regulations should impose additional constraints on the termination authority. Finally, the Department seeks comment on whether the regulations should specify that termination should generally be without prejudice to DHS's ability to recommence removal proceedings if circumstances change except where the termination was based on DHS's failure to sustain the removal charges. Similarly, the Department seeks comment on whether immigration judges or Appellate Immigration Judges may terminate a case only on a party's motion or whether there are situations where EOIR adjudicators may exercise termination authority *sua sponte*.

### D. Sua Sponte Reopening or Reconsideration and Self-Certification

The Department proposes to amend its regulations at 8 CFR 1003.2(a) and 1003.23(b), respectively, governing the ability of immigration judges and the Board to *sua sponte* reopen or reconsider a case by restoring the regulatory standard in effect before the promulgation of the AA96 Final Rule.[40] The restored standard provides that an immigration judge and the Board may

---

[40] The Department recognizes that an action is not, by its literal definition, ''*sua sponte*'' when the action is undertaken pursuant to a request made by a party to the proceedings. *See Sua sponte*, Black's Law Dictionary (11th ed. 2019) (''Without prompting or suggestion; on its own motion.''). Nonetheless, immigration judges and the Board have long entertained motions for *sua sponte* reopening, *Djie* v. *Garland*, 39 F.4th 280, 282 n.1 (5th Cir. 2022), and the Department will continue to use this term for motions that may be granted in ''exceptional situations,'' *Matter of G–D–*, 22 I&N Dec. 1132, 1133 (BIA 1999); *Matter of J–J–*, 21 I&N Dec. 976, 985 (BIA 1997).

reopen or reconsider a case upon their own motion at any time after they have rendered a decision if they have jurisdiction.

Prior to the AA96 Final Rule, the original regulation conferring authority to *sua sponte* reopen or reconsider cases had been in effect since 1958, *see Dada,* 554 U.S. at 12–13, and had served as a vital tool to prevent injustices in the immigration system. *See, e.g., Matter of X–G–W–,* 22 I&N Dec. 71 (BIA 1998) (holding that, in a specific circumstance, a fundamental change in asylum law that made the noncitizen eligible for relief warranted *sua sponte* reopening); *see also P–O–J–,* No.: AXXX–XXI–700, 2016 WL 1084517, at *1 (BIA Feb. 24, 2016) (non-precedential) (*sua sponte* reopening and terminating because noncitizen obtained asylee status). For example, without the availability of such a tool, noncitizens who would otherwise be eligible for an initial grant of, or return to, lawful status may be removed from the United States. *See Centro Legal de la Raza,* 524 F. Supp. 3d at 971 (stating that "elimination [of *sua sponte* authority] will foreclose the only avenue of relief for some noncitizens who would otherwise be eligible for relief from removal").

The strong need for *sua sponte* authority in certain limited circumstances is underscored by the fact that, in promulgating prior regulations implementing statutory motions to reopen and reconsider, the Department specifically declined to add a good cause exception to the statutory time and number limits on such motions due to the availability of *sua sponte* reopening and reconsideration. *See* 61 FR at 18902. Removing *sua sponte* authority without creating a similar safety valve would prevent EOIR adjudicators from remedying the types of exceptional circumstances described above.

Moreover, the longstanding availability of *sua sponte* reopening and reconsideration operated under a workable scheme. For example, the Board has published decisions applying the "exceptional circumstances" standard in specific situations and has the ability to publish further decisions clarifying the standard as necessary. *See, e.g., Matter of Yauri,* 25 I&N Dec. 103, 110–11 (BIA 2009) (applying standard to case involving a pending application before DHS); *Matter of G–D–,* 22 I&N Dec. 1132 (BIA 1999) (applying standard to request based on a change in law). Maintaining the exceptional circumstances standard allows adjudicators sufficient discretion to reopen in meritorious circumstances.

Similarly, the Department is aware of no evidence that immigration judges or the Board routinely used *sua sponte* authority to reopen cases in which a motion to reopen would have been time- or number-barred without considering whether the "exceptional circumstances" standard was met. *See, e.g.,* AA96 Final Rule, 85 FR at 81631 (raising concerns that *sua sponte* reopening could be used to cure filing defects or circumvent regulations). Additionally, at the immigration court level, an immigration judge's exercise of *sua sponte* authority is subject to appellate review by the Board, and the Board can remand where such authority has been used improperly. *See* 8 CFR 1003.2(a); *see also Matter of G–D–,* 22 I&N Dec. at 1132.

The Department finds that the need for *sua sponte* authority in certain cases outweighs any finality concerns in this context. *See, e.g.,* AA96 Final Rule, 85 FR at 81632 (raising finality concerns regarding *sua sponte* motions). *Sua sponte* reopening and reconsideration are reserved for truly exceptional cases and, with limited exceptions, are fully committed to agency discretion. *See Menendez-Gonzalez* v. *Barr,* 929 F.3d 1113, 1116 (9th Cir. 2019) (explaining that *sua sponte* reopening authority is committed to agency discretion and that the court may only review for legal or constitutional error). As noncitizens are not entitled to *sua sponte* reopening or reconsideration, immigration judges and the Board can ensure that such authority only disturbs the finality of proceedings in the limited number of meritorious cases involving exceptional circumstances.

For similar reasons as those described above, the Department proposes to reinstate the authority of the Board to accept untimely or defective appeals through self-certification. 8 CFR 1003.1(c) (proposed).

*E. Board Findings of Fact— Administrative Notice*

The Department proposes to rescind all of the changes that the AA96 Final Rule made to 8 CFR 1003.1(d)(3)(iv) regarding administrative notice at the Board. The Board, like federal courts, has long had the power to take administrative notice of facts not reasonably subject to dispute. *See* Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 FR 54877 (Aug. 26, 2002) (implementing regulations that codified administrative notice authority). The AA96 Final Rule expanded the Board's administrative notice authority to allow it to resolve certain factual disputes in the first instance and to rely on those

determinations to overturn a grant of relief or protection. *See* 8 CFR 1003.1(d)(3)(i) ("The Board will not engage in *de novo* review of findings of fact determined by an immigration judge."). The Department recognizes that it would be unnecessary and inefficient for the Board to remand a case to the immigration judge for facts that are not truly in dispute and would not be disputed once they are called to the parties' attention. However, upon review, the Department believes that the AA96 Final Rule's provisions could invite impermissible factfinding in practice, in contravention of the Department's longstanding regulatory approach. Accordingly, the Department proposes changes regarding administrative notice procedures. *See* 8 CFR 1003.1(d)(3)(iv) (proposed).

In addition, the Department proposes to rescind the AA96 Final Rule's restrictions on the Board's authority to remand to the immigration court for further findings of fact, as discussed in further detail below. Accordingly, the Department finds it unnecessary to retain broad and possibly confusing standards for administrative notice that may prejudice noncitizens, particularly pro se noncitizens, as the Board will have the discretion to either take administrative notice or remand for further fact-finding, as appropriate. *See* 8 CFR 1003.1(d)(3)(iv) (proposed) ("If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to DHS.").

Additionally, the AA96 Final Rule, if made operative, would permit the Board to rely on any "undisputed fact[ ] in the record" to overturn a grant of relief even if the parties did not have a meaningful opportunity to address that fact in the proceedings at the immigration-judge level because, for example, neither the parties nor the immigration judge found it necessary to dispute or probe further about the fact because it appeared irrelevant or tangential. *See* 85 FR at 81651 (8 CFR 1003.1(d)(3)(iv)(A)(4)). Relatedly, the AA96 Final Rule added a new provision that would allow the Board to affirm the underlying decision "on any basis supported by the record" including by relying on "facts that are not reasonably subject to dispute." *See id.* (8 CFR 1003.1(d)(3)(v)).

Although the AA96 Final Rule, if enforced, would afford the parties an opportunity to respond to administratively noticed facts if those facts were used to overturn a grant of relief or protection, 85 FR at 81603 (8 CFR 1003.1(d)(3)(iv)(B)), in practice this could be confusing to noncitizens, particularly those who are pro se.

Accordingly, the Department does not believe the AA96 Final Rule's opportunity-to-respond provision provides adequate procedural protections to noncitizens, such as allowing sufficient opportunity to be heard, to present testimony, and to develop the record on disputed facts. *Cf. Quintero* v. *Garland,* 998 F.3d 612, 626 (4th Cir. 2021) ("Today, we join the broad consensus among our sister circuits by holding that immigration judges have a legal duty to fully develop the record in the cases that come before them. Like the [Board] and the other circuits to have considered this issue, we are persuaded that such a duty necessarily arises from the dictates of [INA 240(b)(1),] 8 U.S.C. 1229a(b)(1) . . .").

The Department is also concerned that the AA96 Final Rule, if effectuated, would permit the Board to affirm a denial of relief or protection on the basis of facts that may not have been developed by the parties or even considered by the immigration judge during removal proceedings, and which did not factor into the immigration judge's denial. Indeed, the AA96 Final Rule does not provide any requirement of notice or opportunity to respond if the Board relies on administratively noticed facts to affirm an immigration judge's decision to deny relief, even if those facts were not relied on by the immigration judge or developed at the hearing.

*F. Board Findings of Fact—Voluntary Departure*

Generally, the proposed rule would retain the voluntary departure-related changes adopted by the AA96 Final Rule, which prohibited the Board from remanding to the immigration judge for consideration of voluntary departure, as described at Section III.F.2 of this preamble. The Department believes that the changes adopted by the AA96 Final Rule with respect to voluntary departure created a workable framework that improved adjudicatory efficiency. *See* Section III.F.2 of this preamble ("Prior to the AA96 Final Rule, the regulations described an immigration judge's authority to grant voluntary departure but did not articulate the Board's authority to do so." (citation omitted)). However, the Department proposes to amend 8 CFR 1003.1(d)(7) and 1240.26(k)(1) to allow the Board to remand cases to the immigration court for the consideration of voluntary departure in the limited circumstances where further fact-finding is needed.

Specifically, the Department proposes to remove the AA96 Final Rule's mandate that "[i]f the Board does not grant the request for voluntary departure, it must deny the request.'' 85 FR at 81652 (8 CFR 1003.1(d)(7)(iv)). In cases where the Board has a complete record and the immigration judge has made sufficient findings of fact, it is generally inefficient and unnecessary for the Board to remand to the immigration judge solely for consideration of the issue of voluntary departure. However, where the voluntary departure record is incomplete or otherwise requires further fact-finding to adjudicate the request, the Board should be permitted to remand the case to the immigration judge to consider the voluntary departure request.

One such example is when a noncitizen makes multiple applications for relief or protection, including voluntary departure. In that case, the immigration judge may choose to grant at least one application but not address other applications, including voluntary departure. If DHS appeals the immigration judge's decision and the Board determines that the noncitizen is not eligible for the relief granted, the voluntary departure record is likely to be incomplete or additional fact-finding may be required to adjudicate the voluntary departure request. *See* 85 FR at 81639–40 (describing commenter concerns with respect to this example).

The AA96 Final Rule, if effectuated, would not allow the Board the option to remand. 8 CFR 1003.1(d)(7)(iv) ("If the Board [did] not grant the request for voluntary departure, it must deny the request.''). However, under the circumstances described above, the Board should be permitted to remand the case to the immigration court to consider the voluntary departure request rather than mandate denial of a potentially eligible request or invite the possibility of improper fact-finding, in violation of 8 CFR 1003.1(d)(3)(iv) (proposed). Accordingly, to make this remand authority clear, the Department also proposes to add a sentence to the end of 8 CFR 1003.1(d)(7)(ii) (proposed), stating that "[if] the record does not contain sufficient factual findings regarding eligibility for voluntary departure, the Board may remand the decision to the immigration judge for further factfinding.''

Additionally, the Department proposes to remove the AA96 Final Rule's prohibition on remands to the immigration judge to consider voluntary departure and to amend the regulations to state that the Board "may,'' rather than "shall,'' consider a request for voluntary departure de novo. 8 CFR 1240.26(k)(1) (proposed). As described above, in cases where the Board has a complete record and the immigration judge has made sufficient findings of fact, it is generally inefficient and unnecessary for the Board to remand to the immigration judge solely to consider the issue of eligibility for voluntary departure. However, where the voluntary departure record is incomplete or otherwise requires further fact-finding to adjudicate the request, the Board should be permitted to remand the case to the immigration judge to consider the voluntary departure request.

Except as described above, this proposed rule would not make further amendments to the voluntary departure provisions enacted by the AA96 Final Rule.

