**46742**    **Federal Register** / Vol. 89, No. 104 / Wednesday, May 29, 2024 / Rules and Regulations

## DEPARTMENT OF JUSTICE

## Executive Office for Immigration Review

**8 CFR Parts 1001, 1003, 1239, and 1240**

**[Docket No. EOIR 021–0410; AG Order No. 5930–2024]**

**RIN 1125–AB18**

### Efficient Case and Docket Management in Immigration Proceedings

**AGENCY:** Executive Office for Immigration Review, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** On September 8, 2023, the Department of Justice ("Department") published a notice of proposed rulemaking ("NPRM") proposing to rescind an enjoined December 2020 rule (the "AA96 Final Rule") that imposed novel limits on the authority of immigration judges and the Board of Immigration Appeals ("BIA" or "Board") to efficiently dispose of cases. Because the AA96 Final Rule has been enjoined since shortly after its issuance, the proposed rule was designed to largely codify the currently operative status quo. After reviewing and considering the public comments received during the comment period, the Department is finalizing the proposed rule with the limited changes described in the preamble. The Department believes that this rule will promote the efficient and expeditious adjudication of cases, afford immigration judges and the Board flexibility to efficiently allocate their limited resources, and protect due process for parties before immigration judges and the Board.

**DATES:** This rule is effective July 29, 2024.

**FOR FURTHER INFORMATION CONTACT:** Raechel Horowitz, Chief, Immigration Law Division, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041, telephone (703) 305–0289.

**SUPPLEMENTARY INFORMATION:**

## I. Background

On December 16, 2020, the Department published a final rule that amended Executive Office for Immigration Review ("EOIR") regulations regarding the handling of appeals and motions before the Board, as well as the authority of immigration judges and Appellate Immigration Judges to administratively close cases. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 81588 (Dec. 16, 2020) ("AA96 Final Rule"). The AA96 Final Rule changes included: (1) implementing simultaneous briefing schedules at the Board for both detained and non-detained cases; (2) limiting adjudicators' freestanding authority to administratively close cases; (3) curtailing adjudicators' sua sponte authority to reopen or reconsider cases; (4) allowing for more expansive factfinding before the Board; (5) restricting the Board's authority to remand cases to the immigration judge; (6) modifying the background checks process at the Board; (7) implementing regulatory internal appeal processing deadlines at the Board; (8) providing the EOIR Director with authority to adjudicate cases in specific circumstances; and (9) allowing for quality case certifications from an immigration judge to the EOIR Director.

The AA96 Final Rule's effective date was January 15, 2021, but the rule was preliminarily enjoined on March 10, 2021, and has not been in effect since that date. *See Centro Legal de la Raza* v. *Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919 (N.D. Cal. 2021). The United States District Court for the Northern District of California determined that the plaintiffs were likely to succeed on the merits of their challenge to the AA96 Final Rule. *Id.* at 928. Specifically, the court concluded that plaintiffs were likely to succeed in claiming that (1) changes implemented by the rule were arbitrary and capricious; (2) the rule violated the Regulatory Flexibility Act; and (3) the rule's delegation of rulemaking authority to the EOIR Director violated the Administrative Procedure Act ("APA"). *Id.* at 962–76.

On September 8, 2023, after reconsidering the AA96 Final Rule, including the comments received during that rulemaking, and the issues identified in the *Centro Legal de la Raza* litigation, the Department published an NPRM in the **Federal Register** proposing to largely rescind the changes made by the AA96 Final Rule, as well as setting standards for administrative closure and the termination of proceedings. *See* Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 88 FR 62242 (Sept. 8, 2023). The NPRM also proposed to retain, with modifications, a limited number of AA96 Final Rule changes, including: (1) allowing the Board to review voluntary departure issues de novo and to issue final decisions on voluntary departure requests in some instances, *id.* at 62267; (2) allowing the Board to retain an appeal while background checks are pending, rather than remand to the immigration judge, *id.* at 62270; (3) modifying the Board's 180-day adjudication timeline for three-member panels to begin running after completion of the record, *id.* at 62270–71; and (4) retaining some technical changes from the AA96 Final Rule, *id.* at 62273. Further, the NPRM also proposed adding definitions for the terms "noncitizen" and "unaccompanied child," as well as proposed minor technical changes. *Id.* at 62272–73.

As explained more fully in the NPRM, the Department believes that rescinding the AA96 Final Rule will promote the efficient and expeditious adjudication of cases, afford immigration judges and the Board flexibility to efficiently allocate their limited resources, and protect due process for parties before immigration judges and the Board. *See generally id.* at 62254–73 (explaining bases for each proposed change).

The comment period for the NPRM opened on September 8, 2023, and closed on November 7, 2023, with 851 comments received.[1] The Department summarizes and responds to the public comments in section III of this preamble, followed by a description of changes made to the NPRM in this final rule in section IV.

## II. Legal Authority

The Department issues this rule pursuant to section 103(g) of the Immigration and Nationality Act ("INA" or "the Act"), 8 U.S.C. 1103(g), as amended by the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135 (as amended). Under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA. HSA 1102, 116 Stat. at 2273–74; INA 103(g)(2), 8 U.S.C. 1103(g)(2).

## III. Public Comments and Responses

Comments received on the NPRM are organized by topic below. Most commenters were supportive of the rule, stating, for example, that administrative closure and termination authority

---

[1] Of these 851 comments, 849 comments were available on *https://www.regulations.gov* for public inspection. The Department did not post one comment because it was a duplicate and withdrew another comment because it contained an inappropriate hyperlink.

would provide adjudicators with needed flexibility to help manage overburdened immigration court dockets, and that rescinding the AA96 Final Rule's appeal-related provisions would help noncitizens more effectively present appeals. In contrast, commenters opposing the rule primarily raised concerns about the administrative closure and termination provisions, which these commenters believed would exacerbate the immigration court backlog, needlessly delay proceedings, and increase incentives for irregular immigration into the United States. The Department addresses these comments below.

*A. Briefing Schedule Changes*

*Comment:* Most commenters expressed support for the proposed rule's provisions rescinding the AA96 Final Rule's changes to briefing schedules before the Board and reinstating longstanding consecutive briefing schedules for noncitizens who are not detained and simultaneous briefing schedules for detained noncitizens.

In doing so, some commenters also proposed a number of changes to briefing schedule procedures. First, commenters suggested increasing the opening briefing schedule from 21 days to 30, 40, or 45 days to provide noncitizens with additional time to submit their briefs. Second, for cases involving detained noncitizens, commenters proposed implementing consecutive rather than simultaneous briefing schedules or, alternatively, allowing reply briefs as a matter of right, rather than as permitted after the filing of a motion, to allow the parties to best address opposing arguments. Third, commenters recommended creating a presumption to automatically extend the brief filing period for pro se applicants to the full extended 90-day period. Fourth, commenters recommended removing the 90-day limit on briefing extensions, stating that there may be good cause for extending beyond that time limit, in up to 90-day increments. Lastly, commenters recommended modifying briefing extension timelines at the Board to ensure meaningful access to additional preparation time, including by relaxing the standards for granting second briefing extensions and using the EOIR Courts & Appeals System ("ECAS") to streamline extension requests so that they may be granted more expediently.

Commenters also recommended implementing a "mailbox rule" for paper filings at the immigration courts and the Board, which would treat a document as filed upon mailing instead of upon arrival or receipt. Commenters explained that a mailbox rule would help alleviate burdens on pro se noncitizens filing in paper, particularly when filing deadlines begin from the date of the immigration judge or Board decision, which may not reach the noncitizen by mail for several days. Alternatively, commenters recommended a limited "mailbox rule," whereby use of overnight delivery services or private couriers would create a presumption that any delivery failure qualifies as an extraordinary circumstance allowing for late filing.

Commenters opposed to this rule's briefing schedule changes stated that the AA96 Final Rule's briefing schedule provisions were more efficient, while still providing for briefing extensions when warranted.

*Response:* The Department is finalizing the NPRM's proposed changes to briefing schedules and extensions without further amendment. The Department believes that the briefing procedures in this rule—which recodifies longstanding practices in place prior to the publication of AA96 Final Rule and which have again been in use since the AA96 Final Rule was enjoined—allow necessary flexibility for the Board to set a briefing schedule as appropriate for each appeal in a manner that will serve both fairness and efficiency interests. *See* 8 CFR 1003.3(c)(1).

As an initial matter, the Department believes 21 days to be a generally sufficient baseline, with which parties are familiar, for submitting initial appeal briefs. This longstanding 21-day filing timeline allows those parties who are prepared to submit briefing on schedule to proceed efficiently, while preserving the availability of briefing extensions when necessary. *See* BIA Practice Manual ch. 4.7(c) (Oct. 25, 2023) ("Extensions"). Further, the Department continues to believe that simultaneous briefing is appropriate in detained cases given the need for expeditious resolution of such cases implicating liberty interests. *Id.*

Additionally, the Department declines to codify procedures allowing for the filing of reply briefs in detained cases as a matter of right. Under this rule, in all non-detained cases, appellees are provided the same time period to file a reply brief that was initially granted to the appellant to file their brief. *See* 8 CFR 1003.3(c)(1). For detained cases, the Board provides a simultaneous 21-day time period for the submission of briefs. *Id.* The Department believes that, in such cases, the simultaneous briefing schedule provides both parties sufficient opportunity to address any

issues needed to be resolved on appeal or to identify any reasons for opposing the appeal, while balancing the need to expeditiously resolve the case.

Further, whether briefs are filed consecutively or simultaneously, the party appealing the immigration judge's decision is tasked with pointing out factual or legal error in the decision warranting remand or reversal, while the party opposing the appeal generally argues in the vast majority of cases that the immigration judge's decision is correct based on the reasoning contained within that decision. Thus, the Department does not believe that the arguments in the opposing party's brief will take the appellant by surprise such that a reply brief would be needed to fairly resolve the appeal in most instances. When rare circumstances arise such that the appeal cannot be fairly adjudicated without additional briefing, in either detained or non-detained cases, the Department believes that the Board has the expertise to determine whether additional briefing—including reply briefing, supplemental briefing, or amicus briefing—is needed to resolve the appeal in any individual case and the flexibility to request such briefing. Moreover, the Department believes that the Board's internal practices and procedures are sufficient to address any additional briefing issues in each individual case. *See generally* BIA Practice Manual chs. 4.6 ("Appeal Briefs"), 4.7 ("Briefing Deadlines").

The Department also declines to automatically extend briefing timelines for pro se noncitizens. Such a provision presents significant administrability concerns, as many noncitizens are searching for, or obtain, representation during the initial appeal and briefing time frame.[2] Automatically providing an extended briefing timeline would result in different briefing timelines for noncitizens depending on whether they obtained counsel before or after briefing schedules were set. That said, in the event that a pro se noncitizen obtains counsel subsequent to the briefing schedule being set, then the noncitizen's counsel may request a briefing extension if needed.

The Department also declines to remove the 90-day limit on briefing extensions. The Department believes

---

[2] The Department is cognizant of the challenges faced by unrepresented detained noncitizens who wish to file an appeal before the Board. Accordingly, since 2001, EOIR has operated the BIA Pro Bono Project to increase pro bono representation for detained noncitizens whose cases are on appeal. *See* EOIR, BIA Pro Bono Project, *https://www.justice.gov/eoir/bia-pro-bono-project* (explaining that the Pro Bono Project "continues to provide a highly valuable service connecting pro se respondents to pro bono counsel").

that this longstanding pre-AA96 Final Rule limit ensures that parties are provided sufficient time to file their briefs, while also helping ensure that the record on appeal is completed and ready for adjudication in a reasonable time frame. *See, e.g.,* Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 FR 54878, 54878, 54895 (Aug. 26, 2002) (maintaining the then-existing 90-day Board briefing limits as part of a rule intended to efficiently "improve the adjudicatory process for the Board").

However, the rule retains the Board's ability to extend filing deadlines. *See* 8 CFR 1003.3(c)(1). Should the Board wish to accept briefing extension requests via ECAS, as suggested by commenters, then the Department need not amend the regulations; rather, the Board may update its procedures within the BIA Practice Manual to implement this change. *See generally* BIA Practice Manual chs. 4.6 ("Appeal Briefs"), 4.7 ("Briefing Deadlines"). The rule also preserves the Board's ability to consider, in its discretion, a brief that has been filed out of time, as well as to request supplemental briefing from the parties after the expiration of the briefing deadline. 8 CFR 1003.3(c)(1). The Department believes that both the regulations and the Board's application of the regulations through internal practices and procedures allow the parties sufficient opportunity to submit relevant arguments via briefing before the Board.

Additionally, comments regarding a "mailbox rule" for paper filings before the immigration courts or the Board are outside of the scope of this rulemaking. This rule focused on the changes made by the AA96 Final Rule to briefing schedules and whether to retain, modify, or rescind those specific provisions. *See* 88 FR at 62254. However, the Department is always considering potential regulatory changes to improve EOIR processes and will take commenter suggestions regarding a "mailbox rule" under advisement.

In response to commenters in favor of the AA96 Final Rule's briefing schedule provisions, the Department believes that this rule's briefing schedule provisions better balance efficient appeal processing with procedural fairness. In general, the Department does not anticipate that retaining the longstanding pre-AA96 Final Rule briefing schedules will draw out or lengthen proceedings, but rather will ensure that parties have adequate time to prepare and file briefs before the Board that will best serve Board members in their adjudications.

The Department also notes that maintaining these longstanding briefing schedules strikes an appropriate balance of providing the parties adequate time for initial briefing, while preserving the opportunity for briefing extensions, as well as the Board's ability to request additional briefing, if such extensions or additional briefing would aid in the ultimate resolution of the case. Further, maintaining these longstanding briefing schedules and procedures may, for example, allow parties to have adequate time to obtain counsel for assistance with the appeal or to submit more detailed briefs that adequately address complex issues. Both of these factors may ultimately increase the efficiency with which Board members can issue a decision in a case because the issues may be more clearly articulated and thoroughly presented. *Cf.* EOIR DM 22–01, *Encouraging and Facilitating Pro Bono Legal Services* 1 (Nov. 5, 2021) ("Competent legal representation provides the court with a clearer record and can save hearing time through more focused testimony and evidence, which in turn allows the judge to make better-informed and more expeditious rulings.").

In sum, the Department believes that the rule's retention of the longstanding briefing procedures before the Board strikes an appropriate balance between the need for expeditious resolution of cases, while maintaining procedural fairness for all parties seeking appellate review before the Board. Accordingly, the Department declines to make further amendments to the regulatory provisions governing briefing before the Board.

## B. Administrative Closure

### 1. Authority for Administrative Closure

*Comment:* Some commenters claimed that this rule's administrative closure provisions are unlawful, stating that administrative closure is not authorized by statute. Commenters favorably cited language from the now-overruled decision in *Matter of Castro-Tum,* 27 I&N Dec. 271 (A.G. 2018), as support for their position that there is no statutory basis for administrative closure in the INA. Commenters further stated that any regulatory administrative closure provision would be contrary to statutory language providing procedures for the completion of removal proceedings, citing INA 240, 8 U.S.C. 1229a. Another commenter stated that, to be consistent with the INA, administrative closure authority should be limited to cases where the noncitizen has a pending application outside of EOIR which, if granted, would obviate the need for removal proceedings.

*Response:* Authorizing administrative closure falls within the Attorney General's broad authority under the INA. The INA not only directs immigration judges to adjudicate cases and sets forth some specific procedures for adjudicating removal proceedings, it also charges the Attorney General with supervising that adjudication system, *see* INA 240, 8 U.S.C. 1229a; INA 103(g)(1), 8 U.S.C. 1103(g)(1), and authorizes the Attorney General, broadly, to "establish such regulations . . . as the Attorney General determines to be necessary" for carrying out his duties in implementing the INA, *see* INA 103(g)(2), 8 U.S.C. 1103(g)(2). That authority comfortably encompasses establishing additional procedural rules that the Attorney General deems will promote the fair and efficient functioning of the adjudication system, especially on the many procedural issues that the INA itself does not address. Indeed, the Attorney General for decades has exercised that authority in myriad ways, including, for example, providing for Board review of most immigration judge decisions, *see generally* 8 CFR 1003.1(b) ("Appellate jurisdiction"), and generally conferring on adjudicators the power to take any action "appropriate and necessary" for the disposition or alternative resolution of a case, as consistent with the law, *id.* §§ 1003.1(d)(1)(ii), 1003.10(b); *see also* Miscellaneous Amendments to Chapter, 23 FR 2670, 2671 (Apr. 23, 1958) (original 1958 regulatory provision authorizing EOIR adjudicators to exercise their discretion as may be "appropriate and necessary" for the disposition of a case). Given the Attorney General's clear and broad authority, and the long history of its exercise to establish similar procedural rules, the only question is whether Congress precluded the Attorney General from using this authority to provide for administrative closure. Congress has not precluded the Attorney General from doing so.

In a more specific way, too, history confirms that the Attorney General's broad authority under the INA encompasses administrative closure. Since at least the 1980s, immigration judges and the Board have exercised their authority, where appropriate, to use administrative closure as a docketing tool. *See Arcos Sanchez* v. *Att'y Gen.,* 997 F.3d 113, 116–17 (3d Cir. 2021); *see also* 88 FR 62243–46 (describing the history of administrative closure). And in the HSA, Congress specified that the Attorney General has "such authorities and functions under

[the INA] relating to the immigration and naturalization of [noncitizens] as were exercised by [EOIR], or by the Attorney General with respect to [EOIR]'' prior to the HSA. HSA 1102, 116 Stat. at 2274; INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. The HSA confirms that the Attorney General may continue to provide for the administrative closure authority that EOIR adjudicators in fact exercised prior to the HSA.

Administrative closure is also a reasonable exercise of the Attorney General's authority to ''establish such regulations . . . as [he] determines to be necessary'' for carrying out his duties in overseeing the EOIR adjudication system, *see* INA 103(g)(2), 8 U.S.C. 1103(g)(2). Administrative closure authority ''is not limited to the immigration context'' and is ''utilized throughout the Federal court system, under a variety of names, as a tool for managing a court's docket.'' *Matter of Avetisyan,* 25 I&N Dec. 688, 690 n.2 (BIA 2012). And immigration adjudicators, like other adjudicators, can in appropriate circumstances use administrative closure to promote the fair and efficient management of their dockets. For example, an immigration judge or an Appellate Immigration Judge may determine that a case may be most efficiently and fairly completed by administratively closing the case to first allow U.S. Citizenship and Immigration Services (''USCIS'') to adjudicate a relief application, which, if granted, may provide the noncitizen with legal status or some other basis that would prevent enforcing an order of removal, thus eliminating the need for further removal proceedings, reducing the immediate need to conclude removal proceedings, or otherwise narrowing the issues before EOIR. As a result, EOIR adjudicators, and EOIR more generally, can direct resources to other cases ripe for adjudication. Commenters have not identified anything that would withdraw administrative closure from the measures that the Attorney General may determine are ''necessary.'' Administrative closure, like the other actions described previously, is a regulatory action the Attorney General has determined should be available for adjudicators to use, to fulfill their statutory responsibilities under the INA and in accordance with due process.

The Department also does not agree that, to be consistent with the INA, administrative closure authority should be limited to cases where the noncitizen has a pending application outside of EOIR, which, if granted, would obviate the need for removal proceedings. Commenters did not point to any provision in the INA that would suggest that administrative closure should be limited in such a way. The Department has previously entered into judicially approved, binding settlement agreements and issued numerous regulations, in compliance with the INA, that provide for administrative closure in a variety of specified situations. *See generally* 88 FR 62244– 45. Further, EOIR adjudicators have long had authority to use administrative closure to pause removal proceedings to give noncitizens an opportunity to pursue newly available pathways to lawful status. *See, e.g., Veliz* v. *Caplinger,* No. 96–1508, 1997 WL 61456, at *1 (E.D. La. Feb. 12, 1997) (noting that the removal proceedings before the agency were administratively closed to allow noncitizens to apply for legalization under the Immigration Reform and Control Act of 1986).

Contrary to any commenter suggestions otherwise, administrative closure does not prevent the ultimate adjudication of removal proceedings, as the case remains pending with EOIR while administratively closed. *See, e.g.,* 8 CFR 1003.18(c) (defining administrative closure as the ''temporary suspension of a case''). Rather, administrative closure temporarily pauses the case until a party files a motion to recalendar the case and the motion is granted. Once recalendared, the case is completed through an order of relief, removal, termination, or dismissal, as warranted by the circumstances of each case. *See, e.g., Arevalo* v. *Barr,* 950 F.3d 15, 18 (1st Cir. 2020) (noting that once the Board recalendared, the case was ''awaiting only the entry of a final decision by the BIA'').

Additionally, commenters' reliance on a portion of an Attorney General decision, *Matter of Castro-Tum,* for the proposition that administrative closure is unauthorized by statute is misplaced. *See* 27 I&N Dec. at 283 (citing *Diaz-Covarrubias* v. *Mukasey,* 551 F.3d 1114, 1118 (9th Cir. 2009); *Hernandez* v. *Holder,* 579 F.3d 864, 877 (8th Cir. 2009), *vacated in part,* 606 F.3d 900 (8th Cir. 2010); *Gonzalez-Caraveo* v. *Sessions,* 882 F.3d 885, 889 (9th Cir. 2018); *Vahora* v. *Holder,* 626 F.3d 907, 917 (7th Cir. 2010)). The Attorney General has overruled *Matter of Castro-Tum* in its entirety. *See Matter of Cruz-Valdez,* 28 I&N Dec. 326, 328–29 (A.G. 2021) (indicating that because various courts of appeals had rejected the reasoning in *Matter of Castro-Tum* and because that decision departed from long-standing practice, the Attorney General found it appropriate to overrule *Matter of Castro-Tum* in its entirety).

Even taken on its own terms, *Matter of Castro-Tum* did not suggest that administrative closure is unauthorized by statute. First, although that decision significantly limited EOIR adjudicators' administrative closure authority, it did not call into question the validity of regulatory provisions expressly authorizing administrative closure. 27 I&N Dec. at 272 (holding that EOIR adjudicators may ''only administratively close a case where a previous regulation or a previous judicially approved settlement expressly authorizes such an action''). Second, none of the four Federal courts of appeals cases cited by *Matter of Castro-Tum* determined that administrative closure was a statutorily invalid procedural tool in immigration court. *See Diaz-Covarrubias,* 551 F.3d at 1116–20; *Gonzalez-Caraveo,* 882 F.3d at 891–94; *Vahora,* 626 F.3d at 914–19; *Hernandez,* 579 F.3d at 877. Rather, each of these decisions addressed the narrow jurisdictional question of whether courts had authority to review an immigration court's denial of administrative closure. All four cases simply referenced, in dicta, the INA's silence on administrative closure in determining whether the INA included statutory language that would provide a meaningful standard by which to review claims challenging administrative closure decisions. *See Diaz-Covarrubias,* 551 F.3d at 1118; *Gonzalez-Caraveo,* 882 F.3d at 891–94; *Vahora,* 626 F.3d at 914–19; *Hernandez,* 579 F.3d at 877–78. Notably, none of these decisions questioned the availability of administrative closure as an immigration court procedural tool. *See Diaz-Covarrubias,* 551 F.3d at 1116–20; *Gonzalez-Caraveo,* 882 F.3d at 889–94; *Vahora,* 626 F.3d at 914–21; *Hernandez,* 579 F.3d at 877–78. For example, in *Vahora,* the court held EOIR's administrative closure determinations to be unreviewable as ''a procedural device, not unlike the myriad other procedural devices employed by quasi-judicial bodies in administrative agencies and in the Executive Office for Immigration Review in particular.'' 626 F.3d at 917.

For these reasons, contrary to commenter claims, administrative closure falls squarely within the authority the INA grants to the Attorney General to establish regulations deemed necessary to administering the immigration laws, INA 240, 8 U.S.C. 1229a; and no provision of the INA prohibits the Attorney General from exercising his broad authority to provide for administrative closure by regulation.

*Comment:* One commenter expressed that EOIR adjudicators should not take

on prosecutorial discretion functions by determining which cases should be adjudicated and which should not, citing separation-of-function principles. Separately, another commenter claimed that the rule would allow immigration judges to unilaterally decline to adjudicate cases rather than ruling on all cases brought before them, which the commenter claimed violates separation of powers.

*Response:* The Department disagrees with commenter assertions that this rule would raise concerns by allowing EOIR adjudicators to decline to adjudicate cases or exercise prosecutorial discretion functions belonging to DHS. The Department is cognizant of and respects the different roles and responsibilities of DHS and EOIR adjudicators in removal proceedings, *see* 88 FR at 62258, and this rule neither alters, impacts, nor diminishes DHS's prosecutorial authority or discretion, nor does the rule authorize immigration judges or Appellate Immigration Judges to unilaterally decline to adjudicate cases, as administratively closed cases still remain pending on EOIR's docket, without actively drawing resources, until a case becomes ripe for adjudication and a decision is issued, *see id.* at 62264–65 (explaining that the rule ''would not change the longstanding principle that immigration judges and Appellate Immigration Judges have no authority to review or second-guess DHS's exercise of prosecutorial discretion, including its decision whether to commence removal proceedings'').

DHS ''exercises its prosecutorial discretion when it decides whether to commence removal proceedings and what charges to lodge against a respondent.'' *Matter of Avetisyan,* 25 I&N Dec. at 694 (citing *Heckler* v. *Chaney,* 470 U.S. 821, 831 (1985) and *Wayte* v. *United States,* 470 U.S. 598, 607 (1985)). This rule does not impede, preclude, or alter DHS's authority or ability to initiate proceedings in the exercise of prosecutorial discretion or authority. Once DHS decides to institute proceedings, that decision is not reviewable by an EOIR adjudicator. *Id.; see also Matter of Bahta,* 22 I&N Dec. 1381, 1391 (BIA 2000). However, after DHS exercises its authority to initiate proceedings and jurisdiction over removal proceedings vests with the immigration judge, the immigration judge has the authority to regulate the proceedings, consistent with applicable law and regulations. *Matter of Avetisyan,* 25 I&N Dec. at 694; 8 CFR 1003.14(a) (stating that jurisdiction vests when a charging document is filed with the immigration court), 1240.1(a)(iv)

(providing immigration judges with the authority to take any action ''consistent with applicable law and regulations as may be appropriate''), 1240.1(c) (providing immigration judges with the authority to ''regulate the course of the hearing'').

Further, EOIR does not use administrative closure as a prosecutorial function. As stated previously, administrative closure has been ''utilized throughout the Federal court system, under a variety of names, as a tool for managing a court's docket,'' underscoring that the use of administrative closure is not a prosecutorial tool and therefore does not violate separation-of-functions principles. *See Matter of Avetisyan,* 25 I&N Dec. at 690 n.2. Administrative closure is a docket-management tool for EOIR adjudicators, separate and distinct from DHS's prosecutorial discretion authority, and is one such way for EOIR adjudicators to manage and regulate proceedings and, more broadly, an immigration judge's calendar or the Board's docket. Accordingly, the rule includes guidelines for specific docket-management tools that are available to EOIR adjudicators as necessary or appropriate to improve the fairness and efficiency of proceedings before them. For example, administrative closure is a tool that can be used, where necessary or appropriate, to temporarily suspend a case that may not be ripe for active adjudication; where there may be pending alternative resolutions to removal that, once resolved, could obviate the need for further proceedings or significantly narrow the issues before EOIR, thus improving fairness and reducing the resources required to ultimately resolve the case; or where the above circumstances are not present but one party requests the case be removed from the active docket or calendar and the other party joins in the request or affirmatively indicates its non-opposition.

For those cases that are administratively closed, either party may file a motion to recalendar, and where the EOIR adjudicator determines that the case should be recalendared, proceedings will be put back on the active docket or calendar. *See* 8 CFR 1003.1(l)(2), 1003.18(c)(2). Thus, while administrative closure may impact the course of proceedings, it does not impact DHS's ability to initiate proceedings, and therefore, does not amount to an exercise of prosecutorial discretion by an EOIR adjudicator. *See Matter of Avetisyan,* 25 I&N Dec. at 694 (''Although administrative closure impacts the course removal proceedings may take, it does not preclude the DHS

from instituting or pursuing those proceedings and so does not infringe on the DHS's prosecutorial discretion.'').

In addition, this rulemaking does not infringe on separation of powers. The rule does not impermissibly assign a judicial role to the Executive Branch because immigration judges and Appellate Immigration Judges are not part of the Judicial Branch. Rather, they are attorneys whom the Attorney General appoints as administrative judges within EOIR, *see* INA 101(b)(4), 8 U.S.C. 1101(b)(4), and who conduct administrative adjudications within the Executive Branch. Furthermore, there continues to be judicial review over EOIR's administrative adjudications unless otherwise directed by law. *See* Immigration Court Practice Manual ch. 1.4(g) (Oct. 25, 2023).

### 2. Efficiency and Immigration Court Backlog

*Comment:* Many commenters supported explicitly authorizing administrative closure by regulation to help ease the immigration court backlog. Commenters stated that, previously, in cases where noncitizens were awaiting USCIS processing of an application or benefit request, those noncitizens would have to appear in immigration court for multiple master calendar hearings to provide status updates to the immigration judge. Commenters explained that these immigration court appearances were an inefficient use of resources for noncitizens, attorneys, and immigration judges. Thus, commenters stated that the rule's administrative closure provisions would increase efficiency by avoiding unnecessary immigration court hearings while awaiting USCIS adjudication of applications.

In contrast, other commenters opposed codifying administrative closure authority, claiming that the use of administrative closure only serves to delay proceedings because it does not dispose of a case on the merits. Commenters stated that immigration judges should instead focus on concluding removal proceedings through a substantive order of relief or removal. Commenters expressed concern that administrative closure would act as a de facto amnesty provision, creating a permanent class of noncitizens without legal status in the United States, and would further incentivize illegal migration. To support this contention, commenters pointed to statistics on existing administratively closed cases that have been closed for many years. These commenters stated that, instead of providing for administrative closure, the Department

should have considered the use of status dockets, continuances, and limited termination authority, which commenters stated would be more appropriate tools when noncitizens are waiting for, or have obtained, relief outside of EOIR.

*Response:* The Department believes that the rule's provisions explicitly codifying administrative closure authority help promote the efficient use of EOIR resources, including valuable docket time. As explained in the NPRM, requiring immigration judges or Appellate Immigration Judges to adjudicate cases where the noncitizen in proceedings has a pending application or petition with USCIS is often an inefficient use of resources, as many of these noncitizens may obtain legal status that obviates the need for further removal proceedings. *See generally* 88 FR at 62257 (explaining that there are scenarios where "it would be wasteful to commit judicial resources to cases where there are pending alternative resolutions to the case that would obviate the need for, or significantly narrow the issues in, removal proceedings"). When administratively closed cases are removed from the immigration court's active calendar or the Board's docket, EOIR adjudicators can then reallocate that docket time to cases ripe for adjudication, including those where DHS has prioritized the removal of the noncitizen or where there are no pending alternative resolutions to removal, thereby helping to reduce the overall number of cases pending before the immigration courts and the Board. Further, once administratively closed cases are recalendared, they often require fewer resources to resolve, as they are often near final completion due to the narrowing of issues resulting from any external adjudications, and for the same reasons, often have a reduced need for any additional continuances.

Moreover, alternatives to administrative closure, including continuances, status dockets, and motions to reopen, are comparatively less efficient than administrative closure in many cases. *See, e.g., id.* at 62257. For example, while a relief application is pending with USCIS, the use of multiple continuances in removal proceedings would require repeatedly rescheduling hearings as each successive continuance is granted. *See Matter of Hashmi,* 24 I&N Dec. 785, 791 n.4 (BIA 2009) (noting that administrative closure can "avoid the repeated rescheduling of a case that is clearly not ready to be concluded"). Status dockets may also be less efficient in such cases, as the immigration court

would be spending valuable time repeatedly requesting status updates for the case, rather than considering whether the case is ripe for adjudication once a party moves to recalendar proceedings after any outside actions have been completed.

Similarly, if the EOIR adjudicator was required to complete adjudication of removal proceedings while a relief application was pending with USCIS, the noncitizen might need to file a motion to reopen the concluded removal proceedings if USCIS ultimately granted their application. This process would require EOIR adjudicators to adjudicate the removal proceeding, a potential appeal, and then a subsequent motion to reopen, which is far less efficient than administratively closing the proceeding until the USCIS adjudication is completed. Such efficiency concerns are further supported by the fairness benefits provided by administrative closure. *See* 88 FR at 62256 (explaining that, in many circumstances, administrative closure allows noncitizens who are prima facie eligible for relief to pursue such relief without threat of immediate removal).

Additionally, the Department believes that administrative closure furthers finality goals, as it helps ensure that, when necessary or appropriate, noncitizens are able to pursue options for reasonably available legal status before removal proceedings are concluded. This helps ensure that the conclusion of removal proceedings, and any related appeals, will be the final determination on a noncitizen's ability to remain in the United States.

Further, the Department rejects commenters' assertion that the use of administrative closure is inefficient because it delays proceedings and does not dispose of a case on the merits. As the Department has explained, administrative closure allows EOIR adjudicators to focus resources on cases that are ripe for adjudication, including those cases with no pending alternative resolutions to removal, thereby improving efficiency in the aggregate. *See id.* at 62256 ("Efficiency also encompasses consideration of prioritization and allocation of resources among different cases.").

By contrast, commenters opposed to the use of administrative closure authority described an excessively narrow view of "efficiency," focusing solely on completing some individual removal proceedings as quickly as possible, with no concern for (1) the resources needed to facilitate those proceedings on an EOIR adjudicator's active docket or calendar; (2) whether

the noncitizen is a priority for removal; (3) whether pausing proceedings to allow for the result of collateral dispositions could obviate the need for continued proceedings or significantly narrow the issues; and (4) whether such temporary removal from the active docket or calendar is necessary or appropriate to the fairness of the proceedings. Additionally, by primarily focusing on some individual cases in removal proceedings, these commenters have not accounted for the larger, systemic efficiencies that administrative closure may create for EOIR in the aggregate. In the Department's view, focusing docket time and other resources on actively adjudicating cases ripe for resolution while cases with other possible resolutions remain pending—like a case with an outstanding petition or application before USCIS as described previously—often results in the overall most efficient use of resources.

Moreover, these regulations do not permit administrative closure to be used as a de facto "amnesty" provision. Rather, they permit adjudicators to use administrative closure to temporarily remove cases from EOIR's active docket only until such cases are ripe for adjudication or resolution. 8 CFR 1003.1(l), 1003.18(c) (defining administrative closure as "the temporary suspension of a case"). While a case is administratively closed, the proceedings remain pending, and the administrative closure itself confers no status upon a noncitizen. Administrative closure is solely a procedural tool to permit the efficient use of resources.

### 3. General Standards for Administrative Closure

*Comment:* Commenters provided several suggestions regarding the general standards for administrative closure. For example, commenters recommended requiring EOIR adjudicators to grant joint and affirmatively unopposed motions and removing the provision providing EOIR adjudicators with the ability to deny such motions based on unusual, clearly identified, and supported reasons. Commenters were concerned that EOIR adjudicators would use this exception to improperly deny such motions when neither party wished to proceed with the removal proceeding.

Relatedly, commenters recommended that, similar to the proposed standard governing joint and affirmatively unopposed motions, granting motions should also be favored when DHS does not respond to a noncitizen's motion for administrative closure in a timely

manner. Commenters stated that favoring the grant of a motion when DHS does not indicate its response would prevent a situation where motions that would otherwise be granted would remain pending indefinitely due to DHS's failure to respond.

*Response:* The regulatory language governing joint and affirmatively unopposed motions sets forth that EOIR adjudicators shall grant motions to administratively close or recalendar that have either been filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition. 8 CFR 1003.1(l)(3), 1003.18(c)(3). EOIR adjudicators may only deny such motions where they have articulated unusual, clearly identified, and supported reasons for doing so. *Id.* The Department declines to remove the exception allowing an EOIR adjudicator to deny the motion for unusual, clearly identified, and supported reasons. As explained in the NPRM, EOIR adjudicators are in the best position to determine how a case should proceed, and there may be circumstances in which the removal proceeding should continue despite the parties' motion. *See* 88 FR at 62260 (explaining that this exception "provides adjudicators the flexibility to address the complexities of an individual case, while requiring the adjudicator to issue a reasoned explanation that provides the parties with due notice of the basis for a denial" of a joint motion to administratively close proceedings).

Moreover, the Department does not share commenters' concerns that EOIR adjudicators would use this exception to improperly deny joint or affirmatively unopposed motions. The Department expects all of its adjudicators to make decisions in accordance with the Act and the regulations, and that they will not improperly deny joint or affirmatively unopposed motions. 8 CFR 1003.1(d)(1) ("The Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations."); 8 CFR 1003.10(b) (same). Additionally, there is a presumption of regularity that attaches to the actions of Government agencies, *see United States Postal Serv.* v. *Gregory,* 534 U.S. 1, 10 (2001), and adjudicators such as immigration judges are "assumed to be . . . capable of judging a particular controversy fairly on the basis of its own circumstances," *Withrow* v. *Larkin,* 421 U.S. 35, 55 (1975) (internal quotation mark omitted). Moreover, adjudicators are required to clearly identify and support the reasons for denying such motions,

thereby creating a record that could be subject to further review.

The Department also declines to treat motions without a DHS response in the same manner as joint and affirmatively unopposed motions and declines to expand the termination ground for joint and affirmatively unopposed motions further. *See id.* at 62259–60 (explaining the joint and affirmatively unopposed standard). While joint and affirmatively unopposed motions should generally be granted in the interests of efficiency given the lack of an adversarial posture, a lack of DHS response to a motion, alone, is not the same as DHS's affirmative expression of non-opposition and does not necessarily convey that DHS maintains no adversarial interest in the case.

Additionally, as this rule does not supplant the immigration courts' or the Board's procedures for processing motions, the Department notes that a motion for administrative closure will not remain pending indefinitely in the event that DHS does not respond. Rather, as is consistent with EOIR's motions practice, the EOIR adjudicator will rule upon the motion once any time limits for responses to motions have passed. *See* 8 CFR 1003.23(a) ("The Immigration Judge may set and extend time limits for the making of motions and replies thereto."); *see also* Immigration Court Practice Manual ch. 5.12 (Oct. 25, 2023) (governing responses to motions); BIA Practice Manual ch. 5.11 (May 8, 2023) (providing that an opposing party has 13 days to respond after being served with the motion and noting that a failure to oppose "will not necessarily result in a grant of [the] motion").

*Comment:* Commenters recommended that the Department specify that a motion to withdraw or substitute representation can be filed and adjudicated while a case remains administratively closed. According to commenters, current practice requires an administratively closed case to be recalendared before a motion to withdraw or substitute can be filed and adjudicated, and then requires the case to be administratively closed again. Other commenters indicated that providing clarity on this issue would improve pro bono representation rates by reducing uncertainty over a representative's ability to move for withdrawal or substitution without risking premature recalendaring of an administratively closed case.

*Response:* In response to comments regarding motions to withdraw or substitute counsel while a case is administratively closed, the Department clarifies that the EOIR adjudicator may

adjudicate such motions without recalendaring the case. Additionally, the Department notes that recalendaring must be upon the motion of a party, and an immigration judge would not be authorized under this rule to recalendar sua sponte to adjudicate a motion to withdraw or substitute counsel. 8 CFR 1003.1(l)(2), 1003.18(c)(2) (authorizing EOIR adjudicators to "recalendar [a] case pursuant to a party's motion to recalendar").