When the Board grants voluntary departure in the first instance, written voluntary departure advisals served electronically or by mail in conjunction with the Board's order will provide adequate notice to noncitizens for purposes of voluntary departure. *See* 8 CFR 1003.3(g)(6)(i)–(ii) (providing for electronic service in eligible cases). In making this decision, the Department considered that the Act authorizes service of the Notice to Appear by mail, including advisals of the consequences for failure to comply with certain requirements described in the Notice to Appear and the consequences for failure to appear. *See* INA 239(a)(1)(F)(iii), 8 U.S.C. 1229(a)(1)(F)(iii) (consequences for failure to provide updated address and telephone information), INA 239(a)(1)(G)(ii), 8 U.S.C. 1229(a)(1)(G)(ii) (consequences for failure to appear). The Department believes that given Congress's authorization of service by mail of such advisals, notwithstanding the significant consequences associated with failure to comply with such requirements, electronic or mail service is also sufficient for voluntary departure advisals.

*G. Board Remand Authority— Additional Findings of Fact*

The Department proposes to rescind all changes that the AA96 Final Rule made to 8 CFR 1003.1(d)(3)(iv) and proposes to remove the AA96 Final Rule's addition of 8 CFR 1003.1(d)(3)(v) [41]—the provisions of the AA96 Final Rule that eliminated the Board's authority to grant a motion to remand based on new evidence that arises while a noncitizen's case is on appeal before the Board. Rescinding these changes would reinstate the

---

[41] As discussed above in Section IV.E of this preamble, the proposed rule would retain some of the administrative notice language at 8 CFR 1003.1(d)(3)(iv)(A) but would move it to 8 CFR 1003.1(d)(3)(iv) and remove paragraph (A).

Board's previous authority to remand based on new evidence (in addition to intervening changes in law) that could impact the basis for the immigration judge's removability determination or that could provide the noncitizen with a form of relief or protection, or other immigration benefit, that would obviate the need for continued removal proceedings or the Board's adjudication of the appeal. 8 CFR 1003.1(d)(3) (proposed). Similar to the provisions of the AA96 Final Rule that eliminated the authority of immigration judges and the Board to grant *sua sponte* reopening or administrative closure, the AA96 Final Rule's provisions that eliminated the Board's authority to remand *sua sponte* based on new evidence could impede certain noncitizens from obtaining an immigration benefit or relief from removal for which they have become prima facie eligible.

Upon review, the Department believes that the AA96 Final Rule's limitations on the Board's remand authority raise fairness concerns and would create inefficiencies that contravene the rule's stated justification. For example, although the AA96 Final Rule would permit remands based on new evidence pertaining to grounds of removability, such as to allow DHS to present new facts regarding a noncitizen's removability, *see* 8 CFR 1003.1(d)(3)(iv)(D) (barring remands except as provided in 8 CFR(d)(7)(v)(B)), 1003.1(d)(7)(v)(B) (not precluding remands for further fact-finding related to ''a question regarding a ground or grounds of removability specified in section 212 or 237 of the Act''), it would preclude the Board from remanding a case at the noncitizen's request for further fact-finding where the noncitizen became prima facie eligible for relief or protection, or other immigration benefit.

This limitation is overly restrictive and raises fairness concerns due to the imbalance between the parties. First, it would not be fair to permit DHS to seek remand based on new evidence discovered during background or security checks that could render an individual *ineligible* for relief, 8 CFR 1003.1(d)(7)(v)(B), but not on the basis of new evidence that could render an individual *eligible* for relief. Second, the AA96 Final Rule ignored that new evidence can relate not just to a ground of removability, but also to grounds for relief. If new evidence indicates that noncitizens have become eligible for new forms of relief from removal, protection, or other immigration benefit, the Board should be able to remand for consideration of that evidence. Such forms of relief from removal, protection,

or other immigration benefit may include: special immigrant juvenile status, adjustment of status, cancellation of removal for certain lawful permanent residents (for example if the noncitizen is successful in obtaining vacatur of a criminal conviction that otherwise precluded applying for that relief before the immigration judge), or asylum or similar protection based on new evidence that only came to light during the appeal process.

Additionally, the AA96 Final Rule suggested that an individual who wishes to obtain relief based on new evidence must file a motion to reopen in accordance with the standard procedures for such motions. *See* 85 FR 81589. While this is technically an available option, substantive and procedural limitations on motions to reopen might make this option more difficult or unavailable for many noncitizens, which raises fairness concerns for noncitizens in proceedings, as well as questions of efficiency, given that additional motions practice invites further litigation that could draw out the resolution of a proceeding. *See, e.g.,* 8 CFR 1003.2(c)(2) (time and number bar on motions to reopen), 1103.7(b)(2) (filing fee for motions to reopen, but not motions to remand); *cf. Garcia-DeLeon,* 999 F.3d at 992 (''True, a noncitizen in removal proceedings whose case is not administratively closed may still submit an I–601 Waiver of Inadmissibility after they complete their consular interview and are determined inadmissible. This old path, however, deterred noncitizens in removal proceedings from obtaining legal status as permanent residents . . . Thus, administrative closure for the limited purpose of permitting noncitizens to apply for provisional unlawful presence waivers increases the likelihood that noncitizens will obtain legal status and resolve their immigration proceedings.'').

In addition to fairness and efficiency concerns, the AA96 Final Rule's limitations on remands for new evidence also conflict with a permanent injunction to which the agency is subject in some circumstances. The permanent injunction requires the Board to accept new evidence related to mental health and to order a limited remand to assess an unrepresented, detained noncitizen's competency to represent themselves in proceedings before EOIR. *See Franco-Gonzalez* v. *Holder,* No. 10–02211, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013); *Franco-Gonzalez* v. *Holder,* No. 10– 02211, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014). In addition, since the issuance of that injunction, EOIR has adopted similar procedures pursuant to

its nationwide policy to provide enhanced procedural protections to unrepresented immigration detainees with serious mental disorders or conditions[42] (''Nationwide Policy'') for similarly situated individuals detained outside of the three states covered by the *Franco-Gonzalez* injunction. Thus, adherence to the AA96 Final Rule would be irreconcilable with adherence to court-ordered permanent injunctions in effect in three States and irreconcilable with EOIR's Nationwide Policy. The Department notes that the AA96 Final Rule would still preclude the Board from remanding proceedings to the immigration judge for the requisite factual findings required by the Nationwide Policy and permanent injunction even if the Board would have been permitted to accept new evidence related to mental competency.

The Department believes that Appellate Immigration Judges have the expertise, knowledge, and training to determine when further fact-finding might be needed given the variables to consider on a case-by-case basis when adjudicating an appeal and that it is in the interest of justice to charge Appellate Immigration Judges with doing so, rather than burdening litigants, many of whom are pro se, with strictly complying with the numerous, inflexible requirements that the AA96 Final Rule set forth at 8 CFR 1003.1(d)(3)(iv)(D)(*1*)–(*5*).[43] As discussed below, the Department also proposes to reinstate the Board's authority to remand cases based upon a ''totality of the circumstances'' analysis.

Accordingly, given the fairness and efficiency concerns implicated in the AA96 Final Rule's limitation on the Board's ability to remand cases, the Department proposes to rescind the AA96 Final Rule's changes to section 1003.1(d)(3)(iv). Rescinding these

---

[42] *See* Press Release, EOIR, *Department of Justice and the Department of Homeland Security Announce Safeguards for Unrepresented Immigration Detainees with Serious Mental Disorders or Conditions* (Apr. 22, 2013), *https:// www.justice.gov/eoir/pr/department-justice-and-department-homeland-security-announce-safeguards-unrepresented.*

[43] For example, if enforced, the Board would only be permitted to remand a case based on a change in the law if the change were to render the initial decision legally erroneous or where the immigration judge's factual findings were ''clearly erroneous.'' Thus, the AA96 Final Rule would not have permitted remands for a change in circumstances, or in a case where the immigration judge failed to make any finding of fact that the Board might consider important to the case. There are undoubtedly other examples of scenarios where it might be appropriate to remand for further fact-finding but that would not have been captured by the AA96 Final Rule. That concern supports leaving the Board the flexibility to make case-by-case determinations.

provisions would allow the Board to retain its prior authority to remand in cases involving new evidence that could impact a noncitizen's removability or render the individual prima facie eligible for relief.

The AA96 Final Rule also precluded immigration judges from considering, on remand, any issues outside of the scope of the Board's remand order, unless pertaining to a question of the immigration judge's continuing jurisdiction over the case. But developments related to a noncitizen's removability or eligibility for protection or relief from removal could arise after a remand. In the Department's view, the better policy is to avoid inefficiencies that result from limiting the scope of a remand, which can lengthen proceedings by precluding immigration judges from addressing all relevant issues in the remanded proceedings. While the Department is cognizant that "[b]oth the public and the Board have significant . . . interests in the finality of immigration proceedings," *Hernandez-Rodriguez* v. *Pasquarell,* 118 F.3d 1034, 1042 (5th Cir. 1997) (citing *Abudu* v. *INS,* 485 U.S. 94, 106–08 (1988)), the Department does not believe that finality interests outweigh the fairness and efficiency concerns that the AA96 Final Rule's inflexible approach creates. Hence, for similar reasons to those described above, the Department proposes to remove this restriction on the immigration judge's authority when considering a case on remand.

The proposed rule would also add to 8 CFR 1003.1(d)(3)(iv) a statement that "[i]f new evidence is submitted on appeal, that submission may be deemed a motion to remand and considered accordingly." This addition would make clear that new evidence submitted on appeal need not be dismissed solely because the party did not file a pleading entitled a "motion to remand." This is in keeping with pre-AA96 Final Rule guidance pertaining to motions to reopen, which the Department also proposes to republish as part of this rulemaking. *See* 8 CFR 1003.2(c)(4) (2019); 8 CFR 1003.2(c)(4) (proposed). These amendments would clarify that the Board has discretion to consider new facts presented on appeal as a motion to remand. This parallels the pre-AA96 Final Rule treatment of new facts presented as part of a motion to reopen prior to the conclusion of proceedings.

*H. Board Remand Authority—Errors in Fact or Law*

The Department proposes to rescind all of the AA96 Final Rule's restrictions on the Board's authority to remand

decisions based upon errors of fact or law, specifically, all changes made to 8 CFR 1003.1(d)(7)(i), and proposes to remove 8 CFR 1003.1(d)(7)(ii), (iii), and (v). As discussed above in Section IV.F of this preamble, the Department proposes to retain, with modifications, 8 CFR 1003.1(d)(7)(iv) (addressing voluntary departure), and to renumber that paragraph as 8 CFR 1003.1(d)(7)(ii). These proposed changes would restore the Board's broad authority to remand decisions to the immigration judge or DHS for "further action as may be appropriate." 8 CFR 1003.1(d)(7)(i) (proposed).

As previously noted in Section III.H.2 of this preamble, the AA96 Final Rule restricted the Board from remanding a decision due to an error of law or fact in the immigration judge's decision if it did not identify the standard of review it applied and the specific error or errors made by the adjudicator. 8 CFR 1003.1(d)(7)(ii)(A). The Department believes that, because the Board's standards of review are expressly delineated by regulation, it is unnecessary to require the Board to explicitly include them in every remand order. *See* 8 CFR 1003.1(d)(3) (requiring factual findings to be reviewed for clear error and legal determinations to be reviewed de novo).

Additionally, as explained in Section III.H.2 of this preamble, the AA96 Final Rule prohibited the Board from remanding a case: (1) based upon a "totality of the circumstances," 8 CFR 1003.1(d)(7)(ii)(B); (2) based on new arguments or evidence, except where the new argument or evidence pertained to a material change in fact or law and substantial evidence supported the change vitiated all grounds of removal, 8 CFR 1003.1(d)(7)(ii)(C); or (3) sua sponte, subject to limited exceptions, 8 CFR 1003.1(d)(7)(ii)(D).

The Department is now proposing to rescind these provisions, thus recodifying the longstanding, more flexible standard that allows the Board to return the case "to DHS or an immigration judge for such further action as may be appropriate." 8 CFR 1003.1(d)(7)(i) (proposed). The Department now believes that this longstanding standard is workable and sufficiently flexible to allow for remands in situations where an error of fact or law warrants remand, or where fairness or efficiency concerns may otherwise be implicated. Given the numerous variables that each case may present, the Department believes the Board requires the flexibility to conduct appellate review, including remanding proceedings when necessary, rather than being limited by the rigid

restrictions that the AA96 Final Rule set forth at 8 CFR 1003.1(d)(7)(ii).

Specifically, the Department believes that Appellate Immigration Judges have the expertise, knowledge, and training to determine when an error of fact or law warrants remand to the immigration judge without the need for significant restrictions on such determinations. In addition, providing the Board with maximum flexibility to remand due to errors of fact or law ensures that the immigration court, which is most familiar with the record as the court tasked with receiving evidence, is able to correct any errors and issue revised orders based on those corrections in the first instance.