The Department further notes that motions to withdraw or substitute counsel should comply with standards for such motions. *See* Immigration Court Practice Manual ch. 2.1(b)(3)(B) (June 20, 2023) (motions to substitute), (C) (motions to withdraw). Consistent with existing standards, attorneys requesting withdrawal from representation should provide evidence with their motion that they notified, or attempted to notify, the noncitizen of the ongoing nature of their proceedings and any upcoming deadlines or hearings, which would reasonably include an explanation that their case is administratively closed but may be recalendared in the future. *See id.* ch. 2.1(b)(3)(C) (calling for notification of pending deadlines; the date, time, and place of the next scheduled hearing; the necessity of meeting deadlines and appearing at scheduled hearings; and the consequences of failing to meet deadlines or appear at scheduled hearings). The Department believes that this rule, which does not impose any limitations on adjudication of such motions, provides sufficient guidance for counsel to make determinations about whether to engage in representation.

*Comment:* Commenters also recommended clarifying that administrative closure is available to detained noncitizens, who may be pursuing alternative relief with USCIS.

*Response:* As an initial matter, the Department notes that the rule, in general, does not distinguish between detained and non-detained cases regarding the exercise of administrative closure authority, as the Department does not believe such an explicit distinction is necessary. Rather, the rule provides that EOIR adjudicators may, in their discretion, administratively close cases after consideration of the totality of the circumstances. *See* 8 CFR 1003.1(l), 1003.18(c) (administrative closure standards).

However, after further consideration, the Department is adding an additional factor—the U.S. Immigration and Customs Enforcement ("ICE") detention status of the noncitizen—to the nonexhaustive list of factors for EOIR

adjudicators to consider as part of the totality of the circumstances when evaluating motions to administratively close or recalendar a case. *See id.* § 1003.1(l)(3)(i)(H) (administrative closure before the Board), 1003.18(c)(3)(i)(H) (administrative closure before immigration judges), 1003.1(l)(3)(ii)(H) (recalendaring before the Board), 1003.18(c)(3)(ii)(H) (recalendaring before immigration judges). Accordingly, where relevant and in addition to other factors applicable to a particular case, EOIR adjudicators must consider a noncitizen's ICE detention status when making a determination about whether to administratively close or recalendar a case.

Several considerations warrant adding this factor for EOIR adjudicators to consider when adjudicating motions to administratively close or recalendar cases where the "totality-of-the-circumstances" standard applies. *See infra* section IV.A of this preamble (providing additional explanation of this change). Administrative closure in cases involving a detained noncitizen may prolong the noncitizen's detention, imposing a greater burden on the noncitizen and additional costs to the Government during the pendency of a case. For those reasons, detained cases present a heightened need for stringent monitoring and continuous reevaluation regarding whether a case is ready to proceed to minimize, to the greatest extent possible, the risk of lengthier than necessary detention and the resulting costs. Accordingly, although the Department reiterates that no single factor is dispositive or more heavily weighted than others in adjudicating a motion to administratively close or recalendar a case, *see* 8 CFR 1003.1(l)(3), 1003.18(c)(3), the fact that a noncitizen is detained in ICE custody will generally weigh against the appropriateness of administrative closure. Conversely, for detained cases that are already administratively closed, the noncitizen's detention status will generally weigh in favor of recalendaring to resume proceedings. In most detained cases, granting continuances as needed while maintaining the case on—or returning the case to—the active docket will be the most appropriate course of action.

That said, this rule does not expressly preclude the administrative closure of a case involving a noncitizen in ICE detention. Again, because a noncitizen's status in ICE detention is not a dispositive factor, there may be some cases where administrative closure is necessary or appropriate despite the noncitizen's detention in ICE custody.

As explained below, *see infra* section IV.A of this preamble, such circumstances may include, for example, permitting a detained noncitizen to pursue available relief with USCIS, such as a Form I–601A, Provisional Unlawful Presence Waiver, or to permit evaluations or treatment related to mental competency concerns. Moreover, the Department is cognizant that there may be unique or compelling circumstances warranting the administrative closure of a case involving a noncitizen in ICE detention based on the totality of the circumstances. Though the Department anticipates that such compelling circumstances will be rare, the Department believes that EOIR adjudicators have the expertise and judgment to evaluate the individual facts and circumstances in each case, including in cases where noncitizens are in ICE detention, to identify whether administrative closure is necessary or appropriate in that particular case.

In sum, the Department believes that the ICE detention status of a noncitizen is a crucial factor for EOIR adjudicators to carefully evaluate when considering a motion to administratively close or recalendar a case. Adding ICE detention status as an explicit factor for EOIR adjudicators to consider when applying the "totality-of-the-circumstances" standard ensures that detained cases will continue to be monitored in the most appropriate fashion, while maintaining EOIR adjudicator discretion to administratively close detained cases in the limited scenarios where it may be appropriate.

*Comment:* Commenters recommended clarifying that both written and oral motions for administrative closure are acceptable. In addition, one commenter raised concerns about a lack of guidance distinguishing when administrative closure or discretionary termination should be used.

*Response:* With regard to written and oral motions, the Department concludes that the proposed regulatory text is sufficient as written to make clear that an administrative closure motion need not take a particular form and can therefore include both written and oral motions. *See* 8 CFR 1003.1(l)(1) ("Board members may, in the exercise of discretion, administratively close a case upon the motion of a party . . . ."), 1003.18(c)(1) ("An immigration judge may, in the exercise of discretion, administratively close a case upon the motion of a party . . . ."). If the Department had intended to permit only written motions, the proposed regulatory text would have explicitly stated that limitation.

In response to a commenter's request to provide EOIR adjudicators with more guidance on the differences between administrative closure and termination, the Department believes the rule provides clear standards for the applicability of both administrative closure and termination. *See generally* 8 CFR 1003.18(c), 1003.18(d). The Department notes that there may be limited circumstances where both options are available in a particular case, namely when a noncitizen is pursuing outside relief with USCIS. *Compare* 8 CFR 1003.18(c)(3)(i)(D) (administrative closure factor requiring demonstrating a likelihood of success on outside relief, but not requiring a filing with USCIS), *with* 8 CFR 1003.18(d)(1)(ii)(B) (discretionary termination provision requiring a prima facie showing on outside relief, and requiring a filing with USCIS).

For example, if the noncitizen is seeking discretionary termination, has a pending filing with USCIS, and is prima facie eligible, the adjudicator may still deny termination as a matter of discretion, but, depending on the individual facts and circumstances of the case, may determine that administrative closure is more appropriate. Because the Department believes that adjudicators are in the best position to determine which procedural tool is most appropriate in a particular case, the Department does not wish to constrain the EOIR adjudicator's discretion, beyond what is already delineated in this rule, by dictating which procedural tool may be necessary or appropriate in any individual case. *See id.* § 1003.1(d)(1)(ii) (requiring adjudicators to use their "independent judgment and discretion" to resolve cases before them), 8 CFR 1003.10(b) (same); *see also Matter of Avetisyan*, 25 I&N Dec. at 695 (explaining that the decision to administratively close proceedings "involves an assessment of factors that are particularly relevant to the efficient management of the resources of the Immigration Courts and the Board," which falls squarely within the duties of EOIR adjudicators).

However, as explained further in section III.C.4 of this preamble, the Department has provided additional guidance on this discretionary termination ground that the Department believes will better assist EOIR adjudicators in weighing whether administrative closure or termination is most appropriate if both tools are potentially available in a particular case. *See* 8 CFR 1003.1(m)(1)(ii), 1003.18(d)(1)(ii). For example, the rule now includes a requirement that the noncitizen file any associated petition,

application, or other action with USCIS, with limited exception, before discretionary termination may be granted, which is not required for the similar administrative closure factor. *See id.* §§ 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). Additionally, the final rule clarifies that EOIR adjudicators do not have sua sponte authority to grant termination and must consider the basis for any opposition to termination raised by a party, which will also help EOIR adjudicators to determine whether termination, as opposed to administrative closure, is the most appropriate option if both tools are available in the case. *See id.* §§ 1003.1(m)(1)(ii), 1003.18(d)(1)(ii).

4. Totality-of-the-Circumstances Factors for Administrative Closure

*Comment:* Numerous commenters raised concerns with specific factors being dispositive to a request for administrative closure.

*Response:* As a general matter, the Department first emphasizes that the proposed administrative closure factors are encompassed within a broader totality-of-the-circumstances analysis, and no single factor is dispositive. To the extent that commenters raised concerns with specific factors included in the rule, the Department notes that the totality analysis allows adjudicators to consider all relevant factors holistically. For example, the totality analysis allows for the adjudicator to consider and weigh relevant factors, as appropriate, given the particular facts of a given case, including parties' arguments and evidence on how much weight to give a certain factor or why a certain factor may be outweighed by other factors.

Fundamentally, the factors enumerated in the rule, along with any other relevant considerations, are intended to elicit evidence relevant to answering straightforward questions, such as: would administrative closure efficiently and fairly help a case reach its ultimate resolution or alternative disposition? *See* 8 CFR 1003.1(l)(3)(i)(A) and (B), (G) and (H), 1003.18(c)(3)(i)(A) and (B), (G) and (H). Is there an outside application, petition, or action that needs to be adjudicated to determine if further removal proceedings are warranted? *See id.* §§ 1003.1(l)(3)(i)(C), 1003.18(c)(3)(i)(C). If so, how likely is the noncitizen to succeed on such a petition, application, or other action? *See id.* §§ 1003.1(l)(3)(i)(D), 1003.18(c)(3)(i)(D). And is the noncitizen being diligent in pursuing such petition, application, or action? *See id.* §§ 1003.1(l)(3)(i)(F), 1003.18(c)(3)(i)(F). The Department

believes the factors enumerated in the rule help provide EOIR adjudicators with guidance to answer such questions. Commenters' concerns regarding each of the specific factors will be addressed in greater detail elsewhere in this section of this preamble.

*Comment:* Commenters provided a number of suggested revisions to the proposed administrative closure factors. One commenter recommended modifying the "reason administrative closure is sought" factor to explicitly state that a noncitizen's employment authorization is a valid consideration for the adjudicator. The commenter explained that employment authorization considerations should weigh in favor of administrative closure when a noncitizen has an application pending with EOIR that serves as the basis for their employment authorization. Commenters noted that, in this situation, dismissing or terminating the noncitizen's proceedings can withdraw the underlying pending application for relief on which the noncitizen's employment authorization eligibility is based.

*Response:* The Department declines to explicitly include employment authorization eligibility as a factor for administrative closure. The Department believes that the totality-of-the-circumstances analysis broadly covers any relevant considerations EOIR adjudicators may assess, and noncitizens may raise such issues identified by commenters if they believe they are relevant to an administrative closure determination. This rule does not preclude EOIR adjudicators from considering employment authorization eligibility as part of the totality of the circumstances for administrative closure where relevant to a particular case. However, the Department notes that employment authorization does not constitute relief, protection, lawful status, deferred action, or similar benefits that would typically have any bearing on removability or relief from removability.

*Comment:* Commenters also recommended broadening the factor focusing on "any requirement that a case be administratively closed in order for a petitioner, application, or other action to be filed with, or granted by DHS." Commenters recommended broadening this to include any outside agency. Commenters explained that noncitizens may be pursuing collateral relief with agencies other than DHS, and that administrative closure should be available in such instances. Other commenters stated that this factor should clarify that administrative

closure is available even when it is not required for USCIS to adjudicate a specific application.

*Response:* The Department declines to broaden the factor focusing on any "requirement that a case be administratively closed in order for a petition, application, or other action to be filed with, or granted by, DHS" to include any outside agency, and not just DHS. This factor is intended to include situations similar to the I–601A, Application for Provisional Unlawful Presence Waiver, where the regulations require administrative closure as a prerequisite to consider that type of waiver. Commenters did not provide, and the Department is unaware of any, specific examples of other entities or agencies where administrative closure is a prerequisite for the petition, application, or other action to be considered or granted.

Lastly, in response to comments stating that administrative closure should be available even when not required for USCIS to adjudicate a specific application, the Department notes that EOIR adjudicators are permitted to administratively close a case when necessary or appropriate, considering the totality of the circumstances, including all relevant factors. 8 CFR 1003.1(d)(1)(ii) (authority of Board), (l)(3) (general administrative closure standards for Board), 1003.10(b) (authority of immigration judges), 1003.18(c)(3) (general administrative closure standards for immigration judges). Thus, the rule does not limit administrative closure in the way commenters suggest, and the Department declines to make any further changes to this specific factor relevant to DHS petitions, applications, or other actions.

*Comment:* Regarding the "likelihood of success" factor, commenters stated that immigration judges should not be required to consider the likelihood of success of any relief outside of EOIR when determining whether to grant administrative closure, as that ultimate relief determination is made by another adjudicative body, and any initial determination by an immigration judge would be speculative. Instead, one commenter recommended focusing this factor simply on whether the noncitizen filed their application with USCIS. Other commenters recommending retaining, but modifying, this "likelihood of success" factor to focus on the likelihood of "eligibility" or "prima facie eligibility" for relief before USCIS, rather than a likelihood of "success." These commenters believed that such a change would better focus on a noncitizens' prima facie eligibility

for relief, and not whether they would ultimately prevail before USCIS. Additional commenters stated that, while EOIR adjudicators may consider the likelihood of success on any relief outside of EOIR when determining whether to grant administrative closure, this factor should not be relied upon to deny administrative closure. Similarly, another commenter stated that certain evidence, such as bona fide determinations made by USCIS, should be dispositive of this factor, although not required.

Additionally, one commenter recommended explicitly stating that applications filed on behalf of another, such as under the Central American Minors ("CAM") program, should be considered under the "likelihood of success" factor.

*Response:* Regarding concerns about the factor addressing the likelihood of success on a petition, application, or other action outside of EOIR, 8 CFR 1003.1(l)(3)(i)(D), 1003.18(c)(3)(i)(D), the Department first notes that this factor has long existed in administrative closure jurisprudence. *See Matter of Avetisyan,* 25 I&N Dec. at 696. Accordingly, as this factor has long been relevant to the determination of whether to grant or deny a request for administrative closure, the Department declines to preclude EOIR adjudicators from considering the "likelihood of success" factor as part of the totality of the circumstances in a decision denying administrative closure, as commenters suggested. Moreover, the Department believes that this factor will help ensure that administrative closure is reserved for cases with a realistic possibility of relief outside of EOIR and is not used as a tool to delay removal proceedings. In practice, this factor can be used to distinguish cases where potential relief is clearly unavailable or so speculative that administrative closure is unwarranted. *See, e.g., id.* (explaining that administrative closure is not appropriate if, for example, "the request is based on a purely speculative event or action (such as a possible change in a law or regulation); an event or action that is certain to occur, but not within a period of time that is reasonable under the circumstances (for example, remote availability of a fourth-preference family-based visa); or an event or action that may or may not affect the course of [a noncitizen's] immigration proceedings (such as a collateral attack on a criminal conviction)"). Accordingly, the Department declines to modify the "likelihood of success" factor to likelihood of "eligibility" or "prima facie eligibility" as commenters suggested. In retaining this factor, the

Department also generally notes that no factor alone is dispositive, and the consideration of this factor is not intended to be a full adjudication of the merits of the outside relief. Rather, the rule instructs adjudicators to consider the likelihood of success outside of EOIR along with any other relevant factors in the totality of the circumstances.

Furthermore, the Department also declines to make any specific evidence dispositive of this factor, such as bona fide determinations by USCIS. Although such evidence may often weigh heavily in favor of this factor, the Department does not believe it should be treated as dispositive, and notes that the weight given to this factor will be dependent upon a totality analysis. *See generally Matter of Interiano-Rosa,* 25 I&N Dec. 264, 265 (BIA 2010) ("Immigration Judges have broad discretion . . . to admit and consider relevant and probative evidence.").

In response to commenters' concerns regarding the applicability of the "likelihood of success" factor to the CAM program, the Department clarifies that adjudicators may consider any petition, application, or other action outside of EOIR proceedings, which can include programs such as CAM. The totality analysis would allow the adjudicator to consider all relevant considerations related to such a program, including whether the noncitizen would likely succeed in qualifying for such a program and what effects such a program would have on the noncitizen's removal proceeding, among others.

*Comment:* With regard to the anticipated duration factor, commenters recommended explicitly stating that adjudicatory timelines or delays at USCIS should not be considered, as those are outside the control of the noncitizen. Other commenters recommended omitting this factor altogether, claiming that the length of administrative closure is outside of a noncitizens' control when it involves waiting on another adjudicative agency. Another commenter recommended making explicit that administrative closure is appropriate to await visa availability, which may otherwise be viewed as a negative under this factor.

*Response:* After further consideration, the Department declines to add additional language to the regulatory text for the "anticipated duration" factor, or to remove this factor altogether. Despite commenter suggestions, the Department has decided against adding language explicitly barring EOIR adjudicators from considering adjudicatory timelines

or delays at USCIS. As written, the "anticipated duration" factor is a longstanding consideration imported from *Matter of Avetisyan,* 25 I&N Dec. at 696.

The Department acknowledges that the NPRM preamble explained that DHS adjudication timelines should not be considered as a negative factor weighing against administrative closure. *See* 88 FR at 62261 ("Moreover, the potential duration of the administrative closure while awaiting DHS adjudication, for example, of a pending application before USCIS, should not weigh against the decision to administratively close proceedings."); 8 CFR 1003.1(l)(3)(i)(E), 1003.18(c)(3)(i)(E) (anticipated duration). However, the Department does not believe it is appropriate to foreclose all consideration of USCIS adjudicatory timelines under this factor, and therefore declines to remove or further limit this provision. For example, remote visa availability may weigh against administrative closure if visa availability is so distant as to be speculative, while an otherwise ready-to-adjudicate application merely waiting on USCIS processing may weigh in favor of administrative closure, despite a potentially lengthy processing time. *See, e.g., Matter of Avetisyan,* 25 I&N Dec. at 696 (explaining that administrative closure was not appropriate when an event or action "is certain to occur, but not within a period of time that is reasonable under the circumstances (for example, remote availability of a fourth-preference family-based visa)"). More generally, USCIS adjudicatory timelines will be given appropriate weight depending upon the totality of the circumstances of each particular case. Accordingly, the Department also declines to include explicit language stating that administrative closure is appropriate to await visa availability, or any other specific adjudication. By not listing specific examples in the regulatory text, EOIR adjudicators may determine whether administrative closure is appropriate after consideration of the individual facts and circumstances of each case.

*Comment:* Some commenters recommended omitting the factor focusing on the responsibility of the parties in contributing to any current or anticipated delays, which commenters believed would be used to fault noncitizens for delays outside of their control, such as adjudications with outside agencies or time to obtain counsel.

*Response:* In response to commenter concerns about the consideration of parties' contribution to any delays, the

Department notes that the parties may submit arguments and evidence explaining any delays or potential delays. For example, a noncitizen may submit evidence demonstrating that their relief application was not immediately filed with USCIS because it was particularly complex or required certain additional supporting evidence. The EOIR adjudicator may then consider such evidence in the totality of the circumstances. The Department notes that the NPRM preamble explained that EOIR adjudicators "should consider both the noncitizen's and DHS's responsibility for any delay." 88 FR at 62261. Accordingly, the Department declines to omit this factor altogether from the regulatory text because whether either party contributed to any delay is relevant to an EOIR adjudicator's assessment of the totality of the circumstances.

*Comment:* Commenters recommended removing the factor focusing on the ultimate anticipated outcome of the case. Commenters explained that this factor may fail to consider circumstances, such as prosecutorial discretion, where administrative closure itself is the ultimate outcome of the case. Additionally, commenters stated that the term "case" is ambiguous as to whether it refers to removal proceedings before EOIR or other relief the noncitizen may be pursuing outside of EOIR.

*Response:* The Department declines to remove the "ultimate anticipated outcome of the case" factor. 8 CFR 1003.1(l)(3)(i)(G), 1003.18(c)(3)(i)(G). This factor is intended to help adjudicators determine whether administrative closure would ultimately assist in efficiently concluding removal proceedings. For example, if a case is administratively closed for the noncitizen to pursue relief that would result in lawful status if granted, once recalendared, the case would be able to conclude efficiently by terminating proceedings. *See id.* §§ 1003.1(m)(1)(i)(D) (requiring termination where the noncitizen has, since the initiation of proceedings, obtained status), 1003.18(d)(1)(i)(D) (same). In contrast, if the underlying basis for the administrative closure request would have little to no effect on the need for continued removal proceedings, then this would weigh against the administrative closure request, although other potential options, such as termination or dismissal, may be available. *See, e.g.,* 8 CFR 239.2(a)(6) (dismissing improvidently issued Notice to Appear).

Additionally, to the extent that DHS requests administrative closure pursuant to their prosecutorial discretion authority, the Department notes that such a request would not change the ultimate anticipated outcome of the case, which ultimately must be resolved through an order of relief, removal, termination, or dismissal once recalendared.

Finally, to further clarify, the term "case" refers to the removal proceeding before EOIR. By looking at the ultimate anticipated outcome of the case before EOIR, this factor is intended to help adjudicators determine what effect, if any, administrative closure would have in helping adjudicators ultimately complete removal proceedings, whether through an order of relief, removal, dismissal, or termination, as relevant.

### 5. Specific Calls for Comments

i. Weighing in Favor of Granting Certain Motions for Administrative Closure

*Comment:* Commenters were supportive of adding language favoring granting motions for administrative closure when the noncitizen demonstrates prima facie eligibility for relief and has demonstrated reasonable diligence in pursuing such relief. Other commenters went further, stating that a pending application with USCIS should be a dispositive factor for granting administrative closure, or that administrative closure should be generally granted so long as the noncitizen states which relief they will be pursuing. These commenters explained that requiring a prima facie eligibility showing was unnecessary, and particularly burdensome for pro se noncitizens.

Moreover, one commenter suggested that, rather than requiring pro se noncitizens to demonstrate a reasonable likelihood of success on the merits—which the commenter stated requires responding to questions of law—and diligence in pursuing any available relief, EOIR instead require that pro se noncitizens demonstrate the basis for the petition, application, or other action and an explanation of the steps that a pro se noncitizen has pursued or intends to pursue within a reasonable time of the administrative closure in furtherance of the petition, application, or other action for adjudication.

Another commenter recommended clarifying that "reasonable diligence" should not consider any adjudicatory delays outside the noncitizen's control. One commenter requested clarification as to what would constitute "reasonably diligent."

*Response:* Upon further consideration, including consideration of the comments received, the Department declines to further amend this provision to weigh in favor of granting certain motions for administrative closure, other than joint motions, as set forth in 8 CFR 1003.1(l)(3) and 1003.18(c)(3). The Department does not believe that any single factor should be dispositive, nor required to be weighed more heavily than another, in the "totality-of-the-circumstances" determination. Rather, the totality determination allows the adjudicator to consider all relevant factors and weigh them accordingly. Treating a single factor as dispositive, or requiring it to be weighed more heavily, would unnecessarily limit adjudicator discretion to determine the best course of action in each individual case. *See, e.g., Matter of Avetisyan,* 25 I&N Dec. at 694 (explaining that EOIR adjudicators have "the responsibility to exercise independent judgment and discretion" in adjudicating the cases before them). For example, in many cases, a pending application with USCIS may ultimately be a determinative factor weighing in favor of administrative closure while that application is being adjudicated by USCIS, while in other cases, administrative closure may not be necessary or appropriate where there is such a pending application with USCIS.

Because the Department is codifying a totality analysis, wherein the adjudicator may consider, and weigh accordingly, a noncitizen's reasonable likelihood of success on the merits and reasonable diligence in pursuing such relief, rather than ascribing the weight of such considerations in the rule, the Department declines to further address concerns related to the "reasonable likelihood of success" or "reasonable diligence" standards.

ii. Specific Scenarios Allowing Administrative Closure With No Pending Relief Outside of EOIR

*Comment:* Some commenters were in favor of adding explicit scenarios allowing for administrative closure when there is no pending relief outside of EOIR, which they believed would help provide consistency to adjudicators. For example, commenters recommended adding the following non-exclusive scenarios: (1) the noncitizen marries a U.S. citizen and intends to pursue an I–130 petition followed by adjustment of status or consular processing; (2) the noncitizen has been a victim of a qualifying crime for U nonimmigrant status and intends to pursue a law enforcement certification; (3) the noncitizen is prima facie eligible for Special Immigrant Juvenile classification ("SIJ") and intends to pursue an SIJ predicate order

in State court; (4) the noncitizen intends to seek mental health treatment and there is a reasonable possibility that such treatment could assist with the noncitizen's pursuit of relief from removal; (5) the noncitizen has suffered abuse in their country of origin but is not able to discuss the details of the abuse with their attorney, though the incident could make them eligible for asylum; (6) the noncitizen is otherwise eligible for cancellation of removal but needs to accrue additional physical presence; (7) the noncitizen is in withholding-only proceedings but is not considered a removal priority by DHS; or (8) the noncitizen believes that they are stateless.

Another commenter stated that limiting administrative closure to specific scenarios was unnecessary, while another commenter stated that they did not have concerns with doing so, as long as the scenarios were not exclusive. Moreover, another commenter recommended clarifying that, in scenarios where the noncitizen is not pursuing outside relief, any reasons for requesting administrative closure should be considered.

*Response:* After further consideration, the Department has decided against adding explicit scenarios in which administrative closure may be appropriate outside of a pending relief application. Commenters provided several examples of scenarios that may warrant administrative closure, depending on the circumstances of the individual case. EOIR may, as appropriate, issue further nonregulatory case examples or training to adjudicators regarding administrative closure and other docket management tools. However, the Department believes that retaining the overall totality-of-the-circumstances analysis will best allow EOIR adjudicators to determine whether a specific request for administrative closure should be granted. Certain totality factors may be more relevant than others in a specific case, such as the speculative nature of the underlying reason for requesting administrative closure, the diligence in pursuing the underlying reason, and how success in pursuing the underlying reason would ultimately affect the pending removal proceeding.

The Department also declines to incorporate the commenter's suggestion to clarify that any reasons for requesting administrative closure should be considered in cases where a noncitizen is not pursing outside relief. The Department believes that the regulatory text is sufficiently clear that pursuing relief outside of EOIR proceedings is not a prerequisite for the administrative closure of a case and that the totality-of-the-circumstances analysis appropriately encompasses consideration of factors relevant to a determination of whether to administratively close a case, including the reason administrative closure is sought. *See* 8 CFR 1003.1(l)(3) (explaining the totality-of-the-circumstances analysis and stating that ''[a]lthough administrative closure may be appropriate where a petition, application, or other action is pending outside of proceedings[,] . . . such a pending petition, application, or other action is not required for a case to be administratively closed''), 1003.18(c)(3) (same); *see also id.* §§ 1003.1(l)(3)(i)(A) (identifying ''[t]he reason administrative closure is sought'' as a relevant factor for consideration as the circumstances of the case warrant), 1003.18(c)(3)(i)(A) (same).

iii. Weighing Opposition to Motions for Administrative Closure

*Comment:* Many commenters supported making a noncitizen's opposition to administrative closure at least a primary consideration, stating that a noncitizen's desire to proceed with their case before EOIR should be a persuasive reason not to administratively close their case. Some commenters recommended going further, proposing that adjudicators should not be able to administratively close proceedings over a noncitizen's objection, particularly if the noncitizen desires to move forward with their removal proceedings in order to pursue available relief before EOIR. Commenters explained that administratively closing proceedings in such circumstances could foreclose relief that is only available in removal proceedings, remove the noncitizen's eligibility for work authorization that is premised on a pending application before EOIR, as well as discourage legal service providers from providing representation before EOIR. Relatedly, one commenter recommended providing noncitizens with 60 days to submit an opposition brief to a DHS motion for administrative closure.

One commenter stated that they would be opposed to the final rule implementing a provision that would provide that if one party opposed administrative closure, the primary consideration for an adjudicator would be whether that party provided a persuasive reason for the case to proceed. Specifically, the commenter stated that such a provision would codify the holding in *Matter of W–Y–U–,* 27 I&N Dec. 17, 20 (BIA 2017), and disproportionately benefit DHS, as DHS would be more likely to oppose administrative closure. The commenter was also concerned that including such a primary consideration requirement would, in cases involving DHS opposition, outweigh a noncitizen's otherwise approvable motion for administrative closure in the name of efficiency at the expense of a noncitizen's due process rights.

One commenter also requested general clarification as to the meaning of ''a persuasive reason'' that the party opposing administrative closure must provide.

*Response:* After further consideration, the Department has decided not to include a regulatory provision requiring the weighting of any specific administrative closure factor more than any others. The Department ultimately believes that EOIR adjudicators are in the best position to determine when administrative closure is appropriate under the totality of the circumstances, and weighting certain factors differently would unnecessarily reduce adjudicators' discretion. Accordingly, to the extent that the Board's holding in *Matter of W–Y–U–* that ''the primary consideration . . . in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits,'' *id.,* is inconsistent with the unweighted, ''totality-of-the-circumstances'' standard implemented by this rule, *Matter of W–Y–U–,* 27 I&N Dec. 17, is superseded.[3]

To be clear: this is not to say that a party's opposition to a motion for administrative closure is not a relevant factor for EOIR adjudicators to consider; to the contrary, it is listed in the regulatory text as such. 8 CFR 1003.1(l)(3)(i)(B), 1003.18(c)(3)(i)(B). And, practically speaking, in many cases a noncitizen's opposition to administrative closure based on a desire to pursue relief before EOIR will likely weigh heavily in favor of denying a

---

[3] The Attorney General has the authority to overrule Board decisions, *see* 8 CFR 1003.1(g)(1) (describing Board decisions as binding ''[e]xcept as Board decisions may be modified or overruled by the Board or the Attorney General''), and, in general, agencies are permitted to change their policies, provided that a reasoned explanation for the policy is given. *See generally Encino Motorcars, LLC* v. *Navarro,* 579 U.S. 211, 221 (2016) (''Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.'' (citing *Nat'l Cable & Telecomms. Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 981–82 (2005))). Such policy changes may be through rulemaking or through adjudication. *See SEC* v. *Chenery Corp.,* 332 U.S. 194, 215 (1947) (holding that agencies may promulgate a general rule of law by either regulation or adjudication).

motion to administratively close proceedings. However, requiring EOIR adjudicators to weight a party's opposition more heavily when adjudicating a motion for administrative closure or maintaining the "primary consideration" standard from *Matter of W–Y–U–* unnecessarily limits adjudicator discretion to evaluate the totality of the circumstances presented by each case.

In response to commenters' suggestions to not allow administrative closure over a noncitizen's objection, the Department believes that the importance of providing EOIR adjudicators with the authority to take "necessary or appropriate" action for the disposition or alternative resolution of cases weighs in favor of providing adjudicators with the ability to administratively close proceedings over a party's objection. *See* 8 CFR 1003.1(d)(1)(ii), 1003.10(b). As explained in the NPRM, "there is a long history of EOIR adjudicators utilizing administrative closure as a helpful tool for managing dockets at both the immigration courts and the Board." 88 FR at 62255. The decision to administratively close proceedings "involves an assessment of factors that are particularly relevant to the efficient management of the resources of the Immigration Courts and the Board." *Matter of Avetisyan,* 25 I&N Dec. at 695. As such, immigration judges and Appellate Immigration Judges are in the best position to determine how a case should proceed, which includes the use of administrative closure when necessary or appropriate.

Moreover, the rule provides, and motions practice before EOIR dictates, that an adjudicator will consider a party's objection in the totality of the circumstances, which provides the noncitizen the ability to explain why administrative closure should not be granted. Practically speaking, the Department expects that it would be rare for an adjudicator to administratively close proceedings over a noncitizen's objection if the noncitizen prefers to proceed with a relief application in removal proceedings. However, there may be cases where an immigration judge or Appellate Immigration Judge determines it is necessary or appropriate to do so. In these cases, the Department notes that the parties also retain the ability to move for recalendaring as necessary.

Because the Department believes that EOIR adjudicators will provide parties with a sufficient opportunity to explain any opposition to a motion to administratively close a case pursuant to both the requirements of this rule and existing EOIR motions practice, the Department declines to add a 60-day opposition briefing regulatory requirement specific to administrative closure motions. *See generally* Immigration Court Practice Manual ch. 5 (explaining standards and procedures for motions before EOIR); BIA Practice Manual ch. 5 (same).

Finally, because the Department is not adding the "persuasive reason" language to the regulatory text, the Department has determined it is unnecessary to further clarify that phrase as part of this rulemaking.

### iv. Sua Sponte Administrative Closure

*Comment:* Some commenters stated that EOIR adjudicators should be able to sua sponte administratively close proceedings, particularly in cases involving pro se noncitizens. Commenters explained that pro se noncitizens may not know that administrative closure is available to them, particularly when they may be eligible for relief with USCIS. Commenters noted that the EOIR adjudicator should explain the possible availability of administrative closure to the noncitizen and allow the noncitizen to raise any concerns with administratively closing proceedings.

In contrast, other commenters opposed sua sponte administrative closure, stating that parties should have the opportunity to present their views on administrative closure before the adjudicator makes their decision. Alternatively, commenters noted that, if the Department decides to provide for sua sponte administrative closure authority, certain safeguards should be implemented, including: (1) preventing sua sponte administrative closure over a noncitizens' objection; and (2) requiring 60 days' notice of sua sponte administrative closure, which would allow the parties time to object. Commenters also recommended providing pro se noncitizens with simple written resources explaining administrative closure (as well as termination).

*Response:* After further consideration, the Department has decided not to include sua sponte administrative closure authority. The Department wants to ensure that the parties are able to provide any evidence relevant to an administrative closure determination, and sua sponte administrative closure authority would potentially allow adjudicators to exercise such authority without consideration of such evidence.

However, the Department notes that, in practice, if an adjudicator believes that administrative closure may be appropriate in a given case, the adjudicator can raise the issue with the parties. If a party is then amenable to administrative closure, the adjudicator may inquire whether the party wishes to move for administrative closure. For those cases before the Board, the adjudicator may request supplemental briefing from the parties to ensure that the positions of the parties are considered as part of the administrative closure determination. 8 CFR 1003.3(c)(1). The requirement of a motion seeking administrative closure ensures that the parties can state their positions on administrative closure before the adjudicator decides whether administrative closure is appropriate in the totality of the circumstances.

Additionally, although the Department is not providing for sua sponte administrative closure authority, the Department appreciates commenter suggestions related to ensuring information about administrative closure and termination is available to all noncitizens before EOIR, including those who may not be represented by counsel. While the Department declines to implement suggestions like providing written information about administrative closure and termination to pro se noncitizens as regulatory requirements via this rulemaking, the Department remains committed to providing information to assist pro se respondents in EOIR proceedings and exploring ways outside of the rulemaking process to adequately do so. *See generally* EOIR, *Immigration Court Online Resource, https://icor.eoir. justice.gov* (last visited Jan. 25, 2024) (providing information about EOIR proceedings).

### 6. Recalendaring

*Comment:* Commenters provided a number of suggestions for modifying the recalendaring factors. First, commenters requested that the Department clarify which party bears the burden of persuasion on the second factor—the basis for any opposition to recalendaring—and whether the burden of persuasion on that factor will shift during the EOIR adjudicator's consideration.

Second, commenters stated that the factor at 8 CFR 1003.1(l)(3)(ii)(D) and 1003.18(c)(3)(ii)(D), considering the length of time between administrative closure and the filing of any application, should be removed altogether, or at least carefully applied. Commenters argued that, for example, relief applications for noncitizen children may take longer to prepare, and that any such preparation should not be viewed as dilatory under this recalendaring factor. Commenters recommended removal of this factor and

stated that it does not adequately take into account the underlying reasons for any delay in filing.

Third, commenters recommended amending the "likelihood of success" factor at 8 CFR 1003.1(l)(3)(ii)(F) and 1003.18(c)(3)(ii)(F) to focus on prima facie eligibility for outside relief, rather than ultimate success of the relief. Commenters stated that this would prevent immigration judges from making initial determinations on outside relief, and instead focus on general eligibility.

Fourth, commenters recommended modifying the factor at 8 CFR 1003.1(l)(3)(ii)(G) and 1003.18(c)(3)(ii)(G), focusing on the ultimate anticipated outcome of the case, to prevent immigration judges from assessing the merits of any relief applications filed with EOIR before the noncitizen has had a chance to present evidence. Commenters suggested focusing this provision on the anticipated outcome if such outcome is other than seeking a final adjudication before EOIR.

Fifth, one commenter recommended using a "good cause" standard for recalendaring, which the commenter stated would benefit noncitizens who did not wish for their removal proceeding to be closed.

*Response:* As an initial matter, the Department notes that a case will be recalendared only upon the motion of a party. *See* 8 CFR 1003.1(l)(2) ("[T]he Board may, in the exercise of discretion, recalendar the case pursuant to a party's motion to recalendar."), 1003.18(c)(2) (same provision for immigration judges). The rule sets forth a non-exhaustive list of factors for the EOIR adjudicator to consider when making a decision with respect to a party's motion to recalendar a case. *Id.* §§ 1003.1(l)(3)(ii)(A) through (H), 1003.18(c)(3)(ii)(A) through (H) (listing factors). And, as discussed in section III.B.3 of this preamble and explained in further detail in section IV.A, the Department is adding an additional factor—the ICE detention status of the noncitizen—to the non-exhaustive list of factors for consideration when evaluating a motion to recalendar. *Id.* §§ 1003.1(l)(3)(ii)(H), 1003.18(c)(3)(ii)(H).

Further, as is consistent with general motions practice before EOIR, a party moving to recalendar will have the opportunity to present their argument to the EOIR adjudicator as to why they believe the case should be recalendared. In doing so, the party may identify the factors they believe are relevant in the recalendaring determination, either from the factors provided by regulation, or by indicating any other factors the

party believes to be relevant to their argument. As is customary in motions practice before EOIR, the adjudicator will then give the opposing party the opportunity to respond to the motion to recalendar. However, this is not a burden-shifting framework, as the adjudicator will ultimately be making the determination based on the totality of the circumstances—considering the arguments made by the parties in support of and in opposition to the motion—and in the exercise of the adjudicator's discretion. *See id.* §§ 1003.1(l)(2), 1003.18(c)(2) (adjudicators may recalendar in their discretion).

Second, with regard to the factor considering the length of time between administrative closure and the filing of any application, the Department notes that EOIR adjudicators will consider any relevant evidence in the totality of the circumstances. *Id.* §§ 1003.1(l)(3), 1003.18(c)(3). Using the commenter's example of preparing a relief application for a noncitizen child, the Department notes that the party may present evidence that any gap in time between administrative closure and the filing of a relief application was due to the complicated nature of preparing that specific relief application, which the adjudicator will consider in assessing the totality of the circumstances. The Department reiterates that in cases where a motion to recalendar is not filed jointly or affirmatively unopposed, the ultimate determination made by EOIR adjudicators will be based on the totality of the circumstances, guided by the non-exhaustive factors established by this rule. *Id.* This standard provides EOIR adjudicators the flexibility to consider all relevant evidence and circumstances, including those surrounding the length of time between the granting of administrative closure and the filing of any petition, application, or other action.

Third, the Department declines to amend the "likelihood of success" factor at 8 CFR 1003.1(l)(3)(ii)(F) and 1003.18(c)(3)(ii)(F) to adopt a "prima facie" standard as commenters suggested. Including a consideration of the likelihood that a noncitizen will succeed on a petition, application, or other action pending outside of EOIR as a relevant factor for reopening is not meant to establish an onerous requirement for EOIR adjudicators. Rather, this factor, derived from *Matter of Avetisyan,* 25 I&N Dec. at 696, is meant to identify circumstances where there is little to no likelihood of success on an outside petition, application, or other action, such that recalendaring may be appropriate in light of the

totality of the circumstances. As discussed in section III.B.4 of this preamble, this factor is intended to ensure that administrative closure is reserved for cases with a realistic probability of relief outside of EOIR.