Moreover, the Board may determine, under the totality of the circumstances, that remand is warranted in other situations, including based on fairness or efficiency concerns. For example, under the AA96 Final Rule, the Board would arguably be unable to remand— as it has, for example, pursuant to *Matter of S–H–,* 23 I&N Dec. at 462–63— in situations where an immigration judge decision contains only a brief summary of the testimony and an ultimate pronouncement on the merits, without thorough discussion of each of the elements of the application for relief or protection. *See Matter of Rodriguez-Carillo,* 22 I&N Dec. 1031, 1033 (BIA 1999) (discussing fairness concerns implicated by cursory decisions).[44] The Department thus believes that rescinding the AA96 Final Rule's provision prohibiting a remand based upon a totality of the circumstances will return the longstanding flexibility to the Board to remand cases for further action as appropriate based on the circumstances presented in each case.

Similarly, under the AA96 Final Rule, the Board would be prohibited from

---

[44] The Department also acknowledges that commenters previously raised concerns, in conjunction with the AA96 rulemaking, that the AA96 Final Rule does not provide an independent ground to remand based on superseding or intervening case law—including litigation surrounding regulations or precedential decisions that were the basis for denying relief—to the extent that such changes do not raise a question of jurisdiction, vitiate all grounds of removability, or relate to an error of law. *See* 85 FR at 81611 (listing commenter concerns); *see also* (8 CFR 1003.1(d)(7) (discussing remand authority). The Department also now believes that this omission unduly restricts appellate review, particularly in light of the increasing number of significant litigation developments pertaining to immigration law in recent years. In some circumstances, for example, Appellate Immigration Judges may deem it appropriate to remand for immigration judges to consider in the first instance the effect of intervening case law, without determining whether the decision under review contains an error of law under this intervening case law. The Department's proposal to restore the Board's broad authority to remand decisions would correct such limitations.

remanding based upon the availability of new evidence where the new evidence did not vitiate all grounds of removability applicable to the noncitizen, even where it might impact the noncitizen's eligibility for relief from removal. Accordingly, as discussed in Section IV.G of this preamble, this prohibition on remands would result in inefficiencies given that such a prohibition would invite additional motions practice and further litigation that could unnecessarily prolong the ultimate resolution of a proceeding. Thus, for the foregoing reasons, the Department proposes to largely rescind these restrictions that the AA96 Final Rule placed on the Board's remand authority so as to restore the Board's flexibility to remand decisions to the immigration judge or DHS for "further action as may be appropriate." 8 CFR 1003.1(d)(7)(i) (proposed).

*I. Background Check*

The Department proposes to amend 8 CFR 1003.1(d)(6) regarding the completion or updating of background checks when a case is pending before the Board. Generally, the proposed rule would retain the background check-related changes from the AA96 Final Rule, which were intended to reduce the availability of Board remands to the immigration court due to background check concerns. The Department believes that the pre-AA96 Final Rule practice of remanding to the immigration court solely for a background check to be completed is an unnecessary procedural action that creates inefficiencies in case processing.[45]

Similar to the AA96 Final Rule, this NPRM proposes that, when completing or updating a background check is necessary to adjudicate an appeal or motion at the Board, the Board will issue a notice to the parties holding the case until such a check is completed and the results are reported to the Board. *See* 8 CFR 1003.1(d)(6)(ii) (proposed). The Board's notice to the parties will explain that DHS will contact the noncitizen with instructions for completing or updating any necessary checks if DHS is otherwise unable to independently update them. *Id.* The Board's notice will also advise the noncitizen of the consequences of

failing to comply with these requirements. *Id.*

However, this proposed rule includes a number of changes from the AA96 Final Rule's background check language. First, the Department is removing language that the AA96 Final Rule added to 8 CFR 1003.1(d)(6)(iii) that would deem a noncitizen's failure to comply with these background check requirements at the Board as an automatic abandonment of their underlying relief application absent a showing of good cause. Instead, the Department proposes to revert to the pre-AA96 Final Rule language, which provides that the Board retains the discretion to, on DHS's motion, remand to the immigration judge to consider such noncompliance in determining whether the underlying relief should be denied. *See* 8 CFR 1003.1(d)(6)(iii) (2019).

Second, the Department proposes to allow the Board the option of further holding a case where DHS has failed to report the results of background checks within 180 days from the date of the Board's notice, rather than requiring the Board to remand to the immigration judge. 8 CFR 1003.1(d)(6)(iii) (proposed). This would account for cases where 180 days may not be a sufficient reporting period or where the case was placed on hold for other reasons. *See* 8 CFR 1003.1(e)(8)(iii) (proposed) (specifying when cases may be placed on hold). This change will help ensure that cases are not unnecessarily remanded to an immigration judge when the Board determines that further holding the case would more efficiently contribute to the completion of the case.

Lastly, the Department proposes to add a minor clarification to 8 CFR 1003.1(d)(6)(v) that this background check section applies to applications for withholding of removal under the Act and applications for protection under the Convention Against Torture, by referencing "immigration relief *or protection.*" *See Matter of M–D–,* 24 I&N Dec. 138, 140 n.1 (BIA 2007) ("When referenced in connection with the background check regulations, the term 'relief' includes any form of relief that permits [a noncitizen] to reside in the United States, including withholding of removal and protection under the Convention Against Torture . . .").

*J. Adjudication Timelines*

The Department proposes to retain the 90- and 180-day processing timelines for single-member and three-member Board decisions but amend 8 CFR 1003.1(e)(1) and (e)(8), regarding internal processing timelines at the Board. The AA96 Final

Rule added or modified a number of Board internal processing timelines, requiring: (1) screening panel review within 14 days of filing or receipt; (2) transcript ordering within seven days after the screening panel completes its review; (3) issuance of briefing schedules within seven days after receiving the transcript or, if no transcript is required, within seven days after the screening panel completes its review; (4) review by a single Appellate Immigration Judge within 14 days of assignment to determine whether a single- or a three-member panel should adjudicate the appeal; (5) summary dismissal of qualifying cases within 30 days of the appeal's filing date; (6) adjudication of interlocutory appeals within 30 days of the appeal's filing date; and (7) completion of three-member decisions within 180 days of the record being complete, rather than 180 days from assignment to the three-member panel. *See* 8 CFR 1003.1(e)(1), (8). The AA96 Final Rule also added tracking and accountability requirements for the Chairman at 8 CFR 1003.1(e)(8)(v).

After further review, the Department has determined that these internal timelines are overly rigid and concern internal Board operations and processes that are not suitable for regulatory action. Given the wide variety of cases before the Board, the varying circumstances of different parties, and possible changes to EOIR's dockets, codifying strict internal timelines in regulatory text does not afford the Board adequate flexibility to process cases efficiently and fairly. Furthermore, processing timelines may be accomplished through internal guidance as necessary. *See* 5 U.S.C. 553(b)(3)(A) (exempting "rules of agency organization, procedure, or practice" from the APA's notice and comment requirements); *see also* 8 CFR 1003.1(a)(2)(i)(C) (providing the Chairman with the authority to "set priorities or time frames for the resolution of cases"). As a result, the proposed rule would remove the specific processing timelines from EOIR's regulations, retaining only the more general 90- and 180-day processing timelines for single-member and three-member Board decisions. This will ensure that the Board continues to resolve cases expeditiously, while giving the Board appropriate flexibility to set internal case management deadlines based on the particular circumstances of the cases at issue and possible changes to EOIR's dockets.

To calculate the 180-day adjudication deadline for three-member panels, the Department believes that starting the

---

[45] The Department recognizes that such procedures necessitate service of notices and advisals electronically or by mail, as opposed to in-person service, and the Department believes that such service is sufficient for the same reasons as those described above with respect to advisals related to voluntary departure. *See* Section IV.F of this preamble.

adjudication period at the time of panel assignment is most appropriate. *See* 8 CFR 1003.1(e)(8)(i) (proposed). Three-member decisions require robust discussion among members of the panel, as well as detailed, thorough decisions, given that three-member decisions are intended to address significant legal issues. *See* 8 CFR 1003.1(e)(6) (explaining that three-member panel decisions are intended to address, among other issues, the need to establish precedent construing the meaning of laws, regulations, or procedures, or cases or controversies of national import). Thus, upon reconsideration, the Department is now of the belief that providing less time for the Board to consider and issue three-member panel decisions would be inefficient, as this truncated timeline could negatively affect the Board's ability to: (1) settle inconsistencies at the immigration court; (2) establish precedent that would clarify significant legal issues; (3) review decisions that may not be in conformity with the law or applicable precedent; (4) resolve cases or controversies of major national import; (5) review clearly erroneous factual determinations; (6) reverse decisions if appropriate to do so; or (7) resolve complex, novel, unusual, or recurring issues of law or fact. *See* 8 CFR 1003.1(e)(6) (2018). This, in turn, could have a cascading negative impact on all EOIR adjudications due to a resultant lack of clarity, consistency, or meaningful review and resolution of important issues that come before EOIR. Conversely, given that single-member Board decisions have, historically, been appropriate for the disposition of unopposed motions, 8 CFR 1003.1(e)(2), affirmances without opinion, 8 CFR 1003.1(e)(4), or "brief orders," 8 CFR 1003.1(e)(5), the Department continues to believe that calculating the 90-day adjudication period from the time of completion of the record on appeal is appropriate. *See* 8 CFR 1003.1(e)(8)(i) (proposed). Returning the adjudicatory processing timelines to the pre-AA96 Final Rule standards would ensure that there is sufficient time for the Board to fully consider and address important issues requiring three-member panel decisions, while still allowing for flexibility and expediency in issuing single-member decisions.

Additionally, the Department proposes to include all "rare circumstances" listed in the regulatory text prior to the AA96 Final Rule under which the Chairman was permitted to hold adjudication of a case or cases. Specifically, the Department proposes that the Board may hold a case or group

of cases where an impending decision by the United States Supreme Court or the relevant United States Court of Appeals, impending Department regulatory amendments, or an impending *en banc* Board decision might substantially determine the outcome of the case or group of cases. 8 CFR 1003.1(e)(8)(iii) (proposed). The Department also proposes to amend the pre-AA96 Final Rule language to account for the potential of "rare circumstances" other than those explicitly described by the regulation in which a hold may be appropriate. *Id.* Accordingly, the Department proposes to add the term "such as" before describing the rare circumstances to make clear that these circumstances are non-exhaustive. *Id.*

### K. Director's Authority To Issue Decisions

The Department proposes to amend 8 CFR 1003.1(e)(8) to remove the EOIR Director's authority to adjudicate cases that are pending beyond the Board's regulatory adjudication timelines. As a result, the Department also proposes to remove the cross-reference prohibiting delegation of the Director's authority—as was set forth in 8 CFR 1003.1(e)(8)—from the regulations at 8 CFR 1003.0(b)(2)(ii). The Department is proposing this change for clarity, as that cross-reference to the Director's authority in 8 CFR 1003.0(b)(2)(ii) would be rendered nonsensical if the changes to proposed 8 CFR 1003.1(e)(8) are finalized.

As a general rule, the EOIR Director does not have the authority to adjudicate, or direct the adjudication of, cases before EOIR. *See* 8 CFR 1003.0(c) ("Except as provided by statute, regulation, or delegation of authority from the Attorney General, or when acting as a designee of the Attorney General, the Director shall have no authority to adjudicate cases arising under the Act or regulations or to direct the result of an adjudication assigned to the Board, an immigration judge, the Chief Administrative Hearing Officer, or an Administrative Law Judge."). Two recent Department rulemakings, however, provided exceptions by allowing the EOIR Director to adjudicate Board cases that are not completed within their regulatory adjudication timelines.

In general, the regulations require single-member appeals to be completed within 90 days of completion of the record, and three-member appeals to be completed within 180 days. *See* 8 CFR 1003.1(e)(8)(i). An August 26, 2019, interim final rule amended this section to require that if a case is not completed

within the time limit and any extension, the Chairman must either assign the case to themselves or a Board Vice Chairman or refer the case to EOIR's Director for adjudication. *See* 84 FR at 44539–40; 8 CFR 1003.1(e)(8)(iii); Organization of the Executive Office for Immigration Review, 85 FR 69465, 69481 (Nov. 3, 2020) (adopting as final). Subsequently, the separate AA96 Final Rule further amended this section to require the Chairman to refer any case to the EOIR Director that is pending adjudication for more than 335 days after the appeal, motion, or remand was filed or received by the Board, subject to certain exceptions. *See* 85 FR at 81591. Taken together, these rulemakings significantly expanded the EOIR Director's authority to adjudicate cases before EOIR.