Fourth, the Department does not intend that EOIR adjudicators substantively adjudicate a noncitizen's ultimate eligibility for relief when assessing the recalendaring factor focusing on "the ultimate anticipated outcome [of] the case." 8 CFR 1003.1(l)(3)(ii)(G), 1003.18(c)(3)(ii)(G). Rather, this factor is included for the adjudicator to consider whether recalendaring is sought to request termination of proceedings or to seek relief before EOIR, among other actions, which would ultimately conclude removal proceedings. Using the commenter's example, if a noncitizen is moving to recalendar proceedings to seek relief for which they are newly eligible, and should the totality of the circumstances support recalendaring, then the EOIR adjudicator may decide to recalendar proceedings to allow the noncitizen to pursue that relief, which would bring finality to the removal proceedings. The EOIR adjudicator will not, as commenters suggested, determine the noncitizen's ultimate eligibility for relief outside of the normal course of proceedings before EOIR.

Fifth, the Department is of the opinion that the factors set forth in this rulemaking provide clear guidance to adjudicators that is more workable than a generalized "good cause" standard. Accordingly, the Department declines to codify a "good cause" standard for recalendaring proceedings and will retain the recalendaring provisions as proposed in the NPRM, with the addition of one factor—the ICE detention status of the noncitizen—as explained previously. *See id.* §§ 1003.1(l)(3)(ii)(H), 1003.18(c)(3)(ii)(H).

## C. Termination and Dismissal

### 1. Distinguishing Between Termination and Dismissal

*Comment:* Commenters expressed support for the rule's distinction between termination and dismissal, stating that it provided needed clarity to allow EOIR adjudicators and parties to focus on the substantive bases for disposition of a case rather than diverting attention to semantic or formal distinctions. However, some commenters stated that DHS motions to dismiss should not be granted as a matter of course or treated as dispositive; rather, commenters

emphasized the importance of allowing noncitizens the opportunity to provide argument before the motion is adjudicated. Commenters also explained that granting DHS motions to dismiss could foreclose a noncitizen's ability to pursue relief before EOIR.

*Response:* The Department agrees with the need to draw a distinction between termination and dismissal and has not made any additional changes to the language proposed by the NPRM. *See* 88 FR at 62262 (distinguishing between termination and dismissal); 8 CFR 1239.2(b). Regarding commenter concerns that DHS motions to dismiss may be treated as dispositive or granted as a matter of course, the Department reiterates that, while this rule clarifies the distinction between termination and dismissal, it does not otherwise alter how EOIR adjudicators evaluate motions, including DHS motions to dismiss. *See Matter of G–N–C–,* 22 I&N Dec. 281, 284 (BIA 1998) (explaining that the language of 8 CFR 239.2(a) (1998) and 239.2(c) (1998) "marks a clear boundary between the time prior to commencement of proceedings, where [DHS] has decisive power to cancel proceedings, and the time following commencement, where [DHS] merely has the privilege to move for dismissal of proceedings" and that, based on the distinction, "the regulation presumably contemplates not just the automatic grant of a motion . . . , but an informed adjudication by" EOIR adjudicators "based on an evaluation of the factors underlying [DHS's] motion").

Further, the Department notes that nothing in the rule mandates that a DHS motion to dismiss should be granted automatically or as a matter of course. Rather, the rule distinguishes between dismissal and termination and clarifies that DHS may only seek dismissal of proceedings for reasons specified in 8 CFR 239.2(a), as cross referenced by 8 CFR 239.2(c). *See* 8 CFR 1239.2(b) and (c). Otherwise, a motion to dismiss that is not in accordance with 8 CFR 239.2(a) "shall be deemed a motion to terminate" and adjudicated pursuant to the standards in this rule for those motions, which include consideration of a party's opposition to a motion to terminate. 8 CFR 1239.2(b); *id.* §§ 1003.1(m)(1)(ii), 1003.10(d)(1)(ii).

Moreover, the Department emphasizes that in scenarios where a noncitizen opposes dismissal of their case because they would prefer to pursue relief before EOIR in removal proceedings, nothing in the rule prevents the parties from presenting relevant evidence as to whether proceedings should be dismissed for any of the reasons provided in 8 CFR 239.2(a) or prevents

a noncitizen in removal proceedings before EOIR from indicating that they wish for proceedings to go forward despite a DHS motion to dismiss. Rather, motions to dismiss follow the same general motions practice before EOIR as any other type of motion, which includes responses to motions. *See generally* Immigration Court Practice Manual ch. 5; BIA Practice Manual ch. 5. As with any motion, before making a determination on a DHS motion to dismiss, an EOIR adjudicator will consider the basis for the motion, any opposition to the motion, and any relevant arguments and evidence presented by the parties. *See, e.g., Matter of G–N–C–,* 22 I&N Dec. at 284–85 (concluding that "a [DHS] motion to terminate proceedings must be adjudicated . . . as would any other motion" and finding error to the extent that an immigration judge terminated proceedings "without considering arguments from both sides").

In sum, the rule neither precludes noncitizens from making arguments regarding a DHS motion to dismiss, nor indicates that a DHS motion to dismiss should be granted as a matter of course. Therefore, the Department has retained the provision at 8 CFR 1239.2(b), as proposed in the NPRM, without further change.

## 2. Authority To Terminate Cases

*Comment:* One commenter stated that this rule would inappropriately give EOIR adjudicators the authority to terminate cases that is not supported by the INA or other law. The commenter opined that EOIR adjudicators only have the authority to terminate or dismiss a pending case if DHS cannot sustain the charges of removability, or if a noncitizen has obtained an immigration benefit or relief that gives them lawful status or U.S. citizenship, or renders the noncitizen no longer subject to removal. Citing section 240(c)(1)(A) of the Act, 8 U.S.C. 1229a(c)(1)(A), and *Matter of S–O–G– & F–D–B–,* 27 I&N Dec. 462 (A.G. 2018), the commenter asserted that EOIR adjudicators otherwise lack the authority to end removal proceedings entirely using termination or dismissal because the INA requires an immigration judge to decide whether a noncitizen is removable at the conclusion of removal proceedings. Specifically, the commenter stated that terminating cases to allow noncitizens to apply for an immigration benefit or relief from a separate agency is premature, presupposes that a noncitizen will receive a benefit or relief—despite EOIR not being the adjudicator of the relief—and conflicts with the statutory obligation to

determine whether a noncitizen is removable. The commenter also expressed concern about maintaining separation-of-function principles and stated that an immigration judge may not override or usurp DHS's exercise of prosecutorial discretion or authority.

*Response:* The Department disagrees with the commenter and believes that the termination and dismissal authorities implemented by this rule are fully consistent with the INA. As the Department explained in response to similar concerns related to administrative closure authority, *see* section III.B.1 of this preamble, the INA provides the Attorney General with the authority to promulgate regulations that the Attorney General deems necessary for implementing the INA, which includes overseeing EOIR's adjudication system. *See* INA 103(g)(1)–(2), 8 U.S.C. 1103(g)(1)–(2). Exercising this statutory authority, the Attorney General has promulgated regulations providing EOIR adjudicators with the general authority to "take any action consistent with their authorities" as "appropriate and necessary for the disposition" of cases. 8 CFR 1003.1(d)(1)(ii), 1003.10(b). The Department is now using this rulemaking to explicitly define these actions to include termination and dismissal. *See id.* ("Such actions include administrative closure, termination of proceedings, and dismissal of proceedings.").

By adding this language, the Department is making clear that termination and dismissal authority is "consistent with . . . authorities under the Act and the regulations." *Id.* §§ 1003.1(d)(1)(ii), 1003.10(b); *see also Gonzalez* v. *Garland,* 16 F.4th 131, 141 (4th Cir. 2021) (explaining that the general regulatory authority encompassing the termination of proceedings is consistent with the INA). Nothing in the INA explicitly precludes EOIR adjudicators from terminating or dismissing removal proceedings. *See Gonzalez,* 16 F.4th at 141–42 ("[W]e fail to see how the general power to terminate proceedings is '[in]consistent' with the authorities bestowed by the INA [and] . . . have found no provisions stating that [EOIR adjudicators] *cannot* terminate removal proceedings . . ."). Indeed, such authority is necessarily inherent in the statute, including, as noted by the commenter, when charges of removability cannot be sustained. *See, e.g., Matter of Sanchez-Herbert,* 26 I&N Dec. 43, 44 (BIA 2012) ("If the DHS meets its burden, the [i]mmigration [j]udge should issue an order of removal; if it cannot, the [i]mmigration [j]udge should terminate proceedings.").

The Department also believes these termination and dismissal provisions are consistent with the specific INA provisions governing removal proceedings. Much like administrative closure authority, termination and dismissal authority provides methods for EOIR adjudicators to manage the cases on their dockets in furtherance of their statutory responsibility to adjudicate cases. *See* INA 240(a)(1), 8 U.S.C. 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of [a noncitizen]."). For example, the discretionary termination provision raised by the commenter, which focuses on a noncitizen pursuing outside relief with USCIS, is consistent with this statutory scheme governing removal proceedings. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). In many cases, noncitizens in removal proceedings may be eligible for relief before USCIS that would, if granted, nullify the grounds of inadmissibility or removability in removal proceedings. Thus, authorizing, but not requiring, EOIR adjudicators to discretionarily terminate such cases, where appropriate, for noncitizens to pursue the specified relief furthers the statutory scheme by allowing USCIS to adjudicate relief that would directly affect whether the noncitizen is removable. *See Matter of Coronado Acevedo,* 28 I&N Dec. 648, 651–52 (A.G. 2022) (indicating that precluding termination of proceedings in certain common situations not accounted for in the regulations "would undermine fair and efficient adjudication" of cases in some instances, including where "termination is necessary for the respondent to be eligible to seek immigration relief before USCIS") (cleaned up).

Similarly, the Department also agrees with the Fourth Circuit's reasoning in *Gonzalez,* concluding that the INA's requirement that an immigration judge shall decide whether a noncitizen is removable at the conclusion of proceedings "certainly does not forbid a termination or delay of 'the proceeding.'" 16 F.4th at 141; INA 240(c)(1)(A), 8 U.S.C. 1229a(c)(1)(A).

Moreover, the Department, as well as DHS, have long recognized that termination is consistent with the INA by authorizing or acknowledging its use in certain circumstances, such as when it would allow noncitizens to seek specific relief or status that the INA makes available to them outside of removal proceedings. *See, e.g.,* 8 CFR 1239.2(f) (2023) (allowing a noncitizen to seek termination to proceed on a naturalization application if certain conditions are met); *see also id.*

214.14(c)(1)(i) (recognizing that a noncitizen may seek termination before EOIR while USCIS adjudicates their petition for U nonimmigrant status); *id.* 214.11(d)(1)(i) (recognizing that a noncitizen may seek termination before EOIR while USCIS adjudicates their petition for T nonimmigrant status). However, as explained in the NPRM, the Department believes that it is important for EOIR adjudicators to have termination authority outside of these existing circumstances, which do not capture all situations where EOIR adjudicators' exercise of that authority may be necessary or appropriate for the disposition of a case. *See, e.g.,* 88 FR at 62263–64 (discussing reasons for requiring or permitting termination in circumstances specified by the rule).

In opposing these changes, the commenter's reliance on *Matter of S–O–G– & F–D–B–* is misplaced. *Matter of S–O–G– & F–D–B–* held that immigration judges have no inherent authority to terminate or dismiss removal proceedings and that immigration judges may dismiss or terminate proceedings only under the circumstances expressly identified in the regulations or where DHS fails to sustain charges of removability. 27 I&N Dec. at 462. Notably, this decision did not call into question the validity of regulatory provisions expressly authorizing termination, and so does not support the proposition that termination and dismissal are not statutorily authorized. *Id.* at 463 (holding that EOIR adjudicators "may not terminate or dismiss those proceedings for reasons other than those expressly set out in the relevant regulations or where DHS has failed to sustain the charges of removability."). *Matter of S–O–G– & F–D–B–* instead focused on whether an EOIR adjudicator's general regulatory authority to take any necessary and appropriate actions includes termination. *See id.* at 466 (analyzing whether termination or dismissal would "exceed the authorized bases for dismissal or termination in the regulations").

In any event, *Matter of S–O–G– & F–D–B–* has been overruled by the Attorney General and its rationale for limiting termination and dismissal to certain narrow circumstances was previously rejected by the Fourth Circuit. *See Matter of Coronado Acevedo,* 28 I&N Dec. at 651 (explaining that "*S–O–G– & F–D–B–* has imposed rigid procedural requirements that would undermine . . . fair and efficient adjudication in certain immigration cases") (cleaned up); *Gonzalez,* 16 F.4th at 142. Furthermore, this rulemaking now clarifies the scope of an EOIR

adjudicator's termination authority by amending the general regulatory provision discussed in *Matter of S–O–G– & F–D–B–* to explicitly include termination as an available action. *See* 8 CFR 1003.1(d)(1)(ii), 1003.10(b).

For similar reasons, these provisions are also consistent with the policies underlying the INA by giving EOIR adjudicators the authority to terminate cases where it would advance the fairness and efficiency goals of the immigration system. *See Stone* v. *INS,* 514 U.S. 386, 398 (1995) (noting that "[u]nderlying considerations of administrative . . . efficiency and fairness to the [noncitizen]" are important considerations when interpreting the INA). The Department believes that this provision of the rule will help to promote fairness by allowing discretionary termination for noncitizens to pursue an application for relief or status with USCIS that Congress has made available to them. *See Meza-Morales* v. *Barr,* 973 F.3d 656, 665 (7th Cir. 2020) (explaining that "cases must be disposed of fairly, and granting a noncitizen the opportunity to pursue relief to which she is entitled may be appropriate and necessary for a fair disposition"). The Department believes that discretionary termination provisions would also help promote efficiency by saving adjudicatory resources for other cases that are ready for resolution in removal proceedings and by limiting the issues to be resolved by EOIR adjudicators should DHS initiate new proceedings.

The Department also disagrees with the commenter that the termination provisions raise separation-of-function concerns or impede DHS's prosecutorial authority in any way. The Department has fully considered the separate roles and responsibilities of DHS and EOIR in removal proceedings and has determined that codifying EOIR adjudicators' authority to grant termination under the specific circumstances identified in the rule is consistent with EOIR's independent adjudicatory authority and would not interfere with DHS's prosecutorial functions. It is well-established that DHS exercises its prosecutorial authority by initiating proceedings and that EOIR adjudicators do not have the authority to review that decision. *See, e.g., Matter of J–A–B– & I–J–V–A–,* 27 I&N Dec. 168, 170 (BIA 2017) (explaining that EOIR adjudicators do not have the authority to review DHS's decision to initiate removal proceedings in a particular case). This rule in no way precludes, alters, or reduces DHS's authority or ability to initiate

proceedings, as such a decision is exclusively within the purview of DHS.

Further, this rule implements several limitations to ensure that discretionary termination authority is not used in a manner that would otherwise conflict with DHS's prosecutorial authority. First, the rule limits the availability of termination to specific, well-defined scenarios. *See* 8 CFR 1003.1(m)(1), 1003.18(d)(1); *see also* 88 FR 62242, 62264 (explaining the bases for discretionary termination in specific discrete scenarios, including where the noncitizen is a beneficiary of TPS, deferred action, and deferred enforced departure, or where an immigrant visa is immediately available to the noncitizen and USCIS has granted a Form 601–A waiver).

Second, in cases where discretionary termination may be authorized because a noncitizen is seeking relief or lawful status that would end the need for continued removal proceedings, the rule imposes additional requirements to ensure that termination is not granted prematurely. For example, as discussed in section IV.G of this preamble, the Department has modified this provision to apply only to cases where the noncitizen has first filed their application with USCIS and has demonstrated prima facie eligibility for such relief, with limited exceptions. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). The Department believes that this modification will mitigate the risk that termination is granted where a noncitizen has no intention of filing the application or does not have a substantial likelihood of obtaining such relief. Additionally, the Department believes that the filing requirement will ensure a seamless transition of the noncitizen's case to USCIS and allow DHS to monitor the adjudication of that case and, if appropriate, refer the noncitizen to removal proceedings after the conclusion of any USCIS adjudications. *See* 8 CFR 239.1(a) (providing DHS immigration officers, including certain USCIS officers, with the authority to issue notices to appear in removal proceedings.).

Third, the rule only allows termination upon the motion of a party, thereby precluding an EOIR adjudicator's use of sua sponte termination. *See id.* §§ 1003.1(m)(1)(ii), 1003.18(d)(1)(ii).

Fourth, the rule also explicitly requires EOIR adjudicators to consider the parties' arguments in support of or in opposition to discretionary termination when adjudicating the motion to terminate, to ensure that the adjudicator has the full benefit of the parties' positions on such termination. The Department believes that this requirement will ensure that DHS's prosecutorial interests in the case are considered. If DHS believes that termination is not warranted in a particular case, the rule provides DHS with an opportunity to present its reasons for opposing termination and requires EOIR adjudicators to consider those reasons in deciding whether termination is necessary or appropriate in the case. *See id.* Additionally, the Department notes that DHS can appeal an immigration judge's decision to the Board or seek reconsideration should DHS disagree with termination. *See* 8 CFR 1003.38 (appeals); 1003.23 (reconsideration).

Fifth, the rule's catch-all discretionary termination ground explicitly provides that EOIR adjudicators may only terminate outside of the enumerated circumstances where, "[d]ue to circumstances comparable to" the enumerated provisions, "termination is similarly necessary or appropriate for the disposition or alternative resolution of the case." 8 CFR 1003.1(m)(1)(ii)(F), 8 CFR 1003.18(d)(1)(ii)(F). However, the rule specifies that the EOIR adjudicator may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion. *See* 8 CFR 1003.1(m)(1)(ii)(F), 8 CFR 1003.18(d)(1)(ii)(F).

Sixth, the Department notes that the rule does not require EOIR adjudicators to terminate proceedings with prejudice. In cases where an EOIR adjudicator terminates proceedings without prejudice, nothing in this rule precludes DHS from deciding, in the exercise of their prosecutorial authority and discretion, to reinitiate removal proceedings.

Seventh, the longstanding dismissal provision at 8 CFR 1239.2(c), which the Departments have retained in the final rule, reinforces the principle that EOIR adjudicators have no authority to grant discretionary termination for reasons that would encroach on DHS's exercise of prosecutorial discretion. That provision allows for dismissal of removal proceedings in certain circumstances related to DHS's exercise of prosecutorial discretion, such as where the charging document was "improvidently issued" or continuation of the case is no longer "in the best interest of the government." *See* 8 CFR 239.2(a)(6), (7). However, an EOIR adjudicator may only grant dismissal of proceedings for these reasons where DHS has affirmatively moved to dismiss the case on one of these grounds. The rule provides no similar basis for discretionary termination on the motion of the noncitizen. *See* 8 CFR 1003.1(m)(1)(ii), 1003.18(d)(1)(ii).

Taken together, the Department believes that these limitations and additional modifications of discretionary termination authority are sufficient to address any concerns that the rule would allow EOIR adjudicators to encroach on DHS's prosecutorial authority.

3. Mandatory Termination

*Comment:* Commenters provided several recommendations regarding the mandatory termination grounds. Commenters recommended modifying the factor covering scenarios when no charge of deportability, inadmissibility, or excludability can be sustained, to include "alienage." Commenters explained that, if DHS fails to establish alienage, then the case must be terminated.

*Response:* The Department believes it is unnecessary to explicitly include DHS's failure to establish alienage under the mandatory termination ground related to a failure to sustain the charges of inadmissibility against the noncitizen, as such scenarios are already encompassed by the mandatory termination ground for a failure to sustain charges of inadmissibility. 8 CFR 1003.1(m)(1)(i)(A), 1003.18(d)(1)(i)(A) (listing "[n]o charge of deportability, inadmissibility, or excludability can be sustained" as a ground for mandatory termination). By necessity, charges of inadmissibility are not sustainable if the noncitizen's alienage is not first established where relevant. *See* 8 CFR 1240.8(c) ("In the case of a respondent charged as being in the United States without being admitted or paroled, [DHS] must first establish the alienage of the respondent."). Additionally, as "alienage is a jurisdictional fact," *U.S. ex rel. Bilokumsky* v. *Tod,* 263 U.S. 149, 153 (1923) (citing *United States* v. *Sing Tuck,* 194 U.S. 161, 167 (1904)), if DHS fails to establish alienage, there would be no legal basis to continue proceedings, and, accordingly, proceedings must be terminated as required by law. 8 CFR 1003.1(m)(1)(i)(F); 1003.18(d)(1)(i)(F) (requiring termination where required by law); *see also* 8 CFR 1240.8.

*Comment:* Commenters also recommended that the standard for mandatorily granting joint or affirmatively unopposed motions to terminate should be expanded to also cover circumstances where DHS does not timely respond to the motion.

Commenters stated that this change would help avoid prolonging removal proceedings while waiting on DHS's response. Other commenters stated that joint or affirmatively unopposed motions to terminate should be granted without exception.

*Response:* As explained in section III.B.3 of this preamble in relation to the similar administrative closure provision, the Department does not believe that expanding the joint or affirmatively unopposed motion standard to DHS non-responses best serves the interests underlying this termination provision. *See* 88 FR at 62263 (explaining that joint and affirmatively unopposed motions should generally be granted as there is no adversarial interest). Moreover, any non-responsiveness from DHS will not substantially delay proceedings, as motions and responses are subject to EOIR adjudicator-imposed time limits. *See* 8 CFR 1003.23(a).

*Comment:* Commenters proposed adding an additional mandatory termination ground for noncitizens with an approved SIJ petition. Commenters stated that this would allow the noncitizen to remain in the United States pending the outcome of their SIJ adjustment of status application, which are currently subject to a backlog while awaiting a priority date.

*Response:* The Department declines to add a provision requiring termination for all individuals with an approved SIJ petition, as the Department does not believe that termination in every such case would be necessary or appropriate. Because an approved SIJ petition itself does not result in lawful status, the Department does not believe it should be included under the mandatory termination provision with other forms of relief that do provide lawful status. *See* 87 FR 13075 (noting that "SIJ is a 'classification'; an individual does not receive an actual 'status' until they become an LPR based on the underlying SIJ classification"). Depending on visa availability, the noncitizen may be able to apply to adjust status in concurrence with their SIJ petition or, if relevant, they may be considered for deferred action while awaiting a visa to become available. *See* USCIS, Policy Alert PA– 2022–10, *Special Immigrant Juvenile Classification and Deferred Action* (Mar. 7, 2022) ("USCIS SIJ Policy Alert") ("Due to ongoing visa number unavailability, the protection that Congress intended to afford SIJs through adjustment of status is often delayed for years, leaving this especially vulnerable population in limbo."). Alternatively, a noncitizen with an approved SIJ petition may never apply to adjust status.

By contrast, the mandatory termination provisions at 8 CFR 1003.1(m)(1)(i)(D) and 1003.18(d)(1)(i)(D) apply to situations in which "the noncitizen would not have been deportable, inadmissible, or excludable as charged if the noncitizen had obtained such status before the initiation of proceedings." Approved SIJ petitions do not meet this definition. *See* USCIS SIJ Policy Alert ("Noncitizens without lawful status who have an approved SIJ petition remain subject to removal . . . .").

This rule does not foreclose termination for noncitizens with approved SIJ petitions, but rather permits discretionary termination after the adjudicator has had the opportunity to consider whether termination may be appropriate for a given case—for example, where the noncitizen is prima facie eligible to adjust status or has received deferred action in connection with their SIJ classification. 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B) (discretionary termination where the noncitizen has demonstrated prima facie eligibility for an application, such as adjustment of status, that USCIS has jurisdiction to adjudicate); 8 CFR 1003.1(m)(1)(ii)(C), 1003.18(d)(1)(ii)(C) (discretionary termination where a noncitizen is the beneficiary of deferred action). The Department believes it is appropriate to limit mandatory termination under 8 CFR 1003.1(m)(1)(i)(D) and 1003.18(d)(1)(i)(D) to situations in which lawful status has been obtained and allow for broader discretion to terminate only as appropriate, particularly when a vulnerable category of noncitizens is still pursuing relief. This provision would allow adjudicators to consider a noncitizen's SIJ classification and availability of adjustment status or deferred action in determining whether termination is appropriate but would not require termination in any such case.

*Comment:* With regard to the mental competency termination ground, one commenter recommended providing standards detailing what qualifies as "mentally incompetent" and what constitutes "adequate safeguards." To do so, the commenter largely recommended codifying the *Matter of M–A–M–* standards, along with related best practices. *See* 25 I&N Dec. 474 (BIA 2011). Relatedly, another commenter believed this termination ground was improper, as it would leave the noncitizen in limbo without legal status and would likely result in a drain on public resources.

*Response:* The Department continues to believe that it is appropriate to include a termination ground covering scenarios when a noncitizen is not mentally competent and adequate safeguards are not available. 8 CFR 1003.1(m)(1)(i)(B), 1003.18(d)(1)(i)(B). Noncitizens must be afforded a procedurally fair hearing, and if a noncitizen lacks sufficient competency to proceed with a hearing, then safeguards must be implemented "'to protect the rights and privileges of the'" noncitizen. *Matter of M–A–M–,* 25 I&N Dec. at 478 (quoting section 240(b)(3) of the INA, 8 U.S.C. 1229a(b)(3)); *see also id.* at 483 (providing examples of safeguards). As the Board has recognized, "even where the court and the parties undertake their best efforts to ensure appropriate safeguards," concerns over the procedural fairness of proceedings may remain, and thus, the "[i]mmigration [j]udge may pursue alternatives with the parties." *Id.* at 483. The Department is of the opinion that termination of proceedings can be an appropriate alternative to carrying out proceedings that would not be fundamentally fair due to the noncitizen's lack of competency and the lack of appropriate safeguards.[4]

That said, the Department notes that "competency is not a static condition. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Id.* at 480 (quoting *Indiana* v. *Edwards,* 554 U.S. 164, 175 (2008) (internal quotations omitted)). Thus, should a noncitizen's mental competency be restored, or should adequate safeguards become available,

---

[4] The Department notes, however, that in many cases, legal representation is a proper and adequate safeguard. *See Matter of M–J–K–,* 26 I&N Dec. 773, 777 (BIA 2016) (noting that prior to determining that no adequate safeguards are available, the "proper course" of action is "to apply the safeguard of legal representation," as "[t]he participation of counsel increases the likelihood of finding a means to proceed fairly"). Moreover, the Board has permitted the use of administrative closure as an appropriate option to allow a noncitizen who is experiencing mental health issues impacting competency to seek treatment to mitigate competency issues so that fundamentally fair proceedings can go forward. *Matter of M–A–M–,* 25 I&N Dec. at 483. Given the wide array of safeguards available in immigration proceedings, the Department anticipates that only in rare cases will there be a lack of appropriate safeguards such that fundamentally fair proceedings are not possible. *See id.* at 481–83 (listing immigration regulations that provide guidance as to appropriate safeguards and drawing from case law to provide a non-exhaustive list of examples of safeguards that immigration judges may apply in cases where a noncitizen lacks mental competency). Ultimately, however, in cases involving issues of mental competency, an immigration judge is best positioned to determine which safeguards are appropriate under the circumstances of a particular case. *Matter of M–J–K–,* 26 I&N Dec. at 775.

nothing in this rulemaking prevents future, procedurally fair proceedings from going forward.

Additionally, the Department declines to codify broad regulatory standards related to mental competency in this rulemaking as requested by a commenter. The Department does not believe this rulemaking is the appropriate vehicle for such broad standards, as it only contains a single termination ground related to mental competency. Moreover, the Department similarly declines to define these terms solely for the purposes of this narrow termination provision, which would risk confusion with broader mental competency guidelines. Notably, however, the Board's decision in *Matter of M–A–M–,* 25 I&N Dec. 474 (BIA 2011), continues to provide applicable guidelines for assessment of competency issues in proceedings before EOIR. Accordingly, the Department does not believe that further codification of competency standards in this rulemaking is necessary at this time.

4. Discretionary Termination

*Comment:* Commenters recommended broadening the discretionary termination ground for an unaccompanied child (''UC'') to pursue asylum before USCIS to cover noncitizens previously determined to be UCs. Specifically, commenters stated that longstanding USCIS policy and a nationwide preliminary injunction extends USCIS's initial asylum jurisdiction not only to an individual determined to meet the UC definition at 8 CFR 1001.1(hh) during the course of EOIR proceedings, but also to individuals previously determined to be UCs, absent an affirmative act by DHS or HHS to terminate such a determination prior to the filing of the individual's asylum application. Commenters also stated that this section should explicitly defer to USCIS's determinations as to when a noncitizen is considered a UC.

Commenters also recommended treating the UC termination ground as mandatory rather than discretionary, which commenters stated would help safeguard due process for child applicants and help reduce the immigration court backlog.

In contrast, other commenters opposed this discretionary termination ground, stating that EOIR should keep UCs on their own dockets until they have had their asylum application adjudicated by USCIS. Commenters raised concerns that terminating proceedings before the UC has their asylum application adjudicated by USCIS would result in the Government losing track of the UC.

*Response:* After further consideration, and as detailed in section IV of this preamble, the Department is modifying the discretionary termination ground relating to UCs pursuing asylum before USCIS. *See* 8 CFR 1003.1(m)(1)(ii)(A), 1003.18(d)(1)(ii)(A). First, the Department is modifying this discretionary termination ground to apply to all noncitizens whose asylum applications are considered to have been filed by a UC such that USCIS may exercise initial jurisdiction pursuant to INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C). The Department recognizes that there may be circumstances, such as by court order, internal USCIS policy, or by a determination of a noncitizen's unaccompanied status, where applications are considered to have been filed by UCs specifically for purposes of this statutory provision. This change ensures that discretionary termination is available when necessary to allow qualifying noncitizens to pursue asylum relief before USCIS under INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C). This change is discussed in further detail in section IV.B of this preamble.

Second, the Department is modifying this UC provision to require the filing of an asylum application with USCIS before an EOIR adjudicator may grant discretionary termination. After further deliberation, the Department believes that this change will best ensure that the noncitizen does not enter a position where they do not have a relief application or removal proceeding pending. This change will therefore allow the Department and DHS to most efficiently track the noncitizen's status and take appropriate action subsequent to USCIS's adjudication of their asylum application.

However, the Department declines to make this provision mandatory rather than discretionary. The Department limited the mandatory termination provisions relating to outside relief to scenarios where such relief has already been obtained. *See* 8 CFR 1003.1(m)(1)(i)(C) and (D), 1003.18(d)(1)(i)(C) and (D). The Department believes it is more appropriate to make discretionary termination available when a noncitizen is still pursuing relief but does not currently have valid legal status. *See, e.g.,* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B) (discretionary termination available when pursuing relief with USCIS).

As the Department notes further, in section IV.C of this preamble, the final rule will require those considered to be

filing as UCs to have filed the asylum application with USCIS, rather than state an intent to file, as proposed in the NPRM, *see* 88 FR at 62264, because the Department believes that this change is necessary to ensure that EOIR adjudicators do not terminate cases involving such vulnerable groups without first mitigating the risk that their cases end up outside of the immigration process with no operationally feasible mechanism to ensure that such noncitizens will submit an affirmative application promptly to USCIS. The Department believes that ensuring that there will be a transition between proceedings before EOIR to proceedings before USCIS is particularly important for cases involving UCs and other similarly situated noncitizens so as to mitigate vulnerabilities of such individuals to trafficking, fraud, or abuse without actively pursuing a path for relief or protection or status. Such concerns would be exacerbated by a policy requiring mandatory termination for such individuals, and the EOIR adjudicator should have the discretion to consider whether termination might be appropriate in each case.

Additionally, the Department notes that this provision does not alter any substantive determinations regarding when, how, or by whom any UC determinations are made.

*Comment:* With regard to the discretionary termination ground based on prima facie eligibility for outside relief, some commenters recommended clarifying that immigration judges may determine prima facie eligibility for naturalization, rather than relying on an ''affirmative communication'' from USCIS. Commenters cited two Board decisions that they believed were erroneously decided and have resulted in USCIS holding an effective veto of an immigration judge's termination decision when the noncitizen is pursuing naturalization. *See Matter of Acosta Hidalgo,* 24 I&N Dec. 103 (BIA 2007); *Matter of Cruz,* 15 I&N Dec. 236 (BIA 1975).

*Response:* The Department notes that the Board, in *Matter of Acosta Hidalgo,* was interpreting the specific regulatory text of 8 CFR 1239.2(f) (2023), which is being removed and reserved in this rulemaking. *See* 24 I&N Dec. at 105–06. Similarly, in *Matter of Cruz,* 15 I&N Dec. at 237, the Board was interpreting the regulatory ''predecessor'' to 8 CFR 1239.2(f) (2023), which was ''essentially identical to'' 8 CFR 1239.2(f) (2023). 24 I&N Dec. at 104. Under the previous regulation, EOIR adjudicators were permitted to terminate removal proceedings only to allow a noncitizen

to proceed to a final hearing on a pending application or petition for naturalization when the noncitizen demonstrated prima facie eligibility and the matter involved exceptionally appealing or humanitarian factors. *See* 8 CFR 1239.2(f) (2023). The Board's holdings in the cases cited by the commenters do not apply to the provisions of this rule, which, while designed to include the circumstances described under former 8 CFR 1239.2(f), are broader in nature. *Compare* 8 CFR 1239.2(f) (2023) ("An immigration judge may terminate removal proceedings to permit the [noncitizen] to proceed to a final hearing on a pending application or petition for naturalization when the [noncitizen] has established prima facie eligibility for naturalization and the matter involves exceptionally appealing or humanitarian factors; in every other case, the removal hearing shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state of the proceedings."), *with* 8 CFR 1003.1(m)(1)(ii)(B) *and* 8 CFR 1003.18(d)(1)(ii)(B) (authorizing termination where "[t]he noncitizen is prima facie eligible for naturalization").

Additionally, circuit courts have criticized the framework established by *Acosta Hidalgo* and former 8 CFR 1239.2(f) (2023) together, noting that it has created operational frustrations, as well as inefficiencies, inconsistencies, and confusion. In particular, *Perriello* v. *Napolitano,* 579 F.3d 135, 140 (2d Cir. 2009), asserted that former 8 CFR 1239.2(f) (2023) was "antiquated" in light of amendments made by the Immigration Act of 1990 ("IMMACT") to the naturalization process. Public Law 101–649, 511(a), 104 Stat. 4978, 5044. As relevant, the changes made by IMMACT, and as codified with minor changes, provide that ". . . no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding . . . ." IMMACT § 407(d)(3), 104 Stat. at 5041; INA 318, 8 U.S.C. 1429. After this amendment, some courts called into question the continued viability of former 8 CFR 1239.2(f) (2023). *See Perriello,* 579 F.3d at 140 (collecting cases). In *Acosta Hidalgo,* the BIA reaffirmed that EOIR adjudicators must "require some form of affirmative communication" from DHS before terminating under former 8 CFR 1239.2(c) (2023).

This framework was confusing, *Perriello* stated, whereby former 8 CFR 1239.2(f) (2023) required an "affirmative communication" by DHS regarding prima facie eligibility for naturalization before terminating removal proceedings,

but where the statute prohibited consideration of an application while the removal proceedings were pending, which could be read to include a prohibition on assessments of prima facie eligibility. *Perriello,* 579 F.3d at 142. The court stated that "[t]he law, in effect, seems to be chasing its tail." *Id.* at 138. Recognizing these concerns, and as discussed in section IV.F of this preamble, this rule eliminates the certification requirement while continuing to recognize DHS's role in the naturalization context. This rule, which authorizes EOIR adjudicators to make a prima facie inquiry into naturalization eligibility, will provide significant efficiencies, and address operational frustrations, inconsistencies, and confusion over adopting a similar requirement to the holding in *Acosta Hidalgo* in relevant cases involving naturalization applications, as EOIR adjudicators will no longer be reliant on USCIS prima facie naturalization determinations before they may adjudicate a motion to terminate, and parties will no longer be required to obtain and produce such certifications.[5] The Department notes that evidence of any such certification from USCIS may be considered by the EOIR adjudicator in determining whether to terminate under this provision. Additionally, this provision does not require EOIR adjudicators to terminate in any case where a noncitizen asserts they are eligible to naturalize, and to the extent that the adjudicator determines that such certification is necessary to render a decision on termination, the

adjudicator may request that the parties produce such a certification.

Moreover, permitting EOIR adjudicators to make an inquiry into a noncitizen's prima facie eligibility for naturalization, despite not having jurisdiction to adjudicate naturalization applications, is consistent with agency practice in analogous contexts. For example, although USCIS has exclusive jurisdiction over U visa applications, an EOIR adjudicator is permitted to assess a noncitizen's prima facie eligibility for U nonimmigrant status. *See Matter of Sanchez-Sosa,* 25 I&N Dec. 807, 813–14 (BIA 2012) (setting forth the inquiry into prima facie eligibility for U nonimmigrant status). Given that EOIR adjudicators lack jurisdiction over naturalization applications, EOIR adjudicators' determinations as to noncitizens' prima facie eligibility for naturalization will not be binding on USCIS.

In sum, nothing in the INA or the regulatory text requires an "affirmative communication" from USCIS as to a noncitizen's prima facie eligibility for naturalization, as this rule authorizes EOIR adjudicators to assess whether a noncitizen is prima facie eligible for naturalization when termination is sought on that basis. 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). Under this rule, immigration judges would not assess prima facie eligibility for naturalization as a part of a noncitizen's naturalization application, INA 318, 8 U.S.C. 1429 ("the findings of the Attorney General in terminating removal proceedings . . . shall not be deemed binding in any way . . . with respect to the question of whether such person has established [] eligibility for naturalization as required by this subchapter"), but rather solely for the purpose of assessing whether termination would be necessary or appropriate to allow the noncitizen to have their application considered by DHS. Nevertheless, as discussed in more detail in section IV.F of this preamble, this rule continues to acknowledge both DHS's unique role as sole administrators over the process to obtain permanent (with limited exceptions) citizenship in the United States and Congress's directive that pending removal proceedings—which are initiated and prosecuted by DHS—should bar consideration of naturalization applications, by limiting termination to pursue a naturalization application to those instances where DHS does not oppose a noncitizen's motion to terminate. 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

*Comment:* Commenters recommended adding standalone discretionary

---

[5] As acknowledged in *Acosta Hidalgo,* the Department cannot compel DHS to produce such a certification, 24 I&N Dec at 107, and where DHS has not done so, cases have unnecessarily stalled without progress towards resolution, leaving the parties in a state of uncertainty and confusion. For example, in *Perriello,* the court stated that "nothing seems to compel DHS to make such a determination [on the noncitizen's prima facie eligibility for naturalization], let alone to issue such a communication." 579 F.3d at 138. *Perriello* also stated that "[i]n some cases . . . DHS has adjudicated naturalization applications while [noncitizens] have awaited termination of their removal proceedings, notwithstanding the bar in [INA 318, 8 U.S.C. 1429] . . . . And in yet other cases, no determination of prima facie eligibility has been made by anybody, leaving [noncitizens] to pursue writs of mandamus in an effort to compel DHS to produce 'affirmative statement[s]' as to prima facie eligibility." *Id.* at 140–41. To illustrate the potentially confusing results, *Perriello* cited an unpublished district court case where a noncitizen had petitioned for relief after DHS concluded that it lacked jurisdiction over the noncitizen's naturalization application, but nonetheless advised that the noncitizen was not prima facie eligible for naturalization. *Id.* In the same case, an immigration judge had previously ruled that the noncitizen was prima facie eligible for naturalization, but the BIA reversed, holding that Board precedent prohibited the immigration judge from making that determination. *Id.*

termination grounds for noncitizens with certain pending USCIS applications, including T visas, U visas, Violence Against Women Act ("VAWA") self-petitions, and SIJ petitions. For example, commenters noted that a standalone discretionary termination ground would be important for many noncitizens with approved SIJ petitions, but who are awaiting a visa priority date. Commenters stated that the rulemaking's existing discretionary termination ground for noncitizens with deferred action—which would cover SIJ applicants in many circumstances—is not sufficient. Commenters explained deferred action for SIJ applicants is purely discretionary and may be removed by a future administration, thereby foreclosing future discretionary termination for SIJ applicants.