After further review, the Department has determined that providing the EOIR Director with such expansive adjudicatory authority is unnecessary. The Department proposes to remove the amendments made to 8 CFR 1003.1(e)(8) by both the August 2019 interim final rule and the related final rule, as well as the AA96 Final Rule, and revert the language back to instructing the Board to refer cases that are not adjudicated in the time required to the Attorney General for decision. 8 CFR 1003.1(e)(8)(ii) (proposed). Further, consistent with the Department's longstanding understanding of the EOIR Director's authorities and limitations, this proposed rule "highlight[s] the Director's role as EOIR's manager," as opposed to an adjudicator, which is more properly the function of the immigration courts and the Board. *See* 65 FR at 81434 (detailing the EOIR Director's broad authority to direct and supervise EOIR's components).

In the event that a Board case passes its regulatory deadline without adjudication, the Department believes that such cases are better addressed internally at the Board, including through the Chairman and Vice Chairman referrals included in this proposed rule, as well as any modified internal procedures, training, and hiring, as necessary. Therefore, the Department proposes to amend 8 CFR 1003.1(e)(8) to remove the EOIR Director's authority to adjudicate Board cases that remain pending past regulatory deadlines.

### L. Quality Assurance Certification

The Department proposes to remove and reserve 8 CFR 1003.1(k), which was added by the AA96 Final Rule to create a procedure for immigration judges to certify cases remanded to them by the Board and allegedly involving Board

error to the EOIR Director. In addition, the Department proposes to remove language added by the AA96 Final Rule that references the EOIR Director's authority to remand cases as part of the quality assurance certification process. *See* 8 CFR 1003.1(e) (proposed).

After further review, the Department believes that the pre-AA96 Final Rule procedures are sufficient to address potential Board errors. As explained above, a party dissatisfied with a Board decision may file a motion to reconsider, 8 CFR 1003.2(a), the noncitizen may pursue a petition for review of a final order of removal in the federal courts of appeals, INA 242(a)(1), 8 U.S.C. 1252(a)(1), and DHS may also seek to refer a Board decision to the Attorney General for further review, 8 CFR 1003.1(h). Within the Department, the Attorney General may certify a decision on the Attorney General's own initiative; an immigration judge may certify to the Board any case that is appealable to the Board; and the Board may reconsider a decision involving an error using the Board's *sua sponte* authority as described elsewhere in this proposed rule. *See* 8 CFR 1003.1(c), (h), 1003.2(a). All of these options that are already available to immigration judges, the Board, the Attorney General, and the parties to the case permit addressing alleged Board errors without the need for a lengthy ancillary process outside of the normal adjudicatory case flow.

The AA96 Final Rule unnecessarily inserted the EOIR Director into the adjudication process. As previously explained, the EOIR Director has historically not possessed the authority to adjudicate, or direct the adjudication of, cases before EOIR, with limited exceptions. *See* 8 CFR 1003.0(c). The AA96 Final Rule created a substantial exception to that general limitation on the Director's authority by allowing the EOIR Director to "exercise delegated authority from the Attorney General identical to that of the Board . . . [including] the authority to issue a precedent decision, and the authority to refer the case to the Attorney General for review" after certification from an immigration judge. 85 FR at 81653; 8 CFR 1003.1(k)(3). In effect, the AA96 Final Rule granted the EOIR Director broad authority to issue precedential decisions if an immigration judge certified a case to the EOIR Director alleging, for example, that the Board decision on remand was contrary to law or was vague, ambiguous, or internally inconsistent, among other reasons. 8 CFR 1003.1(k)(1)(iii). However, given the myriad other responsibilities of the EOIR Director, *see* 8 CFR 1003.0(b)(1), and because other existing agency

procedures are sufficient to address potential errors, the Department believes this broadening of the EOIR Director's adjudicative authority is unnecessary and unwarranted at this time.

*M. Forwarding of Record on Appeal*

The Department proposes to amend the regulations at 8 CFR 1003.5 regarding the forwarding of the record on appeal by largely returning to the regulatory text in effect prior to the AA96 Final Rule. First, the proposed rule would reinstate the requirements for immigration judges to review their oral decision transcripts and approve them within specified timeframes. 8 CFR 1003.5(a) (proposed). Second, the proposed rule would remove a reference to the EOIR Director when discussing the authority to manage the transcription process. *Id.*[46]

The Department originally instituted timelines for immigration judges to review oral decision transcripts in order to "expedite the handling of cases by the Board." Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 FR 7309, 7311 (Feb. 19, 2002) (proposed rule); 67 FR 54878, 54895 (Aug. 26, 2002) (final rule). Subsequently, the AA96 Final Rule completely removed the immigration judge transcript review process to further expedite the appeal process, stating that such review was no longer needed. 85 FR at 81639. However, after further consideration, the Department proposes to reinstate the prior review procedures as necessary to ensure that accurate transcripts are produced. As the source of the oral decision, the immigration judge is in the best position to review the transcript to ensure it is an accurate written version of their oral decision. Moreover, the Department believes that the 14-day review period does not lengthen the appeal process sufficiently to justify completely removing the immigration judge review process. In retaining the immigration judge transcript review process, the Department notes that the process is not intended to allow immigration judges to change their decision after the fact but rather to ensure that the written transcript accurately captures the immigration

judge's oral decision, particularly because minor transcription errors have the potential to cause outsized issues.

The AA96 Final Rule also inserted a reference to the EOIR Director into 8 CFR 1003.5(a), regarding the management of the transcription process, but did not provide an explanation for the addition. On further review, the Department proposes to remove the reference to the EOIR Director in the management of the transcription process as unnecessary. The Chairman and the Chief Immigration Judge will continue to manage the transcription process.

The Department also proposes to retain pre-AA96 Final Rule language at 8 CFR 1003.5(b) regarding procedures for appeals from DHS officer decisions to provide clarity to parties about how to manage the record of proceeding in cases where DHS, upon reconsideration, decides to grant a benefit that has been requested in the appeal to the Board.

*N. Definitional Changes*

The Department proposes adding two definitions to 8 CFR 1001.1. Specifically, the Department proposes to define the terms "noncitizen" and "unaccompanied child." *See* 8 CFR 1001.1(gg)–(hh) (proposed).

First, the proposed rule would define "noncitizen" to be synonymous with the term "alien," which is defined by statute to mean "any person not a citizen or national of the United States." INA 101(a)(3), 8 U.S.C. 1101(a)(3). This change would be consistent with recent terminology usage changes at EOIR. *See* EOIR PM 21–27, *Terminology* (July 26, 2021), *https://www.justice.gov/eoir/book/file/1415216/download; see also Barton* v. *Barr,* 140 S. Ct. 1442, 1446 n.2 (2020) (noting that the opinion "uses the term 'noncitizen' as equivalent to the statutory term 'alien' "). The Department notes that a person may claim United States citizenship or nationality during immigration court proceedings or may obtain United States citizenship or nationality after immigration court proceedings have commenced. The Department proposes to use the term "noncitizen" as equivalent to the term "alien" as used in the regulations to denote a person who is in immigration proceedings before EOIR, including those that claim or later obtain United States citizenship or nationality. The Department requests comments on whether there is an alternative term or terms that would better capture this concept.[47]

---

[46] The proposed rule retains, however, changes made by the AA96 Final Rule to delete references to DHS procedures in paragraph (b) that are not relevant to EOIR and to change the phrase "improve [transcript] quality" to "ensure [transcript] quality." 8 CFR 1003.5(a), (b) (proposed). Due to the high quality of EOIR's digital audio recording system, the role of the Chairman and Chief Immigration Judge in the transcription process is more accurately defined as ensuring the continued quality of transcription, rather than improving it.

[47] The term "respondent" as defined in 8 CFR 1001.1(r) does not cover all persons appearing for proceedings before EOIR but instead describes

Second, the proposed rule would define "unaccompanied child" to be synonymous with "unaccompanied alien child" and its statutory definition at 6 U.S.C. 279(g)(2). Similar to the proposed "noncitizen" definitional change, this change is more consistent with current terminology usage.

*O. Technical Changes*

The Department proposes technical changes in paragraphs amended as noted in this section. Specifically, the Department proposes to replace gendered language with gender-neutral language at 8 CFR 1003.1(e)(8)(ii), 1003.2(c)(1), 1003.23(b)(1), 1003.23(b)(1)(iii), and 1240.26. The Department also proposes to decapitalize the term "Immigration Judge" where appropriate. Lastly, the Department proposes to replace references to "the Service" with "DHS" and references to "alien" with "noncitizen" where appropriate.

*P. Request for Comment*

In *Matter of Pickering,* 23 I&N Dec. 621 (BIA 2003), the Board of Immigration Appeals held that court orders that vacate a noncitizen's conviction will be given effect for immigration purposes only when they are based on a substantive or procedural defect in the underlying criminal proceeding. In *Matter of Thomas & Thompson,* 27 I&N Dec. 674 (A.G. 2019), Attorney General Barr overruled three prior Board decisions—*Matter of Cota-Vargas,* 37 I&N Dec. 849 (BIA 2005), *Matter of Song,* 23 I&N Dec. 173 (BIA 2001), and *Matter of Estrada,* 26 I&N Dec. 749 (BIA 2016)—and held that state-court orders that modify, clarify, or otherwise alter a noncitizen's criminal sentence will similarly be given effect for immigration purposes only when they are based on a substantive or procedural defect in the underlying criminal proceeding, and not when based on reasons unrelated to the merits, such as rehabilitation or avoiding immigration consequences.

Recently, a circuit split has emerged on whether *Matter of Thomas & Thompson* may be applied retroactively in immigration proceedings to orders or criminal proceedings that predated the Attorney General's decision. *Compare*

noncitizens in removal or deportation proceedings. *See* 8 CFR 1001.1(r) (defining respondent "as a person named in a notice to appear or an order to show cause"); INA 239(a)(1), 8 U.S.C. 1229(a)(1) (defining a notice to appear as the charging document that initiates removal proceedings). EOIR conducts other proceedings including "withholding-only" proceedings and "asylum-only" proceedings. *See, e.g.,* 8 CFR 1208.30(g)(2)(iv)(C) (asylum-only proceedings), 1208.2(c)(2) (withholding-only proceedings).

*Zaragoza* v. *Garland,* 52 F.4th 1006, 1010 (7th Cir. 2022) (holding that applying *Matter of Thomas & Thompson* to a preexisting sentence-modification order "is an impermissibly retroactive application of a new rule"), *with Edwards* v. *U.S. Attorney General,* 56 F.4th 951, 962 (11th Cir. 2022) (finding "no retroactivity problem" in similar circumstances). Questions have also arisen over how *Matter of Thomas & Thompson* and *Pickering* apply to particular types of orders. *See, e.g., Matter of Sotelo,* 2019 WL 8197756, at *2 (BIA Dec. 23, 2019) (giving effect to a vacatur order issued under Cal. Penal Code § 1473.7); *Khatkarh* v. *Becerra,* 442 F. Supp. 3d 1277, 1285–86 (E.D. Cal. 2020) (discussing Board decision denying effect to a vacatur order issued under Cal. Penal Code § 1473.7); *Talamantes-Enriquez* v. *U.S. Attorney General,* 12 F.4th 1340, 1354–55 (11th Cir. 2021) (denying effect to a clarification order where the original sentence was not ambiguous, but distinguishing a "sentence order [that] was ambiguous and needed clarification").

The Department invites comment on whether—and if so, to what extent—*Matter of Thomas & Thompson* should be given retroactive effect. In particular, the Department seeks comment and information on the appropriate reference point for the retroactivity inquiry; the extent to which individuals reasonably relied on the Board decisions overturned by *Matter of Thomas & Thompson* (*e.g.,* in entering guilty pleas, in going to trial, in pursuing state-court modifications, clarifications, or alterations, or otherwise); the burden that retroactive application would impose (*e.g.,* the consequence of removal and obstacles individuals may now face to obtaining relief that would satisfy *Thomas & Thompson* or in demonstrating case-specific reliance); and the interests, if any, in applying *Matter of Thomas & Thompson* retroactively. *See, e.g., Zaragoza,* 52 F.4th at 1023; *Retail, Wholesale & Dep't Store Union, AFL–CIO* v. *NLRB,* 466 F.2d 380, 390 (D.C. Cir. 1972); *see also INS* v. *St. Cyr,* 533 U.S. 289, 314–21 (2001). The Department also seeks comment on how *Matter of Thomas & Thompson* and *Pickering* apply to particular types of orders, such as those referenced in *Matter of Sotelo, Katkarh,* and *Talamantes-Enriquez.* Reconsideration of the approach of *Matter of Thomas & Thompson* or *Pickering* is beyond the scope of this rulemaking, which focuses on the application of those decisions without

reaffirming or reconsidering their approach.