One commenter also recommended adding a discretionary termination ground for noncitizens with bona fide determinations from USCIS, but who are awaiting visa availability. The commenter explained that, in these circumstances, the noncitizen already has an otherwise approvable form of relief, and termination would be more efficient than administrative closure while simply waiting on visa availability.

*Response:* The Department declines to add specific discretionary termination grounds for various forms of relief proposed by commenters because the rule's existing termination grounds already broadly cover those forms of relief. The rule includes a discretionary termination ground for a noncitizen who is prima facie eligible for naturalization, lawful status, or relief from removal that USCIS has jurisdiction to adjudicate, and the noncitizen has filed the petition, application, or other action with USCIS, though no filing is required where the noncitizen is prima facie eligible for adjustment of status or naturalization. This would broadly include the types of relief noted by commenters, including T visas, U visas, VAWA self-petitions, and SIJ petitions. 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). More specifically, the Department declines to add standalone discretionary termination grounds for SIJ applicants as proposed by commenters, as speculation of which status categories may receive deferred action under future administrations is outside the scope of this rule.

Further, as explained in more detail in section IV.H of this preamble, the Department is modifying this discretionary termination ground to clarify that EOIR adjudicators may not terminate cases for the express purpose of allowing a noncitizen—other than a

noncitizen who has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C), pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh)—to pursue an asylum application before USCIS. This limitation on termination requires the noncitizen to establish that they warrant termination based on a form of relief that USCIS may adjudicate, but the noncitizen may not seek termination for the purpose of pursuing an affirmative asylum application before USCIS. *Id.* This limitation would also not apply to joint or affirmatively unopposed motions to terminate for the express purpose of permitting a noncitizen to pursue asylum before USCIS where no other relief is being sought, as such motions would be covered under termination provisions designed to address joint or affirmatively unopposed motions. 8 CFR 1003.1(m)(1)(i)(G); 8 CFR 1003.18(d)(1)(i)(G).

Similarly, the Department declines to add a specific discretionary termination ground for noncitizens with bona fide determinations from USCIS. However, the Department notes that such evidence would be relevant to an EOIR adjudicator's determination on any motion to terminate. For example, such evidence may weigh heavily in favor of the noncitizen under the factor concerning prima facie eligibility for relief with USCIS.

*Comment:* One commenter recommended treating the discretionary termination ground for T and U visa applicants in which the parties have filed a motion to terminate under 8 CFR 214.11(d)(1)(i) or 214.14(c)(1)(i) as a mandatory termination ground. The commenter stated that, because these grounds require a joint motion, it should be subject to the mandatory "joint or unopposed" termination ground.

*Response:* In response to commenter concerns, the Department has decided not to finalize the discretionary termination ground related to T and U visas as proposed in the NPRM. As relevant here, a commenter noted that in the proposed discretionary termination ground for U and T visas, the cross-referenced DHS regulatory provisions— 8 CFR 214.11(d)(1)(i) and 214.14(c)(1)(i)—discuss joint motions to terminate. *See, e.g.,* 8 CFR 214.11(d)(1)(i) ("In its discretion, DHS may agree to the [noncitizen]'s request to file with the immigration judge or the Board a joint motion to . . . terminate proceedings without prejudice, . . . while an application for T nonimmigrant status is adjudicated by USCIS."). In turn, the proposed rule referenced these T and U visa regulatory

provisions under the discretionary termination grounds. However, the Department now clarifies that any jointly filed motions to terminate, including those referenced by these provisions, should be considered under the mandatory "joint or unopposed" motion termination ground. *See* 8 CFR 1003.1(m)(1)(i)(G), 1003.18(d)(1)(i)(G). Should any motions described in the DHS regulatory provisions related to U and T visas be presented before EOIR, those motions would constitute joint motions and would be governed by 8 CFR 1003.1(m)(1)(i)(G) or 1003.18(d)(1)(i)(G). Thus, the Department has decided not to finalize the discretionary termination provision cross referencing DHS's regulations addressing T and U visa applicants because, as proposed, it was superfluous. Instead, such motions will be controlled by the joint motions provisions finalized in this rule.

## 5. Specific Calls for Comments

### i. Additional Constraints on Termination

*Comment:* Commenters recommended modifying the termination provisions to state that immigration judges and the Board may not terminate a case if the noncitizen objects to termination, unless termination is required by law. Commenters stated that this would ensure that noncitizens are not foreclosed from pursuing relief before EOIR due to their removal proceeding being terminated.

Another commenter proposed allowing adjudicators to have the discretion to terminate proceedings based on compelling humanitarian grounds in rare and exceptional circumstances. In contrast, other commenters stated that immigration judges should not be allowed to terminate cases before a noncitizen has applied for relief outside of EOIR, as such termination would be premature.

One commenter recommended creating an exhaustive list of circumstances that would authorize an EOIR adjudicator to terminate or dismiss cases, and further limiting such grounds to those where DHS cannot sustain the charges of removability or where the noncitizen has obtained lawful status or U.S. citizenship, or otherwise renders the noncitizen no longer subject to removal.

Separately, a commenter recommended that, when DHS moves for termination, the immigration judge should be required to explain the effect of termination to pro se noncitizens and to solicit their views before adjudicating the motion.

*Response:* First, the Department declines to remove an EOIR adjudicator's ability to terminate proceedings over a party's objection, whether that party be the noncitizen or DHS, with the exception of discretionary motions to terminate for a noncitizen to seek naturalization. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B) (''Where the basis of a noncitizen's motion for termination is that the noncitizen is prima facie eligible for naturalization, the [EOIR adjudicator] shall not grant the motion if it is opposed by DHS.''). This limitation on the EOIR adjudicator's ability to terminate for a noncitizen to seek naturalization when DHS opposes is discussed in greater detail in section IV.F of this preamble.

Notwithstanding the foregoing, as explained in response to a similar request regarding administrative closure, *see supra* section III.B.5.iii of this preamble, the Department believes that the importance of providing EOIR adjudicators with the authority to take ''necessary or appropriate'' action for the disposition or alternative resolution of cases weighs in favor of providing adjudicators with the ability to terminate proceedings over a party's objection. *See* 8 CFR 1003.1(m)(1)(ii); 8 CFR 1003.10(b). Moreover, precluding an EOIR adjudicator from terminating proceedings over a noncitizen's objection—absent a conforming provision for a DHS objection to termination—would result in a procedural imbalance between the parties. Thus, for procedural fairness, the Department declines to add a regulatory provision precluding the EOIR adjudicator from terminating proceedings over the objection of one party.

Notably, the mandatory termination grounds cover situations in which: the individual in proceedings is not removable, is a citizen, or has obtained certain legal status; both parties have jointly requested, or one party has affirmatively non-opposed, termination; fundamentally fair proceedings are not possible due to mental incompetency; or termination is otherwise required by law. *See* 8 CFR 1003.1(m)(1)(i), 1003.18(d)(1)(i). Thus, mandatory termination is intended for scenarios where removal proceedings are no longer needed, even despite possible party objections. Thus, the Department does not anticipate that noncitizens generally would object to termination of proceedings when the foregoing termination grounds are implicated; rather, the Department believes that noncitizens more likely will be requesting termination or will be joining

or affirmatively indicating non-opposition to a DHS motion in these scenarios.

Similarly, for discretionary termination, the Department notes that the enumerated discretionary termination grounds are mainly focused on allowing parties to request termination when a noncitizen may be eligible for a lawful status outside of removal proceedings. *See, e.g.,* 8 CFR 1003.1(m)(1)(ii), 1003.18(d)(1)(ii) (discretionary termination grounds include, for example, noncitizens pursuing relief with DHS or who are the beneficiaries of certain programs). Therefore, the Department believes that, in most cases, noncitizens will be requesting or unopposed to discretionary termination under these provisions. Moreover, even if a noncitizen were to object to a DHS motion to terminate, the Department anticipates that termination over a noncitizen's objection would be rare, particularly where the noncitizen wishes to continue pursuing a relief application in removal proceedings.

However, for clarity, and as explained further in section IV of this preamble, the Department is modifying the rule's discretionary termination language to explicitly state that an EOIR adjudicator ''shall consider the reason termination is sought and the basis for any opposition to termination when adjudicating the motion to terminate.'' 8 CFR 1003.1(m)(1)(ii), 1003.18(d)(1)(ii). The Department believes that this addition will help further clarify that arguments related to a motion for discretionary termination, and particularly any opposition to such a motion, will be considered by the EOIR adjudicator in the course of adjudicating the motion, consistent with longstanding motions practice. *See generally* Immigration Court Practice Manual, ch. 5; BIA Practice Manual, ch. 5, *https://www.justice.gov/eoir/manuals-and-memoranda.*

Further, should either party disagree with the EOIR adjudicator's decision regarding termination, then filing a motion to reconsider the decision or an appeal of the decision may be options for redress. *See generally* 8 CFR 1003.23 (motions to reconsider), 1003.38 (appeals); *see also Matter of Sanchez-Herbert,* 26 I&N Dec. 43 (considering appeal of immigration judge's decision to terminate proceedings).

Next, the Department declines to expand the termination grounds to allow EOIR adjudicators to terminate proceedings based on certain humanitarian grounds, absent DHS consent. As explained in the NPRM, the Department limited such authority to

avoid encroaching on DHS's sole authority to commence removal proceedings, or to exercise prosecutorial discretion where relevant. 88 FR at 62264–65; *see also* 8 CFR 239.1(a) (providing DHS with sole discretion to commence removal proceedings). For example, as the Board observed in *Matter of M–F–O–,* an immigration judge should not terminate proceedings based on the view that the respondent is a low enforcement priority. 28 I&N Dec. 408, 415 n.11 (BIA 2021) (''Although the respondent argues on appeal that he is a low enforcement priority and that his removal proceedings should be terminated or dismissed without prejudice on this basis, it is within [DHS]'s prerogative to exercise prosecutorial discretion in that manner.'' (citing *Matter of J–A–B– & I–J–V–A–,* 27 I&N Dec. at 170 & n.3)).

Further, the Department declines to limit discretionary termination authority to only the specified circumstances listed in the rule, 8 CFR 1003.1(m)(1)(ii)(A) through (E); 8 CFR 1003.18(d)(1)(ii)(A) through (E), as commenters suggested. The Department included a limited catch-all ground for circumstances comparable to the enumerated discretionary termination grounds where such termination is ''necessary or appropriate for the disposition or alternative resolution of the case.'' 8 CFR 1003.1(m)(1)(ii)(F), (m)(2)(ii), 1003.18(d)(1)(ii)(F), (d)(2)(ii). The Department believes that this provision will help ensure EOIR adjudicators have sufficient authority to terminate proceedings when necessary or appropriate, particularly in new or unique circumstances not contemplated by this rule. The Department also notes that this catch-all ground includes specific limitations to prevent unfettered termination, such as prohibiting EOIR adjudicators from terminating a case ''for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.'' *Id.*

In the course of this rulemaking, the Department has reevaluated the discretionary termination ground for cases in which a noncitizen is pursuing relief outside with USCIS. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). After additional consideration, the Department is concerned that the language in the proposed rule, absent any additional limitations, could be read to authorize the termination of a case for the express purpose of allowing a noncitizen to apply for asylum before USCIS, other than a noncitizen who has filed an asylum application with USCIS

pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C), pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh). The final rule precludes such a result, as consistent with the NPRM. *See* 88 FR at 62264 (explaining that "the Department does not intend this proposed ground for discretionary termination to authorize a general practice of terminating proceedings involving prima facie eligibility for asylum" and stating that "the default rule that EOIR adjudicators continue to exercise authority over asylum applications filed by noncitizens in removal proceedings would continue to apply"). These revisions are more consistent with the overall regulatory structure, as 8 CFR 1208.2(b) provides that immigration judges "have exclusive jurisdiction over asylum applications filed by [a noncitizen] . . . after the charging document has been filed with the Immigration Court."

Accordingly, the Department has modified these provisions to clarify that an EOIR adjudicator shall not terminate a case for a noncitizen to pursue an asylum application before USCIS, except as provided for in 8 CFR 1003.1(m)(1)(ii)(A) and 1003.18(d)(1)(ii)(A). 8 CFR 1003.1(m)(1)(ii)(B) (Board), 1003.18(d)(1)(ii)(B) (immigration judges).

Relatedly, the Department has modified the discretionary termination ground focusing on petitions, applications, or other actions that a noncitizen pursues with USCIS to include language requiring that the noncitizen has filed such application, petition, or other action before termination may be granted, though no filing is required where the noncitizen is prima facie eligible for adjustment of status or naturalization. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). Thus, the Department believes that this change is responsive to commenter concerns that EOIR adjudicators "should not be allowed to terminate cases before a noncitizen has applied for relief outside of EOIR." This change is discussed further at section IV.G of this preamble.

The Department declines to amend the rule's termination provisions to include special rules applicable to unrepresented noncitizens, as commenters suggested. The Department is cognizant of the "disadvantages faced by uncounseled noncitizens," *Quintero* v. *Garland,* 998 F.3d 612, 627 (4th Cir. 2021), and acknowledges that the immigration judge's "duty to fully develop the record" is "especially crucial in cases involving unrepresented noncitizens," *id.* However, the

Department declines to adopt different procedural rules based on representation status, which present administrability concerns as representation status can change throughout proceedings. Rather, the Department believes that immigration judges will adequately explain the implications of a motion to terminate to an unrepresented noncitizen, as well as solicit the noncitizen's position on termination prior to ruling on a motion, as these actions are already part of an immigration judge's duty to develop the record.

ii. Termination Without Prejudice to DHS

*Comment:* Commenters stated that terminations should not be automatically considered "without prejudice," explaining that this would limit finality for noncitizens in removal proceedings and may violate the claim preclusion doctrine and the structure of the INA, which commenters stated should prevent DHS from reinitiating proceedings based on the same facts. Another commenter suggested that the Department codify a list of non-exhaustive scenarios in which termination with prejudice may be warranted, including circumstances involving: (1) dilatory conduct by DHS, including filing multiple Notices to Appear and failure to prosecute; (2) DHS counsel repeatedly appearing for hearings unprepared or failing to disclose evidence; (3) DHS counsel's failure to attend any hearings; (4) subsequent judicial decisions; (5) the granting of benefits to respondent by USCIS; and (6) the violation of settlement agreements or injunctions.

*Response:* The Department declines to delineate via regulation whether termination of proceedings should be with or without prejudice. EOIR adjudicators have the authority to take "any action consistent with their authorities . . . as necessary or appropriate for the disposition or alternate resolution of the case," and this authority includes termination of proceedings, as guided by the individual facts and circumstances of the case. 8 CFR 1003.1(d)(1)(ii), 1003.10(b); *see id.* §§ 1003.1(m)(2)(ii), 1003.18(d)(2)(ii). The Department is of the belief that further delineating the specific scenarios suggested by commenters where termination of proceedings would be "with prejudice" does not provide EOIR adjudicators the needed flexibility to consider the individual facts and circumstances of each case.

Relatedly, should a noncitizen's proceedings before EOIR be terminated,

and should DHS place that same noncitizen into new proceedings before EOIR, then EOIR adjudicators have the ability and expertise to determine whether DHS's initiation of new proceedings is impacted in any way by the prior termination order.

In declining to introduce termination prejudice standards by regulation, the Department notes that, in many circumstances, termination of removal proceedings is without prejudice. *See, e.g., B.R.* v. *Garland,* 26 F.4th 827, 840 (9th Cir. 2022) (explaining that the remedy for certain regulatory violations is termination without prejudice). The Department further notes that for a "decision by an immigration judge [to have] a preclusive effect" an "issue must have been actually litigated," and "the determination of the issue" must have been necessary to the judgement. *Islam* v. *Sec., Dep't of Homeland Security,* 997 F.3d 1333, 1341 (11th Cir. 2021) (internal quotation marks omitted); *see Ali* v. *Barr,* 951 F.3d 275, 283 (5th Cir. 2020); *Alvear-Velez* v. *Mukasey,* 540 F.3d 672, 677 (7th Cir. 2008). Moreover, "a dismissal without prejudice is not a decision on the merits for purposes of res judicata." *Abpikar* v. *Holder,* 544 F.App'x 719, 721 (9th Cir. 2013) (quoting *Oscar* v. *Alaska Dep't of Educ. & Early Dev.,* 541 F.3d 978, 981 (9th Cir. 2008)).

In sum, the Department is confident that EOIR adjudicators are equipped to make a determination as to the appropriateness of termination of proceedings in each individual case, and therefore, the Department declines to adopt standards governing the issue of termination "with prejudice" in this rulemaking.

iii. Sua Sponte Termination

*Comment:* Commenters generally opposed inclusion of sua sponte termination authority. Commenters stated that, if an adjudicator believes termination is appropriate, the adjudicator should invite both parties to share their views on termination and treat such views as oral or written motions. Commenters explained that this would allow the parties to provide valuable input, particularly noncitizens who may wish to proceed with their removal proceedings to pursue relief. Other commenters stated that, if the Department includes sua sponte termination authority, parties should be provided proper notice, including a proposed 60-day notice of intent to terminate. Additionally, commenters stated that any sua sponte termination authority should not be allowed over a noncitizen's objection.

*Response:* After consideration, the Department has decided not to provide for sua sponte termination authority when termination is not mandatory. Accordingly, the Department has modified the regulatory text to make clear that a motion from a party is required before an EOIR adjudicator may terminate a case in the exercise of discretion. *See* 8 CFR 1003.1(m)(1)(ii), (m)(2)(ii), 1003.18(d)(1)(ii), (d)(2)(ii). The Department wishes to ensure that the parties are able to provide evidence and arguments in support or opposition to discretionary termination before the EOIR adjudicator makes such a determination. As explained by commenters, there may be instances, for example, when a noncitizen may oppose discretionary termination because they wish to pursue relief before EOIR. However, the Department notes that, in practice, if the adjudicator believes that termination of proceedings may be an appropriate disposition of the case, the adjudicator can raise that issue with the parties. If a party is then interested in seeking termination, the adjudicator may inquire whether the party wishes to move for termination. For those cases before the Board, the adjudicator may request supplemental briefing from the parties to ensure that the positions of the parties are considered as part of the decision whether to terminate proceedings. 8 CFR 1003.3(c). This ensures that the parties can indicate their positions on termination for the record prior to the adjudicator ruling upon the motion to terminate.

iv. Evidence Required

*Comment:* Some commenters stated that noncitizens should not be required to produce evidence of a filing with USCIS as a prerequisite for termination, as such filings may take a significant amount of time to prepare. Commenters noted that such a requirement would, therefore, keep cases on the immigration judge's docket unnecessarily while such filings were being completed. Rather, commenters believed that a finding of prima facie eligibility for relief before USCIS should be sufficient to terminate proceedings. In contrast, other commenters stated that proof of filing with USCIS should be required, but that United States Postal Service ("USPS") tracking or signature confirmation, along with a copy of the application, should be sufficient.

Other commenters recommended that, for purposes of terminating based on underlying legal status, the rulemaking should explicitly state that immigration judges may accept any credible evidence of legal status. Commenters

noted that they previously encountered issues with the availability of specific evidence requested by immigration judges, which resulted in the denial of their motions to terminate.

*Response:* After further consideration, the Department is modifying the relevant discretionary termination ground to require proof of filing with USCIS as a prerequisite to termination. Specifically, the Department has modified the discretionary termination ground focusing on petitions, applications, or other actions that a noncitizen pursues with USCIS seeking relief from removal or lawful status, to include language requiring that the noncitizen has filed such application, petition, or other action. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). In making this change, the Department also included an exception to this USCIS filing requirement for prima facie-eligible adjustment of status applications, so as not to preclude USCIS from accepting adjustment applications because a noncitizen is in removal proceedings. *See id.*

The Department believes this change will help ensure that EOIR is not prematurely terminating proceedings when a relevant application has not yet been filed with USCIS. This filing requirement will also help DHS and EOIR efficiently monitor the status of noncitizens by ensuring that a noncitizen placed into removal proceedings either files an application with USCIS or remains in removal proceedings until final adjudication. Moreover, in cases in which the noncitizen is in the process of preparing their application for filing with USCIS, they may request continuances or administrative closure before EOIR, as relevant, in the interim. If their requests are granted, continuances or administrative closure could significantly reduce the active resources being devoted to the noncitizen's case while they prepare their application for filing. Thus, the Department disagrees with commenter concerns that leaving such cases on the EOIR adjudicator's calendar or docket while noncitizens prepare their applications for filing would necessarily be less efficient than terminating proceedings, even where such filings may take a significant amount of time to complete. Additionally, there is a possibility that—despite the party's stated intent— the relevant petition, application, or action will never successfully be filed with USCIS. To avoid this scenario after proceedings have already been terminated, the Department has added a requirement that the party seeking discretionary termination under this

provision must provide proof of filing with USCIS before the EOIR adjudicator may terminate proceedings, unless the specific petition, application, or action is excepted from the filing requirement. 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

Separately, the Department declines to include explicit language regarding substantive evidentiary standards for motions to terminate. The rule does not limit the types of evidence that an EOIR adjudicator may consider in making a termination decision. Rather, the rule provides EOIR adjudicators with the flexibility to determine whether any submitted evidence is sufficient to grant termination. *See generally Matter of Interiano-Rosa,* 25 I&N Dec. at 265 ("Immigration [j]udges have broad discretion . . . to admit and consider relevant and probative evidence."). Imposing an "any credible evidence" standard, as proposed by commenters, may be too lenient in some circumstances, as an EOIR adjudicator may determine that certain relevant evidence is necessary before granting termination in a specific case.

*D. Sua Sponte Reopening or Reconsideration and Self-Certification*

*Comment:* Commenters expressed support for restoring the Board's traditional authority to sua sponte reopen or reconsider a case, as well as support for restoration of the Board's self-certification authority, noting that these changes provide important procedural protections and provide noncitizens with an avenue to pursue newly available relief.

One commenter recommended providing a non-exhaustive list of circumstances that would qualify as "exceptional circumstances" for sua sponte reopening or reconsideration. Another commenter recommended renaming sua sponte reopening to "reopening in the interests of justice," in order to avoid confusion as parties are often requesting the immigration judge or the Board to exercise their sua sponte reopening authority.

In contrast, another commenter raised concerns with this sua sponte authority, stating that it raised finality concerns for noncitizens whose cases have been positively resolved. As a result, the commenter recommended providing for automatic stays if the Board sua sponte reopened proceedings or, alternatively, guidance on granting discretionary stays in such circumstances.

Separately, commenters also recommended instituting a "mailbox rule" at the Board as an additional alternative to self-certification or sua sponte authority. Commenters

explained that such a rule, which would treat a document as timely once mailed, would provide another avenue for remedying filings that arrive late.

Additionally, one commenter proposed an amendment to the regulations governing motion to reopen time and numerical limitations, which the AA96 Final Rule had modified to include additional exceptions as a safety valve when curtailing adjudicators' sua sponte reopening authority. Specifically, the commenter requested the Department add an additional exception to the motion to reopen time and numerical limitations for when DHS affirmatively non-opposes a motion to reopen. The commenter noted that there is an existing exception to the time and numerical limitations for joint motions to reopen, and requested the language be modified to use the ''joint and affirmatively unopposed'' standard from motions to terminate in this rulemaking.

*Response:* After further consideration, the Department declines to delineate specific scenarios that would qualify as ''exceptional circumstances'' for sua sponte purposes. As explained in the NPRM, the Department believes that the current standard is a workable standard, *see* 88 FR at 62266, and if further clarity is needed, specific scenarios can be addressed through the publication of Board decisions, as necessary, *see id.* Further, the Department believes that changing the terminology of sua sponte authority, which has been consistent in use for decades, would give rise to greater confusion than its use engenders and therefore declines to rename sua sponte authority. *See, e.g., Matter of X– G–W–,* 22 I&N Dec. 71 (BIA 1998).

The Department also declines to add explicit stay-related language to cover scenarios when the Board sua sponte reopens or reconsiders proceedings. Under current regulations, orders of removal are stayed while an appeal is pending, and any case that is reopened or reconsidered would return to a pending posture. *See* 8 CFR 1003.6(a) (stating that a removal order ''shall not be executed . . . while an appeal is pending . . . .''). Additionally, in cases where a party files a motion for sua sponte reopening or reconsideration, the party may make a request for a discretionary stay while the motion is pending, and EOIR has published guidance on discretionary stays in its Practice Manuals. *See* Immigration Court Practice Manual, ch. 8.3; BIA Practice Manual, ch. 6.3, *https:// www.justice.gov/eoir/manuals-and-memoranda.*

The Department further declines to retain an AA96 Final Rule provision

that added limited exceptions to the motion to reopen time and number bars, which the AA96 Final Rule had added only to address some of the effects of limiting sua sponte authority. *See* 85 FR at 81654 (excusing time or number bars where ''a three-member panel of the Board agrees that reopening is warranted'' based upon ''a material change in fact or law underlying a removability ground or grounds specified in section 212 or 237 of the Act that occurred after the entry of an administratively final order that vitiates all grounds of removability''). The Department believes that, by recodifying longstanding sua sponte reopening and reconsideration authority, Appellate Immigration Judges are able to exercise their discretion to consider untimely or number-barred motions to reopen or reconsider cases as appropriate, including scenarios covered by those limited exceptions. As noted in the NPRM, sua sponte reopening and reconsideration is a well- established and recognized practice that has ''operated under a workable scheme.'' 88 FR at 62266.

The Department also declines to modify the existing motion to reopen time and numerical limitation standards to include an exception for affirmatively unopposed motions. This rulemaking focused, as relevant, on whether to retain, modify, or rescind the AA96 Final Rule, which did not make any changes to the joint motion exception for motion to reopen time and number limitations. The Department notes that potential modifications to motion to reopen standards are the subject of a separate future rulemaking under consideration. *See* Motions to Reopen and Reconsider; Effect of Departure; Stay of Removal, RIN 1125–AB01, *https://www.reginfo.gov/public/do/ eAgendaViewRule?pubId= 202304&RIN=1125–AB01.*

Further, and as explained earlier, in section III.A of this preamble, the Department declines to add a broad ''mailbox rule'' to this rulemaking, which is focused on the particular provisions of the AA96 Final Rule, as well as administrative closure and termination authority.

### E. Board Findings of Fact—Voluntary Departure

*Comment:* Commenters raised concerns about the Board providing proper notice to noncitizens if allowed to grant voluntary departure in the first instance. Commenters explained that noncitizens or their attorneys of record often do not receive timely notice from the Board and noted that, if the Board granted voluntary departure in the first

instance, the potential delay in receiving the Board's voluntary departure order would create difficulties for noncitizens who need to post voluntary departure bond, which, as proposed in the NPRM, would have been required to be posted within 10 days of issuance of the Board's voluntary departure order. As a result, commenters suggested increasing the bond posting timeline to 30 days.

*Response:* In light of commenter concerns and in recognition of the fact that Board orders are generally served by mail and received without advance warning—unlike orders of immigration judges, which are frequently served in person on the date of the final hearing on the merits of the voluntary departure request—the Department is further amending the time period for posting the voluntary departure bond. The final rule now states that the Board shall advise the noncitizen of the duty to post the bond with the ICE Field Office Director within 30 business days of the Board's order granting voluntary departure. 8 CFR 1240.26(k)(4). The Department believes this 30-day period will allow noncitizens adequate time to post a voluntary departure bond when the Board, rather than the immigration judge, grants voluntary departure in the first instance.

### F. Background Check

*Comment:* Commenters raised concerns that there is insufficient recourse for noncitizens whose identity checks are not completed in a timely manner by DHS. Therefore, commenters suggested adding a process in which a noncitizen may request the Board to require DHS to meet its obligations under 8 CFR 1003.47(d) or, alternatively, provide a limit as to the amount of time a case may remain pending with the Board solely to complete a background check before it is required to be remanded to the immigration court.

Another commenter recommended that the background check provision should permit the Board to remand a case to an immigration judge without a motion from DHS if the noncitizen fails to complete their background check, which the commenter believed would best allow the noncitizen an opportunity to present evidence regarding their failure to complete their background check to an immigration judge, safeguarding due process, especially for pro se noncitizens. The commenter also recommended adding language to 8 CFR 1003.1(d)(6)(iii) requiring an immigration judge to consider whether the noncitizen had good cause for failing to comply with

background check requirements in instances where the case was remanded to the immigration court.

Alternatively, one commenter stated that the rule should retain the AA96 Final Rule's background check provision, which deemed a noncitizen's failure to comply with background check requirements as an automatic abandonment of their underlying applications, absent a showing of good cause. The commenter believed this provision would best promote efficiency, while safeguarding the noncitizen's ability to explain their failure to comply with background check requirements in the event of unusual or unpredictable hardships.

*Response:* The Department declines to incorporate the commenters' suggested changes to the background check provisions. As explained in the NPRM, the Department is retaining some changes made by the AA96 Final Rule that were intended to reduce remands to the immigration court solely for completion of the required background checks. *See* 88 FR at 62270. The Department continues to believe that remanding cases solely for the completion of background checks is an unnecessary procedural step that creates inefficiencies in EOIR's case processing. *Id.*

The Department disagrees with commenter concerns that the rule contains insufficient protections for noncitizens whose identity checks are not completed in a timely manner. When the Board places a case on hold for completion of any necessary background checks, the rule requires DHS to "report to the Board promptly when" the required checks or investigations "have been completed or updated." 8 CFR 1003.1(d)(6)(iii). If DHS fails to report the results of those checks or investigations to the Board within 180 days of the Board's notice that the case is being placed on hold, the Board may either continue to hold the case or remand to the immigration judge for further proceedings under 8 CFR 1003.47(h). *Id.* Thus, the Board has discretion to continue to hold a case pending DHS's completion of background checks or to remand to the immigration court, depending on the circumstances of each case. Further, in exercising that discretion, the Board can request a status update from DHS as needed and determine whether a remand is necessary based on that update. For example, DHS may notify the Board that a pending background check will be imminently completed, which would weigh in favor of holding the case at the Board. As such, this provision accounts for the Department's

efficiency interests in avoiding unnecessary remands, *see* 88 FR at 62270, while still permitting remands based on individual circumstances. Further, this rule does not affect a party's ability to file a motion to remand in the event of newly available evidence or eligibility for relief. *See* BIA Practice Manual, ch. 5.8 (explaining purpose, standards of, and limitations on motions to remand and stating that "[p]arties may, in appropriate circumstances, move to remand proceedings to the immigration judge to consider newly available evidence or newly acquired eligibility for relief").

The Department also declines to adopt suggested revisions that would permit the Board to remand a case to the immigration court based on a noncitizen's failure to comply with background check requirements absent a motion from DHS. Because DHS is charged with conducting the relevant background checks, the Department continues to believe that DHS is in the best position to move for a remand where necessary as a result of noncompliance with background check requirements. Further, the Department does not believe it is necessary to impose an explicit regulatory requirement that, upon remand, immigration judges must consider whether a noncitizen demonstrated good cause for failing to comply with background check requirements. Under existing regulatory authority, when a case is remanded pursuant to 8 CFR 1003.1(d)(6), immigration judges must consider new information obtained as a result of background checks and may hold an additional hearing to consider "any legal or factual issues" if presented with new information. 8 CFR 1003.47(h). The Department believes that this provision sufficiently authorizes immigration judges to evaluate relevant information when the Board remands a case due to noncompliance with background check requirements.

Finally, as explained in the NPRM, the Department declines to retain the AA96 Final Rule's provision deeming a noncitizen's failure to comply with background check requirements at the Board as an automatic abandonment of the underlying applications for relief absent a showing of good cause. 88 FR at 62270. Rather, the Department believes that this rule, by returning to pre-AA96 Final Rule regulatory language permitting the Board to, upon a motion from DHS, remand a case to the immigration court to consider a noncitizen's noncompliance in evaluating whether the underlying relief should be denied, furthers the

Department's efficiency interests while accounting for scenarios where a remand to the immigration judge may be most appropriate. *Id.* The Department is confident that in cases where DHS moves the Board to remand and the Board does so, immigration judges will appropriately consider both the fact that a noncitizen failed to comply with background check requirements and their reasons for doing so when determining whether underlying applications for relief should be denied as a matter of law or a matter of discretion. *See* 8 CFR 1003.1(h) (stating that in cases remanded from the Board pursuant to 8 CFR 1003.1(d)(6), "the immigration judge shall consider the results of the identity, law enforcement, or security investigations or examinations subject to the provisions of this section" and, if presented with new information, "may hold a further hearing if necessary to consider any legal or factual issues, including issues relating to credibility, if relevant").

## G. Adjudication Timelines

*Comment:* One commenter supported removing the AA96 Final Rule's adjudication timelines, including the time frames on summary dismissals at the Board, but recommended that the Department should further limit the Board's summary dismissal authority. The commenter recommended limiting summary dismissals of appeals to those that are (1) filed on a form of relief already granted to the appealing party; (2) facially improper due to lack of jurisdiction; (3) untimely without a statement of exceptional circumstances; or (4) specifically prohibited by statute or regulation. The commenter believed this would help protect pro se noncitizens from improper summary dismissal.

Another group of commenters raised concerns about returning to the 90-day and 180-day adjudication timelines at the Board and encouraged flexibility in allowing the Board to set case adjudication deadlines.

*Response:* The Department declines to make any substantive changes to the grounds for summary dismissal at the Board, as removing any of the longstanding regulatory grounds under which the Board may summarily dismiss an appeal would hinder the Board's ability to resolve appeals in an efficient, timely manner. Rather, this rule only removes the enjoined procedural timelines for the adjudication of summary dismissals instituted by the AA96 Final Rule and reverts to the pre-AA96 Final Rule framework.

The Department also reinstates and declines to alter the longstanding 90-day and 180-day adjudication timelines at the Board. The Department notes that these timelines do not begin the moment the appeal is filed. Instead, the 90-day timeline for cases adjudicated by a single Appellate Immigration Judge begins upon completion of the record on appeal, and the 180-day timeline for cases adjudicated by a three-member panel begins once an appeal is assigned to the three-member panel. *See* 8 CFR 1003.1(e)(8)(i). The Department believes these longstanding adjudication timelines ensure that Appellate Immigration Judges have sufficient time to review and complete appeals and provide a fair procedure while balancing the need for the efficient resolution of cases and the administrative finality of decisions. *See* 88 FR at 62271 (explaining reasoning for calculations of 90-day and 180-day adjudication timelines). While a group of commenters indicated that the Board's adjudication timelines should be more flexible, the commenters provided no data or evidence to support the assertion that these adjudication time frames are insufficient. In the Department's experience, both the 90-day adjudication timeline for decisions issued by a single Appellate Immigration Judge and the 180-day adjudication timeline for decisions issued by a three-member panel—both of which are the operative status quo—continue to be workable for the Board's internal processing of appeals.

### H. Definitional Changes and Gender Neutrality

*Comment:* Commenters expressed support for the proposed definitions of "noncitizen" and "unaccompanied child" at 8 CFR 1003.1(gg) and (hh), respectively. Commenters who supported these added definitions stated that they aligned with current societal and professional standards of usage. One commenter agreeing with the changes noted that the Department could also use "unaccompanied noncitizen child" or "unaccompanied migrant child" if further definitional clarity was needed.

Commenters also urged EOIR to utilize gender-neutral terms so as not to exclude persons identifying as nonbinary. Commenters offered as example use of the terms "they," "their," "respondent," and "appellant." Alternatively, commenters recommended the use of gender-neutral language where applicable, such as "he or she," and "his or her."

*Response:* After further review, the Department has not made any further changes to the definition of "unaccompanied child" proposed by the NPRM, but has non-substantively modified the "noncitizen" definition to more clearly state that it has the same meaning as the statutory definition of "alien." Separately, the Department has made changes to use gender-neutral language where applicable. *See, e.g.,* 88 FR at 62283 (proposing to replace the terms "his or her" with "the noncitizen"). Further, the Department has identified additional instances of the use of the term "alien" in regulatory provisions being amended by this rulemaking and is updating those provisions to replace the term "alien" with "noncitizen." 8 CFR 1003.2(c)(2), 1003.7, 1003.23(b)(4)(iii)(B).

### I. Matter of Thomas & Thompson

#### 1. General Opposition

*Comment:* Some commenters argued that, for a variety of reasons, *Matter of Thomas & Thompson,* 27 I&N Dec. 674 (A.G. 2019), and *Matter of Pickering,* 23 I&N Dec. 621 (BIA 2003), *rev'd on other grounds, Pickering* v. *Gonzales,* 465 F.3d 263 (6th Cir. 2006), should be withdrawn in their entirety. In particular, commenters stated that the decision in *Matter of Thomas & Thompson*—which held that State court orders altering sentences will be given effect for immigration purposes only when the orders are based on a procedural or substantive defect in the underlying criminal proceedings—marked an abrupt shift in agency law. Commenters stated that, for decades prior, the Department had given full effect to State sentencing alterations without further questioning the basis for alteration. Commenters stated that this deference to State law was in line with 1996 amendments to the INA. Specifically, commenters stated, according to statute, immigration law depends on State courts to determine whether a conviction and sentence exist. INA 101(a)(48)(B), 8 U.S.C. 1101(a)(48)(B). In light of this statutory scheme, commenters stated, the holdings of *Matter of Thomas & Thompson* and *Matter of Pickering*—the latter of which held that State court orders vacating convictions will be given effect for immigration purposes only when the orders are based on a procedural or substantive defect in the underlying criminal proceedings, much as *Matter of Thomas & Thompson* did thereafter with respect to orders altering sentences—are contrary to statute. Commenters stated that the holdings of *Matter of Thomas & Thompson* and *Matter of Pickering* upset the Federal and State constitutional balance, disregard State law objectives, and create additional costs and impacts on the States as they adjust to the new rules. Commenters stated that many States have been forced to pursue new legislation to accommodate the holdings of *Matter of Thomas & Thompson* and *Matter of Pickering,* specifically laws making courts available for individualized constitutional defect litigation that commenters claim might otherwise be unnecessary.

Some commenters focused on what they believed to be the negative effects of the application of *Matter of Thomas & Thompson* and *Matter of Pickering* to public programs that offer mental health and substance abuse treatment. Commenters stated that States sometimes target such programs at individuals with criminal convictions, and that they sometimes entice participation by promising to eliminate, upon successful completion of a program, the legal effects of a conviction. Commenters argued that *Matter of Thomas & Thompson* and *Matter of Pickering* undermine such programs and discourage community participation in them.

Some commenters argued that *Matter of Thomas & Thompson* and *Matter of Pickering* frustrate State efforts to resolve criminal justice matters through streamlined procedures by limiting the effectiveness of State court vacaturs and sentence alterations. In this regard, one commenter highlighted Georgia State court practices specifically, stating that most post-conviction orders in Georgia modifying a sentence or vacating a conviction are drafted on an ad hoc basis with reference to the facts of the specific case, and that determining whether such orders meet the *Matter of Pickering* and *Matter of Thomas & Thompson* standard requires a case-by-case analysis. They speculated that many States likely have practices similar to Georgia, and they argued that EOIR adjudicators should not be required to adhere to *Matter of Pickering* and *Matter of Thomas & Thompson* but should rather be directed to defer to all State court post-conviction orders, without regard to the rationales behind those orders. Such an approach, they argued, would be beneficial in that immigration judges would no longer have to parse orders to ascertain the State court judge's reasoning.