*Q. Reliance Interests*

The Department perceives no reliance interest on the part of any party or entity in any existing policies implicated or effected by the proposed rule, apart from those discussed in the request for comment in Section IV.P of this preamble. Nonetheless, the Department invites commenters to identify any serious reliance interests that may be implicated by the provisions of this proposed rule. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (requiring agencies to consider cognizable "serious reliance interests" when changing policies).

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

The Department is providing a 60-day comment period for this proposed rule to provide the public with "an opportunity to participate in the rule making" as required by the Administrative Procedure Act and in accordance with the guidance provided by Executive Order 12866 and Executive Order 13563. *See* APA, 5 U.S.C. 553(c); E.O. 12866, Regulatory Planning and Review, 58 FR 51735 (Sept. 30, 1993) (stating that rulemakings "in most cases should include a comment period of not less than 60 days"); E.O. 13563, Improving Regulation and Regulatory Review, 76 FR 3821, 3821–22 (Jan. 18, 2011) ("To the extent feasible and permitted by law, each agency shall afford the public . . . a comment period that should generally be at least 60 days.").

The Department reiterates that it proposes discrete changes to the appellate process, decisional finality, and administrative closure. Should rulemakings arise prior to finalization of this proposed rule that impact the changes proposed herein, the Department intends to identify and explain the projected impact that this proposed rule, if finalized, would have on EOIR's operations in conjunction with those future rules in order to give the public notice of the projected intersection between related rulemaking efforts and the opportunity to comment, where appropriate.

The Department does not anticipate that the comment period for this proposed rule will overlap or coincide with other rules, Attorney General decisions, or Board decisions that would affect the effect of the regulatory changes proposed by this NPRM. The Department invites the public to submit comments during the 60-day comment

period regarding anticipated interaction with related rules.[48] For further information, the Department notes the most recent publication of the Unified Agenda outlining the Department's anticipated rulemaking activity through spring 2024. *See* Office of Information and Regulatory Affairs, *Spring 2023 Unified Agenda of Regulatory and Deregulatory Actions, https:// www.reginfo.gov/public/do/ eAgendaMain.*

### B. Regulatory Flexibility Act

The Department has reviewed this NPRM in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and certifies that this NPRM will not have a significant economic impact on a substantial number of small entities. The proposed rule will not regulate ''small entities,'' as that term is defined in 5 U.S.C. 601(6). In the main, this proposed rule reverses the amendments made by the AA96 Final Rule and restores and expands on previously existing authorities exercised by EOIR adjudicators and processes governing appeals filed with the Board. Accordingly, this proposed rule regulates the conduct of immigration proceedings before EOIR and therefore may have a direct impact on noncitizens in such proceedings. The proposed rule may indirectly affect resources or business operations for legal providers representing noncitizens in proceedings before EOIR, but this proposed rule imposes no mandates or requirements on such entities and, therefore, the Department believes that the proposed rule will not have a significant economic impact on a substantial number of small entities. Moreover, the Department believes it is unlikely that

small entities, including legal service providers, have changed their practices since the AA96 Final Rule was enjoined, thus further minimizing the proposed rule's impact on small entities. The AA96 Final Rule was enjoined soon after becoming effective. Thus, the pre-AA96 Final Rule status quo has been in effect since the injunction. Given that the proposed rule generally adopts the pre-AA96 Final Rule status quo—the framework that is currently in place—with only a few alterations, the Department does not expect the changes proposed by this NPRM to have a significant impact on any small entities, as it is unlikely to require any significant change in operations to accommodate the changes proposed herein.

### C. Unfunded Mandates Reform Act of 1995

This proposed rule would not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year (adjusted annually for inflation), and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

### D. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)

The Department has determined that this proposed rule is a ''significant regulatory action'' under section 3(f) of Executive Order 12866, as amended. Accordingly, this proposed rule has been submitted to the Office of Management and Budget for review.

The Department certifies that this proposed rule has been drafted in accordance with the principles of Executive Order 12866, Executive Order 13563, and Executive Order 14094, Modernizing Regulatory Review, 88 FR 21879 (Apr. 6, 2023). Executive Orders 12866, 13563, and 14094 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

Overall, the Department believes that the changes proposed in this NPRM will provide significant benefits to adjudicators, the parties, and the broader public, which outweigh the potential costs.

For example, the proposed rule's provisions for the exercise of administrative closure, termination, and dismissal authority strike a balance between providing sufficient guidance for adjudicators and regulated parties while, at the same time, preserving flexibility that will promote fairer, more efficient, and more uniform case processing and adjudication. Likewise, eliminating projected inefficiencies that could have resulted from implementation of the AA96 standards, including rescinding restrictions on *sua sponte* authority for adjudicators to reopen or reconsider cases, would codify additional flexibility for adjudicators, which could provide significant benefits to noncitizens in certain cases with exceptional circumstances, as discussed above. Further, reinstating Board remand authority will also codify similar flexibility for adjudicators, and is expected to have efficiency benefits as noted in the preamble above. The Department believes that the costs of these provisions mainly relate to any necessary familiarization with the rule, but such costs should be *de minimis,* given that the AA96 Final Rule has never been implemented and this NPRM is proposing to codify the operative status quo. Further, the NPRM is largely either proposing to codify prior longstanding regulatory provisions (*sua sponte* authority, Board remand authority) or longstanding case law (administrative closure). On balance, overall, the Department believes that the fairness and efficiency benefits gained by the aforementioned proposed changes outweigh the potential *de minimis* costs.

Similarly, many of the other proposed changes, including to briefing schedules, background check procedures, Board adjudication timelines, quality assurance certification, forwarding of the record on appeal, and the EOIR Director's case adjudication authority are largely internal case-processing measures with no measurable costs to the public. Moreover, many of these provisions will revert in large part to longstanding pre-AA96 Final Rule regulatory language, with which adjudicators and the parties should already be familiar. Additionally, to the extent that any provisions of the AA96 Final Rule are retained, such as the background check procedures allowing a case to be held at

---

[48] The Department recognizes that litigation is pending for many of the rules noted by the court in *Centro Legal de la Raza.* 524 F. Supp. 3d at 959–62. As provided in the Department's Unified Agenda submission, the Department anticipates modifying or rescinding the following rules identified by the court: Executive Office for Immigration Review; Fee Review, 85 FR 82750 (Dec. 18, 2020); Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 80274 (Dec. 11, 2020); and Procedures for Asylum and Withholding of Removal, 85 FR 81698 (Dec. 16, 2020). Further, rescission of the AA96 Final Rule addresses the court's concerns with the interactions of two other proposed rules—Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal, 85 FR 75942 (Nov. 27, 2020), and Good Cause for a Continuance in Immigration Proceedings, 85 FR 75925 (Nov. 27, 2020). Specifically, the court was concerned that the Department's responses in the AA96 Final Rule to various comments relied on regulatory provisions that it later proposed to amend. *Centro Legal de la Raza,* 524 F. Supp. 3d at 959–62. Publishing this new NPRM, which proposes to rescind the AA96 Final Rule, containing the responses causing concern, thereby eliminates such concerns.

the Board pending a background check, rather than remanded to the immigration court, the Department believes that such provisions will provide efficiencies to the immigration system, which will in turn benefit adjudicators and the parties.

In sum, any changes contemplated by the NPRM would not impact on the public in a way that would render the proposed rule in conflict with the principles of Executive Orders 12866, 13563, and 14094.

*E. Executive Order 13132—Federalism*

This proposed rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this proposed rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988—Civil Justice Reform*

This proposed rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

This NPRM does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35), and its implementing regulations, 5 CFR part 1320.

*H. Congressional Review Act*

This proposed rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804.

**List of Subjects**

*8 CFR Part 1001*

Administrative practice and procedure, Immigration.

*8 CFR Part 1003*

Administrative practice and procedure, Immigration.

*8 CFR Part 1239*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 1240*

Administrative practice and procedure, Aliens.

Accordingly, for the reasons set forth in the preamble, the Department

proposes to amend 8 CFR parts 1001, 1003, 1239, and 1240 as follows:

## PART 1001—DEFINITIONS

■ 1. The authority citation for part 1001 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1101, 1103; Pub. L. 107–296, 116 Stat. 2135; Title VII of Pub. L. 110–229.

■ 2. Amend § 1001.1 by adding paragraphs (gg) and (hh) to read as follows:

### § 1001.1   Definitions.

\*   \*   \*   \*   \*

(gg) The term *noncitizen* means any person not a citizen or national of the United States.

(hh) The term *unaccompanied child* means, and is synonymous with, the term "unaccompanied alien child," as defined in 6 U.S.C. 279(g)(2).

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 3. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 4. Amend § 1003.0 by revising paragraph (b)(2)(ii) to read as follows:

### § 1003.0   Executive Office for Immigration Review.

\*   \*   \*   \*   \*

(b) \*   \*   \*

(2) \*   \*   \*

(ii) The Director may not delegate the authority assigned to the Director in § 1292.18 of this chapter and may not delegate any other authority to adjudicate cases arising under the Act or regulations of this chapter unless expressly authorized to do so.

\*   \*   \*   \*   \*

■ 5. Amend § 1003.1 by:

■ a. Revising paragraphs (a)(2)(i)(E), (c), (d)(1) introductory text, (d)(1)(ii), (d)(3)(iii) and (iv);

■ b. Removing paragraph (d)(3)(v);

■ c. Revising paragraphs (d)(6)(ii) and (iii), (d)(6)(v), (d)(7), (e) introductory text, (e)(1) through (3), (e)(4)(i) introductory text, (e)(4)(ii), (e)(7), (e)(8) introductory text, (e)(8)(i) through (iii), and (v), and (f);

■ d. Removing and reserving paragraph (k); and

■ e. Adding paragraphs (l) and (m).

The additions and revisions read as follows:

### § 1003.1   Organization, jurisdiction, and powers of the Board of Immigration Appeals.

(a) \*   \*   \*

(2) \*   \*   \*

(i) \*   \*   \*

(E) Adjudicate cases as a Board member, including the authority to administratively close and recalendar cases in accordance with paragraph (l) of this section; and

\*   \*   \*   \*   \*

(c) *Jurisdiction by certification.* The Secretary, or any other duly authorized officer of DHS, an immigration judge, or the Board may in any case arising under paragraph (b) of this section certify such case to the Board for adjudication. The Board, in its discretion, may review any such case by certification without regard to the provisions of § 1003.7 if it determines that the parties have already been given a fair opportunity to make representations before the Board regarding the case, including the opportunity to request oral argument and to submit a brief.

(d) \*   \*   \*

(1) *Generally.* The Board shall function as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it. The Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations. In addition, the Board, through precedent decisions, shall provide clear and uniform guidance to DHS, the immigration judges, and the general public on the proper interpretation and administration of the Act and its implementing regulations.

\*   \*   \*   \*   \*

(ii) Subject to the governing standards set forth in paragraph (d)(1)(i) of this section, Board members shall exercise their independent judgment and discretion in considering and determining the cases coming before the Board, and a panel or Board member to whom a case is assigned may take any action consistent with their authorities under the Act and the regulations as necessary or appropriate for the disposition or alternative resolution of the case. Such actions include administrative closure, termination of proceedings, and dismissal of proceedings. The standards for the administrative closure, dismissal, and termination of cases are set forth in paragraph (l) of this section, 8 CFR

1239.2(c), and paragraph (m) of this section, respectively.

\* \* \* \* \*

(3) \* \* \*

(iii) The Board may review de novo all questions arising in appeals from decisions issued by DHS officers.

(iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding cases. A party asserting that the Board cannot properly resolve an appeal without further factfinding must file a motion for remand. If new evidence is submitted on appeal, that submission may be deemed a motion to remand and considered accordingly. If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to DHS.

\* \* \* \* \*

(6) \* \* \*

(ii) Except as provided in paragraph (d)(6)(iv) of this section, if identity, law enforcement, or security investigations or examinations are necessary in order to adjudicate the appeal or motion, the Board will provide notice to both parties that the case is being placed on hold until such time as all identity, law enforcement, or security investigations or examinations are completed or updated and the results have been reported to the Board. The Board's notice will notify the noncitizen that DHS will contact the noncitizen with instructions, consistent with § 1003.47(d), to take any additional steps necessary to complete or update the identity, law enforcement, or security investigations or examinations only if DHS is unable to independently update the necessary identity, law enforcement, or security investigations or examinations. The Board's notice will also advise the noncitizen of the consequences for failing to comply with the requirements of this section. DHS is responsible for obtaining biometrics and other biographical information to complete or update the identity, law enforcement, or security investigations or examinations with respect to any noncitizen in detention.