Finally, some commenters focused on *Matter of Thomas & Thompson* specifically, arguing that the decision erroneously applied the *Matter of Pickering* rule, insofar as it shifted the rule from the context of conviction, according to section 101(a)(48)(A) of the INA, 8 U.S.C. 1101(a)(48)(A), to the

context of sentencing at section 101(a)(48)(B) of the INA, 8 U.S.C. 1101(a)(48)(B). In urging the "withdraw[al]" of *Matter of Thomas & Thompson,* commenters also stated that, in the case of trafficking victims, post-conviction relief may be an essential remedy in relation to convictions for crimes forced to be committed as part of the trafficking.

*Response:* The Department appreciates these comments but declines to respond to them as they are outside the scope of this rulemaking as identified in the NPRM. *See* 88 FR at 62273 ("Reconsideration of the approach of *Matter of Thomas & Thompson* or *Pickering* is beyond the scope of this rulemaking, which focuses on the application of those decisions without reaffirming or reconsidering their approach.").

### 2. Retroactive Application

*Comment:* No commenter argued that *Matter of Thomas & Thompson* should be applied retroactively. Commenters opposed the retroactive application of *Matter of Thomas & Thompson,* providing various reference points for the retroactivity analysis. Some commenters asserted that the most reasonable retroactivity rule would be to apply *Matter of Thomas & Thompson* prospectively only to cases of criminal charges filed after the decision's publication on October 25, 2019. Other commenters argued that EOIR should adopt a bright-line rule that *Matter of Thomas & Thompson* will only apply to convictions finalized after the date of publication. And others urged that any sentencing alteration issued on or before the date of publication should be considered under the previous standard as established in *Matter of Cota-Vargas,* 23 I&N Dec. 849 (BIA 2005), *Matter of Song,* 23 I&N Dec. 173 (BIA 2001), and *Matter of Estrada,* 26 I&N Dec. 749 (BIA 2016). Regarding that previous standard, commenters argued that this framework did not cause an identifiable harm that would justify the unusual decision of retroactively attaching new consequences to criminal sentence alterations.

On the general subject of retroactivity, commenters quoted the Supreme Court's statement that "[r]etroactivity is not favored in the law," and that "individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *INS* v. *St. Cyr,* 533 U.S. 289, 316 (2001) (quoting *Landgraf* v. *USI Film Prod.,* 511 U.S. 244, 265 (1994)). Commenters stated that the Eleventh Circuit, in holding that *Matter of Thomas & Thompson* should be applied retroactively, was incorrect in stating that "the BIA did not retroactively apply a new law" to the noncitizen in that case "but instead applied the Attorney General's determination of what the law had *always* meant." *Edwards* v. *U.S. Att'y Gen.,* 56 F.4th 951, 962 (11th Cir. 2022) ("*Edwards I*") (quoting *Yu* v. *U.S. Atty. Gen.,* 568 F.3d 1328, 1333 (11th Cir. 2009)), *vacated* No. 19–15077, 2024 WL 950198, at *1 (11th Cir. Mar. 6, 2024) ("*Edwards II*") (on panel rehearing the court vacated the original decision and substituted a new decision that "is in all material respects the same as [the] earlier one, except that [the court] explain[s] in more detail why [it] must apply the retroactivity rule from [*Yu*]"). Commenters asserted that the Board has recognized State court sentence alterations in immigration proceedings since 1982, citing the Board's decision of *Matter of Martin,* 18 I&N Dec. 226 (BIA 1982). Thus, commenters stated, instead of clarifying what the law "had always meant," the Attorney General in *Matter of Thomas & Thompson* changed the established law. Commenters therefore argued that EOIR should instead follow the Seventh Circuit's approach. The Seventh Circuit has applied the factors identified in *Retail, Wholesale & Dep't Store Union* v. *NLRB* ("*Retail Union*"), 466 F.2d 380, 390 (D.C. Cir. 1972), relying on *SEC* v. *Chenery Corp.,* 332 U.S. 194 (1947) ("*Retail Union* test" or "*Retail Union* factors"), and held that retroactively applying *Matter of Thomas & Thompson* results in a "manifest injustice" as to a noncitizen who had received a sentence modification before *Matter of Thomas & Thompson* was decided. *Zaragoza* v. *Garland,* 52 F.4th 1006, 1023 (7th Cir. 2022). Finally, commenters stated that making *Matter of Thomas & Thompson* retroactive would be burdensome to the Federal Government. Specifically, the Government would have to relitigate the previously settled issue that EOIR acknowledges sentence alterations for convictions entered on or before October 25, 2019, and would have to address the circuit split over the retroactivity of the *Matter of Thomas & Thompson* rule, which could be reviewed by the Supreme Court.

*Response:* For the reasons discussed in more detail in section IV.K.1 of this preamble, the Department agrees with commenters that *Matter of Thomas & Thompson* should not apply to noncitizens who sought an order vacating, modifying, clarifying, or otherwise altering a sentence before *Matter of Thomas & Thompson* and who ultimately obtained such an order based on that request. Retroactive application of *Matter of Thomas & Thompson* to this category of noncitizens would be manifestly unjust because in seeking such an order they could have reasonably relied on then-existing law to their detriment, and the Department does not believe it would be appropriate or workable for immigration judges to make more specific inquiries into actual reliance for this category of noncitizens. The Department does not, however, adopt a bright-line rule prohibiting application of *Matter of Thomas & Thompson* to all those charged, convicted, or sentenced before *Matter of Thomas & Thompson:* Such a rule would likely cover many noncitizens who did not reasonably rely on the prior state of the law to their detriment. Moreover, as to such noncitizens, the Department believes immigration judges can appropriately and workably identify those noncitizens who actually relied on the pre–*Matter of Thomas & Thompson* state of the law—for whom retroactive application would be manifestly unjust—and provide relief in the circumstances set forth in 8 CFR 1003.55(a)(2).

*Comment:* Commenters argued that, under the five-factor *Retail Union* test, the retroactive application of *Matter of Thomas & Thompson* should be limited. Commenters stated that every U.S. Court of Appeals and the Board apply the *Retail Union* test or a variation of it, providing as an example *Matter of Cordero-Garcia,* 27 I&N Dec. 652 (BIA 2019), and that the U.S. Courts of Appeals have frequently applied a framework akin to the *Retail Union* test to limit the retroactive application of Board or Attorney General decisions, providing as examples *Matter of Diaz-Lizarraga,* 26 I&N Dec. 847 (BIA 2016), and *Matter of Y-L-, A-G-, & R-S-R-,* 23 I&N Dec. 270 (A.G. 2002). Commenters asserted that the *Retail Union* factors weighed in favor of limiting retroactive application of *Matter of Thomas & Thompson* for several reasons. The first, second, and fifth *Retail Union* factors will be discussed in this comment and response, and the third and fourth factors in subsequent comments and responses.

Regarding the first *Retail Union* factor—whether the case is one of first impression—commenters stated that considering whether to apply *Matter of Thomas & Thompson* to individuals who were not party to that case does not constitute a case of first impression. Commenters asserted that the case of first impression was *Matter of Thomas & Thompson* itself; when the Department considers whether to apply *Matter of Thomas & Thompson* to

subsequent cases, it does so as a matter of second impression. Commenters stated that *Matter of Thomas & Thompson* does not present an issue of first impression for noncitizens in general who obtained State sentence alteration orders pursuant to the prior rules established under *Matter of Cota-Vargas, Matter of Song,* and *Matter of Estrada.*

The second factor under *Retail Union* considers whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law. Commenters stated that the Attorney General did not merely fill a void in *Matter of Thomas & Thompson,* which overruled three published decisions, *Matter of Cota-Vargas, Matter of Song,* and *Matter of Estrada,* but that the Attorney General's decision was a dramatic departure from EOIR's prior well-established practice. Commenters stated that, for decades prior to *Matter of Thomas & Thompson,* the Board and U.S. Courts of Appeals honored the full effect of criminal sentencing alterations with regard to immigration consequences, and that this well-established scheme was overruled by *Matter of Thomas & Thompson.*

The fifth *Retail Union* factor considers the statutory interest in applying a new rule retroactively despite the reliance of a party on the old standard. Commenters stated that even if the statutory interest in applying the new rule leaned in favor of retroactivity due to uniformity in application, as determined in *Zaragoza,* 52 F.4th at 1024, this is not sufficient to outweigh the other four factors, which commenters assert all weigh against retroactivity. Some commenters also argued that retroactive application would not further an interest in uniformity, as retroactive application based on the date of the *Matter of Thomas & Thompson* decision would itself *create* non-uniformity between a new case and any case in which the agency had acted prior to *Matter of Thomas & Thompson.* Instead, those commenters reasoned that not applying *Matter of Thomas & Thompson* retroactively would support uniformity because the prior practice under the overturned Board decisions would appropriately apply to all matters occurring before *Matter of Thomas & Thompson* was issued and further suggested that immigration is an ever-changing area of law in which uniformity is difficult to achieve.

Commenters acknowledged that in *Edwards I,* 56 F.4th at 962, the Eleventh Circuit concluded that *Matter of Thomas & Thompson* should be applied retroactively. *See also Edwards II,* 2024 WL 950198 *1, *10 (vacating *Edwards I* but coming to same conclusion). However, commenters argued that, in *Edwards,* the Eleventh Circuit neglected to use the five-factor *Retail Union* test as required by *Chenery,* it did not explain its reasoning in disagreeing with *Zaragoza,* and its retroactive application of *Matter of Thomas & Thompson* acted as a "manifest injustice."

*Response:* As discussed in section IV.K.1 of this preamble, the Department agrees with commenters that it is appropriate to apply the five-factor *Retail Union* test. As further explained, the Department believes that the first factor does not favor—and, if anything, weighs against—retroactive application of *Matter of Thomas & Thompson,* and that the second factor also weighs against retroactivity. The Department believes the fifth factor weighs slightly in favor of retroactive application but that this factor does not outweigh the other factors in the circumstances set forth below in section IV.K.1 of this preamble.

*Comment:* Turning to the third *Retail Union* factor, which focuses on reliance interests, commenters stated that this factor generally supported refraining from retroactive application of *Matter of Thomas & Thompson.* Commenters noted that, prior to *Matter of Thomas & Thompson,* EOIR adjudicators would, under *Matter of Song, Matter of Martin,* and *Matter of Cota-Vargas,* generally give effect to State court orders altering a noncitizen's criminal sentence. As will be discussed in more detail later in this subsection of the preamble, commenters had differing views as to the precise point in criminal proceedings at which reliance on the Board's case law predating *Matter of Thomas & Thompson* should be assessed. But commenters agreed with one another that, prior to *Matter of Thomas & Thompson,* noncitizens had relied on the Board's case law in making decisions in their criminal cases; for example, whether to enter into a plea agreement or seek a sentence alteration. Commenters argued that such reliance was reasonable and that, in a regulation limiting the retroactive application of *Matter of Thomas & Thompson,* noncitizens should not be required to show reliance in their particular case.

In general terms, commenters stated that practitioners have, for decades, been trained on and have relied upon the prior rules. Commenters stated that, with the *Matter of Thomas & Thompson* decision in 2019, individuals who were not removable or who were eligible for relief under the prior rules suddenly faced very different immigration consequences because of the new decision. Additionally, commenters reasoned that applying *Matter of Thomas & Thompson* retroactively to pending proceedings is insupportable under the manifest injustice test and the equitable foundation of retroactivity doctrine, set forth in *Zaragoza,* 52 F.4th at 1023, and *Landgraf* v. *USI Film Prods.,* 511 U.S. 244, 266 (1994).

Commenters discussed that, under the prior framework in effect until 2019, a post-sentencing sentence alteration was fully recognized by the Board without the need to establish a procedural or substantive defect in the proceedings. Commenters explained that many noncitizens received sentencing alterations that were based on legal or procedural defects in the underlying preceding, but there was no cause for the defect to be spelled out explicitly in the alteration, as doing so was not necessary for the alteration to be given effect in immigration proceedings. Noncitizens thus negotiated resolutions to criminal charges with the options and restrictions of this prior framework in place. For example, a noncitizen may have accepted a plea bargain in reliance on the expectation, based on Board case law at the time the plea bargain was entered into, that a sentence could later be altered and that the alteration would be effective for immigration purposes. Commenters stated that, regarding aggravated felonies and the attendant immigration consequences, a noncitizen prior to *Matter of Thomas & Thompson* might reasonably have been willing to negotiate a sentence of one year or more with the expectation that they could later receive a sentence alteration that would be recognized in immigration proceedings. Commenters also stated that, prior to *Matter of Thomas & Thompson,* noncitizens may reasonably have elected to obtain a relatively sparse sentence alteration order in lieu of a more substantive court order in reliance on the expectation that the alteration would be given effect in immigration proceedings.

*Response:* As discussed in detail in section IV.K.1 of this preamble, the Department agrees that the third *Retail Union* factor weighs against retroactive application in certain classes of cases, but declines to adopt a categorical rule that would presume reliance for anyone who pled guilty, was convicted, or was sentenced prior to *Matter of Thomas & Thompson.*

*Comment:* Regarding the fourth *Retail Union* factor, focusing on the burden retroactive application of an agency decision would impose on parties, commenters stated that this factor also weighed in favor of limiting retroactive

application. Specifically, commenters opined that the severe burden of removal alone satisfies the fourth factor and that, where a noncitizen agreed to a plea bargain prior to *Matter of Thomas & Thompson* with the expectation that a subsequent sentence modification would be given effect in immigration proceedings, retaining an attorney to seek other post-conviction relief may well be too expensive. Commenters also stated that applying the *Matter of Thomas & Thompson* rule to cases where criminal charges were filed prior to that decision would create insurmountable burdens regarding the revisiting of past criminal charge adjudications because these convictions often occurred many years in the past and involved privileged and detailed conversations between noncitizens and their counsel. Additionally, with respect to noncitizens who obtained sentence modifications before *Matter of Thomas & Thompson,* commenters asserted that the notion that such a noncitizen can return to court to obtain another modification to satisfy the new rule created by *Matter of Thomas & Thompson* would be unrealistic, and that the courts would likely not be amenable to such a request, especially because many States set time limits on seeking a sentence alteration or prohibit successive motions.

Commenters stated that the Supreme Court has ruled that immigration consequences may be one of the considerations a noncitizen, as well as the sentencing judge, considers in resolving a criminal case. *See Mellouli* v. *Lynch,* 575 U.S. 798, 806–07 (2015). However, commenters stated, under *Matter of Thomas & Thompson,* it is not enough to show that a judge made a lawful modification because some additional defect must be identified. Commenters stated that some States have streamlined procedures for remedying defects in criminal proceedings, including Constitutional defects such as ineffective assistance of counsel. But commenters stated that *Matter of Thomas & Thompson,* by requiring noncitizens to show that a defect was procedural or substantive in nature, functionally precludes them from using these streamlined procedures to remedy such defects and instead requires them to pursue onerous Constitutional-defect post-conviction claims. Commenters stated that *Matter of Thomas & Thompson* and *Matter of Pickering* undermine the full effectiveness of State criminal system reform laws that are aimed to rectify race and national origin discrimination in policing and the criminal justice

system and allow relief on a streamlined basis. According to these commenters, *Matter of Thomas & Thompson* and *Matter of Pickering* functionally preclude noncitizens from using these streamlined procedures to remedy such defects and instead require them to pursue onerous individualized relief to establish, for example, ineffective assistance of counsel.

*Response:* The Department appreciates commenters' views on the fourth *Retail Union* factor and, as discussed in detail in section IV.K.1 of this preamble, agrees that this factor weighs against retroactive application but has concluded that this factor does not tip the balance against retroactive application in all cases.

*Comment:* Commenters suggested different reference points for distinguishing between cases where application of *Matter of Thomas & Thompson* would be considered impermissibly retroactive and those where such application would not. Some commenters argued that *Matter of Thomas & Thompson* should not be applied to any criminal charge initiated prior to the decision, pointing out that criminal defendants often enter into plea negotiations soon after charges are filed. Other commenters argued that the reference point should be the pleading itself, and that *Matter of Thomas & Thompson* should not be applied where the pleading predated that decision, as the potential availability of a sentence modification could influence a noncitizen's willingness to accept a plea offer.

Other commenters focused on the conviction, arguing that *Matter of Thomas & Thompson* should not apply to convictions that predate that decision. Commenters explained that a noncitizen may have accepted a plea offer in reliance on a possible subsequent sentence modification, but that, under the *Matter of Thomas & Thompson* framework, the same noncitizen may have rejected the plea due to the low likelihood of a future sentence modification for purposes of immigration proceedings. Commenters who argued that the conviction was the appropriate reference point cited *Vartelas* v. *Holder,* 566 U.S. 257, 269–70 (2012), where the Supreme Court determined that the reference point for deciding whether the application of a new rule is retroactive is at the time of the conduct targeted by the rule.

Finally, other commenters suggested that the proper reference point should not be the conviction or earlier events, but rather when the noncitizen took substantial steps towards seeking a sentence modification. Thus, *Matter of*

*Thomas & Thompson* would not apply where the noncitizen took such substantial steps prior to the decision. In this regard, commenters argued that noncitizens were likely to rely upon the case law at the time in preparing a sentence modification request to benefit their immigration case, keeping in mind that such requests can take a considerable amount of time to prepare. Some commenters also suggested that the reference point should be when the noncitizen sought a sentence modification, so *Matter of Thomas & Thompson* would not apply where the noncitizen sought such a modification prior to the decision.

*Response:* The Department appreciates the information commenters provided regarding their views on the proper reference points for the retroactivity analysis. As discussed in section IV.K.1 of this preamble, the Department has determined that *Matter of Thomas & Thompson* will not apply to noncitizens who obtained sentence alterations as a result of a request for such alteration made on or before October 25, 2019—the day *Matter of Thomas & Thompson* was published. *See* 8 CFR 1003.55(a)(1)(A). Recognizing that other noncitizens likely also made decisions in reliance on the law as it existed before *Matter of Thomas & Thompson,* the rule also provides a process for noncitizens to establish that *Matter of Thomas & Thompson* should not be applied to them given their detrimental reliance on the prior law. *See* 8 CFR 1003.55(a)(1)(B).

### 3. Defects Under State Law

*Comment:* Some commenters identified specific State law provisions allowing for vacaturs or sentence modifications for grounds those States viewed as defects under State law. They urged the Department to recognize State court orders under such statutes, on the ground that such vacaturs and modifications are based on procedural or substantive defects recognized by State law and thus meet the standards set out in *Matter of Thomas & Thompson* or *Matter of Pickering.* In particular, two commenters addressed Cal. Penal Code § 1473.7, which was mentioned in the request for comment. Both argued that all vacaturs under this statute should be recognized by the Department as based on procedural or substantive defects. In addition, two commenters discussed postconviction orders in Georgia, highlighting the ad hoc nature of many of these orders and arguing that the Department should take them at face value and, in determining whether they are based on procedural or substantive defects and thus given effect

for immigration purposes, defer to the State court's characterization of the order.

*Response:* As explained in detail in section IV.K.2 of this preamble, the Department has elected to address circumstances in which an original order contains a genuine ambiguity, mistake, or typographical error and the State court corrects these issues in order to give effect to the original order's intent. At this time, the Department declines to go further in clarifying how *Matter of Pickering* and *Matter of Thomas & Thompson* apply to particular types of orders under Cal. Penal Code § 1473.7 or any other specific statute. The Department has considered the arguments of commenters on these issues. But the Department continues to weigh whether clarification is warranted and, if so, what type of clarification is most appropriate. Given the importance of this rule and the interest in issuing the rule promptly, the Department has concluded that the balance of interests militates in favor of issuing the rule now rather than delaying the rule further in order to consider additional clarifications, consistent with agencies' general authority to "address a problem one step at a time." *Hercules Inc.* v. *U.S. E.P.A.,* 938 F.2d 276, 282 (D.C. Cir. 1991).

*J. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Some commenters stated that this rulemaking is arbitrary and capricious under the Administrative Procedure Act. Commenters believed that the rule did not examine the full scope of the issue and failed to address alternative solutions, such as summary judgment and contempt authority, which commenters stated would provide the immigration courts with needed efficiencies. Similarly, commenters stated that the rule violates the APA because there are additional rulemakings currently being promulgated that amend related processes, which they contend renders public notice concerning the basis of this rule insufficient. Specifically, one commenter cited to a 2022 joint DHS–DOJ rulemaking providing DHS asylum officers with the authority to adjudicate asylum applications in certain circumstances, as well as a 2023 HHS NPRM proposing to make changes regarding unaccompanied children. The commenter claimed that, without a full understanding of these other rulemakings, commenters cannot

adequately analyze the proposed changes in this rule.

Commenters also stated that the Department failed to provide a Booz Allen Hamilton study cited in the NPRM and, therefore, requested release of the report and additional time to comment.

Commenters also requested various data relating to removal proceedings, termination, and administrative closure, including (1) updated data regarding the number of inactive pending cases; (2) the average length of time a case has been administratively closed; (3) the number of terminated or dismissed cases; (4) the number of UCs by year that have been placed into removal proceedings in recent years; and (5) the grounds for administratively closing, terminating, or dismissing cases.

*Response:* The Department has fully complied with the APA in promulgating this rulemaking. In proposing and finalizing this rulemaking, the Department considered various procedural tools for managing cases in determining the availability and scope of administrative closure and termination authorities. *See, e.g.,* 88 FR at 62256–58 (considering the availability of continuances and motions to reopen in the context of providing for administrative closure authority). The Department ultimately determined that administrative closure and termination would help promote overall efficiency in the immigration courts. *See* 88 FR at 62256 (describing efficiencies created by administrative closure), 62263 (efficiencies created by termination).

Importantly, the Department notes that various procedural tools are not mutually exclusive, and providing standards for administrative closure or termination does not reduce or affect the availability of other procedural tools. The Department will continue to review immigration court procedures to determine whether additional regulatory changes may further promote adjudicatory efficiencies.

With regard to commenters' staggered rulemaking claim, the Department does not believe that this rule is affected by any other recent or immediately forthcoming regulatory efforts, as noted in the NPRM. *See* 88 FR at 62273 ("The Department does not anticipate that the comment period for this proposed rule will overlap or coincide with other rules, Attorney General decisions, or Board decisions that would affect the effect of the regulatory changes proposed by this NPRM."). For instance, the 2022 joint DHS–DOJ rulemaking cited by commenters, which allows for DHS asylum officers to adjudicate

certain asylum applications in the first instance, was published over a year and a half ago, and was effective on May 31, 2022. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) ("Asylum Processing IFR"). Moreover, nothing in the Asylum Processing IFR is affected by the changes proposed in this rule, which focus on administrative closure and termination standards, as well as certain procedures before the Board. Similarly, the HHS proposed rule cited by commenters, which proposes various standards for the care of UCs, is not in any way affected by this rule's singular EOIR discretionary termination ground for UCs wishing to pursue their statutory right to seek asylum before USCIS. *See* Unaccompanied Children Program Foundational Rule, 88 FR 68908 (Oct. 4, 2023). As HHS notes, their NPRM is "solely focus[ed] . . . on proposing requirements that relate specifically to the care and placement of unaccompanied children in ORR custody." *Id.* at 68977.

With regard to the Booz Allen Hamilton Report cited by commenters, the Department notes that the report was cited three times in the NPRM (88 FR at 62246, 62258), is available to the public in EOIR's FOIA Library, and has been available since before this rule's comment period began. *See* EOIR, FOIA Library (last updated Mar. 11, 2024), *https://www.justice.gov/eoir/foia-library-0* (item titled "Legal Case Study: Summary Report").

In response to a request for additional statistics, the Department notes that it posts various adjudication statistics on its website, including data on overall case adjudications and certain statistics related to cases involving UCs, for instance. *See* EOIR, Statistics and Reports (last updated Oct. 3, 2023), *https://www.justice.gov/eoir/statistics-and-reports.* For example, the Department maintains statistics on several of the requests made by the commenter. *See* Inactive But Pending Cases by FY of Administrative Closure, *https://www.justice.gov/eoir/page/file/1307016/download* (inactive pending cases); Administratively Closed Cases, *https://www.justice.gov/eoir/page/file/1061521/download* (average length of administrative closure); FY 2023 Decision Outcomes, *https://www.justice.gov/media/1174716/dl?inline* (number of terminated and dismissed cases); Pending Unaccompanied Noncitizen Child (UAC) Cases, *https://www.justice.gov/media/1174841/dl?inline* (number of UC cases by year).

The Department endeavors to keep these statistics updated at regular intervals, such as quarterly or yearly, depending on the statistic. However, the Department does not maintain underlying data relevant to certain statistics requested by commenters, such as the specific grounds for administratively closing, terminating, or dismissing cases.

### 2. Executive Orders 12866, 13563, 14094

*Comment:* One commenter stated that the Department should conduct an economic impact analysis, including the consideration of any burdens the rule would have on states, municipalities, and United States taxpayers. The commenter also stated that the Department should consider the impact on DHS, which would need to expend additional resources to track the status of noncitizens who have had their cases administratively closed or terminated while they pursue relief outside of EOIR.

*Response:* As explained in the NPRM, the Department considered the cost and benefits of this rule in accordance with the principles of Executive Orders 12866, 13563, and 14094. Fundamentally, the commenter relies on an unfounded assumption that this rule will incentivize unlawful migration or otherwise needlessly delay proceedings, and thus produce costs for the cited groups. However, as the Department explained in the NPRM, the procedures contained in this rule have long existed, and the rule largely codifies the status quo. *See* 88 FR at 62274–75 (noting that "the NPRM is largely either proposing to codify prior longstanding regulatory provisions (*sua sponte* authority, Board remand authority) or longstanding case law (administrative closure)"); *see also* 62244 (noting, for example, that administrative closure has existed since at least the 1980s); *Matter of Vizcarra-Delgadillo,* 13 I&N Dec. 51, 52–53 & n.1, 55 (BIA 1968) (terminating proceedings in the case and noting that "[t]he administrative power to terminate deportation proceedings" existed prior to the promulgation of the authority in the regulations). Accordingly, the Department does not anticipate that the rule could be reasonably expected to change migration behaviors, nor did the commenter provide any evidence to the contrary. For example, the rule does not provide any new types of legal status or lawful methods of entry into the United States. Instead, the procedural tools raised by the commenter— administrative closure and termination—have long existed in immigration proceedings, with administrative closure availability only curtailed for a brief two-month period in early 2021. *See, e.g., Garcia-DeLeon,* 999 F.3d 986, 989 (6th Cir. 2021) ("For at least three decades, immigration judges and the BIA regularly administratively closed cases.").

Moreover, the rule addresses certain procedures in EOIR adjudications, including administrative closure and termination, only in defined circumstances. The legal standards for administrative closure and termination codified by this rulemaking do not allow EOIR adjudicators to unilaterally pause or terminate cases based on any sort of generalized backlog management concerns, but instead are focused on specific legal scenarios in which such tools may be relevant to efficiently managing proceedings. *See, e.g.,* 8 CFR 1003.1(m)(1)(ii)(F), 1003.18(d)(1)(ii)(F) (preventing adjudicators from unilaterally terminating proceedings "for purely humanitarian reasons"). For example, allowing an immigration judge to terminate proceedings where a prima facie approvable application is filed with USCIS can help increase efficiencies by ensuring that only one agency is adjudicating the noncitizen's relief claim at a time. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

To the extent that the commenter raised concerns about DHS exercising its prosecutorial discretion authority to move for administrative closure or termination of proceedings, the Department notes that such authority is outside the scope of this rulemaking. EOIR adjudicators do not have the authority to second-guess DHS's decisions to institute removal proceedings or how DHS prioritizes or pursues such proceedings. *See, e.g.,* 88 FR at 62264–65 ("The proposed rule would not change the longstanding principle that immigration judges and Appellate Immigration Judges have no authority to review or second-guess DHS's exercise of prosecutorial discretion, including its decision whether to commence removal proceedings.").

Further, and contrary to commenter's claims, granting administrative closure is often more efficient than, for example, requiring an immigration judge or Appellate Immigration Judge to adjudicate the case and then later entertain a motion to reopen once the noncitizen is granted outside relief. As explained in the NPRM, administrative closure can be the most efficient procedural tool when a case is not otherwise ready for final adjudication, by conserving scarce adjudicatory resources to focus on other matters that are ready for adjudication. *See* 88 FR at 62256–57.

### 3. Other Regulatory Requirements

*Comment:* Commenters stated that the Department must conduct the appropriate environmental review under the National Environmental Policy Act ("NEPA") before finalizing the rule, which could include an initial environmental assessment or a full environmental impact statement. Commenters claimed that the proposed rule has the potential to increase immigration, which could result in environmental consequences, such that the rule would be subject to NEPA.

*Response:* The Department is adopting and applying DHS's categorical exclusion for rulemaking actions under NEPA as discussed in section V.I of this preamble. As a result, the Department is not required to prepare an environmental assessment or environmental impact statement in conjunction with this rulemaking.

### K. Outside of the Scope

Commenters raised a number of suggestions and concerns that were outside of the scope of this specific rulemaking.

*Comment:* One commenter raised concerns about administrative closure language contained in the AA96 Final Rule—specifically the provisions at 8 CFR 1003.1(d)(1)(ii) (2020) and 1003.10(b) (2020)—rather than any language the Department proposed in the course of this rulemaking. In referring to the AA96 Final Rule's regulatory text at 8 CFR 1003.1(d)(1)(ii) (2020) and 1003.10(b) (2020), the commenter stated that the provisions do not clearly define what constitutes a regulation or court order that authorizes administrative closure.

*Response:* The referenced provisions added by the AA96 Final Rule—8 CFR 1003.1(d)(1)(ii) (2020) and 1003.10(b) (2020)—are being rescinded in this rulemaking. In lieu of such language, this rulemaking provides adjudicators with administrative closure authority subject to the governing standards provided in 8 CFR 1003.1 and 1003.18.

*Comment:* Commenters suggested that the rule explicitly acknowledge and preserve equitable tolling for filing motions to reopen and reconsider, as equitable tolling is an important safeguard for noncitizens who may face barriers to accessing legal counsel, evidence, or other information.

*Response:* Commenters' concerns regarding the equitable tolling doctrine are outside the scope of this rulemaking, as this rulemaking does not address or otherwise modify any existing standards

for equitable tolling. *See also* 85 FR at 81629 (noting that the AA96 Final Rule also does not affect pre-existing exceptions to the time and number limitations on motions to reopen, including equitable tolling). If the Department proposes to address equitable tolling in a future rulemaking, commenters are encouraged to provide comments at that time.

*Comment:* One commenter proposed changes to 8 CFR 1003.23(b)(3), which currently states that motions to reopen to pursue cancellation of removal "may be granted only upon demonstration that the noncitizen was statutorily eligible for such relief prior to the service of a Notice to Appear." The commenter recommended updating the language referencing statutory eligibility at the time of NTA service, in light of the Supreme Court decisions in *Pereira* v. *Sessions,* 138 S. Ct. 2105 (2018), and *Niz-Chavez* v. *Garland,* 141 S. Ct. 1474 (2021), to state that a defective NTA does not preclude statutory eligibility for cancellation of removal based on the stop-time rule.

*Response:* Commenters' concerns regarding Notices to Appear and cancellation of removal are outside the scope of this rulemaking, as this rulemaking addresses neither subject. If the Department pursues future rulemakings regarding Notices to Appear or cancellation of removal, the Department encourages the commenter to provide such proposed changes at that time.

## IV. Final Rule

After considering public comments on the NPRM, and given further reflection, the Department now adopts the NPRM as published with the following changes:

### A. Administrative Closure and Recalendaring—ICE Detention Status as a Factor

The Department has added an additional factor to the nonexhaustive list of factors to be considered when adjudicating administrative closure and recalendaring, which specifies that EOIR adjudicators must consider the "ICE detention status of the noncitizen" when making a determination about whether to administratively close or recalendar a case. *See* 8 CFR 1003.1(l)(3)(i)(H), 1003.18(c)(3)(i)(H) (administrative closure factor); 1003.1(l)(3)(ii)(H), 1003.18(c)(3)(ii)(H) (recalendaring factor).

The Department reiterates that none of the listed factors, including a noncitizen's detention status in ICE custody, are dispositive to the determination of whether administrative closure or recalendaring is necessary or appropriate in a given case. 8 CFR 1003.1(l)(3) ("No single factor is dispositive."); 8 CFR 1003.18(c)(3) (same). Rather, EOIR adjudicators must consider the totality of the circumstances in making such determinations. *Id.*

However, given the potential liberty interests implicated when a noncitizen is in ICE detention during the pendency of a case before EOIR, as well as heightened costs to the Government, a noncitizen's detention status in ICE custody will generally weigh against administrative closure or, alternatively, in favor of recalendaring if already administratively closed. Detention heightens the need to continuously monitor whether a case is ready to proceed to minimize the risk that an individual is detained any longer than necessary. *See, e.g., Reid* v. *Donelan,* 17 F.4th 1, 7 (1st Cir. 2021) (recognizing the court's view that "the Due Process Clause imposes some form of reasonableness limitation on the duration of detention" under certain provisions of the INA) (cleaned up). Therefore, in most circumstances, a detained case should be kept on, or returned to, the active docket, with continuances granted as needed.

As stated previously, however, a noncitizen's status in ICE detention is not a dispositive factor, and it is considered by the EOIR adjudicator as part of the totality of the circumstances. There may be some circumstances where, on balance, administrative closure of a case is necessary or appropriate even when a noncitizen is in ICE detention. For example, an immigration judge may find that, in certain cases, administrative closure is the proper procedural tool to allow a detained noncitizen to pursue available relief with USCIS, such as a Form I–601A, Provisional Unlawful Presence Waiver. *See* 8 CFR 212.7(e)(4)(iii). However, due to the potential liberty interests at stake in detained cases involving potential relief before USCIS, the noncitizen's detention status may weigh against granting administrative closure unless relief before USCIS is expected to be adjudicated expeditiously. Moreover, in many cases, the noncitizen may be detained due to underlying criminal activity, which may implicate other factors that would weigh against administrative closure. *See, e.g.,* 8 CFR 1003.1(l)(3)(i)(D), 1003.18(c)(3)(i)(D) (criminal activity may affect the likelihood of success for relief the noncitizen may wish to pursue).

Conversely, as the Board recognized in *Matter of M–A–M–,* administrative closure may be appropriate in cases involving mental competency issues, including to allow a noncitizen to seek treatment for a condition that impacts mental competency. 25 I&N Dec. at 483. Thus, for example, even if a noncitizen is in ICE detention, it may be necessary or appropriate to administratively close a case where competency issues are implicated to allow for evaluations or medical treatment where an EOIR adjudicator determines that a noncitizen's competency status might be restored. *See id.* at 480 (recognizing that "[m]ental competency is not a static condition").

The Department recognizes that there also may be other particularly compelling circumstances where a noncitizen is in ICE detention but, on balance, administrative closure may be necessary or appropriate in that case given the totality of the circumstances. The Department is confident that EOIR adjudicators will appropriately exercise their independent judgment and discretion in each individual case involving a request for administrative closure or recalendaring, including in those cases where a noncitizen is in ICE detention.

When applying this factor, the Department clarifies that the relevant consideration is whether the noncitizen is in ICE detention; that is, in the custody of DHS, given the aforementioned concerns. The same concerns do not apply to noncitizens in other carceral settings, such as local, State, or Federal custody. Administrative closure may be an appropriate docket management tool in such cases because the noncitizen's incarceration is not dependent upon the outcome of the proceedings before EOIR. Additionally, there may be a less immediate need to divert EOIR resources to expeditiously resolve the case. For example, a noncitizen may be in Federal, State, or local custody during the pendency of criminal proceedings, the resolution of which may directly impact the noncitizen's removability or eligibility for relief or protection from removal in EOIR proceedings. Thus, it may be more efficient to administratively close such cases and then recalendar them when the collateral criminal proceedings have been resolved. In such cases, it would be comparably less efficient to carry out proceedings before EOIR when the outcome of the concurrently pending collateral criminal proceedings would materially affect the outcome of EOIR proceedings.

Additionally, if a noncitizen in Federal, State, or local custody is serving out a lengthy criminal sentence,

there may be a less immediate need to resolve that noncitizen's case before EOIR because any potential removal order would not be executed until the noncitizen had completed their sentence. Thus, in such instances, it may be more efficient to administratively close the noncitizen's case and then to recalendar it closer in time to the noncitizen's eligibility for release. Accordingly, the Department believes a noncitizen's status in ICE detention, specifically, as opposed to other carceral settings, is a unique factor relevant to the determination whether to administratively close or recalendar a case.

*B. Discretionary Termination— Consideration of Arguments in Favor and in Opposition*

The Department has modified the standards for discretionary termination to explicitly require that EOIR adjudicators consider the reason termination is sought and the basis for any opposition to termination when adjudicating a motion to terminate. *See* 8 CFR 1003.1(m)(1)(ii), 1003.18(d)(1)(ii). For consistency and clarity, the Department is using the same phrasing as the parallel administrative closure provisions. *See* 8 CFR 1003.1(l)(3)(i)(A) and (B), 1003.18(c)(3)(i)(A) and (B).

To be clear, the inclusion of these factors in the regulations governing termination and administrative closure is not intended to and does not alter the general motions practice, which as a matter of course requires an EOIR adjudicator to consider the reason for the motion or the basis for any opposition to the motion. *See, e.g.,* Immigration Court Practice Manual ch. 5.12 (general standards for responses to motions). Further, as previously proposed in the NPRM, the Department had no intention of altering existing EOIR motions practice relating to termination. *See* 88 FR at 62264 (noting that "the adjudicator may consider any basis for opposition to termination in making their determination"). However, after considering comments raising concerns about terminating proceedings when a party objects to such termination, the Department believes it would be particularly helpful to clearly state that EOIR adjudicators will consider such objections when adjudicating a motion to terminate. For example, the Department believes that this clarification is responsive to concerns about the use of termination where a noncitizen objects to termination based on a desire to pursue relief in proceedings before EOIR where termination would otherwise foreclose the ability to pursue such relief.

Relatedly, the rule responds to concerns that terminating proceedings would override DHS's prosecutorial discretion by requiring EOIR adjudicators to consider and weigh DHS's objection to termination. This modification to the final rule is intended to clarify that discretionary termination cannot be granted without considering and weighing all arguments for and against discretionary termination. The Department believes that this requirement will help ensure that EOIR adjudicators consider the positions of both parties, including either party's interest in having proceedings go forward, prior to ruling on a motion to terminate.

The new provision states: "The [EOIR adjudicator] shall consider the reason termination is sought and the basis for any opposition to termination when adjudicating the motion to terminate." 8 CFR 1003.1(m)(1)(ii), 1003.18(d)(1)(ii).

*C. Discretionary Termination—UC Asylum Jurisdiction*

The Department has made two modifications to the NPRM's discretionary termination ground relating to cases implicating USCIS's exercise of initial asylum jurisdiction under INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C). *See* 8 CFR 1003.1(m)(1)(ii)(A), 1003.18(d)(1)(ii)(A). First, the Department modified this ground to apply not only to cases involving noncitizens determined by EOIR to be unaccompanied children, as defined by 1001.1(hh), but also to cases in which USCIS would consider their asylum application as one filed by an unaccompanied child such that USCIS may exercise its initial jurisdiction under INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) to adjudicate the asylum application. Thus, this category could include those noncitizens whom DHS previously determined to be UCs and whose asylum applications are amenable to USCIS's initial jurisdiction under INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C). The Department believes that EOIR adjudicators should have discretion to terminate removal proceedings in all potential circumstances where USCIS may exercise its initial jurisdiction over an asylum application pursuant to INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C), such as where USCIS considers the application as one filed by a UC through USCIS policy or by court order. *See, e.g., J.O.P.* v. *U.S. Dep't of Homeland Sec.,* 409 F. Supp. 3d 367, 376 (D. Md. 2019) (issuing a preliminary injunction in a class action involving USCIS policy changes regarding determinations about whether an application is considered as

one filed by a UC). Accordingly, the Department has amended 8 CFR 1003.1(m)(1)(ii)(A) and 1003.18(d)(1)(ii)(A) to provide that an EOIR adjudicator may terminate proceedings when the noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C), pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh).