(iii) In any case placed on hold under paragraph (d)(6)(ii) of this section, DHS shall report to the Board promptly when the identity, law enforcement, or security investigations or examinations have been completed or updated. If DHS obtains relevant information as a result of the identity, law enforcement, or security investigations or examinations, or if the noncitizen fails to comply with the necessary procedures for collecting biometrics or other biographical information after receiving instructions from DHS under paragraph (d)(6)(ii) of this section, DHS may move the Board to remand the record to the immigration judge for consideration of whether, in view of the new information, or the noncitizen's failure to comply with the necessary procedures for collecting biometrics or other biographical information after receiving instructions from DHS under paragraph (d)(6)(ii) of this section, immigration relief or protection should be denied, either on grounds of ineligibility as a matter of law or as a matter of discretion. If DHS fails to report the results of timely completed or updated identity, law enforcement or security investigations or examinations within 180 days from the date of the Board's notice under paragraph (d)(6)(ii) of this section, the Board may continue to hold the case under paragraph (d)(6)(ii) of this section, as needed, or remand the case to the immigration judge for further proceedings under § 1003.47(h).

\* \* \* \* \*

(v) The immigration relief or protection described in § 1003.47(b) and granted by the Board shall take effect as provided in § 1003.47(i).

(7) \* \* \*

(i) The decision of the Board shall be final except in those cases reviewed by the Attorney General in accordance with paragraph (h) of this section. The Board may return a case to DHS or an immigration judge for such further action as may be appropriate without entering a final decision on the merits of the case.

(ii) In cases involving voluntary departure, the Board may issue an order of voluntary departure under section 240B of the Act, with an alternate order of removal, if the noncitizen requested voluntary departure before an immigration judge, the noncitizen's notice of appeal specified that the noncitizen is appealing the immigration judge's denial of voluntary departure and identified the specific factual and legal findings that the noncitizen is challenging, and the Board finds that the noncitizen is otherwise eligible for voluntary departure, as provided in 8 CFR 1240.26(k). In order to grant voluntary departure, the Board must find that all applicable statutory and regulatory criteria have been met, based on the record and within the scope of its review authority on appeal, and that the noncitizen merits voluntary departure as a matter of discretion. If the record does not contain sufficient factual findings regarding eligibility for voluntary departure, the Board may remand the decision to the immigration judge for further factfinding.

(e) *Case management system.* The Chairman shall establish a case management system to screen all cases and to manage the Board's caseload. Unless a case meets the standards for assignment to a three-member panel under paragraph (e)(6) of this section, all cases shall be assigned to a single Board member for disposition. The Chairman, under the supervision of the Director, shall be responsible for the success of the case management system. The Chairman shall designate, from time to time, a screening panel comprising a sufficient number of Board members who are authorized, acting alone, to adjudicate appeals as provided in this paragraph (e). The provisions of this paragraph (e) shall apply to all cases before the Board, regardless of whether they were initiated by filing a Notice of Appeal, filing a motion, or receipt of a remand from Federal court or the Attorney General.

(1) *Initial screening.* All cases shall be referred to the screening panel for review. Appeals subject to summary dismissal as provided in paragraph (d)(2) of this section should be promptly dismissed.

(2) *Miscellaneous dispositions.* A single Board member may grant an unopposed motion or a motion to withdraw an appeal pending before the Board. In addition, a single Board member may adjudicate a DHS motion to remand any appeal from the decision of a DHS officer where DHS requests that the matter be remanded to DHS for further consideration of the appellant's arguments or evidence raised on appeal; a case where remand is required because of a defective or missing transcript; and other procedural or ministerial issues as provided by the case management plan.

(3) *Merits review.* In any case that has not been summarily dismissed, the case management system shall arrange for the prompt completion of the record of proceeding and transcript, and the issuance of a briefing schedule, as appropriate. A single Board member assigned under the case management system shall determine the appeal on the merits as provided in paragraph (e)(4) or (5) of this section, unless the Board member determines that the case is appropriate for review and decision by a three-member panel under the standards of paragraph (e)(6) of this section. The Board member may summarily dismiss an appeal after completion of the record of proceeding.

(4) \* \* \*

(i) The Board member to whom a case is assigned shall affirm the decision of

the DHS officer or the immigration judge without opinion if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

\* \* \* \* \*

(ii) If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: ''The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. *See* 8 CFR 1003.1(e)(4).'' An order affirming without opinion issued under authority of this provision shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision but does signify the Board's conclusion that any errors in the decision of the immigration judge or DHS were harmless or nonmaterial.

\* \* \* \* \*

(7) *Oral argument.* When an appeal has been taken, a request for oral argument if desired shall be included in the Notice of Appeal. A three-member panel or the Board en banc may hear oral argument, as a matter of discretion, at such date and time as is established under the Board's case management plan. Oral argument shall be held at the offices of the Board unless the Deputy Attorney General or the Attorney General's designee authorizes oral argument to be held elsewhere. DHS may be represented before the Board by an officer or counsel of DHS designated by DHS. No oral argument will be allowed in a case that is assigned for disposition by a single Board member.

(8) *Timeliness.* As provided under the case management system, the Board shall promptly enter orders of summary dismissal, or other miscellaneous dispositions, in appropriate cases consistent with paragraph (e)(1) of this section. In all other cases, after completion of the record on appeal, including any briefs, motions, or other submissions on appeal, the Board member or panel to which the case is assigned shall issue a decision on the merits as soon as practicable, with a priority for cases or custody appeals involving detained noncitizens.

(i) Except in exigent circumstances as determined by the Chairman, or as provided in paragraph (d)(6) of this section, the Board shall dispose of all cases assigned to a single Board member within 90 days of completion of the

record, or within 180 days after a case is assigned to a three-member panel (including any additional opinion by a member of the panel).

(ii) In exigent circumstances, the Chairman may grant an extension in particular cases of up to 60 days as a matter of discretion. Except as provided in paragraph (e)(8)(iii) or (iv) of this section, in those cases where the panel is unable to issue a decision within the established time limits, as extended, the Chairman shall either self-assign the case or assign the case to a Vice Chairman for final decision within 14 days or shall refer the case to the Attorney General for decision. If a dissenting or concurring panel member fails to complete the member's opinion by the end of the extension period, the decision of the majority will be issued without the separate opinion.

(iii) In rare circumstances, such as when an impending decision by the United States Supreme Court or a United States Court of Appeals, or impending Department regulatory amendments, or an impending en banc Board decision may substantially determine the outcome of a case or group of cases pending before the Board, the Chairman may hold the case or cases until such decision is rendered, temporarily suspending the time limits described in this paragraph (e)(8).

\* \* \* \* \*

(v) The Chairman shall notify the Director of EOIR and the Attorney General if a Board member consistently fails to meet the assigned deadlines for the disposition of appeals, or otherwise fails to adhere to the standards of the case management system. The Chairman shall also prepare a report assessing the timeliness of the disposition of cases by each Board member on an annual basis.

\* \* \* \* \*

(f) *Service of Board decisions.* The decision of the Board shall be in writing. The Board shall transmit a copy to DHS and serve a copy upon the noncitizen or the noncitizen's representative, as provided in 8 CFR part 1292.

\* \* \* \* \*

(l) *Administrative closure and recalendaring.* Administrative closure is the temporary suspension of a case. Administrative closure removes a case from the Board's docket until the case is recalendared. Recalendaring places a case back on the Board's docket.

(1) *Administrative closure before the Board.* Board members may, in the exercise of discretion, administratively close a case upon the motion of a party, after applying the standard set forth at paragraph (l)(3) of this section. The

administrative closure authority described in this section is not limited by the authority provided in any other provisions in this chapter V that separately authorize or require administrative closure in certain circumstances, including 8 CFR 214.15(l) and (p)(4), 1214.2(a), 1214.3, 1240.62(b), 1240.70(f) through(h), 1245.13, 1245.15(p)(4)(i), and 1245.21(c).

(2) *Recalendaring before the Board.* At any time after a case has been administratively closed under paragraph (l)(1) of this section, the Board may, in the exercise of discretion, recalendar the case pursuant to a party's motion to recalendar. In deciding whether to grant such a motion, the Board shall apply the standard set forth at paragraph (l)(3) of this section.

(3) *Standard for administrative closure and recalendaring.* The Board shall grant a motion to administratively close or recalendar a case filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition, unless the Board articulates unusual, clearly identified, and supported reasons for denying the motion. In all other cases, in deciding whether to administratively close or to recalendar a case, the Board shall consider the totality of the circumstances, including as many of the factors listed under paragraphs (l)(3)(i) and (ii) of this section as are relevant to the particular case. The Board may also consider other factors where appropriate. No single factor is dispositive. Accordingly, the Board, having considered the totality of the circumstances, may grant a motion to administratively close or to recalendar a particular case over the objection of a party. Although administrative closure may be appropriate where a petition, application, or other action is pending outside of proceedings before the Board, such a pending petition, application, or other action is not required for a case to be administratively closed.

(i) As the circumstances of the case warrant, the factors relevant to a decision to administratively close a case include:

(A) The reason administrative closure is sought;

(B) The basis for any opposition to administrative closure;

(C) Any requirement that a case be administratively closed in order for a petition, application, or other action to be filed with, or granted by, DHS;

(D) The likelihood the noncitizen will succeed on any petition, application, or other action that the noncitizen is pursuing, or that the noncitizen states in writing or on the record at a hearing that

they plan to pursue, outside of proceedings before the Board;

(E) The anticipated duration of the administrative closure;

(F) The responsibility of either party, if any, in contributing to any current or anticipated delay; and

(G) The ultimate anticipated outcome of the case.

(ii) As the circumstances of the case warrant, the factors relevant to a decision to recalendar a case include:

(A) The reason recalendaring is sought;

(B) The basis for any opposition to recalendaring;

(C) The length of time elapsed since the case was administratively closed;

(D) If the case was administratively closed to allow the noncitizen to file a petition, application, or other action outside of proceedings before the Board, whether the noncitizen filed the petition, application, or other action and, if so, the length of time that elapsed between when the case was administratively closed and when the noncitizen filed the petition, application, or other action;

(E) If a petition, application, or other action that was pending outside of proceedings before the Board has been adjudicated, the result of that adjudication;

(F) If a petition, application, or other action remains pending outside of proceedings before the Board, the likelihood the noncitizen will succeed on that petition, application, or other action; and

(G) The ultimate anticipated outcome if the case is recalendared.

(m) *Termination.* The Board shall have the authority to terminate cases before it as set forth in paragraphs (m)(1) and (2) of this section. A motion to dismiss a case in removal proceedings before the Board for a reason other than authorized by 8 CFR 1239.2(c) shall be deemed a motion to terminate under paragraph (m)(1) of this section.

(1) *Removal, deportation, and exclusion proceedings*—(i) *Mandatory termination.* In removal, deportation, and exclusion proceedings, the Board shall terminate the case where at least one of the requirements in paragraphs (m)(1)(i)(A) through (G) of this section is met.

(A) No charge of deportability, inadmissibility, or excludability can be sustained.

(B) Fundamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable.

(C) The noncitizen has, since the initiation of proceedings, obtained United States citizenship.

(D) The noncitizen has, since the initiation of proceedings, obtained at least one status listed in paragraphs (m)(1)(i)(D)(*1*) through (*4*) of this section, provided that the status has not been revoked or terminated, and the noncitizen would not have been deportable, inadmissible, or excludable as charged if the noncitizen had obtained such status before the initiation of proceedings.

(*1*) Lawful permanent resident status.

(*2*) Refugee status.

(*3*) Asylee status.

(*4*) Nonimmigrant status as defined in section 101(a)(15)(S), (T), or (U) of the Act.

(E) Termination is required under 8 CFR 1245.13(l).

(F) Termination is otherwise required by law.

(G) The parties jointly filed a motion to terminate, or one party filed a motion to terminate and the other party affirmatively indicated its non-opposition, unless the Board articulates unusual, clearly identified, and supported reasons for denying the motion.

(ii) *Discretionary termination.* In removal, deportation, or exclusion proceedings, the Board may, in the exercise of discretion, terminate the case where at least one of the requirements listed in paragraphs (m)(1)(ii) (A) through (G) of this section is met.

(A) An unaccompanied noncitizen, as defined in 8 CFR 1001.1(hh), states an intent in writing or on the record at a hearing to seek asylum with USCIS, and USCIS has initial jurisdiction over the application pursuant to section 208(b)(3)(C) of the Act.

(B) The noncitizen demonstrates prima facie eligibility for relief from removal or for a lawful status based on a petition, application, or other action that USCIS has jurisdiction to adjudicate, including naturalization or adjustment of status.