Further, expanding the applicability of this discretionary termination ground to capture all potentially qualifying noncitizens will help ensure that EOIR and USCIS are not duplicating adjudicatory efforts, and that the Departments are giving full effect to Congress's intent that qualifying asylum applications should be adjudicated by USCIS. In making this change, the Department notes that it is not taking a position in this rulemaking on how, when, or by whom a UC determination is made.

Second, the Department also modified this ground to require the filing of an asylum application with USCIS before an EOIR adjudicator may grant discretionary termination, to ensure that relevant noncitizens in removal proceedings have a pending application on file with USCIS before any EOIR proceedings are terminated. *See* 8 CFR 1003.1(m)(1)(ii)(A), 1003.18(d)(1)(ii)(A). The change replaces the phrase "states an intent in writing or on the record at a hearing to seek asylum with USCIS" with "has filed an asylum application with USCIS." *Id.* This change will ensure that the Department and DHS can most efficiently monitor the noncitizen's ongoing proceedings and relief applications in order to take any necessary actions as such proceedings or applications are completed or adjudicated.

Taken together, the new provisions now read: "The noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh)." *Id.*

*D. Discretionary Termination—Cross-Reference to DHS Regulations Related to T and U Visas*

The Department has decided not to finalize the discretionary termination ground that cross-references DHS provisions related to T and U visas as proposed in the NPRM. 88 FR at 62278, 62281. As relevant here, commenters noted that in the proposed discretionary termination ground that cross-referenced DHS regulations related to T and U visas, the cross-referenced DHS regulatory provisions—8 CFR

214.11(d)(1)(i) and 214.14(c)(1)(i)—discuss joint motions to terminate. *See, e.g.,* 8 CFR 214.11(d)(1)(i) ("In its discretion, DHS may agree to the [noncitizen]'s request to file with the immigration judge or the Board a joint motion to . . . terminate proceedings without prejudice, . . . while an application for T nonimmigrant status is adjudicated by USCIS."). In turn, the proposed rule referenced these T and U visa regulatory provisions under the discretionary termination grounds. 88 FR at 62278, 62281.

However, the Department clarifies that any jointly filed motions to terminate, including those filed pursuant to the cross-referenced DHS provisions, should be considered under the mandatory "joint or unopposed" motion termination ground. *See* 8 CFR 1003.1(m)(1)(i)(G), 1003.18(d)(1)(i)(G). Thus, should any motions described in the DHS regulatory provisions related to T and U visas be presented before EOIR, those motions would constitute joint motions and would be governed by 8 CFR 1003.1(m)(1)(i)(G) or 1003.18(d)(1)(i)(G). Accordingly, the Department has decided not to finalize the discretionary termination provision for T and U visa applicants because, as proposed, it was superfluous and risked confusion over the proper standard to apply for such joint motions.

*E. Discretionary Termination—Motion Required*

The Department has modified the discretionary termination provisions to make clear that a motion from a party is required before an EOIR adjudicator may terminate a case in the exercise of discretion. *See* 8 CFR 1003.1(m)(1)(ii) and (m)(2)(ii), 1003.18(d)(1)(ii) and (d)(2)(ii). This change is consistent with regulatory provisions requiring a motion from a party before an EOIR adjudicator may grant administrative closure, *see* 8 CFR 1003.1(l)(1), 1003.18(c)(1), and reflects the Department's desire to ensure that parties have an opportunity to present any relevant evidence to EOIR adjudicators before they issue a decision on requests to terminate a case.

Accordingly, in relevant part, the discretionary termination provisions read that "[i]n removal, deportation, or exclusion proceedings, the [EOIR adjudicator] may, in the exercise of discretion, terminate the case upon the motion of a party where at least one of the requirements listed in . . . this section is met." 8 CFR 1003.1(m)(1)(ii) (Board), 1003.18(d)(1)(ii) (immigration judges). Similarly, in the interest of consistency, the provisions governing discretionary termination in other proceedings now read, in relevant part,

"[i]n proceedings other than removal, deportation, or exclusion proceedings, the [EOIR adjudicator] may, in the exercise of discretion, terminate the case upon the motion of a party where terminating the case is necessary or appropriate for the disposition or alternative resolution of the case." 8 CFR 1003.1(m)(2)(ii) (Board), 1003.18(d)(2)(ii) (immigration judges).

*F. Discretionary Termination— Naturalization Eligibility*

Based on existing statutory and regulatory structures, the Department has revised the provisions on discretionary termination on the basis of prima facie eligibility to naturalize. Under INA 318, 8 U.S.C. 1429, "no person shall be naturalized against whom there is outstanding a final finding of deportability," and "no application for naturalization shall be considered by [USCIS] if there is pending against the applicant a removal proceeding." This provision has been interpreted to mean that " 'removal proceedings and final removal orders are to take precedence over naturalization applications.' " *De Lara Bellajaro* v. *Schiltgen,* 378 F.3d 1042, 1045 (9th Cir. 2004) (quoting *Perdomo-Padilla* v. *Ashcroft,* 333 F.3d 964, 970 (9th Cir. 2003)). To better align with the statutory provision precluding consideration of a naturalization application where a removal proceeding is pending, the Department believes it is appropriate, with respect to this narrow category of motions for discretionary termination, to preclude EOIR adjudicators from granting the motion if DHS—which brings removal proceedings—assesses that the noncitizen should remain in EOIR proceedings given the circumstances of the particular case, and if DHS then communicates that assessment to the adjudicator by opposing a motion to terminate. Additionally, as stated in section III.C.4 of this preamble, the Department declines to adopt *Acosta Hidalgo's* limitation on an EOIR adjudicator's authority to make a prima facie determination regarding a noncitizen's eligibility for naturalization without certification from DHS when determining whether to terminate under former 8 CFR 1239.2(f) (2023). The Department has done so for efficiency reasons, and in light of operational frustrations, as well as inconsistencies and confusion over the framework established by *Acosta Hidalgo* with respect to former 8 CFR 1239.2(f) (2023). Under this rule, where a party moves to terminate, the EOIR adjudicator can make their assessment and, absent an express DHS opposition, can terminate

without a need to wait for, or require the parties to obtain or produce, DHS's certification in every case. However, the Department continues to recognize DHS's unique role in adjudicating naturalization applications, and Congress's directive that pending removal proceedings—which DHS serves as the prosecutor in initiating—should bar consideration of naturalization applications, and therefore will not terminate cases over DHS's opposition. Where DHS does oppose, the EOIR adjudicator may proceed to assess best next steps for disposition or alternative resolution of the case without the uncertainty of when or whether DHS will ultimately provide certification as to the noncitizen's prima facie eligibility. On balance, this creates efficiencies for the Department and the parties while also acknowledging DHS's unique role in adjudicating naturalization.

Under this rule, immigration judges would not assess prima facie eligibility for naturalization as a part of a noncitizen's naturalization application, INA 318, 8 U.S.C. 1429 ("the findings of the Attorney General in terminating removal proceedings . . . shall not be deemed binding in any way . . . with respect to the question of whether such person has established [] eligibility for naturalization as required by this subchapter"), but rather solely for the purpose of assessing whether termination would be necessary or appropriate to allow the noncitizen to have their application considered by DHS. Nevertheless, this rule continues to acknowledge both DHS's unique role as sole administrators over the process to obtain permanent (with limited exceptions) citizenship in the United States and its authority to initiate and prosecute removal proceedings, by limiting termination to pursue a naturalization application to those instances where DHS does not oppose a noncitizen's motion to terminate. 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

This provision only applies to motions for discretionary termination based on prima facie eligibility to naturalize under 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). It does not limit, for example, an EOIR adjudicator's ability to apply the mandatory termination grounds at 8 CFR 1003.1(m)(1)(i) and 1003.18(d)(1)(i) to a noncitizen who may be prima facie eligible to naturalize, nor an EOIR adjudicator's ability to grant immigration relief or protection to such a noncitizen.

Where a noncitizen makes a motion for discretionary termination based on eligibility to naturalize, DHS may,

depending on the circumstances of the case and in line with customary EOIR practice, indicate its opposition either by filing a timely written opposition or by announcing its opposition in court, orally and on the record. The regulation does not require DHS to state its rationale for opposing the motion. As long as DHS affirmatively opposes the motion, either orally or through a timely written submission, the EOIR adjudicator must deny the motion. However, the preclusion on granting the motion is only triggered when DHS affirmatively opposes the motion. Should DHS fail to respond to the motion in one of the two ways set out previously, the preclusion on granting the motion is not triggered, and the EOIR adjudicator is authorized to grant the motion in the exercise of their discretion.

This final rule's provisions governing discretionary termination based on prima facie eligibility to naturalize replace the current regulatory provision governing discretionary termination on this ground, previously located at former 8 CFR 1239.2(f) (2023). Under that regulatory provision, as interpreted by the Board, termination required an affirmative statement from DHS that the noncitizen is prima facie eligible to naturalize. *See Matter of Acosta Hidalgo,* 24 I&N Dec. at 107–08. Courts have found that this regulatory scheme is consistent with the Act and comports with due process. *See Shewchun* v. *Holder,* 658 F.3d 557, 563 (6th Cir. 2011) (rejecting a challenge to *Matter of Acosta Hidalgo* and stating that ''Congress has specifically accorded priority to removal proceedings over naturalization proceedings,'' and that ''[a]llowing DHS to have such a high level of control over an alien's removal proceedings is thus consistent with the current statutory framework of immigration law'' (internal citations and quotations omitted)); *Hernandez de Anderson* v. *Gonzales,* 497 F.3d 927, 935 (9th Cir. 2007) (stating that due process is not violated by the requirement that DHS ''provide an affirmative statement that an alien is prima facie eligible for naturalization in order to permit termination of the removal proceedings''). Given the former provision at 8 CFR 1239.2(f), this final rule's provisions governing discretionary termination based on prima facie eligibility to naturalize do not increase DHS's ability to prevent an EOIR adjudicator from terminating proceedings. To the contrary, the final rule's provisions require that, in order to prevent termination, DHS must affirmatively oppose a noncitizen's

motion, whereas under former 1239.2(f) (2023), silence from DHS effectively precluded an EOIR adjudicator from granting a noncitizen's motion to terminate.

Specifically, the Department has amended the regulatory text to provide that, ''[w]here the basis of a noncitizen's motion for termination is that the noncitizen is prima facie eligible for naturalization, the [adjudicator] shall not grant the motion if it is opposed by DHS.'' 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). The Department has done so in light of the statutory scheme governing naturalization and, relatedly, to recognize DHS's unique role in adjudicating naturalization applications, its authority to initiate removal proceedings, and its role as the prosecutor of removal cases.

*G. Discretionary Termination—USCIS Filing Required*

The Department has modified the discretionary termination ground focusing on petitions, applications, or other actions that a noncitizen pursues with USCIS seeking relief from removal or lawful status, to include language requiring that the noncitizen has filed such application, petition, or other action before termination may be granted. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

This change will help ensure that EOIR is not prematurely terminating proceedings when a relevant application has not yet been filed with USCIS. By doing so, it will allow DHS and EOIR to efficiently monitor a noncitizens' status and ensure that a noncitizen placed into removal proceedings either files an application with USCIS or remains in removal proceedings until final adjudication. Moreover, in cases where the noncitizen is in the process of preparing their application for filing with USCIS, they may request continuances or administrative closure before EOIR, as relevant, in the interim. *See* 8 CFR 1003.1(l) and 1003.18(c) (administrative closure); 1003.29 (continuances).

There are two exceptions to this USCIS filing requirement. First, where the motion is based on prima facie eligibility for adjustment of status, the noncitizen is not required to file such an application with USCIS when termination of removal proceedings is a prerequisite to the USCIS filing. *See* 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B). Second, there is no filing requirement where the motion is based on prima facie eligibility to naturalize. *See id.* The Department does not wish to require the filing of a naturalization application with USCIS

as a prerequisite to discretionary termination based on eligibility to naturalize given that, by statute, the application cannot be ''considered'' if the applicant is in removal proceedings, and that such a motion for termination cannot be granted if opposed by DHS. *See* INA 318, 8 U.S.C. 1429; 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

The new provisions read: ''The noncitizen is prima facie eligible for naturalization, relief from removal, or a lawful status; USCIS has jurisdiction to adjudicate the associated petition, application, or other action if the noncitizen were not in proceedings; and the noncitizen has filed the petition, application, or other action with USCIS. However, no filing is required where the noncitizen is prima facie eligible for adjustment of status or naturalization.'' 8 CFR 1003.1(m)(1)(ii)(B), 1003.18(d)(1)(ii)(B).

*H. Discretionary Termination— Clarification on Granting To Pursue Asylum Before USCIS*

The Department has modified the grounds for discretionary termination in removal, deportation, and exclusion proceedings to clarify that EOIR adjudicators may not terminate a case in the exercise of discretion for a noncitizen to pursue an asylum application before USCIS, unless the noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C), pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh). *See id.* The Department has also added similar clarifying regulatory text in the regulatory provisions covering termination in proceedings other than removal, deportation, and exclusion proceedings. *See* 8 CFR 1003.1(m)(2)(iii), 1003.18(d)(2)(iii).

Upon reconsideration, the Department is concerned that the discretionary termination ground based on pursuing relief or a lawful status with USCIS as drafted in the proposed rule, *see* 88 FR at 62264, could have been read to authorize the termination of a case for the express purpose of allowing a noncitizen—other than a noncitizen who has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C), pertaining to unaccompanied children—to apply for asylum with USCIS. This was never the Department's intent. *See* 88 FR at 62264 (explaining that ''the Department does not intend this proposed ground for discretionary termination to authorize a general practice of terminating proceedings involving prima facie

eligibility for asylum'' and stating that ''the default rule that EOIR adjudicators continue to exercise authority over asylum applications filed by noncitizens in removal proceedings would continue to apply''). And as explained in the NPRM, this would be in some tension with 8 CFR 1208.2(b), which grants exclusive jurisdiction to immigration judges over any asylum applications filed ''after the charging document has been filed with the Immigration Court.'' *See id.* As a matter of policy, the retention of exclusive jurisdiction over asylum applications by immigration judges, once the charging document has been filed, maintains efficiency of the immigration system by preventing further delay in the overall adjudication of an application that could occur if the noncitizen attempted to terminate removal proceedings so that they could restart the process with USCIS.

Accordingly, the Department has added clarifying language to this discretionary termination ground to provide that an EOIR adjudicator ''shall not terminate a case for the noncitizen to pursue an asylum application before USCIS, except as provided for'' in 8 CFR 1003.1(m)(1)(ii)(A) and 1003.18(d)(1)(ii)(A). 8 CFR 1003.1(m)(1)(ii)(B) (Board), 1003.18(d)(1)(ii)(B) (immigration judges). Under this provision, EOIR adjudicators may not consider a noncitizen's desire to pursue asylum before USCIS as a basis for discretionary termination, except when related to UC asylum applications.

However, this provision does not affect the ability of the parties to pursue joint or affirmatively non-opposed motions to terminate removal, deportation, or exclusion proceedings—regardless of the basis for such motions—which are adjudicated pursuant to the standards governing mandatory termination. 8 CFR 1003.1(m)(1)(G), 1003.18(d)(1)(1)(G) (directing EOIR adjudicators to grant motions that are jointly filed or where one party affirmatively indicates its non-opposition unless articulating ''unusual, clearly identified, and supported reasons for denying the motion'').

Finally, given the foregoing amendment in the provisions governing removal, deportation, and exclusion proceedings, the Department deemed it necessary to include a conforming provision in the regulatory text governing termination of proceedings other than removal, deportation, and exclusion proceedings. Thus, the Department has added regulatory text to the provisions limiting termination in proceedings other than removal,

deportation, and exclusion proceedings to make clear that neither the Board nor the immigration judge is authorized to terminate a case for the noncitizen to pursue an asylum application before USCIS, unless the noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act, 8 U.S.C. 1158(b)(3)(C), pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh). *See* 8 CFR 1003.1(m)(2)(iii) (Board), 1003.18(d)(2)(iii) (immigration judges).

### I. Voluntary Departure Bond Posting Deadline

The Department has modified 8 CFR 1240.26(k)(4) to state that the Board shall advise the noncitizen of the duty to post any voluntary departure bond with the ICE Field Office Director within 30 business days of the Board's order granting voluntary departure. In recognition of the fact that Board orders are generally served by mail and received without advance warning, the Department believes this 30-day period will allow noncitizens adequate time to post a voluntary departure bond when the Board, rather than the immigration judge, grants voluntary departure in the first instance.

### J. Additional Terminology Updates and Non-Substantive Changes

The Department is non-substantively updating the ''noncitizen'' definition as proposed in the NPRM to better clarify that ''noncitizen'' is synonymous with the statutory term ''alien.'' In the NPRM, the proposed ''noncitizen'' definition stated only that the term meant ''any person not a citizen or national of the United States.'' *See* 88 FR at 62275. In this final rule, the Department has updated the definition to state that the ''term *noncitizen* means 'alien,' as defined in section 101(a)(3) of the Act.'' *See* 8 CFR 1001.1(gg). This maintains the same substantive underlying definition as the NPRM, but also provides better clarity that the terms ''noncitizen'' and ''alien'' are defined to be synonymous.[6]

Relatedly, in addition to the changes the Department proposed in the NPRM regarding replacing the term ''alien'' with ''noncitizen,'' the Department has identified other instances of the use of the term ''alien'' in regulatory provisions the Department is amending in this rulemaking. Accordingly, the Department is also amending 8 CFR 1003.2, 1003.7, and 1003.23(b)(4)(iii)(B)

to replace the term ''alien'' with ''noncitizen'' in those provisions.

The Department is also making clarifying edits regarding the authorities of the Chief Appellate Immigration Judge and Chief Immigration Judge. The Department is amending 8 CFR 1003.1(a)(2)(i)(E) by adding a cross-reference to 8 CFR 1003.1(d)(1)(ii) and is similarly amending 8 CFR 1003.9(b)(5) to include a cross-reference to 8 CFR 1003.10(b), rather than adding an explicit reference to administrative closure authority to each provision as proposed in the NPRM. *See* 88 FR at 62275, 62280. These amendments clarify that the Chief Appellate Immigration Judge and Chief Immigration Judge, respectively, may exercise each of the authorities described in the cross-referenced provisions, including administrative closure authority. *See* 8 CFR 1003.1(a)(2)(i)(E), 1003.9(b)(5).

Additionally, the Department would like to clarify a change made in 8 CFR 1003.1(e)(7) (request for oral argument). Notably, the Department intended to remove gendered language in this provision, and in doing so, inadvertently proposed language identifying the Attorney General in place of the Deputy Attorney General. Specifically, the proposed language stated that ''[o]ral argument shall be held at the offices of the Board unless the Deputy Attorney General *or the Attorney General's* designee authorizes oral argument to be held elsewhere.'' *See* 88 FR at 62277 (emphasis added). This was a drafter's error. To preserve the meaning of the preexisting regulatory language, while removing gendered language—as was the intent in the NPRM—the Department is correcting its drafter's error and updating this provision to replace the incorrect reference to the ''Attorney General'' with a correct reference to the ''Deputy Attorney General.'' 8 CFR 1003.1(e)(7).

Finally, the Department identified an erroneous cross-reference in 8 CFR 1003.1(l)(1) and 1003.18(c)(1) and is amending those provisions to correct the intended cross-reference, by changing the erroneous reference to 8 CFR 214.15(p)(4) to the correct reference to 8 CFR 245.15(p)(4). The Department is also amending a reference to ''this chapter,'' and replacing it with a reference to ''this title'' in those same provisions. *See* 8 CFR 1003.1(l)(1), 1003.18(c)(1).

### K. Application of Matter of Pickering and Matter of Thomas & Thompson

In the NPRM, the Department requested comment on whether—and, if

---

[6] In defining the term ''noncitizen'' this way, the Department intends this term to be interchangeable with the term ''alien'' as used throughout chapter V of title 8 of the Code of Federal Regulations.

so, to what extent—*Matter of Thomas & Thompson,* 27 I&N Dec. 674 (A.G. 2019), should be given retroactive effect and how that decision and *Matter of Pickering,* 23 I&N Dec. 621 (BIA 2003), should apply to particular types of State court orders. 88 FR at 62273. After considering the comments received, the Department has determined to adopt a provision at 8 CFR 1003.55 clarifying the application of *Matter of Thomas & Thompson* and instructing adjudicators to recognize certain types of defects. First, paragraph (a)(1) provides that *Matter of Thomas & Thompson* does not apply where: (A) a court at any time granted a request to modify, clarify, vacate, or otherwise alter the sentence and the request was filed on or before October 25, 2019; or (B) the noncitizen demonstrates that the noncitizen reasonably and detrimentally relied on the availability of an order modifying, clarifying, vacating, or otherwise altering the sentence entered in connection with a guilty plea, conviction, or sentence on or before October 25, 2019. Paragraph (a)(2) states that, for such cases, the adjudicator shall assess the relevant order under *Matter of Cota-Vargas,* 23 I&N Dec. 849 (BIA 2005), *Matter of Song,* 23 I&N Dec. 173 (BIA 2001), and *Matter of Estrada,* 26 I&N Dec. 749 (BIA 2016), as applicable. Second, paragraph (b) instructs adjudicators to give effect to an order that corrects a genuine ambiguity, mistake, or typographical error on the face of the original conviction or sentencing order and that was entered to give effect to the intent of the original order. These provisions are described in detail in sections IV.K.1 and IV.K.2 of this preamble.

### 1. Applicability of Matter of Thomas and Thompson

In *Matter of Pickering,* the Board held that if a State court vacates a noncitizen's conviction for reasons solely related to rehabilitation or immigration hardships, rather than on the basis of a procedural or substantive defect in the underlying criminal proceedings, the conviction is not eliminated for immigration purposes. 23 I&N Dec. at 624. In *Matter of Thomas & Thompson,* Attorney General Barr overruled three prior Board decisions—*Matter of Cota-Vargas,* 37 I&N Dec. 849, which held that an order modifying a sentence is given "full . . . faith and credit" for immigration purposes regardless of the reason for the modification; *Matter of Song,* 23 I&N Dec. 173, which held the same for a sentence that was vacated and revised; and *Matter of Estrada,* 26 I&N Dec. 749, which *Matter of Thomas & Thompson*

understood to establish a "highly general multifactor test[]," I&N Dec. at 684, governing whether an order clarifying a sentence is effective for immigration purposes—and held that State court orders that modify, clarify, or otherwise alter a noncitizen's criminal sentence will similarly be given effect for immigration purposes only when they are based on a substantive or procedural defect in the underlying criminal proceeding, and not when based on reasons unrelated to the merits, such as rehabilitation or avoiding immigration consequences. 27 I&N Dec. at 675.

Recently, a circuit split has emerged on whether *Matter of Thomas & Thompson* may be applied in immigration proceedings to orders altering sentences or to criminal proceedings that predated the Attorney General's decision. *Compare Zaragoza,* 52 F.4th at 1010 (holding that applying *Matter of Thomas & Thompson* to a preexisting sentence alteration order "is an impermissibly retroactive application of a new rule"), *with Edwards II,* 2024 WL 950198, at *10 (following prior precedent to hold that *Matter of Thomas & Thompson* does not "announce[ ] new law" and instead "correctly states what the law always was and how it always should have been applied").[7] Having considered the reasoning of these decisions, precedent on the retroactive application of agency rules adopted through adjudication, and the comments received, the Department has decided to adopt a provision that limits the retroactive application of *Matter of Thomas & Thompson.*

The first and threshold question is whether applying *Matter of Thomas & Thompson* to State court orders altering sentences or to criminal proceedings predating that decision would have a retroactive effect. A new rule operates retroactively when it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Vartelas,* 566 U.S. at 266 (quoting *Soc'y for the Propagation of the Gospel* v. *Wheeler,* 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) (Story, J.)). Here, applying *Matter of Thomas & Thompson* can have such an effect in

substantial classes of cases. Under *Matter of Thomas & Thompson,* individuals who sought relief that would have been recognized under *Matter of Cota-Vargas,* and individuals who had a criminal disposition when *Matter of Cota-Vargas* was effective, lose the pathway to address immigration consequences that *Matter of Cota-Vargas* previously provided. The loss of that pathway thereby "attache[d] a new disability, in respect of" those prior applications or criminal dispositions. *Vartelas,* 566 U.S. at 266 (quoting *Wheeler,* 22 F. Cas. at 767). That remains true, moreover, even where noncitizens had not already received relief under *Matter of Cota-Vargas* and could not be sure that they would receive such relief. In *St. Cyr,* the Supreme Court found that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, 110 Stat. 3009 (1996), imposed a retroactive effect to the extent it eliminated discretionary relief from removal, even though noncitizens might or might not have received such relief. 533 U.S. at 321, 325. The same is true here.

When courts consider the retroactivity of statutes, as in *Vartelas* and *St. Cyr,* and determine that the statutes would have a retroactive effect, that determination often yields a categorical conclusion that the statute does not apply retroactively. To be sure, "[t]he Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration." *St. Cyr,* 533 U.S. at 315 (quoting *Landgraf,* 511 U.S. at 266). Given the concerns that retroactivity can yield, however, "congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result." *Id.* (quoting *Bowen,* 488 U.S. at 208). Courts sometimes undertake that inquiry on a categorical basis and determine that a statute is not retroactive without regard to individualized circumstances. *Id.; see Vartelas,* 566 U.S. at 266.

But when agencies adopt new rules in adjudications, as *Matter of Thomas & Thompson* did, they may engage in "individualized consideration," *St. Cyr,* 533 U.S. at 315, and can weigh whether a new rule should apply retroactively in particular circumstances or whether doing so would work a manifest injustice. Although the Supreme Court has long recognized that agencies may adopt new rules through adjudication, it has emphasized that the retroactive application of those rules "must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and

---

[7] *But see Edwards II,* 2024 WL 950198, at *15, *19 (Jordan, J., concurring) (concurrence stating that the prior precedent "incorrectly relied on precedent related to the retroactivity standard of judicial rather than agency decisionmaking" and concluding that the court should "convene *en banc* and hold that *Chenery* provides the framework for determining the retroactive effect of the Attorney General's ruling in *Thomas*").

equitable principles.'' *SEC* v. *Chenery Corp.,* 332 U.S. 194, 203 (1947). Moreover, it is for ''the agency to decide in the first instance whether giving the change retrospective effect will best effectuate the policies underlying the agency's governing act.'' *NLRB* v. *Food Store Emps. Union, Loc. 347,* 417 U.S. 1, 10 n.10 (1974).

The prevailing test for analyzing that second question and determining whether a new rule adopted via adjudication should apply retroactively weighs five factors: ''(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.'' *Retail Union,* 466 F.2d at 390; *see Montgomery Ward & Co.* v. *FTC,* 691 F.2d 1322, 1328 (9th Cir. 1982). The Board itself has applied this test. *See Matter of Cordero-Garcia,* 27 I&N Dec. at 657 (applying the *Retail Union* factors to determine retroactivity ''[i]n light of the courts' overwhelming adoption of the test and'' ''the desirability of applying the immigration laws with nationwide uniformity''). So have other agencies, as well as courts.[8] *See, e.g., Sne Enters., Inc. & United Steelworkers of Am., AFL–CIO,* 344 NLRB 673 (2005) (NLRB); *Nat'l Fuel Gas Supply Corp.,* 96 FERC ¶ 61,195, 61,852 (2001) (FERC); *Zaragoza,* 52 F.4th at 1010; *Marquez* v. *Garland,* 13 F.4th 108, 112 (2d Cir. 2021); *Francisco-Lopez* v. *Att'y Gen. U.S.,* 970 F.3d 431, 437 (3d Cir. 2020); *Acosta-Olivarria* v. *Lynch,* 799 F.3d 1271, 1275 (9th Cir. 2015). Notably, several U.S. Courts of Appeals have applied this test to limit the retroactive application of Board and Attorney General decisions to crimes committed

before the publication of those decisions, such as *Matter of Diaz-Lizarraga,* 26 I&N Dec. 847,[9] and *Matter of Y–L–, A–G– & R–S–R–,* 23 I&N Dec. 270.[10] And in the Department's view, this test reasonably captures the ''legal and equitable'' principles that the Supreme Court has directed agencies to consider. *See Chenery,* 332 U.S. at 203.[11]

Applying this test, the Department concludes that *Matter of Thomas & Thompson* should not apply retroactively to noncitizens who took certain actions before *Matter of Thomas & Thompson* was issued. The Department accordingly adopts a rule that gives effect to that conclusion and that the Department believes best balances the competing interests.[12]

The first *Retail Union* factor asks ''whether the particular case is one of

first impression.'' *Retail Union,* 466 F.2d at 390. Where the case is of first impression, a court is ''compelled to either apply the new rule retrospectively'' to that case ''or to reject it, as the prohibition against advisory opinions . . . assures that 'every case of first impression has retroactive effect.' '' *Laborers' Int'l Union of N. Am., AFL–CIO* v. *Foster Wheeler Energy Corp.,* 26 F.3d 375, 392 (3d Cir. 1994) (quoting *Chenery,* 332 U.S. at 203). Where the case is not one of first impression, the first factor may weigh against retroactivity. *See Matter of Cordero-Garcia,* 27 I&N Dec. at 658 (noting that the Ninth Circuit has recognized that this factor favors the noncitizen where the agency has ''confronted the problem before, ha[s] established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted.'' (quoting *Miguel-Miguel* v. *Gonzales,* 500 F.3d 941, 951 (9th Cir. 2007) (alterations in the original))). It is unclear how much weight this factor should receive when an agency itself assesses retroactivity: This factor relies in part on ''the prohibition against advisory opinions,'' which binds Article III courts but not agencies. *Laborers' Int'l Union,* 26 F.3d at 392. In all events, the Department is not considering a case of first impression: Before *Matter of Thomas & Thompson* addressed the issue it considered, *Matter of Cota-Vargas* and other decisions had already done so. Accordingly, the first factor does not favor, and if anything weighs against, retroactive application.

The second *Retail Union* factor, which is intertwined with the third factor, asks ''whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law.'' *Retail Union,* 466 F.2d at 390. Where the new rule represents ''an abrupt departure from well-established practice''—rather than ''merely attempting to fill a void in unsettled law''—the second *Retail Union* factor will weigh against retroactive application of the rule, in part because a party's reliance on the old rule is more likely to be reasonable. *See Garfias-Rodriguez* v. *Holder,* 702 F.3d 504, 521 (9th Cir. 2012). But where the new rule merely clarifies an area of unsettled law and therefore the ''party could reasonably have anticipated the change in the law,'' the second factor will favor retroactivity. *Id.*

*Matter of Thomas & Thompson* departed from a rule set forth almost fifteen years earlier in *Matter of Cota-Vargas,* 23 I&N Dec. at 852, and that originates as far back as 1982 when in

---

[8] The majority in *Edwards II* pointed to some cases following the approach set forth in *Yu* in the immigration context, *see* 2024 WL 950198, at *12, but one of those cases addressed an order in which the Attorney General considered the statute to be unambiguous, *see Shou Wei Jin* v. *Holder,* 572 F.3d 392, 397–98 (7th Cir. 2009), two others do not grapple with their decision not to analyze the *Retail Union* factors, *see Espinal-Andrades* v. *Holder,* 777 F.3d 163, 170 (4th Cir. 2015); *Torres* v. *Holder,* 764 F.3d 152, 158 (2d Cir. 2014), and two of the relevant circuits have also issued decisions that do in fact consider the *Retail Union* factors in this context, *see Edwards II,* 2024 WL 950198, at *12 (acknowledging authority going both ways). In all events, the Department has concluded that in this context applying the *Retail Union* factors is consistent with Supreme Court precedent and identifies the relevant considerations.

[9] *See Monteon-Camargo* v. *Barr,* 918 F.3d 423, 431 (5th Cir. 2019); *Obeya* v. *Sessions,* 884 F.3d 442, 449 (2d Cir. 2018); *Garcia-Martinez* v. *Sessions,* 886 F.3d 1291, 1296 (9th Cir. 2019); *Lucio-Rayos* v. *Sessions,* 875 F.3d 573, 578 (10th Cir. 2017).

[10] *See Miguel-Miguel* v. *Gonzales,* 500 F.3d 941, 951–52 (9th Cir. 2007).

[11] The Eleventh Circuit in *Edwards II* noted that it was bound by *Yu's* holding that the Attorney General's authority to issue ''controlling'' rulings on ''all questions of law,'' INA 103(a)(1), 8 U.S.C. 1103(a)(1), ''may mean that when the Attorney General announces a new decision that is a reasonable interpretation of the INA and is entitled to deference, that decision applies retroactively because it is 'the Attorney General's determination of what the law 'ha[s] always meant.''' 2024 WL 950198, at *9 (quoting *Yu,* 568 F.3d at 1333 (quoting *Rivers* v. *Roadway Exp., Inc.,* 511 U.S. 298, 313, n.12 (1994))). But whether or not the Attorney General could rely on that authority to deem a decision fully retroactive, the Department does not believe that this provision dictates it from applying the *Retail Union* test. Doing so falls within the Attorney General's broad authority to ''establish such regulations, prescribe such forms of bond, reports, entries, and other papers, issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out this section.'' INA 103(g)(2), 8 U.S.C. 1103(g)(2). Moreover, as explained below, *Matter of Thomas & Thompson* did not state that the statute was unambiguous, and the courts that have addressed the issue have found the statute ambiguous and deferred to the Attorney General's interpretation of it in *Matter of Thomas & Thompson.* That further militates against regarding *Matter of Thomas & Thompson* as simply identifying what the law has always been.

[12] The Department will apply the approach set forth in this rule in all circuits, including the Eleventh Circuit. Although the Eleventh Circuit in *Edwards II* determined that it was permissible for the BIA to apply *Matter of Thomas & Thompson* retroactively, *Edwards II* did not have the benefit of a rule by the Department addressing retroactivity and did not say that the Department could not apply a different approach to retroactivity than the Eleventh Circuit adopted. *See* 2024 WL 950198, at *10 (''We cannot hold that it was impermissible for the BIA to apply the Attorney General's *Matter of Thomas* decision.''). The Department therefore views *Edwards II* as not inconsistent with applying the approach set forth in this rule nationwide.

*Matter of Martin,* 18 I&N Dec. 226, the Board terminated deportation proceedings because the noncitizen's sentence was modified to less than one year, rendering her not deportable. *Matter of Thomas & Thompson* justified the departure from *Matter of Cota-Vargas* and *Matter of Martin* as an effort to clarify the law and adopt the *Matter of Pickering* standard for sentence alterations. But even so, *Matter of Thomas & Thompson* expressly departed from the established law that formerly governed sentence alterations—*Matter of Cota-Vargas*—and was more than a mere attempt to fill a void in an unsettled area of law. Accordingly, the second factor weighs against retroactive application.

The third *Retail Union* factor looks to "the extent to which the party against whom the new rule is applied relied on the former rule." *Retail Union,* 466 F.2d at 390. Here, *Matter of Cota-Vargas* reasonably induced reliance, across at least two classes of cases.

First, as commenters noted, noncitizens brought motions for and received State court orders before *Matter of Thomas & Thompson* that, under *Matter of Cota-Vargas,* Federal immigration law would have recognized. As commenters emphasized, these noncitizens often would have sought such sentence alteration orders via whatever avenue was most straightforward, including under rehabilitative statutes or based on motions expressly invoking the immigration consequences of their existing sentences. With those orders in hand, *Matter of Cota-Vargas* gave them "a complete defense to removal." *Zaragoza,* 52 F.4th at 1022. And some such noncitizens would have passed up the chance to pursue relief based on a substantive or procedural defect in their original sentences. For example, it may have been easier to persuade a court to reduce a sentence from one year to 364 days based on immigration consequences than to prove that a lawyer failed to adequately advise on immigration consequences in violation of *Padilla* v. *Kentucky,* 559 U.S. 356, 359 (2010), even if the latter ground would have been a meritorious basis for a sentence alteration order. And as commenters identified, many States prohibit successive motions, meaning that a noncitizen who could have obtained an order altering a sentence due to a substantive or procedural defect, but chose a simpler motion relying on *Matter of Cota-Vargas,* would be unable to bring a subsequent motion based on such a defect after *Matter of Thomas & Thompson. See, e.g.,* Ala. R. Crim. P. 32.2(b) (no successive motions

except in narrow circumstances), (d) ("In no event can relief be granted on a claim of ineffective assistance of trial or appellate counsel raised in a successive petition."); Alaska R. Crim. P. 35(b)(2) (prohibiting "second or successive motion for similar relief"); Del. R. Crim. P. Super. Ct. 35(b) ("The court will not consider repetitive requests for reduction of sentence."); Idaho Crim. R. 35(b) ("A defendant may only file one motion seeking a reduction of sentence.").

Second, commenters identified other ways in which noncitizens may have relied on *Matter of Cota-Vargas,* such as by relying on the advice of counsel to accept a plea deal with a sentence that would subject them to immigration consequences because courts in the jurisdiction routinely granted sentence alterations based on rehabilitation or immigration consequences, which immigration courts would have recognized under *Matter of Cota-Vargas.* Commenters submitted educational materials showing that immigration and criminal defense counsel were made aware of *Matter of Cota-Vargas,* and some organizations stated in their comments that they trained attorneys to consider that sentence alterations were categorically given effect for immigration purposes when advising noncitizens. These comments demonstrate that some criminal defendants likely detrimentally relied on the availability of such relief in making decisions during their criminal cases, including accepting pleas, declining pleas and deciding to go to trial, or litigating sentences. Had they known about the rule *Matter of Thomas & Thompson* would eventually adopt, they might reasonably have made different choices. Given the clarity of *Matter of Cota-Vargas,* the evidence that counsel advised noncitizens on the availability and effect of sentence alteration orders, and the import of the possibility of removal in decision-making by criminal defendants, such reliance would have been reasonable. *See Padilla,* 559 U.S. at 364 ("[D]eportation is an integral part— indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes."). And to the extent that noncitizens had a likelihood of reasonable reliance, the Department concludes that the third factor weighs against retroactive application.