(C) The noncitizen is a beneficiary of Temporary Protected Status, deferred action, or Deferred Enforced Departure.

(D) USCIS has granted the noncitizen's application for a provisional unlawful presence waiver pursuant to 8 CFR 212.7(e).

(E) Termination is authorized by 8 CFR 1216.4(a)(6) or 1238.1(e).

(F) The parties have filed a motion to terminate under 8 CFR 214.11(d)(1)(i) or 214.14(c)(1)(i).

(G) Due to circumstances comparable to those described in paragraphs (m)(1)(ii)(A) through (F) of this section, termination is similarly necessary or appropriate for the disposition or alternative resolution of the case. However, the Board may not terminate

a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(2) *Other proceedings*—(i) *Mandatory termination.* In proceedings other than removal, deportation, or exclusion proceedings, the Board shall terminate the case where the parties have jointly filed a motion to terminate, or one party has filed a motion to terminate and the other party has affirmatively indicated its non-opposition, unless the Board articulates unusual, clearly identified, and supported reasons for denying the motion. In addition, the Board shall terminate such a case where required by law.

(ii) *Discretionary termination.* In proceedings other than removal, deportation, or exclusion proceedings, the Board may, in the exercise of discretion, terminate the case where one party has requested termination, and terminating the case is necessary or appropriate for the disposition or alternative resolution of the case. However, the Board may not terminate the case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(iii) *Limitation on Termination.* Nothing in paragraphs (m)(2)(i) and (ii) of this section authorizes the Board to terminate a case where prohibited by another regulatory provision.

■ 6. Amend § 1003.2 by:

■ a. Revising paragraphs (a) and (b)(1);

■ b. Removing the words "Immigration Judge" and adding in their place "immigration judge" in paragraph (c)(2);

■ c. Revising paragraphs (c)(3)(iii) and (iv);

■ d. Removing paragraphs (c)(3)(v) through (vii);

■ e. Adding paragraph (c)(4); and

■ f. Revising paragraphs (f), (g)(3), and (i).

The revisions and addition read as follows:

**§ 1003.2   Reopening or reconsideration before the Board of Immigration Appeals.**

(a) *General.* The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision. A request by DHS or by the party affected by the decision to reopen or reconsider a case the Board has decided must be in the form of a written motion to the Board. The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, subject to the

restrictions of this section. The Board has discretion to deny a motion to reopen even if the moving party has made out a prima facie case for relief.

(b) * * *

(1) A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the prior Board decision and shall be supported by pertinent authority. When a motion to reconsider the decision of an immigration judge or of a DHS officer is pending at the time an appeal is filed with the Board, or when such motion is filed subsequent to the filing with the Board of an appeal from the decision sought to be reconsidered, the motion may be deemed a motion to remand the decision for further proceedings before the immigration judge or the DHS officer from whose decision the appeal was taken. Such motion may be consolidated with and considered by the Board in connection with the appeal to the Board.

*    *    *    *    *

(c) * * *

(3) * * *

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by DHS in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with 8 CFR 1208.24.

(4) A motion to reopen a decision rendered by an immigration judge or DHS officer that is pending when an appeal is filed, or that is filed while an appeal is pending before the Board, may be deemed a motion to remand for further proceedings before the immigration judge or the DHS officer from whose decision the appeal was taken. Such motion may be consolidated with, and considered by the Board in connection with, the appeal to the Board.

*    *    *    *    *

(f) *Stay of deportation.* Except where a motion is filed pursuant to the provisions of § 1003.23(b)(4)(ii) and (b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the immigration judge, or an authorized DHS officer.

(g) * * *

(3) *Briefs and response.* The moving party may file a brief if it is included with the motion. If the motion is filed directly with the Board pursuant to

paragraph (g)(2)(i) of this section, the opposing party shall have 21 days from the date of service of the motion to file a brief in opposition to the motion directly with the Board. If the motion is filed with a DHS office pursuant to paragraph (g)(2)(ii) of this section, the opposing party shall have 21 days from the date of filing of the motion to file a brief in opposition to the motion directly with DHS. In all cases, briefs and any other filings made in conjunction with a motion shall include proof of service on the opposing party. The Board, in its discretion, may extend the time within which such brief is to be submitted and may authorize the filing of a brief directly with the Board. A motion shall be deemed unopposed unless a timely response is made. The Board may, in its discretion, consider a brief filed out of time.

*    *    *    *    *

(i) *Ruling on motion.* Rulings upon motions to reopen or motions to reconsider shall be by written order. Any motion for reconsideration or reopening of a decision issued by a single Board member will be referred to the screening panel for disposition by a single Board member, unless the screening panel member determines, in the exercise of judgment, that the motion for reconsideration or reopening should be assigned to a three-member panel under the standards of § 1003.1(e)(6). If the order directs a reopening and further proceedings are necessary, the record shall be returned to the Immigration Court or the DHS officer having administrative control over the place where the reopened proceedings are to be conducted. If the motion to reconsider is granted, the decision upon such reconsideration shall affirm, modify, or reverse the original decision made in the case.

■ 7. Amend § 1003.3 by revising paragraphs (c)(1) and (2) to read as follows:

### § 1003.3   Notice of appeal.

*    *    *    *    *

(c) * * *

(1) *Appeal from decision of an immigration judge.* Briefs in support of or in opposition to an appeal from a decision of an immigration judge shall be filed directly with the Board. In those cases that are transcribed, the briefing schedule shall be set by the Board after the transcript is available. In cases involving noncitizens in custody, the parties shall be provided 21 days in which to file simultaneous briefs unless a shorter period is specified by the Board. Reply briefs shall be permitted only by leave of the Board and only if filed within 21 days of the deadline for

the initial briefs. In cases involving noncitizens who are not in custody, the appellant shall be provided 21 days in which to file a brief, unless a shorter period is specified by the Board. The appellee shall have the same period of time in which to file a reply brief that was initially granted to the appellant to file their brief. The time to file a reply brief commences from the date upon which the appellant's brief was due, as originally set or extended by the Board. The Board, upon written motion, may extend the period for filing a brief or a reply brief for up to 90 days for good cause shown. In its discretion, the Board may consider a brief that has been filed out of time. In its discretion, the Board may request supplemental briefing from the parties after the expiration of the briefing deadline. All briefs, filings, and motions filed in conjunction with an appeal shall include proof of service on the opposing party.

(2) *Appeal from decision of a DHS officer.* Briefs in support of or in opposition to an appeal from a decision of a DHS officer shall be filed directly with DHS in accordance with the instructions in the decision of the DHS officer. The applicant or petitioner and DHS shall be provided 21 days in which to file a brief, unless a shorter period is specified by the DHS officer from whose decision the appeal is taken, and reply briefs shall be permitted only by leave of the Board. Upon written request of the noncitizen, the DHS officer from whose decision the appeal is taken or the Board may extend the period for filing a brief for good cause shown. The Board may authorize the filing of briefs directly with the Board. In its discretion, the Board may consider a brief that has been filed out of time. All briefs and other documents filed in conjunction with an appeal, unless filed by a noncitizen directly with a DHS office, shall include proof of service on the opposing party.

*    *    *    *    *

■ 8. Revise § 1003.5 to read as follows:

### § 1003.5   Forwarding of record on appeal.

(a) *Appeal from decision of an immigration judge.* If an appeal is taken from a decision of an immigration judge, the record of proceeding shall be promptly forwarded to the Board upon the request or the order of the Board. Where transcription of an oral decision is required, the immigration judge shall review the transcript and approve the decision within 14 days of receipt, or within 7 days after the immigration judge returns to their duty station if the immigration judge was on leave or detailed to another location. The Chairman and the Chief Immigration

Judge shall determine the most effective and expeditious way to transcribe proceedings before the immigration judges, and shall take such steps as necessary to reduce the time required to produce transcripts of those proceedings and to ensure their quality.

(b) *Appeal from decision of a DHS officer.* If an appeal is taken from a decision of a DHS officer, the record of proceeding shall be forwarded to the Board by the DHS officer promptly upon receipt of the briefs of the parties, or upon expiration of the time allowed for the submission of such briefs. A DHS officer need not forward such an appeal to the Board, but may reopen and reconsider any decision made by the officer if the new decision will grant the benefit that has been requested in the appeal. The new decision must be served on the appealing party within 45 days of receipt of any briefs or upon expiration of the time allowed for the submission of any briefs. If the new decision is not served within these time limits or the appealing party does not agree that the new decision disposes of the matter, the record of proceeding shall be immediately forwarded to the Board.

### § 1003.7    [Amended].

■ 9. Amend § 1003.7 by:

■ a. Removing the words "Immigration Judge" and adding in their place the words "immigration judge" wherever they appear; and

■ b. Removing the word "Service" and the words "the Service" and adding in their place the word "DHS" wherever they appear.

■ 10. Amend § 1003.9 by revising paragraph (b)(5) to read as follows:

### § 1003.9    Office of the Chief Immigration Judge.

\*    \*    \*    \*    \*

   (b) \* \* \*

   (5) Adjudicate cases as an immigration judge, including the authority to administratively close and recalendar cases in accordance with § 1003.18(c); and

\*    \*    \*    \*    \*

■ 11. Amend § 1003.10 in paragraph (b) by:

■ a. Revising the second sentence;

■ b. Adding two sentences following the second sentence;

■ c. Revising the newly redesignated fifth sentence; and

■ d. Removing the newly redesignated eight and ninth sentences.

The revisions and additions read as follows:

### § 1003.10    Immigration judges.

\*    \*    \*    \*    \*

(b) \* \* \* In deciding the individual cases before them, and subject to the applicable governing standards set forth in paragraph (d) of this section, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases. Such actions include administrative closure, termination of proceedings, and dismissal of proceedings. The standards for the administrative closure, dismissal, and termination of cases are set forth in § 1003.18(c), 8 CFR 1239.2(c), and § 1003.18(d), respectively. Immigration judges shall administer oaths, receive evidence, and interrogate, examine, and cross-examine noncitizens and any witnesses. \* \* \*

\*    \*    \*    \*    \*

■ 12. Amend § 1003.18 by revising the section heading, adding paragraph headings to paragraphs (a) and (b), and adding paragraphs (c) and (d) to read as follows:

### § 1003.18    Docket management.

   (a) *Scheduling.* \* \* \*

   (b) *Notice.* \* \* \*

   (c) *Administrative closure and recalendaring.* Administrative closure is the temporary suspension of a case. Administrative closure removes a case from the immigration court's active calendar until the case is recalendared. Recalendaring places a case back on the immigration court's active calendar.

   (1) *Administrative closure before immigration judges.* An immigration judge may, in the exercise of discretion, administratively close a case upon the motion of a party, after applying the standard set forth at paragraph (c)(3) of this section. The administrative closure authority described in this section is not limited by the authority provided in any other provisions in this chapter that separately authorize or require administrative closure in certain circumstances, including 8 CFR 214.15(l), and (p)(4), 1214.2(a), 1214.3, 1240.62(b), 1240.70(f) through (h), 1245.13, 1245.15(p)(4)(i), and 1245.21(c).

   (2) *Recalendaring before immigration judges.* At any time after a case has been administratively closed under paragraph (c)(1) of this section, an immigration judge may, in the exercise of discretion, recalendar the case pursuant to a party's motion to recalendar. In deciding whether to grant such a motion, the immigration judge shall apply the standard set forth at paragraph (c)(3) of this section.

   (3) *Standard for administrative closure and recalendaring.* An immigration judge shall grant a motion to administratively close or recalendar filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion. In all other cases, in deciding whether to administratively close or to recalendar a case, an immigration judge shall consider the totality of the circumstances, including as many of the factors listed under paragraphs (c)(3)(i) and (ii) of this section as are relevant to the particular case. The immigration judge may also consider other factors where appropriate. No single factor is dispositive. Accordingly, the immigration judge, having considered the totality of the circumstances, may grant a motion to administratively close or to recalendar a particular case over the objection of a party. Although administrative closure may be appropriate where a petition, application, or other action is pending outside of proceedings before the immigration judge, such a pending petition, application, or other action is not required for a case to be administratively closed.

   (i) As the circumstances of the case warrant, the factors relevant to a decision to administratively close a case include:

   (A) The reason administrative closure is sought;

   (B) The basis for any opposition to administrative closure;

   (C) Any requirement that a case be administratively closed in order for a petition, application, or other action to be filed with, or granted by, DHS;

   (D) The likelihood the noncitizen will succeed on any petition, application, or other action that the noncitizen is pursuing, or that the noncitizen states in writing or on the record at a hearing that they plan to pursue, outside of proceedings before the immigration judge;

   (E) The anticipated duration of the administrative closure;

   (F) The responsibility of either party, if any, in contributing to any current or anticipated delay; and

   (G) The ultimate anticipated outcome of the case.