The fourth *Retail Union* factor requires consideration of "the degree of the burden which a retroactive order imposes on a party." *Retail Union,* 466 F.2d at 390. For noncitizens who cannot

obtain a subsequent order altering their sentence, the burden here would generally be removal. Although "not, in a strict sense, a criminal sanction," *Padilla,* 559 U.S. at 365, removal "is always 'a particularly severe penalty,'" *Lee* v. *United States,* 582 U.S. 357, 370 (2017) (quoting *Padilla,* 559 U.S. at 365). The Department views that burden to be of a high degree that weighs against retroactive application. Even to the extent a noncitizen who already obtained an order altering their sentence that would have qualified under *Matter of Cota-Vargas* could return to State court and seek another order that would satisfy *Matter of Thomas & Thompson,* the need to pursue that relief would impose a substantial burden on noncitizens, many of whom are unrepresented or of limited means— particularly when that relief may ultimately prove impossible to obtain for the reasons provided previously. That burden again weighs against retroactive application.[13]

The fifth, and final, *Retail Union* factor looks at "the statutory interest in applying a new rule despite the reliance of a party on the old standard." *Retail Union,* 466 F.2d at 390. This factor will often "point[ ] in favor of [retroactivity] because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established." *Garfias-Rodriguez* v. *Holder,* 702 F.3d at 523. But courts also have deemed

---

[13] The Department has considered additional alleged burdens commenters raised, specifically that applying *Matter of Thomas & Thompson* to noncitizens whose criminal charges were filed before the decision would create insurmountable burdens regarding the revisiting of past criminal charge adjudications because these convictions often occurred many years in the past and involved privileged and detailed conversations between noncitizens and their counsel. The approach the Department adopts mitigates the concerns regarding dated convictions, and the Department does not believe the privilege concerns militate against the approach it adopts. Specifically, noncitizens whose convictions resulted from charges filed before *Matter of Thomas & Thompson* and who sought an order modifying, clarifying, vacating, or otherwise altering their sentence on or before the day *Matter of Thomas & Thompson* issued and received such an order will benefit from pre-*Matter of Thomas & Thompson* case law. *See* 8 CFR 1003.55(a)(1)(A). For those who did not, the Department believes the approach adopted—that is, applying pre-*Matter of Thomas & Thompson* case law where the noncitizen demonstrates they reasonably and detrimentally relied on the availability of such an order on or before October 25, 2019, 8 CFR 1003.55(a)(1)(B)—is reasonable. The noncitizen alleging detrimental reliance is likely to have the key information required to establish such reliance, and to the extent they may need to disclose attorney-client communications, they are the holders of the attorney-client privilege and are able to waive it. *See Commodity Futures Trading Comm'n* v. *Weintraub,* 471 U.S. 343, 348 (1985) (discussing waiver of attorney-client privilege in the context of corporations).

**46782** Federal Register / Vol. 89, No. 104 / Wednesday, May 29, 2024 / Rules and Regulations

decisions nonretroactive despite this factor, particularly where reliance interests are strong. *E.g., Zaragoza,* 52 F.4th at 1024. And here, where there is a sufficient likelihood of reliance on *Matter of Cota-Vargas,* the Department does not believe that the fifth factor standing alone suffices to require retroactivity.

The Department recognizes that "[t]he government's interest in applying the new rule retroactively may be heightened if the new rule follows from the 'plain language of the statute.' " *Garfias-Rodriguez,* 702 F.3d at 523 (quoting *Great W. Bank* v. *Off. of Thrift Supervision,* 916 F.2d 1421, 1432 (9th Cir. 1990)). *Matter of Thomas & Thompson* did not regard the statute as unambiguous, and the courts that have addressed the issue have found the statute ambiguous and deferred to the Attorney General's interpretation of it in *Matter of Thomas & Thompson. See Zaragoza,* 52 F.4th at 1019; *Edwards II,* 2024 WL 950198, *12. Regardless, the Department believes the fifth factor would not outweigh the other four factors in the context of (1) those who sought orders altering their sentence before *Matter of Thomas & Thompson* or (2) those who otherwise show detrimental reliance on *Matter of Cota-Vargas.*[14]

Taken together, the Department has determined that the *Retail Union* factors militate against retroactive application in certain circumstances where there is a substantial likelihood of reliance. In order to implement that determination, the Department has decided to adopt a two-pronged approach that tailors the retroactivity of *Matter of Thomas & Thompson* based on (1) circumstances where there is the greatest likelihood of reliance and (2) the Department's assessment of the feasibility and appropriateness of adjudicating case-specific reliance questions. The Department assesses that this approach best balances the relevant considerations.

First, the Department will recognize as effective for immigration purposes any order modifying, clarifying, vacating, or otherwise altering a criminal sentence where the request was filed on or before October 25, 2019, the day *Matter of Thomas & Thompson* issued. As stated previously, noncitizens seeking to alter their sentence before *Matter of Thomas & Thompson* reasonably could have sought any available type of sentence altering order, including under rehabilitative statutes or based on motions expressly invoking the immigration consequences of their existing sentences. And some noncitizens would have passed up the chance to pursue relief based on a substantive or procedural defect in their original sentences, which may have been more difficult and costly to establish. Furthermore, as commenters identified, many states prohibit successive sentence-altering motions, meaning that such noncitizens are now likely unable to obtain a conforming alteration order.

To be sure, not all noncitizens who received a sentence-altering order before *Matter of Thomas & Thompson* may be able to show reliance in this way. But for an adjudicator to assess whether such reliance exists in an individual case, they would likely have to consider complicated State law questions outside those they commonly consider, and which are likely to be outside their expertise. Specifically, the adjudicator would likely have to consider two questions: (1) whether the noncitizen's original sentence suffered from a substantive or procedural defect; and (2) whether under State law the noncitizen would be unable to obtain a second sentence alteration, including whether such a request would have been timely after *Matter of Thomas & Thompson.* EOIR's adjudicators do not have experience analyzing whether a sentence was marred by a defect that could have been addressed by a State court or whether under State law a noncitizen could seek a second sentence alteration. And requiring adjudicators to determine whether a State court erred when issuing a sentence—in some cases years or decades earlier—would involve immigration courts in burdensome and time-consuming litigation, often involving factual materials and State court records not easily accessible to immigration courts, on matters entirely collateral to the Federal immigration proceeding. *Matter of Thomas & Thompson* itself emphasized that its rule would not require courts to engage in such an inquiry. 27 I&N Dec. at 686 ("[I]mmigration judges should not need to wade into the intricacies of state criminal law in applying this opinion's rule.").

For similar reasons, immigration judges and the Board need not—and should not—consider whether noncitizens who received relief that would suffice under *Matter of Cota-Vargas* could, after *Matter of Thomas & Thompson,* return to State court and seek relief that would qualify under *Matter of Thomas & Thompson.* The Department has considered the argument that, if noncitizens have an unfettered ability to return to State court, their reliance interests are weaker. But the Department does not agree that this argument supports a broader retroactivity rule. As commenters identified, many noncitizens will face barriers to seeking further relief from State courts—due to statutes of limitations, procedural bars on successive motions, or State courts' perception that prior relief granted on other grounds moots noncitizens' new requests. Additionally, doing so may require noncitizens to incur significant legal expense, including in cases where it is all but certain that the request will be denied. Moreover, such a requirement could substantially burden State courts.

Accounting for the interests of the immigration system as a whole, the Department assesses that it is preferable to adopt a categorical rule of nonretroactivity when a noncitizen sought a sentence alteration prior to *Matter of Thomas & Thompson.* This approach finds support in the general retroactivity principles that apply to agency adjudications. The Department's ultimate charge from the Supreme Court is to strike a "balance" that accounts for "statutory design" and "legal and equitable principles," *Chenery,* 332 U.S. at 203, and "best effectuate[s] the policies underlying the . . . governing act." *Food Store,* 417 U.S. at 10 n.10. Moreover, the D.C. Circuit has recognized that the permissibility of a retroactivity decision under the *Retail Union* factors is "ultimately . . . founded upon the requirement of the [APA] that agency action not be 'arbitrary, capricious, an abuse of discretion, or otherwise not in

---

[14] The Department has considered some commenters' arguments that the fifth factor favors nonretroactivity because determining retroactive application based, in part, on the date *Matter of Thomas & Thompson* was issued would create discordance between cases that pre-date and post-date that decision. The Department believes these comments misunderstand the uniformity factor, which weighs the interest in applying the new rule—what the law is currently understood to mean—and applying that view of the law uniformly. *See, e.g., Cazarez-Gutierrez* v. *Ashcroft,* 382 F.3d 905, 912 (9th Cir. 2004) (stressing "the strong interest in national uniformity in the administration of immigration laws"). But even assuming these commenters are right that this factor could favor nonretroactivity, that would not change the ultimate rule the Department is adopting here. For individuals who sought an order modifying, clarifying, vacating, or otherwise altering a criminal sentence where the request was filed on or before the day *Matter of Thomas & Thompson* issued, the "non-uniformity" of the variety these commenters raise would not be implicated; the Department has determined that the decision should not apply retroactively to this category of individuals. And for individuals who did not seek such an order, the Department has determined that this purported "non-uniformity" is not sufficient to warrant a categorical approach to nonretroactivity, given the ability to identify cases in which such individuals actually relied on the pre-*Matter of Thomas & Thompson* law, as discussed elsewhere in this rule.

accordance with law.' " *Cassell* v. *FCC*, 154 F.3d 478, 483 n.4 (D.C. Cir. 1998) (quoting 5 U.S.C. 706(2)(A)); *see Yakima Valley Cablevision, Inc.* v. *FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986) ("Obviously, in many instances, a retroactive change in policy is perfectly appropriate; however, the law requires that an agency explain why it has decided to take this rather extraordinary step. The agency must explain how it determined that the balancing of the harms and benefits favors giving a change in policy retroactive application."). By adopting a rule that accounts for systemic considerations in its balancing of harms and benefits, the Department does just what the Supreme Court and the D.C. Circuit have directed. *Cf. Nat'l Cable & Telecomm. Ass'n* v. *FCC*, 567 F.3d 659, 670–71 (D.C. Cir. 2009) (noting that FCC's decision to apply a new rule to existing contracts was permissible because agency's "extensive discussion" of "the relative benefits and burdens of applying its rule to existing contracts . . . easily satisfies the Commission's obligation under our deferential standard of review," where FCC found retroactive application "strongly in the public interest"); *N. Carolina Utilities Comm'n* v. *FERC*, 741 F.3d 439, 450 (4th Cir. 2014) (holding that "FERC . . . appropriately considered doctrinal stability when determining whether to grant rehearing" to apply new policy enacted while case was pending, as "[a]gencies are certainly entitled to consider the broader regulatory implications of their decisions").

Second, the rule instructs adjudicators to apply the pre-*Matter of Thomas & Thompson* law to those who establish actual reliance on that law. The Department recognizes that other noncitizens besides those who sought State court sentence alterations likely reasonably relied on *Matter of Cota-Vargas* to their detriment. For example, and as commenters emphasized, there are likely noncitizens who pleaded guilty to an offense without knowing the likely sentence or agreed to a higher sentence than they otherwise would have in the belief that they could easily obtain an order altering their sentence in the future that would be given effect for immigration purposes under *Matter of Cota-Vargas*.

That said, the Department does not agree with commenters that the possibility of such reliance requires declining to apply *Matter of Thomas & Thompson* on a categorical basis to all those who were charged, convicted, or sentenced before the decision was issued. Unlike for those who obtained a non-complying sentence alteration in reliance on *Matter of Cota-Vargas* and now face obstacles to obtaining a complying order, the Department has identified an administrable way to inquire into reliance for this category of cases without requiring adjudicators to wade into complicated State law issues. Specifically, the rule requires noncitizens claiming reliance to demonstrate that the noncitizen reasonably and detrimentally relied on the availability of a sentence alteration in connection with a guilty plea, conviction, or sentence on or before October 25, 2019. 8 CFR 1003.55(a)(1)(B). Immigration judges are well positioned to evaluate the credibility of the noncitizen's claims and the factual questions of reasonable and detrimental reliance. Given the availability of this approach, the *Retail Union* factors weigh differently: *Matter of Thomas & Thompson* will not apply retroactively where there is actual reliance (thus vindicating reliance and fairness interests) but will apply when such reliance is absent (thus vindicating the interest in applying what *Matter of Thomas & Thompson* has determined the law should provide).[15]

[15] The Department has considered how this requirement interacts with the burdens set forth in section 240(c)(2), (3)(A), and (4)(A) of the INA, 8 U.S.C. 1229a(c)(2), (3)(A), and (4)(A). Where the noncitizen is charged as inadmissible, they bear the burden to establish that they are not, INA 240(c)(2), 8 U.S.C. 1229a(c)(2), and where a noncitizen seeks relief or protection from removal, they bear the burden of proof to establish that they are eligible and, where the form of relief is discretionary, that they merit a favorable exercise of discretion, INA 240(c)(4)(A), 8 U.S.C. 1229a(c)(4)(A). In those circumstances, it will always be the noncitizen's burden to prove that they have not been convicted of the crime specified in the charge, and requiring that they establish actual reliance to benefit from the pre-*Matter of Thomas & Thompson* law is consistent with that burden.

Where a noncitizen is charged as removable, ICE bears the burden of establishing by clear and convincing evidence that the noncitizen is removable as charged. INA 240(c)(3)(A), 8 U.S.C. 1229a(c)(3)(A). Courts have generally concluded that in such circumstances the burden is on the Government to establish that a vacated conviction remains valid for removability purposes. *See, e.g., Barakat* v. *Holder*, 621 F.3d 398, 403–05 (6th Cir. 2010) (where a noncitizen is charged as removable, "the government bears the burden of proving that a vacated conviction remains valid for immigration purposes" (quoting *Pickering*, 465 F.3d at 269 n.4)). But *Matter of Thomas & Thompson* did not answer this question for sentence modifications. *See* 27 I&N Dec. at 689–90 (declining to specifically address the burden for establishing the reason for a sentence modification). Nor need the Department address here the general question that *Matter of Thomas & Thompson* reserved. This rule instead addresses only a narrow situation when (1) ICE establishes that a noncitizen has been convicted; (2) the sentence ordered has been modified after *Matter of Thomas & Thompson*; and (3) the immigration judge determines that this modification was not based on a substantive or procedural defect (regardless of who bears the burden of proof on that issue). In that situation, the noncitizen's original sentence remains valid for immigration purposes

In advocating for a rule categorically declining to apply *Matter of Thomas & Thompson* to any noncitizen who was charged, convicted, sentenced, or otherwise engaged in sentencing advocacy before that decision, commenters invoked the Seventh Circuit's statement that "the critical question is not whether a party actually relied on the old law, but whether such reliance would have been reasonable." *Zaragoza*, 52 F.4th at 1023 (quoting *Velasquez-Garcia* v. *Holder*, 760 F.3d 571, 582 (7th Cir. 2014) (in turn citing *Vartelas*, 566 U.S. at 273–77)). The Department agrees with these commenters that actual reliance is not essential and that "the likelihood of reliance on prior law strengthens the case for reading a new[ ] [rule] prospectively." *Id.* But the Department disagrees that actual reliance is irrelevant or that the Supreme Court's retroactivity case law requires the Department to adopt a rule that does not consider actual reliance. The statement on which these commenters rely derives from the Supreme Court's holding that, as applied to statutes, the presumption against retroactivity does not require "actual reliance." *Vartelas*, 566 U.S. at 273. But that issue differs from the one the Department now addresses, for the reason explained previously: When the Department decides whether to apply a rule adopted in adjudication retroactively, it can engage in individualized consideration of reliance in a manner that courts generally do not do when weighing the retroactivity of statutes. When the Department does so, actual reliance is relevant to striking the "balance" *Chenery* directs. *Chenery*, 332 U.S. at 203. And here, the Department has determined that it can more easily assess actual reliance as to the relevant category of individuals. As a result, the Department believes that considering actual reliance for this category of noncitizens as part of the *Retail Union* analysis reflects an appropriate balance among equity, administrability, and application of the rule announced in *Matter of Thomas & Thompson.*

2. Procedural or Substantive Defects

The Department also sought comment on whether it should clarify how *Matter of Thomas & Thompson* and *Matter of Pickering* apply to particular types of

under *Matter of Thomas & Thompson*'s statement of current law, and the noncitizen is arguing, based on principles of retroactivity, that the sentence should nonetheless be assessed under the pre-*Matter of Thomas & Thompson* scheme. Placing the burden on the noncitizen in that narrow situation does not conflict with the statutory burden of proof. And doing so is reasonable, because the noncitizen is the party likely to have information relevant to the question at issue.

orders. *See Matter of Sotelo,* 2019 WL 8197756, at *2 (BIA Dec. 23, 2019) (giving effect to a vacatur order issued under Cal. Penal Code § 1473.7); *Khatkarh* v. *Becerra,* 442 F. Supp. 3d 1277, 1285–86 (E.D. Cal. 2020) (discussing Board decision denying effect to a vacatur order issued under Cal. Penal Code § 1473.7); *Talamantes-Enriquez* v. *U.S. Att'y Gen.,* 12 F.4th 1340, 1354–55 (11th Cir. 2021) (denying effect to a clarification order where the original sentence was not ambiguous, but distinguishing a ''sentence order [that] was ambiguous and needed clarification''). Having considered those comments, the Department has concluded that it should answer one question through this rule: whether to recognize State court alteration or other orders that correct genuine ambiguities, mistakes, and typographical errors on the face of the original order. In paragraph (b) of 8 CFR 1003.55, the Department provides guidance on that question.

Specifically, the rule clarifies that adjudicators shall give effect to an order that corrects a genuine ambiguity, mistake, or typographical error on the face of the original conviction or sentencing order and that was entered to give effect to the intent of the original order. 8 CFR 1003.55(b). Consistent with *Matter of Pickering* and *Matter of Thomas & Thompson,* the focus of the ''procedural or substantive defect'' inquiry is whether the subsequent order addresses a defect in the underlying proceedings or order. Where there is a genuine ambiguity, mistake, or typographical error on the face of the original order that a subsequent order merely corrects, the adjudicator must give effect to such corrective order. For example, if the original conviction document lists ''30 years'' as the sentence imposed for a first-time non-violent petty theft conviction, but a subsequent order corrects the sentence to ''30 days,'' as reflected in other documents in the conviction record, the subsequent order would merely have corrected a mistake or typographical error in the original order, and an adjudicator would be required to give effect to the subsequent order.

This approach is consistent with the approach of *Matter of Thomas & Thompson* and the Department's statement that ''[r]econsideration of the approach of *Matter of Thomas & Thompson* . . . is beyond the scope of this rulemaking.'' 88 FR at 62273. *Matter of Thomas & Thompson* ''overruled'' *Matter of Estrada,* 26 I&N Dec. 749 (BIA 2016)—a case in which the Board had given effect to a State court order correcting a sentence the

Board deemed ambiguous—and stated that ''[t]he test[] described in th[at] case[] will no longer govern.'' 27 I&N Dec. at 690. The Department understands *Matter of Thomas & Thompson* to have disapproved of *Matter of Estrada*'s use of a ''highly general multifactor test[],'' *id.* at 685, based on concerns that this test would give effect to State court orders that did not correct a genuine ambiguity, mistake, or typographical error in a noncitizen's ''original sentence'' and instead sought to ''avoid immigration consequences,'' *id.* But these concerns are absent when the original order contains a genuine ambiguity, mistake, or typographical error and the State court corrects these issues in order to give effect to the original order's intent. The Department does not understand *Matter of Thomas & Thompson* to preclude giving effect to such orders. To the contrary, doing so is fully consistent with the approach of *Matter of Thomas & Thompson* and with the INA: That order simply identifies what the sentence always should have been and is not ''based on reasons unrelated to the merits of the underlying criminal proceeding, such as rehabilitation or immigration hardship.'' *Id.* at 674. For example, to the extent that the use of ''[s]tandard sentencing forms'' like those the Eleventh Circuit considered in *Talamantes-Enriquez* v. *U.S. Att'y Gen.,* 12 F.4th 1340, 1346 (11th Cir. 2021), yielded a genuine ambiguity, mistake, or typographical error that a subsequent order then corrected so as to accurately reflect the intent of the original order, adjudicators should give effect to those orders.

## V. Regulatory Requirements

### A. Administrative Procedure Act

This final rule is consistent with the notice-and-comment rulemaking requirements described at 5 U.S.C. 553(b) and (c). Further, this final rule is being published with a 60-day effective date, meeting the general requirements of 5 U.S.C. 553(d).

### B. Regulatory Flexibility Act

The Department has reviewed this rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)) and the Attorney General certifies that this rule will not have a significant economic impact on a substantial number of small entities. The rule will not regulate ''small entities,'' as that term is defined in 5 U.S.C. 601(6). Primarily, this rule reverses the amendments made by the AA96 Final Rule and restores and expands on previously existing authorities exercised by EOIR

adjudicators and processes governing appeals filed with the Board. Accordingly, this rule regulates the conduct of immigration proceedings before EOIR and therefore may have a direct impact on noncitizens in such proceedings. The rule may indirectly affect resources or business operations for legal providers representing noncitizens in proceedings before EOIR, but the rule imposes no mandates or requirements on such entities; therefore, the rule will not have a significant economic impact on a substantial number of small entities.

Moreover, the AA96 Final Rule was enjoined soon after becoming effective, and the pre-AA96 Final Rule status quo has been in effect since the injunction. As a result, it is unlikely that small entities, including legal service providers, have changed their practices since the AA96 Final Rule was enjoined, thus further minimizing this rule's economic impact on small entities. Given that this rule generally adopts the pre-AA96 Final Rule status quo—the framework that is currently in place—with only a few alterations, the changes in this rule are unlikely to have a significant economic impact on any small entities, as it is unlikely to require any significant change in operations to accommodate the changes herein.

### C. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year (adjusted annually for inflation), and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

### D. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)

The Department certifies that this rule has been drafted in accordance with the principles of Executive Order 12866, Executive Order 13563, and Executive Order 14094. Those Executive Orders direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects; distributive impacts; and equity). Executive Order 13563

emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Further, the Office of Information and Regulatory Affairs of OMB reviewed this rule as a significant regulatory action under Executive Order 12866, as amended.

Overall, the Department expects that this rule will provide significant benefits to adjudicators, the parties, and the broader public that outweigh the potential costs.

This rule's expected benefits include providing clear guidance to adjudicators and regulated parties while maintaining adjudicator discretion and eliminating inefficiencies that likely would have resulted from the AA96 Final Rule.

For example, this rule's provisions for the exercise of administrative closure, termination, and dismissal authority strike a balance between providing sufficient guidance for adjudicators and regulated parties while, at the same time, preserving flexibility that will promote fairer, more efficient, and more uniform case processing and adjudication. Likewise, by eliminating projected inefficiencies that could have resulted from implementation of the AA96 standards, this rule codifies additional flexibility for adjudicators, which could provide significant benefits to noncitizens in certain cases with exceptional circumstances, as discussed in the NPRM. 88 FR at 62266.

Further, reinstating Board remand authority will also codify similar flexibility for adjudicators and is expected to have efficiency benefits as noted in the NPRM. 88 FR at 62268–70. The Department believes that the costs of these provisions mainly relate to any necessary familiarization with the rule, but such costs should be *de minimis,* given that the AA96 Final Rule has never been implemented and this rule is codifying the operative status quo. Further, this rule is largely codifying either prior longstanding regulatory provisions (*sua sponte* authority, Board remand authority) or longstanding case law (administrative closure). And, by codifying the operative status quo, this rule will help ensure that parties are relying on, and citing to, active regulatory provisions, rather than potentially relying on currently-enjoined language. On balance, overall, the Department believes that the fairness and efficiency benefits gained by the changes in this rule outweigh the potential *de minimis* costs.

Similarly, many of the other changes, including to briefing schedules, background check procedures, Board adjudication timelines, quality assurance certification, forwarding of the record on appeal, and the EOIR Director's case adjudication authority are largely internal case-processing measures with no measurable costs to the public. Moreover, many of these provisions are being reverted in large part to longstanding pre-AA96 Final Rule regulatory language, with which adjudicators and the parties should already be familiar. Additionally, to the extent provisions of the AA96 Final Rule have been retained, such as the background check procedures allowing a case to be held at the Board pending a background check, rather than to be remanded to the immigration court, the Department believes that such provisions will provide efficiencies to the immigration system, which will in turn benefit adjudicators and the parties. The Department believes that more efficient case processing and adjudication will benefit the public as well by reducing strain on limited resources.

In sum, any changes made by the rule would not impact the public in a way that would render the rule in conflict with the principles of Executive Orders 12866, 13563, and 14094.

### E. Executive Order 13132—Federalism

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988—Civil Justice Reform

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

This rule does not include new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35), and its implementing regulations, 5 CFR part 1320.

### H. Congressional Review Act

This rule does not meet the criteria in 5 U.S.C. 804(2).

### I. National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), codified as amended at 42 U.S.C. 4321–4347, requires all Federal agencies to assess the environmental impact of their actions. Congress enacted NEPA in order to encourage productive and enjoyable harmony between humans and the environment, recognizing the profound impact of human activity and the critical importance of restoring and maintaining environmental quality to the overall welfare of humankind. 42 U.S.C. 4321, 4331. NEPA's twin aims are to ensure agencies consider the environmental effects of their proposed actions in their decision-making processes and inform and involve the public in that process. *Id.* 4331. NEPA created the Council on Environmental Quality ("CEQ"), which promulgated NEPA implementing regulations, 40 CFR parts 1500 through 1508 ("CEQ regulations").

To comply with NEPA, agencies determine the appropriate level of review of the environmental effect of their proposed actions—an environmental impact statement ("EIS"), environmental assessment ("EA"), or use of a categorical exclusion ("CE"). 42 U.S.C. 4336. If a proposed action is likely to have significant environmental effects, the agency must prepare an EIS and document its decision in a record of decision. *Id.* 4336(b)(1). If the proposed action is not likely to have significant environmental effects or the effects are unknown, the agency may instead prepare an EA, which involves a more concise analysis and process than an EIS. *Id.* 4336(b)(2). Following the EA, the agency may conclude the process with a finding of no significant impact if the analysis shows that the action will have no significant effects. *Id.* If the analysis in the EA finds that the action is likely to have significant effects, however, then an EIS is required.

Alternatively, under NEPA and the CEQ regulations, a Federal agency can establish CEs—categories of actions that the agency has determined normally do not significantly affect the quality of the human environment—in their agency NEPA procedures. *Id.* 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). If an agency determines that a CE covers a proposed action, it then evaluates the proposed action for extraordinary circumstances in which a normally excluded action may have a significant effect. 40 CFR 1501.4(b). If no extraordinary circumstances are present or if further analysis determines that the extraordinary circumstances do not involve the potential for significant environmental impacts, the agency may apply the CE to the proposed action

**46786** Federal Register / Vol. 89, No. 104 / Wednesday, May 29, 2024 / Rules and Regulations

without preparing an EA or EIS. 42 U.S.C. 4336(a)(2), 40 CFR 1501.4. If the extraordinary circumstances have the potential to result in significant effects, the agency is required to prepare an EA or EIS. 40 CFR 1501.4(b)(2).

Section 109 of NEPA, enacted as part of the Fiscal Responsibility Act of 2023, allows a Federal agency to ''adopt'' another agency's CEs for a category of proposed agency actions. 42 U.S.C. 4336c. To use another agency's CEs under section 109, an agency must identify the relevant CEs listed in another agency's (''establishing agency'') NEPA procedures that cover its category of proposed actions or related actions; consult with the establishing agency to ensure that the proposed adoption of the CE to a category of actions is appropriate; identify to the public the CE that the agency plans to use for its proposed actions; and document adoption of the CE. *Id.*

This notification documents the Department's adoption under section 109 of NEPA of DHS's CE A3 for rulemakings under section 109 of NEPA to apply to this rulemaking action. DHS established a CE in the DHS NEPA Instruction Manual that covers regulatory actions as follows:

A3 Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:

(a) Those of a strictly administrative or procedural nature;

(b) Those that implement, without substantive change, statutory or regulatory requirements;

(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

(d) Those that interpret or amend an existing regulation without changing its environmental effect;

(e) Technical guidance on safety and security matters; or

(f) Guidance for the preparation of security plans.[16]

The Department and DHS consulted on the appropriateness of the Department's adoption of the CE for application to this rulemaking. The Department and DHS's consultation included a review of DHS's experience developing and applying this CE. The

[16] *See* NEPA Instruction Manual 023–01–001–01 Rev. 01, Appendix A (''Table 1—DHS List of Categorical Exclusions'') A–1—A–2 (Nov. 6, 2014) (''DHS NEPA Instruction Manual''), *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%20023-01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

Department also took into account that it has worked on joint rulemakings with DHS on immigration issues and has relied on DHS's CE in the past. *See, e.g.,* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, 88 FR 18227, 18238–39 (Mar. 28, 2023) (joint DOJ–DHS rulemaking relying upon DHS's CE); 87 FR at 18193 (same).

After review, the Department determined that this rule is very similar to the type of DHS rulemaking actions that qualify for this CE and, therefore, the impacts of this rule will be very similar to the impacts of DHS rulemakings for which this CE applies. The Department similarly found that this rule clearly fits into the categories described in the DHS CE—specifically paragraphs (a) and (d)—and is not part of a larger action. *See* DHS NEPA Instruction Manual at sec. V.B.2 (steps for determining applicability of DHS categorical exclusion).

Substantively, this rule largely codifies longstanding practices already in place before the issuance of the AA96 Final Rule and mainly represents the currently operative status quo due to the injunction of the AA96 Final Rule shortly after its effective date. Primarily, the rule affects adjudicatory docket management tools of an administrative and procedural nature, including administrative closure, termination, and dismissal of proceedings, as well as various Board processes for adjudicating appeals. The provisions regarding *Matter of Thomas & Thompson* are similarly strictly procedural as they merely instruct adjudicators which law to apply to avoid retroactivity concerns without changing any legal requirements. As such, the rule is covered by DHS's CE as administrative and procedural in nature, as well as largely serving only to amend existing regulations without changing their environmental effect.

Additionally, the Department examined whether there were any extraordinary circumstances in which a normally excluded action could have a significant effect requiring preparation of an EA or EIS. The DHS NEPA Instruction Manual lists relevant extraordinary circumstances, including, for example, ''potentially significant effect[s] on public health or safety.'' *See* DHS NEPA Instruction Manual at sec. V.B.2.c.i. After review of DHS's extraordinary circumstances, the Department has determined that no extraordinary circumstances are present that would prevent the use of DHS's CE for this rule. As explained previously,

this rule focuses on immigration court procedural tools and Board processes, many of which are merely codifying the operative status quo. As a result, the processes being regulated in this rule do not result in any of the listed extraordinary circumstances.

Therefore, the Department applies DHS CE A3 to this final rule to comply with NEPA.

*J. Severability*

To the extent that any portion of this rule is stayed, enjoined, not implemented, or otherwise held invalid by a court, the Department intends for all other parts of the rule that are capable of operating in the absence of the specific portion that has been invalidated to remain in effect. For example, administrative closure and termination are two separate procedural tools that operate independently of each other. If one of these tools was enjoined, for instance, the other tool is fully capable of separate operation. Likewise, the rule's Board-related procedural changes—such as to briefing schedules, background checks, sua sponte reopening and reconsideration, and adjudication timelines, among others—are distinct from the rule's codification of standards for administrative closure and termination; therefore, the Board-related provisions would not be affected if those procedural tools were enjoined or otherwise invalidated. Similarly, the rule's clarification of the applicability of *Matter of Thomas & Thompson* may also operate independently of the remaining provisions of the rule and would be unaffected if any other portion of the rule were enjoined or invalidated.

**List of Subjects**

*8 CFR Part 1001 and 1003*

Administrative practice and procedure, Immigration.

*8 CFR Part 1239*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 1240*

Administrative practice and procedure, Aliens.

Accordingly, for the reasons set forth in the preamble, the Department amends 8 CFR parts 1001, 1003, 1239, and 1240 as follows:

**PART 1001—DEFINITIONS**

■ 1. The authority citation for part 1001 continues to read as follows:

**Authority:** 5 U.S.C. 301; 8 U.S.C. 1101, 1103; Pub. L. 107–296, 116 Stat. 2135; Title VII of Pub. L. 110–229.

■ 2. Amend § 1001.1 by adding paragraphs (gg) and (hh) to read as follows:

### § 1001.1   Definitions.

\*    \*    \*    \*    \*

(gg) The term *noncitizen* means "alien," as defined in section 101(a)(3) of the Act.

(hh) The term *unaccompanied child* means "unaccompanied alien child," as defined in 6 U.S.C. 279(g)(2).

## PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW

■ 3. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C. 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28 U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 4. Amend § 1003.0 by revising paragraph (b)(2)(ii) to read as follows:

### § 1003.0   Executive Office for Immigration Review.

\*    \*    \*    \*    \*

(b) \*    \*    \*

(2) \*    \*    \*

(ii) The Director may not delegate the authority assigned to the Director in § 1292.18 of this chapter and may not delegate any other authority to adjudicate cases arising under the Act or regulations of this chapter unless expressly authorized to do so.

\*    \*    \*    \*    \*

■ 5. Amend § 1003.1 by:
■ a. Revising paragraphs (a)(2)(i)(E), (c), (d)(1) introductory text, (d)(1)(ii), (d)(3)(iii) and (iv);
■ b. Removing paragraph (d)(3)(v);
■ c. Revising paragraphs (d)(6)(ii) and (iii), (d)(6)(v), (d)(7), (e) introductory text, (e)(1) through (3), (e)(4)(i) introductory text, (e)(4)(ii), (e)(7), (e)(8) introductory text, (e)(8)(i) through (iii), and (v), and (f);
■ d. Removing and reserving paragraph (k); and
■ e. Adding paragraphs (l) and (m).
The revisions and additions read as follows:

### § 1003.1   Organization, jurisdiction, and powers of the Board of Immigration Appeals.

(a) \*    \*    \*

(2) \*    \*    \*

(i) \*    \*    \*

(E) Adjudicate cases as a Board member, including the authorities

described in paragraph (d)(1)(ii) of this section; and

\*    \*    \*    \*    \*

(c) *Jurisdiction by certification.* The Secretary, or any other duly authorized officer of DHS, an immigration judge, or the Board may in any case arising under paragraph (b) of this section certify such case to the Board for adjudication. The Board, in its discretion, may review any such case by certification without regard to the provisions of § 1003.7 if it determines that the parties have already been given a fair opportunity to make representations before the Board regarding the case, including the opportunity to request oral argument and to submit a brief.

(d) \*    \*    \*

(1) *Generally.* The Board shall function as an appellate body charged with the review of those administrative adjudications under the Act that the Attorney General may by regulation assign to it. The Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations. In addition, the Board, through precedent decisions, shall provide clear and uniform guidance to DHS, the immigration judges, and the general public on the proper interpretation and administration of the Act and its implementing regulations.

\*    \*    \*    \*    \*

(ii) Subject to the governing standards set forth in paragraph (d)(1)(i) of this section, Board members shall exercise their independent judgment and discretion in considering and determining the cases coming before the Board, and a panel or Board member to whom a case is assigned may take any action consistent with their authorities under the Act and the regulations as necessary or appropriate for the disposition or alternative resolution of the case. Such actions include administrative closure, termination of proceedings, and dismissal of proceedings. The standards for the administrative closure, dismissal, and termination of cases are set forth in paragraph (l) of this section, 8 CFR 1239.2(c), and paragraph (m) of this section, respectively.

\*    \*    \*    \*    \*

(3) \*    \*    \*

(iii) The Board may review de novo all questions arising in appeals from decisions issued by DHS officers.

(iv) Except for taking administrative notice of commonly known facts such as current events or the contents of official documents, the Board will not engage in factfinding in the course of deciding cases. A party asserting that the Board

cannot properly resolve an appeal without further factfinding must file a motion for remand. If new evidence is submitted on appeal, that submission may be deemed a motion to remand and considered accordingly. If further factfinding is needed in a particular case, the Board may remand the proceeding to the immigration judge or, as appropriate, to DHS.

\*    \*    \*    \*    \*

(6) \*    \*    \*

(ii) Except as provided in paragraph (d)(6)(iv) of this section, if identity, law enforcement, or security investigations or examinations are necessary in order to adjudicate the appeal or motion, the Board will provide notice to both parties that the case is being placed on hold until such time as all identity, law enforcement, or security investigations or examinations are completed or updated and the results have been reported to the Board. The Board's notice will notify the noncitizen that DHS will contact the noncitizen with instructions, consistent with § 1003.47(d), to take any additional steps necessary to complete or update the identity, law enforcement, or security investigations or examinations only if DHS is unable to independently update the necessary identity, law enforcement, or security investigations or examinations. The Board's notice will also advise the noncitizen of the consequences for failing to comply with the requirements of this section. DHS is responsible for obtaining biometrics and other biographical information to complete or update the identity, law enforcement, or security investigations or examinations with respect to any noncitizen in detention.

(iii) In any case placed on hold under paragraph (d)(6)(ii) of this section, DHS shall report to the Board promptly when the identity, law enforcement, or security investigations or examinations have been completed or updated. If DHS obtains relevant information as a result of the identity, law enforcement, or security investigations or examinations, or if the noncitizen fails to comply with the necessary procedures for collecting biometrics or other biographical information after receiving instructions from DHS under paragraph (d)(6)(ii) of this section, DHS may move the Board to remand the record to the immigration judge for consideration of whether, in view of the new information, or the noncitizen's failure to comply with the necessary procedures for collecting biometrics or other biographical information after receiving instructions from DHS under paragraph (d)(6)(ii) of this section, immigration relief or

protection should be denied, either on grounds of ineligibility as a matter of law or as a matter of discretion. If DHS fails to report the results of timely completed or updated identity, law enforcement or security investigations or examinations within 180 days from the date of the Board's notice under paragraph (d)(6)(ii) of this section, the Board may continue to hold the case under paragraph (d)(6)(ii) of this section, as needed, or remand the case to the immigration judge for further proceedings under § 1003.47(h).

\*    \*    \*    \*    \*

(v) The immigration relief or protection described in § 1003.47(b) and granted by the Board shall take effect as provided in § 1003.47(i).

(7) *Finality of decision.* (i) The decision of the Board shall be final except in those cases reviewed by the Attorney General in accordance with paragraph (h) of this section. The Board may return a case to DHS or an immigration judge for such further action as may be appropriate without entering a final decision on the merits of the case.

(ii) In cases involving voluntary departure, the Board may issue an order of voluntary departure under section 240B of the Act, with an alternate order of removal, if the noncitizen requested voluntary departure before an immigration judge, the noncitizen's notice of appeal specified that the noncitizen is appealing the immigration judge's denial of voluntary departure and identified the specific factual and legal findings that the noncitizen is challenging, and the Board finds that the noncitizen is otherwise eligible for voluntary departure, as provided in 8 CFR 1240.26(k). In order to grant voluntary departure, the Board must find that all applicable statutory and regulatory criteria have been met, based on the record and within the scope of its review authority on appeal, and that the noncitizen merits voluntary departure as a matter of discretion. If the record does not contain sufficient factual findings regarding eligibility for voluntary departure, the Board may remand the decision to the immigration judge for further factfinding.

(e) *Case management system.* The Chairman shall establish a case management system to screen all cases and to manage the Board's caseload. Unless a case meets the standards for assignment to a three-member panel under paragraph (e)(6) of this section, all cases shall be assigned to a single Board member for disposition. The Chairman, under the supervision of the Director, shall be responsible for the success of the case management system. The Chairman shall designate, from time to time, a screening panel comprising a sufficient number of Board members who are authorized, acting alone, to adjudicate appeals as provided in this paragraph (e). The provisions of this paragraph (e) shall apply to all cases before the Board, regardless of whether they were initiated by filing a Notice of Appeal, filing a motion, or receipt of a remand from Federal court or the Attorney General.

(1) *Initial screening.* All cases shall be referred to the screening panel for review. Appeals subject to summary dismissal as provided in paragraph (d)(2) of this section should be promptly dismissed.

(2) *Miscellaneous dispositions.* A single Board member may grant an unopposed motion or a motion to withdraw an appeal pending before the Board. In addition, a single Board member may adjudicate a DHS motion to remand any appeal from the decision of a DHS officer where DHS requests that the matter be remanded to DHS for further consideration of the appellant's arguments or evidence raised on appeal; a case where remand is required because of a defective or missing transcript; and other procedural or ministerial issues as provided by the case management plan.

(3) *Merits review.* In any case that has not been summarily dismissed, the case management system shall arrange for the prompt completion of the record of proceeding and transcript, and the issuance of a briefing schedule, as appropriate. A single Board member assigned under the case management system shall determine the appeal on the merits as provided in paragraph (e)(4) or (5) of this section, unless the Board member determines that the case is appropriate for review and decision by a three-member panel under the standards of paragraph (e)(6) of this section. The Board member may summarily dismiss an appeal after completion of the record of proceeding.