   (ii) As the circumstances of the case warrant, the factors relevant to a decision to recalendar a case include:

   (A) The reason recalendaring is sought;

   (B) The basis for any opposition to recalendaring;

(C) The length of time elapsed since the case was administratively closed;

(D) If the case was administratively closed to allow the noncitizen to file a petition, application, or other action outside of proceedings before the immigration judge, whether the noncitizen filed the petition, application, or other action and, if so, the length of time that elapsed between when the case was administratively closed and when the noncitizen filed the petition, application, or other action;

(E) If a petition, application, or other action that was pending outside of proceedings before the immigration judge has been adjudicated, the result of that adjudication;

(F) If a petition, application, or other action remains pending outside of proceedings before the immigration judge, the likelihood the noncitizen will succeed on that petition, application, or other action; and

(G) The ultimate anticipated outcome if the case is recalendared.

(d) *Termination.* Immigration judges shall have the authority to terminate cases before them as set forth in paragraphs (d)(1) and (2) of this section. A motion to dismiss a case in removal proceedings before an immigration judge for a reason other than authorized by 8 CFR 1239.2(c) shall be deemed a motion to terminate under paragraph (d)(1) of this section.

(1) *Removal, deportation, and exclusion proceedings*—(i) *Mandatory termination.* In removal, deportation, and exclusion proceedings, immigration judges shall terminate the case where at least one of the requirements in paragraphs (d)(1)(i)(A) through (G) of this section is met.

(A) No charge of deportability, inadmissibility, or excludability can be sustained.

(B) Fundamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable.

(C) The noncitizen has, since the initiation of proceedings, obtained United States citizenship.

(D) The noncitizen has, since the initiation of proceedings, obtained at least one status listed in paragraphs (d)(1)(i)(D)(*1*) through (*4*) of this section, provided that the status has not been revoked or terminated, and the noncitizen would not have been deportable, inadmissible, or excludable as charged if the noncitizen had obtained such status before the initiation of proceedings.

(*1*) Lawful permanent resident status.

(*2*) Refugee status.

(*3*) Asylee status.

(*4*) Nonimmigrant status as defined in section 101(a)(15)(S), (T), or (U) of the Act.

(E) Termination is required under 8 CFR 1245.13(l).

(F) Termination is otherwise required by law.

(G) The parties jointly filed a motion to terminate, or one party filed a motion to terminate and the other party affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion.

(ii) *Discretionary termination.* In removal, deportation, or exclusion proceedings, immigration judges may, in the exercise of discretion, terminate the case where at least one of the requirements listed in paragraphs (d)(1)(ii)(A) through (G) of this section is met.

(A) An unaccompanied child, as defined in 8 CFR 1001.1(hh), states an intent in writing or on the record at a hearing to seek asylum with USCIS, and USCIS has initial jurisdiction over the application pursuant to section 208(b)(3)(C) of the Act.

(B) The noncitizen demonstrates prima facie eligibility for relief from removal or for a lawful status based on a petition, application, or other action that USCIS has jurisdiction to adjudicate, including naturalization or adjustment of status.

(C) The noncitizen is a beneficiary of Temporary Protected Status, deferred action, or Deferred Enforced Departure.

(D) USCIS has granted the noncitizen's application for a provisional unlawful presence waiver pursuant to 8 CFR 212.7(e).

(E) Termination is authorized by 8 CFR 1216.4(a)(6) or 1238.1(e).

(F) The parties have filed a motion to terminate under 8 CFR 214.11(d)(1)(i) or 214.14(c)(1)(i).

(G) Due to circumstances comparable to those described in paragraphs (d)(1)(ii)(A) through (F) of this section, termination is similarly necessary or appropriate for the disposition or alternative resolution of the case. However, immigration judges may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(2) *Other proceedings*—(i) *Mandatory termination.* In proceedings other than removal, deportation, or exclusion proceedings, immigration judges shall terminate the case where the parties have jointly filed a motion to terminate, or one party has filed a motion to

terminate and the other party has affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion. In addition, immigration judges shall terminate such a case where required by law.

(ii) *Discretionary termination.* In proceedings other than removal, deportation, or exclusion proceedings, immigration judges may, in the exercise of discretion, terminate the case where one party has requested termination, and terminating the case is necessary or appropriate for the disposition or alternative resolution of the case. However, immigration judges may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(iii) *Limitation on termination.* Nothing in paragraphs (d)(2)(i) and (ii) of this section authorizes immigration judges to terminate a case where prohibited by another regulatory provision.

■ 13. Amend § 1003.23 by:

■ a. Revising paragraph (a);

■ b. Revising the first sentence and removing the second sentence of paragraph (b)(1) introductory text;

■ c. In paragraph (b)(1), removing the words ''the Service'' and adding in their place the word ''DHS'', wherever they appear;

■ d. Revising paragraphs (b)(1)(iii) through (v), (b)(2) and (3), and (b)(4)(i) and (ii);

■ e. In paragraph (b)(4)(iii)(B), removing the words ''Immigration Judge'' and adding in their place the words ''immigration judge''; and

■ f. Removing paragraphs (b)(4)(v) and (vi).

The revisions read as follows:

### § 1003.23  Reopening or reconsideration before the Immigration Court.

(a) *Pre-decision motions.* Unless otherwise permitted by the immigration judge, motions submitted prior to the final order of an immigration judge shall be in writing and shall state, with particularity the grounds therefor, the relief sought, and the jurisdiction. The immigration judge may set and extend time limits for the making of motions and replies thereto. A motion shall be deemed unopposed unless timely response is made.

(b) * * *

(1) *In general.* An immigration judge may upon the immigration judge's own motion at any time, or upon motion of DHS or the noncitizen, reopen or

reconsider any case in which the judge has rendered a decision, unless jurisdiction is vested with the Board of Immigration Appeals. * * *

\* \* \* \* \*

(iii) *Assignment to an immigration judge.* If the immigration judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or a delegate of the Chief Immigration Judge shall reassign such motion to another immigration judge.

(iv) *Replies to motions; decision.* The immigration judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the immigration judge.

(v) *Stays.* Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the immigration judge, the Board, or an authorized DHS officer.

(2) *Motion to reconsider.* A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the immigration judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying a previous motion to reconsider.

(3) *Motion to reopen.* A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A motion to reopen for the purpose of providing the noncitizen an opportunity to apply for any form of discretionary relief will not be granted if it appears that the noncitizen's right to apply for such relief was fully explained to them by the immigration judge and an opportunity to apply therefor was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1)

of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) of the Act (cancellation of removal for certain permanent residents) or 240A(b) of the Act (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only upon demonstration that the noncitizen was statutorily eligible for such relief prior to the service of a Notice to Appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the noncitizen inadmissible or removable under sections 237(a)(2) or (a)(4) of the Act, whichever is earliest. The immigration judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) \* \* \*

(i) *Asylum and withholding of removal.* The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the noncitizen. However, the noncitizen may request a stay and, if granted by the immigration judge, the noncitizen shall not be removed pending disposition of the motion by the immigration judge. If the original asylum application was denied based upon a finding that it was frivolous, then the noncitizen is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) *Order entered in absentia or in removal proceedings.* An order of removal entered in absentia or in removal proceedings pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the noncitizen demonstrates that the failure to appear was because of exceptional circumstances as defined in section 240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time upon the noncitizen's demonstration of lack of

notice in accordance with section 239(a)(1) or (2) of the Act, or upon the noncitizen's demonstration of the noncitizen's Federal or State custody and the failure to appear was through no fault of the noncitizen. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding shall be required if the noncitizen has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion under this paragraph shall stay the removal of the noncitizen pending disposition of the motion by the immigration judge. A noncitizen may file only one motion pursuant to this paragraph (b)(4)(ii).

\* \* \* \* \*

## PART 1239—INITIATION OF REMOVAL PROCEEDINGS

■ 14. The authority citation for part 1239 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1221, 1229.

■ 15. Amend § 1239.2 by:
■ a. Revising paragraph (b); and
■ b. Removing and reserving paragraph (f).

The revisions read as follows:

### § 1239.2  Cancellation of notice to appear.

\* \* \* \* \*

(b) *Ordering termination or dismissal.* After commencement of proceedings, an immigration judge or Board member shall have authority to resolve or dispose of a case through an order of dismissal or an order of termination. An immigration judge or Board member may enter an order of dismissal in cases where DHS moves for dismissal pursuant to paragraph (c) of this section. A motion to dismiss removal proceedings for a reason other than those authorized by paragraph (c) of this section shall be deemed a motion to terminate and adjudicated pursuant to 8 CFR 1003.1(m), pertaining to cases before the Board, or 8 CFR 1003.18(d), pertaining to cases before the immigration court, as applicable.

\* \* \* \* \*

## PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF NONCITIZENS IN THE UNITED STATES

■ 16. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 17. The heading for part 1240 is revised to read as set forth above.

■ 18. Amend § 1240.26 by:

■ a. As shown in the following table, removing the words in the left column and adding in their place the words in the right column wherever they appear:

| An alien | A noncitizen. |
|---|---|
| an alien | a noncitizen. |
| the alien | the noncitizen. |
| alien's | noncitizen's. |

■ b. By removing the words ''his or her'' and adding in their place the words ''the noncitizen's'' in paragraphs (b)(3)(i) introductory text, (b)(3)(i)(A), (b)(4)(ii), and (i);

■ c. By removing the words ''his or her'' and adding in their place the words ''the ICE Field Office Director's'' in paragraph (c)(4); and

■ d. revising paragraphs (k)(1), (k)(2) introductory text, (k)(3) introductory text, (k)(4), and (*l*).

The revisions read as follows:

**§ 1240.26   Voluntary departure—authority of the Executive Office for Immigration Review.**

\*    \*    \*    \*    \*

(k) \* \* \*

(1) If the Board finds that an immigration judge incorrectly denied a noncitizen's request for voluntary departure or failed to provide appropriate advisals, the Board may consider the noncitizen's request for voluntary departure de novo and, if warranted, may enter its own order of voluntary departure with an alternate order of removal.

(2) In cases in which a noncitizen has appealed an immigration judge's decision or in which DHS and the noncitizen have both appealed an immigration judge's decision, the Board shall not grant voluntary departure under section 240B(a) of the Act unless:

\*    \*    \*    \*    \*

(3) In cases in which DHS has appealed an immigration judge's decision, the Board shall not grant voluntary departure under section 240B(b) of the Act unless:

\*    \*    \*    \*    \*

(4) The Board may impose such conditions as it deems necessary to ensure the noncitizen's timely departure from the United States, if supported by the record on appeal and within the scope of the Board's authority on appeal. Unless otherwise indicated in this section, the Board shall advise the noncitizen in writing of the conditions set by the Board, consistent with the conditions set forth in paragraphs (b), (c), (d), (e), (h), and (i) of this section (other than paragraph (c)(3)(ii) of this section), except that the Board shall advise the noncitizen of the duty to post the bond with the ICE Field Office Director within 10 business days of the Board's order granting voluntary departure. If documentation sufficient to assure lawful entry into the country to which the noncitizen is departing is not contained in the record, but the noncitizen continues to assert a request for voluntary departure under section 240B of the Act and the Board finds that the noncitizen is otherwise eligible for voluntary departure under the Act, the Board may grant voluntary departure for a period not to exceed 120 days, subject to the condition that the noncitizen

within 60 days must secure such documentation and present it to DHS and the Board. If the Board imposes conditions beyond those specifically enumerated, the Board shall advise the noncitizen in writing of such conditions. The noncitizen may accept or decline the grant of voluntary departure and may manifest a declination either by written notice to the Board, by failing to timely post any required bond, or by otherwise failing to comply with the Board's order. The grant of voluntary departure shall automatically terminate upon a filing by the noncitizen of a motion to reopen or reconsider the Board's decision, or by filing a timely petition for review of the Board's decision. The noncitizen may decline voluntary departure when unwilling to accept the amount of the bond or other conditions.

(*l*) *Penalty for failure to depart.* There shall be a rebuttable presumption that the civil penalty for failure to depart, pursuant to section 240B(d)(1)(A) of the Act, shall be set at $3,000 unless the immigration judge or the Board specifically orders a higher or lower amount at the time of granting voluntary departure within the permissible range allowed by law. The immigration judge or the Board shall advise the noncitizen of the amount of this civil penalty at the time of granting voluntary departure.

Dated: August 18, 2023.

**Merrick B. Garland,**

*Attorney General.*

[FR Doc. 2023–18199 Filed 9–7–23; 8:45 am]

**BILLING CODE 4410–30–P**