(4) \*    \*    \*

(i) The Board member to whom a case is assigned shall affirm the decision of the DHS officer or the immigration judge without opinion if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

\*    \*    \*    \*    \*

(ii) If the Board member determines that the decision should be affirmed without opinion, the Board shall issue an order that reads as follows: "The Board affirms, without opinion, the result of the decision below. The decision below is, therefore, the final agency determination. *See* 8 CFR 1003.1(e)(4).'' An order affirming without opinion issued under authority of this provision shall not include further explanation or reasoning. Such an order approves the result reached in the decision below; it does not necessarily imply approval of all of the reasoning of that decision but does signify the Board's conclusion that any errors in the decision of the immigration judge or DHS were harmless or nonmaterial.

\*    \*    \*    \*    \*

(7) *Oral argument.* When an appeal has been taken, a request for oral argument if desired shall be included in the Notice of Appeal. A three-member panel or the Board en banc may hear oral argument, as a matter of discretion, at such date and time as is established under the Board's case management plan. Oral argument shall be held at the offices of the Board unless the Deputy Attorney General or the Deputy Attorney General's designee authorizes oral argument to be held elsewhere. DHS may be represented before the Board by an officer or counsel of DHS designated by DHS. No oral argument will be allowed in a case that is assigned for disposition by a single Board member.

(8) *Timeliness.* As provided under the case management system, the Board shall promptly enter orders of summary dismissal, or other miscellaneous dispositions, in appropriate cases consistent with paragraph (e)(1) of this section. In all other cases, after completion of the record on appeal, including any briefs, motions, or other submissions on appeal, the Board member or panel to which the case is assigned shall issue a decision on the merits as soon as practicable, with a priority for cases or custody appeals involving detained noncitizens.

(i) Except in exigent circumstances as determined by the Chairman, or as provided in paragraph (d)(6) of this section, the Board shall dispose of all cases assigned to a single Board member within 90 days of completion of the record, or within 180 days after a case is assigned to a three-member panel (including any additional opinion by a member of the panel).

(ii) In exigent circumstances, the Chairman may grant an extension in particular cases of up to 60 days as a matter of discretion. Except as provided in paragraph (e)(8)(iii) or (iv) of this section, in those cases where the panel is unable to issue a decision within the

established time limits, as extended, the Chairman shall either self-assign the case or assign the case to a Vice Chairman for final decision within 14 days or shall refer the case to the Attorney General for decision. If a dissenting or concurring panel member fails to complete the member's opinion by the end of the extension period, the decision of the majority will be issued without the separate opinion.

(iii) In rare circumstances, such as when an impending decision by the United States Supreme Court or a United States Court of Appeals, or impending Department regulatory amendments, or an impending en banc Board decision may substantially determine the outcome of a case or group of cases pending before the Board, the Chairman may hold the case or cases until such decision is rendered, temporarily suspending the time limits described in this paragraph (e)(8).

\*    \*    \*    \*    \*

(v) The Chairman shall notify the Director of EOIR and the Attorney General if a Board member consistently fails to meet the assigned deadlines for the disposition of appeals, or otherwise fails to adhere to the standards of the case management system. The Chairman shall also prepare a report assessing the timeliness of the disposition of cases by each Board member on an annual basis.

\*    \*    \*    \*    \*

(f) *Service of Board decisions.* The decision of the Board shall be in writing. The Board shall transmit a copy to DHS and serve a copy upon the noncitizen or the noncitizen's representative, as provided in 8 CFR part 1292.

\*    \*    \*    \*    \*

(l) *Administrative closure and recalendaring.* Administrative closure is the temporary suspension of a case. Administrative closure removes a case from the Board's docket until the case is recalendared. Recalendaring places a case back on the Board's docket.

(1) *Administrative closure before the Board.* Board Members may, in the exercise of discretion, administratively close a case upon the motion of a party, after applying the standard set forth at paragraph (l)(3) of this section. The administrative closure authority described in this section is not limited by the authority provided in any other provisions in this title that separately authorize or require administrative closure in certain circumstances, including 8 CFR 214.15(l), 245.15(p)(4), 1214.2(a), 1214.3, 1240.62(b), 1240.70(f) through (h), 1245.13, 1245.15(p)(4)(i), and 1245.21(c).

(2) *Recalendaring before the Board.* At any time after a case has been administratively closed under paragraph (l)(1) of this section, the Board may, in the exercise of discretion, recalendar the case pursuant to a party's motion to recalendar. In deciding whether to grant such a motion, the Board shall apply the standard set forth at paragraph (l)(3) of this section.

(3) *Standard for administrative closure and recalendaring.* The Board shall grant a motion to administratively close or recalendar filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition, unless the Board articulates unusual, clearly identified, and supported reasons for denying the motion. In all other cases, in deciding whether to administratively close or to recalendar a case, the Board shall consider the totality of the circumstances, including as many of the factors listed under paragraphs (l)(3)(i) and (ii) of this section as are relevant to the particular case. The Board may also consider other factors where appropriate. No single factor is dispositive. The Board, having considered the totality of the circumstances, may grant a motion to administratively close or to recalendar a particular case over the objection of a party. Although administrative closure may be appropriate where a petition, application, or other action is pending outside of proceedings before the Board, such a pending petition, application, or other action is not required for a case to be administratively closed.

(i) As the circumstances of the case warrant, the factors relevant to a decision to administratively close a case include:

(A) The reason administrative closure is sought;

(B) The basis for any opposition to administrative closure;

(C) Any requirement that a case be administratively closed in order for a petition, application, or other action to be filed with, or granted by, DHS;

(D) The likelihood the noncitizen will succeed on any petition, application, or other action that the noncitizen is pursuing, or that the noncitizen states in writing or on the record at a hearing that they plan to pursue, outside of proceedings before the Board;

(E) The anticipated duration of the administrative closure;

(F) The responsibility of either party, if any, in contributing to any current or anticipated delay;

(G) The ultimate anticipated outcome of the case pending before the Board; and

(H) The ICE detention status of the noncitizen.

(ii) As the circumstances of the case warrant, the factors relevant to a decision to recalendar a case include:

(A) The reason recalendaring is sought;

(B) The basis for any opposition to recalendaring;

(C) The length of time elapsed since the case was administratively closed;

(D) If the case was administratively closed to allow the noncitizen to file a petition, application, or other action outside of proceedings before the Board, whether the noncitizen filed the petition, application, or other action and, if so, the length of time that elapsed between when the case was administratively closed and when the noncitizen filed the petition, application, or other action;

(E) If a petition, application, or other action that was pending outside of proceedings before the Board has been adjudicated, the result of that adjudication;

(F) If a petition, application, or other action remains pending outside of proceedings before the Board, the likelihood the noncitizen will succeed on that petition, application, or other action;

(G) The ultimate anticipated outcome if the case is recalendared; and

(H) The ICE detention status of the noncitizen.

(m) *Termination.* The Board shall have the authority to terminate cases before it as set forth in paragraphs (m)(1) and (2) of this section. A motion to dismiss a case in removal proceedings before the Board for a reason other than authorized by 8 CFR 1239.2(c) shall be deemed a motion to terminate under paragraph (m)(1) of this section.

(1) *Removal, deportation, and exclusion proceedings*—(i) *Mandatory termination.* In removal, deportation, and exclusion proceedings, the Board shall terminate the case where at least one of the requirements in paragraphs (m)(1)(i)(A) through (G) of this section is met.

(A) No charge of deportability, inadmissibility, or excludability can be sustained.

(B) Fundamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable.

(C) The noncitizen has, since the initiation of proceedings, obtained United States citizenship.

(D) The noncitizen has, since the initiation of proceedings, obtained at least one status listed in paragraphs (m)(1)(i)(D)(*1*) through (*4*) of this section, provided that the status has not

been revoked or terminated, and the noncitizen would not have been deportable, inadmissible, or excludable as charged if the noncitizen had obtained such status before the initiation of proceedings.

(*1*) Lawful permanent resident status.

(*2*) Refugee status.

(*3*) Asylee status.

(*4*) Nonimmigrant status as defined in section 101(a)(15)(S), (T), or (U) of the Act.

(E) Termination is required under 8 CFR 1245.13(l).

(F) Termination is otherwise required by law.

(G) The parties jointly filed a motion to terminate, or one party filed a motion to terminate and the other party affirmatively indicated its non-opposition, unless the Board articulates unusual, clearly identified, and supported reasons for denying the motion.

(ii) *Discretionary termination.* In removal, deportation, or exclusion proceedings, the Board may, in the exercise of discretion, terminate the case upon the motion of a party where at least one of the requirements listed in paragraphs (m)(1)(ii)(A) through (F) of this section is met. The Board shall consider the reason termination is sought and the basis for any opposition to termination when adjudicating the motion to terminate.

(A) The noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh).

(B) The noncitizen is prima facie eligible for naturalization, relief from removal, or a lawful status; USCIS has jurisdiction to adjudicate the associated petition, application, or other action if the noncitizen were not in proceedings; and the noncitizen has filed the petition, application, or other action with USCIS. However, no filing is required where the noncitizen is prima facie eligible for adjustment of status or naturalization. Where the basis of a noncitizen's motion for termination is that the noncitizen is prima facie eligible for naturalization, the Board shall not grant the motion if it is opposed by DHS. The Board shall not terminate a case for the noncitizen to pursue an asylum application before USCIS, except as provided for in paragraph (m)(1)(ii)(A) of this section.

(C) The noncitizen is a beneficiary of Temporary Protected Status, deferred action, or Deferred Enforced Departure.

(D) USCIS has granted the noncitizen's application for a provisional unlawful presence waiver pursuant to 8 CFR 212.7(e).

(E) Termination is authorized by 8 CFR 1216.4(a)(6) or 1238.1(e).

(F) Due to circumstances comparable to those described in paragraphs (m)(1)(ii)(A) through (E) of this section, termination is similarly necessary or appropriate for the disposition or alternative resolution of the case. However, the Board may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(2) *Other proceedings*—(i) *Mandatory termination.* In proceedings other than removal, deportation, or exclusion proceedings, the Board shall terminate the case where the parties have jointly filed a motion to terminate, or one party has filed a motion to terminate and the other party has affirmatively indicated its non-opposition, unless the Board articulates unusual, clearly identified, and supported reasons for denying the motion. In addition, the Board shall terminate such a case where required by law.

(ii) *Discretionary termination.* In proceedings other than removal, deportation, or exclusion proceedings, the Board may, in the exercise of discretion, terminate the case upon the motion of a party where terminating the case is necessary or appropriate for the disposition or alternative resolution of the case. However, the Board may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(iii) *Limitation on termination.* Nothing in paragraphs (m)(2)(i) and (ii) of this section authorizes the Board to terminate a case where prohibited by another regulatory provision. Further, nothing in paragraphs (m)(2)(i) and (ii) of this section authorizes the Board to terminate a case for the noncitizen to pursue an asylum application before USCIS, unless the noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh).

■ 6. Amend § 1003.2 by:

■ a. As shown in the following table, removing the words in the left column and adding in their place the words in the right column wherever they appear:

| | |
|---|---|
| an alien ..................... | a noncitizen. |
| the alien ................... | the noncitizen. |
| alien's ..................... | noncitizen's. |

■ b. Revising paragraphs (a) and (b)(1);

■ c. Removing the words "Immigration Judge" and adding in their place "immigration judge" in paragraph (c)(2) wherever they appear;

■ d. Revising paragraphs (c)(3)(iii) and (iv);

■ e. Removing paragraphs (c)(3)(v) through (vii);

■ f. Adding paragraph (c)(4); and

■ g. Revising paragraphs (f), (g)(3), and (i).

The revisions and addition read as follows:

### § 1003.2 Reopening or reconsideration before the Board of Immigration Appeals.

(a) *General.* The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision. A request by DHS or by the party affected by the decision to reopen or reconsider a case the Board has decided must be in the form of a written motion to the Board. The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board, subject to the restrictions of this section. The Board has discretion to deny a motion to reopen even if the moving party has made out a prima facie case for relief.

(b) * * * *

(1) A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the prior Board decision and shall be supported by pertinent authority. When a motion to reconsider the decision of an immigration judge or of a DHS officer is pending at the time an appeal is filed with the Board, or when such motion is filed subsequent to the filing with the Board of an appeal from the decision sought to be reconsidered, the motion may be deemed a motion to remand the decision for further proceedings before the immigration judge or the DHS officer from whose decision the appeal was taken. Such motion may be consolidated with and considered by the Board in connection with the appeal to the Board.

*   *   *   *   *

(c) * * *

(3) * * *

(iii) Agreed upon by all parties and jointly filed. Notwithstanding such agreement, the parties may contest the issues in a reopened proceeding; or

(iv) Filed by DHS in exclusion or deportation proceedings when the basis of the motion is fraud in the original proceeding or a crime that would support termination of asylum in accordance with 8 CFR 1208.24.

(4) A motion to reopen a decision rendered by an immigration judge or

DHS officer that is pending when an appeal is filed, or that is filed while an appeal is pending before the Board, may be deemed a motion to remand for further proceedings before the immigration judge or the DHS officer from whose decision the appeal was taken. Such motion may be consolidated with, and considered by the Board in connection with, the appeal to the Board.

\*    \*    \*    \*    \*

(f) *Stay of deportation.* Except where a motion is filed pursuant to the provisions of § 1003.23(b)(4)(ii) and (b)(4)(iii)(A), the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the Board, the immigration judge, or an authorized DHS officer.

(g) \*    \*    \*

(3) *Briefs and response.* The moving party may file a brief if it is included with the motion. If the motion is filed directly with the Board pursuant to paragraph (g)(2)(i) of this section, the opposing party shall have 21 days from the date of service of the motion to file a brief in opposition to the motion directly with the Board. If the motion is filed with a DHS office pursuant to paragraph (g)(2)(ii) of this section, the opposing party shall have 21 days from the date of filing of the motion to file a brief in opposition to the motion directly with DHS. In all cases, briefs and any other filings made in conjunction with a motion shall include proof of service on the opposing party. The Board, in its discretion, may extend the time within which such brief is to be submitted and may authorize the filing of a brief directly with the Board. A motion shall be deemed unopposed unless a timely response is made. The Board may, in its discretion, consider a brief filed out of time.

\*    \*    \*    \*    \*

(i) *Ruling on motion.* Rulings upon motions to reopen or motions to reconsider shall be by written order. Any motion for reconsideration or reopening of a decision issued by a single Board member will be referred to the screening panel for disposition by a single Board member, unless the screening panel member determines, in the exercise of judgment, that the motion for reconsideration or reopening should be assigned to a three-member panel under the standards of § 1003.1(e)(6). If the order directs a reopening and further proceedings are necessary, the record shall be returned to the immigration court or the DHS

officer having administrative control over the place where the reopened proceedings are to be conducted. If the motion to reconsider is granted, the decision upon such reconsideration shall affirm, modify, or reverse the original decision made in the case.

■ 7. Amend § 1003.3 by revising paragraphs (c)(1) and (2) to read as follows:

### § 1003.3  Notice of appeal.

\*    \*    \*    \*    \*

(c) \*    \*    \*

(1) *Appeal from decision of an immigration judge.* Briefs in support of or in opposition to an appeal from a decision of an immigration judge shall be filed directly with the Board. In those cases that are transcribed, the briefing schedule shall be set by the Board after the transcript is available. In cases involving noncitizens in custody, the parties shall be provided 21 days in which to file simultaneous briefs unless a shorter period is specified by the Board. Reply briefs shall be permitted only by leave of the Board and only if filed within 21 days of the deadline for the initial briefs. In cases involving noncitizens who are not in custody, the appellant shall be provided 21 days in which to file a brief, unless a shorter period is specified by the Board. The appellee shall have the same period of time in which to file a reply brief that was initially granted to the appellant to file their brief. The time to file a reply brief commences from the date upon which the appellant's brief was due, as originally set or extended by the Board. The Board, upon written motion, may extend the period for filing a brief or a reply brief for up to 90 days for good cause shown. In its discretion, the Board may consider a brief that has been filed out of time. In its discretion, the Board may request supplemental briefing from the parties after the expiration of the briefing deadline. All briefs, filings, and motions filed in conjunction with an appeal shall include proof of service on the opposing party.

(2) *Appeal from decision of a DHS officer.* Briefs in support of or in opposition to an appeal from a decision of a DHS officer shall be filed directly with DHS in accordance with the instructions in the decision of the DHS officer. The applicant or petitioner and DHS shall be provided 21 days in which to file a brief, unless a shorter period is specified by the DHS officer from whose decision the appeal is taken, and reply briefs shall be permitted only by leave of the Board. Upon written request of the noncitizen, the DHS officer from whose decision the appeal is taken or the Board may extend the period for

filing a brief for good cause shown. The Board may authorize the filing of briefs directly with the Board. In its discretion, the Board may consider a brief that has been filed out of time. All briefs and other documents filed in conjunction with an appeal, unless filed by a noncitizen directly with a DHS office, shall include proof of service on the opposing party.

\*    \*    \*    \*    \*

■ 8. Revise § 1003.5 to read as follows:

### § 1003.5  Forwarding of record on appeal.

(a) *Appeal from decision of an immigration judge.* If an appeal is taken from a decision of an immigration judge, the record of proceeding shall be promptly forwarded to the Board upon the request or the order of the Board. Where transcription of an oral decision is required, the immigration judge shall review the transcript and approve the decision within 14 days of receipt, or within 7 days after the immigration judge returns to their duty station if the immigration judge was on leave or detailed to another location. The Chairman and the Chief Immigration Judge shall determine the most effective and expeditious way to transcribe proceedings before the immigration judges, and shall take such steps as necessary to reduce the time required to produce transcripts of those proceedings and to ensure their quality.

(b) *Appeal from decision of a DHS officer.* If an appeal is taken from a decision of a DHS officer, the record of proceeding shall be forwarded to the Board by the DHS officer promptly upon receipt of the briefs of the parties, or upon expiration of the time allowed for the submission of such briefs. A DHS officer need not forward such an appeal to the Board, but may reopen and reconsider any decision made by the officer if the new decision will grant the benefit that has been requested in the appeal. The new decision must be served on the appealing party within 45 days of receipt of any briefs or upon expiration of the time allowed for the submission of any briefs. If the new decision is not served within these time limits or the appealing party does not agree that the new decision disposes of the matter, the record of proceeding shall be immediately forwarded to the Board.

### § 1003.7  [Amended]

■ 9. Amend § 1003.7 by:

■ a. Removing the words "Immigration Judge" and adding in their place the words "immigration judge" wherever they appear;

■ b. Removing the word "alien" and adding in its place the word "noncitizen"; and

■ c. Removing the word "Service" and the words "the Service" and adding in their place the word "DHS" wherever they appear.

■ 10. Amend § 1003.9 by revising paragraph (b)(5) to read as follows:

### § 1003.9    Office of the Chief Immigration Judge.

\*    \*    \*    \*    \*

(b) \* \* \*

(5) Adjudicate cases as an immigration judge, including the authorities described in § 1003.10(b); and

\*    \*    \*    \*    \*

■ 11. Amend § 1003.10 in paragraph (b) by:

■ a. Revising the second sentence;

■ b. Adding two sentences following the second sentence;

■ c. Revising the fifth sentence; and

■ d. Removing eighth and ninth sentences.

The revisions and additions read as follows:

### § 1003.10    Immigration judges.

\*    \*    \*    \*    \*

(b) \* \* \* In deciding the individual cases before them, and subject to the applicable governing standards set forth in paragraph (d) of this section, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of such cases. Such actions include administrative closure, termination of proceedings, and dismissal of proceedings. The standards for the administrative closure, dismissal, and termination of cases are set forth in § 1003.18(c), 8 CFR 1239.2(c), and § 1003.18(d), respectively. Immigration judges shall administer oaths, receive evidence, and interrogate, examine, and cross-examine noncitizens and any witnesses. \* \* \*

\*    \*    \*    \*    \*

■ 12. Amend § 1003.18 by revising the section heading, adding paragraph headings to paragraphs (a) and (b), and adding paragraphs (c) and (d) to read as follows:

### § 1003.18    Docket management.

(a) *Scheduling.* \* \* \*

(b) *Notice.* \* \* \*

(c) *Administrative closure and recalendaring.* Administrative closure is the temporary suspension of a case. Administrative closure removes a case from the immigration court's active calendar until the case is recalendared. Recalendaring places a case back on the immigration court's active calendar.

(1) *Administrative closure before immigration judges.* An immigration judge may, in the exercise of discretion, administratively close a case upon the motion of a party, after applying the standard set forth at paragraph (c)(3) of this section. The administrative closure authority described in this section is not limited by the authority provided in any other provisions in this title that separately authorize or require administrative closure in certain circumstances, including 8 CFR 214.15(l), 245.15(p)(4), 1214.2(a), 1214.3, 1240.62(b), 1240.70(f) through (h), 1245.13, 1245.15(p)(4)(i), and 1245.21(c).

(2) *Recalendaring before immigration judges.* At any time after a case has been administratively closed under paragraph (c)(1) of this section, an immigration judge may, in the exercise of discretion, recalendar the case pursuant to a party's motion to recalendar. In deciding whether to grant such a motion, the immigration judge shall apply the standard set forth at paragraph (c)(3) of this section.

(3) *Standard for administrative closure and recalendaring.* An immigration judge shall grant a motion to administratively close or recalendar filed jointly by both parties, or filed by one party where the other party has affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion. In all other cases, in deciding whether to administratively close or to recalendar a case, an immigration judge shall consider the totality of the circumstances, including as many of the factors listed under paragraphs (c)(3)(i) and (ii) of this section as are relevant to the particular case. The immigration judge may also consider other factors where appropriate. No single factor is dispositive. The immigration judge, having considered the totality of the circumstances, may grant a motion to administratively close or to recalendar a particular case over the objection of a party. Although administrative closure may be appropriate where a petition, application, or other action is pending outside of proceedings before the immigration judge, such a pending petition, application, or other action is not required for a case to be administratively closed.

(i) As the circumstances of the case warrant, the factors relevant to a decision to administratively close a case include:

(A) The reason administrative closure is sought;

(B) The basis for any opposition to administrative closure;

(C) Any requirement that a case be administratively closed in order for a petition, application, or other action to be filed with, or granted by, DHS;

(D) The likelihood the noncitizen will succeed on any petition, application, or other action that the noncitizen is pursuing, or that the noncitizen states in writing or on the record at a hearing that they plan to pursue, outside of proceedings before the immigration judge;

(E) The anticipated duration of the administrative closure;

(F) The responsibility of either party, if any, in contributing to any current or anticipated delay;

(G) The ultimate anticipated outcome of the case pending before the immigration judge; and

(H) The ICE detention status of the noncitizen.

(ii) As the circumstances of the case warrant, the factors relevant to a decision to recalendar a case include:

(A) The reason recalendaring is sought;

(B) The basis for any opposition to recalendaring;

(C) The length of time elapsed since the case was administratively closed;

(D) If the case was administratively closed to allow the noncitizen to file a petition, application, or other action outside of proceedings before the immigration judge, whether the noncitizen filed the petition, application, or other action and, if so, the length of time that elapsed between when the case was administratively closed and when the noncitizen filed the petition, application, or other action;

(E) If a petition, application, or other action that was pending outside of proceedings before the immigration judge has been adjudicated, the result of that adjudication;

(F) If a petition, application, or other action remains pending outside of proceedings before the immigration judge, the likelihood the noncitizen will succeed on that petition, application, or other action;

(G) The ultimate anticipated outcome if the case is recalendared; and

(H) The ICE detention status of the noncitizen.

(d) *Termination.* Immigration judges shall have the authority to terminate cases before them as set forth in paragraphs (d)(1) and (2) of this section. A motion to dismiss a case in removal proceedings before an immigration

judge for a reason other than authorized by 8 CFR 1239.2(c) shall be deemed a motion to terminate under paragraph (d)(1) of this section.

(1) *Removal, deportation, and exclusion proceedings*—(i) *Mandatory termination.* In removal, deportation, and exclusion proceedings, immigration judges shall terminate the case where at least one of the requirements in paragraphs (d)(1)(i)(A) through (G) of this section is met.

(A) No charge of deportability, inadmissibility, or excludability can be sustained.

(B) Fundamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable.

(C) The noncitizen has, since the initiation of proceedings, obtained United States citizenship.

(D) The noncitizen has, since the initiation of proceedings, obtained at least one status listed in paragraphs (d)(1)(i)(D)(*1*) through (*4*) of this section, provided that the status has not been revoked or terminated, and the noncitizen would not have been deportable, inadmissible, or excludable as charged if the noncitizen had obtained such status before the initiation of proceedings.

(*1*) Lawful permanent resident status.

(*2*) Refugee status.

(*3*) Asylee status.

(*4*) Nonimmigrant status as defined in section 101(a)(15)(S), (T), or (U) of the Act.

(E) Termination is required under 8 CFR 1245.13(l).

(F) Termination is otherwise required by law.

(G) The parties jointly filed a motion to terminate, or one party filed a motion to terminate and the other party affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion.

(ii) *Discretionary termination.* In removal, deportation, or exclusion proceedings, immigration judges may, in the exercise of discretion, terminate the case upon the motion of a party where at least one of the requirements listed in paragraphs (d)(1)(ii)(A) through (F) of this section is met. The immigration judge shall consider the reason termination is sought and the basis for any opposition to termination when adjudicating the motion to terminate.

(A) The noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh).

(B) The noncitizen is prima facie eligible for naturalization, relief from removal, or lawful status; USCIS has jurisdiction to adjudicate the associated petition, application, or other action if the noncitizen were not in proceedings; and the noncitizen has filed the petition, application, or other action with USCIS. However, no filing is required where the noncitizen is prima facie eligible for adjustment of status or naturalization. Where the basis of a noncitizen's motion for termination is that the noncitizen is prima facie eligible for naturalization, the immigration judge shall not grant the motion if it is opposed by DHS. Immigration judges shall not terminate a case for the noncitizen to pursue an asylum application before USCIS, except as provided for in paragraph (d)(1)(ii)(A) of this section.

(C) The noncitizen is a beneficiary of Temporary Protected Status, deferred action, or Deferred Enforced Departure.

(D) USCIS has granted the noncitizen's application for a provisional unlawful presence waiver pursuant to 8 CFR 212.7(e).

(E) Termination is authorized by 8 CFR 1216.4(a)(6) or 1238.1(e).

(F) Due to circumstances comparable to those described in paragraphs (d)(1)(ii)(A) through (E) of this section, termination is similarly necessary or appropriate for the disposition or alternative resolution of the case. However, immigration judges may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(2) *Other proceedings*—(i) *Mandatory termination.* In proceedings other than removal, deportation, or exclusion proceedings, immigration judges shall terminate the case where the parties have jointly filed a motion to terminate, or one party has filed a motion to terminate and the other party has affirmatively indicated its non-opposition, unless the immigration judge articulates unusual, clearly identified, and supported reasons for denying the motion. In addition, immigration judges shall terminate such a case where required by law.

(ii) *Discretionary termination.* In proceedings other than removal, deportation, or exclusion proceedings, immigration judges may, in the exercise of discretion, terminate the case upon the motion of a party where terminating the case is necessary or appropriate for the disposition or alternative resolution of the case. However, immigration judges may not terminate a case for purely humanitarian reasons, unless DHS expressly consents to such termination, joins in a motion to terminate, or affirmatively indicates its non-opposition to a noncitizen's motion.

(iii) *Limitation on termination.* Nothing in paragraphs (d)(2)(i) and (ii) of this section authorizes immigration judges to terminate a case where prohibited by another regulatory provision. Further, nothing in paragraphs (d)(2)(i) and (ii) of this section authorizes the immigration judge to terminate a case for the noncitizen to pursue an asylum application before USCIS, unless the noncitizen has filed an asylum application with USCIS pursuant to section 208(b)(3)(C) of the Act pertaining to unaccompanied children, as defined in 8 CFR 1001.1(hh).

■ 13. Amend § 1003.23 by:
■ a. In the section heading, removing the words "Immigration Court" and add in their place the words "immigration court";
■ b. Revising paragraph (a);
■ c. Revising the first sentence of and removing the second sentence of paragraph (b)(1) introductory text;
■ d. In paragraph (b)(1), removing the words "the Service" and adding in their place the word "DHS", wherever they appear;
■ e. Revising paragraphs (b)(1)(iii) through (v), (b)(2) and (3), and (b)(4)(i) and (ii);
■ f. In paragraph (b)(4)(iii)(B), removing the words "Immigration Judge" and adding in their place the words "immigration judge" and removing the word "alien" and adding in its place the word "noncitizen"; and
■ g. Removing paragraphs (b)(4)(v) and (vi).

The revisions read as follows:

**§ 1003.23 Reopening or reconsideration before the immigration court.**

(a) *Pre-decision motions.* Unless otherwise permitted by the immigration judge, motions submitted prior to the final order of an immigration judge shall be in writing and shall state, with particularity the grounds therefor, the relief sought, and the jurisdiction. The immigration judge may set and extend time limits for the making and replying to of motions and replies thereto. A motion shall be deemed unopposed unless timely response is made.

(b) * * *

(1) *In general.* An immigration judge may upon the immigration judge's own motion at any time, or upon motion of DHS or the noncitizen, reopen or

reconsider any case in which the judge has rendered a decision, unless jurisdiction is vested with the Board of Immigration Appeals. * * *

*    *    *    *    *

(iii) *Assignment to an immigration judge.* If the immigration judge is unavailable or unable to adjudicate the motion to reopen or reconsider, the Chief Immigration Judge or a delegate of the Chief Immigration Judge shall reassign such motion to another immigration judge.

(iv) *Replies to motions; decision.* The immigration judge may set and extend time limits for replies to motions to reopen or reconsider. A motion shall be deemed unopposed unless timely response is made. The decision to grant or deny a motion to reopen or a motion to reconsider is within the discretion of the immigration judge.

(v) *Stays.* Except in cases involving in absentia orders, the filing of a motion to reopen or a motion to reconsider shall not stay the execution of any decision made in the case. Execution of such decision shall proceed unless a stay of execution is specifically granted by the immigration judge, the Board, or an authorized DHS officer.

(2) *Motion to reconsider.* A motion to reconsider shall state the reasons for the motion by specifying the errors of fact or law in the immigration judge's prior decision and shall be supported by pertinent authority. Such motion may not seek reconsideration of a decision denying a previous motion to reconsider.

(3) *Motion to reopen.* A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits and other evidentiary material. Any motion to reopen for the purpose of acting on an application for relief must be accompanied by the appropriate application for relief and all supporting documents. A motion to reopen will not be granted unless the immigration judge is satisfied that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing. A motion to reopen for the purpose of providing the noncitizen an opportunity to apply for any form of discretionary relief will not be granted if it appears that the noncitizen's right to apply for such relief was fully explained to them by the immigration judge and an opportunity to apply therefor was afforded at the hearing, unless the relief is sought on the basis of circumstances that have arisen subsequent to the hearing. Pursuant to section 240A(d)(1)

of the Act, a motion to reopen proceedings for consideration or further consideration of an application for relief under section 240A(a) of the Act (cancellation of removal for certain permanent residents) or 240A(b) of the Act (cancellation of removal and adjustment of status for certain nonpermanent residents) may be granted only upon demonstration that the noncitizen was statutorily eligible for such relief prior to the service of a Notice to Appear, or prior to the commission of an offense referred to in section 212(a)(2) of the Act that renders the noncitizen inadmissible or removable under sections 237(a)(2) or (a)(4) of the Act, whichever is earliest. The immigration judge has discretion to deny a motion to reopen even if the moving party has established a prima facie case for relief.

(4) * * *

(i) *Asylum and withholding of removal.* The time and numerical limitations set forth in paragraph (b)(1) of this section shall not apply if the basis of the motion is to apply for asylum under section 208 of the Act or withholding of removal under section 241(b)(3) of the Act or withholding of removal under the Convention Against Torture, and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous proceeding. The filing of a motion to reopen under this section shall not automatically stay the removal of the noncitizen. However, the noncitizen may request a stay and, if granted by the immigration judge, the noncitizen shall not be removed pending disposition of the motion by the immigration judge. If the original asylum application was denied based upon a finding that it was frivolous, then the noncitizen is ineligible to file either a motion to reopen or reconsider, or for a stay of removal.

(ii) *Order entered in absentia or in removal proceedings.* An order of removal entered in absentia or in removal proceedings pursuant to section 240(b)(5) of the Act may be rescinded only upon a motion to reopen filed within 180 days after the date of the order of removal, if the noncitizen demonstrates that the failure to appear was because of exceptional circumstances as defined in section 240(e)(1) of the Act. An order entered in absentia pursuant to section 240(b)(5) may be rescinded upon a motion to reopen filed at any time upon the noncitizen's demonstration of lack of

notice in accordance with section 239(a)(1) or (2) of the Act, or upon the noncitizen's demonstration of the noncitizen's Federal or State custody and the failure to appear was through no fault of the noncitizen. However, in accordance with section 240(b)(5)(B) of the Act, no written notice of a change in time or place of proceeding shall be required if the noncitizen has failed to provide the address required under section 239(a)(1)(F) of the Act. The filing of a motion under this paragraph (b)(4)(ii) shall stay the removal of the noncitizen pending disposition of the motion by the immigration judge. A noncitizen may file only one motion pursuant to this paragraph (b)(4)(ii).

*    *    *    *    *

■ 14. Add subpart D, consisting of § 1003.55, to read as follows:

## Subpart D—Special Provisions

### § 1003.55    Treatment of post-conviction orders.

(a) *Applicability of Matter of Thomas & Thompson, 27 I&N Dec. 674 (A.G. 2019).* (1) *Matter of Thomas & Thompson* shall not apply to a criminal sentence:

(i) Where a court at any time granted a request to modify, clarify, vacate, or otherwise alter the sentence and the request was filed on or before October 25, 2019; or

(ii) Where the noncitizen demonstrates that the noncitizen reasonably and detrimentally relied on the availability of an order modifying, clarifying, vacating, or otherwise altering the sentence entered in connection with a guilty plea, conviction, or sentence on or before October 25, 2019.

(2) Where paragraph (a)(1) of this section applies, the adjudicator shall assess the relevant order under *Matter of Cota-Vargas,* 23 I&N Dec. 849 (BIA 2005), *Matter of Song,* 23 I&N Dec. 173 (BIA 2001), and *Matter of Estrada,* 26 I&N Dec. 749 (BIA 2016), as applicable.

(b) *Post-conviction orders correcting errors.* Adjudicators shall give effect to an order that corrects a genuine ambiguity, mistake, or typographical error on the face of the original conviction or sentencing order and that was entered to give effect to the intent of the original order.

## PART 1239—INITIATION OF REMOVAL PROCEEDINGS

■ 15. The authority citation for part 1239 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1221, 1229.

■ 16. Amend § 1239.2 by:

■ a. Adding paragraph (b); and
■ b. Removing and reserving paragraph (f).

The addition reads as follows:

**§ 1239.2    Cancellation of notice to appear.**

\*    \*    \*    \*    \*

(b) *Ordering termination or dismissal.* After commencement of proceedings, an immigration judge or Board member shall have authority to resolve or dispose of a case through an order of dismissal or an order of termination. An immigration judge or Board member may enter an order of dismissal in cases where DHS moves for dismissal pursuant to paragraph (c) of this section. A motion to dismiss removal proceedings for a reason other than those authorized by paragraph (c) of this section shall be deemed a motion to terminate and adjudicated pursuant to 8 CFR 1003.1(m), pertaining to cases before the Board, or 8 CFR 1003.18(d), pertaining to cases before the immigration court, as applicable.

\*    \*    \*    \*    \*

**PART 1240—PROCEEDINGS TO DETERMINE REMOVABILITY OF NONCITIZENS IN THE UNITED STATES**

■ 17. The authority citation for part 1240 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1158, 1182, 1186a, 1186b, 1225, 1226, 1227, 1228, 1229a, 1229b, 1229c, 1252 note, 1361, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681).

■ 18. The heading for part 1240 is revised to read as set forth above.

■ 19. Amend § 1240.26 by:
■ a. As shown in the following table, removing the words in the left column and adding in their place the words in the right column wherever they appear:

| | |
|---|---|
| An alien ..................... | A noncitizen. |
| an alien ..................... | a noncitizen. |
| the alien ..................... | the noncitizen. |
| alien's ........................ | noncitizen's. |

■ b. Removing the words ''his or her'' and adding in their place the words ''the noncitizen's'' in paragraphs (b)(3)(i) introductory text, (b)(3)(i)(A);

■ c. Removing the words ''his or her'' and adding in their place the words ''the ICE Field Office Director's'' in paragraph (c)(4);
■ d. Removing the words ''his or her'' and adding in their place the words ''the noncitizen's'' in paragraphs (c)(4)(ii), and (i); and
■ e. Revising paragraphs (k)(1), (k)(2) introductory text, (k)(3) introductory text, (k)(4), and (l).

The revisions read as follows:

**§ 1240.26    Voluntary departure—authority of the Executive Office for Immigration Review.**

\*    \*    \*    \*    \*

(k) \*    \*    \*

(1) If the Board finds that an immigration judge incorrectly denied a noncitizen's request for voluntary departure or failed to provide appropriate advisals, the Board may consider the noncitizen's request for voluntary departure de novo and, if warranted, may enter its own order of voluntary departure with an alternate order of removal.

(2) In cases in which a noncitizen has appealed an immigration judge's decision or in which DHS and the noncitizen have both appealed an immigration judge's decision, the Board shall not grant voluntary departure under section 240B(a) of the Act unless:

\*    \*    \*    \*    \*

(3) In cases in which DHS has appealed an immigration judge's decision, the Board shall not grant voluntary departure under section 240B(b) of the Act unless:

\*    \*    \*    \*    \*

(4) The Board may impose such conditions as it deems necessary to ensure the noncitizen's timely departure from the United States, if supported by the record on appeal and within the scope of the Board's authority on appeal. Unless otherwise indicated in this section, the Board shall advise the noncitizen in writing of the conditions set by the Board, consistent with the conditions set forth in paragraphs (b) through (e), (h), and (i) of this section (other than paragraph (c)(3)(ii) of this section), except that the Board shall advise the noncitizen of the duty to post

the bond with the ICE Field Office Director within 30 business days of the Board's order granting voluntary departure. If documentation sufficient to assure lawful entry into the country to which the noncitizen is departing is not contained in the record, but the noncitizen continues to assert a request for voluntary departure under section 240B of the Act and the Board finds that the noncitizen is otherwise eligible for voluntary departure under the Act, the Board may grant voluntary departure for a period not to exceed 120 days, subject to the condition that the noncitizen within 60 days must secure such documentation and present it to DHS and the Board. If the Board imposes conditions beyond those specifically enumerated, the Board shall advise the noncitizen in writing of such conditions. The noncitizen may accept or decline the grant of voluntary departure and may manifest a declination either by written notice to the Board, by failing to timely post any required bond, or by otherwise failing to comply with the Board's order. The grant of voluntary departure shall automatically terminate upon a filing by the noncitizen of a motion to reopen or reconsider the Board's decision, or by filing a timely petition for review of the Board's decision. The noncitizen may decline voluntary departure when unwilling to accept the amount of the bond or other conditions.

(l) *Penalty for failure to depart.* There shall be a rebuttable presumption that the civil penalty for failure to depart, pursuant to section 240B(d)(1)(A) of the Act, shall be set at $3,000 unless the immigration judge or the Board specifically orders a higher or lower amount at the time of granting voluntary departure within the permissible range allowed by law. The immigration judge or the Board shall advise the noncitizen of the amount of this civil penalty at the time of granting voluntary departure.

Dated: May 15, 2024.

**Merrick B. Garland,**
*Attorney General.*

[FR Doc. 2024–11121 Filed 5–28–24; 8:45 am]

**BILLING CODE 4410–30–P**